FILED
6/16/2020 6:33 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kajuana Cook DEPUTY

CAUSE NO. _____ DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant.* | § | __116TH__ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION
## AND RULE 194 REQUEST FOR DISCLOSURES

Plaintiff WattStock LLC ("WattStock") files this Original Petition against Defendant Alta Power LLC ("Alta" or "Defendant") and respectfully shows the Court as follows:

### I.  DISCOVERY–CONTROL PLAN

1.     Plaintiff intends to conduct discovery in this action under Level 2 pursuant to Texas Rule of Civil Procedure 190.3.

### II.  RELIEF SOUGHT

2.     Pursuant to Texas Rule of Civil Procedure 47, Plaintiff states that it seeks monetary relief of over $1,000,000.

### III.  PARTIES

3.     Plaintiff WattStock is a Texas limited liability company located in Dallas, Texas.

4.     Defendant Alta is a Texas limited liability company located at 4605 Post Oak Place Dr., Ste. 270, Houston, Texas 77027. It can be served through its registered agent, Matthew E. Laterza, at its registered address of 4605 Post Oak Place Drive, Suite 270, Houston, Texas 77027.

## IV. JURISDICTION

5. This Court has subject-matter jurisdiction over Plaintiff's claims because the amounts sought are within the jurisdictional limits of this Court.

6. This Court has personal jurisdiction over Defendant Alta because Alta maintains its principal place of business in the State of Texas, regularly conducts business in this State, maintains an agent for service of process in this State, and knowingly entered into contracts with Plaintiff in this State and purposefully availed itself of the privileges of this State by entering into such contracts.

## V. VENUE

7. Venue for Plaintiff's claims is proper in this Court pursuant to Texas Civil Practice and Remedies Code § 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in Dallas County, Texas. Specifically, the relevant contractual agreements between the parties and third-party suppliers were negotiated by WattStock in Dallas County and/or were to be performed in whole or in part in Dallas County.

8. Venue for Plaintiff's claims is further proper in this Court pursuant to a mandatory venue provision in the primary contractual agreement between the parties. Specifically, the Master Agreement between Plaintiff and Defendant dated February 27, 2019, contains a choice-of-venue provision in Section 12.1 requiring that "[a]ny disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas."[1] Plaintiff sues for breach of the Master Agreement itself, as well as for breach of several related contractual agreements that all involve the business relationship between Plaintiff and Defendant defined by the Master Agreement, such that the Master Agreement's choice-of-venue clause is applicable here.

---

[1] **Ex. 1** at p.9 § 12.1

## VI. FACTS

9.      WattStock is a supplier of used and refurbished gas turbine power generation units and services that combine significantly lower capital cost savings with a wrap-around original equipment manufacturer warranty.

10.      In conjunction with General Electric ("GE"), WattStock developed the concept of TRUEPackage™ refurbished LM-series gas turbine power generation units. This program seeks to connect existing LM turbine generators in the market whose owners no longer have a use for them with buyers seeking small "peak" units that can support increasing wind and solar power without the financial burden of a brand new unit. Similar to the preowned luxury vehicle market, WattStock and GE sell fully refurbished turbines and even full turbine power generation units with new-equipment warranties and performance guarantees at a price point around 65% that of a new unit.

11.      Alta is a new power project developer with a plan to develop power generation projects in the Texas market using surplus combustion turbine packages. Specifically, Alta planned to develop three separate sites each with three 50mW units, for a total of nine units or 450mW. Alta's business plan required those nine units to be online for the 2020 summer peak season, which meant that it needed the units to be delivered between December 2019 and February 2020 to allow time for installation and testing at the sites before energy production would begin in May 2020.

12.      WattStock became aware of Alta in 2018 through its sales efforts. Alta had been working on early stage project development (site location and purchase, market studies, initial permit applications, etc.) for some time prior to the start of their relationship with WattStock. However, Alta had not yet obtained project financing. WattStock believed that Alta's desired schedule for the project was highly ambitious but possible.

13. On or about February 27, 2019, WattStock and Alta entered into a Master Agreement ("Master Agreement"), a true and correct copy of which is attached as **Exhibit 1**.[2] Under the Master Agreement, the parties agreed that WattStock would work to locate and identify nine LM6000 Generator Sets[3] for Alta's project.[4] The parties further agreed that WattStock, with the approval of Alta, would arrange inspections with the existing owners of such Generator Sets and other Assets[5] to inspect and evaluate their condition and refurbishment requirements, provide a scope of work to complete refurbishments for each LM6000 Generator Set, and enter into negotiations with the existing owner on purchase terms or a purchase option consistent with terms approved by Alta.[6] The Master Agreement expressly requires Alta to "reimburs[e] WattStock for WattStock's out-of-pocket expenses incurred in performing Asset inspections."[7] Finally, the parties agreed that they would subsequently enter into one or more definitive Equipment Purchase and Sale Agreement(s) ("EPA" or "EPAs") describing the scope, terms, and price under which Alta would eventually purchase from WattStock each refurbished LM6000 Generator Set.[8]

14. Although Alta had not yet obtained project financing, it asked WattStock to begin working under the Master Agreement right away due to the expedited, ambitious schedule for getting

---

[2] A "First Amendment to Master Agreement" was subsequently executed by the parties on or about February 5, 2020, and is included as part of Exhibit 1.

[3] "Generator Sets" means a skid-mounted, GE aeroderivative combustion turbine power generation package refurbished by WattStock. **Ex. 1** at p.2.

[4] **Ex. 1** at p.3, Art. 2.

[5] "Assets" means major sub-components of an LM6000 Generator Set that may qualify for purchase of the Business Purpose including (i) generator set package with combustion turbine engine and electric generator, (ii) generator set pacakage without combustion turbine engine and/or electric generator, (iii) combustion turbine engine only, (iv) electric generator only, and/or (v) such other equipment as the Parties may agree. **Ex. 1** at p.1.

[6] **Ex. 1** at pp.3-4, Art. 3.

[7] **Ex. 1** at p.4 § 3.1.

[8] **Ex. 1** at pp.4-5, Art. 4.

the project online. WattStock agreed and began promptly began working to fulfill its obligations under the Master Agreement.

15.     Throughout 2019 and 2020, Alta struggled to obtain financing for its project. Alta made many decisions that may have impeded its ability to secure financing. Specifically, Alta opted to source the project capital themselves, without the aid of an advisory firm. Alta also attempted to raise both senior debt and equity so as to reduce the amount of additional cash it would have to invest. What followed was a year of failed closings on potential financing, including rejected deals from Deutsch Bank in May 2019, from Mitsubishi in September or October 2019, and from Starwood Capital in March or April 2020.

16.     Meanwhile, beginning in April 2019 and continuing through 2020, Alta made repeated assurances to WattStock that financing was in sight and that it expected to close on various financing deals "soon," "in 6 weeks," or in similar time frames. Such financing never materialized despite continued assurances from Alta. WattStock nevertheless relied on these assurances and continued to expend time and money fulfilling its obligations under the Master Agreement.

17.     Meanwhile, as it became apparent that Alta was having particular difficulty raising equity financing (as opposed to debt), Alta declined to seek sufficient debt financing to cover the original scope of the project and instead reconfigured the project multiple times to reduce the equity that would have to be sold. While the project originally began as a three-site, nine-unit project in February 2019, Alta subsequently revised its plan to a two-site, six-unit project, then a one-site, three-unit project, and ultimately just a one-site, two-unit project.

18.     The constant reconfiguration of the project by Alta resulted in a large workload for WattStock which was undertaken at WattStock's own out-of-pocket expense. Specifically, WattStock

needed to contract, and then constantly renegotiate, purchase agreements with the used equipment sellers it identified. Each renegotiation (made necessary by Alta's constantly changing plans) required amendments to purchase agreements, additional deposits, and new timelines. In the absence of any firm supply agreements with Alta (caused by Alta's continued lack of financing), WattStock also had to devise stopgap agreements to mirror WattStock's obligations with the owners/sellers. Further, with every revision to a unit purchase agreement, WattStock had to revise its commitments with GE. This went on for so long that GE was forced to revise their pricing on their portions of the work. With Alta's financing continuing to fall through, it became necessary for the parties to enter into multiple stop-gap agreements to stand in place of a normal ESA (the ESA had been largely negotiated by June 2019 but was never executed due to Alta's continued lack of financing).

19.     On or about August 9, 2019, the parties entered an agreement—memorialized in a letter—that acknowledged WattStock's ongoing work under the Master Agreement and recognized the need for WattStock to subcontract certain refurbishment work to GE prior to the financial closing of Alta's project financing and therefore prior to the final execution of the ESA ("Backstop Letter"). A true and correct copy of the Backstop Letter is attached as **Exhibit 2**. Under the Backstop Letter, Alta agreed to reimburse WattStock for cancellation fees charged by GE should the ESA not close prior to September 15, 2019, up to a maximum of $750,000.[9]

20.     On or about December 23, 2019—after Alta's difficulty in obtaining financing continued to result in the delay of the final ESA—Alta finally agreed to enter into the WattStock LLC Limited Notice to Proceed Proposal to Alta Power LLC for the Goodlow Peak Power Site for

---

[9] **Ex. 2** at p.1.

Two (2) TRUEPackage™ LM6000 PC Sprint GTG's (the "WattStock/Alta LNTP"). A true and correct copy of the WattStock/Alta LNTP is attached as **Exhibit 3**.

21.     The WattStock/Alta LNTP superseded and replaced the Backstop Letter.[10] The WattStock/Alta LNTP further defined the scope of WattStock's ongoing work, set out the agreed pricing for such work, and contemplated that Alta's project financing would close no later than February 28, 2020.[11] The WattStock/Alta LNTP also established certain payment and termination schedules, including a provision specifying that if Alta terminated the agreement through no fault of WattStock later than October 25, 2019, it would be liable for 100% of the contract price.[12]

22.     Throughout 2019 and 2020, WattStock performed its obligations under the Master Agreement by entering into multiple agreements with various owners of Generator Sets and/or Assets, each of which required WattStock to incur out-of-pocket expenses for inspections and make down payments on the equipment to secure the right or option to purchase such equipment.

23.     One such agreement was a Purchase and Sale Agreement Between EthosEnergy Power Solutions LLC and WattStock LLC dated May 13, 2019 (the "Ethos PSA"), which required WattStock to make a down payment to secure the right to purchase three LM6000 Sprint Gas Turbine Generator Sets from EthosEnergy Power Solutions LLC ("Ethos").[13] A true and correct copy of the Ethos PSA is attached as **Exhibit 4**.

24.     On or about May 22, 2019, WattStock created draft of a Limited Notice to Proceed for PSA Execution and Down Payment for the Ethos Surplus LM6000 Package ("Ethos LNTP"), wherein Alta would authorize WattStock to proceed with the Ethos PSA. The Ethos LNTP obligated

---

[10] **Ex. 3** at p.4 § 6.
[11] **Ex. 3** at p.4 § 6.
[12] **Ex. 3** at pp.5-6 § 8.
[13] **Ex. 4** at p.5 § 3.1.

Alta to wire WattStock the sum of $315,000 by close of business on May 24, 2019. Alta did not execute the Ethos LNTP but did authorize WattStock to proceed with the Ethos PSA through a separate agreement memorialized through e-mail (the "Ethos Authorization"). However, Alta ultimately made only a partial payment to WattStock and refused to pay the remaining amount due to WattStock under the Ethos Authorization.

25.     WattStock also entered into many other agreements with owners of Generator Sets and/or Assets substantially similar to the Ethos PSA in furtherance of its obligations under the Master Agreement. However, many of these agreements had to be cancelled as a result of Alta's indecisiveness and failure to obtain proper financing and/or were later assigned to Alta directly such that WattStock was relieved of its obligations under such agreements.

26.     In accordance with Article 3 of the Master Agreement, WattStock submitted invoices to Alta for inspection work and other out-of-pocket expenses performed by WattStock while negotiating the above-referenced agreements with various owners of Generator Sets and/or Assets, including invoices for margin or markup on such work and deposits paid by WattStock to owners/sellers. Despite Alta's obligation to pay such invoices pursuant to Section 3.1 of the Master Agreement and despite Alta's payment for certain invoices, Alta has failed and refused to pay for several of WattStock's invoices on demand.[14]

27.     As of June 2020, Alta has still failed to close on project financing and has otherwise failed to honor its obligations to WattStock, including by failing to adhere to project timelines for closing on the purchase of Generator Sets and Assets and failing to pay amounts owed to WattStock under the Master Agreement, the WattStock/Alta LNTP, and the Ethos Authorization. On or about

---

[14] *See* __Ex. 1__ at p.4 § 3.1.

June 1, 2020, Alta sent WattStock a letter titled "Termination of Master Agreement and WattStock LLC Limited Notice to Proceed Proposal to Alta Power LLC" wherein in wrongly accused WattStock of various breaches of the Master Agreement and the WattStock/Alta LNTP and, without cause, stated its intention, either expressly or implicitly, to cancel those agreements.

## VII. CAUSES OF ACTION

*Breach of Contract – Master Agreement*

28.　　Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

29.　　The Master Agreement is a valid and enforceable written contract between Plaintiff and Defendant.

30.　　WattStock performed its obligations under the Master Agreement by performing its required scope of work under the contract, including but not limited to diligently identifying, contracting, and renegotiating contracts for Generator Sets and Assets.

31.　　Alta breached its obligations under the Master Agreement by, among other things, failing to cooperate with WattStock to allow the closing of PSAs on certain Generator Sets and Assets, failing to pay invoices submitted by WattStock for WattStock's expenses under Section 3.1 of the Master Agreement, and purporting to cancel the Master Agreement without cause.

32.　　Alta's breach is a direct and proximate cause of damages to WattStock. Specifically, WattStock has incurred out-of-pocket expenses which Alta has failed to reimburse as obligated by the Master Agreement.

*Breach of Contract – WattStock/Alta LNTP*

33.    Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

34.    The WattStock/Alta LNTP is a valid and enforceable written contract between Plaintiff and Defendant.

35.    WattStock performed its obligations under the WattStock/Alta LNTP by performing its required scope of work under the contract, including but not limited to diligently identifying, contracting, and renegotiating contracts for Generator Sets and Assets and taking steps to perform refurbishment work and to subcontract certain refurbishment work to GE.

36.    Alta breached its obligations under the WattStock/Alta LNTP by, among other things, failing to cooperate with WattStock to allow the closing of PSAs on certain Generator Sets and Assets, failing to pay WattStock amounts owed for WattStock's work under the WattStock/Alta LNTP, and purporting to cancel the WattStock/Alta LNTP without cause, entitling WattStock to seek 100% of the contract price in accordance with Section 8 of that agreement.

37.    Alta's breach is a direct and proximate cause of damages to WattStock. Specifically, WattStock has incurred out-of-pocket expenses for work and services performed pursuant to the WattStock/Alta LNTP which Alta has failed to pay and has purported to cancel the WattStock/Alta LNTP without cause, thereby attempting to deprive WattStock of all future amounts owed to WattStock under that agreement.

*Breach of Contract – Ethos Authorization*

38.    Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

39. The Ethos Authorization is a valid and enforceable written contract between Plaintiff and Defendant.

40. WattStock performed its obligations under the Ethos Authorization by proceeding to negotiate the Ethos PSA as authorized by Alta.

41. Alta breached its obligations under the Ethos Authorization by, among other things, making only a partial payment under the Ethos Authorization while failing to pay WattStock the remaining balance owed to WattStock under that agreement.

42. Alta's breach is a direct and proximate cause of damages to WattStock. Specifically, WattStock has incurred out-of-pocket expenses under the Ethos PSA which Alta has failed to fully reimburse as required by the Ethos Authorization.

*Quantum Meruit*

43. Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

44. In the alternative to some or all of the breaches of contract asserted above, WattStock pleads that, in the event any of the contracts above are found to be unenforceable for any reason, then Alta is liable on one or more claims of quantum meruit. Specifically, WattStock provided valuable services or materials to Alta as set forth above, Alta accepted such services or materials for its own benefit, and Alta had reasonable notice that WattStock expected compensation for such services or materials but failed to pay WattStock for such services or materials, directly and proximately causing damage to WattStock.

## VIII. CONDITIONS PRECEDENT

45. All conditions precedent to the relief requested in this pleading have occurred, have been performed, have been waived, or have been rendered impossible.

## IX. REQUEST FOR ATTORNEYS' FEES

46. Plaintiff requests an award of costs and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 38.001(8) and any applicable contractual provisions or common law.

## X. RULE 194 REQUEST FOR DISCLOSURE

47. Pursuant to Texas Rule of Civil Procedure 194, Defendant is requested to disclose, within fifty (50) days of service of this request, the information or material described in Rule 194.2.

## XI. PRAYER

48. For the foregoing reasons, Plaintiff WattStock prays that Defendant Alta be cited to appear and answer herein and that Plaintiff be awarded judgment against Defendant for all of its economic damages, together with all applicable pre-judgment and post-judgment interest, in an amount to be proven at trial.

49. Plaintiff further prays for its costs and reasonable and necessary attorneys' fees, as well as all other relief to which it may be entitled.

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**


By: */s/ Brian N. Hail*
    **Brian N. Hail**
    bhail@krcl.com
    State Bar No. 08705500
    **Andrew D. Robertson**
    drobertson@krcl.com
    State Bar No. 24090845

901 Main St.
Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299

**ATTORNEYS FOR PLAINTIFF**

# EXHIBIT "1"

## MASTER AGREEMENT

This Master Agreement ("Agreement") is made and entered into as of the 27th day of February 2019 ("Effective Date") by and between Alta Power LLC, a Texas limited liability company ("Alta") with offices at 4605 Post Oak Place Dr. Suite 270, Houston, TX 77027, and WattStock LLC, a Texas limited liability company ("WattStock") with offices at Suite 850, 4040 North Central Expressway, Dallas, Texas 75204. Alta and WattStock are also each referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Alta is a power plant developer with a unique strategy for developing power generation projects in the Texas market using surplus combustion turbine packages; and

WHEREAS, WattStock is a supplier of power generation equipment and services, with extensive knowledge of the power equipment market; and

WHEREAS, Alta and WattStock seek to enter into an agreement or agreements to leverage each Party's unique skills to provide for an expedited and efficient means for (i) locating, evaluating, and pricing surplus combustion turbine generator assets available for purchase, (ii) purchasing and refurbishing of selected generator assets, and (iii) designing, constructing, and operating power generation plants in the Texas market ("Business Purpose").

NOW, THEREFORE, for and in consideration of the mutual covenants and promises and representations contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Alta and WattStock agree as follows:

### Article 1.    Definitions

Whenever used in this Agreement with initial capitalization, the following definitions shall be applicable:

**"Affiliate"** of a Party means any other person (natural person, corporation limited liability company, partnership, firm, association, or any other entity whether acting in an individual, fiduciary or other capacity) that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the Party specified, including, without limitation such Party's owners, directors, officers, and employees.

**"Assets"** means major sub-components of an LM6000 Generator Set that may qualify for purchase for the Business Purpose including (i) generator set package with combustion turbine engine and electric generator, (ii) generator set package without combustion turbine engine and/or electric generator, (iii) combustion turbine engine only, (iv) electric generator only, and/or (v) such other equipment as the Parties may agree.

**"Business Day"** means a Day, other than a Saturday or Sunday or a legal or bank holiday, in the State of Texas.

**"Business Purpose"** has the meaning ascribed to it in the Preamble.

1

"**Confidential Information**" means the existence and terms of this Agreement, the fact that discussions are taking place between the Parties concerning the Business Purpose, and any and all information related to the Business Purpose disclosed to a Receiving Party prior to, on or after the Effective Date by a Disclosing Party (whether written, oral, digital or visual) that has economic value and is not generally known to the public, or which would constitute a trade secret under the U.S. Uniform Trade Secrets Act and any oral, electronic or written communications thereof, including without limitation information concerning discoveries, developments, designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, computer programs, program code, specifications, analyses, reports, drawings, sketches, models, samples, data, algorithms, trade secrets, models, samples, calculations, formulas, WattStock manufacturing specifications or methods, analytical or quality control methods, actual and projected sales information, cost, price and other financial information, information relating to actual or potential suppliers and customers. markets, marketing opportunities, business structure, assets, liabilities, budgets, operations and strategies or other technical or business information, together with any information developed or derived by Receiving Party from such disclosed information.

"**Day**" or "**day**" means a calendar day, unless otherwise specified.

"**Disclosing Party**" means a Party providing Confidential Information to the Receiving Party.

"**Effective Date**" has the meaning ascribed to it in the Preamble.

"**Equipment Purchase and Sale Agreement**" means a definitive agreement to be entered into by Alta and WattStock for the purchase by Alta from WattStock of an LM6000 Generator Set.

"**Exclusivity Period**" has the meaning ascribed to in Article 6.1.

"**Initial List of Assets**" has the meaning ascribed to in Article 2.1.

"**Inspection Conclusions and Estimates**" means any reports, condition assessments, analyses, recommendations, estimates to repair or refurbish, proposals, work scopes or other information prepared by WattStock or for WattStock by any WattStock subcontractor based upon Inspection Data.

"**Inspection Data**" means any information documenting the existing condition of the Asset including borescope photos, videos, operation and maintenance logs or other data obtained during the course of an Asset inspection but excluding any Inspection Conclusions and Estimates.

"**LM6000 Generator Set**" means a skid-mounted, GE aeroderivative combustion turbine power generation package refurbishment by WattStock.

2

"**Owner**" means the person or entity that owns or controls the right to sell an Asset. The term "Owner" may include third-party agents or brokers retained by the title holder of the Asset to find potential buyers.

"**Receiving Party**" means a Party to whom Disclosing Party provides Confidential Information.

"**Representatives**" of a Party means any attorneys, accountants, consultants, agents and advisors, as well as actual or prospective partners, joint venturers, co-owners, lenders, financing parties, underwriters, and equity investors.

"**Term**" has the meaning ascribed to it in Article 5.

### Article 2.    Identifying and Prioritizing LM6000 Generator Sets

2.1    Promptly following the Effective Date, WattStock will deliver to Alta as Confidential Information an initial list of Assets that WattStock believes may be available for purchase. The initial list will include general information about the country of the Asset's last known location, its approximate age, and if available, price being asked by the Owner ("Initial List of Assets").

2.2    Within two (2) Business Days following Alta's receipt of the Initial List of Assets, Alta shall (i) advise WattStock in writing of any Asset on the Initial List of Assets that Alta has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide WattStock with reasonable documentation demonstrating Alta's prior awareness of the Asset and Alta's efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

2.3    The Parties shall jointly rank-order the Initial List of Assets with goal of developing a list of top target Assets sufficient, once refurbished, as required, by WattStock, to make up nine (9) LM6000 Generator Sets.

2.4    At any time during the Term of this Agreement, either Party may disclose to the other Party as Confidential Information additional Assets that were not on the Initial List of Assets. In such event, the Party receiving the disclosure information shall within two (2) Business Days following its receipt of the newly disclosed Asset, (i) advise the disclosing Party in writing that the receiving Party has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide the disclosing Party with reasonable documentation demonstrating the receiving Party's prior awareness of the Asset and its efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

### Article 3.    Securing Right to Purchase Units

3.1    With approval of Alta, WattStock will arrange with the Owner of an Asset an inspection to evaluate the condition and refurbishment requirements of such Asset. Alta understands and acknowledges that the types of Asset inspections that WattStock will be able to perform in the

field cannot identify all defects in an Asset, even with the benefit of borescope inspections of the internals of a combustion turbine engine. Alta will be responsible for reimbursing WattStock for WattStock's out-of-pocket, expenses incurred in performing Asset inspections. Aggregate expenses in excess of $20,000 will require prior written Alta approval. WattStock shall provide Alta with a copy of the Inspection Data and WattStock may retain a copy of the Inspection Data. Any Inspection Conclusions and Estimates delivered by WattStock to Alta shall be WattStock Confidential Information.

3.2    Following inspection of Assets sufficient to make-up a generator package, WattStock will provide to Alta as Confidential Information a not-to-exceed price for an agreed upon scope of work to complete an LM6000 Generator Set. For the avoidance of doubt, the agreed upon scope of work for the LM6000 Generator Set will exclude any defects that are not reasonably identifiable through the field inspections performed by WattStock pursuant to Article 3.1.

3.3    Prior to WattStock securing from the Owner of an Asset the exclusive right to purchase same, WattStock and Alta would agree in writing on the terms, including the amount of any non-refundable payments Alta would agree upon in order that WattStock may secure the right to purchase the Asset.

3.4    WattStock would then enter into negotiations with the Owner of an Asset on purchase terms or a purchase option consistent with the terms approved by Alta. Commencing from the date that WattStock and Alta have agreed pursuant to Article 3.1 that WattStock should inspect an Asset and continuing through the first to occur of the date that (i) Alta rejects such Asset, (ii) Owner declines to grant WattStock an exclusive right to purchase such Asset, or (iii) is sixty (60) days following WattStock's latest proposal to the Owner of an Asset to grant WattStock an exclusive right to purchase such Asset (or such longer period as may be agreed by the Parties) and Owner still has not granted WattStock an exclusive right to purchase the Asset, WattStock agrees it shall not market such Asset to any third-parties.

### Article 4. Refurbishing of Assets for Alta

4.1    Alta and WattStock will enter into one or more definitive Equipment Purchase and Sale Agreement describing the scope, terms, and price under which Alta would purchase from WattStock each LM6000 Generator Set.

4.2    Alta acknowledges that the price for each LM6000 Generator Set may vary due to the variable conditions of each Asset and the variable scopes of refurbishment work that may be required for each Asset. Certain defects or conditions, including what is commonly referred to as "fallout", are not discoverable until the Asset is disassembled in a repair shop setting. To the extent such additional repairs are discovered, the Parties would agree to a change order to the Equipment Purchase and Sale Agreement, including price and schedule to perform the work.

4.3    All amounts paid by Alta to WattStock for payment to the Owner to secure the Asset (excluding reimbursement of WattStock expenses described in Article 3.1) shall be treated as payments toward the purchase price of the LM6000 Generator Set.

4

4.4     If Alta and WattStock are unable to reach agreement on an Equipment Purchase and Sale Agreement then the Parties will agree upon a plan for dealing with any Assets that were secured with the intent of incorporation into an LM6000 Generator Set.

4.5     Failure by the Parties to reach agreement on any one (1) Equipment Purchase and Sale Agreement shall not be grounds for terminating this Agreement.

### Article 5. Term

5.1     The term of this Agreement shall be twenty-four (24) months following the Effective Date, unless the Parties have agreed to an extension in writing or the Agreement has been earlier terminated pursuant to Article 11.

### Article 6. Exclusivity and Non-Circumvention

6.1     For any Assets that an Owner has granted WattStock an exclusive right to purchase during the Term of this Agreement, Alta will have an exclusive right to purchase an LM6000 Generator Set from WattStock utilizing such Asset for the period equal to WattStock's exclusivity ("Exclusivity Period").

6.2     Without derogation of any confidentially obligations pursuant to Article 7, during the Term of this Agreement and for a period of twelve (12) months following the expiration or termination of this Agreement for Assets that have been inspected pursuant to Article 3 of this Agreement or for a period of six (6) months for Assets that have not been inspected pursuant to Article 3 of this Agreement:

A. Alta agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset (1) on the Initial Assets List or (2) otherwise disclosed by WattStock to Alta during the Term of this Agreement; and

B. WattStock agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset disclosed by Alta to WattStock during the Term of this Agreement, except as otherwise provided in the Agreement.

C. WattStock shall be free to purchase an Asset without any restrictions or further obligations to Alta with respect to such Asset in the following circumstances:

   i.   If Alta rejects an Asset for use in connection with the Business Purpose for any reason;

   ii.  If WattStock is unable to reach agreement with Owner on purchase terms or a purchase option consistent on the terms approved by Alta;

   iii. If Alta and WattStock cannot agree on terms of an Equipment Purchase Sale Agreement.

5

### Article 7. Confidentiality

7.1     The Parties agree that the WattStock Standard Mutual Nondisclosure Agreement that was entered by the Parties on or about May 8, 2018 is hereby superseded by this Agreement. Any Confidential Information disclosed pursuant to that prior Mutual Nondisclosure Agreement shall continue to be deemed Confidential Information protected against disclosure pursuant to this Article 7.

7.2     Confidential Information shall not be disclosed to any third party by Receiving Party or any of its Affiliates or Representatives, and shall not be used by Receiving Party or any of its Affiliates or Representatives for any purpose other than the Business Purpose, including but not limited to developing and/or providing any product or service or establishing any relationship that is competitive with or against the best interests of the Disclosing Party. Confidential Information shall be held in strict confidence by the Receiving Party and shall not be disclosed in any manner whatsoever without the prior written consent of the Disclosing Party, except to those Affiliates or Representatives of the Receiving Party with a need to know the Confidential Information in connection with the Business Purpose. The Receiving Party shall inform any of its Affiliates or Representatives to whom Confidential Information is disclosed of the existence of the restrictions in this Article 7, and that the Confidential Information has been shared with the Receiving Party in strict confidence. The Receiving Party shall be responsible for any breach or threatened breach of this Article 7 by its Affiliates or Representatives or any third-party to whom its Affiliates or Representatives disclose Confidential Information. The Receiving Party and its Affiliates and Representatives shall protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Receiving Party uses to protect its own confidential and proprietary information.

7.3     The Disclosing Party has reserved and shall retain all rights, title, and interest to the Confidential Information disclosed to the Receiving Party. No express or implied license or right is granted to Receiving Party with respect to any intellectual property or other proprietary rights of the Disclosing Party with respect to the Confidential Information. The Receiving Party shall not acquire any patent, copyright, trademark, or other intellectual property rights in such Confidential Information except for the limited right to use the Confidential Information for the specific purposes described herein. Any invention made or discovery based upon or arising from the Confidential Information is, and shall remain, the sole property of the Disclosing Party.

7.4     This Article 7 imposes no obligation upon the Receiving Party with respect to Confidential Information that: (i) is or becomes generally known or publicly available through no fault of the Receiving Party; (ii) was known to the Receiving Party on a non-confidential basis prior to disclosure by the Disclosing Party (iii) is lawfully obtained by the Receiving Party from a third-party under no obligation of confidentiality or (iv) is independently developed by or for the Receiving Party without use of the Confidential Information.

7.5     In the event that the Receiving Party is requested or required (by oral questions, interrogatories, requests for information, or by applicable legal or regulatory authority or by any

rule or regulation of any stock exchange or market or by any administrative or government body) to disclose any Confidential Information, the Receiving Party shall promptly notify the Disclosing Party in writing of such request or requirement prior to disclosure so that the Disclosing Party may seek an appropriate protective order and/or waive compliance with the terms of this Article 7, as applicable. The Parties shall cooperate with each other and their respective counsel in any Party's efforts to prevent such disclosure of Confidential Information. In the event that a protective order or other remedy is not obtained, by the time that the Receiving Party is required to disclose the Confidential Information, or the Disclosing Party waives compliance with the provisions hereof, the Receiving Party agrees to furnish only that portion of the Confidential Information that it reasonably determines, in consultation with its counsel, is legally required to be disclosed, and to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information after its disclosure.

7.6     At any time upon written request of the Disclosing Party, the Receiving Party shall promptly destroy (and supply written confirmation thereof to the Disclosing Party) all Confidential Information, including all copies, summaries, extracts and notes thereof, in possession of the Receiving Party or any of its Affiliates or Representatives.

7.7     Neither Party makes any representations or warranties, whether written or oral, statutory, express or implied, with respect to any information provided hereunder, including without limitation any warranty of accurateness, completeness, merchantability or fitness for a particular purpose. Neither the Disclosing Party nor any of its Affiliates or Representatives shall have any liability resulting from the use of the Confidential Information by the Receiving Party.

7.8     Notwithstanding any expiration or termination of this Agreement, all obligations of confidentiality and all restrictions on the use of Confidential Information under this Article 7 shall remain in effect for a period of three (3) years following the date of expiration of termination, and with respect to Confidential Information that constitutes a trade secret under applicable law, for as long as such information remains a trade secret.

7.9     The Parties hereto agree that money damages would not be a sufficient remedy for any breach of this Article 7 and that the Disclosing Party shall be entitled to injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Article 7. Such remedy shall not be the exclusive remedy for any breach of this Article 7 but shall be in addition to all other rights and remedies available at law or in equity.

### Article 8. Indemnification

8.1     Both Alta and WattStock agree to indemnify and hold one another harmless from and against any and all liability, loss, expense, attorneys' fees, or claims for physical injury to third-parties and/or physical damages to property of third-parties from or in any way connected to the performance of this Agreement, but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from such indemnifying Party's negligence, willful misconduct or intentional acts.

### Article 9. Limitation of Liability

9.1 EXCEPTING ARTICLE 6 (EXCLUSIVITY AND NON-CIRCUMVENTION), ARTICLE 7 (CONFIDENTIALITY), AND 8 (INDEMNIFICATION):

A. **TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY AGREES TO LIMIT THE OTHER PARTY'S LIABILITY FOR ANY AND ALL CLAIMS, LOSSES, COSTS, DAMAGES OF ANY NATURE WHATSOEVER OR CLAIMS EXPENSES FROM ANY CAUSE OR CAUSES, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT-WITNESS FEES AND COSTS, SO THAT THE TOTAL AGGREGATE LIABILITY OF A PARTY TO THE OTHER SHALL NOT EXCEED THE AMOUNT OF USD $100,000. IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT HOWEVER ALLEGED OR ARISING, UNLESS OTHERWISE PROHIBITED BY LAW.**

B. **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.**

### Article 10. Warranty Disclaimer

10.1 WattStock makes no warranty, express or implied, including regarding the condition of an Asset or title thereto. All warranties, if any, to be made by WattStock to Alta will be set forth in any executed Equipment Purchase and Sale Agreements.

### Article 11. Termination

11.1 Neither Party may terminate the Agreement for its convenience.

11.2 Alta may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of WattStock or (ii) a material breach of this Agreement by WattStock which WattStock fails to cure within thirty (30) days after notice thereof from Alta.

11.3 WattStock may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of Alta or (ii) a material breach of this Agreement by Alta which Alta fails to cure within thirty (30) days after notice thereof from WattStock.

11.5 Expiration or termination of this Agreement shall not terminate, modify or otherwise impact any Equipment Purchase and Sale Agreement in effect as of the effective date of

expiration or termination of this Agreement; provided, however, in the event of a bankruptcy by one Party, the non-filing Party shall have the right to terminate any or all pending Equipment Purchase and Sale Agreement(s) for cause.

### Article 12. Miscellaneous

12.1    The Agreement shall be governed by the laws of the state of Texas. Any disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas.

12.2    Any notice or other formal communication to be given under this Agreement shall be in writing and signed by or on behalf of the Party giving it. All such communications will be deemed given: (a) at the time of delivery, if delivered to the appropriate address by hand or by internationally recognized overnight courier service (costs prepaid); (b) at the time of transmission, if sent by fax or email with confirmation of transmission by the transmitting equipment; or (c) at the time of receipt or rejection by the addressee, if sent by certified mail, return receipt requested, provided that, in each case, where the delivery, transmission, receipt or rejection occurs outside working hours, notice shall be deemed given at the start of working hours on the next business day. The mailing or delivery addresses, email addresses and fax numbers for the Parties for the purpose of this clause are:

**If to Alta:**

| | |
|---|---|
| COMPANY: | Alta Power LLC |
| ATTENTION: | Matthew Laterza |
| ADDRESS: | 4605 Post Oak Place Dr, Suite 270 |
| CITY: | Houston |
| STATE: | Texas |
| ZIP: | 77027 |
| EMAIL: | mlaterza@altapowerdev.com |
| Copy to: | twest@altapowerdev.com |

**If to WattStock:**

| | |
|---|---|
| COMPANY: | WattStock LLC |
| ATTENTION: | Jay Manning |
| ADDRESS: | Suite 850, 4040 North Central Expressway |
| CITY: | Dallas |
| STATE: | Texas |
| ZIP: | 75204 |
| EMAIL: | j.manning@wattstock.com |
| Copy to: | p.jenevein@wattstock.com |

12.3    Each Party hereto has been represented by counsel and participated in the drafting of this Agreement. This Agreement shall be construed as if drafted jointly by the Parties and no

9

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

12.4 Each Party shall bear its own legal and other costs in connection with the negotiation and preparation of this Agreement and any subsequent definitive agreements contemplated hereby.

12.5 Each Party agrees to comply with all applicable laws during the performance of its obligations pursuant to this Agreement, including:

A. Fair Labor Standards Act of 1938, as amended;
B. Occupational Safety and Health Act of 1970, as amended;
C. anti-bribery and anti-corruption laws, including, as applicable, the United States Foreign Corrupt Practices Act and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions dated 21 November 1997;
D. any applicable laws and regulations concerning the export or import of products or technology; and
E. applicable anti-money laundering, anti-terrorism and related laws of the United States and, when applicable, the country in which an Asset is located.

12.6 Each Party represents and covenants to the other that it will not directly or indirectly:

A. Offer, give, make, promise, pay or authorize the offering, giving, making, promising or payment of any money, gift, or anything of value to any government official, that is an officer or employee of any government, or any department, agency or instrumentality thereof, any public international organization, any person acting in an official capacity on behalf of such government, any candidate for or appointee to a political or government office, or any political party;
B. Knowingly engage in any transaction which involves:
   i. Receiving, transferring, transporting, retaining, using, structuring, diverting, or hiding the proceeds of any criminal activity whatsoever, including drug trafficking, fraud, and bribery of any individual covered in 12.6.A above;
   ii. Engaging, becoming involved in, financing, supporting financially or otherwise sponsoring, facilitating, or giving aid or comfort to any terrorist person, activity or organization; and
   iii. Employing, engaging in any transaction or otherwise conducting business with a "designated person," namely a person or entity that appears on any list issued by the United States or the United Nations with respect to money laundering, terrorism financing, drug trafficking, or economic or military embargoes.

12.7 This Agreement does not create any agency or employment relationship, partnership, joint venture or co-venture between Alta and WattStock. Neither Party is granted any express or implied right or authority to assume or to create any obligation on behalf of or in the name of the other Party. Each Party shall pay for all social security, federal income taxes, unemployment insurance, workmen's compensation insurance, pensions, annuities or other liabilities or taxes incurred by, or on behalf of, or for the benefit of such Party or any of its Representatives, agents,

employees or servants who are not directly employed by the other Party, and arising out of the performance by the its obligations under this Agreement.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, the parties have executed this Master Agreement in duplicate originals effective as of the Effective Date.

**WATTSTOCK LLC**

By: _____

Printed Name: _____

Title: _____

**ALTA POWER LLC**

By: _____

Printed Name: _____

Title: _____

## FIRST AMENDMENT TO MASTER AGREEMENT

This First Amendment to Master Agreement ("Amendment") is made and entered into as of the 5th day of February, 2020 ("Amendment Effective Date") by and between ALTA POWER LLC, a Texas limited liability company ("Alta") with offices at 4605 Post Oak Place Dr. Suite 270, Houston, TX 77027, and WATTSTOCK LLC, a Texas limited liability company ("WattStock") with offices at Suite 850, 4040 North Central Expressway, Dallas, Texas 75204. Alta and WattStock are also each referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Alta and WattStock entered into that certain Master Agreement dated effective as of the 27th day of February 2019 ("Original Agreement"); and

WHEREAS, Alta and WattStock desire to amend the Original Agreement to make certain changes to the Original Agreement as are set forth in this Amendment.

NOW, THEREFORE, for and in consideration of the mutual covenants and promises and representations contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree that the Original Agreement is hereby amended as is set forth below. Unless otherwise expressly provided in this Amendment, defined terms used in this Amendment shall have the meanings ascribed to them in the Original Agreement.

Section 6.2(A) of the Original Agreement is hereby amended and restated to read:

"Alta agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset (1) on the Initial Assets List or (2) otherwise disclosed by WattStock to Alta during the Term of this Agreement, except as may be expressly agreed by WattStock in writing; and."

1.     Miscellaneous. This Amendment shall become effective only upon full execution and delivery by Alta and WattStock. All provisions of the Original Agreement not explicitly amended or modified in this Amendment shall remain in full force and effect, and the Original Agreement, as modified by this Amendment, shall be binding upon and shall inure to the benefit of the parties hereto, their successors and permitted assigns.

2.     Applicable Law and Venue. This Amendment shall be governed by the laws of the state of Texas. Any disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas.

3.     Counsel Review. Each Party hereto has been represented by counsel and participated in the drafting of this Amendment. This Amendment shall be construed as if drafted

1

jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Amendment.

4. Legal Costs. Each Party shall bear its own legal and other costs in connection with the negotiation and preparation of this Amendment.

5. Counterparts. This Amendment may be executed in any number of counterparts. All counterparts together will be taken to constitute one instrument.

IN WITNESS WHEREOF, the parties have executed this Amendment in duplicate originals effective as of the Amendment Effective Date.

**ALTA POWER LLC**, a Texas
limited liability company,

By: _____
Name: _Mathew Litoz9_
Title: _CFO_

**WATTSTOCK LLC,** a Texas limited
liability company

By: _Andrew F Herr_
Name: _Andy F Iley_
Title: _CEO_

2

# EXHIBIT "2"



POWERING THE FUTURE OF TEXAS

Dear Andy:

Alta Power LLC, or one or more of its Affiliates, and WattStock LLC are close to executing two agreements for WattStock to supply six LM6000s gas turbine power units. Important components of WattStock's work under those agreements will be subcontracted to GE. In addition, one of the significant challenges facing Alta and this project is a very tight delivery schedule to allow the units being online for next summer.

To help meet that tight time schedule, we understand that WattStock is willing to enter into a contract with GE prior to the financial closing of Alta's project financing and therefore prior to the Effective Date of the Equipment and Services Supply Agreement ("ESA") being negotiated by Alta's Affiliate(s) and WattStock. By entering into an agreement with GE now, WattStock will be able to reserve engine overhaul slots and secure other necessary GE resources in a timely fashion. We understand further that should Alta be unable to execute the ESA or the Effective Date of such ESA is delayed beyond the dates in the table below, WattStock may incur cancellation charges associated with that GE contract. Alta understands that WattStock is incurring this potential liability on Alta's behalf and that the benefits of doing so will inure solely to Alta in the form of an accelerated project completion.

We understand that the cancellation penalties WattStock would incur are as follows:

| Termination on or Before | Termination Amount Due (USD) |
|---|---|
| 8/16/2019 | $375,000 |
| 9/16/2019 | $750,000 |

Accordingly, Alta agrees to reimburse WattStock for these cancelation fees, should the Effective Date of the ESA not occur prior to September 15, up to a maximum of $750,000. We further understand and agree that the reimbursement process would work as follows:

1. If the ESA Effective Date has not occurred on or before August 15, 2019, WattStock will invoice Alta for $375,000, payable net 15 days, but will not cancel the GE contract.

2. If the ESA Effective Date has not occurred on or before September 15, 2019 WattStock will invoice Alta for an additional $375,000, payable net 15 days, and will cancel the GE contract. Alta will not be liable for any further cancellation charges arising from the WattStock-GE contract beyond the total of $750,000.

3. If WattStock has issued and/or been paid for the August 15 invoice for $375,000 but the ESA Effective Date occurs prior to September 15, WattStock will cancel the invoice if not yet paid, and either refund any monies received or credit any received amounts to other WattStock-Alta invoices, at Alta's preference.

Alta Power LLC · 4605 Post Oak Place Dr. Suite 270 · Houston, Texas 77027
www.altapowerdev.com

If the above conforms to your understanding, please countersign below and return.

Thank you very much

**ALTA POWER LLC**

By: _____

Printed Name: Matthew Laterza
Title: Chief Financial Officer
Date: August 9 2019

**WATTSTOCK LLC**

By: _____

Printed Name: Andrew F Herr
Title: Chief Operating Officer
Date: 8/9/19

2

# EXHIBIT "3"



# WattStock LLC Limited Notice to Proceed Proposal

## to

# Alta Power LLC

### for the

### Goodlow Peak Power Site

### for

### Two (2) TRUEpackage™ LM6000 PC Sprint GTG's

### December 23,, 2019

Prepared by: Jay C. Manning
J.MANNING@WATTSTOCK.COM
713.248.4148



December 23, 2019

Mr. William Phelps
Alta Power LLC
4605 Post Oak Place Dr., Suite 270
Houston, TX 77027

Subject: LM6000PC TRUE Package Limited Notice to Proceed Proposal for the Goodlow Site

Dear Bill,

After numerous meetings and discussions between and among WattStock LLC, Alta LLC, and GE, we have prepared the following revised proposal. This Proposal is also sometimes referred to herein as Purchase Order.

All terms and conditions of our proposal are contained within our attached Proposal/Purchase Order.

Thank you for this opportunity to work with Alta, and please do not hesitate to call me if you have any questions.

Regards,

WattStock LLC

Jay C. Manning
**President**



## 1. Scope of LNTP Work and LNTP Pricing

| Description | Quantity | Delivery | Price ($) |
|---|---|---|---|
| Woodard Controls Upgrade Hardware | 2 | 2/28/2020 | 453,218 |
| Fin-Fan Lube Oil Cooler | 1 | 2/28/2020 | 188,415 |
| Internal Gas Vent Valve | 2 | 2/28/2020 | 12,495 |
| Generator Enclosure Design to modify from 50Hz Design | 1 | 2/28/2020 | 431,635 |
| Gas Turbine/Generator Coupling | 1 | 2/28/2020 | 90,452 |
| Generator Lube Oil (GLO) Skid | 2 | 2/28/2020 | 443,390 |
| Automatic Voltage Regulator - EX2100e (AVR) | 2 | 2/28/2020 | 44,855 |
| External Block & Bleed Gas Valves | 2 | 2/28/2020 | 69,113 |
| Approx. 1100 hours of Engineering Support for Engineering Drawings | 1 | 2/28/2020 | 149,858 |
| Woodward Acarsoy Cancellation Fee 1 NA | 1 | N/A | 48,213 |
| GE Acarsoy Engineering Labor Charge 1 NA | 1 | N/A | 32,609 |
| Supplier Non-Returnable/Cancellation/Restocking fee's* | TBD* | TBD | TBD |
| 20% WattStock Markup | | N/A | 491,063 |
| TOTAL (subject to maximum increase of $285,000 for items marked *) | | | 2,455,316 |

Notes to Above Table:

*(i) Any Supplier materials related to the 3rd Acarsoy Unit have been cancelled. Those materials that are non-returnable, or subject to supplier cancellation/restocking fees, GE will invoice WattStock at cost plus 10%, and WattStock will in turn invoice Alta for the amount invoiced by GE without further markup. These fees are for items such as: Generator GLO, block valves, gas valves, AVR, etc.*

*(ii) Any reference to Acarsoy cancellation fees does not refer to any cancellation fees or liability that may be payable by WattStock if the Acarsoy PSA is terminated.*

*(iii) Note: The above price is in 2019 US Dollars, and does not include applicable sales, excise, value added, use or similar taxes.*

## 2. LIST OF ENGINEERING ITEMS – *Due within five (5) business days following project financial closing:*

Preliminary Main Unit (General Arrangement)
Preliminary Anchor Bolt
Preliminary One-Line Diagram
Preliminary Foundation Loads
Air Filter (General Arrangement)
Sprint Skid (General Arrangement)
Water Injection (General Arrangement)
Aux Skid (General Arrangement)
Plan & Elevation (P&E) for TCP
Technical Specification for package motors and heaters



## 3. Changes

The LNTP Price shall be adjusted as necessary to take account of (a) Change Orders, or (b) other adjustments specifically provided for in this Proposal. Prices shall not change without the express written consent of Customer in a Change Order signed by both parties.

Changes to specifications, drawings, services or hardware will be evaluated by Seller for a Change in Scope to the Proposal. Seller will quote the changes and a Customer Change Order must be received before work is to proceed.

Storage Costs, additional travel, delays at work, unit restart delays and overtime work out of scope of the project will be subject to the Change Order process above and considered additional work and will be charged according to Seller's published rates at time of execution and in lieu of any pre-existing agreement. As of the date of this revision to the Proposal, no such additional work has occurred.

## 4. Compliance

Compliance and certifications are within current Seller's design practices and standards. The price presented here does not include compliance with any state or local codes unless expressly defined by Customer prior to sale.

## 5. Proposal Basis

Price quoted herein is valid for five (5) days.

Price quoted is per the Terms and Conditions stated herein.

Parts and Services are subject to prior sale.

Subject to Article 2 on this LNTP, delivery time of drawings shall be confirmed upon the execution of Equipment and Services Supply Agreement.

## 6. Commercial Items

Terms and Conditions

This Proposal is in accordance with WattStock Terms and Conditions attached hereto as Exhibit A. In the event of any conflict in the terms and conditions between this LNTP agreement and the WattStock Terms and Conditions, the terms and conditions of the proposal shall govern. Customer and Seller agree that in the event a firm ESA is executed for the TRUEPackages (i) all payments made under this LNTP shall be applied to the ESA Purchase Price**, (ii) all work performed under this LNTP will be deemed to have been work performed pursuant to the ESA, and (iii) the terms and conditions of this LNTP shall be replaced in their entirety by the terms and conditions of the ESA. Upon execution of this LNTP by both parties and receipt by WattStock of the first $750,000 payment referenced in Article 7, this LNTP will supersede the letter signed by Alta Power LLC on August 9, 2019 that the parties have commonly referred to as the "backstop letter".

**As of the date of this LNTP Proposal, the Purchase Price is $19,583,426, based upon the below listed assumptions:

- Scope of work described in Exhibit B attached to December 21, 2019 draft of Equipment Supply Agreement;
- Purchase of 2 Nuh Cemento Units for a combined price of $8,125,000;
- Project financial closing no later than February 28, 2020;
- Guaranteed substantial completion no sooner than 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Site does not change;

WattStock Limited Notice to Proceed Proposal to Alta Power

CONFIDENTIAL: NOT FOR DISTRIBUTION

Page 4 | 15



- Schedule is not substantially different from 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Lender due diligence changes;
- ESA changes from present version;
- ESA Purchase Price subject adjustment in accordance with final terms of the Equipment Supply Agreement, including for example, discovery of latent or concealed conditions which differ materially from those described in the borescope inspection reports.

## 7. Payment Terms & Schedule

| Milestone | Amount | Net Receipt of Invoice |
|---|---|---|
| 1. Upon LNTP Purchase Order Execution | $750,000 | 2 business Days |
| 2. Second Invoice | $750,000 | 5 days |
| 3. Invoice Issued January 28, 2019 Prior to Expected Parts Shipment (Cash received prior to releasing material for shipment) | $464,253 | 25 days |
| 4. Supplier Non-Returnable/Cancellation/Restocking Fees (if any) - to be invoiced no later than January 28, 2020 | TBD | 25 days |
| 5. Upon Financial Close of the Project | $491,063 | 2 days |

All payments will be made via wire transfer and, except as otherwise provided in the Milestone table above, are due no later than 30 days from receipt of Seller's invoice without any setoff (including, without limitation, setoff under other contracts with Seller or with WattStock LLC or its affiliates). These terms will take precedence over any conflicting payment terms referenced. Seller agrees to provide Buyer within two (2) business days following Seller's receipt of Buyer's wire transfer of funds paid to Seller pursuant to this LNTP a wire transfer confirmation showing that such payments made by Buyer to Seller (excluding the payment for Seller's 20% markup to be made upon closing of Buyer's financing for the project referenced in Milestone #5) have been remitted to General Electric Company.

## 8. Termination Schedule

In the event Buyer terminates the Purchase Order through no fault of Seller, or Seller terminates the Purchase Order for Buyer default, the Buyer shall be liable to Seller for the following termination amounts:



| Termination on or Before | Termination Amount Due (USD) |
|---|---|
| 8/16/2019 | 15% of Contract |
| 9/16/2019 | 30% of Contract |
| 10/25/2019 | 75% of Contract |
| 12/6/2019 | 100% of Contract |

Upon receipt of payment of all amounts due, (i) WS will deliver to Buyer all materials procured under this LNTP to which WattStock has received title from GE, and (ii) Buyer and Seller shall then have no further liability to the other under this LNTP.

## 9. Invoicing Methods

Unless mutually agreed otherwise, WattStock shall submit invoices to Customer by e-mail, and if Customer so requests then WattStock shall also provide to Customer a paper invoice by regular mail.



## 10.Submittal and Acceptance

This proposal submitted by:

Name: _Jay C. Manning_

Title: _President_

For: _WattStock LLC_

Date: _July 19, 2019_

This Proposal is accepted by Customer:

Name: _____

Title: _CFO_

For: _Alta Power LLC_



**EXHIBIT A – TERMS AND CONDITIONS OF SALE**

**1. Scope of Supply**

1.1. The Seller shall supply the Equipment and perform the associated Services as more fully described in the Proposal, subject to the terms and conditions as set forth in the Contract. The Equipment and Services are collectively referred to herein as the "Work".

**2. Price**

2.1. The Buyer shall pay to the Seller the Contract Price in consideration of the Work. The Contract Price is exclusive of sales, VAT or other taxes, which will be added at the time of invoicing, unless a tax exemption or resale certificate is provided. The Contract Price shall be adjusted as necessary to take account of (a) Change Orders, including those related to the exercise of any options that may be described in the Proposal, or (b) other adjustments provided for in the Contract.

**3. Payments**

3.1. Payment of the Contract Price shall be made via wire transfer in accordance with the Payment Schedule and the payment terms set forth in the Proposal..

3.2. Wire transfer instructions shall be provided on each invoice. Payments are due ten [10] days from Buyer's receipt of Seller's invoice. Late payments shall be subject to an interest charge equal to the lesser of (i) five percentage points (5%) in excess of the prime rate as published in the Wall Street Journal, at that time, compounded on a monthly basis or (ii) the maximum rate allowed by applicable law.

3.3. Seller may require that any or all payments by Buyer to Seller will be secured by an on-demand irrevocable standby letter of credit issued or confirmed by a United States or other bank acceptable to Seller on terms acceptable to Seller ("Payment Security"). If required by Seller, the Payment Security shall become operative and delivered to Seller within (30) thirty Days after the Effective Date, but in any event prior to Seller delivery of the Equipment to Buyer. All Payment Security shall provide for partial payments pro rata on partial deliveries and for the payment of any charges for storage, export shipment, price adjustments, cancellation or termination, and all other payments due from Buyer under this Contract against Seller's invoice and certification of the charges and grounds for such payment. Buyer will increase the amount(s) and/or extend the validity period(s) and make appropriate modifications to any Payment Security within ten (10) days of Seller's notification that such is necessary to provide for payments to become due.

**4. Effect of Changes in Contract Price**

4.1. If any adjustment results in an increase to the Contract Price, Buyer shall pay for the increase in accordance with the applicable Change Order and corresponding invoice submitted by Seller. If any adjustment results in a decrease in the Contract Price, payments previously made shall be retained by the Seller and will be applied to subsequent payments as they become due.

4.2. Seller shall not be responsible for back charges or field modifications performed by Buyer unless Seller authorizes such charges in writing prior to the incurrence thereof. Buyer specifically waives any right of set-off relating to such charges. Any claim or set-off for back charges

shall be accompanied by a copy of such written authorization. In no event shall Buyer offset any amounts due under the Contract by amounts that may be due Buyer from Seller or any of its Affiliates under this Contract or any other agreement, judgment or order.

**5. Certain Buyer Obligations**

5.1. In addition to the other Buyer obligations described in the Contract, Buyer shall be responsible for timely obtaining all permits required for owning, installing, operating and maintaining the Equipment, including environmental and use permits, all other licenses (including but not limited to export licenses, import licenses), exemptions, permits (including but not limited to foreign exchange permits and work permits), authorizations, approvals, local building and construction permits, and easements necessary for the construction and operation of the Facility, and shall be responsible for any additional costs, fees or fines arising from any delay or failure to obtain such permits, licenses, exemptions, authorizations or approvals, even though any such permits, licenses, exemptions, authorizations or approvals may be applied for by Seller.

5.2. Seller shall not be liable if any permits, licenses, exemptions, authorizations or approvals are delayed, denied, revoked, restricted or not renewed and Buyer shall not be relieved thereby of its obligations under this Contract, including paying Seller for the Equipment.

**6. Delivery.**

6.1. The Seller shall deliver the Equipment ExWorks (Incoterms 2010) ("Delivery").

**7. Risk of Loss.**

7.1. With respect to each item of Equipment, risk of loss shall pass to the Buyer upon the earliest of (i) Delivery, (ii) shipment to storage as provided hereinbelow, or (iii) passage of title to the Buyer pursuant to Contract.

**8. Shipment to Storage.**

8.1. If any part of the Equipment cannot be shipped to the Buyer when ready due to any cause not attributable to the Seller, the Seller may ship such Equipment to storage, such storage being in accordance with any technical specifications or other instructions provided by the Seller. Buyer shall make all reasonable efforts to inform Seller of the potential for this event to occur. If such Equipment is placed in storage, including storage at the Seller's facility, the following conditions shall apply: (i) title and risk of loss shall thereupon pass to the Buyer; (ii) any amounts otherwise payable to the Seller upon Delivery or shipment shall be payable upon presentation of the Seller's invoice(s); (iii) all expenses incurred by the Seller, such as for preparation for and placement into storage, handling, inspection, short-term preservation, storage, removal charges and any taxes shall be payable by the Buyer upon submission of the Seller's invoice(s); (iv) if the Contract includes Services, any such Services shall be subsequently changed to the rate prevailing at the time of actual use and Buyer shall pay the net increase; and (v) when conditions permit and upon payment of all amounts due hereunder, the Seller shall resume Delivery of the Equipment. Notwithstanding anything to the contrary contained herein, storage, and shipment to storage, and arranging for insurance once in storage is



8.2. the sole and direct responsibility of the Buyer and the Seller shall not assume any liability associated therewith and Buyer shall indemnify, defend and hold Seller harmless for any damages, costs, expenses and fees, including reasonable attorneys' fees associated therewith. Any Seller invoicing or collection related to shipment is only a service provided to the Buyer and represents no direct or indirect responsibility associated with storage.

9. Observation and Inspection

9.1. Observation at the Site.

9.1.1. The Seller shall be afforded access during normal business hours to observe the Work in progress at the Site. The Seller may visit the Site at any time or times, or may maintain representatives to observe Buyer's or Buyer's contractors work, provided such activity and inspections do not unreasonably interfere with the Work.

9.2. Inspections and Tests at Seller's Facilities.

9.2.1. Upon the Buyer's request, the Buyer's inspector shall be provided reasonable access to the Seller's facilities during normal business hours to obtain information on production progress and make inspections.

9.2.2. Inspections and Tests at Suppliers' Facilities.

9.2.3. Subject to the conditions set forth in the foregoing paragraph, the Seller will make reasonable efforts to obtain for the Buyer's access to Seller's suppliers' facilities for the purposes described in the paragraph above if applicable.

10. Warranty

10.1. Warranty Period.

10.1.1. The Seller shall warrant the Equipment and the associated Services on the terms set forth in this Article for twelve (12) months following the date the Equipment is energized at the Site or eighteen (18) months following the date of Seller's Notice of Delivery/Readiness to Ship, whichever period shall first expire (the "Warranty Period"), unless otherwise stated in the Proposal. Equipment must be transported and stored in accordance with Seller's recommendations.

10.2. Warranty Coverage

10.3. The Seller warrants to the Buyer that during the Warranty Period (i) the Equipment to be delivered hereunder (A) shall meet the technical specifications outlined in the Proposal when operated in accordance with the Seller's or original manufacturer's written guidelines or operation instructions and, in the absence thereof, in accordance with generally accepted operation practices of the electric power producing industry, and (B) shall be free from defects in material, workmanship and title; and (ii) the Services shall be performed in a competent, diligent manner.

10.4. Remedy

10.4.1. If the Equipment delivered or Services performed hereunder do not meet the above warranties during the Warranty Period, the Buyer shall promptly notify the Seller in writing and make the Equipment available for correction. The Seller shall thereafter, as soon as is practicable, correct any warranty defect, at its option and expense, (i) by re-performing the defective Services, (ii) repairing the defective part of the Equipment, or (iii) by making available necessary

replacement parts at Seller's factory. Buyer shall, at Seller's option, return any defective part that is replaced by Seller at Buyer's expense to Seller's designated repair facility within thirty (30) Days from the date of written instruction by Seller. The Seller shall provide technical advisory Services reasonably necessary for any such repair of the Equipment, but the Seller shall not be responsible for (i) removal or replacement of structures or other parts of the facility and (ii) site labor or transportation of parts or components. The Buyer shall be responsible for the installation of any repaired or replacement part and for payment of any customs duties or similar levies, which may be assessed as a result of the shipment of any such replacement parts. If a defect in the Equipment or part thereof cannot be corrected by the Seller's reasonable efforts, the Parties will negotiate an equitable adjustment in price with respect to such Equipment or part thereof, however the adjustment in price shall be limited to the price of the respective equipment

10.5. Warranty on Remedial Work.

10.5.1. Any re-performed service or repaired or replacement part furnished under this warranty shall carry warranties on the same terms as set forth above, except that the applicable warranty period for the repair/replacement part or re-performed Service shall be for the longer of (a) the remainder of the original Warranty Period or (b) three (3) months from the date of such re-performance, repair or replacement. In any event the repair/replacement warranty period and the Seller's responsibilities set forth herein for such repaired or replacement part shall end no later than three (3) months after expiration of the original Warranty Period.

10.6. Exclusions.

10.6.1. The Seller does not warrant the Equipment or any repaired or replacement parts against normal wear and tear, including that due to environment or operation, or erosion, corrosion or material deposits from fluids. The warranties and remedies set forth herein are further conditioned upon (i) the proper storage, installation, operation, and maintenance of the Equipment in conformance with the operation instruction manuals (including revisions thereto) provided by the Seller and/or its subcontractors or suppliers, as applicable (including any required warranty preservation services in the event of long term storage) and (ii) repair or modification pursuant to the Seller's instructions or approval. The Buyer shall keep proper records of operation and maintenance during the Warranty Period and make such records available to Seller for reasonable review and inspection.

11. Exclusive Remedies and Warranties.

11.1. THE PRECEDING PARAGRAPHS SET FORTH THE SOLE AND EXCLUSIVE REMEDIES FOR ALL CLAIMS BASED ON FAILURE OF OR DEFECT IN THE EQUIPMENT AND SERVICES PROVIDED UNDER THE CONTRACT, WHETHER THE FAILURE OR DEFECT ARISES BEFORE OR DURING THE WARRANTY PERIOD AND WHETHER A CLAIM, HOWEVER INSTITUTED, IS BASED ON CONTRACT, INDEMNITY, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND GUARANTEES WHETHER WRITTEN, ORAL, IMPLIED



OR STATUTORY. NO IMPLIED STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY

12. Taxes

12.1. Seller Taxes.

12.1.1. Unless otherwise specified in the Contract, the Seller shall be responsible for, and shall pay directly, all sales and use taxes imposed on Seller or its subcontractors and for which they are required to pay sales and use tax, (b) all personal property taxes imposed on Seller, (c) all franchise and income taxes imposed on Seller or its subcontractors, and (d) all payroll, unemployment, occupational, or employment compensation tax, social security tax, or similar tax, each as imposed on Seller or its subcontractors ("Seller Taxes"). If Buyer deducts or withholds Seller Taxes, the Buyer shall furnish within thirty (30) Days of the Seller's request official receipts from the appropriate governmental authority for each deducted or withheld Seller Taxes.

12.2. Buyer Taxes.

12.2.1. Equipment exported from the United States is presumed to be exempt from Buyer taxes levied with the United States. When requested by Seller, Buyer agrees to furnish without charge evidence of tax or duty exemption acceptable to the taxing or customer authorities. Furthermore, if Buyer arranges for export shipment, Buyer agrees to provide Seller without charge, an export bill of lading. The Buyer shall be responsible for, and shall pay directly when due and payable, (a) any sales or use taxes, duties, or dues directly imposed on Buyer with respect to the Work or Equipment (b) real and personal property taxes on the Site, Facility or any Equipment to which Owner holds title at the relevant time; and (c) income taxes directly imposed on Buyer ("Buyer Taxes"). All payments due and payable by the Buyer to the Seller hereunder shall be made in the full amount of the Contract Price, free and clear of all deductions and withholding, for Buyer Taxes. If the Buyer deducts or withholds Buyer Taxes from Seller payments, the Buyer shall pay additional amounts to the Seller to cause the amounts actually received by the Seller, net of deducted or withheld Buyer Taxes, to equal the full amount of the Contract Price, and shall provide to the Seller within thirty (30) Days of Seller's request, accurate official receipts from the appropriate governmental authority for deducted or withheld Buyer Taxes. If the Seller is required to pay Buyer Taxes, the Buyer shall, promptly upon presentation of the Seller's invoice for such Buyer Taxes, pay to the Seller in the Contract Currency an amount equal to the U.S. dollar of such Buyer Taxes

13. Invoices.

13.1. The Seller shall issue an official value-added, sales (or similar) tax invoice in addition to the Contract Price, in accordance with applicable laws

14. Duty Drawback.

14.1. All rights to drawback of customs duties paid by the Seller to the customs authorities of the country of manufacture of any Equipment belong to and shall remain with Seller. Buyer agrees to cooperate with Seller and to furnish such documents to Seller as may be necessary to obtain drawback.

15. Changes

15.1. Changes Resulting from Force Majeure, Changes in Codes, or Changes in Law.

15.1.1. If any change to the Codes and Standards, Ambient Site Conditions, Site Requirements or any Change in Law has a negative impact in the cost or time to perform the Work or requires a change to the Equipment or Services, the Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted. If the Seller is entitled to a Change Order, the Seller shall submit to the Buyer a draft Change Order.

15.2. Buyer-Initiated Changes.

15.2.1. The Buyer shall have the right to request that the Seller consider changes to the Equipment or the Services, including modifications, alterations or additions. If the Buyer wishes to request such a change, the Buyer shall notify the Seller in writing. Within fifteen (15) Days after receipt of such notice (unless otherwise extended by mutual agreement), the Seller shall advise the Buyer of the feasibility of the requested change, and shall submit to the Buyer a draft Change Order, unless the matter requires further investigation and research in which case Seller will provide an estimate of the time frame in which Seller will be able to submit a detailed response to Buyer.

15.3. Seller-Initiated Changes.

15.3.1. If the Seller wishes to propose a change, or if the Seller is entitled to a Change Order pursuant to the provisions of this Contract, the Seller shall submit to the Buyer a draft Change Order.

15.4. Contents of Draft Change Order

15.4.1. Any draft Change Order shall include: (i) a technical description of the proposed change in such detail as the Buyer may reasonably require, (ii) a lump sum firm price adjustment (increase or decrease) in the Contract Price, if any, caused by the proposed change, (iii) all potential effect(s), if any, on the Scheduled Delivery Date(s), or any other schedule or date for performance by the Seller hereunder caused by the proposed change, and (iv) all potential effect(s), if any, on the Seller's ability to comply with any of its obligations hereunder, including the Seller's warranties and Performance Guarantees caused by the proposed change.

15.5. Process for Concluding Change Order.

15.5.1. The Buyer shall, within two (2) Days from the date of receipt of such information, either approve or disapprove the draft Change Order in writing or request additional time to consider the draft Change Order. If the Buyer approves the Change Order, the Buyer and the Seller shall then sign the Change Order that shall operate as an amendment to this Contract. Any delays resulting from a delay in this procedure are the sole responsibility of the Buyer.

15.6. Agreement Required.

15.6.1. Except for Change Orders to which the Seller is expressly entitled pursuant to this Contract, all changes under this contract shall be subject to mutual agreement, and no Change Order will be effective until signed by both Parties.

16. Excusable Delays



16.1. The Seller shall not have any liability or be considered to be in breach or default of its obligations under this Contract to the extent that performance of such obligations is delayed or prevented, directly or indirectly, due to, but not limited to, the following:

16.1.1. causes beyond its reasonable control;

16.1.2. acts of God;

16.1.3. acts (or failures to act) of governmental authorities;

16.1.4. fires, severe weather conditions, floods earthquakes;

16.1.5. strikes or other labor disturbances;

16.1.6. war (declared or undeclared), terrorism, epidemics, civil unrest, riots;

16.1.7. delays or accidents in transportation or car or transporter shortages; or

16.1.8. delays in the prerequisite work of the Buyer, Buyer's other contractors or suppliers, or other acts (or omissions) of the Buyer, including but not limited to failure to promptly: (A) provide the Seller with information and approvals necessary to permit the Seller to proceed with work immediately and without interruption, or (B) comply with the terms of payment; or shipment to storage in accordance with the Contract.

16.2. The Seller shall notify the Buyer of any such excusable delay. Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted.

17. General Indemnity

17.1. General Indemnity.

17.1.1. Each party (each an "Indemnifying Party") shall be liable to and indemnify the other party, its officers, employees, agents and subcontractors (each an "Indemnified Party") for any physical injuries to third parties or physical damage to third party property, and, at its expense, shall defend against and hold the Indemnified Party harmless from any claims raised by a third party arising in connection with the Contract, to the extent such physical damages are caused by the negligence of the Indemnifying Party or its officers, employees, agents or subcontractors and to the extent the Indemnified Party is liable to the third party under applicable law.

17.2. Concurrent Negligence.

17.2.1. If physical damage or injury is caused by the joint or concurrent negligence of the parties, their officers, employees, agents, or subcontractors, the parties shall bear the loss in proportion to their or their officers', employees', agents' or subcontractors' degree of negligence.

17.3. Notice.

17.3.1. The indemnities provided in this Article shall apply only if the party seeking indemnity gives the Indemnifying Party prompt notice of any claim and provides the Indemnifying Party all necessary information and assistance so that the Indemnifying Party may, at its option, defend or settle the claim.

17.4. "Third Parties" Defined.

17.4.1. "Third parties" under this Article do not include the Parties, the owner of the Site, their affiliates, agents, successors or assigns, any operation or maintenance contractor of the Parties or the owner of

the Site, or any entity (i) with an equity or security interest in any Party or the owner of the Site, or their assets or property, (ii) that seeks to claim any rights, power or privileges of one of the Parties or the owner of the Site, or (iii) that seeks to claim as a third party beneficiary of one of the Parties or the owner of the Site. No portion of the Equipment, the Facility, electricity, fuel or hydrocarbons is "third party property" for the purposes of this Article.

18. Insurance

18.1. Insurance for Injuries to Workers (Worker's Compensation).

18.1.1. During the term of this Contract, both Parties shall maintain the insurance for work-related injuries or disease of their own employees in such forms and amounts as may be required by laws that are applicable to each Party and its employees.

18.2. General Liability and Automobile Insurance

18.2.1. During the term of this Contract, each Party shall maintain the following insurance coverage at its own expense to protect its own interests: (i) Commercial General Liability or Public Liability insurance, in broad form, either per occurrence and effective for at least three years after the expiration of the Contract, that includes coverage for contractual liability, bodily injury and third party property damage, with a combined single limit of not less than U.S. $1,000,000 per occurrence and U.S. $1,000,000 in the aggregate annually, for primary and excess policies combined; and (ii) automobile liability insurance covering all owned, non-owned, and hired automobiles used by it in connection with the Work, if any, with a combined single limit of not less than U.S. $1,000,000 per occurrence, for primary and excess policies combined.

18.2.2. Each of the foregoing insurance policies shall not be cancelled or materially changed without thirty (30) Days' advance written notice to the other Party or, in the case of non-payment, ten (10) Days' advance written notice. Upon request, each Party shall deliver to the other Party certificates of insurance showing that the foregoing insurance is in full force and effect.

18.3. Failure to Maintain Insurance.

18.3.1. If at any time the Buyer fails to maintain insurance complying with the requirements of the Contract in full force and effect, (a) the Buyer shall be responsible for any resulting losses or costs sustained by the Seller and shall hold the Seller harmless from actions brought against the Seller as the result of the absence of the Buyer's required insurance, and (b) the Seller shall not be required but may elect to do any of the following: (i) immediately suspend all or a portion of the Work and entitled to an equitable adjustment in the price, schedule and other terms of this Contract for the impact of the suspension, (ii) pay premiums or purchase alternate insurance at Buyer's expense or (iii) pursue such other remedies as may be allowed by law, equity, or the Contract.

19. Buyer's Risks.

19.1. In no event shall the Seller be responsible for Buyer's Risks. Buyer's Risks include damages and losses due to (i) war, hostilities, terrorism, rebellion, revolution, civil disturbances, nuclear radiation or similar occurrence, (ii) acts or omissions of the Buyer, (iii) natural perils (such as flood or earthquake) or other perils to the extent that peril is



excluded from the ARBR/CAR policy coverage or the loss is in excess of the policy limits.

20. Suspension

20.1. Suspension by Buyer of Work at Site.

20.1.1. The Buyer shall have the right, at any time, to suspend Work at the Site upon written notice to the Seller. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension.

20.2. Suspension by Buyer of Work in Seller's Facilities.

20.2.1. It is expressly agreed that the Buyer shall have no right to suspend Work of Seller on the Equipment before Delivery.

20.3. Suspension by Seller.

20.3.1. The Seller shall have the right to suspend all Work, including the delivery of any Equipment, upon the failure of the Buyer to make any payment when due. The Seller shall further have the right to suspend any shipment of the Equipment if all payments due prior to the applicable Scheduled Delivery Date have not been made. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension, except that Seller's suspension shall not be deemed to extend the Warranty Period hereunder.

21. Termination for Cause

21.1. Grounds for Termination by Buyer.

21.1.1. The Buyer shall have the right to terminate the Contract for cause in the event that the Seller: (i) becomes insolvent, makes an assignment for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; (ii) substantially breaches and fails to comply or perform its material obligations hereunder (but only with respect to a material obligation for which this Contract does not provide exclusive remedies), (iii) notwithstanding satisfaction of all conditions precedent, Seller refuses to execute a loan agreement on terms substantially in accordance with the Loan Agreement Term Sheet attached to this LNTP, provided that: (A) the Buyer shall first have provided the Seller with written notice of the nature of such breach and of the Buyer's intention to terminate this Contract as a result of such breach, and (B) the Seller shall have failed within thirty (30) Days after receipt of such notice (or such extended period as is considered reasonable by the Parties) either (1) to commence to cure such breach and diligently thereafter to pursue such cure, or (2) to provide reasonable evidence that no such breach has occurred; or (iv) Seller's relationship with General Electric Company, or any of its affiliates, is terminated through no fault of the Buyer.

21.2. Remedy in the Event of Termination by Buyer.

21.2.1. If the Buyer terminates the Contract as provided above, the Buyer shall pay the Seller for that portion of the Contract Price allocable to the Equipment title transferred or Services performed prior to the termination. If the payments received by the Seller as of the date of such termination are in excess of such portion of the Contract Price, the Seller shall return the excess of such payments to the Buyer. In addition, the Seller shall pay to Buyer an amount equal to the difference between that portion of the Contract Price allocable to the terminated Work and such actual and reasonable amount paid by the Buyer to another vendor for equipment comparable to those terminated, subject to the limitation of liability set forth in Article 22.

21.3. Grounds for Termination by Seller.

21.3.1. The Seller shall have the right to terminate the Contract for cause in the event that the Buyer: (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; or (ii) substantially breaches and fails to comply or perform its material obligations hereunder, including failure to comply with the requirement of the Contract, or fails to make any payment when due or to fulfill any payment conditions, including any payment security, as set forth in this Contract, provided: (A) that the Seller shall first have provided the Buyer with written notice of the nature of such failure and of the Seller's intention to terminate this Contract as a result of such failure, and (B) that the Buyer shall have failed within thirty (30) Days after receipt of such notice to correct such failure.

21.4. Remedy in the Event of Termination by Seller.

21.4.1. If the Seller terminates the Contract as provided above, the Buyer shall pay to the Seller the charges set forth in the Termination Schedule. In such event, Seller shall retain title to all Equipment not yet delivered to Buyer as of the effective date of termination.

22. Limitation of Liability

22.1. Limitation.

22.1.1. The total liability of the Seller for all claims arising out of or relating to the performance or breach of the Contract or use of any Equipment shall not exceed the portion of the Contract Price allocable to the portion of the Equipment giving rise to the claim. The Seller's liability shall terminate at the end of the Warranty Period for the Equipment giving rise to the claim. The Buyer may enforce a claim that accrued before that date by commencing an action, as applicable under the dispute resolution clause, before the expiration of the applicable statute of limitations or repose, but not later than ninety (90) Days after the expiry of the Warranty Period.

22.2. Consequential Damages.

22.2.1. The Seller shall not be liable for loss of profit or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages.

23. Sale, Transfer, Assignment to Third Party.



23.1. If the Buyer is supplying, transferring or assigning the Work to a third party, the Buyer shall require the third party to agree to be bound by this Article. If the Buyer does not obtain this agreement for the Seller's benefit, or if the agreement is found void or unenforceable, the Buyer shall indemnify, defend and hold the Seller, its Affiliates, subcontractors and suppliers of any tier, and their agents and employees, individually or collectively, harmless from and against any and all liability arising out of claims made by the third party in excess of the limitations and exclusions of this Article.

24. Gratuitous Advice.

24.1. The Seller shall not be liable for any advice or assistance that is not required under this Contract.

25. Limitations to Prevail.

25.1. The limitations and exclusions in the Contract shall apply regardless whether a claim is based in contract (including warranty or indemnity), tort (including negligence or strict liability), statute, equity or any other extra-contractual theory.

26. Limitation of Remedies; Overriding Effect.

26.1. The Buyer's and the Seller's rights, obligations and remedies arising out of or relating to the Work are limited to those rights, obligations and remedies described in the Contract. This Article shall prevail over any conflicting or inconsistent terms in the Contract, unless those terms further restrict the Seller's liability.

27. Export Control

27.1. Export Controls.

27.1.1. The Buyer hereby agrees that it shall not, except as said laws and regulations may expressly permit, make any disposition by way of transshipment, re-export, diversion or otherwise, of U.S. origin goods and technical data (including computer software), or the direct product thereof, supplied by the Seller hereunder. The obligations of the Parties to comply with all applicable export control laws and regulations shall survive any termination, or discharge of any other contract obligations.

27.2. Buyer to Keep Informed.

27.2.1. The Buyer undertakes to keep itself fully informed of, and to comply with, the export control laws and regulations of the respective Government and any amendments thereof.

28. Assignment

28.1. Eligible Assignees.

28.1.1. An Eligible Assignee is: (i) an Affiliate of the Buyer, or (ii) an engineering or construction contractor under contract with the Buyer for the installation of the Equipment, provided that the Eligible Assignee offers Seller satisfactory evidence of its ability (both financial and otherwise) to fulfill the obligations of Buyer hereunder; in either case provided that the Seller would not be penalized or become subject to additional requirements under any Law as a result of entering into contract with such person.

28.2. Buyer's Right to Assign to Eligible Assignees.

28.2.1. The Buyer may once assign its rights and delegate its obligations under the Contract to an Eligible Assignee, provided: (i) that the Buyer shall notify the Seller of its intent to assign no less than ten (10) Days prior to the execution of any such assignment; (ii) that Buyer

shall either (at Seller's option and election) (A) guarantee the obligations of the assignee by executing a guaranty in a form acceptable to Seller or (B) retain its obligations under any payment, indemnity and any bonus provisions of the Contract; (iii) that the first assignee may not further assign or delegate any rights or obligations hereunder except to the original Buyer; and (iv) that the Buyer shall in no event assign to its engineering or construction contractor the right to receive liquidated damages under the Contract.

28.3. Collateral Assignment.

28.3.1. The Buyer may also assign a collateral interest in this Contract to a lender who is not an Eligible Assignee as collateral security for a loan for the acquisition of the Equipment, provided however, that Buyer and Lender agree that any future assignment to the Lender shall occur only as the result of the exercise by Lender of its remedies under the loan agreements relative to a bankruptcy or liquidation of Buyer. Under no circumstances, however, shall a collateral assignment require Seller to deliver Equipment to Buyer or an assignee if Seller has not been fully paid for such Equipment.

28.4. All Other Assignments and Transfers by Buyer.

28.4.1. All other assignments or transfers by Buyer of any or all of its duties or rights under this Contract (by operation of law or otherwise) are subject to Seller's prior written consent. Further, Buyer agrees that, until Buyer receives title to the Equipment as set forth herein, Buyer shall not, directly or indirectly sell, offer to sell or otherwise broker the Equipment.

28.5. Seller's Right to Assign.

28.5.1. The Seller may assign its rights and delegate its obligations under this Contract to any Affiliate or subsidiary company. Seller may assign its rights and obligations to other parties with the prior written consent of Buyer. In the event of such assignment, the Seller's assignee will be responsible for the assigned Work and will invoice directly to and collect payments directly from the Buyer.

28.6. Conditions.

28.6.1. Any assignment shall be subject to all limitations of liability contained in this Contract. The Buyer may not assign this Contract except in accordance with this Article. Any purported assignment not in accordance with this Article shall be void and without effect.

29. Dispute Resolution

29.1. Referral to Senior Management.

29.1.1. Any and all controversies, disputes or differences between the Parties to the Contract, if not amicably settled by the Parties with thirty (30) Days following written notice of dispute, shall be referred to senior management of the Parties for resolution. In the event the dispute has not been resolved within forty-five (45) Days following referral to senior management, or such longer period as the Parties may mutually agree, then either Party may, upon ten (10) Days' notice to the other party, pursue their remedies at law.

30. Venue.

30.1. Any legal action or proceeding with respect to the Contract shall be brought in the United States District Court for the Southern District of Texas or, in a District Court of the State of Texas in Harris County. Each of the Parties hereby accepts and consents to, generally and



unconditionally, the jurisdiction of the aforesaid courts and appellate courts from any appeal thereof. Each of the Parties irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at the address first set forth in the this Contract. Each of the Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Contract brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

31. Governing Law
   31.1. The Contract, including but not limited to, the validity, performance and all matters relating to the interpretation and effect of this Contract and all further documents executed pursuant to it, shall be construed and interpreted in accordance with the laws of the State of Texas, excluding their conflict of law rules, provided that any provision of such law invalidating any provision of this Contract or modifying the intent of the Parties as expressed in the terms of this Contract shall not apply.

32. Effective Date
   32.1. The Contract shall become effective when it is signed by both Parties (the "Effective Date"), however, the Seller shall not be required to commence any Work associated with, connected to, or arising from, directly or indirectly, the Equipment or Services, until the Seller receives the initial payment described in the Proposal, together with any required Payment Security. Further, if the initial payment or required Payment Security is not timely received in accordance with the terms of this Contract (the "Delayed NTP"), in addition to Seller's right to terminate, the Seller shall have the right to adjust the Scheduled Delivery.

33. Entire Agreement
   33.1. The Contract represents the entire agreement between the Parties with respect to the Work, and supersedes in its entirety all prior

agreements concerning the subject matter hereof, and no modification, amendment, revision, waiver, or other change shall be binding on either Party unless consented to in writing by the Party's authorized representative. Any oral or written representation, warranty, course of dealing, or trade usage not contained or referenced herein shall not be binding on either Party. Each Party agrees that it has not relied on, or been induced by, any representations of the other Party not contained in the Contract.

34. Miscellaneous Provisions
   34.1. Third-Party Beneficiaries.
       34.1.1. Except as provided in the Article entitled "Limitation of Liability", these provisions are for the benefit of the Parties hereto and not for any other third party.
   34.2. Survival.
       34.2.1. All provisions or obligations contained in the Contract which by their nature or effect are required or intended to be observed, kept or performed after termination or expiration of this Contract shall survive and remain binding upon and for the benefit of the Parties, including, without limitation, the Articles with the following titles, which shall survive termination of this Contract: Taxes, Warranty, Patents, General Indemnity, Limitation of Liability, Proprietary Information, Dispute Resolution, Governing Law, Software License, Personal Data Protection, Export Control, Contract Documents, Entire Agreement and Miscellaneous Provisions.
   34.3. Non-Waiver.
       34.3.1. Waiver by either Party of any right under the Contract shall not be deemed a waiver by such Party of any other right hereunder.
   34.4. Invalidity.
       34.4.1. The invalidity in whole or in part of any part of the Contract shall not affect the validity of the remainder of this Contract.

35. Counterparts.
This Contract may be signed in any number of counterparts, each of which shall constitute one and the same instrument.



# EXHIBIT "4"

# PURCHASE AND SALE AGREEMENT

## BETWEEN

### EthosEnergy Power Solutions LLC

### And

### WATTSTOCK LLC

-i-

## GAS TURBINE GENERATOR PURCHASE AND SALE AGREEMENT

This GAS TURBINE GENERATOR PURCHASE AND SALE AGREEMENT ("Agreement"), dated as of the 13th day of May, 2019 ("Execution Date"), is made and entered into by and between EthosEnergy Power Solutions, LLC ("Seller") and WattStock LLC, ("Buyer"). Buyer and Seller are referred to herein individually as a "Party" and collectively as the "Parties".

### WITNESSETH:

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Equipment (as defined herein) pursuant to the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1 Certain Definitions. For purposes of this Agreement, the following terms have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power (i) to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise), (ii) to vote fifty percent (50%) or more of the total combined voting power of such Person, or (iii) to direct the voting of sufficient securities to elect at least 50% of the board of directors or similar governing body of such Person.

"Agreement" shall have the meaning provided in the preamble.

"Applicable Law(s)" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets.

"Bill of Sale" means that bill of sale to be executed by Seller and delivered to Buyer in accordance with the terms herein, substantially in the form attached hereto as Exhibit B.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Houston, Texas are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Buyer" shall have the meaning provided in the preamble.

"Claim" means any demand, obligation, liability, action, claim (including, but not limited to, any claim for damage to property or injury to or death of any persons), cause of action

chose in action, right of recovery or right of set-off of whatever kind, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority of any nature whether civil, criminal, regulatory or otherwise and whether at law or in equity.

"Delivery Date" means the date(s) that Seller gives notice that the Equipment (as described in Exhibit A) is available Ex Works at the Delivery Point.

"Delivery Point" shall have the meaning provided in Section 4.3.

"Environmental Law(s)" means all Applicable Laws in effect on the date hereof, relating to the protection of human health and safety, the environment, or natural resources, including but not limited to any Laws relating to Releases of regulated substances or Hazardous Materials.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the ownership or operation of the Equipment including, without limitation, Liabilities related to:

     (a)     the transportation, storage, use or disposal of Hazardous Materials, waste or other regulated substances;

     (b)     the Release of Hazardous Materials, waste or other regulated substances;

     (c)     any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments;

     (d)     any other obligations imposed under Environmental Laws with respect to the Equipment; and

     (e)     all obligations with respect to personal injury, property damages, wrongful death and other damages and losses arising under Applicable Law as a result of any of the matters identified in subparagraphs (a) – (d) of this paragraph.

"Equipment" means those items listed on Exhibit A attached hereto.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of a governmental entity or any political subdivision thereof, and any tribunal, court or arbitrator(s) of competent jurisdiction.

"Hazardous Materials" means all substances defined or regulated as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or regulated under Environmental Laws.

"Law" means any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, order, injunction, writ, decree or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, damages, expenses, awards, judgments, settlement payments, fines, penalties, costs, royalties, proceedings, deficiencies or

obligations (including, without limitation, those arising out of any Claim, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, accrued, contingent or otherwise and whether due or to become due, and whether or not resulting from Third Party Claims, and any reasonable out-of-pocket costs and expenses (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any Claim or in investigating any of the same or in asserting any rights hereunder), but not including damages based on any theory of liability for any special, indirect, incidental, consequential (including lost profits), exemplary, or punitive damages.

"Lien" means any lien, mortgage, pledge, security interest, lease, charge, option, conditional and installment sales agreements, right of first refusal, any transfer restriction under any shareholder or similar agreement or any encumbrance of any kind.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Party" or "Parties" shall have the meaning provided in the preamble.

"Permitted Liens" means Liens securing payment to materialmen, warehouse, storage, mechanics, repairmen, employees, contractors, operators, royalty owners and taxing authorities or the Landlord and other similar Liens or charges relating to any of the Equipment to the extent any of the foregoing arise as a result of any inspection, work, survey or services performed at the request of Buyer, or any of its Affiliates, contractors or agents.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Personal Property Taxes" means any ad valorem Taxes or personal property Taxes due or payable as a result of the ownership of the Equipment.

"Purchase Price" means TWO HUNDRED THOUSAND AND NO/100 US DOLLARS (USD$200,000.00) for the Equipment.

"Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit or disposal of Hazardous Materials, waste or other regulated substances into the environment.

"Seller" shall have the meaning provided in the preamble.

"Seller's knowledge" or "to the knowledge of Seller" means the actual knowledge of the current employees of Seller or its Affiliates directly and actively engaged in the operation, maintenance or storage of the Equipment.

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Internal Revenue Code § 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed

**Exhibit 4 - Page 5**

by or on behalf of any Governmental Authority, in each case whether such Tax arises by law, contract or otherwise.

"Third Party Claim" means a Claim by a Person (including a Governmental Authority) other than Buyer, Seller or their respective Affiliates, successors, assigns, officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys.

"Transaction Documents" means this Agreement and the Bill of Sale.

## ARTICLE II
## PURCHASE AND SALE OF EQUIPMENT

2.1  Purchase and Sale of Equipment.  Subject to the terms and conditions contained herein, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase, accept and receive from Seller, all of Seller's right, title and interest in and to the Equipment.

2.2  Purchase Price.  In consideration of payment by Buyer to the Seller of the Purchase Price, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Equipment in accordance with the terms of this Agreement.

2.3  Payments to be Delivered by Buyer.  Buyer shall deliver to Seller Purchase Price in accordance with Article III.

2.4  Documents to Be Delivered by Seller.  Following Seller's receipt of the Purchase Price in cleared and immediately available funds, Seller shall deliver to Buyer the Bill of Sale.

## ARTICLE III
## PAYMENTS

Upon the terms and subject to the conditions contained in this Agreement, in consideration of the sale, assignment, transfer and delivery of the Equipment, Buyer shall cause to be paid to Seller the nonrefundable Purchase Price as follows:

3.1  Payment

Within three (3) Business Days of the execution of this Agreement but in no event later than May 31, 2019, Buyer shall cause to be paid to the Seller via wire transfer payment in the amount of TWO HUNDRED THOUSAND AND NO/100 US DOLLARS (USD $200,000.00), such that the funds shall have cleared and be immediately available to Seller on May 31, 2019.

3.2  Account Information.  Buyer shall make all payments due Seller under the Agreement into the following account:

> Wells Fargo
> Account # 4124322306
> ABA: 121000248
> SWIFT: WFBIUS6S
> 1000 Louisiana St
> Houston TX 77002

## ARTICLE IV
## TITLE, RISK OF LOSS, EQUIPMENT WARRANTY AND DELIVERY

4.1 _Title; Risk of Loss; Storage._ Title to the Equipment identified in Exhibit A shall pass to the Buyer on receipt of the Purchase Price as set forth in Article III, Section 3.1. Upon such transfer of title, risk of loss of the Equipment and the obligation to insure and store the Equipment (including the cost to insure the Equipment for the amount of the full Purchase Price and to pay all storage costs) shall transfer to Buyer. If the Equipment is not picked up within thirty (30) days of Buyer's receipt of written notice that the Equipment is available at the Delivery Point, the cost of storing the Equipment for such period and until such time as the Equipment is picked up shall be invoiced to the Buyer.

4.2 _Equipment Warranty._ Buyer acknowledges that the Equipment is previously-owned, and Buyer is purchasing the Equipment without warranty in "as-is, where-is" condition, as defined in Seller's Proposal No 19-008042rev1 dated May 13th, 2019.

4.3 _Delivery of Equipment._ Seller agrees to deliver the Equipment identified in Exhibit A ex works to Buyer at Seller's storage facility located at 15730 Beaumont Highway, Houston , Texas 77049 (the "Delivery Point").

4.4 _Schedule for Equipment Delivery._ The Delivery Date shall occur no later than one (1) day after Seller's receipt of the Purchase Price as set forth in Article III, Section 3.1.

## ARTICLE V
## INDEMNIFICATION

5.1 _Indemnification by Buyer._ Buyer agrees to defend, indemnify and hold harmless Seller, its Affiliates, successors, assigns, and its and their respective officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys from all Claims and Liabilities for any damage or destruction to the Equipment or any Third Party Claim imposed upon, incurred by, or asserted against Seller for bodily injuries, death and/or property loss or damage, in each such case of damage, destruction or Third Party Claim to the extent caused by, or attributable to, Buyer and/or Buyer's agents', representatives' or contractors' actions, omissions or negligence, arising out of, relating to, resulting from or in connection with (i) any site change study, equipment survey or any other inspection or testing of the Equipment conducted by Buyer and/or Buyer's agents, representatives or contractors, including any survey, inspection or test conducted by, on behalf of or for the benefit of Buyer or any of its Affiliates; (ii) any broker, sales agent, financial advisor or other third party claiming any fee, commission or like payment by, through, on account of or on behalf of Buyer or any of its Affiliates, resulting from the sale of the Equipment, (iii) any material misrepresentation or breach of any material warranty or representation given by Buyer in this Agreement or any Transaction Document to which Buyer is a party or material breach of any material covenant or agreement made by Buyer in this Agreement or any Transaction Document to which Buyer is a party, including, without limitation, those obligations in respect of Taxes set forth in Article IX hereof and (iv) from and after the transfer of title, arising out of, relating to, resulting from or in connection with (1) any Third Party Claim

based upon events occurring after the transfer of title and relating to the Equipment, or (2) the storage, transportation or use of any of the Equipment after the transfer of title.

5.2 Indemnification by Seller. Seller agrees to defend, indemnify and hold harmless Buyer, its Affiliates, successors, assigns, and its and their respective officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys from all Claims and Liabilities for any damage or destruction to the Equipment or any Third Party Claim imposed upon, incurred by, or asserted against Buyer for bodily injuries, death and/or property loss or damage, in each such case of damage, destruction or Third Party Claim to the extent caused by, or attributable to, Seller and/or Seller's agents', representatives' or contractors' actions, omissions or negligence, arising out of, relating to, or resulting from or in connection with (i) any material misrepresentation or breach of any material warranty or representation given by Seller in this Agreement or any Transaction Document to which Seller is a party or material breach of any material covenant or agreement made by Seller in this Agreement or any Transaction Document to which Seller is a party; and (ii) prior to the transfer of title e, arising out of, relating to, resulting from or in connection with any Third Party Claim based upon events occurring prior to the transfer of title and relating to the Equipment.

5.3 Environmental Indemnity.

(a) From and after the transfer of title, Buyer shall indemnify, defend and hold harmless Seller and its Affiliates, and their respective agents, directors, shareholders, partners, employees, officers, consultants, representatives, attorneys, successors and assigns, from and against any and all Environmental Liabilities and Obligations and Claims for the same, in each case arising from, resulting from, incident to, or otherwise relating to or concerning the Equipment that arise from events that occur after the transfer of title.

(b) From and after the transfer of title, Seller shall indemnify, defend and hold harmless Buyer and its Affiliates, and their respective agents, directors, shareholders, partners, employees, officers, consultants, representatives, attorneys, successors and assigns, from and against any and all Environmental Liabilities and Obligations and Claims for the same, in each case arising from, resulting from, incident to, or otherwise relating to or concerning the Equipment that arise from events that occur prior to the transfer of title.

5.4 LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT ALLOWED BY LAW, SELLER'S TOTAL LIABILITY TO BUYER ON ALL CLAIMS OF ANY KIND, WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, INDEMNITY, OR OTHERWISE, ARISING OUT OF THE PERFORMANCE OR BREACH OF THE AGREEMENT SHALL NOT EXCEED AN AMOUNT EQUAL TO THE PURCHASE PRICE PAID TO DATE ON ALL CLAIMS OF ANY KIND, WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, INDEMNITY, OR OTHERWISE, ARISING OUT OF THE PERFORMANCE OR BREACH OF THE AGREEMENT. EACH PARTY'S LIABILITY HEREUNDER IS LIMITED AT ALL TIMES BY THE PROVISIONS OF SECTION 10.3.

5.5 Indemnification Notice. If any Party (or its Affiliates, successors or assigns or its or their respective officers, directors, agents, shareholders, partners, employees,

consultants, representatives and attorneys) (each. an "Indemnified Party") entitled to or seeking indemnification hereunder (a) determines that any event. occurrence. fact, condition or claim has given or could reasonably be expected to give rise to Liabilities which such Indemnified Party is or may be entitled to, or may seek, indemnification under this Agreement. or (b) otherwise identifies an event, occurrence. fact. condition or Claim giving rise (or which may give rise) to a right of indemnification hereunder in favor of such Indemnified Party (any of the foregoing. an "Indemnity Claim"), such Indemnified Party shall promptly notify the Party obligated to provide indemnification or from whom indemnification is being or will be sought (the "Indemnifying Party") in writing of such Indemnity Claim (a "Claim Notice") describing in reasonable detail the facts giving rise to the claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such Liability; provided. however, the failure of any Indemnified Party to give timely notice thereof shall not affect any of its rights to indemnification hereunder nor relieve the Indemnifying Party from any of its indemnification obligations hereunder, except to the extent the Indemnifying Party is materially prejudiced by such failure.

     5.6  <u>Indemnification Procedure</u>.  Any obligation to provide indemnification hereunder with respect to any Third Party Claim shall be subject to the following terms and conditions:

     (a)  Upon receipt of a Claim Notice in respect of any such Third Party Claim. the Indemnifying Party shall. at its cost and expense and upon notice to the Indemnified Party within thirty (30) days of its receipt of such Claim Notice. assume and control the defense. compromise. settlement and investigation of such Indemnity Claim. including the management of any proceeding relating thereto. and shall employ and engage counsel reasonably acceptable to the Indemnified Party; provided. however, that if there exists a material conflict of interest (other than one of a monetary nature) or if the Indemnified Party has been advised by counsel that there may be one or more legal or equitable defenses available to it that are different from or additional to those available to the Indemnifying Party, which. in either case, would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party. then the Indemnified Party shall be entitled to retain its own counsel at the cost and expense of the Indemnifying Party (except that the Indemnifying Party shall not be obligated to pay the fees and expenses of more than one separate counsel for all Indemnified Parties. taken together).

     (b)  The Indemnified Party may. at its own cost and expense, participate in the defense of such Indemnity Claim and agrees to cooperate with the Indemnifying Party in such efforts and make available to the Indemnifying Party all witnesses. records. materials and information in the Indemnified Party's possession. under its control or to which it may have access as may be reasonably required by the Indemnifying Party.  The Indemnifying Party will keep the Indemnified Party reasonably informed of the progress of the defense of any such Indemnity Claim.  If the Indemnifying Party fails to so assume the defense and investigation of any such Indemnity Claim as provided in this Section 5.6. (i) the Indemnified Party shall have the right to undertake the defense. compromise. settlement and investigation of such Indemnity Claim on behalf of. and at the cost and expense of and for the account and risk of the Indemnifying Party, (ii) the Indemnifying Party agrees to cooperate with the Indemnified Party in such efforts. and (iii) the Indemnified Party will keep the Indemnifying Party reasonably informed of the progress of the defense of any such Indemnity Claim.

(c)     If a Third Party Claim is made by any Governmental Authority, the Indemnifying Party agrees to consult with the Indemnified Party prior to communicating with such Governmental Authority (but, for avoidance of doubt, the Indemnifying Party shall be under no obligation to take account of the views of the Indemnified Party).

5.7 Settlement of Indemnity Claims.     The Indemnifying Party shall not, without the written consent of the Indemnified Party, (a) settle or compromise any Indemnity Claim or consent to the entry of any final judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff, as applicable, of a written release or releases from all liability in respect of such Indemnity Claim of all Indemnified Parties affected by such Indemnity Claim, or (b) settle or compromise any Indemnity Claim if the settlement or compromise imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder.   No Indemnity Claim that is being defended in good faith by the Indemnifying Party shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party.

5.8 Exclusive Remedy.   THE PARTIES ACKNOWLEDGE AND AGREE THAT THE REMEDIES SET FORTH IN THIS ARTICLE V, TOGETHER WITH AND SUBJECT TO THE LIMITATIONS ON LIABILITY, SURVIVAL PERIODS, DISCLAIMERS AND LIMITATIONS ON REMEDIES SET FORTH ANYWHERE IN THIS AGREEMENT ARE INTENDED TO BE, AND SHALL BE, THE EXCLUSIVE REMEDIES WITH RESPECT TO ANY ASPECT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR THE BILL OF SALE. EACH PARTY HEREBY RELEASES, WAIVES AND DISCHARGES, AND COVENANTS NOT TO SUE WITH RESPECT TO, ANY CLAIM WITH RESPECT TO ANY ASPECT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE BILL OF SALE NOT EXPRESSLY PROVIDED FOR IN THIS AGREEMENT OR THE BILL OF SALE, IN EACH CASE TO THE MAXIMUM EXTENT PERMITTED BY LAW.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that:

6.1 Organization and Good Standing.   Seller is a limited liability company duly organized and validly existing under the laws of the jurisdiction in which it was formed and Seller has the requisite power and authority to own, lease and operate its material assets and properties and to carry on its business as now conducted.   Seller is duly qualified to transact business and is in good standing in each jurisdiction in which its business as now conducted or its ownership of the Equipment makes such qualification necessary.

6.2 Authorization of Agreement.   Seller has the requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party.   The execution and delivery of this Agreement and the other Transaction Documents to which Seller is a party by Seller and the consummation by Seller of the transactions contemplated by this Agreement and such other Transaction Documents have been duly and validly authorized by all necessary action on the part of Seller.   This Agreement has

been, and the other Transaction Documents to which Seller is a party will be, duly executed and delivered by Seller and, assuming due execution and delivery by Buyer, constitute (or in the case of the other Transaction Documents will constitute upon the execution and delivery thereof) valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting or relating to the enforcement of creditors' rights and by general equitable principles regardless of whether enforcement is sought in equity or at law.

6.3    No Violation; Consents.

(a)    The execution and delivery by Seller of this Agreement and the other Transaction Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational or constituent documents of Seller, (ii) violate any Order of any Governmental Authority to which Seller is bound or subject, (iii) violate any Applicable Law, or (iv) breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any note, bond, mortgage, indenture, material agreement or other instrument by which Seller is bound or by which its assets are subject, other than, in the case of clauses (ii), (iii) and (iv), any conflict, violation, breach, default, requirement for consents, rights of acceleration, cancellation, or termination that would not materially and adversely affect the ability of Seller to perform its obligations under this Agreement or would not result in any Lien (other than Permitted Liens) on the Equipment.

(b)    No Order or permit issued by, or declaration or filing with, or notification to, or waiver or consent from any Governmental Authority is required on the part of Seller in connection with the execution and delivery of this Agreement or any Transaction Documents to which Seller is a party, the consummation of the transactions contemplated hereby or thereby, or the compliance with or performance by Seller of any provision contained in this Agreement or any of the Transaction Documents to which Seller is party, other than any such Order, permit, declaration, filing, notification, waiver or consent the failure of which to obtain would not materially and adversely affect the ability of Seller to perform its obligations under this Agreement or any of the Transaction Documents to which it is party.

6.4    Litigation.    There is no action, proceeding or Order pending or, to Seller's knowledge, threatened against Seller or any of its Affiliates that seeks to restrain or prohibit the consummation, legality or validity of the transactions contemplated hereby.

6.5    Title to the Equipment.    As set forth in Section 4.1, Seller shall deliver to Buyer good and marketable title to the Equipment free and clear of any Liens, excluding Permitted Liens.

6.6    Preferential Rights.    No rights of first offer or refusal or other preferential rights to purchase any of the Equipment are held by any Person.

6.7    Financial Advisors.    Neither Seller nor any of its Affiliates has entered into a contract with any broker, finder or financial advisor that would obligate Buyer to pay any

fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

7.1 <u>Organization and Good Standing</u>. Buyer is a Limited Liability Company duly organized and validly existing under the laws of the jurisdiction in which it was formed and Buyer has the requisite power and authority to own, lease and operate its material assets and properties and to carry on its business as now conducted. Buyer is duly qualified to transact business and is in good standing in each jurisdiction in which its business as now conducted makes such qualification necessary.

7.2 <u>Authorization of Agreement</u>. Buyer has the requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party. The execution and delivery of this Agreement and the other Transaction Documents to which it is a party by Buyer and the consummation by Buyer of the transactions contemplated by this Agreement and such other Transaction Documents have been duly and validly authorized by all necessary action on the part of Buyer. This Agreement has been, and the other Transaction Documents to which it is a party will be, duly executed and delivered by Buyer and, assuming due execution and delivery by Seller, constitute (or in the case of the other Transaction Documents will constitute upon the execution and delivery thereof) valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting or relating to the enforcement of creditors' rights and by general equitable principles regardless of whether enforcement is sought in equity or at law.

7.3 <u>No Violation; Consents</u>.

(a) The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational or constituent documents of Buyer, (ii) violate any Order of any Governmental Authority to which Buyer is bound or subject, (iii) violate any Applicable Law, or (iv) breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any note, bond, mortgage, indenture, material agreement or other instrument by which Buyer is bound or by which its assets are subject, other than, in the case of clauses (ii), (iii) and (iv), any conflict, violation, breach, default, requirement for consents, rights of acceleration, cancellation or termination that would not materially and adversely affect the ability of Buyer to perform its obligations under this Agreement.

(b) To the knowledge of Buyer, no Order or permit issued by, or declaration or

filing with. or notification to. or waiver or consent from. any Governmental Authority is required on the part of Buyer in connection with the execution and delivery of this Agreement or any of the Transaction Documents to which Buyer is a party. the consummation of the transactions contemplated hereby or thereby. or the compliance or performance by Buyer with any of the provisions contained in this Agreement or any of the Transaction Documents to which Buyer is a party. other than any such Order. permit. declaration. filing. notification. waiver or consent the failure of which to obtain would not materially and adversely affect the ability of Buyer to perform its obligations under this Agreement or any of the Transaction Documents to which it is party.

7.4 <u>Litigation</u>. There is no action, proceeding or Order pending or. to the knowledge of Buyer. threatened against Buyer or any of its Affiliates that seeks to restrain or prohibit the consummation. legality or validity of the transactions contemplated hereby.

7.5 <u>Financial Capability</u>. Buyer has sufficient cash and cash equivalents and/or credit facilities or letters of credit (and has provided Seller with evidence thereof) to purchase the Equipment and to consummate the transactions contemplated by this Agreement. including, without limitation, payments of fees and expenses contemplated hereunder. Buyer is not aware of any facts or circumstances that would cause Buyer to be unable to pay the Purchase Price in accordance with the terms of this Agreement.

7.6 <u>Financial Advisors</u>. Neither Buyer nor any of its Affiliates has entered into a contract with any broker, finder or financial advisor that would obligate Seller pay any fee or commission or like payment to any broker. finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement.

7.7 <u>Export Certifications</u>. Buyer certifies that Buyer will not export. resell. or otherwise dispose of the Equipment in violation of any law. regulation. administrative ruling or other order issued by any branch or agency of the United States government, including the resale or export by Buyer (A) into any country not then approved for export by the United States government. or (B) to any person or entity to whom sales by US citizens are barred by the United States government at the time of any such resale or export.

7.8 <u>Ethics. Corrupt Practices. Anti-terror Crime & Security. and Bribery. Buyer agrees to comply with the EthosEnergy Business Ethics Policy and the substantive provisions of the US Foreign Corrupt Practices Act 1977 (the "FCPA") and the UK's Anti-terror Crime & Security Act 2001 ("ATCSA") and Bribery Act 2010 ("Bribery Act"). whether or not it is subject to the FCPA. ATCSA or Bribery Act. Buyer will not take any action that might cause Seller to be in violation of the FCPA. ATCSA or Bribery Act or other applicable anti-bribery legislation. Buyer covenants and agrees. on behalf of the Buyer, that all Affiliated Persons of the Buyer that provide services under or relating to the Agreement (a) will be advised of the Business Ethics Policy and the compliance policies of the Seller set forth therein; (b) will comply with the substantive provisions of the FCPA. ATCSA and Bribery Act; and (c) will take no action that might cause the Seller to be in violation of the FCPA. ATCSA or Bribery Act or other applicable anti-bribery legislation.</u>

7.9 <u>Installation of Equipment</u>. Buyer shall install the Equipment in full compliance with the prudent industry practices and in addition Buyer certifies that all fuel, water, consumables, etc. shall conform to OEM specifications.

## ARTICLE VIII
## OTHER COVENANTS

8.1 <u>Public Announcements</u>. None of Seller, Buyer nor any of their respective Affiliates, nor any of their agents or representatives, shall issue any press release or public statement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written consent of the other Party; provided that either Party may make such disclosure as it may determine in good faith, after consultation with counsel, is required by any Applicable Law, Order or obligations pursuant to any listing agreement with, or any rules or regulations of, any national securities exchange so long as the Party intending to make such disclosure gives the other Party prior notice of such disclosure and uses its commercially reasonable efforts, consistent with such Applicable Law, Order or obligation, to consult with the other Party with respect to the text thereof.

8.2 <u>Further Assurances</u>. Each of the Parties will execute and deliver such additional instruments and other documents and will take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the other Transaction Documents.

## ARTICLE IX
## TAXES

9.1 <u>Personal Property Taxes</u>. All Personal Property Taxes relating to the Equipment for the taxable year in which the sale occurs shall be apportioned as of the transfer of title between Seller and Buyer. Seller shall be liable for the portion of such Personal Property Taxes based upon the number of days in the taxable year occurring prior to the transfer of title, and Buyer shall be liable for the portion of such Personal Property Taxes based upon the number of days in the year occurring on and after the respective transfer of title. For any taxable year in which an apportionment is required, Buyer shall file all required reports and returns incident to these Taxes assessed for the taxable year in which the transfer of title occurs that are not filed by Seller as of the date title transfers. If Seller has paid any portion of Personal Property Taxes apportioned to Buyer under this Section 9.1, Buyer shall pay to Seller, promptly upon notice from Seller, to which shall be annexed copies of the relevant tax filing and demand of the portion of such Taxes apportioned to Buyer, Buyer's share of such Taxes.

9.2 <u>Sales and Other Transfer Taxes and Duties</u>. The Purchase Price does not include any sales, use, excise, gain or other transfer Taxes imposed in connection with the sale of the Equipment. Buyer shall pay any such Taxes, as well as any applicable conveyance, transfer and recording fee, and real estate transfer stamps, documentation or other Taxes imposed on the transfer of the Equipment pursuant to the Agreement. If Buyer is of the opinion that it is exempt from the payment of any such Tax, Buyer shall furnish to Seller the appropriate Tax exemption certificate. The Purchase Price does not include any duties or tariffs imposed in connection with the export or import of the Equipment after the transfer of title. If Seller believes in good faith that it may be liable for remittance of any Tax in connection with Buyer's purchase of the Equipment

and subsequent handling, work, export, or other action or inaction. Buyer will pay the amount of such Tax to the Seller at title transfer in addition to the Purchase Price. If Buyer can subsequently demonstrate to the Seller that such Tax was not due by providing all necessary documentation, certifications, and other evidence required for Seller to properly demonstrate such inapplicability to the relevant governmental authorities, Seller shall refund the amount of such Tax to the Seller upon receipt of such documentation. Such documentation shall be sufficient in the sole opinion of the Seller.

<div align="center">

**ARTICLE X**
**LIMITATIONS**

</div>

10.1 <u>Buyer's Review</u>.

(a) <u>No Reliance</u>. Buyer has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement, and to consummate the transactions contemplated hereby. In connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, Buyer has not relied upon, and Buyer expressly waives and releases Seller from any liability for any claims (including claims based upon fraudulent inducement) relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of any type provided by Seller or its Affiliates or any of their representatives, except for those representations and warranties expressly set forth in Article VI, subject at all times to the limitations set forth in this Article X. In deciding to enter into this Agreement, and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own knowledge, investigation, judgment and analysis (and that of its attorneys, accountants, consultants and representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Seller or its Affiliates or any of their representatives, other than the express representations and warranties of Seller set forth in Article VI, subject at all times to the limitations set forth in this Article X.

(b) <u>Limited Duties</u>. Any and all duties and obligations that any Party may have to the other Party with respect to or in connection with the Equipment, this Agreement, the Transaction Documents or the transactions contemplated hereby or thereby are limited to those specifically set forth in this Agreement and the Transaction Documents. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement or the Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever. Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement or any Transaction Document, whether or not existing and whether foreseeable or unforeseeable. Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of any other Party under this Agreement or any Transaction Document on the basis of any implied obligation or otherwise.

10.2 <u>LIMITATION OF REPRESENTATIONS AND WARRANTIES</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE VI, SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT OR SELLER OR THE BUSINESS, ASSETS OR LIABILITIES OF SELLER AND IT IS

<div align="center">

***Page 62***         **Exhibit 4 - Page 15**

</div>

UNDERSTOOD THAT BUYER TAKES THE EQUIPMENT "AS IS" AND "WHERE IS" SPECIFICALLY, SELLER MAKES NO REPRESENTATION AS TO THE CONDITION. VALUE OR QUALITY OF THE EQUIPMENT OR THE PROSPECTS (FINANCIAL OR OTHERWISE). RISKS AND OTHER INCIDENTS OF THE EQUIPMENT, AND SELLER DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE EQUIPMENT, OR ANY PORTION THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN. WHETHER LATENT OR PATENT.    BUYER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT. SELLER HAS NOT MADE, AND SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND BUYER HEREBY EXPRESSLY WAIVES. ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW. BY STATUTE OR OTHERWISE RELATING TO. AND BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLER AND ITS AFFILIATES AND EACH OF ITS REPRESENTATIVES IN CONNECTION WITH. THE ACCURACY. COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS OR COMMUNICATIONS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER OR ITS REPRESENTATIVES BY OR ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES OR ANY OF ITS REPRESENTATIVES IN CONNECTION THEREWITH.

10.3  NO CONSEQUENTIAL OR PUNITIVE DAMAGES.   NO PARTY (OR ITS AFFILIATES OR ANY OTHER PERSON) SHALL. UNDER ANY CIRCUMSTANCE. BE LIABLE TO ANY OTHER PARTY (OR ITS AFFILIATES OR ANY OTHER PERSON) FOR ANY CONSEQUENTIAL, EXEMPLARY. SPECIAL. INDIRECT. INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT. OR ANY ASSIGNMENT, BILL OF SALE, AGREEMENT. INSTRUMENT OR CERTIFICATE DELIVERED HEREUNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO. LOSS OF REVENUE OR INCOME. COST OF CAPITAL. OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

10.4  No Recourse.   No past, present or future director, officer, employee, member, shareholder, incorporator, partner and/or Affiliate of Seller or any Affiliate thereof shall have any liability for any obligations of Seller under this Agreement or for any claim based on, in respect of or by reason of such obligations or their creation.

<div align="center">

**ARTICLE XI**
**[INTENTIONALLY NOT USED]**

**ARTICLE XII**
**[INTENTIONALLY NOT USED]**

</div>

**ARTICLE XIII**
**TERMINATION**

13.1 <u>Termination</u>. This Agreement may be terminated and the Transaction abandoned at any time prior to the Payment as follows:

(a) by written agreement of Buyer and Seller;

(b) by Buyer if there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 days after written notice thereof shall have been received by Seller;

(c) by Seller:

(i) if the Purchase Price has not been delivered strictly in conformance with the payment terms herein;

(ii) if there shall have been a material breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 days after written notice thereof shall have been received by Buyer; provided, however, Buyer's right to cure any default related to payments shall be limited to three (3) days.

13.2 <u>Effect of Termination; Default</u>. If this Agreement is terminated under Section 13.1, written notice thereof shall forthwith be given to the other Party and this Agreement will thereafter become void and have no further force and effect and all further obligations of Seller and Buyer to each other under this Agreement will terminate without further obligation or Liability of Seller or Buyer to the other Party (other than with respect to breaches, if any, of this Agreement occurring prior to such termination), except that:

(a) If this Agreement is terminated by Seller pursuant to Section 13.1(c)(i), this Agreement shall terminate immediately with no further obligation of either Party.

(b) If this Agreement is terminated by Seller pursuant to Section 13.1(c)(ii), Seller shall be entitled to retain any payments in respect of the Purchase Price paid prior to termination as set forth herein, (i) Buyer and Seller shall be released from any further obligations or liability arising in connection with this Agreement and (ii) Seller shall be entitled to retain title to all Equipment.

(c) Notwithstanding the foregoing, Section 5.4, Section 8.2 (Public Announcements), Article X (Limitations), Section 14.4 (Dispute Resolution), Section 14.8 (Governing Law), Section 14.10 (Notices) shall survive any such termination of this Agreement.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Nonsurvival of Representations, Warranties and Covenants.    Subject to Section 13.2(c), all representations and warranties of the Parties made herein or in any other agreement delivered pursuant to this Agreement shall not survive beyond one (1) year from the transfer of title on the Equipment in Exhibit A and there shall be no liability in respect thereof after such date; provided, that the representations and warranties of Seller in Sections 6.5 and 6.6 shall survive perpetually.

14.2    Expenses.    Except as otherwise set forth in this Agreement, each of Seller and Buyer shall bear its own expenses (including, without limitation, attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

14.3    Incorporation of Exhibits.    The exhibits and Seller's proposal identified in this Agreement are incorporated herein by reference and made a part hereof.

14.4    Dispute Resolution.

In the event of a dispute between the Parties arising under or relating to this Agreement, prior to seeking relief from any court of competent jurisdiction, such dispute shall be referred to a representative of senior management of each of the Parties for resolution for a period of no less than thirty (30) days.   Pending resolution of any claim or dispute, the Parties shall continue to perform their obligations under this Agreement.

Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of any Texas state court or federal court of the United States of America sitting in Houston, Texas, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the Parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such Texas state court or, to the extent permitted by law, in such federal court.   Each of the Parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Each Party hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any right to a trial by jury, and (ii) any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the Agreement in any Texas state or federal court.   Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right to which it may be entitled, on account of place of residence or domicile.

14.5    No Right of Set-Off.    Buyer, for itself and for its Affiliates, successors and assigns hereby unconditionally and, irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer or any of its Affiliates, successors and assigns has or may

have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

14.6     Entire Agreement; Amendments and Waivers.   This Agreement (including the schedules and exhibits attached hereto) and the Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede any other agreements, written or oral, among Seller and Buyer concerning such subject matter.   This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.   No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.   The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.   No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.7     Governing Law.   THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

14.8     Headings.   The section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

14.9     Notices.   All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or telecopy numbers (or to such other address or telecopy number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller:     EthosEnergy Power Solutions, LLC
                  2800 North Loop West, Ste. 1200

Houston. TX 77092
Telephone: 713-812-2300
Facsimile: 713-688-0739
Attention: Mike Fisher
Title: President. Asset Trading

If to Buyer:
WattStock LLC
16415 Jacintoport Blvd.
Houston. TX 77015
C: 713.248.4148
Attention: Jay C. Manning
Title:

Or to such other individual or address as a Party hereto may designate for itself by notice given as herein provided.

14.10    Severability.    If any provision of this Agreement is held or determined to be invalid or unenforceable, the balance of this Agreement shall remain in effect.    In such event. the parties shall negotiate in good faith replacement provisions that will be valid and enforceable and that provide the same or substantially similar economic effect as provided by the invalid or unenforceable provisions.

14.11    Binding Effect: Assignment.    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.    Unless specifically set forth herein, nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement.    Seller may assign this Agreement to an affiliate of Seller upon three (3) days' written notice to Buyer. No further assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Buyer (by operation of law or otherwise) without the prior written consent of the other Party. such consent to not be unreasonably withheld. and any attempted or purported assignment without the required consents shall be void.

14.12    U.S. Dollars.    All dollar amounts set forth herein are United States (U.S.) Dollars.

14.13    Counterparts.    This Agreement may be executed and delivered by facsimile signature. which shall be binding upon the Parties. upon the transmission of such facsimile and in any number of counterparts. each of which will be deemed an original. but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF.** the Parties have caused this Agreement to be executed by their respective duly authorized officers, effective as of the date first written above.

By: [signature]                    17 May 2019

Name: [JAY C. MANNING]

Title: [ PRESIDENT

By: [ MARK DOBLER. ]

Name: [ _____ ]

Title: [ _____ ]

Exhibit A – Equipment Description
Exhibit B – Bill of Sale





**EXHIBIT B**

### EQUIPMENT BILL OF SALE

EthosEnergy Power Solutions LLC ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does this ___ day of May, 2019 hereby grant, sell, assign, transfer and convey unto WattStock LLC. (the "Buyer"), good and marketable title in and to the Equipment (as defined in that certain Purchase and Sale Agreement between Seller and Buyer dated as of the 13th day of May 2019 (the "Purchase Agreement")) to have and to hold for its disposition. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

This Bill of Sale is made pursuant to, and is subject to the terms and conditions set forth in, the Purchase Agreement. Nothing contained herein shall be construed to limit, terminate or expand the representations, warranties, covenants, disclaimers, exclusions, remedies and indemnities set forth in the Purchase Agreement.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE VI OF THE PURCHASE AGREEMENT, SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT OR SELLER OR THE BUSINESS, ASSETS OR LIABILITIES OF SELLER AND IT IS UNDERSTOOD THAT BUYER TAKES THE EQUIPMENT "AS IS" AND "WHERE IS"; SPECIFICALLY, SELLER MAKES NO REPRESENTATION AS TO THE CONDITION, VALUE OR QUALITY OF THE EQUIPMENT OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE EQUIPMENT AND SELLER DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE EQUIPMENT, OR ANY PORTION THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT. BUYER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AGREEMENT, SELLER HAS NOT MADE, AND SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND BUYER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLER AND ITS AFFILIATES AND EACH OF ITS REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS OR COMMUNICATIONS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER OR ITS REPRESENTATIVES BY OR ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES OR ANY OF ITS REPRESENTATIVES IN CONNECTION THEREWITH.

For the avoidance of doubt, this Bill of Sale is made pursuant to, and subject to the terms of, the Purchase Agreement. In the event of any conflict or ambiguity between the terms of this instrument and the Purchase Agreement, the Purchase Agreement shall control.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Texas, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than Buyer and Seller and their respective successors and permitted assigns, any remedy or claim under or by reason of this instrument or any agreements, terms, covenants or conditions hereof.   The agreements, terms, covenants and conditions contained in this instrument shall be for the sole and exclusive benefit of, and bind and inure to the benefit of, Buyer and Seller and their respective successors and permitted assigns.

This Bill of Sale may be executed by facsimile signature and in any number of counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale as of the date first written above.

SELLER:

[                                                                    ]

By:_____

Name: _____

Title: _____

Dated: _____

# FORM NO. 353-3 - CITATION
# THE STATE OF TEXAS

To:  **ALTA POWER LLC**
     **BY SERVING REGISTERED AGENT MATTHEW E LATERZA**
     **4605 POST OAK PLACE DRIVE SUITE 270**
     **HOUSTON TEXAS 77027**

GREETINGS:

You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. Your answer should be addressed to the clerk of the **116th District Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being **WATTSTOCK LLC**

Filed in said Court **16th day of June, 2020** against

**ALTA POWER LLC**

For Suit, said suit being numbered **DC-20-08331,** the nature of which demand is as follows:
Suit on **CNTR CNSMR COM DEBT** etc. as shown on said petition **& REQUEST FOR DISCLOSURE**, a copy of which accompanies this citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 17th day of June, 2020.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____, Deputy
    ANGELA CONEJO

---

**ESERVE**

**CITATION**

**DC-20-08331**

**WATTSTOCK LLC**
**vs.**
**ALTA POWER LLC**

ISSUED THIS
**17th day of June, 2020**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By: ANGELA CONEJO, Deputy
_____

**Attorney for Plaintiff**
**BRIAN N HAIL**
**KANE RUSSELL COLEMAN LOGAN PC**
**901 MAIN ST STE 5200**
**DALLAS TEXAS 75202**
**214-777-4200**
**bhail@krcl.com**

**DALLAS COUNTY**
**SERVICE FEES**
**NOT PAID**

# OFFICER'S RETURN

Case No. :  DC-20-08331

Court No.116th District Court

Style: WATTSTOCK LLC

 vs.

ALTA POWER LLC

Came to hand on the _____day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____ at _____ o'clock _____ .M. on the _____day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by

me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|  |  |  |
|---|---|---|
| For serving Citation | $_____ | _____ |
| For mileage | $_____ | of _____County, _____ |
| For Notary | $_____ | By_____Deputy |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.


_____

Notary Public_____County_____

FILED
6/22/2020 3:59 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

## CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| **WATTSTOCK LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **v.** | § | |
| | § | **DALLAS COUNTY, TEXAS** |
| **ALTA POWER LLC** | § | |
| | § | **116TH JUDICIAL DISTRICT** |

## ALTA POWER'S ORIGINAL ANSWER AND COUNTERCLAIM

TO THE HONORABLE TONYA PARKER:

COMES NOW Alta Power LLC ("Alta Power" or "Alta"), Defendant and Counter-Plaintiff in the above-captioned cause, and files this its Original Answer and Counterclaim, and in support thereof, would respectfully show this Court as follows:

## I.
## GENERAL DENIAL

Alta Power denies each and every allegation and cause of action set forth in WattStock LLC's ("WattStock") Original Petition and any further amended or supplemental petitions (the "Petition"), and demands strict proof thereof as required by the Constitution and the laws of the State of Texas. *See* TEX. R. CIV. P. 92.

## II.
## AFFIRMATIVE DEFENSES

Pleading further, alternatively, and by way of affirmative defense, Alta Power asserts the following affirmative defenses:

1. WattStock's claims are barred due to its material breaches of the Master Agreement, the LNTP, and the Ethos Authorization.

2. WattStock's claim for attorneys' fees fails for lack of presentment.

## III.
## ALTA POWER'S COUNTERCLAIMS: PARTIES

1.      Counter-Plaintiff, Alta Power LLC is a Texas limited liability company located in Houston, Texas.

2.      Counter-Defendant WattStock, LLC is a limited liability company located in Dallas, Texas and Houston, Texas and has appeared in this case.

## IV.
## RELIEF SOUGHT

3.      Pursuant to Texas Rule of Civil Procedure 47, Alta Power states that it seeks monetary relief over $1,000,000.

## V.
## ALTA POWER'S COUNTERCLAIMS: FACTUAL BACKGROUND

4.      Alta Power is an experienced power project developer focusing on efficient, economical and environmentally friendly power generation in Texas. In an effort to equip its planned power plants in Texas, Alta Power needed assistance with procuring previously owned, refurbished combustion turbine packages.

5.      WattStock purports to be a technical, financial and operational expert in the field of power generation who is "uniquely positioned to assist clients buy and sell generation assets and assess the condition of assets."[1] WattStock proclaims that in working with GE, its "partner," it locates, purchases and ultimately provides a completely OEM refurbished, fully warranted, used gas turbine for a fraction of the cost of a new gas turbine.[2]

6.      On February 27, 2019, after hearing these representations from WattStock, Alta Power and WattStock entered into the Master Agreement so that WattStock could, on Alta Power's

---

[1] https://www.wattstock.com/equipment-sales [sic.]
[2] https://www.wattstock.com/how-ctp-works

2

behalf, "locate, evaluate, and price surplus combustion turbine generator assets available for purchase, [and] (ii) purchase and refurbish . . . selected generator assets. . ."[3] Due to the highly proprietary nature of the work to be done and sensitive nature of the communications between the parties, the Master Agreement included a two-page Confidentiality clause. The Confidentiality clause provided, in relevant part, that neither party would disclose any Confidential Information, including "price and other financial information . . business structure . . .operations and strategies or other technical or business information. . ."[4]

7.      As WattStock would be traveling the world over searching for and inspecting these used turbines, the parties agreed that "Alta will be responsible for reimbursing WattStock for WattStock's out-of-pocket expenses incurred in performing Asset inspections."[5] However, the parties further agreed that Alta's obligation to reimburse "out-of-pocket expenses" was not unlimited as "[a]ggregate expenses in excess of $20,000 will require prior written Alta approval."[6] To date, Alta has timely paid all invoices from WattStock with respect to any such "out-of-pocket expenses incurred in performing Asset inspections."

8.      The Master Agreement contemplated an early termination for only two reasons: "(i) insolvency or bankruptcy of [either Party] or (ii) a material breach of this Agreement by [either Party] which [the breaching party] fails to cure within thirty (30) days after notice thereof."[7]

9.      The parties also entered into the CONFIDENTIAL December 23, 2019 Limited Notice to Proceed Proposal ("LNTP").[8] The purpose of the LNTP was for Alta to begin funding certain long lead time items (engineering work and replacement parts) that WattStock would need

---

[3] *See* Master Agreement, p. 1, attached as Ex. 1 to WattStock's Petition.
[4] *Id*. at p. 2 and ¶7.2
[5] *Id*. at ¶ 3.1
[6] *Id*.
[7] *Id*. at ¶¶11.2 and 11.3.
[8] *See* Ex. 3 to the WattStock Petition.

to acquire from its "partner," GE, in order to complete the refurbishment work for Alta's Goodlow project. WattStock indicated in July 2019 that it did not want to spend any of its own money to fund the payment obligations to GE under the LNTP without a backstop from Alta. Consequently, as a condition of the LNTP, both parties agreed that Alta would reimburse WattStock as its payment obligations to GE became due. The LNTP provides basic terms between the parties concerning the two turbines WattStock was to refurbish for Alta Power's Goodlow Project. The LNTP provides fairly explicit payment details, including WattStock's ongoing obligation to provide Alta with "a wire transfer confirmation showing that such payments made by [Alta] to [WattStock] . . . have been remitted to GE" within two business days of Alta's payment to WattStock.[9] The purpose for this provision was obvious: as WattStock was working with its "partner" GE to refurbish the turbines, GE would bill WattStock directly. GE would invoice WattStock; WattStock would invoice Alta attaching the underlying GE invoice; Alta would pay WattStock; and, WattStock would then pay GE. This is the practice that the parties agreed to.

10.    On or about December 24, 2019–one business day following execution of the LNTP–WattStock submitted Invoice AP-12242019-GDLW-001, Rev 0 to Alta (along with the associated backup invoices and other documentation from GE) for $750,000. Alta wired $750,000 to WattStock the same day. WattStock sent Alta confirmation of its payment to GE on or about December 30, 2019. On or about January 7, 2020 WattStock submitted Invoice AP-01072020-GDLW-001, Rev 0 to Alta (along with the associated backup invoices and other documentation from GE) for $750,000. On or about January 13, 2020 Alta wired $750,000 to WattStock to pay this invoice. Several days passed without Alta receiving confirmation of WattStock paying GE. Finally, on January 24, 2020 WattStock forwarded confirmation via text message that payment to

---

[9] *Id.* at ¶ 7.

GE had been made that day – eleven days after WattStock received the funds from Alta. WattStock acknowledged that its payment to GE was late and in violation of the LNTP's two-business day notice provision, but claimed because its "wire guy was in bed" the payment was delayed.

11.     Then, on or about January 28, 2020 WattStock submitted Invoice AP-01282020-GDLW-001, Rev 0 to Alta Power. The invoice, for $464,253 was for "Payment 3 per WattStock LNTP." Alta requested, on numerous occasions, the underlying GE invoice to WattStock - - as it had been provided on the preceding invoices. WattStock failed to respond and to this day cannot provide a substantiating GE invoice. Alta has learned that WattStock has yet to be invoiced by GE for this amount and that all outstanding GE invoices to WattStock with respect to Alta's project have been paid. WattStock, in January 2020, was disingenuously trying to receive those funds from Alta although they were not yet billed, incurred or owed. WattStock was doing so because it was insolvent and needed Alta's funds to continue its day-to-day business operations.

12.     As part of the agreement between Alta and WattStock to locate and secure used turbines, WattStock identified a gas turbine owned by Bosen Enerji Elektrik Üretim A.Ş., a Turkish company ("Bosen"), as a potential acquisition. Alta agreed that this unit looked interesting and appeared to be priced reasonably. Alta authorized WattStock to enter into a purchase contract with Bosen for $2,600,000 for the turbine. The purchase contract required a down payment of $260,000, which Alta wired to WattStock on or about June 13, 2019. The contract, according to WattStock, also provided that if Bosen ultimately sold the unit to an entity other than WattStock, WattStock (and thereby Alta) would be entitled to a full refund of the $260,000 down payment.

13.     The purchase agreement between WattStock and Bosen (approved by Alta) purportedly also provided WattStock with an exclusive purchase right through late September 2019. On or about October 1, 2019, WattStock informed Alta that Bosen had reached out and

5

expressed a willingness to extend the exclusivity provision for several months for an additional $100,000. Alta instructed WattStock to extend the agreement with Bosen and Alta wired $100,000 to WattStock that same day. Later that day, Alta changed its mind and decided that extending the term of the Bosen contract was not worth $100,000. Alta instructed WattStock to not extend the Bosen contract and not send the $100,000 to Bosen. WattStock confirmed that it had not taken any action with respect to Bosen. Alta requested that WattStock return the $100,000. These instructions were confirmed and verified by WattStock.[10]

14. On January 23, 2020, in response to Alta's inquiry concerning the status of the return of Alta's $100,000, Mr. Andrew Herr (WattStock's Chief Executive Officer) unequivocally acknowledged that WattStock owed Alta $100,000[11]:

| From: | Andrew Herr <afherr@gmail.com> |
|---|---|
| Sent: | Thursday, January 23, 2020 12:13 PM |
| To: | William Phelps |
| Cc: | Matthew Laterza; 'Jay Manning' |
| Subject: | Bosun Deposits |

Bill:

You are correct. We owe Alta a refund of the Bosun deposit. I will let you know as soon as we have initiated payment – which will not happen until next week at the earliest.

Thanks for bringing this to my attention.

Regards

Andy

Andrew F. Herr
US Mobile :: +1 972.963 0058

---

[10] *See* October 30, 2019 email exchange between Matthew Laterza, Jay Manning and Andrew Herr re Bosen Payment, attached hereto and marked as Ex. A.

[11] *See* January 23, 2020 email from Andrew Herr to William Phelps re: Bosun [sic] Deposits, attached hereto and marked as Ex. B.

On May 6, 2020, Alta asked for an update on the supposed imminent return of its $100,000. WattStock replied that due to WattStock's "financial stress," and notwithstanding its express acknowledgment that the funds were owed to Alta, WattStock would not be returning the funds.[12]

15.    Alta recently learned that Bosen sold the unit to another entity and returned Alta's $260,000 to WattStock. WattStock has not returned these funds to Alta.

16.    On or about April 10, 2020 WattStock approached Alta about Alta acquiring WattStock. WattStock's Chairman and primary investor, Patrick Jenevein, indicated that he was growing weary of continuing to fund WattStock's monthly overhead. He acknowledged that WattStock's only real project that had a chance to generate revenue and profits over the next year was Alta's Goodlow project. Alta recognized that there was potential future value in acquiring WattStock; however, given WattStock's admitted limited balance sheet, its tangible value was zero. The parties discussed this and Mr. Jenevein acknowledged that the only way to consummate a transaction would be through deferred payments (through a typical "earnout" structure). Alta sent WattStock two proposals for earnout structures that are consistent with commercial market terms for transactions such as this. However, Mr. Jenevein changed his mind and demanded that any transaction would require cash up-front.

17.    This demand for immediate cash led Alta to resume its efforts to collect the $100,000 refund for the Bosen extension payment that was never made. Suddenly, WattStock's story changed. Despite WattStock's unequivocal acknowledgement that the $100,000 was due to Alta and would be paid imminently, WattStock now indicated that its position was that a "credit" was owed to Alta. WattStock also then manufactured invoices for "mark-ups" on deposit money and other expenses (including an after-the-fact $315,000 invoice from WattStock marking up the

---

[12] See May 7, 2020 email from Andrew Herr to Matthew Laterza re: Bosen 100K Deposit Refund, attached hereto and marked as Ex. C.

$200,000 purchase price of the Ethos unit) and demanded payment on these fabricated invoices. These "expenses" (all of which vastly exceed the $20,000 limit) were never approved by Alta. There is no agreement between Alta and WattStock whereby WattStock is entitled to arbitrarily "mark-up" its expenses or deposits.  When Alta asked WattStock to justify its exorbitant "mark-ups" Andrew Herr explained that such charges were allowed because they were "not prohibited by the contract."

18.     Since May 7, 2020, Alta has tried, unsuccessfully, to engage WattStock in meaningful discussions to sever their commercial relationship, a fundamental condition of which would be the return of Alta's $100,000.  WattStock still refuses to return these monies.

19.     In all, Alta has paid WattStock approximately $1,500,000 under the terms of the Master Agreement and LNTP.  To date, it has virtually nothing to show for it.

20.     On May 20, 2020, pursuant to ¶11.2(ii) of the Master Agreement, Alta Power notified WattStock of WattStock's material breach (and theft) and demanded same be cured in thirty (30) days.  WattStock failed to timely cure this material breach.  Additionally, because WattStock's "financial stress" is nothing less than insolvency, Alta also invoked 11.2(i) as grounds for termination.

## VI.
## ALTA POWER'S COUNTERCLAIMS

### DECLARATORY RELIEF

21.     Alta Power re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

22.     Alta Power brings this suit for a declaratory judgment under TEX. CIV. PRAC. & REM. CODE § 37.003 against WattStock.

23.     Accordingly, Alta requests that the Court declare the following:

8

    a. The Master Agreement does not allow WattStock to charge "mark-ups" on deposits, expenses or option fees;

    b. The LNTP does not allow WattStock to charge "mark-ups" on deposits, expenses or option fees;

    c. As of May 20, 2020, WattStock was insolvent and Alta was therefore entitled to immediately terminate the Master Agreement;

    d. WattStock's insolvency vitiates the Master Agreement and excuses Alta of any further performance;

    e. WattStock's material breach of the Master Agreement vitiates the Master Agreement and excuses Alta of any further performance; and,

    f. Alta assumes all of WattStock's rights and title to any and all assets subject to the Master Agreement or LNTP.

**BREACH OF CONTRACT**

24. Alta Power re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

25. The Master Agreement and LNTP are valid, enforceable contracts.

26. Alta performed all of its obligations under both the Master Agreement and LNTP.

27. In addition to the breaches expressly referenced above, WattStock also intentionally breached both agreements by its disclosure of confidential information in the filing of its frivolous lawsuit.

28. WattStock is also in breach due to its refusal to return the $260,000 refunded Bosen deposit to Alta.

29. WattStock's breaches directly and proximately caused direct and consequential damages to Alta Power in an amount that is within the jurisdictional limits of this Court.

30. In addition, pursuant to the terms of the contracts and §38.001 of the Texas Civil Practice and Remedies Code, Alta Power is entitled to recover its reasonable attorneys' fees.

## FRAUD and FRAUDULENT INDUCMENT

31.     Alta re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

32.     The elements of fraud are: (1) that the speaker made a material misrepresentation; (2) that he knew was false when he made it or that he made recklessly without any knowledge of its truth and as a positive assertion; (3) with the intent that the other party act upon it; (4) that the other party acted in reliance on the misrepresentation; and (5) suffered injury thereby.[13]   A representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question."[14]

33.     WattStock made numerous misrepresentations to Alta in order to induce Alta into sending hundreds of thousands of dollars to WattStock.  These misrepresentations included the following:

a.  GE and WattStock were "partners," working together to refurbish the turbines;

b.  WattStock incurred substantial "out of pocket" expenses in performing its tasks pursuant to the Master Agreement and LNTP;

c.  WattStock had extensive experience with successful refurbishment projects;

d.  WattStock had substantial financial backing and would be able to complete the projects contemplated by the parties; and,

e.  WattStock had extensive contacts in the industry and was fully capable of locating a significant number of refurbish-able used gas turbines on the global market.

---

[13] *Italian Cowboy*, 341 S.W.3d at 337.
[14] *Id.*

10

34. Alta justifiably relied on these representations and consequently paid WattStock hundreds of thousands of dollars.

## BREACH OF FIDUCIARY DUTY

35. Alta Power re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

36. WattStock owes a limited fiduciary duty to Alta Power insofar as Alta's funds in WattStock's possession are concerned. Alta paid $360,000[15] to WattStock to hold in trust with respect to the Bosen Unit.

37. WattStock has flatly refused to return these funds to Alta in breach of its fiduciary obligation.

## NEGLIGENT MISREPRESENTATION

38. Alta Power re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

39. Alta pleading in the alternative, asserts that in the event that WattStock's misrepresentations and concealments described above were not made with the intent to deceive, they were made with reckless disregard for the truth and with negligence towards the truth.

40. WattStock understood that Alta Power would be relying on these statements and representations, and in fact, the representations at issue were directed towards Alta with the intent that Alta rely on them.

41. Alta Power justifiably and reasonably relied on the statements and suffered significant financial injury as described herein as a result.

---

[15] This figure is based on the $100,000 Alta paid WattStock for the Bosen extension that WattStock agreed to return to Alta as well as Alta's $260,000 down payment on the Bosen unit that was refunded to WattStock by Bosen.

**TEXAS THEFT LIABILITY ACT**

42. Alta Power re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

43. The Texas Theft Liability Act (the "TLA") is encoded at Sections 134.001-134.005 of the Texas Civil Practice and Remedies Code. The TLA provides that "[a] person who commits theft is liable for the damages resulting from the theft."[16] Further, the TLA states that "a person who has sustained damages resulting from theft" can recover "from a person who commits theft, the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1000" as well as "court costs and reasonable and necessary attorney's fees." [17]

44. The elements of a cause of action for theft of property under the TLA are: (1) demonstrating plaintiff's possessory right to the property, (2) defendant's unlawful appropriation of the property by taking it without the plaintiff's effective consent, (3) defendant's intent to deprive, and (4) the theft caused damages to the plaintiff.[18]

45. Alta has a possessory right to the $360,000 it paid WattStock for the Bosen Unit.[19] WattStock misappropriated and enjoyed these monies knowing full well it was not entitled to same. All of this was done without Alta's consent. WattStock intended to and in fact did deprive Alta of these monies which led Alta to suffer significant financial damages in an amount to be proven at trial, plus court costs and reasonable and necessary attorney's fees as allowed by the TLA.

---

[16] TEX. CIV. PRAC. & REM. CODE ANN. § 134.003(a) (defining "theft" to include theft of real or personal property under the Texas Penal Code).

[17] *Id.* § 134.003(a), § 134.005(a)(1), (b).

[18] *See, e.g., First State Bank, NA v. Morse*, 227 S.W.3d 820, 826 (Tex. App.–Amarillo 2007, no pet.); *Rowland v. State*, 744 S.W.2d 610, 611 (Tex. Crim. App. 1988).

[19] *See* footnote 15 *supra.*

12

## CONVERSION

46.     Alta Power re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

47.     Alta Power is entitled to the $360,000 it paid to WattStock for the Bosen Unit.[20]

48.     WattStock wrongfully exercised dominion and control over these funds. Alta has demanded the return of these funds. WattStock has refused to return same.

49.     WattStock's malicious actions have directly and proximately caused direct and consequential damages to Alta in an amount that is within the jurisdictional limits of this Court.

50.     WattStock's malicious actions further justify recovery of exemplary damages.

## MONEY HAD AND RECEIVED AND UNJUST ENRICHMENT

51.     Alta re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by the Texas Rules of Civil Procedure 58.

52.     As a result of WattStock's tortious conduct, it was unjustly enriched as set forth above.

53.     WattStock unlawfully holds $360,000 of Alta Power's money.[21] In both equity and good conscience this money belongs to Alta.

54.     WattStock has refused to repay Alta Power these funds and now actually takes the position that it is entitled to this money.

55.     Through its actions, WattStock has been unjustly enriched and as a result Alta Power has suffered actual damage.

---

[20] *Id.*
[21] *Id.*

## VII.
## DAMAGES

56.     In light of WattStock's conduct, Alta Power has directly and proximately suffered actual, special, and consequential damages that are within the jurisdictional limits of this Court. Alta Power is also entitled to recover punitive or exemplary damages pursuant to the Texas Civil Practice and Remedies Code, Texas statutory law and Texas common law.

57.     As permitted under all applicable law, Alta Power seeks the recovery of all attorneys' fees incurred in connection with the prosecution of its claims for TLA violations and breaches of contract. *See* TEX. CIV. PRAC. & REM. CODE § 38.001; applicable provisions of the Master Agreement and the LNTP; and, the TLA, TEX. CIV. PRAC. & REM. CODE §134.005(b).

## VIII.
## CONDITIONS PRECEDENT

58.     All conditions precedent to Alta's right to recover and to WattStock's liability, including presentment of attorneys' fees, have been performed, have been waived, or have occurred.

## IX.
## REQUEST FOR DISCLOSURE

59.     Under Texas Rule of Civil Procedure 194, Alta Power requests that WattStock disclose within thirty (30) days of this request the information or material described in Rule 194.2.

## X.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Alta Power LLC respectfully requests that after a trial on the merits, Alta Power have judgment as requested herein, together with any and all actual and consequential damages, exemplary damages, reasonable and necessary attorneys' fees and costs, pre- and post-judgment interest at the maximum rate allowed by law until paid, and any other and further relief, at law or in equity, to which Alta Power may show itself justly entitled.

14

Additionally, Alta Power further prays that WattStock take nothing by its claims against Alta Power, that Alta Power be discharged from such claims, and that the Court grant such other and further relief, both general and special, at law and in equity, to which Alta Power may be justly entitled.

Respectfully submitted,

LIGHTFOOT FRANKLIN & WHITE

By: _____

Jared I. Levinthal
State Bar No. 24002467
levinthal@lightfootlaw.com
Kaitlyn M. Faucett
State Bar No. 24081490
kfaucett@lightfootlaw.com
1885 Saint James Place, Suite 1150
Houston, Texas 77056
(713) 960-1488 Telephone
(713) 960-8991 Facsimile

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent in compliance with the Texas Rules of Civil Procedure on this the 22nd day of June 2020 on all counsel of record.

_____

Jared I. Levinthal

# EXHIBIT

# A

## Matthew Laterza

| | |
|---|---|
| **From:** | Jay Manning <j.manning@wattstock.com> |
| **Sent:** | Wednesday, October 30, 2019 2:47 PM |
| **To:** | Matthew Laterza; Andrew Herr |
| **Cc:** | William Phelps |
| **Subject:** | RE: Bosen Payment |
| **Attachments:** | RE: Open Issues with Bosen First Amendment |

Matt- per Alta instructions, WattStock did not forward on to Bosen the $100,000 that was to be paid upon execution of the First Amendment to the PSA. The draft of the First Amendment was only sent to Bosen on October 1 following Alta's approval of the draft and commitment to send to WattStock the $100,000 which Bosen was then told would be delivered by end of that week. You may recall that Bosen then came back with requested changes to the First Amendment and as described in the attached email chain, the discussions with Bosen on the First Amendment and the $100k stopped.

Regards,

Jay

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Wednesday, October 30, 2019 10:03 AM
**To:** Jay Manning <j.manning@wattstock.com>; Andrew Herr <a.herr@wattstock.com>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** Bosen Payment

Jay & Andy,

Can you please confirm that the $100K that we sent you for Bosen has NOT been sent to Turkey yet?

Thanks,
Matt

1

# EXHIBIT

# B

**Matthew Laterza**

| | |
|---|---|
| **From:** | Andrew Herr <afherr@gmail.com> |
| **Sent:** | Thursday, January 23, 2020 12:13 PM |
| **To:** | William Phelps |
| **Cc:** | Matthew Laterza; 'Jay Manning' |
| **Subject:** | Bosun Deposits |

Bill:

You are correct. We owe Alta a refund of the Bosun deposit. I will let you know as soon as we have initiated payment – which will not happen until next week at the earliest.

Thanks for bringing this to my attention.

Regards

Andy

Andrew F. Herr
US Mobile :: +1 972.963.0058

# EXHIBIT

# C

**Matthew Laterza**

| | |
|---|---|
| **From:** | Andrew Herr <a.herr@wattstock.com> |
| **Sent:** | Thursday, May 7, 2020 4:31 PM |
| **To:** | Matthew Laterza |
| **Cc:** | William Phelps; 'Patrick Jenevein' |
| **Subject:** | RE: Bosen 100K Deposit Refund |

Matt:

Yes, Alta is due a credit re the Bosen deposit. And yes, we are under financial stress – the virus has halted all work on -- and cash flow from -- other contracts; and Alta has not initiated the Goodlow project. Our (more recent) expectation was that you were going to initiate that project in mid-February. And the latest update provided by Alta indicates that you are now going to initiate the project in this quarter, which would be good news indeed.

Given this, we agree that there is a Bosen deposit credit owed Alta but not necessarily a payable. We believe the most reasonable resolution of this matter is that Alta and WattStock agree to net the Bosen deposit out of either a) Alta's initial payment to WattStock for the Goodlow project, OR b) out of monies to be owed WattStock in the event of contract cancellation. One or the other of these would appear to be a near-term event. If there are acute financial issues pressuring Alta to collect this in advance of settling our other accounts, we need to know.

Give me a call and we can discuss.

Thanks,

Andy

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Wednesday, May 6, 2020 11:45 AM
**To:** Patrick Jenevein <p.jenevein@wattstock.com>; Andrew Herr <a.herr@wattstock.com>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** Bosen 100K Deposit Refund

Patrick & Andy:

Can you please provide an update on the refund of $100,000 due to Alta from WattStock for the incremental Bosen down payment that was cancelled. We have been asking for this repeatedly for the past +/- six months. We were told in late January (see attached email) that a refund would be forthcoming, but still have yet to receive it.

If there are financial issues that are preventing WattStock from returning the $100,000 to Alta, we need to know immediately.

Thanks,

1

Matt

FILED
7/24/2020 1:21 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL ANSWER TO
## DEFENDANT'S COUNTERCLAIMS

Plaintiff/Counterclaim Defendant WattStock LLC ("WattStock") files its Original Answer to Defendant's Counterclaims as follows:

## I.
## GENERAL DENIAL

1. Pursuant to Texas Rule of Civil Procedure 92, WattStock denies each and every allegation contained in Defendant Alta Power LLC's Original Answer and Counterclaim ("Counterclaims") and demands strict proof thereof in accordance with the Texas Rules of Civil Procedure.

## II.
## SPECIFIC DENIAL OF CONDITIONS PRECEDENT

2. Pursuant to Texas Rule of Civil Procedure 54, WattStock specifically denies Defendant's allegation in Paragraph 58 of the Counterclaims that all conditions precedent to Defendant's Counterclaims have been performed, have been waived, or have occurred. Specifically, WattStock denies that Alta has properly made presentment of its claim for attorney's fees.

## III.
## AFFIRMATIVE DEFENSES

3.      By way of affirmative defense, should such be necessary, WattStock would show that Defendant's Counterclaims are barred by the following defenses. To the extent that any defense may be inconsistent with Plaintiff's general denial or with any other defense, such defenses are pleaded in the alternative.

4.      Defendant's Counterclaims are barred, in whole or in part, by Defendant's prior material breach of the contract(s).

5.      Defendant's Counterclaims are barred, in whole or in part, by Defendant's fraud.

6.      Defendant's Counterclaims are barred, in whole or in part, by Defendant's failure to perform conditions precedent.

7.      Defendant's Counterclaims are barred, in whole or in part, by a valid and enforceable limitation-of-liability provision.

8.      Defendant's Counterclaims are barred, in whole or in part, by Defendant's own fault.

9.      Defendant's Counterclaims are barred, in whole or in part, by equitable estoppel.

10.      Defendant's Counterclaims are barred, in whole or in part, by WattStock's superior title or right to possess.

## IV.
## ATTORNEYS' FEES

11.      With respect to Defendant's claim for attorneys' fees under Texas Civil Practice & Remedies Code §§ 38.001 and 134.005, WattStock would show the Court that it is a limited liability company and is therefore not liable for such attorneys' fees as a matter of law.  *Alta Mesa Holdings, LP v. Ives*, 488 S.W.3d 438, 453–55 (Tex. App.–Houston [14th Dist.] 2016, pet. denied).

WHEREFORE, Plaintiff/Counterclaim Defendant WattStock LLC prays that Defendant Alta Power LLC take nothing by its Counterclaims and that WattStock recover any and all relief to which it may be entitled.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: /s/ Brian Hail
    Brian N. Hail
    State Bar No. 08705500
    bhail@krcl.com
    Andrew D. Robertson
    State Bar No. 24090845
    drobertson@krcl.com

901 Main Street
Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4201
Telecopy: (214) 777-4299

*Attorneys for Plaintiff/Counterclaim Defendant*

## CERTIFICATE OF SERVICE

This is to certify that on the 24th day of July, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

VIA E-SERVICE:
Jared I. Levinthal
levinthal@lightfootlaw.com
Kaitlyn M. Faucett
kfaucett@lightfootlaw.com
LIGHTFOOT FRANKLIN & WHITE
1885 Saint James Place, Suite 1150
Houston, Texas 77056

*Attorneys for Defendant/Counterclaim Plaintiff*

/s/ Brian N. Hail
Brian N. Hail

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Vicki Sedon on behalf of Brian Hail
Bar No. 8705500
vsedon@krcl.com
Envelope ID: 44810133
Status as of 07/27/2020 08:22:34 AM -05:00

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 7/24/2020 1:21:43 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 7/24/2020 1:21:43 PM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 7/24/2020 1:21:43 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 7/24/2020 1:21:43 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 7/24/2020 1:21:43 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 7/24/2020 1:21:43 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 7/24/2020 1:21:43 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 7/24/2020 1:21:43 PM | SENT |

FILED
7/24/2020 4:05 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Marcus Turner DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED PETITION

Plaintiff WattStock LLC ("WattStock") files its First Amended Petition against Defendant Alta Power LLC ("Alta" or "Defendant") and respectfully shows the Court as follows:

### I. DISCOVERY–CONTROL PLAN

1.      Plaintiff intends to conduct discovery in this action under Level 2 pursuant to Texas Rule of Civil Procedure 190.3.

### II. RELIEF SOUGHT

2.      Pursuant to Texas Rule of Civil Procedure 47, Plaintiff states that it seeks monetary relief of over $1,000,000.

### III. PARTIES

3.      WattStock is a Texas limited liability company located in Dallas, Texas.

4.      Alta is a Texas limited liability company who has appeared in this lawsuit.

## IV. JURISDICTION

5.    This Court has subject-matter jurisdiction over Plaintiff's claims because the amounts sought are within the jurisdictional limits of this Court.

6.    This Court has personal jurisdiction over Defendant Alta because Alta maintains its principal place of business in the State of Texas, regularly conducts business in this State, maintains an agent for service of process in this State, and knowingly entered into contracts with Plaintiff in this State and purposefully availed itself of the privileges of this State by entering into such contracts.

## V. VENUE

7.    Venue for Plaintiff's claims is proper in this Court pursuant to Texas Civil Practice and Remedies Code § 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in Dallas County, Texas. Specifically, the relevant contractual agreements between the parties and third-party suppliers were negotiated by WattStock in Dallas County and/or were to be performed in whole or in part in Dallas County.

8.    Venue for Plaintiff's claims is further proper in this Court pursuant to a mandatory venue provision in the primary contractual agreement between the parties. Specifically, the Master Agreement between Plaintiff and Defendant dated February 27, 2019, contains a choice-of-venue provision in Section 12.1 requiring that "[a]ny disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas."[1] Plaintiff sues for breach of the Master Agreement itself, as well as for breach of several related contractual agreements that all involve the business relationship between Plaintiff and Defendant defined by the Master Agreement, such that the Master Agreement's choice-of-venue clause is applicable here.

---

[1] **Ex. 1** at p.9 § 12.1

## VI. FACTS

9. WattStock is a supplier of used and refurbished gas turbine powered generation units and services that combine significantly lower capital cost savings with a wrap-around original equipment manufacturer warranty.

10. In conjunction with General Electric ("GE"), WattStock developed the concept of TRUEPackage™ refurbished LM-series gas turbine power generation units ("Gen Sets" or "Units"). This program seeks to connect existing LM-series generator units in the market whose owners no longer have a use for them with buyers seeking small "peak" units that can support increasing wind and solar power without the financial burden of a brand new unit. Similar to the preowned luxury vehicle market, WattStock and GE sell fully refurbished gas Gen Sets with new-equipment warranties and performance guarantees at a price point around 65% that of a new unit.

11. Alta is a new power project developer with a plan to develop power generation projects in the Texas market using surplus Gen Sets. Specifically, Alta planned to develop three separate sites (often referred to as "Jacksonville", "Goodlow", and "Lufkin", and collectively "The Project") of the three sites having multiple Gen Sets with each Gen Set producing approximately 50mW, for a total of nine units or approximately 450mW. The number of Gen Sets per Project vacillated over time as Alta struggled to raise the necessary financing for the intended three (3) Gen Set model. While Alta represented itself to WattStock as having experience in such projects, upon information and belief, the Project was the first such project undertaken by Alta itself. Alta's business plan required those nine units to be online for the 2020 summer peak season, which meant that it needed the units to be delivered to the various sites between December 2019 and February 2020 to

allow time for installation and testing at the sites before energy production would begin in May 2020.

12.     WattStock became aware of Alta in 2018 through its sales efforts. Alta had been working on early stage project development (site location and purchase, market studies, initial permit applications, etc.) for some time prior to the start of their relationship with WattStock. However, Alta had not yet obtained project financing. WattStock believed that Alta's desired schedule for the project was highly ambitious but possible.

13.     On or about February 27, 2019, WattStock and Alta entered into a Master Agreement ("Master Agreement"), a true and correct copy of which is attached as **Exhibit 1**.[2] Under the Master Agreement, the parties agreed that WattStock would work to locate and identify nine LM6000 Gen Sets[3] for The Project.[4] The parties further agreed that WattStock, with the approval of Alta, would arrange inspections with the existing owners of such Gen Sets and other Assets[5] to inspect and evaluate their condition and refurbishment requirements, provide a scope of work to complete refurbishments for each LM6000 Gen Set, and enter into negotiations with the existing owner on purchase terms or a purchase option consistent with terms approved by Alta.[6] The Master Agreement expressly requires Alta to "reimburs[e] WattStock for WattStock's out-of-pocket expenses incurred in performing Asset inspections."[7] Finally, the parties agreed that they would subsequently

---

[2] A "First Amendment to Master Agreement" was subsequently executed by the parties on or about February 5, 2020, and is included as part of Exhibit 1.
[3] "Generator Sets" means a skid-mounted, GE aeroderivative combustion turbine power generation package refurbished by WattStock. **Ex. 1** at p.2.
[4] **Ex. 1** at p.3, Art. 2.
[5] "Assets" means major sub-components of an LM6000 Generator Set that may qualify for purchase of the Business Purpose including (i) generator set package with combustion turbine engine and electric generator, (ii) generator set package without combustion turbine engine and/or electric generator, (iii) combustion turbine engine only, (iv) electric generator only, and/or (v) such other equipment as the Parties may agree. **Ex. 1** at p.1.
[6] **Ex. 1** at pp.3-4, Art. 3.
[7] **Ex. 1** at p.4 § 3.1.

enter into one or more definitive Equipment Purchase and Sale Agreement(s) ("EPA" or "EPAs", and later referred to as "ESAs") describing the scope, terms, and price under which Alta would eventually purchase from WattStock each refurbished LM6000 Gen Set.[8]

14.     Although Alta had not yet obtained project financing, it asked WattStock to begin working under the Master Agreement right away due to the expedited, ambitious schedule for getting the project online. WattStock agreed and promptly began working to fulfill its obligations under the Master Agreement.

15.     Throughout 2019 and 2020, Alta struggled to obtain financing for The Project. Alta made many decisions that may have impeded its ability to secure financing. Specifically, Alta opted to source the project capital themselves, without the aid of an advisory firm. Based on information and belief, Alta also attempted to raise both senior debt and equity so as to reduce the amount of additional cash it would have to invest. What followed was a year of failed closings on potential financing, including rejected deals from Deutsche Bank in May 2019, from Mitsubishi in September or October 2019, and from Starwood Capital in March or April 2020.

16.     Meanwhile, beginning in April 2019 and continuing through 2020, Alta made repeated assurances to WattStock that financing was in sight and that it expected to close on various financing deals "soon," "in 6 weeks," or in similar time frames. Such financing never materialized despite continued assurances from Alta. WattStock nevertheless relied on these assurances and continued to expend time and money fulfilling its obligations under the Master Agreement.

17.     Meanwhile, as it became apparent that Alta was having particular difficulty raising equity financing (as opposed to debt), Alta failed to secure sufficient debt financing to cover the

---

[8] **Ex. 1** at pp.4-5, Art. 4.

original scope of the project and instead reconfigured the project multiple times to reduce the equity that would have to be sold. While the project originally began as a three-site, nine-unit project in February 2019, Alta subsequently revised its plan to a two-site, six-unit project, then a one-site, three-unit project, and ultimately just a one-site, two-unit project located at the Goodlow site.

18.     The constant reconfiguration of the project by Alta resulted in a large workload for WattStock which was undertaken at WattStock's own out-of-pocket expense. Specifically, WattStock needed to contract, and then constantly renegotiate, purchase agreements with the used equipment sellers it identified. Each renegotiation (made necessary by Alta's constantly changing plans) required amendments to purchase agreements, additional deposits, and new timelines. In the absence of any firm supply agreements with Alta (caused by Alta's continued lack of financing), WattStock also had to devise stopgap agreements with Alta to mirror WattStock's obligations with the owners/sellers. Further, with every revision to a unit purchase agreement, WattStock had to revise its commitments with GE, who was responsible for repairing the turbines and suppling various parts and engineering services. This went on for so long that GE was forced to revise their pricing on their portions of the work. With Alta's financing continuing to fall through, it became necessary for the parties to enter into multiple stop-gap agreements to stand in place of a normal ESA as called for in the Master Agreement (the ESA had been largely negotiated by June 2019 but was never executed due to Alta's continued lack of financing).

19.     To facilitate the aggressive project schedule, it was necessary to order some items that had particularly long lead times.  In June, WattStock negotiated with Alta a "Limited Notice to Proceed" agreement ("LNTP") whereby WattStock would order long lead time items (from GE) and Alta would agree to paying for them, regardless of obtaining financing. WattStock entered into an

appropriate agreement with GE to supply the items, but then Alta refused to execute the drafted

LNTP. WattStock informed Alta that it would have to cancel its order with GE. Then, on or about

August 9, 2019, the parties entered an agreement—memorialized in a letter—that acknowledged

WattStock's ongoing work under the Master Agreement and recognized the need for WattStock to

subcontract certain refurbishment work to GE prior to the financial closing of Alta's project

financing and therefore prior to the final execution of an ESA ("Backstop Letter"). A true and correct

copy of the Backstop Letter is attached as **Exhibit 2**. Under the Backstop Letter, Alta agreed to

reimburse WattStock for cancellation fees charged by GE should the ESA not close prior to

September 15, 2019, up to a maximum of $750,000.[9] Alta refused to pay these invoiced amounts.

20.     On or about December 23, 2019—after Alta's difficulty in obtaining financing

continued to result in the delay of the final ESA—Alta finally agreed to enter into the WattStock

LLC Limited Notice to Proceed Proposal to Alta Power LLC for the Goodlow Peak Power Site for

Two (2) TRUEPackage™ LM6000 PC Sprint GTG's (the "WattStock/Alta LNTP"). A true and

correct copy of the WattStock/Alta LNTP is attached as **Exhibit 3**.

21.     The WattStock/Alta LNTP superseded and replaced the Backstop Letter.[10] The

WattStock/Alta LNTP further defined the scope of WattStock's ongoing work, set out the agreed

pricing for such work, and contemplated that Alta's project financing would close no later than

February 28, 2020.[11] The WattStock/Alta LNTP also established certain payment and termination

schedules, including a provision specifying that if Alta terminated the agreement through no fault

of WattStock later than October 25, 2019, it would be liable for 100% of the LNTP contract price.[12]

---

[9] **Ex. 2** at p.1.
[10] **Ex. 3** at p.4 § 6.
[11] **Ex. 3** at p.4 § 6.
[12] **Ex. 3** at pp.5-6 § 8.

22.    Throughout 2019 and 2020, WattStock performed its obligations under the Master Agreement by entering into multiple agreements with various owners of Gen Sets and/or Assets, each of which required WattStock to incur out-of-pocket expenses for conducting on-site inspections, negotiating the terms and conditions of sale, and making down payments on the equipment to secure the right or option to purchase such equipment.

23.    One such agreement was a Purchase and Sale Agreement Between EthosEnergy Power Solutions LLC and WattStock LLC dated May 13, 2019 (the "Ethos PSA"), which required WattStock to make a down payment to secure the right to purchase three LM6000 Sprint Gas Turbine Generator Sets from EthosEnergy Power Solutions LLC ("Ethos").[13] A true and correct copy of the Ethos PSA is attached as **Exhibit 4**.

24.    On or about May 22, 2019, WattStock created a draft of a Limited Notice to Proceed for PSA Execution and Down Payment for the Ethos Surplus LM6000 Package ("Ethos LNTP"), wherein Alta would authorize WattStock to proceed with the Ethos PSA. The Ethos LNTP obligated Alta to wire WattStock the sum of $315,000 by close of business on May 24, 2019. Alta did not execute the Ethos LNTP but did authorize WattStock to proceed with the Ethos PSA through a separate agreement memorialized through e-mail (the "Ethos Authorization"). However, Alta ultimately made only a partial payment to WattStock and refused to pay the remaining amount due to WattStock under the Ethos Authorization.

25.    WattStock also entered into many other agreements with owners of Gen Sets and/or Assets substantially similar to the Ethos PSA in furtherance of its obligations under the Master

---

[13] **Ex. 4** at p.5 § 3.1.

Agreement. However, many of these agreements had to be cancelled as a result of Alta's indecisiveness and failure to obtain proper financing.

26.     In accordance with Article 3 of the Master Agreement and the related contractual agreements between WattStock and Alta, WattStock submitted invoices to Alta for inspection work and other out-of-pocket expenses performed by WattStock while negotiating the above-referenced agreements with various owners of Gen Sets and/or Assets, including invoices for margin or markup on such work and deposits paid by WattStock to owners/sellers. Despite Alta's obligation to pay such invoices pursuant to Section 3.1 of the Master Agreement and despite Alta's payment for certain invoices, Alta has failed and refused to pay for several of WattStock's invoices on demand.[14]

27.     As of June 2020, Alta has still failed to close on project financing and has otherwise failed to honor its obligations to WattStock, including by failing to adhere to project timelines for closing on the purchase of Gen Sets and Assets and failing to pay amounts owed to WattStock under the Master Agreement, the WattStock/Alta LNTP, the Ethos Authorization, and the other related contractual agreements. On or about June 1, 2020, Alta sent WattStock a letter titled "Termination of Master Agreement and WattStock LLC Limited Notice to Proceed Proposal to Alta Power LLC" wherein in wrongly accused WattStock of various breaches of the Master Agreement and the WattStock/Alta LNTP and, without cause, stated its intention, either expressly or implicitly, to cancel those agreements.

---

[14] *See* Ex. 1 at p.4 § 3.1.

## VII. CAUSES OF ACTION

*Breach of Contract – Master Agreement*

28.     Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

29.     The Master Agreement is a valid and enforceable written contract between Plaintiff and Defendant.

30.     WattStock performed its obligations under the Master Agreement by performing its required scope of work under the contract, including but not limited to diligently identifying, contracting, and renegotiating contracts for Gen Sets and Assets.

31.     Alta breached its obligations under the Master Agreement by, among other things, failing to cooperate with WattStock to allow the closing of PSAs on certain Gen Sets and Assets, failing to pay invoices submitted by WattStock for WattStock's expenses under Section 3.1 of the Master Agreement, and purporting to cancel the Master Agreement without cause.

32.     Alta's breach is a direct and proximate cause of damages to WattStock. Specifically, WattStock has incurred out-of-pocket expenses which Alta has failed to reimburse as obligated by the Master Agreement.

*Breach of Contract – WattStock/Alta LNTP and Related Contractual Agreements*

33.     Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

34.     The WattStock/Alta LNTP and separate contractual agreements related thereto (where Alta approved and directed WattStock's actions to sign PSAs, engage escrow agents, wire down payments, and negotiate amendments and extensions in furtherance of WattStock's

obligations under the WattStock/Alta LNTP) are valid and enforceable written contracts between Plaintiff and Defendant.

35.     WattStock performed its obligations under these contracts by performing its required scope of work under the contracts, including but not limited to diligently identifying, contracting, and renegotiating contracts for Gen Sets and Assets and taking steps to perform refurbishment work and to subcontract certain refurbishment work to GE.

36.     Alta breached its obligations under the WattStock/Alta LNTP and separate contractual agreements related thereto by, among other things, failing to cooperate with WattStock to allow the closing of PSAs on certain Gen Sets and Assets, failing to pay WattStock amounts owed for WattStock's work under the WattStock/Alta LNTP and related contractual agreements, and purporting to cancel the WattStock/Alta LNTP without cause, entitling WattStock to seek 100% of the contract price in accordance with Section 8 of that agreement.

37.     Alta's breach is a direct and proximate cause of damages to WattStock. Specifically, WattStock has incurred out-of-pocket expenses for work and services performed pursuant to the WattStock/Alta LNTP and related contractual agreements which Alta has failed to pay and has purported to cancel the WattStock/Alta LNTP without cause, thereby attempting to deprive WattStock of all future amounts owed to WattStock under that agreement.

*Breach of Contract – Ethos Authorization*

38.     Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

39.     The Ethos Authorization is a valid and enforceable written contract between Plaintiff and Defendant.

40.     WattStock performed its obligations under the Ethos Authorization by proceeding to negotiate the Ethos PSA as authorized by Alta.

41.     Alta breached its obligations under the Ethos Authorization by, among other things, making only a partial payment under the Ethos Authorization while failing to pay WattStock the remaining balance owed to WattStock under that agreement.

42.     Alta's breach is a direct and proximate cause of damages to WattStock. Specifically, WattStock has incurred out-of-pocket expenses under the Ethos PSA which Alta has failed to fully reimburse as required by the Ethos Authorization.

*Quantum Meruit*

43.     Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

44.     In the alternative to some or all of the breaches of contract asserted above, WattStock pleads that, in the event any of the contracts above are found to be unenforceable for any reason, then Alta is liable on one or more claims of quantum meruit. Specifically, WattStock provided valuable services or materials to Alta as set forth above, Alta accepted such services or materials for its own benefit, and Alta had reasonable notice that WattStock expected compensation for such services or materials but failed to pay WattStock for such services or materials, directly and proximately causing damage to WattStock.

*Fraud*

45.     Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

46.     Beginning in early 2019 and continuing through 2020, Alta made repeated assurances to WattStock that financing was in sight and that it expected to close on various financing deals "soon," "in 6 weeks," or in similar time frames. Such representations were false when made and Alta knew that such representations were false in that it knew no such financing was reasonably certain at any time.

47.     Alta further represented that it was experienced in developing power generation projects. Such representation was false when made, as Alta knew that it was a new entity that had never developed any prior projects before The Projects.

48.     Alta intended WattStock to rely on the above representations concerning its imminent financing and prior experience in entering into the Master Agreement, the WattStock/Alta LNTP, and other related contractual agreements.

49.     WattStock actually and reasonably relied upon such representations to its detriment by entering into the Master Agreement, the WattStock/Alta LNTP, and other related contractual agreements and by funding down payments and other expenses out of pocket for Alta's benefit. Such reliance caused injury to WattStock in the form of various payments and advances made by WattStock for Alta's benefit that have not been reimbursed by Alta.

### *Negligent Misrepresentation*

50.     Plaintiff re-alleges and incorporates all factual allegations set forth above as if fully set forth herein, as allowed by Texas Rule of Civil Procedure 58.

51.     In the alternative to fraud, Alta made the representations identified above in the course of its business or in a transaction in which it had a pecuniary interest and that such information was provided for the guidance of WattStock.

52.     Alta did not use reasonable care in obtaining or communicating such information.

53.     WattStock justifiably relied on such representations to its detriment by entering into the Master Agreement, the WattStock/Alta LNTP, and other related contractual agreements and by funding down payments and other expenses out of pocket for Alta's benefit. Such reliance caused injury to WattStock in the form of various payments and advances made by WattStock for Alta's benefit that have not been reimbursed by Alta.

## VIII.   CONDITIONS PRECEDENT

54.     All conditions precedent to the relief requested in this pleading have occurred, have been performed, have been waived, or have been rendered impossible.

## IX.   REQUEST FOR ATTORNEYS' FEES

55.     Plaintiff requests an award of costs and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 38.001(8) and any applicable contractual provisions or common law.

## X.   PRAYER

56.     For the foregoing reasons, Plaintiff WattStock prays that Defendant Alta be cited to appear and answer herein and that Plaintiff be awarded judgment against Defendant for all of its economic damages (including actual damages, lost profits, cost of delay in performance, cost of mitigation, and cost of substitute performance) proximately caused by Defendant's conduct, and for punitive damages permitted under law as a result of Defendant's fraud, together with all applicable pre-judgment and post-judgment interest, in an amount to be proven at trial.

57.     Plaintiff further prays for its costs and reasonable and necessary attorneys' fees, as well as all other relief to which it may be entitled.

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: */s/ Brian N. Hail*
   **Brian N. Hail**
   bhail@krcl.com
   State Bar No. 08705500
   **Andrew D. Robertson**
   drobertson@krcl.com
   State Bar No. 24090845

901 Main St., Suite 5200
Dallas, Texas 75202
Telephone:   (214) 777-4200
Facsimile:   (214) 777-4299

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

     I certify that a true and correct copy of the foregoing document was served on the following

counsel this 24th day of July, 2020:

**VIA E-FILE**
Jared I. Levinthal
Kaitlyn M. Faucett
Lightfoot Franklin & White
1885 Saint James Place, Suite 115
Houston, Texas 77056
***Attorneys for Defendants***

        */s/ Brian N. Hail*
        Brian N. Hail

# EXHIBIT "1"

## MASTER AGREEMENT

This Master Agreement ("Agreement") is made and entered into as of the 27th day of February 2019 ("Effective Date") by and between Alta Power LLC, a Texas limited liability company ("Alta") with offices at 4605 Post Oak Place Dr. Suite 270, Houston, TX 77027, and WattStock LLC, a Texas limited liability company ("WattStock") with offices at Suite 850, 4040 North Central Expressway, Dallas, Texas 75204. Alta and WattStock are also each referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Alta is a power plant developer with a unique strategy for developing power generation projects in the Texas market using surplus combustion turbine packages; and

WHEREAS, WattStock is a supplier of power generation equipment and services, with extensive knowledge of the power equipment market; and

WHEREAS, Alta and WattStock seek to enter into an agreement or agreements to leverage each Party's unique skills to provide for an expedited and efficient means for (i) locating, evaluating, and pricing surplus combustion turbine generator assets available for purchase, (ii) purchasing and refurbishing of selected generator assets, and (iii) designing, constructing, and operating power generation plants in the Texas market ("Business Purpose").

NOW, THEREFORE, for and in consideration of the mutual covenants and promises and representations contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Alta and WattStock agree as follows:

### Article 1.    Definitions

Whenever used in this Agreement with initial capitalization, the following definitions shall be applicable:

"**Affiliate**" of a Party means any other person (natural person, corporation limited liability company, partnership, firm, association, or any other entity whether acting in an individual, fiduciary or other capacity) that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the Party specified, including, without limitation such Party's owners, directors, officers, and employees.

"**Assets**" means major sub-components of an LM6000 Generator Set that may qualify for purchase for the Business Purpose including (i) generator set package with combustion turbine engine and electric generator, (ii) generator set package without combustion turbine engine and/or electric generator, (iii) combustion turbine engine only, (iv) electric generator only, and/or (v) such other equipment as the Parties may agree.

"**Business Day**" means a Day, other than a Saturday or Sunday or a legal or bank holiday, in the State of Texas.

"**Business Purpose**" has the meaning ascribed to it in the Preamble.

1

**"Confidential Information"** means the existence and terms of this Agreement, the fact that discussions are taking place between the Parties concerning the Business Purpose, and any and all information related to the Business Purpose disclosed to a Receiving Party prior to, on or after the Effective Date by a Disclosing Party (whether written, oral, digital or visual) that has economic value and is not generally known to the public, or which would constitute a trade secret under the U.S. Uniform Trade Secrets Act and any oral, electronic or written communications thereof, including without limitation information concerning discoveries, developments, designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, computer programs, program code, specifications, analyses, reports, drawings, sketches, models, samples, data, algorithms, trade secrets, models, samples, calculations, formulas, WattStock manufacturing specifications or methods, analytical or quality control methods, actual and projected sales information, cost, price and other financial information, information relating to actual or potential suppliers and customers, markets, marketing opportunities, business structure, assets, liabilities, budgets, operations and strategies or other technical or business information, together with any information developed or derived by Receiving Party from such disclosed information.

**"Day" or "day"** means a calendar day, unless otherwise specified.

**"Disclosing Party"** means a Party providing Confidential Information to the Receiving Party.

**"Effective Date"** has the meaning ascribed to it in the Preamble.

**"Equipment Purchase and Sale Agreement"** means a definitive agreement to be entered into by Alta and WattStock for the purchase by Alta from WattStock of an LM6000 Generator Set.

**"Exclusivity Period"** has the meaning ascribed to in Article 6.1.

**"Initial List of Assets"** has the meaning ascribed to in Article 2.1.

**"Inspection Conclusions and Estimates"** means any reports, condition assessments, analyses, recommendations, estimates to repair or refurbish, proposals, work scopes or other information prepared by WattStock or for WattStock by any WattStock subcontractor based upon Inspection Data.

**"Inspection Data"** means any information documenting the existing condition of the Asset including borescope photos, videos, operation and maintenance logs or other data obtained during the course of an Asset inspection but excluding any Inspection Conclusions and Estimates.

**"LM6000 Generator Set"** means a skid-mounted, GE aeroderivative combustion turbine power generation package refurbishment by WattStock.

2

**"Owner"** means the person or entity that owns or controls the right to sell an Asset. The term "Owner" may include third-party agents or brokers retained by the title holder of the Asset to find potential buyers.

**"Receiving Party"** means a Party to whom Disclosing Party provides Confidential Information.

**"Representatives"** of a Party means any attorneys, accountants, consultants, agents and advisors, as well as actual or prospective partners, joint venturers, co-owners, lenders, financing parties, underwriters, and equity investors.

**"Term"** has the meaning ascribed to it in Article 5.

### Article 2.    Identifying and Prioritizing LM6000 Generator Sets

2.1    Promptly following the Effective Date, WattStock will deliver to Alta as Confidential Information an initial list of Assets that WattStock believes may be available for purchase. The initial list will include general information about the country of the Asset's last known location, its approximate age, and if available, price being asked by the Owner ("Initial List of Assets").

2.2    Within two (2) Business Days following Alta's receipt of the Initial List of Assets, Alta shall (i) advise WattStock in writing of any Asset on the Initial List of Assets that Alta has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide WattStock with reasonable documentation demonstrating Alta's prior awareness of the Asset and Alta's efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

2.3    The Parties shall jointly rank-order the Initial List of Assets with goal of developing a list of top target Assets sufficient, once refurbished, as required, by WattStock, to make up nine (9) LM6000 Generator Sets.

2.4    At any time during the Term of this Agreement, either Party may disclose to the other Party as Confidential Information additional Assets that were not on the Initial List of Assets. In such event, the Party receiving the disclosure information shall within two (2) Business Days following its receipt of the newly disclosed Asset, (i) advise the disclosing Party in writing that the receiving Party has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide the disclosing Party with reasonable documentation demonstrating the receiving Party's prior awareness of the Asset and its efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

### Article 3.    Securing Right to Purchase Units

3.1    With approval of Alta, WattStock will arrange with the Owner of an Asset an inspection to evaluate the condition and refurbishment requirements of such Asset. Alta understands and acknowledges that the types of Asset inspections that WattStock will be able to perform in the

field cannot identify all defects in an Asset, even with the benefit of borescope inspections of the internals of a combustion turbine engine. Alta will be responsible for reimbursing WattStock for WattStock's out-of-pocket, expenses incurred in performing Asset inspections. Aggregate expenses in excess of $20,000 will require prior written Alta approval. WattStock shall provide Alta with a copy of the Inspection Data and WattStock may retain a copy of the Inspection Data. Any Inspection Conclusions and Estimates delivered by WattStock to Alta shall be WattStock Confidential Information.

3.2     Following inspection of Assets sufficient to make-up a generator package, WattStock will provide to Alta as Confidential Information a not-to-exceed price for an agreed upon scope of work to complete an LM6000 Generator Set. For the avoidance of doubt, the agreed upon scope of work for the LM6000 Generator Set will exclude any defects that are not reasonably identifiable through the field inspections performed by WattStock pursuant to Article 3.1.

3.3     Prior to WattStock securing from the Owner of an Asset the exclusive right to purchase same, WattStock and Alta would agree in writing on the terms, including the amount of any non-refundable payments Alta would agree upon in order that WattStock may secure the right to purchase the Asset.

3.4     WattStock would then enter into negotiations with the Owner of an Asset on purchase terms or a purchase option consistent with the terms approved by Alta. Commencing from the date that WattStock and Alta have agreed pursuant to Article 3.1 that WattStock should inspect an Asset and continuing through the first to occur of the date that (i) Alta rejects such Asset, (ii) Owner declines to grant WattStock an exclusive right to purchase such Asset, or (iii) is sixty (60) days following WattStock's latest proposal to the Owner of an Asset to grant WattStock an exclusive right to purchase such Asset (or such longer period as may be agreed by the Parties) and Owner still has not granted WattStock an exclusive right to purchase the Asset, WattStock agrees it shall not market such Asset to any third-parties.

### Article 4. Refurbishing of Assets for Alta

4.1     Alta and WattStock will enter into one or more definitive Equipment Purchase and Sale Agreement describing the scope, terms, and price under which Alta would purchase from WattStock each LM6000 Generator Set.

4.2     Alta acknowledges that the price for each LM6000 Generator Set may vary due to the variable conditions of each Asset and the variable scopes of refurbishment work that may be required for each Asset. Certain defects or conditions, including what is commonly referred to as "fallout", are not discoverable until the Asset is disassembled in a repair shop setting. To the extent such additional repairs are discovered, the Parties would agree to a change order to the Equipment Purchase and Sale Agreement, including price and schedule to perform the work.

4.3     All amounts paid by Alta to WattStock for payment to the Owner to secure the Asset (excluding reimbursement of WattStock expenses described in Article 3.1) shall be treated as payments toward the purchase price of the LM6000 Generator Set.

4.4     If Alta and WattStock are unable to reach agreement on an Equipment Purchase and Sale Agreement then the Parties will agree upon a plan for dealing with any Assets that were secured with the intent of incorporation into an LM6000 Generator Set.

4.5     Failure by the Parties to reach agreement on any one (1) Equipment Purchase and Sale Agreement shall not be grounds for terminating this Agreement.

### Article 5. Term

5.1     The term of this Agreement shall be twenty-four (24) months following the Effective Date, unless the Parties have agreed to an extension in writing or the Agreement has been earlier terminated pursuant to Article 11.

### Article 6. Exclusivity and Non-Circumvention

6.1     For any Assets that an Owner has granted WattStock an exclusive right to purchase during the Term of this Agreement, Alta will have an exclusive right to purchase an LM6000 Generator Set from WattStock utilizing such Asset for the period equal to WattStock's exclusivity ("Exclusivity Period").

6.2     Without derogation of any confidentiality obligations pursuant to Article 7, during the Term of this Agreement and for a period of twelve (12) months following the expiration or termination of this Agreement for Assets that have been inspected pursuant to Article 3 of this Agreement or for a period of six (6) months for Assets that have not been inspected pursuant to Article 3 of this Agreement:

A. Alta agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset (1) on the Initial Assets List or (2) otherwise disclosed by WattStock to Alta during the Term of this Agreement; and

B. WattStock agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset disclosed by Alta to WattStock during the Term of this Agreement, except as otherwise provided in the Agreement.

C. WattStock shall be free to purchase an Asset without any restrictions or further obligations to Alta with respect to such Asset in the following circumstances:

   i.    If Alta rejects an Asset for use in connection with the Business Purpose for any reason;

   ii.   If WattStock is unable to reach agreement with Owner on purchase terms or a purchase option consistent on the terms approved by Alta;

   iii.  If Alta and WattStock cannot agree on terms of an Equipment Purchase Sale Agreement.

5

## Article 7. Confidentiality

7.1    The Parties agree that the WattStock Standard Mutual Nondisclosure Agreement that was entered by the Parties on or about May 8, 2018 is hereby superseded by this Agreement. Any Confidential Information disclosed pursuant to that prior Mutual Nondisclosure Agreement shall continue to be deemed Confidential Information protected against disclosure pursuant to this Article 7.

7.2    Confidential Information shall not be disclosed to any third party by Receiving Party or any of its Affiliates or Representatives, and shall not be used by Receiving Party or any of its Affiliates or Representatives for any purpose other than the Business Purpose, including but not limited to developing and/or providing any product or service or establishing any relationship that is competitive with or against the best interests of the Disclosing Party. Confidential Information shall be held in strict confidence by the Receiving Party and shall not be disclosed in any manner whatsoever without the prior written consent of the Disclosing Party, except to those Affiliates or Representatives of the Receiving Party with a need to know the Confidential Information in connection with the Business Purpose. The Receiving Party shall inform any of its Affiliates or Representatives to whom Confidential Information is disclosed of the existence of the restrictions in this Article 7, and that the Confidential Information has been shared with the Receiving Party in strict confidence. The Receiving Party shall be responsible for any breach or threatened breach of this Article 7 by its Affiliates or Representatives or any third-party to whom its Affiliates or Representatives disclose Confidential Information. The Receiving Party and its Affiliates and Representatives shall protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Receiving Party uses to protect its own confidential and proprietary information.

7.3    The Disclosing Party has reserved and shall retain all rights, title, and interest to the Confidential Information disclosed to the Receiving Party. No express or implied license or right is granted to Receiving Party with respect to any intellectual property or other proprietary rights of the Disclosing Party with respect to the Confidential Information. The Receiving Party shall not acquire any patent, copyright, trademark, or other intellectual property rights in such Confidential Information except for the limited right to use the Confidential Information for the specific purposes described herein. Any invention made or discovery based upon or arising from the Confidential Information is, and shall remain, the sole property of the Disclosing Party.

7.4    This Article 7 imposes no obligation upon the Receiving Party with respect to Confidential Information that: (i) is or becomes generally known or publicly available through no fault of the Receiving Party; (ii) was known to the Receiving Party on a non-confidential basis prior to disclosure by the Disclosing Party (iii) is lawfully obtained by the Receiving Party from a third-party under no obligation of confidentiality or (iv) is independently developed by or for the Receiving Party without use of the Confidential Information.

7.5    In the event that the Receiving Party is requested or required (by oral questions, interrogatories, requests for information, or by applicable legal or regulatory authority or by any

rule or regulation of any stock exchange or market or by any administrative or government body) to disclose any Confidential Information, the Receiving Party shall promptly notify the Disclosing Party in writing of such request or requirement prior to disclosure so that the Disclosing Party may seek an appropriate protective order and/or waive compliance with the terms of this Article 7, as applicable. The Parties shall cooperate with each other and their respective counsel in any Party's efforts to prevent such disclosure of Confidential Information. In the event that a protective order or other remedy is not obtained, by the time that the Receiving Party is required to disclose the Confidential Information, or the Disclosing Party waives compliance with the provisions hereof, the Receiving Party agrees to furnish only that portion of the Confidential Information that it reasonably determines, in consultation with its counsel, is legally required to be disclosed, and to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information after its disclosure.

7.6     At any time upon written request of the Disclosing Party, the Receiving Party shall promptly destroy (and supply written confirmation thereof to the Disclosing Party) all Confidential Information, including all copies, summaries, extracts and notes thereof, in possession of the Receiving Party or any of its Affiliates or Representatives.

7.7     Neither Party makes any representations or warranties, whether written or oral, statutory, express or implied. with respect to any information provided hereunder, including without limitation any warranty of accurateness, completeness, merchantability or fitness for a particular purpose. Neither the Disclosing Party nor any of its Affiliates or Representatives shall have any liability resulting from the use of the Confidential Information by the Receiving Party.

7.8     Notwithstanding any expiration or termination of this Agreement, all obligations of confidentiality and all restrictions on the use of Confidential Information under this Article 7 shall remain in effect for a period of three (3) years following the date of expiration of termination, and with respect to Confidential Information that constitutes a trade secret under applicable law, for as long as such information remains a trade secret.

7.9     The Parties hereto agree that money damages would not be a sufficient remedy for any breach of this Article 7 and that the Disclosing Party shall be entitled to injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Article 7. Such remedy shall not be the exclusive remedy for any breach of this Article 7 but shall be in addition to all other rights and remedies available at law or in equity.

### Article 8. Indemnification

8.1     Both Alta and WattStock agree to indemnify and hold one another harmless from and against any and all liability, loss, expense, attorneys' fees, or claims for physical injury to third-parties and/or physical damages to property of third-parties from or in any way connected to the performance of this Agreement, but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from such indemnifying Party's negligence, willful misconduct or intentional acts.

### Article 9. Limitation of Liability

9.1   EXCEPTING ARTICLE 6 (EXCLUSIVITY AND NON-CIRCUMVENTION), ARTICLE 7 (CONFIDENTIALITY), AND 8 (INDEMNIFICATION):

A. TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY AGREES TO LIMIT THE OTHER PARTY'S LIABILITY FOR ANY AND ALL CLAIMS, LOSSES, COSTS, DAMAGES OF ANY NATURE WHATSOEVER OR CLAIMS EXPENSES FROM ANY CAUSE OR CAUSES, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT-WITNESS FEES AND COSTS, SO THAT THE TOTAL AGGREGATE LIABILITY OF A PARTY TO THE OTHER SHALL NOT EXCEED THE AMOUNT OF USD $100,000. IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT HOWEVER ALLEGED OR ARISING, UNLESS OTHERWISE PROHIBITED BY LAW.

B. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.

### Article 10. Warranty Disclaimer

10.1   WattStock makes no warranty, express or implied, including regarding the condition of an Asset or title thereto. All warranties, if any, to be made by WattStock to Alta will be set forth in any executed Equipment Purchase and Sale Agreements.

### Article 11. Termination

11.1   Neither Party may terminate the Agreement for its convenience.

11.2   Alta may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of WattStock or (ii) a material breach of this Agreement by WattStock which WattStock fails to cure within thirty (30) days after notice thereof from Alta.

11.3   WattStock may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of Alta or (ii) a material breach of this Agreement by Alta which Alta fails to cure within thirty (30) days after notice thereof from WattStock.

11.5   Expiration or termination of this Agreement shall not terminate, modify or otherwise impact any Equipment Purchase and Sale Agreement in effect as of the effective date of

expiration or termination of this Agreement; provided, however, in the event of a bankruptcy by one Party, the non-filing Party shall have the right to terminate any or all pending Equipment Purchase and Sale Agreement(s) for cause.

### Article 12. Miscellaneous

12.1    The Agreement shall be governed by the laws of the state of Texas. Any disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas.

12.2    Any notice or other formal communication to be given under this Agreement shall be in writing and signed by or on behalf of the Party giving it. All such communications will be deemed given: (a) at the time of delivery, if delivered to the appropriate address by hand or by internationally recognized overnight courier service (costs prepaid); (b) at the time of transmission, if sent by fax or email with confirmation of transmission by the transmitting equipment; or (c) at the time of receipt or rejection by the addressee, if sent by certified mail, return receipt requested, provided that, in each case, where the delivery, transmission, receipt or rejection occurs outside working hours, notice shall be deemed given at the start of working hours on the next business day. The mailing or delivery addresses, email addresses and fax numbers for the Parties for the purpose of this clause are:

**If to Alta:**

| | |
|---|---|
| COMPANY: | Alta Power LLC |
| ATTENTION: | Matthew Laterza |
| ADDRESS: | 4605 Post Oak Place Dr, Suite 270 |
| CITY: | Houston |
| STATE: | Texas |
| ZIP: | 77027 |
| EMAIL: | mlaterza@altapowerdev.com |
| Copy to: | twest@altapowerdev.com |

**If to WattStock:**

| | |
|---|---|
| COMPANY: | WattStock LLC |
| ATTENTION: | Jay Manning |
| ADDRESS: | Suite 850, 4040 North Central Expressway |
| CITY: | Dallas |
| STATE: | Texas |
| ZIP: | 75204 |
| EMAIL: | j.manning@wattstock.com |
| Copy to: | p.jenevein@wattstock.com |

12.3    Each Party hereto has been represented by counsel and participated in the drafting of this Agreement. This Agreement shall be construed as if drafted jointly by the Parties and no

9

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

12.4 Each Party shall bear its own legal and other costs in connection with the negotiation and preparation of this Agreement and any subsequent definitive agreements contemplated hereby.

12.5 Each Party agrees to comply with all applicable laws during the performance of its obligations pursuant to this Agreement, including:

A. Fair Labor Standards Act of 1938, as amended;
B. Occupational Safety and Health Act of 1970, as amended;
C. anti-bribery and anti-corruption laws, including, as applicable, the United States Foreign Corrupt Practices Act and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions dated 21 November 1997;
D. any applicable laws and regulations concerning the export or import of products or technology; and
E. applicable anti-money laundering, anti-terrorism and related laws of the United States and, when applicable, the country in which an Asset is located.

12.6 Each Party represents and covenants to the other that it will not directly or indirectly:

A. Offer, give, make, promise, pay or authorize the offering, giving, making, promising or payment of any money, gift, or anything of value to any government official, that is an officer or employee of any government, or any department, agency or instrumentality thereof, any public international organization, any person acting in an official capacity on behalf of such government, any candidate for or appointee to a political or government office, or any political party;
B. Knowingly engage in any transaction which involves:
    i. Receiving, transferring, transporting, retaining, using, structuring, diverting, or hiding the proceeds of any criminal activity whatsoever, including drug trafficking, fraud, and bribery of any individual covered in 12.6.A above;
    ii. Engaging, becoming involved in, financing, supporting financially or otherwise sponsoring, facilitating, or giving aid or comfort to any terrorist person, activity or organization; and
    iii. Employing, engaging in any transaction or otherwise conducting business with a "designated person," namely a person or entity that appears on any list issued by the United States or the United Nations with respect to money laundering, terrorism financing, drug trafficking, or economic or military embargoes.

12.7 This Agreement does not create any agency or employment relationship, partnership, joint venture or co-venture between Alta and WattStock. Neither Party is granted any express or implied right or authority to assume or to create any obligation on behalf of or in the name of the other Party. Each Party shall pay for all social security, federal income taxes, unemployment insurance, workmen's compensation insurance, pensions, annuities or other liabilities or taxes incurred by, or on behalf of, or for the benefit of such Party or any of its Representatives, agents,

employees or servants who are not directly employed by the other Party, and arising out of the performance by the its obligations under this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties have executed this Master Agreement in duplicate originals effective as of the Effective Date.

| WATTSTOCK LLC | ALTA POWER LLC |
|---|---|
| By: | By: |
| Printed Name: | Printed Name: Matthew Laterza |
| Title: PRESIDENT | Title: CFO |

## FIRST AMENDMENT TO MASTER AGREEMENT

This First Amendment to Master Agreement ("Amendment") is made and entered into as of the 5th day of February, 2020 ("Amendment Effective Date") by and between ALTA POWER LLC, a Texas limited liability company ("Alta") with offices at 4605 Post Oak Place Dr. Suite 270, Houston, TX 77027, and WATTSTOCK LLC, a Texas limited liability company ("WattStock") with offices at Suite 850, 4040 North Central Expressway, Dallas, Texas 75204. Alta and WattStock are also each referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Alta and WattStock entered into that certain Master Agreement dated effective as of the 27th day of February 2019 ("Original Agreement"); and

WHEREAS, Alta and WattStock desire to amend the Original Agreement to make certain changes to the Original Agreement as are set forth in this Amendment.

NOW, THEREFORE, for and in consideration of the mutual covenants and promises and representations contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree that the Original Agreement is hereby amended as is set forth below. Unless otherwise expressly provided in this Amendment, defined terms used in this Amendment shall have the meanings ascribed to them in the Original Agreement.

Section 6.2(A) of the Original Agreement is hereby amended and restated to read:

"Alta agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset (1) on the Initial Assets List or (2) otherwise disclosed by WattStock to Alta during the Term of this Agreement, except as may be expressly agreed by WattStock in writing; and."

1.      Miscellaneous. This Amendment shall become effective only upon full execution and delivery by Alta and WattStock. All provisions of the Original Agreement not explicitly amended or modified in this Amendment shall remain in full force and effect, and the Original Agreement, as modified by this Amendment, shall be binding upon and shall inure to the benefit of the parties hereto, their successors and permitted assigns.

2.      Applicable Law and Venue. This Amendment shall be governed by the laws of the state of Texas. Any disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas.

3.      Counsel Review. Each Party hereto has been represented by counsel and participated in the drafting of this Amendment. This Amendment shall be construed as if drafted

1

EXECUTION COPY

jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Amendment.

4.    Legal Costs. Each Party shall bear its own legal and other costs in connection with the negotiation and preparation of this Amendment.

5.    Counterparts. This Amendment may be executed in any number of counterparts. All counterparts together will be taken to constitute one instrument.


IN WITNESS WHEREOF, the parties have executed this Amendment in duplicate originals effective as of the Amendment Effective Date.

**ALTA POWER LLC**, a Texas limited liability company,

By: _____
Name: _Mattlewlatc039_
Title: _CFO_

**WATTSTOCK LLC,** a Texas limited liability company

By: _____
Name: _____
Title: _CEC_

2

# EXHIBIT "2"



POWERING THE FUTURE OF TEXAS

Dear Andy:

Alta Power LLC, or one or more of its Affiliates, and WattStock LLC are close to executing two agreements for WattStock to supply six LM6000s gas turbine power units. Important components of WattStock's work under those agreements will be subcontracted to GE. In addition, one of the significant challenges facing Alta and this project is a very tight delivery schedule to allow the units being online for next summer.

To help meet that tight time schedule, we understand that WattStock is willing to enter into a contract with GE prior to the financial closing of Alta's project financing and therefore prior to the Effective Date of the Equipment and Services Supply Agreement ("ESA") being negotiated by Alta's Affiliate(s) and WattStock. By entering into an agreement with GE now, WattStock will be able to reserve engine overhaul slots and secure other necessary GE resources in a timely fashion. We understand further that should Alta be unable to execute the ESA or the Effective Date of such ESA is delayed beyond the dates in the table below, WattStock may incur cancellation charges associated with that GE contract. Alta understands that WattStock is incurring this potential liability on Alta's behalf and that the benefits of doing so will inure solely to Alta in the form of an accelerated project completion.

We understand that the cancellation penalties WattStock would incur are as follows:

| Termination on or Before | Termination Amount Due (USD) |
|---|---|
| 8/16/2019 | $375,000 |
| 9/16/2019 | $750,000 |

Accordingly, Alta agrees to reimburse WattStock for these cancelation fees, should the Effective Date of the ESA not occur prior to September 15, up to a maximum of $750,000. We further understand and agree that the reimbursement process would work as follows:

1. If the ESA Effective Date has not occurred on or before August 15,2019, WattStock will invoice Alta for $375,000, payable net 15 days, but will not cancel the GE contract.

2. If the ESA Effective Date has not occurred on or before September 15, 2019 WattStock will invoice Alta for an additional $375,000, payable net 15 days, and will cancel the GE contract. Alta will not be liable for any further cancellation charges arising from the WattStock-GE contract beyond the total of $750,000.

3. If WattStock has issued and/or been paid for the August 15 invoice for $375,000 but the ESA Effective Date occurs prior to September 15, WattStock will cancel the invoice if not yet paid, and either refund any monies received or credit any received amounts to other WattStock-Alta invoices, at Alta's preference.

If the above conforms to your understanding, please countersign below and return.

Thank you very much

**ALTA POWER LLC**

By: _____

Printed Name: Matthew Laterza

Title: Chief Financial Officer

Date: August 9, 2019

**WATTSTOCK LLC**

By: _____

Printed Name: Andrew F Herr

Title: Chief Operating Officer

Date: 8/19/19

2

# EXHIBIT "3"



# WATTSTOCK LLC LIMITED NOTICE TO PROCEED PROPOSAL

## TO

# ALTA POWER LLC

### FOR THE

### GOODLOW PEAK POWER SITE

### FOR

### TWO (2) TRUEPACKAGE™ LM6000 PC SPRINT GTG'S

### DECEMBER 23, , 2019

PREPARED BY: JAY C. MANNING
J.MANNING@WATTSTOCK.COM
713.248.4148

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION



December 23, 2019

Mr. William Phelps
Alta Power LLC
4605 Post Oak Place Dr., Suite 270
Houston, TX 77027

Subject: LM6000PC TRUE Package Limited Notice to Proceed Proposal for the Goodlow Site

Dear Bill,

After numerous meetings and discussions between and among WattStock LLC, Alta LLC, and GE, we have prepared the following revised proposal. This Proposal is also sometimes referred to herein as Purchase Order.

All terms and conditions of our proposal are contained within our attached Proposal/Purchase Order.

Thank you for this opportunity to work with Alta, and please do not hesitate to call me if you have any questions.

Regards,

WattStock LLC

Jay C. Manning
**President**



## 1. Scope of LNTP Work and LNTP Pricing

| Description | Quantity | Delivery | Price ($) |
|---|---|---|---|
| Woodard Controls Upgrade Hardware | 2 | 2/28/2020 | 453,218 |
| Fin-Fan Lube Oil Cooler | 1 | 2/28/2020 | 188,415 |
| Internal Gas Vent Valve | 2 | 2/28/2020 | 12,495 |
| Generator Enclosure Design to modify from 50Hz Design | 1 | 2/28/2020 | 431,635 |
| Gas Turbine/Generator Coupling | 1 | 2/28/2020 | 90,452 |
| Generator Lube Oil (GLO) Skid | 2 | 2/28/2020 | 443,390 |
| Automatic Voltage Regulator - EX2100e (AVR) | 2 | 2/28/2020 | 44,855 |
| External Block & Bleed Gas Valves | 2 | 2/28/2020 | 69,113 |
| Approx. 1100 hours of Engineering Support for Engineering Drawings | 1 | 2/28/2020 | 149,858 |
| Woodward Acarsoy Cancellation Fee 1 NA | 1 | N/A | 48,213 |
| GE Acarsoy Engineering Labor Charge 1 NA | 1 | N/A | 32,609 |
| Supplier Non-Returnable/Cancellation/Restocking fee's* | TBD* | TBD | TBD |
| 20% WattStock Markup | | N/A | 491,063 |
| TOTAL (subject to maximum increase of $285,000 for items marked *) | | | 2,455,316 |

Notes to Above Table:

*(i) Any Supplier materials related to the 3rd Acarsoy Unit have been cancelled. Those materials that are non-returnable, or subject to supplier cancellation/restocking fees, GE will invoice WattStock at cost plus 10%, and WattStock will in turn invoice Alta for the amount invoiced by GE without further markup. These fees are for items such as: Generator GLO, block valves, gas valves, AVR, etc.*

*(ii) Any reference to Acarsoy cancellation fees does not refer to any cancellation fees or liability that may be payable by WattStock if the Acarsoy PSA is terminated.*

(iii) *Note: The above price is in 2019 US Dollars, and does not include applicable sales, excise, value added, use or similar taxes.*

## 2. LIST OF ENGINEERING ITEMS – *Due within five (5) business days following project financial closing:*

Preliminary Main Unit (General Arrangement)
Preliminary Anchor Bolt
Preliminary One-Line Diagram
Preliminary Foundation Loads
Air Filter (General Arrangement)
Sprint Skid (General Arrangement)
Water Injection (General Arrangement)
Aux Skid (General Arrangement)
Plan & Elevation (P&E) for TCP
Technical Specification for package motors and heaters

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION



## 3. Changes

The LNTP Price shall be adjusted as necessary to take account of (a) Change Orders, or (b) other adjustments specifically provided for in this Proposal. Prices shall not change without the express written consent of Customer in a Change Order signed by both parties.

Changes to specifications, drawings, services or hardware will be evaluated by Seller for a Change in Scope to the Proposal. Seller will quote the changes and a Customer Change Order must be received before work is to proceed.

Storage Costs, additional travel, delays at work, unit restart delays and overtime work out of scope of the project will be subject to the Change Order process above and considered additional work and will be charged according to Seller's published rates at time of execution and in lieu of any pre-existing agreement. As of the date of this revision to the Proposal, no such additional work has occurred.

## 4. Compliance

Compliance and certifications are within current Seller's design practices and standards. The price presented here does not include compliance with any state or local codes unless expressly defined by Customer prior to sale.

## 5. Proposal Basis

Price quoted herein is valid for five (5) days.

Price quoted is per the Terms and Conditions stated herein.

Parts and Services are subject to prior sale.

Subject to Article 2 on this LNTP, delivery time of drawings shall be confirmed upon the execution of Equipment and Services Supply Agreement.

## 6. Commercial Items

Terms and Conditions

This Proposal is in accordance with WattStock Terms and Conditions attached hereto as Exhibit A. In the event of any conflict in the terms and conditions between this LNTP agreement and the WattStock Terms and Conditions, the terms and conditions of the proposal shall govern. Customer and Seller agree that in the event a firm ESA is executed for the TRUEPackages (i) all payments made under this LNTP shall be applied to the ESA Purchase Price**, (ii) all work performed under this LNTP will be deemed to have been work performed pursuant to the ESA, and (iii) the terms and conditions of this LNTP shall be replaced in their entirety by the terms and conditions of the ESA. Upon execution of this LNTP by both parties and receipt by WattStock of the first $750,000 payment referenced in Article 7, this LNTP will supersede the letter signed by Alta Power LLC on August 9, 2019 that the parties have commonly referred to as the "backstop letter".

**As of the date of this LNTP Proposal, the Purchase Price is $19,583,426, based upon the below listed assumptions:

- Scope of work described in Exhibit B attached to December 21, 2019 draft of Equipment Supply Agreement;
- Purchase of 2 Nuh Cemento Units for a combined price of $8,125,000;
- Project financial closing no later than February 28, 2020;
- Guaranteed substantial completion no sooner than 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Site does not change;

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

Page 4 | 15



- Schedule is not substantially different from 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Lender due diligence changes;
- ESA changes from present version;
- ESA Purchase Price subject adjustment in accordance with final terms of the Equipment Supply Agreement, including for example, discovery of latent or concealed conditions which differ materially from those described in the borescope inspection reports.

## 7. Payment Terms & Schedule

| Milestone | Amount | Net Receipt of Invoice |
|---|---|---|
| 1. Upon LNTP Purchase Order Execution | $750,000 | 2 business Days |
| 2. Second Invoice | $750,000 | 5 days |
| 3. Invoice Issued January 28, 2019 Prior to Expected Parts Shipment (Cash received prior to releasing material for shipment) | $464,253 | 25 days |
| 4. Supplier Non-Returnable/Cancellation/Restocking Fees (if any) - to be invoiced no later than January 28, 2020 | TBD | 25 days |
| 5. Upon Financial Close of the Project | $491,063 | 2 days |

All payments will be made via wire transfer and, except as otherwise provided in the Milestone table above, are due no later than 30 days from receipt of Seller's invoice without any setoff (including, without limitation, setoff under other contracts with Seller or with WattStock LLC or its affiliates). These terms will take precedence over any conflicting payment terms referenced. Seller agrees to provide Buyer within two (2) business days following Seller's receipt of Buyer's wire transfer of funds paid to Seller pursuant to this LNTP a wire transfer confirmation showing that such payments made by Buyer to Seller (excluding the payment for Seller's 20% markup to be made upon closing of Buyer's financing for the project referenced in Milestone #5) have been remitted to General Electric Company.

## 8. Termination Schedule

In the event Buyer terminates the Purchase Order through no fault of Seller, or Seller terminates the Purchase Order for Buyer default, the Buyer shall be liable to Seller for the following termination amounts:



| Termination on or Before | Termination Amount Due (USD) |
|---|---|
| 8/16/2019 | 15% of Contract |
| 9/16/2019 | 30% of Contract |
| 10/25/2019 | 75% of Contract |
| 12/6/2019 | 100% of Contract |

Upon receipt of payment of all amounts due, (i) WS will deliver to Buyer all materials procured under this LNTP to which WattStock has received title from GE, and (ii) Buyer and Seller shall then have no further liability to the other under this LNTP.

## 9. Invoicing Methods

Unless mutually agreed otherwise, WattStock shall submit invoices to Customer by e-mail, and if Customer so requests then WattStock shall also provide to Customer a paper invoice by regular mail.



## 10.Submittal and Acceptance

This proposal submitted by:

Name:  Jay C. Manning

Title:  President

For:  WattStock LLC

Date:  July 19, 2019

This Proposal is accepted by Customer:

Name:

Title:  CFO

For:  Alta Power LLC



**EXHIBIT A – TERMS AND CONDITIONS OF SALE**

**1. Scope of Supply**

1.1. The Seller shall supply the Equipment and perform the associated Services as more fully described in the Proposal, subject to the terms and conditions as set forth in the Contract. The Equipment and Services are collectively referred to herein as the "Work".

**2. Price**

2.1. The Buyer shall pay to the Seller the Contract Price in consideration of the Work. The Contract Price is exclusive of sales, VAT or other taxes, which will be added at the time of invoicing, unless a tax exemption or resale certificate is provided. The Contract Price shall be adjusted as necessary to take account of (a) Change Orders, including those related to the exercise of any options that may be described in the Proposal, or (b) other adjustments provided for in the Contract.

**3. Payments**

3.1. Payment of the Contract Price shall be made via wire transfer in accordance with the Payment Schedule and the payment terms set forth in the Proposal..

3.2. Wire transfer instructions shall be provided on each invoice. Payments are due ten [10] days from Buyer's receipt of Seller's invoice. Late payments shall be subject to an interest charge equal to the lesser of (i) five percentage points (5%) in excess of the prime rate as published in the Wall Street Journal, at that time, compounded on a monthly basis or (ii) the maximum rate allowed by applicable law.

3.3. Seller may require that any or all payments by Buyer to Seller will be secured by an on-demand irrevocable standby letter of credit issued or confirmed by a United States or other bank acceptable to Seller on terms acceptable to Seller ("Payment Security"). If required by Seller, the Payment Security shall become operative and delivered to Seller within (30) thirty Days after the Effective Date, but in any event prior to Seller delivery of the Equipment to Buyer. All Payment Security shall provide for partial payments pro rata on partial deliveries and for the payment of any charges for storage, export shipment, price adjustments, cancellation or termination, and all other payments due from Buyer under this Contract against Seller's invoice and certification of the charges and grounds for such payment. Buyer will increase the amount(s) and/or extend the validity period(s) and make appropriate modifications to any Payment Security within-ten (10) days of Seller's notification that such is necessary to provide for payments to become due.

**4. Effect of Changes in Contract Price**

4.1. If any adjustment results in an increase to the Contract Price, Buyer shall pay for the increase in accordance with the applicable Change Order and corresponding invoice submitted by Seller. If any adjustment results in a decrease in the Contract Price, payments previously made shall be retained by the Seller and will be applied to subsequent payments as they become due.

4.2. Seller shall not be responsible for back charges or field modifications performed by Buyer unless Seller authorizes such charges in writing prior to the incurrence thereof. Buyer specifically waives any right of set-off relating to such charges. Any claim or set-off for back charges shall be accompanied by a copy of such written authorization. In no event shall Buyer offset any amounts due under the Contract by amounts that may be due Buyer from Seller or any of its Affiliates under this Contract or any other agreement, judgment or order.

**5. Certain Buyer Obligations**

5.1. In addition to the other Buyer obligations described in the Contract, Buyer shall be responsible for timely obtaining all permits required for owning, installing, operating and maintaining the Equipment, including environmental and use permits, all other licenses (including but not limited to export licenses, import licenses), exemptions, permits (including but not limited to foreign exchange permits and work permits), authorizations, approvals, local building and construction permits, and easements necessary for the construction and operation of the Facility, and shall be responsible for any additional costs, fees or fines arising from any delay or failure to obtain such permits, licenses, exemptions, authorizations or approvals, even though any such permits, licenses, exemptions, authorizations or approvals may be applied for by Seller.

5.2. Seller shall not be liable if any permits, licenses, exemptions, authorizations or approvals are delayed, denied, revoked, restricted or not renewed and Buyer shall not be relieved thereby of its obligations under this Contract, including paying Seller for the Equipment.

**6. Delivery.**

6.1. The Seller shall deliver the Equipment ExWorks (Incoterms 2010) ("Delivery").

**7. Risk of Loss.**

7.1. With respect to each item of Equipment, risk of loss shall pass to the Buyer upon the earliest of (i) Delivery, (ii) shipment to storage as provided hereinbelow, or (iii) passage of title to the Buyer pursuant to Contract.

**8. Shipment to Storage.**

8.1. If any part of the Equipment cannot be shipped to the Buyer when ready due to any cause not attributable to the Seller, the Seller may ship such Equipment to storage, such storage being in accordance with any technical specifications or other instructions provided by the Seller. Buyer shall make all reasonable efforts to inform Seller of the potential for this event to occur. If such Equipment is placed in storage, including storage at the Seller's facility, the following conditions shall apply: (i) title and risk of loss shall thereupon pass to the Buyer; (ii) any amounts otherwise payable to the Seller upon Delivery or shipment shall be payable upon presentation of the Seller's invoice(s); (iii) all expenses incurred by the Seller, such as for preparation for and placement into storage, handling, inspection, short-term preservation, storage, removal charges and any taxes shall be payable by the Buyer upon submission of the Seller's invoice(s); (iv) if the Contract includes Services, any such Services shall be subsequently changed to the rate prevailing at the time of actual use and Buyer shall pay the net increase; and (v) when conditions permit and upon payment of all amounts due hereunder, the Seller shall resume Delivery of the Equipment. Notwithstanding anything to the contrary contained herein, storage, and shipment to storage, and arranging for insurance once in storage is



8.2. the sole and direct responsibility of the Buyer and the Seller shall not assume any liability associated therewith and Buyer shall indemnify, defend and hold Seller harmless for any damages, costs, expenses and fees, including reasonable attorneys' fees associated therewith. Any Seller invoicing or collection related to shipment is only a service provided to the Buyer and represents no direct or indirect responsibility associated with storage.

9. Observation and Inspection

9.1. Observation at the Site.

9.1.1. The Seller shall be afforded access during normal business hours to observe the Work in progress at the Site. The Seller may visit the Site at any time or times, or may maintain representatives to observe Buyer's or Buyer's contractors work, provided such activity and inspections do not unreasonably interfere with the Work.

9.2. Inspections and Tests at Seller's Facilities.

9.2.1. Upon the Buyer's request, the Buyer's inspector shall be provided reasonable access to the Seller's facilities during normal business hours to obtain information on production progress and make inspections.

9.2.2. Inspections and Tests at Suppliers' Facilities.

9.2.3. Subject to the conditions set forth in the foregoing paragraph, the Seller will make reasonable efforts to obtain for the Buyer's access to Seller's suppliers' facilities for the purposes described in the paragraph above if applicable.

10. Warranty

10.1. Warranty Period.

10.1.1. The Seller shall warrant the Equipment and the associated Services on the terms set forth in this Article for twelve (12) months following the date the Equipment is energized at the Site or eighteen (18) months following the date of Seller's Notice of Delivery/Readiness to Ship, whichever period shall first expire (the "Warranty Period"), unless otherwise stated in the Proposal. Equipment must be transported and stored in accordance with Seller's recommendations.

10.2. Warranty Coverage

10.3. The Seller warrants to the Buyer that during the Warranty Period (i) the Equipment to be delivered hereunder (A) shall meet the technical specifications outlined in the Proposal when operated in accordance with the Seller's or original manufacturer's written guidelines or operation instructions and, in the absence thereof, in accordance with generally accepted operation practices of the electric power producing industry, and (B) shall be free from defects in material, workmanship and title; and (ii) the Services shall be performed in a competent, diligent manner.

10.4. Remedy

10.4.1. If the Equipment delivered or Services performed hereunder do not meet the above warranties during the Warranty Period, the Buyer shall promptly notify the Seller in writing and make the Equipment available for correction. The Seller shall thereafter, as soon as is practicable, correct any warranty defect, at its option and expense, (i) by re-performing the defective Services, (ii) repairing the defective part of the Equipment, or (iii) by making available necessary

replacement parts at Seller's factory. Buyer shall, at Seller's option, return any defective part that is replaced by Seller at Buyer's expense to Seller's designated repair facility within thirty (30) Days from the date of written instruction by Seller. The Seller shall provide technical advisory Services reasonably necessary for any such repair of the Equipment, but the Seller shall not be responsible for (i) removal or replacement of structures or other parts of the facility and (ii) site labor or transportation of parts or components. The Buyer shall be responsible for the installation of any repaired or replacement part and for payment of any customs duties or similar levies, which may be assessed as a result of the shipment of any such replacement parts. If a defect in the Equipment or part thereof cannot be corrected by the Seller's reasonable efforts, the Parties will negotiate an equitable adjustment in price with respect to such Equipment or part thereof, however the adjustment in price shall be limited to the price of the respective equipment

10.5. Warranty on Remedial Work.

10.5.1. Any re-performed service or repaired or replacement part furnished under this warranty shall carry warranties on the same terms as set forth above, except that the applicable warranty period for the repair/replacement part or re-performed Service shall be for the longer of (a) the remainder of the original Warranty Period or (b) three (3) months from the date of such re-performance, repair or replacement. In any event the repair/replacement warranty period and the Seller's responsibilities set forth herein for such repaired or replacement part shall end no later than three (3) months after expiration of the original Warranty Period.

10.6. Exclusions.

10.6.1. The Seller does not warrant the Equipment or any repaired or replacement parts against normal wear and tear, including that due to environment or operation, or erosion, corrosion or material deposits from fluids. The warranties and remedies set forth herein are further conditioned upon (i) the proper storage, installation, operation, and maintenance of the Equipment in conformance with the operation instruction manuals (including revisions thereto) provided by the Seller and/or its subcontractors or suppliers, as applicable (including any required warranty preservation services in the event of long term storage) and (ii) repair or modification pursuant to the Seller's instructions or approval. The Buyer shall keep proper records of operation and maintenance during the Warranty Period and make such records available to Seller for reasonable review and inspection.

11. Exclusive Remedies and Warranties.

11.1. THE PRECEDING PARAGRAPHS SET FORTH THE SOLE AND EXCLUSIVE REMEDIES FOR ALL CLAIMS BASED ON FAILURE OF OR DEFECT IN THE EQUIPMENT AND SERVICES PROVIDED UNDER THE CONTRACT, WHETHER THE FAILURE OR DEFECT ARISES BEFORE OR DURING THE WARRANTY PERIOD AND WHETHER A CLAIM, HOWEVER INSTITUTED, IS BASED ON CONTRACT, INDEMNITY, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND GUARANTEES WHETHER WRITTEN, ORAL, IMPLIED



OR STATUTORY. NO IMPLIED STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY

12. Taxes

12.1. Seller Taxes.

12.1.1. Unless otherwise specified in the Contract, the Seller shall be responsible for, and shall pay directly, all sales and use taxes imposed on Seller or its subcontractors and for which they are required to pay sales and use tax, (b) all personal property taxes imposed on Seller, (c) all franchise and income taxes imposed on Seller or its subcontractors, and (d) all payroll, unemployment, occupational, or employment compensation tax, social security tax, or similar tax, each as imposed on Seller or its subcontractors ("Seller Taxes"). If Buyer deducts or withholds Seller Taxes, the Buyer shall furnish within thirty (30) Days of the Seller's request official receipts from the appropriate governmental authority for each deducted or withheld Seller Taxes.

12.2. Buyer Taxes.

12.2.1. Equipment exported from the United States is presumed to be exempt from Buyer taxes levied with the United States. When requested by Seller, Buyer agrees to furnish without charge evidence of tax or duty exemption acceptable to the taxing or customer authorities. Furthermore, if Buyer arranges for export shipment, Buyer agrees to provide Seller without charge, an export bill of lading. The Buyer shall be responsible for, and shall pay directly when due and payable, (a) any sales or use taxes, duties, or dues directly imposed on Buyer with respect to the Work or Equipment (b) real and personal property taxes on the Site, Facility or any Equipment to which Owner holds title at the relevant time; and (c) income taxes directly imposed on Buyer to the Seller hereunder ("Buyer Taxes"). All payments due and payable by the Buyer to the Seller hereunder shall be made in the full amount of the Contract Price, free and clear of all deductions and withholding, for Buyer Taxes. If the Buyer deducts or withholds Buyer Taxes from Seller payments, the Buyer shall pay additional amounts to the Seller to cause the amounts actually received by the Seller, net of deducted or withheld Buyer Taxes, to equal the full amount of the Contract Price, and shall provide to the Seller within thirty (30) Days of Seller's request, accurate official receipts from the appropriate governmental authority for deducted or withheld Buyer Taxes. If the Seller is required to pay Buyer Taxes, the Buyer shall, promptly upon presentation of the Seller's invoice for such Buyer Taxes, pay to the Seller in the Contract Currency an amount equal to the U.S. dollar of such Buyer Taxes

13. Invoices.

13.1. The Seller shall issue an official value-added, sales (or similar) tax invoice in addition to the Contract Price, in accordance with applicable laws

14. Duty Drawback.

14.1. All rights to drawback of customs duties paid by the Seller to the customs authorities of the country of manufacture of any Equipment belong to and shall remain with Seller. Buyer agrees to cooperate with Seller and to furnish such documents to Seller as may be necessary to obtain drawback.

15. Changes

15.1. Changes Resulting from Force Majeure, Changes in Codes, or Changes in Law.

15.1.1. If any change to the Codes and Standards, Ambient Site Conditions, Site Requirements or any Change in Law has a negative impact in the cost or time to perform the Work or requires a change to the Equipment or Services, the Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted. If the Seller is entitled to a Change Order, the Seller shall submit to the Buyer a draft Change Order.

15.2. Buyer-Initiated Changes.

15.2.1. The Buyer shall have the right to request that the Seller consider changes to the Equipment or the Services, including modifications, alterations or additions. If the Buyer wishes to request such a change, the Buyer shall notify the Seller in writing. Within fifteen (15) Days after receipt of such notice (unless otherwise extended by mutual agreement), the Seller shall advise the Buyer of the feasibility of the requested change, and shall submit to the Buyer a draft Change Order, unless the matter requires further investigation and research in which case Seller will provide an estimate of the time frame in which Seller will be able to submit a detailed response to Buyer.

15.3. Seller-Initiated Changes.

15.3.1. If the Seller wishes to propose a change, or if the Seller is entitled to a Change Order pursuant to the provisions of this Contract, the Seller shall submit to the Buyer a draft Change Order.

15.4. Contents of Draft Change Order

15.4.1. Any draft Change Order shall include: (i) a technical description of the proposed change in such detail as the Buyer may reasonably require, (ii) a lump sum firm price adjustment (increase or decrease) in the Contract Price, if any, caused by the proposed change, (iii) all potential effect(s), if any, on the Scheduled Delivery Date(s), or any other schedule or date for performance by the Seller hereunder caused by the proposed change, and (iv) all potential effect(s), if any, on the Seller's ability to comply with any of its obligations hereunder, including the Seller's warranties and Performance Guarantees caused by the proposed change.

15.5. Process for Concluding Change Order.

15.5.1. The Buyer shall, within two (2) Days from the date of receipt of such information, either approve or disapprove the draft Change Order in writing or request additional time to consider the draft Change Order. If the Buyer approves the Change Order, the Buyer and the Seller shall then sign the Change Order that shall operate as an amendment to this Contract. Any delays resulting from a delay in this procedure are the sole responsibility of the Buyer.

15.6. Agreement Required.

15.6.1. Except for Change Orders to which the Seller is expressly entitled pursuant to this Contract, all changes under this contract shall be subject to mutual agreement, and no Change Order will be effective until signed by both Parties.

16. Excusable Delays



16.1. The Seller shall not have any liability or be considered to be in breach or default of its obligations under this Contract to the extent that performance of such obligations is delayed or prevented, directly or indirectly, due to, but not limited to, the following:

16.1.1. causes beyond its reasonable control;

16.1.2. acts of God;

16.1.3. acts (or failures to act) of governmental authorities;

16.1.4. fires, severe weather conditions, floods earthquakes;

16.1.5. strikes or other labor disturbances;

16.1.6. war (declared or undeclared), terrorism, epidemics, civil unrest, riots;

16.1.7. delays or accidents in transportation or car or transporter shortages; or

16.1.8. delays in the prerequisite work of the Buyer, Buyer's other contractors or suppliers, or other acts (or omissions) of the Buyer, including but not limited to failure to promptly: (A) provide the Seller with information and approvals necessary to permit the Seller to proceed with work immediately and without interruption, or (B) comply with the terms of payment; or shipment to storage in accordance with the Contract.

16.2. The Seller shall notify the Buyer of any such excusable delay. Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted.

17. General Indemnity

17.1. General Indemnity.

17.1.1. Each party (each an "Indemnifying Party") shall be liable to and indemnify the other party, its officers, employees, agents and subcontractors (each an "Indemnified Party") for any physical injuries to third parties or physical damage to third party property, and, at its expense, shall defend against and hold the Indemnified Party harmless from any claims raised by a third party arising in connection with the Contract, to the extent such physical damages are caused by the negligence of the Indemnifying Party or its officers, employees, agents or subcontractors and to the extent the Indemnified Party is liable to the third party under applicable law.

17.2. Concurrent Negligence.

17.2.1. If physical damage or injury is caused by the joint or concurrent negligence of the parties, their officers, employees, agents, or subcontractors, the parties shall bear the loss in proportion to their or their officers', employees', agents' or subcontractors' degree of negligence.

17.3. Notice.

17.3.1. The indemnities provided in this Article shall apply only if the party seeking indemnity gives the Indemnifying Party prompt notice of any claim and provides the Indemnifying Party all necessary information and assistance so that the Indemnifying Party may, at its option, defend or settle the claim.

17.4. "Third Parties" Defined.

17.4.1. "Third parties" under this Article do not include the Parties, the owner of the Site, their affiliates, agents, successors or assigns, any operation or maintenance contractor of the Parties or the owner of

the Site, or any entity (i) with an equity or security interest in any Party or the owner of the Site, or their assets or property, (ii) that seeks to claim any rights, power or privileges of one of the Parties or the owner of the Site, or (iii) that seeks to claim as a third party beneficiary of one of the Parties or the owner of the Site. No portion of the Equipment, the Facility, electricity, fuel or hydrocarbons is "third party property" for the purposes of this Article.

18. Insurance

18.1. Insurance for Injuries to Workers (Worker's Compensation).

18.1.1. During the term of this Contract, both Parties shall maintain the insurance for work-related injuries or disease of their own employees in such forms and amounts as may be required by laws that are applicable to each Party and its employees.

18.2. General Liability and Automobile Insurance

18.2.1. During the term of this Contract, each Party shall maintain the following insurance coverage at its own expense to protect its own interests: (i) Commercial General Liability or Public Liability insurance, in broad form, either per occurrence and effective for at least three years after the expiration of the Contract, that includes coverage for contractual liability, bodily injury and third party property damage, with a combined single limit of not less than U.S. $1,000,000 per occurrence and U.S. $1,000,000 in the aggregate annually, for primary and excess policies combined; and (ii) automobile liability insurance covering all owned, non-owned, and hired automobiles used by it in connection with the Work, if any, with a combined single limit of not less than U.S. $1,000,000 per occurrence, for primary and excess policies combined.

18.2.2. Each of the foregoing insurance policies shall not be cancelled or materially changed without thirty (30) Days' advance written notice to the other Party or, in the case of non-payment, ten (10) Days' advance written notice. Upon request, each Party shall deliver to the other Party certificates of insurance showing that the foregoing insurance is in full force and effect.

18.3. Failure to Maintain Insurance.

18.3.1. If at any time the Buyer fails to maintain insurance complying with the requirements of the Contract in full force and effect, (a) the Buyer shall be responsible for any resulting losses or costs sustained by the Seller and shall hold the Seller harmless from actions brought against the Seller as the result of the absence of the Buyer's required insurance, and (b) the Seller shall not be required but may elect to do any of the following: (i) immediately suspend all or a portion of the Work and be entitled to an equitable adjustment in the price, schedule and other terms of this Contract for the impact of the suspension, (ii) pay premiums or purchase alternate insurance at Buyer's expense or (iii) pursue such other remedies as may be allowed by law, equity, or the Contract.

19. Buyer's Risks.

19.1. In no event shall the Seller be responsible for Buyer's Risks. Buyer's Risks include damages and losses due to (i) war, hostilities, terrorism, rebellion, revolution, civil disturbances, nuclear radiation or similar occurrence, (ii) acts or omissions of the Buyer, (iii) natural perils (such as flood or earthquake) or other perils to the extent that peril is



excluded from the ARBR/CAR policy coverage or the loss is in excess of the policy limits.

20. Suspension

20.1. Suspension by Buyer of Work at Site.

20.1.1. The Buyer shall have the right, at any time, to suspend Work at the Site upon written notice to the Seller. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension.

20.2. Suspension by Buyer of Work in Seller's Facilities.

20.2.1. It is expressly agreed that the Buyer shall have no right to suspend Work of Seller on the Equipment before Delivery.

20.3. Suspension by Seller.

20.3.1. The Seller shall have the right to suspend all Work, including the delivery of any Equipment, upon the failure of the Buyer to make any payment when due. The Seller shall further have the right to suspend any shipment of the Equipment if all payments due prior to the applicable Scheduled Delivery Date have not been made. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension, except that Seller's suspension shall not be deemed to extend the Warranty Period hereunder.

21. Termination for Cause

21.1. Grounds for Termination by Buyer.

21.1.1. The Buyer shall have the right to terminate the Contract for cause in the event that the Seller: (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; (ii) substantially breaches and fails to comply or perform its material obligations hereunder (but only with respect to a material obligation for which this Contract does not provide exclusive remedies), (iii) notwithstanding satisfaction of all conditions precedent, Seller refuses to execute a loan agreement on terms substantially in accordance with the Loan Agreement Term Sheet attached to this LNTP, provided that: (A) the Buyer shall first have provided the Seller with written notice of the nature of such breach and of the Buyer's intention to terminate this Contract as a result of such breach, and (B) the Seller shall have failed within thirty (30) Days after receipt of such notice (or such extended period as is considered reasonable by the Parties) either (1) to commence to cure such breach and diligently thereafter to pursue such cure, or (2) to provide reasonable evidence that no such breach has occurred; or (iv) Seller's relationship with General Electric Company, or any of its affiliates, is terminated through no fault of the Buyer.

21.2. Remedy in the Event of Termination by Buyer.

21.2.1. If the Buyer terminates the Contract as provided above, the Buyer shall pay the Seller for that portion of the Contract Price allocable to the Equipment title transferred or Services performed prior to the termination. If the payments received by the Seller as of the date of such termination are in excess of such portion of the Contract Price, the Seller shall return the excess of such payments to the Buyer. In addition, the Seller shall pay to Buyer an amount equal to the difference between that portion of the Contract Price allocable to the terminated Work and such actual and reasonable amount paid by the Buyer to another vendor for equipment comparable to those terminated, subject to the limitation of liability set forth in Article 22.

21.3. Grounds for Termination by Seller.

21.3.1. The Seller shall have the right to terminate the Contract for cause in the event that the Buyer: (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; or (ii) substantially breaches and fails to comply or perform its material obligations hereunder, including failure to comply with the requirement of the Contract, or fails to make any payment when due or to fulfill any payment conditions, including any payment security, as set forth in this Contract, provided: (A) that the Seller shall first have provided the Buyer with written notice of the nature of such failure and of the Seller's intention to terminate this Contract as a result of such failure, and (B) that the Buyer shall have failed within thirty (30) Days after receipt of such notice to correct such failure.

21.4. Remedy in the Event of Termination by Seller.

21.4.1. If the Seller terminates the Contract as provided above, the Buyer shall pay to the Seller the charges set forth in the Termination Schedule. In such event, Seller shall retain title to all Equipment not yet delivered to Buyer as of the effective date of termination.

22. Limitation of Liability

22.1. Limitation.

22.1.1. The total liability of the Seller for all claims arising out of or relating to the performance or breach of the Contract or use of any Equipment shall not exceed the portion of the Contract Price allocable to the portion of the Equipment giving rise to the claim. The Seller's liability shall terminate at the end of the Warranty Period for the Equipment giving rise to the claim. The Buyer may enforce a claim that accrued before that date by commencing an action, as applicable under the dispute resolution clause, before the expiration of the applicable statute of limitations or repose, but not later than ninety (90) Days after the expiry of the Warranty Period.

22.2. Consequential Damages.

22.2.1. The Seller shall not be liable for loss of profit or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages.

23. Sale, Transfer, Assignment to Third Party.



23.1. If the Buyer is supplying, transferring or assigning the Work to a third party, the Buyer shall require the third party to agree to be bound by this Article. If the Buyer does not obtain this agreement for the Seller's benefit, or if the agreement is found void or unenforceable, the Buyer shall indemnify, defend and hold the Seller, its Affiliates, subcontractors and suppliers of any tier, and their agents and employees, individually or collectively, harmless from and against any and all liability arising out of claims made by the third party in excess of the limitations and exclusions of this Article.

24. Gratuitous Advice.
    24.1. The Seller shall not be liable for any advice or assistance that is not required under this Contract.

25. Limitations to Prevail.
    25.1. The limitations and exclusions in the Contract shall apply regardless whether a claim is based in contract (including warranty or indemnity), tort (including negligence or strict liability), statute, equity or any other extra-contractual theory.

26. Limitation of Remedies; Overriding Effect.
    26.1. The Buyer's and the Seller's rights, obligations and remedies arising out of or relating to the Work are limited to those rights, obligations and remedies described in the Contract. This Article shall prevail over any conflicting or inconsistent terms in the Contract, unless those terms further restrict the Seller's liability.

27. Export Control
    27.1. Export Controls.
        27.1.1. The Buyer hereby agrees that it shall not, except as said laws and regulations may expressly permit, make any disposition by way of transshipment, re-export, diversion or otherwise, of U.S. origin goods and technical data (including computer software), or the direct product thereof, supplied by the Seller hereunder. The obligations of the Parties to comply with all applicable export control laws and regulations shall survive any termination, or discharge of any other contract obligations.
    27.2. Buyer to Keep Informed.
        27.2.1. The Buyer undertakes to keep itself fully informed of, and to comply with, the export control laws and regulations of the respective Government and any amendments thereof.

28. Assignment
    28.1. Eligible Assignees.
        28.1.1. An Eligible Assignee is: (i) an Affiliate of the Buyer, or (ii) an engineering or construction contractor under contract with the Buyer for the installation of the Equipment, provided that the Eligible Assignee offers Seller satisfactory evidence of its ability (both financial and otherwise) to fulfill the obligations of Buyer hereunder; in either case provided that the Seller would not be penalized or become subject to additional requirements under any Law as a result of entering into contract with such person.
    28.2. Buyer's Right to Assign to Eligible Assignees.
        28.2.1. The Buyer may once assign its rights and delegate its obligations under the Contract to an Eligible Assignee, provided: (i) that the Buyer shall notify the Seller of its intent to assign no less than ten (10) Days prior to the execution of any such assignment; (ii) that Buyer

shall either (at Seller's option and election) (A) guarantee the obligations of the assignee by executing a guaranty in a form acceptable to Seller or (B) retain its obligations under any payment, indemnity and any bonus provisions of the Contract; (iii) that the first assignee may not further assign or delegate any rights or obligations hereunder except to the original Buyer; and (iv) that the Buyer shall in no event assign to its engineering or construction contractor the right to receive liquidated damages under the Contract.

28.3. Collateral Assignment.
    28.3.1. The Buyer may also assign a collateral interest in this Contract to a lender who is not an Eligible Assignee as collateral security for a loan for the acquisition of the Equipment, provided however, that Buyer and Lender agree that any future assignment to the Lender shall occur only as the result of the exercise by Lender of its remedies under the loan agreements relative to a bankruptcy or liquidation of Buyer. Under no circumstances, however, shall a collateral assignment require Seller to deliver Equipment to Buyer or an assignee if Seller has not been fully paid for such Equipment.

28.4. All Other Assignments and Transfers by Buyer.
    28.4.1. All other assignments or transfers by Buyer of any or all of its duties or rights under this Contract (by operation of law or otherwise) are subject to Seller's prior written consent. Further, Buyer agrees that, until Buyer receives title to the Equipment as set forth herein, Buyer shall not, directly or indirectly sell, offer to sell or otherwise broker the Equipment.

28.5. Seller's Right to Assign.
    28.5.1. The Seller may assign its rights and delegate its obligations under this Contract to any Affiliate or subsidiary company. Seller may assign its rights and obligations to other parties with the prior written consent of Buyer. In the event of such assignment, the Seller's assignee will be responsible for the assigned Work and will invoice directly to and collect payments directly from the Buyer.

28.6. Conditions.
    28.6.1. Any assignment shall be subject to all limitations of liability contained in this Contract. The Buyer may not assign this Contract except in accordance with this Article. Any purported assignment not in accordance with this Article shall be void and without effect.

29. Dispute Resolution
    29.1. Referral to Senior Management.
        29.1.1. Any and all controversies, disputes or differences between the Parties to the Contract, if not amicably settled by the Parties with thirty (30) Days following written notice of dispute, shall be referred to senior management of the Parties for resolution. In the event the dispute has not been resolved within forty-five (45) Days following referral to senior management, or such longer period as the Parties may mutually agree, then either Party may, upon ten (10) Days' notice to the other party, pursue their remedies at law.

30. Venue.
    30.1. Any legal action or proceeding with respect to the Contract shall be brought in the United States District Court for the Southern District of Texas or, in a District Court of the State of Texas in Harris County. Each of the Parties hereby accepts and consents to, generally and



unconditionally, the jurisdiction of the aforesaid courts and appellate courts from any appeal thereof. Each of the Parties irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at the address first set forth in the this Contract. Each of the Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Contract brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

31. Governing Law

31.1. The Contract, including but not limited to, the validity, performance and all matters relating to the interpretation and effect of this Contract and all further documents executed pursuant to it, shall be construed and interpreted in accordance with the laws of the State of Texas, excluding their conflict of law rules, provided that any provision of such law invalidating any provision of this Contract or modifying the intent of the Parties as expressed in the terms of this Contract shall not apply.

32. Effective Date

32.1. The Contract shall become effective when it is signed by both Parties (the "Effective Date"), however, the Seller shall not be required to commence any Work associated with, connected to, or arising from, directly or indirectly, the Equipment or Services, until the Seller receives the initial payment described in the Proposal, together with any required Payment Security. Further, if the initial payment or required Payment Security is not timely received in accordance with the terms of this Contract (the "Delayed NTP"), in addition to Seller's right to terminate, the Seller shall have the right to adjust the Scheduled Delivery.

33. Entire Agreement

33.1. The Contract represents the entire agreement between the Parties with respect to the Work, and supersedes in its entirety all prior agreements concerning the subject matter hereof, and no modification, amendment, revision, waiver, or other change shall be binding on either Party unless consented to in writing by the Party's authorized representative. Any oral or written representation, warranty, course of dealing, or trade usage not contained or referenced herein shall not be binding on either Party. Each Party agrees that it has not relied on, or been induced by, any representations of the other Party not contained in the Contract.

34. Miscellaneous Provisions

34.1. Third-Party Beneficiaries.

34.1.1. Except as provided in the Article entitled "Limitation of Liability", these provisions are for the benefit of the Parties hereto and not for any other third party.

34.2. Survival.

34.2.1. All provisions or obligations contained in the Contract which by their nature or effect are required or intended to be observed, kept or performed after termination or expiration of this Contract shall survive and remain binding upon and for the benefit of the Parties, including, without limitation, the Articles with the following titles, which shall survive termination of this Contract: Taxes, Warranty, Patents, General Indemnity, Limitation of Liability, Proprietary Information, Dispute Resolution, Governing Law, Software License, Personal Data Protection, Export Control, Contract Documents, Entire Agreement and Miscellaneous Provisions.

34.3. Non-Waiver.

34.3.1. Waiver by either Party of any right under the Contract shall not be deemed a waiver by such Party of any other right hereunder.

34.4. Invalidity.

34.4.1. The invalidity in whole or in part of any part of the Contract shall not affect the validity of the remainder of this Contract.

35. Counterparts.

This Contract may be signed in any number of counterparts, each of which shall constitute one and the same instrument.



# EXHIBIT "4"

# PURCHASE AND SALE AGREEMENT

## BETWEEN

**EthosEnergy Power Solutions LLC**

### And

**WATTSTOCK LLC**

-i-

## GAS TURBINE GENERATOR PURCHASE AND SALE AGREEMENT

This GAS TURBINE GENERATOR PURCHASE AND SALE AGREEMENT ("Agreement"), dated as of the 13th day of May, 2019 ("Execution Date"), is made and entered into by and between EthosEnergy Power Solutions, LLC ("Seller") and WattStock LLC, ("Buyer"). Buyer and Seller are referred to herein individually as a "Party" and collectively as the "Parties".

## WITNESSETH:

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Equipment (as defined herein) pursuant to the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1  Certain Definitions.   For purposes of this Agreement, the following terms have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power (i) to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise), (ii) to vote fifty percent (50%) or more of the total combined voting power of such Person, or (iii) to direct the voting of sufficient securities to elect at least 50% of the board of directors or similar governing body of such Person.

"Agreement" shall have the meaning provided in the preamble.

"Applicable Law(s)" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets.

"Bill of Sale" means that bill of sale to be executed by Seller and delivered to Buyer in accordance with the terms herein, substantially in the form attached hereto as Exhibit B.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Houston, Texas are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Buyer" shall have the meaning provided in the preamble.

"Claim" means any demand, obligation, liability, action, claim (including, but not limited to, any claim for damage to property or injury to or death of any persons), cause of action

chose in action, right of recovery or right of set-off of whatever kind, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority of any nature whether civil, criminal, regulatory or otherwise and whether at law or in equity.

"Delivery Date" means the date(s) that Seller gives notice that the Equipment (as described in Exhibit A) is available Ex Works at the Delivery Point.

"Delivery Point" shall have the meaning provided in Section 4.3.

"Environmental Law(s)" means all Applicable Laws in effect on the date hereof, relating to the protection of human health and safety, the environment, or natural resources, including but not limited to any Laws relating to Releases of regulated substances or Hazardous Materials.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the ownership or operation of the Equipment including, without limitation, Liabilities related to:

(a)     the transportation, storage, use or disposal of Hazardous Materials, waste or other regulated substances;

(b)     the Release of Hazardous Materials, waste or other regulated substances;

(c)     any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments;

(d)     any other obligations imposed under Environmental Laws with respect to the Equipment; and

(e)     all obligations with respect to personal injury, property damages, wrongful death and other damages and losses arising under Applicable Law as a result of any of the matters identified in subparagraphs (a) – (d) of this paragraph.

"Equipment" means those items listed on Exhibit A attached hereto.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of a governmental entity or any political subdivision thereof, and any tribunal, court or arbitrator(s) of competent jurisdiction.

"Hazardous Materials" means all substances defined or regulated as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or regulated under Environmental Laws.

"Law" means any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, order, injunction, writ, decree or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, damages, expenses, awards, judgments, settlement payments, fines, penalties, costs, royalties, proceedings, deficiencies or

obligations (including, without limitation, those arising out of any Claim, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, accrued, contingent or otherwise and whether due or to become due, and whether or not resulting from Third Party Claims, and any reasonable out-of-pocket costs and expenses (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any Claim or in investigating any of the same or in asserting any rights hereunder), but not including damages based on any theory of liability for any special, indirect, incidental, consequential (including lost profits), exemplary, or punitive damages.

"Lien" means any lien, mortgage, pledge, security interest, lease, charge, option, conditional and installment sales agreements, right of first refusal, any transfer restriction under any shareholder or similar agreement or any encumbrance of any kind.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Party" or "Parties" shall have the meaning provided in the preamble.

"Permitted Liens" means Liens securing payment to materialmen, warehouse, storage, mechanics, repairmen, employees, contractors, operators, royalty owners and taxing authorities or the Landlord and other similar Liens or charges relating to any of the Equipment to the extent any of the foregoing arise as a result of any inspection, work, survey or services performed at the request of Buyer, or any of its Affiliates, contractors or agents.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Personal Property Taxes" means any ad valorem Taxes or personal property Taxes due or payable as a result of the ownership of the Equipment.

"Purchase Price" means TWO HUNDRED THOUSAND AND NO/100 US DOLLARS (USD$200,000.00) for the Equipment.

"Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit or disposal of Hazardous Materials, waste or other regulated substances into the environment.

"Seller" shall have the meaning provided in the preamble.

"Seller's knowledge" or "to the knowledge of Seller" means the actual knowledge of the current employees of Seller or its Affiliates directly and actively engaged in the operation, maintenance or storage of the Equipment.

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Internal Revenue Code § 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed

by or on behalf of any Governmental Authority, in each case whether such Tax arises by law, contract or otherwise.

"Third Party Claim" means a Claim by a Person (including a Governmental Authority) other than Buyer, Seller or their respective Affiliates, successors, assigns, officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys.

"Transaction Documents" means this Agreement and the Bill of Sale.

## ARTICLE II
## PURCHASE AND SALE OF EQUIPMENT

2.1 Purchase and Sale of Equipment. Subject to the terms and conditions contained herein, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase, accept and receive from Seller, all of Seller's right, title and interest in and to the Equipment.

2.2 Purchase Price. In consideration of payment by Buyer to the Seller of the Purchase Price, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Equipment in accordance with the terms of this Agreement.

2.3 Payments to be Delivered by Buyer. Buyer shall deliver to Seller Purchase Price in accordance with Article III.

2.4 Documents to Be Delivered by Seller. Following Seller's receipt of the Purchase Price in cleared and immediately available funds, Seller shall deliver to Buyer the Bill of Sale.

## ARTICLE III
## PAYMENTS

Upon the terms and subject to the conditions contained in this Agreement, in consideration of the sale, assignment, transfer and delivery of the Equipment, Buyer shall cause to be paid to Seller the nonrefundable Purchase Price as follows:

3.1 Payment

Within three (3) Business Days of the execution of this Agreement but in no event later than May 31, 2019, Buyer shall cause to be paid to the Seller via wire transfer payment in the amount of TWO HUNDRED THOUSAND AND NO/100 US DOLLARS (USD $200,000.00), such that the funds shall have cleared and be immediately available to Seller on May 31, 2019.

3.2 Account Information. Buyer shall make all payments due Seller under the Agreement into the following account:

Wells Fargo
Account # 4124322306
ABA: 121000248
SWIFT: WFBIUS6S
1000 Louisiana St
Houston TX 77002

**Exhibit 4 - Page 6**

## ARTICLE IV
## TITLE, RISK OF LOSS, EQUIPMENT WARRANTY AND DELIVERY

4.1 Title; Risk of Loss; Storage. Title to the Equipment identified in Exhibit A shall pass to the Buyer on receipt of the Purchase Price as set forth in Article III, Section 3.1. Upon such transfer of title, risk of loss of the Equipment and the obligation to insure and store the Equipment (including the cost to insure the Equipment for the amount of the full Purchase Price and to pay all storage costs) shall transfer to Buyer. If the Equipment is not picked up within thirty (30) days of Buyer's receipt of written notice that the Equipment is available at the Delivery Point, the cost of storing the Equipment for such period and until such time as the Equipment is picked up shall be invoiced to the Buyer.

4.2 Equipment Warranty. Buyer acknowledges that the Equipment is previously-owned, and Buyer is purchasing the Equipment without warranty in "as-is, where-is" condition, as defined in Seller's Proposal No 19-008042rev1 dated May 13th, 2019.

4.3 Delivery of Equipment. Seller agrees to deliver the Equipment identified in Exhibit A ex works to Buyer at Seller's storage facility located at 15730 Beaumont Highway, Houston , Texas 77049 (the "Delivery Point").

4.4 Schedule for Equipment Delivery. The Delivery Date shall occur no later than one (1) day after Seller's receipt of the Purchase Price as set forth in Article III, Section 3.1.

## ARTICLE V
## INDEMNIFICATION

5.1 Indemnification by Buyer. Buyer agrees to defend, indemnify and hold harmless Seller, its Affiliates, successors, assigns, and its and their respective officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys from all Claims and Liabilities for any damage or destruction to the Equipment or any Third Party Claim imposed upon, incurred by, or asserted against Seller for bodily injuries, death and/or property loss or damage, in each such case of damage, destruction or Third Party Claim to the extent caused by, or attributable to, Buyer and/or Buyer's agents', representatives' or contractors' actions, omissions or negligence, arising out of, relating to, resulting from or in connection with (i) any site change study, equipment survey or any other inspection or testing of the Equipment conducted by Buyer and/or Buyer's agents, representatives or contractors, including any survey, inspection or test conducted by, on behalf of or for the benefit of Buyer or any of its Affiliates; (ii) any broker, sales agent, financial advisor or other third party claiming any fee, commission or like payment by, through, on account of or on behalf of Buyer or any of its Affiliates, resulting from the sale of the Equipment, (iii) any material misrepresentation or breach of any material warranty or representation given by Buyer in this Agreement or any Transaction Document to which Buyer is a party or material breach of any material covenant or agreement made by Buyer in this Agreement or any Transaction Document to which Buyer is a party, including, without limitation, those obligations in respect of Taxes set forth in Article IX hereof and (iv) from and after the transfer of title, arising out of, relating to, resulting from or in connection with (1) any Third Party Claim

**Exhibit 4 - Page 7**

based upon events occurring after the transfer of title and relating to the Equipment, or (2) the storage, transportation or use of any of the Equipment after the transfer of title.

5.2 Indemnification by Seller. Seller agrees to defend, indemnify and hold harmless Buyer, its Affiliates, successors, assigns, and its and their respective officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys from all Claims and Liabilities for any damage or destruction to the Equipment or any Third Party Claim imposed upon, incurred by, or asserted against Buyer for bodily injuries, death and/or property loss or damage, in each such case of damage, destruction or Third Party Claim to the extent caused by, or attributable to, Seller and/or Seller's agents', representatives' or contractors' actions, omissions or negligence, arising out of, relating to, or resulting from or in connection with (i) any material misrepresentation or breach of any material warranty or representation given by Seller in this Agreement or any Transaction Document to which Seller is a party or material breach of any material covenant or agreement made by Seller in this Agreement or any Transaction Document to which Seller is a party; and (ii) prior to the transfer of title e, arising out of, relating to, resulting from or in connection with any Third Party Claim based upon events occurring prior to the transfer of title and relating to the Equipment.

5.3 Environmental Indemnity.

(a) From and after the transfer of title, Buyer shall indemnify, defend and hold harmless Seller and its Affiliates, and their respective agents, directors, shareholders, partners, employees, officers, consultants, representatives, attorneys, successors and assigns, from and against any and all Environmental Liabilities and Obligations and Claims for the same, in each case arising from, resulting from, incident to, or otherwise relating to or concerning the Equipment that arise from events that occur after the transfer of title.

(b) From and after the transfer of title, Seller shall indemnify, defend and hold harmless Buyer and its Affiliates, and their respective agents, directors, shareholders, partners, employees, officers, consultants, representatives, attorneys, successors and assigns, from and against any and all Environmental Liabilities and Obligations and Claims for the same, in each case arising from, resulting from, incident to, or otherwise relating or concerning the Equipment that arise from events that occur prior to the transfer of title.

5.4 LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT ALLOWED BY LAW, SELLER'S TOTAL LIABILITY TO BUYER ON ALL CLAIMS OF ANY KIND, WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, INDEMNITY, OR OTHERWISE, ARISING OUT OF THE PERFORMANCE OR BREACH OF THE AGREEMENT SHALL NOT EXCEED AN AMOUNT EQUAL TO THE PURCHASE PRICE PAID TO DATE ON ALL CLAIMS OF ANY KIND, WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, INDEMNITY, OR OTHERWISE, ARISING OUT OF THE PERFORMANCE OR BREACH OF THE AGREEMENT. EACH PARTY'S LIABILITY HEREUNDER IS LIMITED AT ALL TIMES BY THE PROVISIONS OF SECTION 10.3.

5.5 Indemnification Notice. If any Party (or its Affiliates, successors or assigns or its or their respective officers, directors, agents, shareholders, partners, employees

Exhibit 4 - Page 8

consultants, representatives and attorneys) (each, an "Indemnified Party") entitled to or seeking indemnification hereunder (a) determines that any event, occurrence, fact, condition or claim has given or could reasonably be expected to give rise to Liabilities which such Indemnified Party is or may be entitled to, or may seek, indemnification under this Agreement, or (b) otherwise identifies an event, occurrence, fact, condition or Claim giving rise (or which may give rise) to a right of indemnification hereunder in favor of such Indemnified Party (any of the foregoing, an "Indemnity Claim"), such Indemnified Party shall promptly notify the Party obligated to provide indemnification or from whom indemnification is being or will be sought (the "Indemnifying Party") in writing of such Indemnity Claim (a "Claim Notice") describing in reasonable detail the facts giving rise to the claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such Liability; provided, however, the failure of any Indemnified Party to give timely notice thereof shall not affect any of its rights to indemnification hereunder nor relieve the Indemnifying Party from any of its indemnification obligations hereunder, except to the extent the Indemnifying Party is materially prejudiced by such failure.

5.6 Indemnification Procedure. Any obligation to provide indemnification hereunder with respect to any Third Party Claim shall be subject to the following terms and conditions:

(a) Upon receipt of a Claim Notice in respect of any such Third Party Claim, the Indemnifying Party shall, at its cost and expense and upon notice to the Indemnified Party within thirty (30) days of its receipt of such Claim Notice, assume and control the defense, compromise, settlement and investigation of such Indemnity Claim, including the management of any proceeding relating thereto, and shall employ and engage counsel reasonably acceptable to the Indemnified Party; provided, however, that if there exists a material conflict of interest (other than one of a monetary nature) or if the Indemnified Party has been advised by counsel that there may be one or more legal or equitable defenses available to it that are different from or additional to those available to the Indemnifying Party, which, in either case, would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party, then the Indemnified Party shall be entitled to retain its own counsel at the cost and expense of the Indemnifying Party (except that the Indemnifying Party shall not be obligated to pay the fees and expenses of more than one separate counsel for all Indemnified Parties, taken together).

(b) The Indemnified Party may, at its own cost and expense, participate in the defense of such Indemnity Claim and agrees to cooperate with the Indemnifying Party in such efforts and make available to the Indemnifying Party all witnesses, records, materials and information in the Indemnified Party's possession, under its control or to which it may have access as may be reasonably required by the Indemnifying Party. The Indemnifying Party will keep the Indemnified Party reasonably informed of the progress of the defense of any such Indemnity Claim. If the Indemnifying Party fails to so assume the defense and investigation of any such Indemnity Claim as provided in this Section 5.6, (i) the Indemnified Party shall have the right to undertake the defense, compromise, settlement and investigation of such Indemnity Claim on behalf of, and at the cost and expense of and for the account and risk of the Indemnifying Party, (ii) the Indemnifying Party agrees to cooperate with the Indemnified Party in such efforts, and (iii) the Indemnified Party will keep the Indemnifying Party reasonably informed of the progress of the defense of any such Indemnity Claim.

Exhibit 4 - Page 9

(c) If a Third Party Claim is made by any Governmental Authority, the Indemnifying Party agrees to consult with the Indemnified Party prior to communicating with such Governmental Authority (but, for avoidance of doubt, the Indemnifying Party shall be under no obligation to take account of the views of the Indemnified Party).

5.7 Settlement of Indemnity Claims. The Indemnifying Party shall not, without the written consent of the Indemnified Party, (a) settle or compromise any Indemnity Claim or consent to the entry of any final judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff, as applicable, of a written release or releases from all liability in respect of such Indemnity Claim of all Indemnified Parties affected by such Indemnity Claim, or (b) settle or compromise any Indemnity Claim if the settlement or compromise imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder. No Indemnity Claim that is being defended in good faith by the Indemnifying Party shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party.

5.8 Exclusive Remedy. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE REMEDIES SET FORTH IN THIS ARTICLE V, TOGETHER WITH AND SUBJECT TO THE LIMITATIONS ON LIABILITY, SURVIVAL PERIODS, DISCLAIMERS AND LIMITATIONS ON REMEDIES SET FORTH ANYWHERE IN THIS AGREEMENT ARE INTENDED TO BE, AND SHALL BE, THE EXCLUSIVE REMEDIES WITH RESPECT TO ANY ASPECT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR THE BILL OF SALE. EACH PARTY HEREBY RELEASES, WAIVES AND DISCHARGES, AND COVENANTS NOT TO SUE WITH RESPECT TO, ANY CLAIM WITH RESPECT TO ANY ASPECT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE BILL OF SALE NOT EXPRESSLY PROVIDED FOR IN THIS AGREEMENT OR THE BILL OF SALE, IN EACH CASE TO THE MAXIMUM EXTENT PERMITTED BY LAW.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that:

6.1 Organization and Good Standing. Seller is a limited liability company duly organized and validly existing under the laws of the jurisdiction in which it was formed and Seller has the requisite power and authority to own, lease and operate its material assets and properties and to carry on its business as now conducted. Seller is duly qualified to transact business and is in good standing in each jurisdiction in which its business as now conducted or its ownership of the Equipment makes such qualification necessary.

6.2 Authorization of Agreement. Seller has the requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party. The execution and delivery of this Agreement and the other Transaction Documents to which Seller is a party by Seller and the consummation by Seller of the transactions contemplated by this Agreement and such other Transaction Documents have been duly and validly authorized by all necessary action on the part of Seller. This Agreement has

been, and the other Transaction Documents to which Seller is a party will be, duly executed and delivered by Seller and, assuming due execution and delivery by Buyer, constitute (or in the case of the other Transaction Documents will constitute upon the execution and delivery thereof) valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting or relating to the enforcement of creditors' rights and by general equitable principles regardless of whether enforcement is sought in equity or at law.

### 6.3 No Violation; Consents.

(a)    The execution and delivery by Seller of this Agreement and the other Transaction Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational or constituent documents of Seller, (ii) violate any Order of any Governmental Authority to which Seller is bound or subject, (iii) violate any Applicable Law, or (iv) breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any note, bond, mortgage, indenture, material agreement or other instrument by which Seller is bound or by which its assets are subject, other than, in the case of clauses (ii), (iii) and (iv), any conflict, violation, breach, default, requirement for consents, rights of acceleration, cancellation, or termination that would not materially and adversely affect the ability of Seller to perform its obligations under this Agreement or would not result in any Lien (other than Permitted Liens) on the Equipment.

(b)    No Order or permit issued by, or declaration or filing with, or notification to, or waiver or consent from any Governmental Authority is required on the part of Seller in connection with the execution and delivery of this Agreement or any Transaction Documents to which Seller is a party, the consummation of the transactions contemplated hereby or thereby, or the compliance with or performance by Seller of any provision contained in this Agreement or any of the Transaction Documents to which Seller is party, other than any such Order, permit, declaration, filing, notification, waiver or consent the failure of which to obtain would not materially and adversely affect the ability of Seller to perform its obligations under this Agreement or any of the Transaction Documents to which it is party.

6.4 Litigation.    There is no action, proceeding or Order pending or, to Seller's knowledge, threatened against Seller or any of its Affiliates that seeks to restrain or prohibit the consummation, legality or validity of the transactions contemplated hereby.

6.5 Title to the Equipment.    As set forth in Section 4.1, Seller shall deliver to Buyer good and marketable title to the Equipment free and clear of any Liens, excluding Permitted Liens.

6.6 Preferential Rights.    No rights of first offer or refusal or other preferential rights to purchase any of the Equipment are held by any Person.

6.7 Financial Advisors.    Neither Seller nor any of its Affiliates has entered into a contract with any broker, finder or financial advisor that would obligate Buyer to pay any

fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

7.1 Organization and Good Standing. Buyer is a Limited Liability Company duly organized and validly existing under the laws of the jurisdiction in which it was formed and Buyer has the requisite power and authority to own, lease and operate its material assets and properties and to carry on its business as now conducted. Buyer is duly qualified to transact business and is in good standing in each jurisdiction in which its business as now conducted makes such qualification necessary.

7.2 Authorization of Agreement. Buyer has the requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party. The execution and delivery of this Agreement and the other Transaction Documents to which it is a party by Buyer and the consummation by Buyer of the transactions contemplated by this Agreement and such other Transaction Documents have been duly and validly authorized by all necessary action on the part of Buyer. This Agreement has been, and the other Transaction Documents to which it is a party will be, duly executed and delivered by Buyer and, assuming due execution and delivery by Seller, constitute (or in the case of the other Transaction Documents will constitute upon the execution and delivery thereof) valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting or relating to the enforcement of creditors' rights and by general equitable principles regardless of whether enforcement is sought in equity or at law.

7.3 No Violation; Consents.

(a) The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational or constituent documents of Buyer, (ii) violate any Order of any Governmental Authority to which Buyer is bound or subject, (iii) violate any Applicable Law, or (iv) breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any note, bond, mortgage, indenture, material agreement or other instrument by which Buyer is bound or by which its assets are subject, other than, in the case of clauses (ii), (iii) and (iv), any conflict, violation, breach, default, requirement for consents, rights of acceleration, cancellation or termination that would not materially and adversely affect the ability of Buyer to perform its obligations under this Agreement.

(b) To the knowledge of Buyer, no Order or permit issued by, or declaration of

filing with, or notification to, or waiver or consent from, any Governmental Authority is required on the part of Buyer in connection with the execution and delivery of this Agreement or any of the Transaction Documents to which Buyer is a party, the consummation of the transactions contemplated hereby or thereby, or the compliance or performance by Buyer with any of the provisions contained in this Agreement or any of the Transaction Documents to which Buyer is a party, other than any such Order, permit, declaration, filing, notification, waiver or consent the failure of which to obtain would not materially and adversely affect the ability of Buyer to perform its obligations under this Agreement or any of the Transaction Documents to which it is party.

7.4 Litigation. There is no action, proceeding or Order pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates that seeks to restrain or prohibit the consummation, legality or validity of the transactions contemplated hereby.

7.5 Financial Capability. Buyer has sufficient cash and cash equivalents and/or credit facilities or letters of credit (and has provided Seller with evidence thereof) to purchase the Equipment and to consummate the transactions contemplated by this Agreement, including, without limitation, payments of fees and expenses contemplated hereunder. Buyer is not aware of any facts or circumstances that would cause Buyer to be unable to pay the Purchase Price in accordance with the terms of this Agreement.

7.6 Financial Advisors. Neither Buyer nor any of its Affiliates has entered into a contract with any broker, finder or financial advisor that would obligate Seller pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement.

7.7 Export Certifications. Buyer certifies that Buyer will not export, resell, or otherwise dispose of the Equipment in violation of any law, regulation, administrative ruling or other order issued by any branch or agency of the United States government, including the resale or export by Buyer (A) into any country not then approved for export by the United States government, or (B) to any person or entity to whom sales by US citizens are barred by the United States government at the time of any such resale or export.

7.8 Ethics, Corrupt Practices, Anti-terror Crime & Security, and Bribery. Buyer agrees to comply with the EthosEnergy Business Ethics Policy and the substantive provisions of the US Foreign Corrupt Practices Act 1977 (the "FCPA") and the UK's Anti-terror Crime & Security Act 2001 ("ATCSA") and Bribery Act 2010 ("Bribery Act"), whether or not it is subject to the FCPA, ATCSA or Bribery Act. Buyer will not take any action that might cause Seller to be in violation of the FCPA, ATCSA or Bribery Act or other applicable anti-bribery legislation. Buyer covenants and agrees, on behalf of the Buyer, that all Affiliated Persons of the Buyer that provide services under or relating to the Agreement (a) will be advised of the Business Ethics Policy and the compliance policies of the Seller set forth therein; (b) will comply with the substantive provisions of the FCPA, ATCSA and Bribery Act; and (c) will take no action that might cause the Seller to be in violation of the FCPA, ATCSA or Bribery Act or other applicable anti-bribery legislation.

7.9 Installation of Equipment. Buyer shall install the Equipment in full compliance with the prudent industry practices and in addition Buyer certifies that all fuel, water, consumables, etc. shall conform to OEM specifications.

## ARTICLE VIII
## OTHER COVENANTS

8.1 Public Announcements. None of Seller, Buyer nor any of their respective Affiliates, nor any of their agents or representatives, shall issue any press release or public statement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written consent of the other Party; provided that either Party may make such disclosure as it may determine in good faith, after consultation with counsel, is required by any Applicable Law, Order or obligations pursuant to any listing agreement with, or any rules or regulations of, any national securities exchange so long as the Party intending to make such disclosure gives the other Party prior notice of such disclosure and uses its commercially reasonable efforts, consistent with such Applicable Law, Order or obligation, to consult with the other Party with respect to the text thereof.

8.2 Further Assurances. Each of the Parties will execute and deliver such additional instruments and other documents and will take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the other Transaction Documents.

## ARTICLE IX
## TAXES

9.1 Personal Property Taxes. All Personal Property Taxes relating to the Equipment for the taxable year in which the sale occurs shall be apportioned as of the transfer of title between Seller and Buyer. Seller shall be liable for the portion of such Personal Property Taxes based upon the number of days in the taxable year occurring prior to the transfer of title, and Buyer shall be liable for the portion of such Personal Property Taxes based upon the number of days in the year occurring on and after the respective transfer of title. For any taxable year in which an apportionment is required, Buyer shall file all required reports and returns incident to these Taxes assessed for the taxable year in which the transfer of title occurs that are not filed by Seller as of the date title transfers. If Seller has paid any portion of Personal Property Taxes apportioned to Buyer under this Section 9.1, Buyer shall pay to Seller, promptly upon notice from Seller, to which shall be annexed copies of the relevant tax filing and demand of the portion of such Taxes apportioned to Buyer, Buyer's share of such Taxes.

9.2 Sales and Other Transfer Taxes and Duties. The Purchase Price does not include any sales, use, excise, gain or other transfer Taxes imposed in connection with the sale of the Equipment. Buyer shall pay any such Taxes, as well as any applicable conveyance, transfer and recording fee, and real estate transfer stamps, documentation or other Taxes imposed on the transfer of the Equipment pursuant to the Agreement. If Buyer is of the opinion that it is exempt from the payment of any such Tax, Buyer shall furnish to Seller the appropriate Tax exemption certificate. The Purchase Price does not include any duties or tariffs imposed in connection with the export or import of the Equipment after the transfer of title. If Seller believes in good faith that it may be liable for remittance of any Tax in connection with Buyer's purchase of the Equipment

and subsequent handling. work. export. or other action or inaction. Buyer will pay the amount of such Tax to the Seller at title transfer in addition to the Purchase Price. If Buyer can subsequently demonstrate to the Seller that such Tax was not due by providing all necessary documentation. certifications. and other evidence required for Seller to properly demonstrate such inapplicability to the relevant governmental authorities. Seller shall refund the amount of such Tax to the Seller upon receipt of such documentation. Such documentation shall be sufficient in the sole opinion of the Seller.

## ARTICLE X
## LIMITATIONS

### 10.1 Buyer's Review.

(a)     No Reliance.   Buyer has had the opportunity to ask questions. and has received sufficient answers, in connection with its decision to enter into this Agreement. and to consummate the transactions contemplated hereby.   In connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. Buyer has not relied upon. and Buyer expressly waives and releases Seller from any liability for any claims (including claims based upon fraudulent inducement) relating to or arising from. any representation. warranty, statement. advice. document, projection, or other information of any type provided by Seller or its Affiliates or any of their representatives. except for those representations and warranties expressly set forth in Article VI. subject at all times to the limitations set forth in this Article X.   In deciding to enter into this Agreement. and to consummate the transactions contemplated hereby. Buyer has relied solely upon its own knowledge. investigation. judgment and analysis (and that of its attorneys, accountants. consultants and representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of. Seller or its Affiliates or any of their representatives, other than the express representations and warranties of Seller set forth in Article VI. subject at all times to the limitations set forth in this Article X.

(b)     Limited Duties.   Any and all duties and obligations that any Party may have to the other Party with respect to or in connection with the Equipment, this Agreement. the Transaction Documents or the transactions contemplated hereby or thereby are limited to those specifically set forth in this Agreement and the Transaction Documents.   Neither the duties nor obligations of any Party, nor the rights of any Party. shall be expanded beyond the terms of this Agreement or the Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever.   Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur. suffer or perform any act. condition or obligation contrary to the terms of this Agreement or any Transaction Document. whether or not existing and whether foreseeable or unforeseeable.   Each of the Parties acknowledges that it would be unfair, and that it does not intend. to increase any of the obligations of any other Party under this Agreement or any Transaction Document on the basis of any implied obligation or otherwise.

10.2 LIMITATION OF REPRESENTATIONS AND WARRANTIES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE VI. SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES. WRITTEN OR ORAL. STATUTORY, EXPRESS OR IMPLIED. CONCERNING THE EQUIPMENT OR SELLER OR THE BUSINESS. ASSETS OR LIABILITIES OF SELLER AND IT IS

UNDERSTOOD THAT BUYER TAKES THE EQUIPMENT "AS IS" AND "WHERE IS" SPECIFICALLY, SELLER MAKES NO REPRESENTATION AS TO THE CONDITION, VALUE OR QUALITY OF THE EQUIPMENT OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE EQUIPMENT, AND SELLER DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE EQUIPMENT, OR ANY PORTION THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT. BUYER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER HAS NOT MADE, AND SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND BUYER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLER AND ITS AFFILIATES AND EACH OF ITS REPRESENTATIVES IN CONNECTION WITH, THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS OR COMMUNICATIONS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER OR ITS REPRESENTATIVES BY OR ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES OR ANY OF ITS REPRESENTATIVES IN CONNECTION THEREWITH.

10.3 NO CONSEQUENTIAL OR PUNITIVE DAMAGES. NO PARTY (OR ITS AFFILIATES OR ANY OTHER PERSON) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PARTY (OR ITS AFFILIATES OR ANY OTHER PERSON) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, OR ANY ASSIGNMENT, BILL OF SALE, AGREEMENT, INSTRUMENT OR CERTIFICATE DELIVERED HEREUNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO, LOSS OF REVENUE OR INCOME, COST OF CAPITAL, OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

10.4 No Recourse. No past, present or future director, officer, employee, member, shareholder, incorporator, partner and/or Affiliate of Seller or any Affiliate thereof shall have any liability for any obligations of Seller under this Agreement or for any claim based on, in respect of or by reason of such obligations or their creation.

## ARTICLE XI
## [INTENTIONALLY NOT USED]

## ARTICLE XII
## [INTENTIONALLY NOT USED]

## ARTICLE XIII
## TERMINATION

13.1 Termination. This Agreement may be terminated and the Transaction abandoned at any time prior to the Payment as follows:

(a) by written agreement of Buyer and Seller;

(b) by Buyer if there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 days after written notice thereof shall have been received by Seller;

(c) by Seller:

(i) if the Purchase Price has not been delivered strictly in conformance with the payment terms herein;

(ii) if there shall have been a material breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 days after written notice thereof shall have been received by Buyer; provided, however, Buyer's right to cure any default related to payments shall be limited to three (3) days.

13.2 Effect of Termination; Default. If this Agreement is terminated under Section 13.1, written notice thereof shall forthwith be given to the other Party and this Agreement will thereafter become void and have no further force and effect and all further obligations of Seller and Buyer to each other under this Agreement will terminate without further obligation or Liability of Seller or Buyer to the other Party (other than with respect to breaches, if any, of this Agreement occurring prior to such termination), except that:

(a) If this Agreement is terminated by Seller pursuant to Section 13.1(c)(i), this Agreement shall terminate immediately with no further obligation of either Party.

(b) If this Agreement is terminated by Seller pursuant to Section 13.1(c)(ii), Seller shall be entitled to retain any payments in respect of the Purchase Price paid prior to termination as set forth herein, (i) Buyer and Seller shall be released from any further obligations or liability arising in connection with this Agreement and (ii) Seller shall be entitled to retain title to all Equipment.

(c) Notwithstanding the foregoing, Section 5.4, Section 8.2 (Public Announcements), Article X (Limitations), Section 14.4 (Dispute Resolution), Section 14.8 (Governing Law), Section 14.10 (Notices) shall survive any such termination of this Agreement.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Nonsurvival of Representations, Warranties and Covenants.    Subject to Section 13.2(c), all representations and warranties of the Parties made herein or in any other agreement delivered pursuant to this Agreement shall not survive beyond one (1) year from the transfer of title on the Equipment in Exhibit A and there shall be no liability in respect thereof after such date; provided, that the representations and warranties of Seller in Sections 6.5 and 6.6 shall survive perpetually.

14.2    Expenses.    Except as otherwise set forth in this Agreement, each of Seller and Buyer shall bear its own expenses (including, without limitation, attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

14.3    Incorporation of Exhibits.    The exhibits and Seller's proposal identified in this Agreement are incorporated herein by reference and made a part hereof.

14.4    Dispute Resolution.

In the event of a dispute between the Parties arising under or relating to this Agreement, prior to seeking relief from any court of competent jurisdiction, such dispute shall be referred to a representative of senior management of each of the Parties for resolution for a period of no less than thirty (30) days.    Pending resolution of any claim or dispute, the Parties shall continue to perform their obligations under this Agreement.

Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of any Texas state court or federal court of the United States of America sitting in Houston, Texas, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the Parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such Texas state court or, to the extent permitted by law, in such federal court.    Each of the Parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Each Party hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any right to a trial by jury, and (ii) any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the Agreement in any Texas state or federal court.    Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right to which it may be entitled, on account of place of residence or domicile.

14.5    No Right of Set-Off.    Buyer, for itself and for its Affiliates, successors and assigns hereby unconditionally and, irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer or any of its Affiliates, successors and assigns has or may

have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

14.6     Entire Agreement; Amendments and Waivers.     This Agreement (including the schedules and exhibits attached hereto) and the Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede any other agreements, written or oral, among Seller and Buyer concerning such subject matter.     This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.     No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.     No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.7     Governing Law.     THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

14.8     Headings.     The section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

14.9     Notices.     All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or telecopy numbers (or to such other address or telecopy number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller:     EthosEnergy Power Solutions, LLC
                  2800 North Loop West, Ste. 1200

Exhibit 4 - Page 19

Houston, TX 77092
Telephone: 713-812-2300
Facsimile: 713-688-0739
Attention: Mike Fisher
Title: President, Asset Trading

If to Buyer:

WattStock LLC
16415 Jacintoport Blvd.
Houston, TX 77015
C: 713.248.4148
Attention: Jay C. Manning
Title:

Or to such other individual or address as a Party hereto may designate for itself by notice given as herein provided.

14.10 <u>Severability.</u> If any provision of this Agreement is held or determined to be invalid or unenforceable, the balance of this Agreement shall remain in effect. In such event, the parties shall negotiate in good faith replacement provisions that will be valid and enforceable and that provide the same or substantially similar economic effect as provided by the invalid or unenforceable provisions.

14.11 <u>Binding Effect; Assignment.</u> This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Unless specifically set forth herein, nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement. Seller may assign this Agreement to an affiliate of Seller upon three (3) days' written notice to Buyer. No further assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Buyer (by operation of law or otherwise) without the prior written consent of the other Party, such consent to not be unreasonably withheld, and any attempted or purported assignment without the required consents shall be void.

14.12 <u>U.S. Dollars.</u> All dollar amounts set forth herein are United States (U.S.) Dollars.

14.13 <u>Counterparts.</u> This Agreement may be executed and delivered by facsimile signature, which shall be binding upon the Parties, upon the transmission of such facsimile and in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers, effective as of the date first written above.

By: _____     17/MAY2019

Name: JAY C. MANNING

Title: [ PRESIDENT

By: [ MARK DOBLER . ]

Name: [ _____ ]

Title: [ _____ ]


Exhibit A – Equipment Description
Exhibit B – Bill of Sale





**Exhibit 4 - Page 22**

**EXHIBIT B**

### EQUIPMENT BILL OF SALE

EthosEnergy Power Solutions LLC ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does this ___ day of May, 2019 hereby grant, sell, assign, transfer and convey unto WattStock LLC, (the "Buyer"), good and marketable title in and to the Equipment (as defined in that certain Purchase and Sale Agreement between Seller and Buyer dated as of the 13th day of May 2019 (the "Purchase Agreement")) to have and to hold for its disposition. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

This Bill of Sale is made pursuant to, and is subject to the terms and conditions set forth in. the Purchase Agreement. Nothing contained herein shall be construed to limit, terminate or expand the representations, warranties, covenants, disclaimers, exclusions, remedies and indemnities set forth in the Purchase Agreement.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE VI OF THE PURCHASE AGREEMENT, SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT OR SELLER OR THE BUSINESS, ASSETS OR LIABILITIES OF SELLER AND IT IS UNDERSTOOD THAT BUYER TAKES THE EQUIPMENT "AS IS" AND "WHERE IS"; SPECIFICALLY, SELLER MAKES NO REPRESENTATION AS TO THE CONDITION, VALUE OR QUALITY OF THE EQUIPMENT OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE EQUIPMENT AND SELLER DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE EQUIPMENT, OR ANY PORTION THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT. BUYER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AGREEMENT, SELLER HAS NOT MADE, AND SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND BUYER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLER AND ITS AFFILIATES AND EACH OF ITS REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS OR COMMUNICATIONS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER OR ITS REPRESENTATIVES BY OR ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES OR ANY OF ITS REPRESENTATIVES IN CONNECTION THEREWITH.

For the avoidance of doubt, this Bill of Sale is made pursuant to, and subject to the terms of, the Purchase Agreement. In the event of any conflict or ambiguity between the terms of this instrument and the Purchase Agreement, the Purchase Agreement shall control.

**Exhibit 4 - Page 23**

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Texas, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than Buyer and Seller and their respective successors and permitted assigns, any remedy or claim under or by reason of this instrument or any agreements, terms, covenants or conditions hereof. The agreements, terms, covenants and conditions contained in this instrument shall be for the sole and exclusive benefit of, and bind and inure to the benefit of, Buyer and Seller and their respective successors and permitted assigns.

This Bill of Sale may be executed by facsimile signature and in any number of counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale as of the date first written above.

SELLER:
[                                        ]

By:_____
Name: _____
Title: _____
Dated: _____

**Exhibit 4 - Page 25**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Vicki Sedon on behalf of Brian Hail
Bar No. 8705500
vsedon@krcl.com
Envelope ID: 44820366
Status as of 07/27/2020 10:50:29 AM -05:00

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 7/24/2020 4:05:14 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 7/24/2020 4:05:14 PM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 7/24/2020 4:05:14 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 7/24/2020 4:05:14 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 7/24/2020 4:05:14 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 7/24/2020 4:05:14 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 7/24/2020 4:05:14 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 7/24/2020 4:05:14 PM | SENT |

CAUSE NO. DC-20-08331

| | |
|---|---|
| **WATTSTOCK LLC** | In the District Court |
| **vs.** | Dallas County, Texas |
| **ALTA POWER LLC** | 116th District Court |

### SCHEDULING ORDER (LEVEL 2)

In accordance with Rules 166, 190 and 192 of the Texas Rules of Civil Procedure, the Court makes the following order to control discovery and the schedule of this cause.

1.    This case will be ready and is set for  **Non-Jury Trial on 07/26/2021 at 9:00 a.m.** (the "Initial Trial Setting").  Reset or continuance of the initial Trial Setting will not alter any deadlines established in this Order or established by the Texas Rules of Civil Procedure, unless otherwise provided by order. If not reached as set, the case may be carried to the next week.

Trial announcements must be made in accordance with rule 3.02 Local Rules of the Civil Courts of Dallas County Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a, Texas Rules of Civil Procedure.

2.    Unless otherwise ordered, discovery in this case will be controlled by

Rule 190.3 (Level 2)

of the Texas Rules of Civil Procedure. Except by agreement of the party, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.    Any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed no later than seven (7) days after the close of the Discovery Period, or such objection is waived.  Any motion to compel responses to discovery (other than relating to factual matters arising after the end of the Discovery Period) must be filed no later than seven (7) days after the close of the discovery period or such complaint is waived, except for the sanction of exclusion under Rule 193.6.

4.    Motions for summary judgment, expert challenges, or other dispositive motions must be heard no later than thirty (30) days prior to trial.

5.    Any amended pleadings asserting new causes of action or affirmative defenses must be filed no later than thirty (30) days before the end of the discovery period <u>and any other amended pleadings must be filed no later than seven (7) days after the end</u> of the discovery period.  Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within two (2) weeks after the pleading to which they respond. Except with leave of court, TRCP 166a(c) motions must be heard no later than thirty (30) days before trial.

6.    No additional parties may be joined more than five (5) months after the commencement of this case except on motion for leave showing good cause.   This paragraph does not otherwise alter the requirements of Rule 38.  The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

7.    The parties shall mediate this case no later than thirty (30) days before the Initial Trial Setting, unless otherwise provided by court order. Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **Unless, within 14 days of the date of this Order, the parties file and bring to the attention of the Court Coordinator a Joint Notice of Agreed Upon Substitute Mediator _or_ a Joint Motion Requesting Appointment of Mediator Pursuant to Civil Practice & Remedies Code § 37.004 (revised and effective September 1, 2015), the parties agree to mediate this case with <u>Maxel Silverberg whose phone number is 972-764-4300.</u> The Motion Requesting Appointment of Mediator should include a brief description of the nature of the dispute, and any novel legal, language, demographic, or other issues the parties desire to have the Court consider in appointing a mediator. The provisions contained herein regarding mediation will be strictly enforced.  Parties violating the requirements of this Order will be required to show cause as to why they are in violation of same.**

8.    Fourteen (14) days before the current Trial Setting, the parties shall exchange a list of exhibits, including any demonstrative aids and affidavits, and shall exchange copies of any exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned.  Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation.  Rule 193.7 applies to this designation.  **On or before ten (10) days before the current Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreement on such matters**.  By 4 pm on the Thursday before the current Trial Setting, the parties shall file with the Court the materials stated in Rule 166(e), an estimate for the length of trial, designation of deposition testimony to be offered in direct examination and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each

party's pre trial materials shall be delivered to the Judge's Chambers by 4 p.m. the Thursday before the trial setting.

9. A pre-trial conference shall be conducted from 8 a.m. to 9 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trial conference shall be scheduled the week before the trial setting.

Plaintiff/Plaintiff's counsel shall serve a copy of this Order on any currently named defendant(s) answering after this date.

Signed, 8/21/2020

_____
TONYA PARKER, PRESIDING JUDGE

This case is governed by the Court's Policies and Procedures and Dallas County Local Rules, available at
www.dallascounty.org

FILED
8/30/2020 10:37 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

## CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| **WATTSTOCK LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **v.** | § | |
| | § | **DALLAS COUNTY, TEXAS** |
| **ALTA POWER LLC** | § | |
| | § | **116TH JUDICIAL DISTRICT** |

## UNOPPOSED MOTION TO WITHDRAW
## AND SUBSTITUTE COUNSEL

TO THE HONORABLE JUDGE TONYA PARKER:

Defendant, **ALTA POWER LLC** (hereinafter "Defendant") respectfully requests this Court to permit a simultaneous withdrawal and substitution of counsel on its behalf and in support thereof would state the following:

1.     Defendant, **ALTA POWER LLC**, requests that its current counsel of record Jared I. Levinthal and the law firm of LIGHTFOOT FRANKLIN & WHITE, LLC be permitted to withdraw.  Defendant wishes to substitute and designate Michael Cancienne of the law firm JORDAN, LYNCH & CANCIENNE, PLLC, 1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056, as Defendant's new attorneys of record.  Defendant requests further that Michael Cancienne be designated as lead counsel.

2.     This withdrawal and substitution of counsel is not made for purposes of delay, but so justice may be done.

## PRAYER

Defendant consents to this withdrawal and substitution of counsel of record and therefore prays that this withdrawal and substitution be granted and for such other and further relief both at law and in equity to which Defendant shows itself justly entitled.

Respectfully submitted,

LIGHTFOOT FRANKLIN & WHITE, LLC

By:_____

     Jared I. Levinthal
     State Bar No. 24002467
     levinthal@lightfootlaw.com
     1885 Saint James Place, Suite 1150
     Houston, Texas 77056
     (713) 960-1488 Telephone
     (713) 960-8991 Facsimile

**ATTORNEYS FOR DEFENDANT
ALTA POWER LLC**

## CERTIFICATE OF CONFERENCE

    I hereby certify that I have conferred with all counsel and they are unopposed to this Motion.

_____
    Jared I. Levinthal

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was delivered to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 30th day of September 2020:

Brian N. Hail
Andrew D. Robertson
KANE RUSSELL COLEMAN LOGAN, PC
901 Main Street, Suite 5200
Dallas, Texas 75202

Michael Cancienne
JORDAN, LYNCH & CANCIENNE, PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056

Jared I. Levinthal

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Natalie Sanchez on behalf of Jared Levinthal
Bar No. 24002467
nsanchez@lightfootlaw.com
Envelope ID: 46701336
Status as of 10/1/2020 9:16 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 9/30/2020 10:37:33 AM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 9/30/2020 10:37:33 AM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 9/30/2020 10:37:33 AM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 9/30/2020 10:37:33 AM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 9/30/2020 10:37:33 AM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 9/30/2020 10:37:33 AM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 9/30/2020 10:37:33 AM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 9/30/2020 10:37:33 AM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 9/30/2020 10:37:33 AM | SENT |

**CAUSE NO. DC-20-08331**

| | | |
|---|---|---|
| **WATTSTOCK LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **v.** | § | |
| | § | |
| | § | **DALLAS COUNTY, TEXAS** |
| **ALTA POWER LLC** | § | |
| | § | **116TH JUDICIAL DISTRICT** |

## ORDER GRANTING UNOPPOSED MOTION TO WITHDRAW
## AND SUBSTITUTE COUNSEL

The Court considered Defendant's Unopposed Motion to Withdraw and Substitute Counsel.

The Court having found that the Motion is in order, is hereby GRANTED and the Court finds that Michael Cancienne and the law firm JORDAN, LYNCH & CANCIENNE, PLLC is hereby substituted as attorney of record for Defendant, Alta Power LLC. Furthermore, Michael Cancienne is designated as lead counsel for Defendant.

It is further ordered that counsel Jared I. Levinthal and the law firm of LIGHTFOOT FRANKLIN & WHITE, LLC is hereby permitted to withdraw as attorneys of record for Defendant. The Court's records shall so reflect this change in counsel and it shall be recorded in the Court's docket.

SIGNED this ___5th___ day of ___October___, 2020.

_____
JUDGE PRESIDING

APPROVED AND ENTRY REQUESTED:

LIGHTFOOT FRANKLIN & WHITE, LLC

By:_____

    Jared I. Levinthal
    State Bar No. 24002467
    levinthal@lightfootlaw.com
    1885 Saint James Place, Suite 1150
    Houston, Texas 77056
    (713) 960-1488 Telephone
    (713) 960-8991 Facsimile

**ATTORNEYS FOR DEFENDANT
ALTA POWER LLC**

FILED
10/7/2020 9:50 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JOHN WHITE DEPUT

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC, <br>     Plaintiff/Counter Defendant, | IN THE DISTRICT COURT OF |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC, <br>     Defendant/Counter Plaintiff. | 116th JUDICIAL DISTRICT |

## NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL

Please take notice that Kevin Jordan (Texas Bar No. 11014800) and Joseph W. ("Jeb") Golinkin II (Texas Bar No. 24087596) of Jordan, Lynch & Cancienne PLLC, 1980 Post Oak Boulevard, Suite 2300, Houston, Texas 77056 will be appearing as additional counsel of record on behalf of Defendant Alta Power LLC. Please direct all filings and correspondence to the undersigned in addition to current counsel of record, Michael Cancienne.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: _____*Michael Cancienne*_____
    Michael Cancienne
    State Bar No. 24055256
    Kevin Jordan
    State Bar No. 11014800
    Joseph W. ("Jeb") Golinkin II
    State Bar No. 24087596
    1980 Post Oak Blvd., Suite 2300
    Houston, Texas 77056
    Telephone: 713.955.4025
    Facsimile: 713.955.9644
    mcancienne@jlcfirm.com
    kjordan@jlcfirm.com
    jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was sent to the following counsel of record through the Court's electronic filing system on October 7, 2020.

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for Wattstock LLC*

_____ */s/ Jeb Golinkin* _____
Jeb Golinkin

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Thomas on behalf of Michael Cancienne
Bar No. 24055256
lthomas@jlcfirm.com
Envelope ID: 46953909
Status as of 10/7/2020 1:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 10/7/2020 9:50:51 AM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 10/7/2020 9:50:51 AM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 10/7/2020 9:50:51 AM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 10/7/2020 9:50:51 AM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 10/7/2020 9:50:51 AM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 10/7/2020 9:50:51 AM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 10/7/2020 9:50:51 AM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 10/7/2020 9:50:51 AM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 10/7/2020 9:50:51 AM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 10/7/2020 9:50:51 AM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 10/7/2020 9:50:51 AM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 10/7/2020 9:50:51 AM | SENT |

FILED
10/21/2020 1:26 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC, <br>     Plaintiff/Counter Defendant, | IN THE DISTRICT COURT OF |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC, <br>     Defendant/Counter Plaintiff. | 116th JUDICIAL DISTRICT |

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND TANGIBLE THINGS

TO:    Plaintiff/Counter-Defendant Wattstock, LLC, by and through its attorneys of record Brian N. Hail, Andrew D. Robertson, Kane Russell Coleman Logan PC, 901 Main Street, Suite 5200, Dallas, Texas 75202.

Pursuant to Texas Rule of Civil Procedure 205.3, Alta Power LLC files this Notice of Subpoena to Produce Documents and Tangible Things from non-party General Electric Company. The documents/and or items requested are set out in "Exhibit A" to this Notice, and shall be produced at the offices of Jordan Lynch & Cancienne PLLC—1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056—no later than 20 days after service of the Subpoena.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By:    *Michael Cancienne*
       Michael Cancienne
       State Bar No. 24055256
       Kevin Jordan
       State Bar No. 11014800
       Joseph W. ("Jeb") Golinkin II
       State Bar No. 24087596
       1980 Post Oak Blvd., Suite 2300
       Houston, Texas 77056
       Telephone:  713.955.4025
       mcancienne@jlcfirm.com
       kjordan@jlcfirm.com
       jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was sent to the following counsel of record through the Court's electronic filing system on October 21, 2020.

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for Wattstock LLC*

_____*/s/ Jeb Golinkin*_____
Jeb Golinkin

2

**EXHIBIT "A"**

**Definitions**

1.      "Wattstock" means Wattstock LLC and any of its subsidiaries or parent companies.

2.      "GE" means General Electric Company and any of its subsidiaries, including but not limited to GE Packaged Power, LLC., and GE Capital.

3.      "Alta" means Alta Power LLC.

4.      "Bosen" means BOSEN Energy Electric Production Inc.

5.      "Communication" or "Communications" include conversations, discussions, meetings, emails, text messages, telephone calls, letters, telecopies, and all other forms of oral or written expression by which information may be conveyed.

6.      "Document" and "Documents" as used herein includes any written, recorded, or graphic matter, however produced or reproduced, including, but not limited to, memoranda, reports, studies, analyses, contracts, agreements, charts, graphs, indices, data sheets, information in magnetic or electronic form (including data processing cards or tapes and computer disks and electronic mail), and notes, work papers, entries, letters, telegrams, telecopies, advertisements, brochures, circulars, tapes, records, bulletins, papers, books, pamphlets, accounts, invoices, bills, order forms, photographs, calendars, or diaries. If you do not have custody or control of the original, the term "document" shall also include any carbon, photograph, or photocopy, or any other copies, reproductions, or facsimiles thereof. If you have custody or control of the original and copies, reproductions, or facsimiles, the term "document" shall mean the original and any copy, reproduction, or facsimile that is in any way different from the original. This definition includes all ESI.

7.      "Identify" means:

    (a)     with respect to an individual, the person's full name, title at the time in question, and current or last known employer, business address, and home address;

    (b)     with respect to a company, the name of the company, the place of incorporation of the company, and the address of the company's principal place of business;

    (c)     with respect to a document, the date, the full names of the author(s) and each addressee or distributee, the subject matter(s), and/or title, a brief description of its contents, and its present location and custodian;

    (d)     with respect to a communication, the date, location, and general subject matter, all participants in or to the

3

communication, and all witnesses or other persons who have knowledge or information thereof.

8.    "Person" means any natural individual in any capacity whatsoever or any entity or organization, including, but not limited to, a public or private corporation, partnership, joint venture, association, union, collective bargaining unit, trust, agency commission, bureau or department.

## **Document Requests**

1.    All documents and communications concerning the actual or prospective "refurbish[ing] [of] existing LM2500 and LM6000 Gas Turbines manufactured by GE" for Wattstock or Alta.

2.    All documents and communications concerning the actual or prospective resale of existing LM2500 and LM6000 Gas Turbines manufactured by GE" to Wattstock or Alta.

3.    All documents and communications concerning the February 27, 2019 Master Agreement between Alta and Wattstock.

4.    All documents and communications concerning the Acarsoy Surplus LM6000 package.

5.    All documents and communications concerning the LM6000PC TRUEPackage LNTP between GE and Wattstock dated July 18, 2019.

6.    All documents and communications concerning GE's "LM6000PC Contractual Services Agreement Budgetary Proposal" to Alta.

7.    All invoices sent to or received from Wattstock since January 1, 2018.

8.    Any contracts or written agreements (including those that have expired) between Wattstock and GE.

9.    Documents sufficient to identify all money received from Wattstock since January 1, 2018.

10.    Documents sufficient to identify the basis and/or reason for any money transferred between Wattstock and GE since January 1, 2018.

11.    Documents sufficient to identify all services provided to Wattstock since January 1, 2018.

12.    Documents sufficient to identify all work done or services provided that in any way concern Wattstock since January 1, 2018.

13.    All documents and communications concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

4

14.   All text messages concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

15.   All documents and communications concerning financing for any actual or prospective project concerning Alta.

16.   All text messages concerning financing for any actual or prospective project concerning Alta.

17.   All documents and communications with any third-party concerning Alta.

18.   All documents and communications concerning Alta's efforts to obtain financing from Deutsche Bank in connection with any contract with Wattstock.

19.   All documents and communications concerning any September 16, 2019 proposal prepared by GE related to the "ALTA LNTP project."

20.   All documents and communications related to the GE Power Services-Aero Contract Change Order transmitted to or discussed with Wattstock on November 22, 2019 concerning Alta.

21.   All documents and communications related to any work done by GE directly or indirectly related the December 23, 2019 Limited Notice to Proceed Proposal to Alta for the Goodlow Peak Power Site for Two (2) TRUEpackage ML6000 PC Sprint GTG's," including but not limited to:

- Woodard Controls Upgrade Hardware;

- Fin-Fan Lube Oil Cooler;

- Internal Gas Vent Valve;

- Generator Enclosure Design to modify from 50Hz Design;

- Gas Turbine/Generator Coupling;

- Generator Lube Oil (GLO) Skid;

- Automatic Voltage Regulator-EX2100e(AVR);

- External Block & Bleed Gas Valves;

- Approx. 1100 hours of Engineering Support for Engineering Drawings.

22.     All documents and communications concerning any actual or prospective "Equipment Purchase and Sale Agreement" between Acarsoy Enerji Elektrik Üretim San. Ve Tic. A.S. and Wattstock.

23.     All documents and communications concerning the GE LM6000PC Unit owned and/or operated by Nuh Energy since January 1, 2018.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Thomas on behalf of Michael Cancienne
Bar No. 24055256
lthomas@jlcfirm.com
Envelope ID: 47391388
Status as of 10/22/2020 12:22 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 10/21/2020 1:26:50 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kevin Jordan | | kjordan@jlcfirm.com | 10/21/2020 1:26:50 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 10/21/2020 1:26:50 PM | SENT |

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Connie Nims | | cnims@krcl.com | 10/21/2020 1:26:50 PM | SENT |

FILED
11/5/2020 10:12 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF/COUNTERCLAIM DEFENDANT WATTSTOCK, LLC'S OBJECTION TO ALTA POWER LLC'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND TANGIBLE THINGS

TO:    Alta Power LLC, by and through its counsel of record, Michael Cancienne, JORDAN, LYNCH & CANCIENNE, PLLC, 1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056.

Plaintiff/Counterclaim Defendant WattStock, LLC ("WattStock" or "Plaintiff") serves its Objection to Alta Power, LLC's ("Alta" or "Defendant") Notice of Subpoena to Produce Documents and Tangible Things ("Subpoena") as follows:

WattStock objects that Alta's Subpoena, served pursuant to Texas Rule of Civil Procedure 205.3 is defective on its face because WattStock is a party to this litigation. Rule 205.3 provides that "[a] party may compel production of documents and tangible things **from a nonparty** by serving ... the notice required in Rule 205.2 and a subpoena compelling production or inspection of documents or tangible things." Tex. R. Civ. P. 205.3(a) (emphasis added). WattStock is a party to this litigation, not a "nonparty" within the meaning of Rule 205.3, and a subpoena therefore cannot be used to compel the production of any documents from WattStock. Because Rule 205.3 is inapplicable to WattStock, WattStock need not respond to the Subpoena.

WattStock further objects that the Subpoena provides only twenty (20) days for compliance rather than the thirty (30) days required by Rule 196.2(a) for a request for production to a party.

To the extent that Alta may later serve a request for production seeking the same or similar documents, WattStock reserves the right to assert any and all objections it may have to specific requests in accordance with Texas Rule of Civil Procedure 196.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: /s/ Brian N. Hail
    Brian N. Hail
    bhail@krcl.com
    State Bar No. 08705500
    Andrew D. Robertson
    drobertson@krcl.com
    State Bar No. 24090845

901 Main St.
Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that on 5th day of November, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

VIA E-SERVICE:
Michael Cancienne
mcancienne@jlcfirm.com
JORDAN, LYNCH & CANCIENNE, PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056

**ATTORNEYS FOR DEFENDANT/
COUNTERCLAIM PLAINTIFF**

/s/ Brian N. Hail
Brian N. Hail

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Vicki Sedon on behalf of Brian Hail
Bar No. 8705500
vsedon@krcl.com
Envelope ID: 47833108
Status as of 11/5/2020 2:15 PM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Connie Nims | | cnims@krcl.com | 11/5/2020 10:12:15 AM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 11/5/2020 10:12:15 AM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 11/5/2020 10:12:15 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 11/5/2020 10:12:15 AM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 11/5/2020 10:12:15 AM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 11/5/2020 10:12:15 AM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 11/5/2020 10:12:15 AM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 11/5/2020 10:12:15 AM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 11/5/2020 10:12:15 AM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 11/5/2020 10:12:15 AM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 11/5/2020 10:12:15 AM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 11/5/2020 10:12:15 AM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 11/5/2020 10:12:15 AM | SENT |

FILED
11/5/2020 10:20 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Shelia Bradley DEPUTY

## SUBPOENA TO PRODUCE DOCUMENTS OR THINGS

## THE STATE OF TEXAS

To any Sheriff or Constable of the State of Texas or other person authorized to serve subpoenas under RULE 176 OF TEXAS RULES OF CIVIL PROCEDURE. - GREETINGS -

You are hereby commanded to subpoena and summon the following witness(es):
Custodian of Records for:

General Electric Company
c/o Reg. Agent - CT Corporation System
1999 Bryan Street, Suite 900
Dallas, TX 75201

To produce the documents outlined in the attached **Exhibit "A"** on **November 23, 2020** to the Offices of Jordan Lynch & Cancienne PLLC, 1980 Post Oak Blvd., Suite 2300, Houston, TX 77056. This subpoena is issued at the request of the **Defendant and Counter-Plaintiff, Alta Power LLC,** represented by **Michael Cancienne**, Attorney of Record, in that Certain Cause No. **DC-20-08331,** pending on the docket of the **116th Judicial District Court of Dallas County,** Texas, styled:

WATTSTOCK LLC

vs.

ALTA POWER LLC

WITNESS MY HAND, this _2nd_ day of _November_, 20_20_

ANN L THOMPSON
124243611
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JUNE 13, 2022

_____
NOTARY PUBLIC

**176.8 Enforcement of Subpoena. (a) _Contempt._** Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

## OFFICER'S RETURN

Came to hand this _2nd_ day of _November_, 20_20_, and executed this the _3rd_ day of _November_, 20 _20_, in the following manner: By delivering to the witness _General Electric Company by serving_, a true copy hereof. _registered agent CT Corporation System_

Returned this _4tg_ day of _November_, 20_20_. (Terri thongsavat)

PROCESS SERVER
Chaffy Lambert
PSC#19014 EXP: 11/30/2022

Order No. 22642.001

FILED
11/24/2020 3:40 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION TO COMPEL DISCOVERY RESPONSES

Plaintiff/Counterclaim Defendant WattStock LLC ("WattStock") files its Motion to Compel Discovery Responses from Defendant/Counterclaim Plaintiff Alta Power LLC ("Alta" or "Defendant") and respectfully shows the Court as follows:

### I. INTRODUCTION

Alta has obstructed WattStock's efforts to conduct basic, preliminary discovery in this matter by failing to fully respond to certain interrogatories, by failing to produce certain responsive documents in response to requests for production, and by raising boilerplate objections without merit in response to multiple discovery requests. In light of Alta's failure to provide responses to the discovery requests below and its numerous responses outright refusing to produce responsive documents without a Court order, WattStock now seeks an order compelling Alta to fully respond to the written discovery at issue in this Motion pursuant to Texas Rules of Civil Procedure 215.

### II. BACKGROUND

WattStock is a supplier of used and refurbished gas turbine power generation units and services. Alta is a new power project developer with a plan to develop power generation projects in the Texas market using surplus combustion turbine packages. WattStock became aware of Alta in

2018 through its sales efforts. Alta had been working on early stage project development (site location and purchase, market studies, initial permit applications, etc.) for some time prior to the start of their relationship with WattStock. However, Alta had not yet obtained project financing. On or about February 27, 2019, WattStock and Alta entered into a Master Agreement ("Master Agreement"), pursuant to which they agreed that WattStock would work to locate and identify nine LM6000 Generator Sets[1] for Alta's project. The parties further agreed that WattStock, with the approval of Alta, would arrange inspections with the existing owners of such Generator Sets and other Assets[2] to inspect and evaluate their condition and refurbishment requirements, provide a scope of work to complete refurbishments for each LM6000 Generator Set, and enter into negotiations with the existing owner on purchase terms or a purchase option consistent with terms approved by Alta. The Master Agreement expressly requires Alta to reimburse WattStock for WattStock's out-of-pocket expenses incurred in performing Asset inspections. Finally, the parties agreed that they would subsequently enter into one or more definitive Equipment Purchase and Sale Agreement(s) ("EPA" or "EPAs") describing the scope, terms, and price under which Alta would eventually purchase from WattStock each refurbished LM6000 Generator Set.

Although Alta had not yet obtained project financing, it asked WattStock to begin working under the Master Agreement right away due to the expedited, ambitious schedule for getting the project online. WattStock agreed and began promptly began working to fulfill its obligations under

---

[1] "Generator Sets" means a skid-mounted, GE aeroderivative combustion turbine power generation package refurbished by WattStock.

[2] "Assets" means major sub-components of an LM6000 Generator Set that may qualify for purchase of the Business Purpose including (i) generator set package with combustion turbine engine and electric generator, (ii) generator set pacakage without combustion turbine engine and/or electric generator, (iii) combustion turbine engine only, (iv) electric generator only, and/or (v) such other equipment as the Parties may agree.

the Master Agreement. Throughout 2019 and 2020, however, Alta struggled to obtain financing for its project. Meanwhile, beginning in April 2019 and continuing through 2020, Alta made repeated assurances to WattStock that financing was in sight and that it expected to close on various financing deals "soon," "in 6 weeks," or in similar time frames. Such financing never materialized despite continued assurances from Alta.

Alta proceeded to make numerous changes to the scope of its planned project and such constant reconfiguration of the project by Alta resulted in a large workload for WattStock which was undertaken at WattStock's own out-of-pocket expense. With Alta's financing continuing to fall through, it became necessary for the parties to enter into multiple stop-gap agreements to stand in place of a normal ESA (the ESA had been largely negotiated by June 2019 but was never executed due to Alta's continued lack of financing). The parties subsequently entered into multiple other agreements and WattStock performed its obligations under each of those agreements while incurring substantial out-of-pocket costs. WattStock also entered into many other agreements with owners of Generator Sets and/or Assets substantially in furtherance of its obligations under the Master Agreement. However, many of these agreements had to be cancelled as a result of Alta's indecisiveness and failure to obtain proper financing. Alta has further refused to pay WattStock various sums owed under the Master Agreement and related agreements between the parties for work performed by WattStock to date.

As of June 2020, Alta had still failed to close on project financing and had otherwise failed to honor its obligations to WattStock, including by failing to adhere to project timelines for closing on the purchase of Generator Sets and Assets and failing to pay amounts owed to WattStock under the Master Agreement and other related contractual agreements. On or about June 1, 2020, Alta

sent WattStock a letter titled "Termination of Master Agreement and WattStock LLC Limited Notice to Proceed Proposal to Alta Power LLC" wherein in wrongly accused WattStock of various breaches of the Master Agreement and the WattStock/Alta LNTP and, without cause, stated its intention, either expressly or implicitly, to cancel those agreements.

On June 16, 2020, WattStock brought this lawsuit for breach of the various contracts between the parties, seeking to recover its out-of-pocket expenses which Alta has failed to reimburse and other damages resulting from Alta's breaches. Alta answered on June 22, 2020, asserting a wide spectrum of contractual and tort counterclaims, including claims for declaratory relief, breach of contract, fraud and fraudulent inducement, breach of fiduciary duty, negligent misrepresentation, violations of the Texas Theft Liability Act, conversion, money had and received, unjust enrichment,

On July 24, 2020, WattStock served Alta with its First Set of Interrogatories (totaling 13 interrogatories) and its First Requests for Production (totaling 31 requests).

On August 24, 2020, Alta served its Answers to WattStocks's First Set of Interrogatories and its Objections and Responses to WattStock's First Request for Production.

On or about September 30, 2020, Alta substituted counsel in this matter.

On November 18, 2020, following multiple conferences between WattStock's counsel and Alta's new counsel on an earlier draft of this Motion, Alta served its First Amended Answers to WattStock's First Set of Interrogatories ("Interrogatory Responses") and its First Amended Objections and Responses to WattStock's First Request for Production ("RFP Responses"), attached hereto as **Exhibit 1** and **Exhibit 2** respectively.

### III. DISCOVERY REQUESTS AT ISSUE AND ARGUMENT

#### A. Plaintiff's First Set of Interrogatories

WattStock seeks to compel responses to its First Set of Interrogatories pursuant to Texas Rules of Civil Procedure 197 and 215.1(b)(3).

#### *Interrogatory No. 2*

Interrogatory No. 2 asks Alta to "[e]xplain what steps Alta took to obtain financing for The Projects, including the identities of all potential investors in The Projects with whom Alta negotiated in 2019 or 2020 and the date(s) and amount(s) of any ultimate investment(s) in The Projects." Alta objects that such interrogatory is overly broad, unduly burdensome, irrelevant, and an improper fishing expedition.

The request is not overbroad or a prohibited fishing expedition, as it asks about specific investments and/or potential investments that Alta was supposed to be attempting to procure under the parties' agreement and is limited to a specific one-year period. *Contra In re American Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (holding that discovery requests were an overbroad fishing expedition because they were "not tied to particular products the plaintiffs claim to have used, and [were] not limited to time periods such use may have occurred."). The request is also relevant for the same reasons, particularly given that WattStock's entire agreement with Alta was dependent on Alta obtaining financing for The Projects. As for Alta's final objection, Alta has not explained what is overly burdensome about the request to identify its financing efforts during a one-year period. The Court should overrule Alta's objections.

Subject to its objections, Alta answers only by providing the names of various institutions

that it "interacted with ... concerning obtaining financing for The Projects[.]"[3] Such an answer is partially nonresponsive to the interrogatory, as it fails to identify with any specificity "what steps Alta took to obtain financing for The Projects" in accordance with its obligations to WattStock. The Court should compel a complete response to this interrogatory.

### Interrogatory No. 5

Interrogatory No. 5 asks Alta to "[e]xplain why Alta reduced the size of The Projects consisting of three sites, totaling nine units, to one site totaling two units." Alta objects that this requests "is intentionally misleading and it is therefore incapable of answering due to same."[4] Alta provides no substantive response to this interrogatory, citing Comment 4 to Texas Rule of Civil Procedure 199. However, Rule 199 deals with oral examinations and is not applicable to interrogatory responses, which are governed by Rule 197. The comments to Rule 197, unlike Rule 199, do not provide any excuse for a party not to answer based on a perceived defect in the question. See Tex. R. Civ. P. 197 at Comments 1 and 2. Alta's objection is without merit and the Court should overrule it.

If Alta believes that Interrogatory No. 5 is "intentionally misleading," then it should clarify what it believes is misleading about the request and provide a substantive answer subject to whatever clarification it may wish to provide. Alta's outright refusal to answer the interrogatory, however, is improper and the Court should compel a complete response.

---

[3] **Ex. 1** at p.5.

[4] **Ex. 1** at p.6.

*Interrogatory No. 6*

Interrogatory No. 6 is a basic contention interrogatory that seeks additional detail about certain specific allegations in Alta's affirmative defenses and counterclaims. Alta objects to the interrogatory as "an impermissible contention request" and asserts that Alta may obtain nothing more than a basic statement of contentions but not "a marshalling of evidence." Subject to its objections, Alta incorporates its entire counterclaim by reference, provides minimal generic allegations (without identifying any specific provisions of any agreement as instructed by the interrogatory), and then promises to supplement the response.[5]

"Rule 197.1 permits a party to serve contention interrogatories to 'inquire whether a party makes a specific legal or factual contention **and may ask the responding party to state the legal theories and to describe in general the factual bases for the party's claims or defenses**[.]" *In re Sting Soccer Group, LP*, No. 05-17-00317-CV, 2017 WL 5897454, at *5 (Tex. App.—Dallas Nov. 30, 2017, no pet.) (emphasis added). Interrogatory No. 6 does not require Alta to "marshal" any of its evidence, but is a simple contention interrogatory that is fully permissible under Rule 197.1 and binding precedent from the Dallas Court of Appeals. Alta's objection is entirely without merit and this Court should overrule it.

As for Alta's response subject to its objections, Alta's incorporation by reference of its counterclaim is inappropriate. The entire purpose of the contention interrogatories is to clarify the legal theories and the general factual bases for the broad allegations made in the counterclaim. *See In re Sting Soccer Group, LP*, 2017 WL 5897454, at *5. Nor do Alta's generic representations unsupported by citations to any specific provisions of an agreement provide any further clarity into

---

[5] Ex. 1 at p.6.

Alta's claims or contentions in this lawsuit. Alta has thus failed to fully and adequately respond to this interrogatory and the Court should compel a complete answer.

### B. Plaintiff's First Requests for Production

WattStock further seeks to compel responses to certain requests in its First Request for Production pursuant to Texas Rules of Civil Procedure 196 and 215.1(b)(3).

### Request No. 7

Request for Production No. 7 seeks "[a]ll drafts of any financing agreements, loan documents, term sheets, or other documents evidencing any potential investment in The Projects by any investor other than Alta that did not close for any reason." Alta objects to this request on the grounds that it seeks proprietary, confidential information and it states that it will "not disclose such information absent Court Order." Alta further objects that the request is overly broad and unduly burdensome because it seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence.[6]

This request is neither overly broad nor unduly burdensome. It seeks specific information about Alta's efforts to obtain financing for The Projects at issue in this case. The relevance of the request is also apparent: Alta's repeated inability or unwillingness to obtain project financing is a key part of this case that directly relates to the parties' contractual agreements and entire business relationship. WattStock is entitled to seek discovery of Alta's efforts to obtain financing and to determine why Alta failed to obtain proper financing. To the extent Alta believes such information is confidential and proprietary, it may produce the records under a protective order.

Alta's objections to this request are without merit and the Court should overrule them. Alta

---

[6] Ex. 2 at p.5.

has failed to fully and adequately respond to the interrogatory subject to its objections and the Court should therefore compel complete answers.

### *Request Nos. 10, 12, 13, 14, and 16*

These requests all seek information about Alta's business, ownership, and solvency. Specifically, the requests are as follows:

> No. 10: All documents reflecting the current unit holders of Alta and the number of units owned by each.

> No. 12: All federal tax returns filed by Alta for the last three (3) years.

> No. 13: All annual, semi-annual, quarterly, or other balance sheets of Alta for the last three (3) years.

> No. 14: The current Alta balance sheet, as well as a current income statement, cash flow statement, and statement of members' equity.

> No. 16: All current term sheets for future equity raises or additional debt that are currently under consideration by Alta.

Alta objects to each of these requests on the grounds that they seek proprietary, confidential information and it states as to all of the requests that it will "not disclose such information absent Court Order." Alta further objects that the requests are overly broad and unduly burdensome because they seek information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence.[7]

These requests are neither overly broad nor unduly burdensome. On the contrary, the requests seek specific company and financial information that should be maintained by Alta in its ordinary course of business and should be readily available to Alta. Request Nos. 12 and 13 are limited to a three (3) year period so as to avoid any undue burden or irrelevant responsive material,

---

[7] Ex. 2 at pp.6–7.

and Request Nos. 10, 14, and 16 are limited to the "current" versions of the documents requested for the same reasons. Such requests are properly limited in scope so as to seek only information that would be relevant to this lawsuit. The relevance of the requests is also apparent: Alta's repeated inability or unwillingness to obtain project financing is a key part of this case that directly relates to the parties' contractual agreements and entire business relationship. WattStock is entitled to seek discovery of Alta's business and financial information in order to determine exactly why Alta failed to obtain proper financing. To the extent Alta believes such information is confidential and proprietary, it may produce the records under a protective order.

Alta's objections to these requests are without merit and the Court should overrule them. Alta has failed to fully and adequately respond to these interrogatories subject to its objections and the Court should therefore compel complete answers.

## IV. Conclusion and Prayer

For the foregoing reasons, WattStock respectfully prays that the Court grant this Motion as stated above, grant it reasonable and necessary expenses—including attorneys' fees—incurred as a result of this Motion, in an amount to be proven up at the hearing on this matter, and grant it such other and further relief to which it may be justly entitled.

Dated November 24, 2020.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: */s/ Brian N. Hail*
      **Brian N. Hail**
      bhail@krcl.com
      State Bar No. 08705500
      **Andrew D. Robertson**
      drobertson@krcl.com
      State Bar No. 24090845

901 Main St., Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299

**ATTORNEYS FOR PLAINTIFF /
COUNTERCLAIM DEFENDANT**

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on November 9, November 13, and November 16, 2020, he (through his associate) conferred via telephone calls and e-mail exchanges on each of the discovery issues contained in this Motion. Such conferences resulted in Alta's service of amended discovery responses on November 18, 2020, and resolved several of WattStock's outstanding issues. However, counsel have not been able to agree on the limited remaining issues addressed by this Motion, and the Motion is therefore presented to this Court for determination.

      */s/ Brian N. Hail*

## CERTIFICATE OF SERVICE

This is to certify that on the 24<sup>th</sup> day of November, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

**Michael Cancienne**
Kevin Jordan
Joseph W. ("Jeb") Golinkin II
**1980 Post Oak Blvd., Suite 2300**
Houston, Texas 77056

**ATTORNEYS FOR ALTA POWER LLC**

*/s/ Brian N. Hail*
Brian N. Hail

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC, | IN THE DISTRICT COURT OF |
| Plaintiff/Counter Defendant, | |
| | |
| v. | DALLAS COUNTY, TEXAS |
| | |
| ALTA POWER LLC, | |
| Defendant/Counter Plaintiff. | 116th JUDICIAL DISTRICT |

## DEFENDANT ALTA POWER, LLC'S FIRST AMENDED ANSWERS TO WATTSTOCK'S FIRST SET OF INTERROGATORIES

TO:    Plaintiff, WattStock, LLC, by and through their attorneys of record, Brian N. Hail and Andrew D. Robertson, KANE RUSSELL COLEMAN LOGAN PC, 901 Main St., Dallas, Texas, 75202.

Pursuant to the Texas Rules of Civil Procedure, Alta Power LLC ("Alta" or "Alta Power") serves this, its First Amended Answers to Plaintiff's First Set of Interrogatories.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By:    *Michael Cancienne*
Michael Cancienne
State Bar No. 24055256
Kevin Jordan
State Bar No. 11014800
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone:  713.955.4025
Facsimile:  713.955.9644
mcancienne@jlcfirm.com
kjordan@jlcfirm.com
jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

EXHIBIT 1  Page 1 of 10

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was sent to the following counsel of record by electronic mail on November 18, 2020:

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for Wattstock LLC*

_____*/s/ Michael Cancienne*_____
Michael Cancienne

2

EXHIBIT 1  Page 2 of 10

## **GENERAL OBJECTIONS**

1.    Alta objects to WattStock's Definitions and Instructions contained in the discovery to the extent that same seek to alter or expand Alta's obligations to respond to same under the Texas Rules of Civil Procedure.

2.    To the extent the definition of "you" and "your" includes Alta's attorneys, the discovery seeks information protected from discovery by the attorney/client privilege and the attorney work product doctrine.

EXHIBIT 1  Page 3 of 10

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all of Alta's prior experience as a power project developer, including the location(s) and operational date(s) of any power project developed by Alta.

**ANSWER:** Alta objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a). Alta further objects to this Interrogatory on the grounds that it is nothing more than an improper fishing expedition. The Texas Supreme Court has expressly rejected the notion that a discovery device can be used to "fish." *In re National Lloyds Ins.* 507 S.W.3d 219, 223-25 (Tex. 2016); *In re National Lloyds Ins.*, 449 S.W.3d 486, 489-90 (Tex. 2014); *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 181 (Tex.1999) (orig. proceeding); *K Mart Corp. v. Sanderson*, 937 S.W.2d 429 (Tex.1996). Subject to and without waiving the foregoing objections, Alta's prior experience in the power project industry includes the following:

| Utility/Station | Unit Size MWe | Fuel | Project Description |
|---|---|---|---|
| BP Whiting | 250 | NatGas | EPC Combustion controls and new Pollution Control System for 5 boilers (50MW EA) |
| Huntsman Corporation, Port Neches | 142 | NatGas | EPC Combustion controls and new Pollution Control System for 5 boilers ranging from 12MW to 70MW |
| Western Resources, Gordon Evans | 530 | Oil/NatGas | Project Manager new Combustion Controls & Pollution Control System for 2 boilers (Unit1 - 150MW; Unit2 - 380MW) |
| Entergy, Waterford | 840 | Oil/NatGas | Project Manager new Combustion Controls & Pollution Control System for 2 boilers (420MW EA) |
| Ameren, Duck Creek | 470 | Coal | EPC Low NOx Burners |
| TVA, Johnsonville | 150 | Coal | EPC Low NOx Burners |
| TVA, Johnsonville | 750 | Coal | EPC Pollution Control System (SNCR/OFA) for 6 boilers (125MW EA) |
| TVA, John Sevier | 740 | Coal | EPC Pollution Control System (SNCR/OFA) for 4 boilers (185MW EA) |
| Lubrizol, Houston | 20 | NatGas | EPC Combustion Controls & new Flue Gas Recirculation system |

4

EXHIBIT 1 Page 4 of 10

| Westlake Polymer | 20 | Oil/NatGas | EPC Combustion Controls & new Flue Gas Recirculation system |
|---|---|---|---|
| SMEPA, Morrow Station | 410 | Coal | EPC Pollution Control System (SNCR) for 2 boilers (205MW EA) |
| City of Lansing, Erickson | 165 | Coal | EPC Pollution Control System (SNCR) for boiler |
| AKSA, Turkey | 285 | Coal/NatGas | EPC Combustion Controls & Pollution Control System (SCR); Project Manager for plant start-up commissioning |
| Southern Company, Plant Smith | 380 | Coal | EPC Pollution Control System (SNCR) for 2 boilers (Unit1 175MW & Unit2 205MW) |
| Blue Ridge Paper, Ashville | 40 | Coal | EPC Pollution Control System (SNCR) for boiler |
| Entergy, Gerald Andrus | 800 | Oil/NatGas | EPC Combustion Controls and new Pollution Control System for boiler |
| Point Comfort Power | 100 | NatGas | Owner/ Developer 2 x CTG GE LM6000PC SPRINT (refurbished) |
| Chamon Power | 100 | NatGas | Owner/ Developer 2 x CTG GE LM6000PC SPRINT (refurbished) |

**INTERROGATORY NO. 2:**

Explain what steps Alta took to obtain financing for The Projects, including the identities of all potential investors in The Projects with whom Alta negotiated in 2019 or 2020 and the date(s) and amount(s) of any ultimate investment(s) in The Projects.

**ANSWER:** Alta objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a). Alta further objects to this Interrogatory on the grounds that it is nothing more than an improper fishing expedition. The Texas Supreme Court has expressly rejected the notion that a discovery device can be used to "fish." *In re National Lloyds Ins.* 507 S.W.3d 219, 223-25 (Tex. 2016); *In re National Lloyds Ins.*, 449 S.W.3d 486, 489-90 (Tex. 2014); *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 181 (Tex.1999) (orig. proceeding); *K Mart Corp. v. Sanderson*, 937 S.W.2d 429 (Tex.1996). Subject to and without waiving the foregoing objections, Alta has not obtained financing for The Projects. Alta interacted with the following concerning obtaining financing for The Projects:

Ares, EIG, ECP, GIP, GIC, Angelo Gordon, Alliance Bernstein, Mass Mutual, John Hancock, DNB Nordbank, Texas Capital Bank, Cadence Bank, Atlas Credit, Anchorage Capital, Blackstone, Arroyo Energy, Rockland Capital, Carlyle, Hullstreet Energy, EMG, Charlesbank, Oaktree, Rock Hill, Quantum Energy, Capital Dynamics, EIV Capital, Starwood Infrastrucre, Mason Capital, Moore Capital, Avenue Capital, Mill Rock Capital, Basalt Infrastructure, Fengate, AMP Infrastructure, IFM

EXHIBIT 1 Page 5 of 10

Investors, ING, Vantage Infrastructure, Blackrock Real Assets Team, Prudential, Allstate, Cigna, Apollo, Stonepeak, Fortress, GSO, Nomura, GE Capital, Arclight, Alcentra, Angel Island, Beach Point, Benefit Street, Blue Torch, Capital Southwest, Derby Capital, Deerpath, Guggenheim, King Street, KKR, Macquarie, Marathon, MGG, Neuberger Berman, NexBank, Perot, Riverstone, Solus, Stellus, Summit Credit, TCW, WhiteOak, BBVA, MUFG, Investec, CIT, Deutsche Bank, BNP Paribas, Societe Generale, First Tennessee, Orion Energy, Perot, Renova, Santander, SMBC, RBC, UMB, TPG, TD Securities, and Western Alliance.

**INTERROGATORY NO. 3:**
Explain why Alta did not close on financing for the Goodlow Project on or before February 28, 2020 as represented in the WattStock/Alta LNTP.

**ANSWER:**  Alta objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).  Alta further objects to this Interrogatory on the grounds that it is nothing more than an improper fishing expedition.  The Texas Supreme Court has expressly rejected the notion that a discovery device can be used to "fish." *In re National Lloyds Ins.* 507 S.W.3d 219, 223-25 (Tex. 2016); *In re National Lloyds Ins.*, 449 S.W.3d 486, 489-90 (Tex. 2014); *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 181 (Tex.1999) (orig. proceeding); *K Mart Corp. v. Sanderson*, 937 S.W.2d 429 (Tex.1996).  Subject to and without waiving the foregoing objections, closing did not occur because Starwood's internal approval process had not been completed and was put on indefinite hold as a result of the COVID-19 global pandemic.  Since this time, Alta has continued discussions with a variety of other interested financing sources, all of whom are included in the list above.

**INTERROGATORY NO. 4:**
If You contend that Alta paid WattStock approximately $1,500,000 without receiving any material benefit in exchange, explain the basis for that contention.

**ANSWER:**  Alta objects to this Interrogatory on the grounds that it is an impermissible contention request.  Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1.  Subject to and without waiving the foregoing objections, Alta has paid WattStock $1,500,000 and has not received any of the items covered by the LNTP or any other equipment/gear related to the project.  Instead, WattStock has stolen money from Alta (see Bosen deposit) and has pursued meritless litigation against Alta.

**INTERROGATORY NO. 5:**
Explain why Alta reduced the size of The Projects consisting of three- sites, totaling nine-units, to one-site totaling two-units.

**ANSWER:**  Alta objects to this Interrogatory on the grounds that it is intentionally misleading and it is therefore incapable of answering due to same. Tex.R.Civ.P. 199, cmt. 4.

6

EXHIBIT 1  Page 6 of 10

**INTERROGATORY NO. 6:**

If You contend that WattStock committed a material breach of the Master Agreement, the LNTP, and the Ethos Authorization, as alleged in Paragraph 1 of Your Affirmative Defenses, explain the factual basis for that contention. As part of Your answer, identify all specific provisions of such agreements that You contend WattStock materially breached and the dates of any and all notices of each breach sent to WattStock.

**ANSWER:** Alta objects to this Interrogatory on the grounds that it is an impermissible contention request. Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Subject to and without waiving the foregoing objections, please see Alta's Counterclaim for a detailed explanation of WattStock's breaches of contract. Alta further provides that there was no "Ethos Authorization" given to Wattstock, and this is a document that Wattstock cannot and has not produced. Alta further alleges that Wattstock's breached agreements with Alta by (1) the improper disclosure of confidential information to third parties,(2) becoming insolvent and unable to return certain funds to Alta, and (3) misappropriating funds from Alta. Discovery is on-going. Alta will supplement this response.

**INTERROGATORY NO. 7:**

If You contend that any invoices, expenses, fees, or other amounts charged by WattStock to Alta are not allowed by the Master Agreement or any other contract between WattStock and Alta, explain the factual basis for that contention. As part of Your answer, identify each specific provision of such contract(s) that You contend prohibits the charge and the dates of all notice of each breach sent to WattStock.

**ANSWER:** Alta objects to this Interrogatory on the grounds that it is an impermissible contention request. Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Subject to and without waiving the foregoing objections, please see Alta's Counterclaim for a detailed explanation of WattStock's breaches of contract. Alta further states that there is no contractual provision that provides for payment to Wattstock by Alta for any amount claimed by Wattstock. Alta has no payment obligation for any of the "outstanding" invoices because the parties have no agreement regarding the payment of the "outstanding" invoices. Under the terms of the Master Agreement, the parties agreed that Alta Power would compensate WattStock for specific out-of-pocket expenses incurred in arranging inspection and evaluation of the condition of the used aeroderivative gas turbines, with prior written approval needed for expenditures in excess of $20,000.00.

GE and WattStock demanded a procedure by which WattStock would negotiate the purchase price of each unit and acquire the unit in WattStock's name for an agreed amount. The parties then would negotiate a price by which Alta Power would purchase the installed unit from WattStock. Any amounts paid by Alta Power in the interim period would be credited towards the purchase price Alta Power agreed to pay WattStock. Each unit would cost multiple millions of dollars. WattStock's margin would be based on the difference in what it purchased the unit for and the final price charged

7

EXHIBIT 1 Page 7 of 10

to Alta Power for purchase and installation of the unit. At no time prior to entering into the Master Agreement did WattStock indicate it would attempt to "mark-up" goods or services acquired in the interim period by invoices to WattStock. Alta Power never agreed to such a procedure and the Master Agreement contains no provisions that allow WattStock to send "marked up" invoices

**INTERROGATORY NO. 8:**
If You contend that WattStock is or was insolvent at any time between May 20, 2020 and the present date, explain the factual basis for that contention.

**ANSWER:** Alta objects to this Interrogatory on the grounds that it is an impermissible contention request. Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Subject to and without waiving the foregoing objections, WattStock explained that due to "financial stress" it was unable to return Alta's $100,000 Bosen deposit. Answering further, if WattStock had the funds, it would have paid Alta the $100,000 Bosen deposit it admittedly owed back to Alta.

| | |
|---|---|
| From: | Andrew Herr <a.herr@wattstock.com> |
| Sent: | Thursday, May 7, 2020 4:31 PM |
| To: | Matthew Laterza |
| Cc: | William Phelps; 'Patrick Jenevein' |
| Subject: | RE: Bosen 100K Deposit Refund |

Matt:

Yes, Alta is due a credit re the Bosen deposit. And yes, we are under financial stress – the virus has halted all work on -- and cash flow from -- other contracts; and Alta has not initiated the Goodlow project. Our (more recent) expectation was that you were going to initiate that project in mid-February. And the latest update provided by Alta indicates that you are now going to initiate the project in this quarter, which would be good news indeed.

Given this, we agree that there is a Bosen deposit credit owed Alta but not necessarily a payable. We believe the most reasonable resolution of this matter is that Alta and WattStock agree to net the Bosen deposit out of either a) Alta's initial payment to WattStock for the Goodlow project, OR b) out of monies to be owed WattStock in the event of contract cancellation. One or the other of these would appear to be a near-term event. If there are acute financial issues pressuring Alta to collect this in advance of settling our other accounts, we need to know.

Give me a call and we can discuss.

Thanks,

Andy

**INTERROGATORY NO. 9:**
Explain how each of the representations identified by You in Paragraph 33 of Your Counterclaims was false at the time that WattStock allegedly made such representations to Alta.

**ANSWER:** Alta objects to this Interrogatory on the grounds that it is an impermissible contention request. Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . .

8

EXHIBIT 1 Page 8 of 10

not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1.  Subject to and without waiving the foregoing objections, in addition to the reasons set forth in the Counterclaim,

GE and WattStock are not and never have been "partners";
All of WattStock's legitimate "out of pocket" expenses were reimbursed by Alta;
WattStock has had no experience in refurbishment projects;
At the time of the Master Agreement, there was no formal agreement by GE to backstop WattStock (or take over for WattStock) in the event of WattStock's default;
WattStock was unable to locate any LM6000 gas turbines that were not also being widely marketed by other equipment brokers.

**INTERROGATORY NO. 10:**
Explain how You justifiably relied on each of the representations identified by You in Paragraph 33 of Your Counterclaims to Your detriment.

**ANSWER:**  Alta objects to this Interrogatory on the grounds that it is an impermissible contention request.  Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1.  Subject to and without waiving the foregoing objections, in addition to the reasons set forth in the Counterclaim, WattStock misrepresented its relationship with GE, and Alta was required (by financing partners) to get a letter from GE supporting the project; this caused a delay to the closing schedule that was ultimately fatal. In short, Alta has spent several million dollars relying on WattStock's "expert" advice and has nothing to show for it.

**INTERROGATORY NO. 11:**
If You contend that WattStock owes Alta fiduciary duties under a formal fiduciary relationship, explain the factual basis for that contention.

**ANSWER:**  Alta objects to this Interrogatory on the grounds that it is an impermissible contention request.  Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1.  Subject to and without waiving the foregoing objections, WattStock was entrusted with Alta's funds and has failed to act as a fiduciary with respect to same – even after explicitly acknowledging that "[w]e owe Alta a refund on the Bosun [sic.] deposit."

**INTERROGATORY NO. 12:**
If You contend that WattStock owes Alta fiduciary duties under an informal fiduciary relationship, explain the factual basis for that contention.

**ANSWER:**  Alta objects to this Interrogatory on the grounds that it is an impermissible contention

EXHIBIT 1  Page 9 of 10

request. Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Subject to and without waiving the foregoing objections, WattStock was entrusted with Alta's funds and has failed to act as a fiduciary with respect to same - even after explicitly acknowledging that "[w]e owe Alta a refund on the Bosun [sic.] deposit."

**INTERROGATORY NO. 13:**
If You contend that Alta has a superior right of possession (as compared to WattStock) to the $360,000 identified in Paragraphs 45, 47, and 53 of Your Counterclaims, explain the factual basis for that contention.

**ANSWER:** Alta objects to this Interrogatory on the grounds that it is an impermissible contention request. Plaintiffs are entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Subject to and without waiving the foregoing objections, Alta's Counterclaim contains the factual basis supporting its claim of theft. Answering further, the simple fact is that Alta paid this money to WattStock for the Bosen Unit. The Bosen Unit, ultimately was not purchased for Alta and WattStock was refunded the $260,000 down payment from Bosen and kept the $100,000 extension fee from Alta. This money is Alta's.

10

EXHIBIT 1  Page 10 of 10

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC, | IN THE DISTRICT COURT OF |
| *Plaintiff/Counter Defendant*, | |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC, | |
| *Defendant/Counter Plaintiff.* | 116th JUDICIAL DISTRICT |

### DEFENDANT ALTA POWER, LLC'S FIRST AMENDED OBJECTIONS AND RESPONSES TO WATTSTOCK'S FIRST REQUEST FOR PRODUCTION

TO:   Plaintiff, WattStock, LLC, by and through their attorneys of record, Brian N. Hail and Andrew D. Robertson, Kane Russell Coleman Logan PC, 901 Main St., Dallas, Texas, 75202.

Pursuant to the Texas Rules of Civil Procedure, Alta Power LLC ("Alta" or "Alta Power") serves this, its First Amended Responses to Plaintiff's Request for Production.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By:   *Michael Cancienne*
Michael Cancienne
State Bar No. 24055256
Kevin Jordan
State Bar No. 11014800
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone:  713.955.4025
Facsimile:  713.955.9644
mcancienne@jlcfirm.com
kjordan@jlcfirm.com
jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

EXHIBIT 2  Page 1 of 13

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was sent to the following counsel of record by electronic mail on November 18, 2020:

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for Wattstock LLC*

_____*/s/ Jeb Golinkin*_____

Jeb Golinkin

EXHIBIT 2  Page 2 of 13

## **GENERAL OBJECTIONS**

1.    Alta objects to WattStock's Definitions and Instructions contained in the discovery to the extent that same seek to alter or expand Alta's obligations to respond to same under the Texas Rules of Civil Procedure.

2.    To the extent the definition of "you" and "your" includes Alta's attorneys, the discovery seeks information protected from discovery by the attorney/client privilege and the attorney work product doctrine.

3.    Alta objects to producing documents as requested by WattStock. Responsive documents will be made available for inspection and copying at the offices of Alta's counsel during normal business hours.

4.    Alta objects to producing documents in the timeframe requested by WattStock as WattStock failed to timely produce its documents. Although WattStock's responses were due on July 31, 2020, it failed to produce documents therewith. WattStock did not produce its documents until 19 days later, on August 19, 2020. Consequently, Alta intends to produce its documents on or before September 12, 2020, 19 days from now.

EXHIBIT 2  Page 3 of 13

## OBJECTIONS AND RESPONSES TO REQUESTS FOR RODUCTION

**REQUEST NO. 1:**
All documents identified by You in response to any of Plaintiffs' First Set of Interrogatories to Defendant.

**RESPONSE:** Please see Alta's production.


**REQUEST NO. 2:**
Your representation and/or fee agreements with Your counsel in this case.

**RESPONSE:** Alta objects to this Request on the grounds that it is overly broad, unduly burdensome and seeks materials protected by privilege. Tex.R.Civ.P. 192.3(a) and Tex.R.Civ.P. 193.3(c). Subject to and without waiving the foregoing objections, a redacted fee agreement can be found in Alta's production.


**REQUEST NO. 3:**
All copies of any executed contract between You and WattStock in Your custody, control, or possession.

**RESPONSE:** Alta objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a) Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of "copies of any executed contract between" the parties and copies of such documents have been attached as exhibits to WattStock's Petition. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.


**REQUEST NO. 4:**
All copies of any unexecuted draft of a contractual agreement between You and WattStock in Your custody, control, or possession.

**RESPONSE:** Alta objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a) Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of "unexecuted draft of a contractual agreement between" the parties. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

Page **4** of 13

EXHIBIT 2 Page 4 of 13

**REQUEST NO. 5:**

All copies relating to any informal contractual agreement between You and WattStock, such as a written agreement on material terms memorialized by email or other electronic communications rather than by a single contract document, as well as any form of authorization or approval by You of conduct by WattStock.

**RESPONSE:** Alta objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a)  Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a).  More specifically, WattStock is already in possession of "any informal contractual agreement between" the parties. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 6:**

All financing agreements, loan documents, term sheets, or other documents evidencing any investment in the The Projects by any investor other than Alta.

**RESPONSE:**  Alta objects to this Request on the grounds that it seeks proprietary, confidential information.  And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order.  Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).  Subject to the foregoing objections, Alta has no documents responsive to this Request.

**REQUEST NO. 7:**

All drafts of any financing agreements, loan documents, term sheets, or other documents evidencing any potential investment in The Projects by any investor other than Alta that did not close for any reason.

**RESPONSE:**  Alta objects to this Request on the grounds that it seeks proprietary, confidential information.  And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order.  Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).

**REQUEST NO. 8:**

All Secretary of State filings for Alta (as well as any parent or subsidiary of Alta), including but not limited to its Certificate of Formation.

Page **5** of **13**

EXHIBIT 2  Page 5 of 13

**RESPONSE:** Alta objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a)  Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a).  More specifically, such "Secretary of State filings for Alta" can be found online at:

https://www.sos.state.tx.us/corp/sosda/index.shtml.

**REQUEST NO. 9:**
Alta's current operating agreement.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information.  And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order.  Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).  Subject to the foregoing objections, Alta has not located any documents responsive to this Request.

**REQUEST NO. 10:**
All documents reflecting the current unit holders of Alta and the number of units owned by each.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information.  And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order.  Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).

**REQUEST NO. 11:**
All distributions made by Alta to any of its members.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information.  And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order.  Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).

**REQUEST NO. 12:**

EXHIBIT 2  Page 6 of 13

All federal tax returns filed by Alta for the last three (3) years.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information. And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order. Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).

**REQUEST NO. 13:**
All annual, semi-annual, quarterly, or other balance sheets of Alta for the last three (3) years.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information. And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order. Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).

**REQUEST NO. 14:**
The current Alta balance sheet, as well as a current income statement, cash flow statement, and statement of members' equity.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information. And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order. Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).

**REQUEST NO. 15:**
All past and current business plans for Alta, including but not limited to business plans for the The Projects.

**RESPONSE:** Alta objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a). Alta further objects to this Request on the grounds that it seeks proprietary, confidential information. And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

Page **7** of 13

EXHIBIT 2 Page 7 of 13

**REQUEST NO. 16:**
All current term sheets for future equity raises or additional debt that are currently under consideration by Alta.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information. And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order. Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a).

**REQUEST NO. 17:**
All project summaries, compilations, investor materials, marketing materials, or other documents evidencing Alta's experience as a power project developer or any specific projects developed by Alta other than The Projects.

**RESPONSE:** Alta objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a). Alta further objects to this Request on the grounds that it seeks proprietary, confidential information. And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 18:**
All communications between You and any investor or potential investor related to the The Projects.

**RESPONSE:** Alta objects to this Request on the grounds that it seeks proprietary, confidential information. And, in light of the fact that WattStock has routinely violated the Confidentiality provisions of the very contracts upon which it sues, Alta will not disclose such information absent Court Order. Alta further objects to this Request on the grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Tex.R.Civ.P. 192.3(a). Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 19:**
All communications between You and GE related to WattStock or Your relationship with

EXHIBIT 2  Page 8 of 13

WattStock.

**RESPONSE**: Alta objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of certain "communications between [Alta] and GE related to WattStock or [Alta's] relationship with WattStock." Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 20:**
All communications between You and GE related to The Projects.

**RESPONSE:** Alta objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of certain "communications between [Alta] and GE related to The Projects" Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 21:**
All communications between You and GE related to this lawsuit.

**RESPONSE:** Alta objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of certain "communications between [Alta] and GE related to this lawsuit." Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 22:**
All documents in Your custody, control, or possession that form the factual basis for Your contention that "Alta has timely paid all invoices from WattStock with respect to any such 'out-of-pocket expenses incurred in performing Asset inspections," as alleged in Paragraph 7 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically,

EXHIBIT 2 Page 9 of 13

WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 23:**

All invoices, bills, wire confirmations, associated backup invoices, other associated documentation, and communications referenced in Paragraphs 10 and 11 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 24:**

All communications or documents in Your custody, control, or possession that form the factual basis for Your contention that "Alta has paid WattStock approximately $1,500,000 under the terms of the Master Agreement and LNTP," as alleged in Paragraph 19 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 25:**

All documents in Your custody, control, or possession that form the factual basis for Your allegation that WattStock has committed "theft," as alleged in Paragraph 20 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request

EXHIBIT 2 Page 10 of 13

on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 26:**

All documents in You custody, control, or possession that form the factual basis of Your contentions in Paragraph 20 of Your Counterclaim that "WattStock's 'financial stress' is nothing less than insolvency" and in Paragraph 23 of Your Counterclaim that "[a]s of May 20, 2020, WattStock was insolvent and Alta was therefore entitled to immediately terminate the Master Agreement."

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 27:**

All documents in Your custody, control, or possession that form the factual basis of Your contention that "Alta performed all of its obligations under both the Master Agreement and LNTP," as alleged in Paragraph 26 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 28:**

All communications between You and WattStock that You contend contain a materially false representation made by WattStock to You, including but not limited to any of the alleged representations identified in Paragraph 33 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention

Page **11** of **13**

EXHIBIT 2 Page 11 of 13

request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 29:**

All documents in Your custody, control, or possession that form the factual basis for Your contention that "WatStock owes a limited fiduciary duty to Alta Power insofar as Alta's funds in WattStock's possession are concerned," as alleged in Paragraph 36 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**REQUEST NO. 30:**

All documents in Your custody, control, or possession that form the factual basis for Your contention that "Alta has a possessory right to the $360,000 it paid WattStock for the Bosen Unit," as alleged in Paragraph 36 of Your Counterclaim or that "Alta Power is entitled to the $360,000 it paid to WattStock for the Bosen Unit," as alleged in Paragraph 47 of Your Counterclaim, or that "WattStock unlawfully holds $360,000 of Alta Power's money," as alleged in Paragraph 53 of Your Counterclaim.

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

EXHIBIT 2 Page 12 of 13

## REQUEST NO. 31:

All documents in Your custody, control, or possession that form the factual basis for Your contention that Alta is entitled to exemplary damages as a result of WattStock's "malicious actions."

**RESPONSE:** Alta objects to this Request on the grounds that it is an impermissible contention request. WattStock is entitled to discover only "a party's legal and factual contentions . . . but . . . not . . . more than a basic statement of these contentions and . . . not . . . a marshalling of evidence." TEX. R. CIV. P. 192 cmt. 5; *see also* TEX. R. CIV. P. 197 cmt. 1. Alta further objects to this Request on the grounds that "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." Tex.R.Civ.P. 1924(a). More specifically, WattStock is already in possession of responsive documents. Subject to and without waiving the foregoing objections, Alta has conducted a reasonable search for and produced documents identified as responsive to this Request.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Vicki Sedon on behalf of Brian Hail
Bar No. 8705500
vsedon@krcl.com
Envelope ID: 48401052
Status as of 11/25/2020 11:26 AM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Connie Nims | | cnims@krcl.com | 11/24/2020 3:40:24 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 11/24/2020 3:40:24 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 11/24/2020 3:40:24 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 11/24/2020 3:40:24 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 11/24/2020 3:40:24 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 11/24/2020 3:40:24 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 11/24/2020 3:40:24 PM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 11/24/2020 3:40:24 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 11/24/2020 3:40:24 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 11/24/2020 3:40:24 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 11/24/2020 3:40:24 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 11/24/2020 3:40:24 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 11/24/2020 3:40:24 PM | SENT |

FILED
11/24/2020 3:45 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kellie Juricek DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION FOR ENTRY OF PROTECTIVE ORDER

Plaintiff/Counterclaim Defendant WattStock LLC ("WattStock") files its Motion for Entry of Protective Order and respectfully shows the Court as follows:

In its First Amended Objections and Responses to WattStock's First Request for Production, Defendant/Counterclaim Plaintiff Alta Power LLC ("Alta") answered multiple requests for production by stating that it would "not disclose such information absent Court Order."[1] Counsel subsequently conferred and agreed that a protective order was necessary in this case to preserve the confidential and proprietary information of both parties. Accordingly, counsel exchanged multiple e-mails over several days in an attempt to negotiate the appropriate scope of such an order.

On November 18, 2020, counsel for WattStock sent counsel for Alta a "Proposed Protective Order" adopted from the standard order used by many district courts in Dallas County. The following day, counsel for WattStock send a revised version of this "Proposed Protective Order," which is attached hereto as **Exhibit 1**.

---

[1] *See* WattStock's Motion to Compel Discovery Responses, filed contemporaneously with this Motion.

On November 23, 2020, counsel for Alta affirmed its objection to the inclusion of a "highly confidential" designation for any document production and asserted that such a category would make document use more complicated than necessary. Counsel for Alta stated that, absent WattStock's agreement to remove the "highly confidential" category of document designation, the parties "should submit alternate proposals to the Court for review."

WattStock therefore submits its Proposed Protective Order to the Court and prays that the Court approve WattStock's version with the **inclusion** of a "highly confidential" category. Such a designation is necessary to protect WattStock's trade secrets and/or other confidential and proprietary information in this case, will not impose any undue burden on Alta, and is consistent with other protective orders routinely entered by Dallas County courts.

Dated November 24, 2020.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: _/s/ Andrew D. Robertson_
     **Brian N. Hail**
     bhail@krcl.com
     State Bar No. 08705500
     **Andrew D. Robertson**
     drobertson@krcl.com
     State Bar No. 24090845

901 Main St., Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299

**ATTORNEYS FOR PLAINTIFF /
COUNTERCLAIM DEFENDANT**

## CERTIFICATE OF CONFERENCE

The undersigned certifies that he exchanged multiple e-mails with counsel for Alta on this matter between November 18, 2020 and November 23, 2020. While the parties are in agreement that a protective order is necessary in this case, they have been unable to agree on the language for such an order. This Motion is therefore presented to this Court for determination.

/s/ Andrew D. Robertson

## CERTIFICATE OF SERVICE

This is to certify that on the 24th day of November, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

Michael Cancienne
Kevin Jordan
Joseph W. ("Jeb") Golinkin II
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056

ATTORNEYS FOR ALTA POWER LLC

/s/ Andrew D. Robertson
Andrew D. Robertson

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## (PROPOSED) PROTECTIVE ORDER

In order to preserve the rights of litigants in these proceedings to claim confidentiality of certain documents to be produced in this litigation by the parties, the Court orders as follows:

1. Terms.

    a. "Confidential Information" means information that constitutes a trade secret or reveals confidential research, development, or commercial information. Confidential Information does not include information that has been disclosed in the public domain.

    b. "Highly Confidential Information" means Confidential Information that any party, in good faith, believes to be particularly or especially sensitive and confidential, including, without limitation, trade secrets, data compilations, standard operating procedures, and/or methodologies and that would provide any other party in the litigation with an unfair advantage in the marketplace. Such information is to be viewed ONLY by a receiving party's counsel and is not to be shared with counsel's clients or others not within the scope of counsel's immediate legal team.

    c. "Protected Documents" means materials, documents or discovery responses containing Confidential Information or Highly Confidential Information disclosed or produced by any party in this litigation.

    d. "Confidential Material" means any document(s) claimed pursuant to Section 2(a) or (b) of this Order and any Confidential Information or Highly Confidential Information claimed to be contained therein, to the extent allowed by this Order.

Page **1** of **7**

2. Designation.

    a. A document (or portion of a document) that a party determines in good faith to be a Protected Document may be claimed as confidential or highly confidential by (1) stamping the term "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on the document, or (2) using any other reasonable method agreed to by the parties. Such stamping shall not obscure any writings on the documents.

    b. A party may, on the record of a deposition or by written notice to opposing counsel not later than seventy-two hours after receipt of the deposition transcript, claim any portion(s) of the deposition as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" based on a good faith determination that any portions so claimed constitute a Protected Document. To the extent possible, any portions so claimed shall be transcribed separately and marked by the court reporter as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" as appropriate.

    c. By claiming a document Confidential Material pursuant to Section 2(a) or 2(b), a party represents that it has made a bona fide, good faith determination that the document does, in fact, contain Confidential Information or Highly Confidential Information.

3. Challenge to Claim.

    a. Any party may challenge a claim made under Section 2(a) or 2(b) by written notice of its objection to counsel for the claiming party or non-party. Challenge to a claim made under Section 2(b) may be made either upon the record of the deposition or as provided in the preceding sentence.

    b. In the event a claim is challenged, the party requesting confidential treatment will move for an appropriate ruling from the Court. The material shall be treated as Confidential Material until the expiration of twenty days if no motion is made by the party requesting confidential treatment (at which time the material shall no longer be treated as Confidential Material), or, if a motion is made, until the Court rules.

    c. A party shall not be obligated to challenge the propriety of the designation of documents as Confidential Materials at the time of designation, and failure to do so shall not preclude a subsequent challenge to the designation.

    d. In the event of a successful challenge to any Confidential Material, the Court shall have the discretion to award reasonable and necessary attorneys' fees incurred in pursuing the challenge to the challenging party.

4. Use of Confidential Material Limited.

PROTECTIVE ORDER

8077052v3 (72553.00002.000)

EXHIBIT 1 Page 2 of 7

Confidential Material shall be treated as confidential and used (1) by counsel in this case solely for the litigation of this case or (2) by counsel in other actions arising out of the same or similar set of facts, transactions, or occurrences that are asserted in the petition filed in this case solely for the litigation of such actions. Except as set forth in Section 6, Confidential Material shall not be revealed without the express written consent of the party claiming same as Confidential Material or upon written order of the Court.

5. Not Applicable to Trial.

This Order shall not apply to the disclosure of Protected Documents or the information contained therein at the time of trial, through the receipt of Protected Documents into evidence or through the testimony of witnesses. The closure of trial proceedings and sealing of the record of a trial involve considerations not presently before the Court. These issues may be taken up as a separate matter upon the motion of any party in compliance with Rule 76a TRCP.

6. Permitted Disclosures.

Confidential Material may be shown, disseminated, or disclosed only to the following persons:

    a.    *The Court*—Any party may disclose and submit CONFIDENTIAL INFORMATION or HIGHLY CONFIDENTIAL INFORMATION to the Court, including all persons employed by the Court. Any CONFIDENTIAL INFORMATION or HIGHLY CONFIDENTIAL INFORMATION, and information derived therefrom, which are filed with the Court shall be filed in accordance with the following procedure: The party filing any paper which reflects, contains or includes any material designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" subject to this Protective Order shall also file shall file the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" material in a sealed envelope bearing a statement substantially in the following form until such time as this Court has considered the motion: "This envelope contains material subject to a Protective Order of this Court. Pursuant to the Protective Order, proceedings have been initiated according to the TRCP. The contents of this envelope should not be disclosed, revealed or made public."

    b.    *Outside Counsel*—CONFIDENTIAL INFORMATION and HIGHLY CONFIDENTIAL INFORMATION may be disclosed to outside counsel for the parties in this action, including counsel's employees and outside contractors used to perform clerical functions.

PROTECTIVE ORDER

8077052v3 (72553.00002.000)

EXHIBIT 1 Page 3 of 7

c.    *Receiving Parties*—CONFIDENTIAL INFORMATION may be disclosed (1) to in-house counsel and (2) to other employees of a Receiving Party whose participation in the prosecution or defense of the action, is necessary in the good faith assessment of counsel for the Receiving Party.

d.    *Expert Witnesses*—CONFIDENTIAL INFORMATION may be disclosed to outside experts retained to work on this action, including employees of such experts and persons providing clerical or support services. The Parties agree that before any CONFIDENTIAL INFORMATION is provided to an expert witness, the Receiving Party must obtain written consent from the Producing Party. The parties agree that such persons shall agree in writing in a form substantially similar to **Exhibit "A"** attached hereto **in advance of receiving** any CONFIDENTIAL INFORMATION to be subject to its terms.

e.    *Employees And Former Employees Of The Producing Party*—CONFIDENTIAL INFORMATION of the Producing Party may be disclosed by the Receiving Party during any deposition in this action or at trial of the action to any employee of the Producing Party or its affiliates and any former employee of the Producing Party or its affiliates who was employed by the Producing Party or its affiliates (1) on the date the document was prepared or dated, or (2) on the dates to which the information relates. Such information may also be disclosed to any attorney representing such person at his or her deposition.

f.    *Non-parties*—CONFIDENTIAL INFORMATION may be disclosed during any deposition in the action or at trial of the actions to a non-party witness (and any attorney representing such person at his or her deposition) so long as the non-party and its attorney execute Exhibit A attached to this order. By way of contrast, HIGHLY CONFIDENTIAL INFORMATION may not be disclosed to non-parties and in the event a non-party becomes a party, HIGHLY CONFIDENTIAL INFORMATION designated may not be provided to non-parties without express permission of the Producing Party.

g.    *Court Reporters*—CONFIDENTIAL INFORMATION and HIGHLY CONFIDENTIAL INFORMATION may be disclosed to court reporters rendering court reporting services for depositions or the trial in the Civil Actions, including the employees of such court reporters.

PROTECTIVE ORDER

8077052v3 (72553.00002.000)

EXHIBIT 1  Page 4 of 7

7. Agreement by Recipients.

Before being given access to Confidential Material, each person described in paragraph 6(b), (c) or (e), shall be advised of the terms of this Order, shall be given a copy of this Order, and shall sign a copy of Exhibit "A."

8. Retention of Jurisdiction by Court.

This Court shall retain jurisdiction to make amendments, modifications, and additions to this Order as the Court may, from time to time, deem appropriate, as well as to resolve any disputes.

9. Production Not a Waiver.

The Production of Confidential Material pursuant to this Order is not intended to constitute a waiver of any privilege or right to claim the trade secret or confidential status of the documents, materials, or information produced.

10. Public Health and Safety.

Nothing in this Order is intended to prevent any party from raising with the Court any concern that the non-disclosure of certain Confidential Material may have a possible adverse effect upon the general public health or safety, or the administration or operation of government or public office.

This Order does not seal Court Records in this case and is only intended to facilitate the prompt production of discovery materials. Any motion to seal Court Records must strictly adhere to Rule 76a, TRCP. No determination is being made by the Court at this time that these documents are confidential or entitled to protection. Such issues are reserved and will be ruled upon pursuant to this Order and any applicable notice and hearing provisions. This Order merely provides a framework for the parties to claim such materials as confidential to preserve their right to seek protection for these documents as confidential proprietary information, and to preserve such issues for ruling until each party may prepare their appropriate arguments on these issues.

PROTECTIVE ORDER

8077052v3 (72553.00002.000)

EXHIBIT 1 Page 5 of 7

Signed this the _____ day of _____, 2020.


_____
Judge Presiding,
116th District Court

PROTECTIVE ORDER

8077052v3 (72553.00002.000)

EXHIBIT 1  Page 6 of 7

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## EXHIBIT A

The undersigned states subject to the penalties of perjury:

1. I have been retained by a party to this litigation or by a party's counsel of record to offer analysis or advice, either as an expert witness or consultant.

2. I have been furnished a copy of the Protective Order entered in this case restricting the use of Confidential information.

3. I promise to abide by the Protective Order with respect to Confidential documents and information furnished to me in this litigation.

4. As a condition to receipt of Confidential documents and information in this litigation, I consent to personal jurisdiction over me in the 116th Judicial District Court, solely for the purpose of enforcing the Protective Order.

Signed: _____

Dated: _____

_____
Printed Name

_____
Address

_____
City, State, Zip

Page **7** of **7**

PROTECTIVE ORDER

8077052v3 (72553.00002.000)

EXHIBIT 1 Page 7 of 7

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Vicki Sedon on behalf of Andrew Robertson
Bar No. 24090845
vsedon@krcl.com
Envelope ID: 48401673
Status as of 11/25/2020 11:30 AM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Connie Nims | | cnims@krcl.com | 11/24/2020 3:45:01 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 11/24/2020 3:45:01 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 11/24/2020 3:45:01 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 11/24/2020 3:45:01 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 11/24/2020 3:45:01 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 11/24/2020 3:45:01 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 11/24/2020 3:45:01 PM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 11/24/2020 3:45:01 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 11/24/2020 3:45:01 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 11/24/2020 3:45:01 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 11/24/2020 3:45:01 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 11/24/2020 3:45:01 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 11/24/2020 3:45:01 PM | SENT |

FILED
11/25/2020 3:21 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Margaret Thomas DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF/COUNTERCLAIM DEFENDANT WATTSTOCK, LLC'S MOTION TO QUASH ALTA POWER LLC'S SUBPOENA TO PRODUCE DOCUMENTS AND THINGS TO NON-PARTY GENERAL ELECTRIC COMPANY AND OBJECTIONS TO SUBPOENA

Plaintiff/Counterclaim Defendant WattStock, LLC ("WattStock" or "Plaintiff") files its Motion to Quash Alta Power LLC's Subpoena to Produce Documents and Things to Non-Party General Electric Company and Objections to Subpoena ("Motion"). For the following reasons, WattStock seeks a protective order from this Court against Defendant/Counterclaim Plaintiff Alta Power LLC ("Alta" or "Defendant") preventing the requested third-party discovery from proceeding and further, or in the alternative, seeks to limit the scope of such third-party discovery as a result of WattStock's objections. In support of this request, WattStock respectfully shows the Court as follows:

## I.
## INTRODUCTION

On October 21, 2020, Alta served on WattStock a Notice of Subpoena to Produce Documents and Tangible Things ("Notice").[1] This Notice **did not** attach any actual subpoena, nor was such a subpoena served separately on WattStock. The Notice stated that it was being served "[p]ursuant to Texas Rule of Civil Procedure 205.3" but it did not identify any third party on whom a subpoena was

---

[1] **Exhibit 1**, Notice of Subpoena to Produce Documents and Tangible Things, filed October 21, 2020.

to be served in the title of the Notice. Further, the text of the Notice did not clearly reference any subpoena to be served directly on a non-party, but instead provided notice of a subpoena "to Produce Documents and Tangible Things from non-party General Electric Company" ("GE"). WattStock therefore read such notice as being served on WattStock and interpreted it as seeking documents GE documents in WattStock's possession (particularly given the absence of any actual subpoena addressed to GE), and WattStock therefore filed a limited objection to the Notice on the grounds that a Rule 205.3 subpoena could not be used on WattStock as a party to the litigation.[2] Alta did not respond to that objection in any way or offer any clarity that it had *actually served* a subpoena on GE (despite the fact that WattStock's objection made it clear WattStock did not realize any third-party subpoena had been served).

On Friday, November 13, 2020, WattStock received a voicemail from counsel in the Litigation Department of GE Power in New York, who informed WattStock that he had just received a third-party subpoena in this lawsuit from Alta.

On Monday, November 16, 2020, counsel for WattStock contacted counsel for Alta to inquire about whether a subpoena had, in fact, been served on GE. WattStock objected to any such subpoena on the basis that Alta failed to comply with Rule 205.2. Counsel confirmed that Alta did serve GE with the a Subpoena to Produce Documents and Things (the "GE Subpoena") ten days after serving the October 21 Notice and counsel disputed that proper notice was not provided by Alta.

**WattStock was never provided with a copy of the GE Subpoena on October 21, 2020, or at the time that Alta served the GE Subpoena on GE. WattStock was never provided a copy of the GE Subpoena by Alta at all, even after inquiring about the issue on November 16. Indeed,**

---

[2] **Exhibit 2**, Plaintiff/Counterclaim Defendant WattStock, LLC's Objection to Alta Power LLC's Notice of Subpoena to Produce Documents and Tangible Things, filed November 5, 2020.

**WattStock did not obtain a copy of the GE Subpoena until November 24, 2020 (from GE's counsel).**[3]

WattStock now moves for a protective order quashing the GE Subpoena on the grounds that it was not properly served in accordance with the Texas Rules of Civil Procedure. Further, or in the alternative, WattStock raises several objections to the substantive requests contained in the GE Subpoena and asks the Court to rule on such objections and limit the scope of the GE Subpoena accordingly.

## II.
## ARGUMENT AND AUTHORITIES

### A. Legal Standards

When a party seeks discovery from a non-party witness located in a different state, "the trial court with jurisdiction over the underlying lawsuit ... has the authority to determine whether the requested [discovery is] irrelevant, so requests for relief based on the scope of discovery are properly addressed to that court."[4] As stated by the Supreme Court of Texas, and recently clarified by the Fourteenth Court of Appeals, the court with jurisdiction over the underlying case is generally responsible for determining the relevancy and materiality of the evidence sought, while the courts of the witness's home state have the obligation to protect the witness's legal rights, including, for example, questions of privilege.[5] While these opinions specifically dealt with the application of Rule 201.2—Depositions in Texas for Use in Proceedings in Foreign Jurisdictions—the general rule of law

---

[3] **Exhibit 3**, GE Subpoena, served November 3, 2020.

[4] *In re Issuance of Subpoenas for the Depositions of Bennett, et al.*, 502 S.W.3d 373, 375 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

[5] *See id.* at 377–78 (citing *Ex parte Taylor*, 220 S.W. 74, 75 (Tex. 1920)).

is presumptively the same in the analogous (reverse) context that is presented here.[6]  Accordingly, it is for this Court to decide whether the non-party discovery sought by Alta in this case is relevant, narrowly tailored, and within the scope of discovery.

"In general, a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party."[7]  Pursuant to Rule 176.6(e) of the Texas Rules of Civil Procedure, a party **or any other person affected** by a subpoena may challenge the subpoena by filing a motion for protective order.[8] "To protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights, the court may make any order in the interest of justice and may—among other things—order that: (1) the requested discovery not be sought in whole or in part [or] (2) the extent or subject matter of discovery be limited[.]"[9]

## B.  Grounds to Quash – No Service on WattStock

The Court should initially quash the Subpoena in its entirety and grant a protective order pursuant to Rule 192.6 preventing GE from producing the requested discovery because the GE Subpoena was never served by Alta on WattStock.[10]

---

[6] *See Ex parte Taylor*, 220 S.W. at 75 ("In general, the relevancy and materiality of the testimony adduced is for the determination of the court having jurisdiction of the cause; but the court executing the request will see, for instance, for that the witness is not compelled to give evidence which is privileged.").

[7] TEX. R. CIV. P. 192.3(a).

[8] TEX. R. CIV. P. 176.6(e).

[9] TEX. R. CIV. P. 192.6(b).

[10] *See In re Guardianship of Benavides*, No. 04–13–00196-CV, 2014 WL 1494606, at *2 (Tex. App.–San Antonio Apr. 16, 2014, no pet.) (citing TEX. R. CIV. P. 205.2) ("The notice **and subpoena** must be served on the non-party and on all other parties to the litigation.").

When counsel for WattStock raised this deficiency with counsel for Alta, counsel for Alta claimed to have complied with the rules and provided an additional copy of the Notice that was served on October 21. However, as the Court can see from Exhibit 1, such Notice does not include any actual subpoena to be issued to GE and the actual GE Subpoena was never provided to WattStock until WattStock obtained a copy from GE's counsel on November 24, 2020.[11]

## C. Objections to Specific Document Requests.

In addition, or in the alternative, to the request for a protective order under Rule 192.6, WattStock further objects to the specific categories of documents sought by Alta on the following grounds. In general, the majority of Alta's requests are far overreaching, seeking information about GE's business relationship with WattStock that goes far beyond the issues related to Alta. But they are also an improper attempt to circumvent Alta's contractual obligations to WattStock. As raised in WattStock's pleadings in this case, Alta entered into contracts with WattStock pursuant to which WattStock agreed to provide Alta with TRUEPackage™ refurbished LM-series gas turbine power generation units. But Alta has never paid WattStock for its services under those agreements, resulting in this lawsuit. Through the GE Subpoena, Alta now seeks to delve into proprietary and confidential information surrounding WattStock's third-party business relationship with GE despite the fact that GE is not a party to this lawsuit and was not a party to any agreement between Alta and WattStock. Such information has no relevance to this lawsuit and Alta is not entitled to obtain it under any argument, particularly when Alta has failed to pay WattStock for the very refurbishment services and processes it now seeks to obtain discovery about.

---

[11] **Exhibit 1**, Notice.

1. All documents and communications concerning the actual or prospective "refurbish[ing] [of] existing LM2500 and LM6000 Gas Turbines manufactured by GE" for Wattstock or Alta.

   **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

2. All documents and communications concerning the actual or prospective resale of existing LM2500 and LM6000 Gas Turbines manufactured by GE" to Wattstock or Alta.

   **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

3. All documents and communications concerning the February 27, 2019 Master Agreement between Alta and Wattstock.

   **RESPONSE:** WattStock objects to this request on the grounds that the documents and communications sought are obtainable from some other source that is more convenient, less burdensome, or less expensive. Tex. R. Civ. P. 192.4(a). Alta is necessarily already in possession of any documents or communications exchanged between Alta and WattStock.

4.      All documents and communications concerning the Acarsoy Surplus LM6000 package.

        **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

5.      All documents and communications concerning the LM6000PC TRUEPackage LNTP between GE and Wattstock dated July 18, 2019.

        **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

6.      All documents and communications concerning GE's "LM6000PC Contractual Services Agreement Budgetary Proposal" to Alta.

        **RESPONSE:** WattStock objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds

that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

7.      All invoices sent to or received from Wattstock since January 1, 2018.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks proprietary and confidential business information which Alta is not entitled to discover.

8.      Any contracts or written agreements (including those that have expired) between Wattstock and GE.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

9.    Documents sufficient to identify all money received from Wattstock since January 1, 2018.

**RESPONSE:** WattStock objects to this request on the grounds that it is vague, ambiguous, and fails to identify the documents sought with sufficient particularity. WattStock further objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence.

10.    Documents sufficient to identify the basis and/or reason for any money transferred between Wattstock and GE since January 1, 2018.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

11.    Documents sufficient to identify all services provided to Wattstock since January 1, 2018.

**RESPONSE:** WattStock objects to this request on the grounds that it is vague, ambiguous, and fails to identify the documents sought with sufficient particularity.

12.    Documents sufficient to identify all work done or services provided that in any way concern Wattstock since January 1, 2018.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. To the extent this request may seek information concerning work done for GE or services provided to GE by WattStock, WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed

discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

13. All documents and communications concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

14. All text messages concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and

confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

15. All documents and communications concerning financing for any actual or prospective project concerning Alta.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

16. All text messages concerning financing for any actual or prospective project concerning Alta.

**RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

17.    All documents and communications with any third-party concerning Alta.

    **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock). WattStock further objects to this request to the extent that it seeks documents or communications made in anticipation of litigation, which are protected by the work–product doctrine. Tex. R. Civ. P. 192.5.

18.    All documents and communications concerning Alta's efforts to obtain financing from Deutsche Bank in connection with any contract with Wattstock.

    **RESPONSE:** No objection.

19.    All documents and communications concerning any September 16, 2019 proposal prepared by GE related to the "ALTA LNTP project."

    **RESPONSE:** WattStock further objects to this request on the grounds that it is vague, ambiguous, and fails to identify the documents sought with sufficient particularity. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

20. All documents and communications related to the GE Power Services-Aero Contract Change Order transmitted to or discussed with Wattstock on November 22, 2019 concerning Alta.

   **RESPONSE:** WattStock objects to this request on the grounds that it is vague, ambiguous, and fails to identify the documents sought with sufficient particularity. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

21. All documents and communications related to any work done by GE directly or indirectly related the December 23, 2019 Limited Notice to Proceed Proposal to Alta for the Goodlow Peak Power Site for Two (2) TRUEpackage ML6000 PC Sprint GTG's," including but not limited to:

   1. Woodard Controls Upgrade Hardware;

   2. Fin-Fan Lube Oil Cooler;

   3. Internal Gas Vent Valve;

   4. Generator Enclosure Design to modify from 50Hz Design;

   5. Gas Turbine/Generator Coupling;

   6. Generator Lube Oil (GLO) Skid;

   7. Automatic Voltage Regulator-EX2100e(AVR);

   8. External Block & Bleed Gas Valves;

   9. Approx. 1100 hours of Engineering Support for Engineering Drawings.

   **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, and fails to identify the documents sought with sufficient particularity. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit,

taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

22.    All documents and communications concerning any actual or prospective "Equipment Purchase and Sale Agreement" between Acarsoy Enerji Elektrik Üretim San. Ve Tic. A.S. and Wattstock.

    **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature, or scope. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

23.    All documents and communications concerning the GE LM6000PC Unit owned and/or operated by Nuh Energy since January 1, 2018.

    **RESPONSE:** WattStock objects to this request on the grounds that it seeks information that is neither relevant to the claims or defenses presented in this lawsuit, nor is it reasonably likely to lead to the discovery of admissible evidence. WattStock further objects to this request on the grounds that it is vague, ambiguous, and fails to identify the documents sought with sufficient particularity. WattStock further objects to this request on the grounds that it is overbroad and unduly burdensome. WattStock further objects to this request on the grounds that "the burden or expenses of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). More specifically, this request seeks, either directly or indirectly, proprietary and confidential business information

which Alta was contractually obligated to pay WattStock to obtain; in light of Alta's failure to pay WattStock, allowing such discovery would result in an extreme burden to WattStock and an unjust windfall to Alta (as Alta would effectively be using discovery in this case to obtain for free that proprietary and confidential information which it was required to pay WattStock for under the terms of its agreements with WattStock).

## III.
## PRAYER

For the foregoing reasons, WattStock respectfully requests that this Court quash the GE Subpoena in its entirety and grant a protective order relieving GE of any obligation to respond to the GE Subpoena. Further, or in the alternative, WattStock respectfully requests that this Court sustain its objections to the specific requests served on GE and limit the scope of discovery in accordance with the Court's rulings on such objections. WattStock also prays for all other relief to which it may be justly entitled.

Dated November 25, 2020.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: /s/ Brian N. Hail
    Brian N. Hail
    bhail@krcl.com
    State Bar No. 08705500
    Andrew D. Robertson
    drobertson@krcl.com
    State Bar No. 24090845

901 Main St.
Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299

**ATTORNEYS FOR PLAINTIFF /**
**COUNTERCLAIM DEFENDANT**

## CERTIFICATE OF CONFERENCE

The undersigned certifies that he conferred by e-mail with counsel for Alta on this matter on November 16, 2020. Alta disputes that it failed to properly serve WattStock. This Motion is therefore presented to this Court for determination.

/s/ Andrew D. Robertson

## CERTIFICATE OF SERVICE

This is to certify that on the 25th day of November, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

Michael Cancienne
E: mcancienne@jlcfirm.com
Kevin Jordan
E: kjordan@jlcfirm.com
Joseph W. ("Jeb") Golinkin II
E: jgolinkin@jlcfirm.com
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056

ATTORNEYS FOR ALTA POWER LLC

Ted Lefebvre
E: ted.lefebvre@ge.com

Julie Frauenhofer
E: julie.frauenhofer@ge.com

Michael D. Fisse
E: mfisse@daiglefisse.com
Daigle Fisse & Kessenich
227 Highway 21
Madisonville, LA 70447

ATTORNEYS FOR NON-PARTY
GENERAL ELECTRIC COMPANY

/s/ Brian N. Hail
Brian N. Hail

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC,<br>Plaintiff/Counter Defendant, | IN THE DISTRICT COURT OF |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC,<br>Defendant/Counter Plaintiff. | 116<sup>th</sup> JUDICIAL DISTRICT |

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND TANGIBLE THINGS

TO:     Plaintiff/Counter-Defendant Wattstock, LLC, by and through its attorneys of record Brian N. Hail, Andrew D. Robertson, Kane Russell Coleman Logan PC, 901 Main Street, Suite 5200, Dallas, Texas 75202.

Pursuant to Texas Rule of Civil Procedure 205.3, Alta Power LLC files this Notice of Subpoena to Produce Documents and Tangible Things from non-party General Electric Company. The documents/and or items requested are set out in "Exhibit A" to this Notice, and shall be produced at the offices of Jordan Lynch & Cancienne PLLC—1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056—no later than 20 days after service of the Subpoena.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By:     *Michael Cancienne*
Michael Cancienne
State Bar No. 24055256
Kevin Jordan
State Bar No. 11014800
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone:  713.955.4025
mcancienne@jlcfirm.com
kjordan@jlcfirm.com
jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

EXHIBIT 1  Page 1 of 6

## **CERTIFICATE OF SERVICE**

This certifies that a copy of the above and foregoing was sent to the following counsel of record through the Court's electronic filing system on October 21, 2020.

> Brian N. Hail
> Andrew D. Robertson
> Kane Russell Coleman Logan PC
> 901 Main Street, Suite 5200
> Dallas, Texas 75202
> bhail@krcl.com
> drobertson@krcl.com
> *Attorneys for Wattstock LLC*

>        */s/ Jeb Golinkin*
>       Jeb Golinkin

2

EXHIBIT 1  Page 2 of 6

## EXHIBIT "A"

## Definitions

1.     "Wattstock" means Wattstock LLC and any of its subsidiaries or parent companies.

2.     "GE" means General Electric Company and any of its subsidiaries, including but not limited to GE Packaged Power, LLC., and GE Capital.

3.     "Alta" means Alta Power LLC.

4.     "Bosen" means BOSEN Energy Electric Production Inc.

5.     "Communication" or "Communications" include conversations, discussions, meetings, emails, text messages, telephone calls, letters, telecopies, and all other forms of oral or written expression by which information may be conveyed.

6.     "Document" and "Documents" as used herein includes any written, recorded, or graphic matter, however produced or reproduced, including, but not limited to, memoranda, reports, studies, analyses, contracts, agreements, charts, graphs, indices, data sheets, information in magnetic or electronic form (including data processing cards or tapes and computer disks and electronic mail), and notes, work papers, entries, letters, telegrams, telecopies, advertisements, brochures, circulars, tapes, records, bulletins, papers, books, pamphlets, accounts, invoices, bills, order forms, photographs, calendars, or diaries. If you do not have custody or control of the original, the term "document" shall also include any carbon, photograph, or photocopy, or any other copies, reproductions, or facsimiles thereof. If you have custody or control of the original and copies, reproductions, or facsimiles, the term "document" shall mean the original and any copy, reproduction, or facsimile that is in any way different from the original. This definition includes all ESI.

7.     "Identify" means:

     (a)     with respect to an individual, the person's full name, title at the time in question, and current or last known employer, business address, and home address;

     (b)     with respect to a company, the name of the company, the place of incorporation of the company, and the address of the company's principal place of business;

     (c)     with respect to a document, the date, the full names of the author(s) and each addressee or distributee, the subject matter(s), and/or title, a brief description of its contents, and its present location and custodian;

     (d)     with respect to a communication, the date, location, and general subject matter, all participants in or to the

3

EXHIBIT 1  Page 3 of 6

communication, and all witnesses or other persons who have knowledge or information thereof.

8. "Person" means any natural individual in any capacity whatsoever or any entity or organization, including, but not limited to, a public or private corporation, partnership, joint venture, association, union, collective bargaining unit, trust, agency commission, bureau or department.

## **Document Requests**

1. All documents and communications concerning the actual or prospective "refurbish[ing] [of] existing LM2500 and LM6000 Gas Turbines manufactured by GE" for Wattstock or Alta.

2. All documents and communications concerning the actual or prospective resale of existing LM2500 and LM6000 Gas Turbines manufactured by GE" to Wattstock or Alta.

3. All documents and communications concerning the February 27, 2019 Master Agreement between Alta and Wattstock.

4. All documents and communications concerning the Acarsoy Surplus LM6000 package.

5. All documents and communications concerning the LM6000PC TRUEPackage LNTP between GE and Wattstock dated July 18, 2019.

6. All documents and communications concerning GE's "LM6000PC Contractual Services Agreement Budgetary Proposal" to Alta.

7. All invoices sent to or received from Wattstock since January 1, 2018.

8. Any contracts or written agreements (including those that have expired) between Wattstock and GE.

9. Documents sufficient to identify all money received from Wattstock since January 1, 2018.

10. Documents sufficient to identify the basis and/or reason for any money transferred between Wattstock and GE since January 1, 2018.

11. Documents sufficient to identify all services provided to Wattstock since January 1, 2018.

12. Documents sufficient to identify all work done or services provided that in any way concern Wattstock since January 1, 2018.

13. All documents and communications concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

4

EXHIBIT 1 Page 4 of 6

14. All text messages concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

15. All documents and communications concerning financing for any actual or prospective project concerning Alta.

16. All text messages concerning financing for any actual or prospective project concerning Alta.

17. All documents and communications with any third-party concerning Alta.

18. All documents and communications concerning Alta's efforts to obtain financing from Deutsche Bank in connection with any contract with Wattstock.

19. All documents and communications concerning any September 16, 2019 proposal prepared by GE related to the "ALTA LNTP project."

20. All documents and communications related to the GE Power Services-Aero Contract Change Order transmitted to or discussed with Wattstock on November 22, 2019 concerning Alta.

21. All documents and communications related to any work done by GE directly or indirectly related the December 23, 2019 Limited Notice to Proceed Proposal to Alta for the Goodlow Peak Power Site for Two (2) TRUEpackage ML6000 PC Sprint GTG's," including but not limited to:

- Woodard Controls Upgrade Hardware;

- Fin-Fan Lube Oil Cooler;

- Internal Gas Vent Valve;

- Generator Enclosure Design to modify from 50Hz Design;

- Gas Turbine/Generator Coupling;

- Generator Lube Oil (GLO) Skid;

- Automatic Voltage Regulator-EX2100e(AVR);

- External Block & Bleed Gas Valves;

- Approx. 1100 hours of Engineering Support for Engineering Drawings.

5

EXHIBIT 1  Page 5 of 6

22. All documents and communications concerning any actual or prospective "Equipment Purchase and Sale Agreement" between Acarsoy Enerji Elektrik Üretim San. Ve Tic. A.S. and Wattstock.

23. All documents and communications concerning the GE LM6000PC Unit owned and/or operated by Nuh Energy since January 1, 2018.

6

EXHIBIT 1  Page 6 of 6

FILED
11/5/2020 10:12 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF/COUNTERCLAIM DEFENDANT WATTSTOCK, LLC'S OBJECTION TO ALTA POWER LLC'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND TANGIBLE THINGS

TO: Alta Power LLC, by and through its counsel of record, Michael Cancienne, JORDAN, LYNCH & CANCIENNE, PLLC, 1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056.

Plaintiff/Counterclaim Defendant WattStock, LLC ("WattStock" or "Plaintiff") serves its Objection to Alta Power, LLC's ("Alta" or "Defendant") Notice of Subpoena to Produce Documents and Tangible Things ("Subpoena") as follows:

WattStock objects that Alta's Subpoena, served pursuant to Texas Rule of Civil Procedure 205.3 is defective on its face because WattStock is a party to this litigation. Rule 205.3 provides that "[a] party may compel production of documents and tangible things **from a nonparty** by serving ... the notice required in Rule 205.2 and a subpoena compelling production or inspection of documents or tangible things." Tex. R. Civ. P. 205.3(a) (emphasis added). WattStock is a party to this litigation, not a "nonparty" within the meaning of Rule 205.3, and a subpoena therefore cannot be used to compel the production of any documents from WattStock. Because Rule 205.3 is inapplicable to WattStock, WattStock need not respond to the Subpoena.

WattStock further objects that the Subpoena provides only twenty (20) days for compliance rather than the thirty (30) days required by Rule 196.2(a) for a request for production to a party.

To the extent that Alta may later serve a request for production seeking the same or similar documents, WattStock reserves the right to assert any and all objections it may have to specific requests in accordance with Texas Rule of Civil Procedure 196.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: */s/ Brian N. Hail*
    Brian N. Hail
    bhail@krcl.com
    State Bar No. 08705500
    Andrew D. Robertson
    drobertson@krcl.com
    State Bar No. 24090845

901 Main St.
Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299

**ATTORNEYS FOR PLAINTIFF**

WATTSTOCK, LLC'S OBJECTION TO ALTA POWER, LLC'S NOTICE OF SUPBOENA TO PRODUCE
DOCUMENTS AND TANGIBLE THINGS - Page 2    8048888 v1 (72553.00002.000)
EXHIBIT 2  Page 2 of 3

## CERTIFICATE OF SERVICE

This is to certify that on 5th day of November, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

VIA E-SERVICE:
Michael Cancienne
mcancienne@jlcfirm.com
JORDAN, LYNCH & CANCIENNE, PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056

**ATTORNEYS FOR DEFENDANT/
COUNTERCLAIM PLAINTIFF**

/s/ Brian N. Hail
Brian N. Hail

WATTSTOCK, LLC'S OBJECTION TO ALTA POWER, LLC'S NOTICE OF SUPBOENA TO PRODUCE
DOCUMENTS AND TANGIBLE THINGS - Page 3                    8048888 v1 (72553.00002.000)

EXHIBIT 2  Page 3 of 3



**Service of Process Transmittal**
11/03/2020
CT Log Number 538529744

**TO:**  Nina Hutchinson, Litigation & Strategic Legal Specialist
General Electric Company
5 NECCO ST
BOSTON, MA 02210-1403

**RE:**  **Process Served in Texas**

**FOR:**  General Electric Company  (Domestic State: NY)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | WATTSTOCK LLC, Pltf. vs. ALTA POWER LLC, Dft. // To: General Electric Company |
| **DOCUMENT(S) SERVED:** | Letter(s), Subpoena, Notice, Certificate(s), Exhibit(s), Attachment(s) |
| **COURT/AGENCY:** | 116th Judicial District Court Dallas County, TX<br>Case # DC2008331 |
| **NATURE OF ACTION:** | Subpoena - Business records - Pertaining to All documents and communications concerning the actual or prospective existing LM2500 and LM6000 Gas Turbines manufactured by GE" for Wattstock or Alta (See document for additional requests) |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/03/2020 at 03:00 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | 11/23/2020 (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Ann L. Thompson<br>Continental Court Reporters, Inc.<br>5300 Memorial Drive, Suite 250<br>Houston, TX 77007-8250<br>713-522-5080 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/04/2020, Expected Purge Date: 11/09/2020<br><br>Image SOP<br><br>Email Notification, Nina Hutchinson  nina.hutchinson@ge.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>155 Federal St Ste 700<br>Boston, MA 02110-1727 |
| **For Questions:** | 800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

Page 1 of  1 / AP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EXHIBIT 3  Page 1 of 11

 Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:** Tue, Nov 3, 2020

**Server Name:** Drop Service

| Entity Served | GENERAL ELECTRIC COMPANY |
|---|---|
| Agent Name | CT CORP SYSTEM |
| Case Number | DC2008331 |
| Jurisdiction | TX |



EXHIBIT 3  Page 2 of 11



*(handwritten: 128 / 19064 / 11-3-2020 / 11-30-2022)*

**CCR CONTINENTAL COURT REPORTERS**
Reporting • Video • Records Retrieval • Videoconferencing

Corporate Headquarters
5300 Memorial Drive, Suite 250
Houston, TX 77007-8250

P:(713) 522-5080     F:(713) 522-0440

November 2, 2020

General Electric Company
c/o Reg. Agent - CT Corporation System
1999 Bryan Street, Suite 900
Dallas,TX 75201

RE:     ***Service of Subpoena to General Electric Company***
          ***Our File Number:  22642.001***

Custodian of Records,

Attached is a subpoena to produce documents outlined in the attached Exhibit "A" to the Offices of Jordan Lynch & Cancienne PLLC, 1980 Post Oak Blvd., Suite 2300, Houston, TX 77056. Records are to be produced on or before November 23, 2020.

If you have any questions, please contact the ordering attorney, Michael Cancienne at 713-955-4025 or at mcancienne@jlcfirm.com.

Thank you for your prompt attention to this matter.

Respectfully yours,
**CONTINENTAL COURT REPORTERS, INC.**

Ann L. Thompson
Litigation Records

Enclosures

EXHIBIT 3  Page 3 of 11

## SUBPOENA TO PRODUCE DOCUMENTS OR THINGS

### THE STATE OF TEXAS

To any Sheriff or Constable of the State of Texas or other person authorized to serve subpoenas under RULE 176 OF TEXAS RULES OF CIVIL PROCEDURE. - GREETINGS -

You are hereby commanded to subpoena and summon the following witness(es):
Custodian of Records for:

**General Electric Company**
**c/o Reg. Agent - CT Corporation System**
**1999 Bryan Street, Suite 900**
**Dallas, TX 75201**

To produce the documents outlined in the attached **Exhibit "A"** on **November 23, 2020** to the Offices of Jordan Lynch & Cancienne PLLC, 1980 Post Oak Blvd., Suite 2300, Houston, TX 77056. This subpoena is issued at the request of the **Defendant and Counter-Plaintiff, Alta Power LLC,** represented by **Michael Cancienne**, Attorney of Record, in that Certain Cause No. **DC-20-08331**, pending on the docket of the **116th Judicial District Court of Dallas County,** Texas, styled:

**WATTSTOCK LLC**

**vs.**

**ALTA POWER LLC**

WITNESS MY HAND, this _____2nd_____ day of _____November_____, 20_20_

ANN L THOMPSON
124243611
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JUNE 13, 2022

_____
NOTARY PUBLIC

**176.8 Enforcement of Subpoena. (a)** *Contempt.* Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

### OFFICER'S RETURN

Came to hand this _____ day of _____, 20____, and executed this the _____ day of _____, 20____,

in the following manner: By delivering to the witness _____, a true copy hereof.

Returned this _____ day of _____, 20____.

_____
PROCESS SERVER

Order No. 22642.001

EXHIBIT 3   Page 4 of 11

FILED
10/21/2020 1:26 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC,<br>　　　Plaintiff/Counter Defendant, | IN THE DISTRICT COURT OF |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC,<br>　　　Defendant/Counter Plaintiff. | 116th JUDICIAL DISTRICT |

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND TANGIBLE THINGS

TO:　Plaintiff/Counter-Defendant Wattstock, LLC, by and through its attorneys of record Brian N. Hail, Andrew D. Robertson, Kane Russell Coleman Logan PC, 901 Main Street, Suite 5200, Dallas, Texas 75202.

Pursuant to Texas Rule of Civil Procedure 205.3, Alta Power LLC files this Notice of Subpoena to Produce Documents and Tangible Things from non-party General Electric Company. The documents/and or items requested are set out in "Exhibit A" to this Notice, and shall be produced at the offices of Jordan Lynch & Cancienne PLLC—1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056—no later than 20 days after service of the Subpoena.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: _____*Michael Cancienne*_____
　　　Michael Cancienne
　　　State Bar No. 24055256
　　　Kevin Jordan
　　　State Bar No. 11014800
　　　Joseph W. ("Jeb") Golinkin II
　　　State Bar No. 24087596
　　　1980 Post Oak Blvd., Suite 2300
　　　Houston, Texas 77056
　　　Telephone: 713.955.4025
　　　mcancienne@jlcfirm.com
　　　kjordan@jlcfirm.com
　　　jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

EXHIBIT 3　Page 5 of 11

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to the following counsel of record through the Court's electronic filing system on October 21, 2020.

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for Wattstock LLC*

_/s/ Jeb Golinkin_
Jeb Golinkin

2

EXHIBIT 3 Page 6 of 11

## EXHIBIT "A"

### Definitions

1. "Wattstock" means Wattstock LLC and any of its subsidiaries or parent companies.

2. "GE" means General Electric Company and any of its subsidiaries, including but not limited to GE Packaged Power, LLC., and GE Capital.

3. "Alta" means Alta Power LLC.

4. "Bosen" means BOSEN Energy Electric Production Inc.

5. "Communication" or "Communications" include conversations, discussions, meetings, emails, text messages, telephone calls, letters, telecopies, and all other forms of oral or written expression by which information may be conveyed.

6. "Document" and "Documents" as used herein includes any written, recorded, or graphic matter, however produced or reproduced, including, but not limited to, memoranda, reports, studies, analyses, contracts, agreements, charts, graphs, indices, data sheets, information in magnetic or electronic form (including data processing cards or tapes and computer disks and electronic mail), and notes, work papers, entries, letters, telegrams, telecopies, advertisements, brochures, circulars, tapes, records, bulletins, papers, books, pamphlets, accounts, invoices, bills, order forms, photographs, calendars, or diaries. If you do not have custody or control of the original, the term "document" shall also include any carbon, photograph, or photocopy, or any other copies, reproductions, or facsimiles thereof. If you have custody or control of the original and copies, reproductions, or facsimiles, the term "document" shall mean the original and any copy, reproduction, or facsimile that is in any way different from the original. This definition includes all ESI.

7. "Identify" means:

    (a) with respect to an individual, the person's full name, title at the time in question, and current or last known employer, business address, and home address;

    (b) with respect to a company, the name of the company, the place of incorporation of the company, and the address of the company's principal place of business;

    (c) with respect to a document, the date, the full names of the author(s) and each addressee or distributee, the subject matter(s), and/or title, a brief description of its contents, and its present location and custodian;

    (d) with respect to a communication, the date, location, and general subject matter, all participants in or to the

3

EXHIBIT 3 Page 7 of 11

communication, and all witnesses or other persons who have knowledge or information thereof.

8.     "Person" means any natural individual in any capacity whatsoever or any entity or organization, including, but not limited to, a public or private corporation, partnership, joint venture, association, union, collective bargaining unit, trust, agency commission, bureau or department.

## Document Requests

1.     All documents and communications concerning the actual or prospective "refurbish[ing] [of] existing LM2500 and LM6000 Gas Turbines manufactured by GE" for Wattstock or Alta.

2.     All documents and communications concerning the actual or prospective resale of existing LM2500 and LM6000 Gas Turbines manufactured by GE" to Wattstock or Alta.

3.     All documents and communications concerning the February 27, 2019 Master Agreement between Alta and Wattstock.

4.     All documents and communications concerning the Acarsoy Surplus LM6000 package.

5.     All documents and communications concerning the LM6000PC TRUEPackage LNTP between GE and Wattstock dated July 18, 2019.

6.     All documents and communications concerning GE's "LM6000PC Contractual Services Agreement Budgetary Proposal" to Alta.

7.     All invoices sent to or received from Wattstock since January 1, 2018.

8.     Any contracts or written agreements (including those that have expired) between Wattstock and GE.

9.     Documents sufficient to identify all money received from Wattstock since January 1, 2018.

10.    Documents sufficient to identify the basis and/or reason for any money transferred between Wattstock and GE since January 1, 2018.

11.    Documents sufficient to identify all services provided to Wattstock since January 1, 2018.

12.    Documents sufficient to identify all work done or services provided that in any way concern Wattstock since January 1, 2018.

13.    All documents and communications concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

4

EXHIBIT 3  Page 8 of 11

14.     All text messages concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

15.     All documents and communications concerning financing for any actual or prospective project concerning Alta.

16.     All text messages concerning financing for any actual or prospective project concerning Alta.

17.     All documents and communications with any third-party concerning Alta.

18.     All documents and communications concerning Alta's efforts to obtain financing from Deutsche Bank in connection with any contract with Wattstock.

19.     All documents and communications concerning any September 16, 2019 proposal prepared by GE related to the "ALTA LNTP project."

20.     All documents and communications related to the GE Power Services-Aero Contract Change Order transmitted to or discussed with Wattstock on November 22, 2019 concerning Alta.

21.     All documents and communications related to any work done by GE directly or indirectly related the December 23, 2019 Limited Notice to Proceed Proposal to Alta for the Goodlow Peak Power Site for Two (2) TRUEpackage ML6000 PC Sprint GTG's," including but not limited to:

- Woodard Controls Upgrade Hardware;

- Fin-Fan Lube Oil Cooler;

- Internal Gas Vent Valve;

- Generator Enclosure Design to modify from 50Hz Design;

- Gas Turbine/Generator Coupling;

- Generator Lube Oil (GLO) Skid;

- Automatic Voltage Regulator-EX2100e(AVR);

- External Block & Bleed Gas Valves;

- Approx. 1100 hours of Engineering Support for Engineering Drawings.

5

EXHIBIT 3 Page 9 of 11

22. All documents and communications concerning any actual or prospective "Equipment Purchase and Sale Agreement" between Acarsoy Enerji Elektrik Üretim San. Ve Tic. A.S. and Wattstock.

23. All documents and communications concerning the GE LM6000PC Unit owned and/or operated by Nuh Energy since January 1, 2018.

6

EXHIBIT 3 Page 10 of 11

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Thomas on behalf of Michael Cancienne
Bar No. 24055256
lthomas@jlcfirm.com
Envelope ID: 47391388
Status as of 10/22/2020 12:22 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 10/21/2020 1:26:50 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 10/21/2020 1:26:50 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 10/21/2020 1:26:50 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 10/21/2020 1:26:50 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 10/21/2020 1:26:50 PM | SENT |

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Connie Nims | | cnims@krcl.com | 10/21/2020 1:26:50 PM | SENT |

EXHIBIT 3 Page 11 of 11

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Vicki Sedon on behalf of Brian Hail
Bar No. 8705500
vsedon@krcl.com
Envelope ID: 48431379
Status as of 11/30/2020 11:48 AM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Vicki Sedon | | vsedon@krcl.com | 11/25/2020 3:21:00 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 11/25/2020 3:21:00 PM | SENT |
| Connie Nims | | cnims@krcl.com | 11/25/2020 3:21:00 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 11/25/2020 3:21:00 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 11/25/2020 3:21:00 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 11/25/2020 3:21:00 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 11/25/2020 3:21:00 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 11/25/2020 3:21:00 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 11/25/2020 3:21:00 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 11/25/2020 3:21:00 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 11/25/2020 3:21:00 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 11/25/2020 3:21:00 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 11/25/2020 3:21:00 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 11/25/2020 3:21:00 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kevin Jordan | | kjordan@jlcfirm.com | 11/25/2020 3:21:00 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 11/25/2020 3:21:00 PM | SENT |

FILED
2/1/2020 4:51 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

**NOTICE OF HEARING ON PLAINTIFF'S MOTION TO COMPEL DISCOVERY RESPONSES, PLAINTIFF'S MOTION FOR ENTRY OF PROTECTIVE ORDER, AND PLAINTIFF/COUNTERCLAIM DEFENDANT WATTSTOCK'S MOTION TO QUASH**

Plaintiff WattStock LLC, serves this Notice of Hearing on 1)  Plaintiff/Counterclaim Defendant WattStock, LLC's Motion to Quash Alta Power LLC's Subpoena to Produce Documents and Things to Non-Party General Electric Company and Objections to Subpoena, e-filed 11.25.2020; 2) Plaintiff's Motion to Compel Discovery Responses, e-filed November 24, 2020, and 3) Plaintiff's Motion for Entry of Protective Order, e-filed 11.24.2020, which have been scheduled for January 6, 2021 at 3:15 p.m. via teleconference hearing with Hon. Tonya Parker, Presiding.  Procedures for the hearing will be forwarded by the Court to all parties.

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: */s/ Brian N. Hail*
      **Brian N. Hail**
      bhail@krcl.com
      State Bar No. 08705500
      **Andrew D. Robertson**
      drobertson@krcl.com
      State Bar No. 24090845

901 Main St., Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299
**ATTORNEYS FOR PLAINTIFF /
COUNTERCLAIM DEFENDANT**

## CERTIFICATE OF SERVICE

This is to certify that on the 1st day of December, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

Michael Cancienne
Kevin Jordan
Joseph W. ("Jeb") Golinkin II
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056

ATTORNEYS FOR ALTA POWER LLC

                      */s/ Brian N. Hail*
                      Brian N. Hail

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Vicki Sedon on behalf of Brian Hail
Bar No. 8705500
vsedon@krcl.com
Envelope ID: 48534027
Status as of 12/2/2020 2:45 PM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Vicki Sedon | | vsedon@krcl.com | 12/1/2020 4:51:53 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 12/1/2020 4:51:53 PM | SENT |
| Connie Nims | | cnims@krcl.com | 12/1/2020 4:51:53 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 12/1/2020 4:51:53 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 12/1/2020 4:51:53 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 12/1/2020 4:51:53 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 12/1/2020 4:51:53 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 12/1/2020 4:51:53 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 12/1/2020 4:51:53 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 12/1/2020 4:51:53 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 12/1/2020 4:51:53 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 12/1/2020 4:51:53 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 12/1/2020 4:51:53 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 12/1/2020 4:51:53 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 12/1/2020 4:51:53 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 12/1/2020 4:51:53 PM | SENT |

FILED
12/7/2020 12:15 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Lafonda Sims DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff/Counter Defendant, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| Defendant/Counter Plaintiff. | § | 116th JUDICIAL DISTRICT |

## ALTA POWER LLC'S MOTION FOR ENTRY OF PROTECTIVE ORDER AND RESPONSE TO WATTSTOCK'S MOTION FOR ENTRY OF PROTECTIVE ORDER

Alta Power LLC ("Alta Power") files this Motion for Entry of Protective Order and Response to WattStock LLC's ("WattStock") Motion for Entry of Protective Order and would respectfully show the following:

## I.    INTRODUCTION

This is a  dispute between two companies that worked together as customer and supplier in the electrical energy market. This is not a trade secrets case nor does it involve intellectual property of either party. The parties agree that a protective order should be entered. WattStock, however, proposes a protective order that creates a level of protection not needed in this case, complicates the litigation, is contrary Texas law, and violates the due process clauses of both the Texas and Federal Constitutions.

WattStock's proposed protective order creates a class of documents (defined broadly and vaguely as "Highly Confidential") that could *only* be seen by outside counsel. Such designated documents could not be shared with the parties, in-house counsel, third-party witnesses or even retained experts during discovery. While WattStock's proposal allows the use of these documents at trial, WattStock's proposed protective order would prohibit those same documents

1

from being used in depositions of fact or expert witnesses. WattStock's proposal is unnecessary, contrary to the interest of justice, and would add to the costs and complexity of litigating this dispute. Because of this, the Court should reject WattStock's proposal.

Instead, Alta Power asks the Court to enter a slightly modified version of the standard protective order used by the 14th, 44th, 134th, and 192nd district courts. Such a protective order provides adequate protection for confidential information and does not needlessly burden the parties, experts, and this Court.

## II. BACKGROUND

Alta Power was established to provide a creative and profitable way to supply additional capacity to the energy-grid when supply fell short of demand. Alta Power intended to purchase and place into service used aeroderivative gas turbines that could be turned on and off efficiently and quickly to help meet instances in which power demand exceeded available supply. During these times, prices are highest, and Alta Power intended to capture a substantial share of this market. General Electric ("GE") is one of the limited suppliers of aeroderivative gas turbines. GE and WattStock worked as partners and convinced Alta Power to use their services and products. Alta Power invested millions of dollars based on representations and has nothing to show for it. WattStock filed this pre-emptive suit and Alta Power filed counterclaims after a dispute arose between the parties.

Although the parties have engaged in discovery, both parties have withheld certain documents pending entry of an appropriate protective order. The dispute here concerns what form the protective order should take. Alta Power urges the Court to adopt a protective order that tracks—with three narrow exceptions—the language of the Standard Protective Order provided on the websites of the 14th, 44th, 134th, and 192nd district courts. On the other hand, WattStock urges the Court to enter a protective order that creates a class of documents ("Highly

Confidential") that severely and unnecessarily limits their disclosure beyond outside counsel. WattStock's proposed order defines "Highly Confidential Information":

> 'Highly Confidential Information' means Confidential Information that any party, in good faith, believes to be particularly or especially sensitive and confidential, including, without limitation, trade secrets, data compilations, standard operating procedures, and/or methodologies and that would provide any other party in the litigation with an unfair advantage in the marketplace. <u>Such information is to be viewed ONLY by a receiving party's counsel and is not to be shared with counsel's clients or others not within the scope of counsel's immediate legal team.</u>

(*See* WattStock Proposed Protective Order at ¶1.b). (emphasis in original). By defining "Highly Confidential Information" subjectively—"Confidential Information that any party, in good faith, *believes* to be especially sensitive"—WattStock's proposed protective order makes it virtually impossible to challenge a "Highly Confidential" designation. WattStock's proposal does not even attempt to explain what attributes might make certain information "especially sensitive." It also invites lawyers to act on their belief that certain information is "especially sensitive" at absurd times. For example, WattStock's proposed protective order expressly authorizes the parties to *orally* designate information "Highly Confidential" "*on the record during a deposition.*" (*Id.* at ¶ 2.2.) In the event this happened, counsel would be barred from inquiring about the newly designated document during the deposition.

## III. DISCUSSION

### A. WattStock's Proposal Violates Alta Power's due process rights and conflicts with Texas law.

WattStock's restrictive protective order violates Alta Power's due process rights and conflicts with Texas law. First, if entered, WattStock's proposal would prohibit the parties' lawyers from sharing any information designated "Highly Confidential" with client representatives. Clients and their representatives have a due process right to participate in litigation and assist counsel in the preparation and presentation of their case. *In re M-I, LLC*, 505

3

S.W.3d 569, 575 (Tex. 2016). Thus, a presumption exists in favor of client participation. *Id.* That presumption can be overcome only in very limited circumstances upon a showing of significant harm made by the opposing party. *Id.* The Texas Supreme Court made clear in *In re MI, LLC* that Courts should not engage in "summary deprivation" of a party's right to participate. *Id.*

WattStock is asking this court to do exactly that without providing *any* evidence (other than vague conclusory statements) to justify its request. WattStock's proposed Protective Order turns the required procedure on its head by creating a category summarily shielded from client participation based on a vague standard determined by each party's counsel. Alta Power does not claim an instance could never exist under which the due process presumption could be overcome.[1] But this is very much the exception, not the rule. Rather than create a class of documents for which additional, burdensome litigation will likely be necessary (as WattStock proposes), the parties can move for a protective order on the rare document or documents for which it has a good faith belief the constitutionally protected presumption of participation can be overcome.

Second, WattStock's proposal goes further than summary deprivation of Alta Power's right to have representatives participate in the defense of its case. WattStock is asking this Court to enter an order under which the parties could not show "Highly Confidential" documents to retained experts. Alta Power has found no case in Texas in which a Court has prohibited disclosure of documents to a retained expert.

Third, WattStock's proposal would also severely restrict the use of "Highly Confidential" Documents during discovery. For example, the parties would be prohibited from

---

[1] Alta Power is hard-pressed to conceive of one since this is not a trade secret case and is instead a commercial dispute between parties who formerly worked together. Alta Power asked WattStock to explain why this was necessary. WattStock's response was essentially "Alta Power never paid for the documents." *See* Email from Drew Robertson to Michael Cancienne dated November 23, 2020, attached as Exhibit 3.

questioning an employee about a "Highly Confidential" document in deposition, *even if that employee authored the document*. (*See* WattStock Protective Order at ¶ 6.e.) ("Confidential Information" can be used with producing party's employees but not "Highly Confidential" information). Similarly, the parties would be prohibited from using a "Highly Confidential" document in deposing a third-party witness, even if that witness had previously received the document. (*Id.* at ¶ 6.f.) WattStock fails to justify these extreme requests that would violate Alta Power's right to due process here. Such an unworkable protocol makes little sense in this case.

Fourth, WattStock's proposal conflicts with Texas's Open Court's provisions of the Texas Constitution and the Texas Rules of Civil Procedure. While WattStock's proposed order allows for the use of "Highly Confidential" documents at trial (*Id.* at ¶ 5), those same "Highly Confidential" documents could not be shown to each party before they are introduced at trial. Nor could they be used to question witnesses, third parties or even experts during discovery. Again, WattStock provides absolutely no justification for this process. The only way a document designated "Highly Confidential" could be used before its introduction at trial is by filing it with the Court. (*Id.* at ¶ 6.a.) And to use the documents, such documents must be filed in a sealed envelope stating it cannot be disclosed to the public. (*Id.*) Such a procedure would violate the Texas Open Courts provision of the Texas Constitution and Texas Rule of Civil Procedure 76a. Rule 76a makes it clear that "court records," which includes "all documents of any nature filed in connection with any matter before any civil court," are presumed to be open and may be sealed only upon a showing of (1) a specific, serious and substantial interest; and (2) no less restrictive means than sealing will adequately protect those interest. WattStock is asking this Court to create a category of documents that can be preliminarily "sealed" in violation of Texas law. WattStock is asking this Court to turn the presumption of openness on its head rather than focus on particular documents that may be entitled to protection.

**B.** **There is no basis for WattStock's restrictive protective order.**

WattStock offers no evidence to support the inclusion of such a restrictive class of documents in this litigation. This is not a case involving trade secrets or intellectual property. And, as detailed below, the standard protective order provides adequate protection for document confidentiality. Alta Power has repeatedly asked counsel for WattStock to explain why WattStock believes a "highly confidential" category was necessary. (*See, e.g.,* 11/18/20 Email from Alta Power to WattStock, attached as Ex. 1; 11/19/20 Email from Alta Power to WattStock, attached as Ex. 2; 11/23/20 Email from WattStock to Alta Power, attached as Ex. 3.) The only basis WattStock has identified for such a restrictive class of documents is that WattStock does not want to disclose work product it claims it has not been paid for. (11/23/20 Email from WattStock to Alta Power, attached as Ex. 3.)

But WattStock does not even own the documents it is referencing—GE does. And Alta Power's Proposed Protective Order explicitly bars the use of any Confidential Information outside the litigation:

> Except as set forth in Section 6, Confidential Material shall not be revealed or used without the express written consent of the party claiming same as Confidential Material or upon written order of the Court.

(Alta Power's Proposed Protective Order at Section 4.) Finally, as detailed above, to the extent that WattStock has a legitimate basis for withholding documents, it can and should seek protection in those limited instances, as provided by Texas Law.

WattStock also claims, without citing any evidence, that these heightened protections are necessary because the documents at issue may be "trade secrets." (WattStock's Motion for Entry of Protective Order at 2.) The "Highly Confidential" designation would still be unnecessary even if WattStock had established that this case involved document considered "trade

secret." Texas Rule of Evidence 507 authorizes courts to limit the disclosure of trade secrets. The rule, however, requires "a party asserting the trade secret privilege has the burden of proving that the discovery information sought qualifies as a trade secret. If met, the burden shifts to the party seeking trade secret discovery to establish that the information is necessary for a fair adjudication of its claim." *In re Bass*, 113 S.W.3d 735, 737 (Tex. 2003) (citing *In re Continental General Tire, Inc.,* 979 S.W.2d 609 (Tex.1998)).

WattStock does not even attempt to meet this burden: WattStock has identified no discovery requests that calls for the production of "trade secrets," and it has not asserted any "trade secret privilege" in response to the relevant discovery requests.

**C.     The Court should adopt Alta Power's proposed protective order.**

The Court should also reject WattStock's proposed order is because Alta Power's less restrictive proposed protective order provides adequate protection of confidential information. Unlike WattStock's proposed order, Alta Power's proposed protective order is identical to that employed by the 14th, 44th, 134th, and 192nd district courts with three exceptions. (*See* Redline of Changes Against Standard Protective Order Employed by 14th, 44th, 134th, and 192nd district courts, attached as Ex. 4.) First, Alta's proposed protective order extends the time a party has to designate information "Confidential" from seventy-two hours to seven days. Such a change makes inadvertent disclosure less likely.

Second, Alta Power's proposed protective order clarifies that counsel for the parties may share information designated "Confidential" with their client representatives as part of litigation. While the proposed orders are silent on the issue, Alta Power does not believe this omission was intended to prohibit the disclosure of "confidential information" to clients as part of litigation. The proposed order simply clarifies this issue to avoid conflict between the parties.

Finally, Alta Powers proposed protective order adds the words "or use" to Section

6 so that it is even clearer that no person, including employees of Alta Power, can use any Confidential Information for any purpose outside this litigation without obtaining written permission from the producing party.

Alta Power's proposed protective order provides adequate protection and does not violate the parties' rights and Texas law.

## IV. CONCLUSION

No basis exists for summary disposition of Alta Power's due process right to participate in the defense of this case. No basis exists for the Court to summarily exclude a self-selected category of documents from discovery in this case. No basis exists for the Court to disregard the Texas Open Courts provision and turn Rule 76a on its head. Alta Power requests that the Court enter a standard protective order based on the one suggested by the 14th, 44th, 134th, and 192nd district courts with slight modifications.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: _____*Michael Cancienne*_____
    Michael Cancienne
    State Bar No. 24055256
    Kevin Jordan
    State Bar No. 11014800
    Joseph W. ("Jeb") Golinkin II
    State Bar No. 24087596
    1980 Post Oak Blvd., Suite 2300
    Houston, Texas 77056
    Telephone: 713.955.4025
    Facsimile: 713.955.9644
    mcancienne@jlcfirm.com
    kjordan@jlcfirm.com
    jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was sent to the following counsel of record via the Court's electronic filing system on December 7, 2020:

>Brian N. Hail
>Andrew D. Robertson
>Kane Russell Coleman Logan PC
>901 Main Street, Suite 5200
>Dallas, Texas 75202
>bhail@krcl.com
>drobertson@krcl.com
>*Attorneys for WattStock LLC*

>    */s/ Michael Cancienne*
>Michael Cancienne

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PROTECTIVE ORDER

In order to preserve the rights of litigants in these proceedings to claim confidentiality of certain documents to be produced in this litigation by the parties, the Court orders as follows:

1. Terms.

   a. "Confidential Information" means information that constitutes a trade secret or reveals confidential research, development, or commercial information. Confidential Information does not include information that has been disclosed in the public domain.

   b. "Protected Documents" means materials, documents or discovery responses containing Confidential Information or Highly Confidential Information disclosed or produced by any party in this litigation.

   c. "Confidential Material" means any document(s) claimed pursuant to Section 2(a) of this Order and any Confidential Information claimed to be contained therein, to the extent allowed by this Order.

2. Designation.

   a. A document (or portion of a document) that a party determines in good faith to be a Protected Document may be claimed as confidential or highly confidential by (1) stamping the term "CONFIDENTIAL" on the document, or (2) using any other reasonable method agreed to by the parties. Such stamping shall not obscure any writings on the documents.

   b. A party may, on the record of a deposition or by written notice to opposing counsel not later than seven days after receipt of the final deposition transcript, claim any portion(s) of the deposition as "CONFIDENTIAL" based on a good faith

1

determination that any portions so claimed constitute a Protected Document. To the extent possible, any portions so claimed shall be transcribed separately and marked by the court reporter as "CONFIDENTIAL."

c.  By claiming a document Confidential Material pursuant to Section 2(a) or 2(b), a party represents that it has made a bona fide, good faith determination that the document does, in fact, contain Confidential Information or Highly Confidential Information.

3. Challenge to Claim.

a.  Any party may challenge a claim made under Section 2(a) or 2(b) by written notice of its objection to counsel for the claiming party or non-party. Challenge to a claim made under Section 2(b) may be made either upon the record of the deposition or as provided in the preceding sentence.

b.  In the event a claim is challenged, the party requesting confidential treatment will move for an appropriate ruling from the Court. The material shall be treated as Confidential Material until the expiration of twenty days if no motion is made by the party requesting confidential treatment (at which time the material shall no longer be treated as Confidential Material), or, if a motion is made, until the Court rules.

c.  A party shall not be obligated to challenge the propriety of the designation of documents as Confidential Materials at the time of designation, and failure to do so shall not preclude a subsequent challenge to the designation.

4. Use of Confidential Material Limited.

Confidential Material shall be treated as confidential and used (1) by counsel in this case solely for the litigation of this case or (2) by counsel in other actions arising out of the same or similar set of facts, transactions, or occurrences that are asserted in the petition filed in this case solely for the litigation of such actions. Except as set forth in Section 6, Confidential Material shall not be revealed or used without the express written consent of the party claiming same as Confidential Material or upon written order of the Court.

5. Not Applicable to Trial.

This Order shall not apply to the disclosure of Protected Documents or the information contained therein at the time of trial, through the receipt of Protected Documents into evidence or through the testimony of witnesses. The closure of trial proceedings and sealing of the record of a trial involve considerations not presently before the Court. These issues may be taken up as a separate matter upon the motion of any party in compliance with Rule 76a TRCP.

2

6. Permitted Disclosures.

Confidential Material may be shown, disseminated, or disclosed only to the following persons:

    a.    All attorneys of record for the parties in this case, including members of their respective law firms, and their employees assisting in the preparation of this case for trial;

    b.    Experts and consultants retained by the parties for the preparation or trial of this case;

    c.    Translators privately retained by the parties for the preparation or trial of this case;

    d.    The Court, its staff, court reporters. deposition videographers. mediators, court appointed translators, witnesses. and the jury in this case;

    e.    Any attorney representing a party in other present or future cases in any court in the United States against the party asserting confidentiality alleging claims arising out of the same or similar set of facts, transactions, or occurrences that are asserted in the petition filed in this case.

    f.    Employees of the parties in this case, including in-house counsel.

7. Agreement by Recipients.

Before being given access to Confidential Material, each person described in paragraph 6(b), (c), (e), or (f) shall be advised of the terms of this Order, shall be given a copy of this Order, and shall sign a copy of Exhibit "A."

8. Retention of Jurisdiction by Court.

This Court shall retain jurisdiction to make amendments, modifications, and additions to this Order as the Court may, from time to time, deem appropriate, as well as to resolve any disputes.

9. Production Not a Waiver.

The Production of Confidential Material pursuant to this Order is not intended to constitute a waiver of any privilege or right to claim the trade secret or confidential status of the documents, materials, or information produced.

10. Public Health and Safety.

Nothing in this Order is intended to prevent any party from raising with the Court any concern that the non-disclosure of certain Confidential Material may

have a possible adverse effect upon the general public health or safety, or the administration or operation of government or public office.

This Order does not seal Court Records in this case and is only intended to facilitate the prompt production of discovery materials. Any motion to seal Court Records must strictly adhere to Rule 76a, TRCP. No determination is being made by the Court at this time that these documents are confidential or entitled to protection. Such issues are reserved and will be ruled upon pursuant to this Order and any applicable notice and hearing provisions. This Order merely provides a framework for the parties to claim such materials as confidential to preserve their right to seek protection for these documents as confidential proprietary information, and to preserve such issues for ruling until each party may prepare their appropriate arguments on these issues.

Signed this the_____ day of _____, 2020.


_____
Judge Presiding,
116th District Court

4

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant*, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## <u>EXHIBIT A</u>

The undersigned states subject to the penalties of perjury:

1. I have been retained by a party to this litigation or by a party's counsel of record to offer analysis or advice, either as an expert witness or consultant.

2. I have been furnished a copy of the Protective Order entered in this case restricting the use of Confidential information.

3. I promise to abide by the Protective Order with respect to Confidential documents and information furnished to me in this litigation.

4. As a condition to receipt of Confidential documents and information in this litigation, I consent to personal jurisdiction over me in the 116th Judicial District Court, solely for the purpose of enforcing the Protective Order.

Signed: _____

Dated: _____


_____

Printed Name

_____

Address

_____

City, State, Zip

# Exhibit 1

| | |
|---|---|
| **From:** | Michael Cancienne |
| **To:** | Drew Robertson |
| **Cc:** | Brian Hail; Jeb Golinkin |
| **Subject:** | RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944] |
| **Date:** | Wednesday, November 18, 2020 8:28:39 PM |
| **Attachments:** | image001.png |

Drew –

Why the highly confidential designation? Is there a need for that in this case?  I am struggling to see a need for it in this case, and it adds to the costs associated with litigation significantly.


Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 18, 2020 1:49 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


The base form of the order is the standard Dallas County order that most of the judges utilize. Judge Parker doesn't have it on her website specifically, but she has used it before and several of the other judges have it posted for download. That version is attached here as a PDF.

We have made some modifications to the standard Dallas County order, including a "Highly Confidential" category for use by attorneys but not to be shared with parties. And I've revised the categories of persons entitled to view different designations of documents based on our prior experience and use of similar orders.

Thanks,

**DREW ROBERTSON**
Attorney

# KRCL

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel**  214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>

**Sent:** Wednesday, November 18, 2020 1:34 PM
**To:** Drew Robertson <DRobertson@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Is this a form from Judge Parker? I didn't see one on her website.

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 18, 2020 1:04 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]
**Importance:** High


Michael,

Please review the attached proposed protective order and let us know if you have any revisions.

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Monday, November 16, 2020 11:30 AM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Thanks, Drew –

And on the GE issue, we discussed the service of the subpoena and no issue was raised as to the

compliance with the rules, but I told you I'd send over any objections to GE that you served on me as a courtesy.

And, to clarify, Alta will produce docs responsive to 7, 12, 13, 14 to the extent we have them after a protective order is in place.

We look forward to reviewing the draft protective order. And a note on confidentiality: our client remains concerned with the perceived cavalier approach WS took to confidential documents early in the litigation. We hope the protective order that details the handling of confidential information will provide prevent these issues from arising going forward.

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Monday, November 16, 2020 11:19 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Michael,

To follow up on this morning's call, this will confirm our agreement that you will serve amended responses to Rog 2, 6, and 7 as well as amend all "see Alta's production" responses to provide more clarity as to whether responsive documents have been produced with the production or whether there were no responsive documents for each request. The remaining issues are still contested.

Also, if you are willing to clarify with your amended responses that for RFP 7, 12, 13, 14, you will produce responsive documents subject to a protective order, that would address our concern that your current response says you will not do so absent "a Court order." The way it reads currently it sounds like you are requiring us to compel the protection, but if the issue is just protection/confidentiality, then we don't have any disagreement on those RFPs.

Regarding the protective order, I will retrieve Judge Parker's standard order and send a copy over after I have reviewed it. If her standard order is workable for this case, we can go ahead and get that executed and in front of the Court today.

Finally, you agree to provide the supplemental responses we have discussed by close of business on Wednesday, 11/18.

Please let me know if any of this is incorrect and thanks for working with me on these.

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 4:52 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Does 11am work?

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 13, 2020 4:20 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Michael,

I can't do 1:30. How about something Monday morning?

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 9:43 AM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Drew,

See below.  Seems I need to better understand what you are asking for on a few issues – can you call me at 1:30 on Monday? If so, I'll send an invite. I will hold off on substantive amendment until we get that clear so I can avoid multiple amendments.

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 13, 2020 9:32 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Michael,

Hope all is well. I was optimistic that we had resolved a majority of the issues below based on our conversation, but I'm concerned that we haven't heard back from you or anyone else in your office all week. Please advise whether you are providing amended responses today in accordance with what I have outlined or if we will have to proceed with filing the entire motion to compel.

Thank you,

**DREW ROBERTSON**
Attorney

**KRCL**

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Drew Robertson

**Sent:** Tuesday, November 10, 2020 9:23 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]
**Importance:** High

Michael,

To follow up on our conference yesterday, my understanding of where we stand is as follows:

- Rog 2 – you will amend your response to state that there were no ultimate investments.
  - What about the steps Alta took to obtain financing? Do you have any intention of providing additional detail about negotiations (dates, offers, etc.) beyond the names of the potential investors you identified, or do you intend to stand on the response as is with only the one revision we discussed about the ultimate investments?

Alta's answer provides a substantive response. Your questions in the subpart are not consistent with what ROG 2 seeks.

- Rog 5 – you believe the rog misrepresents the facts and have no response to the rog as written

This is correct.

- Rogs 6 and 7 – you believe that your amended pleading expected in roughly "two weeks" will provide more clarity

  - Are you willing to supplement the rog responses to provide such clarity this week? If so, we can probably avoid a motion on these two.

I am awaiting guidance from client but suspect we'll provide further clarity to avoid any further issue here.

- RFP 6, 9, and 16 – you have no responsive documents and will amend the response to say so

This is correct for 6 and 9. 16 is really over broad as written and impossible to respond. We should discuss further. I'm free Monday at 1:30 pm.

- RFP 7, 12, 13, 14 – you have responsive documents but want a protective and/or confidentiality order in place before producing subject to such order(s)
  - Our current issue is that these responses say you will not produce absent a "Court order" to do so. If you will produce with a protective order, please clarify in an amended response. We have no objection to entering into a protective/confidentiality

order.

I asked you to provide a protective order. If you want us to draft, we are happy to.

- RFP 10 and 11 – you dispute their relevance / no agreement possible

Yes

- RFP 15 – you dispute its <u>current</u> relevance / no agreement possible at this time

Yes. This simply means I could foresee a possibility where our claims are amended and this information becomes relevant.

- RFP 17 and 18 – you will check with the client to confirm that you have no additional responsive documents and will amend the response to say so

I think we discussed the problems with this – our obligation is to conduct a reasonable search and produce responsive documents. I can confirm we have conducted a search for documents and have produced them.

- Finally, can you clarify your position on our general objection that your responses fail to provide one of the four (4) permissible responses under Rule 196.2?
  - As mentioned, we believe your direction to "see Alta's production" is too vague to comply with Rule 196.2 and request that you provide a more definitive statement in accordance with the rule. Please let us know whether you are willing to amend these.

I disagree with what you are claiming, perhaps because I do not fully understand it. Happy to talk further.

Please let me know if any of this is incorrected. **<u>For the parts that we appear to have reached an agreement, please provide amended responses by the close of business on Friday of this week so that we can determine what portions of the motion may still need to be resolved by the Court.</u>**

Thank you,

**DREW ROBERTSON**
Attorney

**KRCL**

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Drew Robertson
**Sent:** Friday, November 6, 2020 3:36 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb

Golinkin <[jgolinkin@jlcfirm.com](mailto:jgolinkin@jlcfirm.com)>
**Cc:** Brian Hail <[BHail@krcl.com](mailto:BHail@krcl.com)>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

11:00 a.m. on Monday will work, and I will follow up with Brian before then regarding your request.

Talk to you then.

Thanks,

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
[krcl.com](http://krcl.com) | [krclblogs.com](http://krclblogs.com)

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <[mcancienne@jlcfirm.com](mailto:mcancienne@jlcfirm.com)>
**Sent:** Friday, November 6, 2020 3:25 PM
**To:** Drew Robertson <[DRobertson@krcl.com](mailto:DRobertson@krcl.com)>; Kevin Jordan <[kjordan@jlcfirm.com](mailto:kjordan@jlcfirm.com)>; Jeb Golinkin <[jgolinkin@jlcfirm.com](mailto:jgolinkin@jlcfirm.com)>
**Cc:** Brian Hail <[BHail@krcl.com](mailto:BHail@krcl.com)>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Sorry for the miscommunication – I was thinking early Friday afternoon would work and was hoping for confirmation from you.  Anyway, how about we talk on Monday?  I'm free at 9am or 11am.  Will you have the information I've been requesting below by then?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <[DRobertson@krcl.com](mailto:DRobertson@krcl.com)>
**Sent:** Friday, November 6, 2020 3:22 PM
**To:** Michael Cancienne <[mcancienne@jlcfirm.com](mailto:mcancienne@jlcfirm.com)>; Kevin Jordan <[kjordan@jlcfirm.com](mailto:kjordan@jlcfirm.com)>; Jeb Golinkin <[jgolinkin@jlcfirm.com](mailto:jgolinkin@jlcfirm.com)>
**Cc:** Brian Hail <[BHail@krcl.com](mailto:BHail@krcl.com)>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Michael,

Hadn't heard anything further so just wanted to follow up and see if you're still available to confer today?

Thanks,

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
**krcl.com | krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 4, 2020 5:24 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Thanks, Drew – I'll get with my client tomorrow and we can plan to talk on Friday. Of course, I am hoping a motion to compel can be avoided.

I suggest early afternoon Frida to talk.

While we are talking discovery, I've repeatedly reached out to Brian requesting information on WattStock's discovery responses as well as dates for deposition of Mr. Watson. I was told I'd have a substantive response a couple times but am still waiting. Can you please check on those issues?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 4, 2020 5:11 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-

iManage.FID2005944]


Counsel,

We have several outstanding issues with the written discovery responses served by your predecessor counsel on August 24 in this case. We are hopeful that we can work with you to resolve these issues, but intend to file the attached motion to compel by the end of the week as to any matters for which we can't reach an agreement.

To that end, please let us know your availability tomorrow and/or Friday to conference on this motion.

Thanks,

**DREW ROBERTSON**
Attorney

**KRCL**

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel**  214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

# Exhibit 2

| | |
|---|---|
| **From:** | Michael Cancienne |
| **To:** | Drew Robertson |
| **Cc:** | Brian Hail; Jeb Golinkin |
| **Subject:** | Re: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944] |
| **Date:** | Thursday, November 19, 2020 6:58:52 PM |
| **Attachments:** | image001.png |

Can you let me know that documents you are talking about?

Michael Cancienne
Jordan, Lynch & Cancienne PLLC
713.294.0073


On Nov 19, 2020, at 6:38 PM, Drew Robertson <DRobertson@krcl.com> wrote:


Michael,

We think there are some documents that may need to be attorneys' eyes only at least initially, and it wouldn't surprise us if you do as well. We aren't going to over-use that designation and we're certain you won't either, but it's a pretty standard provision we include in a lot of our commercial litigation cases.

Also, Brian got back to me with a couple of additional revisions, which I have included here in red. Please review and let me know your thoughts.

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel**  214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

---

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 18, 2020 8:29 PM
**To:** Drew Robertson <DRobertson@krcl.com>
**Cc:** Brian Hail <BHail@krcl.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Drew –

Why the highly confidential designation? Is there a need for that in this case?  I am struggling to see a need for it in this case, and it adds to the costs associated with

litigation significantly.


Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 18, 2020 1:49 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]


The base form of the order is the standard Dallas County order that most of the judges utilize. Judge Parker doesn't have it on her website specifically, but she has used it before and several of the other judges have it posted for download. That version is attached here as a PDF.

We have made some modifications to the standard Dallas County order, including a "Highly Confidential" category for use by attorneys but not to be shared with parties. And I've revised the categories of persons entitled to view different designations of documents based on our prior experience and use of similar orders.

Thanks,

DREW ROBERTSON
Attorney
<image001.png>

Kane Russell Coleman Logan PC
901 Main Street | Suite 5200 | Dallas, Texas 75202
Tel 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 18, 2020 1:34 PM
**To:** Drew Robertson <DRobertson@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]


Is this a form from Judge Parker? I didn't see one on her website.

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 18, 2020 1:04 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]
**Importance:** High


Michael,

Please review the attached proposed protective order and let us know if you have any
revisions.

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
**krcl.com** | **krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete
it. Thank you.

---

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Monday, November 16, 2020 11:30 AM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>;
Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]


Thanks, Drew –

And on the GE issue, we discussed the service of the subpoena and no issue was raised
as to the compliance with the rules, but I told you I'd send over any objections to GE
that you served on me as a courtesy.

And, to clarify, Alta will produce docs responsive to 7, 12, 13, 14 to the extent we have
them after a protective order is in place.

We look forward to reviewing the draft protective order.  And a note on confidentiality: our client remains concerned with the perceived cavalier approach WS took to confidential documents early in the litigation. We hope the protective order that details the handling of confidential information will provide prevent these issues from arising going forward.

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Monday, November 16, 2020 11:19 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Michael,

To follow up on this morning's call, this will confirm our agreement that you will serve amended responses to Rog 2, 6, and 7 as well as amend all "see Alta's production" responses to provide more clarity as to whether responsive documents have been produced with the production or whether there were no responsive documents for each request. The remaining issues are still contested.

Also, if you are willing to clarify with your amended responses that for RFP 7, 12, 13, 14, you will produce responsive documents subject to a protective order, that would address our concern that your current response says you will not do so absent "a Court order." The way it reads currently it sounds like you are requiring us to compel the protection, but if the issue is just protection/confidentiality, then we don't have any disagreement on those RFPs.

Regarding the protective order, I will retrieve Judge Parker's standard order and send a copy over after I have reviewed it. If her standard order is workable for this case, we can go ahead and get that executed and in front of the Court today.

Finally, you agree to provide the supplemental responses we have discussed by close of business on Wednesday, 11/18.

Please let me know if any of this is incorrect and thanks for working with me on these.

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

---

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 4:52 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>;
Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]

Does 11am work?

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 13, 2020 4:20 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]

Michael,

I can't do 1:30. How about something Monday morning?

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 9:43 AM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>;
Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]


Drew,

See below.  Seems I need to better understand what you are asking for on a few issues
– can you call me at 1:30 on Monday? If so, I'll send an invite. I will hold off on
substantive amendment until we get that clear so I can avoid multiple amendments.

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 13, 2020 9:32 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]


Michael,

Hope all is well. I was optimistic that we had resolved a majority of the issues below
based on our conversation, but I'm concerned that we haven't heard back from you or
anyone else in your office all week. Please advise whether you are providing amended
responses today in accordance with what I have outlined or if we will have to proceed
with filing the entire motion to compel.

Thank you,

**DREW ROBERTSON**
Attorney
<image001.png>

Kane Russell Coleman Logan PC
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete
it. Thank you.

**From:** Drew Robertson
**Sent:** Tuesday, November 10, 2020 9:23 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]
**Importance:** High

Michael,

To follow up on our conference yesterday, my understanding of where we stand is as
follows:

- Rog 2 – you will amend your response to state that there were no ultimate
  investments.
  - What about the steps Alta took to obtain financing? Do you have any
    intention of providing additional detail about negotiations (dates, offers,
    etc.) beyond the names of the potential investors you identified, or do
    you intend to stand on the response as is with only the one revision we
    discussed about the ultimate investments?

Alta's answer provides a substantive response. Your questions in the subpart are not
consistent with what ROG 2 seeks.

- Rog 5 – you believe the rog misrepresents the facts and have no response to the
  rog as written

This is correct.

- Rogs 6 and 7 – you believe that your amended pleading expected in roughly
  "two weeks" will provide more clarity

  - Are you willing to supplement the rog responses to provide such clarity
    this week? If so, we can probably avoid a motion on these two.

I am awaiting guidance from client but suspect we'll provide further clarity to avoid any
further issue here.

  <!--[if !supportLists]-->•    <!--[endif]-->RFP 6, 9, and 16 – you have no responsive
    documents and will amend the response to say so

This is correct for 6 and 9.  16 is really over broad as written and impossible to respond.
We should discuss further. I'm free Monday at 1:30 pm.

<!--[if !supportLists]-->•    <!--[endif]-->RFP 7, 12, 13, 14 – you have responsive documents but want a protective and/or confidentiality order in place before producing subject to such order(s)

<!--[if !supportLists]-->o  <!--[endif]-->Our current issue is that these responses say you will not produce absent a "Court order" to do so. If you will produce with a protective order, please clarify in an amended response. We have no objection to entering into a protective/confidentiality order.

I asked you to provide a protective order.  If you want us to draft, we are happy to.

<!--[if !supportLists]-->•    <!--[endif]-->RFP 10 and 11 – you dispute their relevance / no agreement possible

Yes

<!--[if !supportLists]-->•    <!--[endif]-->RFP 15 – you dispute its <u>current</u> relevance / no agreement possible at this time

Yes. This simply means I could foresee a possibility where our claims are amended and this information becomes relevant.

<!--[if !supportLists]-->•    <!--[endif]-->RFP 17 and 18 – you will check with the client to confirm that you have no additional responsive documents and will amend the response to say so

I think we discussed the problems with this – our obligation is to conduct a reasonable search and produce responsive documents. I can confirm we have conducted a search for documents and have produced them.

<!--[if !supportLists]-->•    <!--[endif]-->Finally, can you clarify your position on our general objection that your responses fail to provide one of the four (4) permissible responses under Rule 196.2?

<!--[if !supportLists]-->o  <!--[endif]-->As mentioned, we believe your direction to "see Alta's production" is too vague to comply with Rule 196.2 and request that you provide a more definitive statement in accordance with the rule. Please let us know whether you are willing to amend these.

I disagree with what you are claiming, perhaps because I do not fully understand it. Happy to talk further.

Please let me know if any of this is incorrected. **<u>For the parts that we appear to have reached an agreement, please provide amended responses by the close of business on Friday of this week so that we can determine what portions of the motion may</u>**

**still need to be resolved by the Court.**

Thank you,

**DREW ROBERTSON**
Attorney
<image001.png>

Kane Russell Coleman Logan PC
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

---

**From:** Drew Robertson
**Sent:** Friday, November 6, 2020 3:36 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

11:00 a.m. on Monday will work, and I will follow up with Brian before then regarding your request.

Talk to you then.

Thanks,

**DREW ROBERTSON**
Attorney
<image001.png>

Kane Russell Coleman Logan PC
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

---

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 6, 2020 3:25 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Sorry for the miscommunication – I was thinking early Friday afternoon would work

and was hoping for confirmation from you.  Anyway, how about we talk on Monday?
I'm free at 9am or 11am.  Will you have the information I've been requesting below by
then?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 6, 2020 3:22 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]

Michael,

Hadn't heard anything further so just wanted to follow up and see if you're still
available to confer today?

Thanks,

**DREW ROBERTSON**
Attorney
<image001.png>

Kane Russell Coleman Logan PC
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel**  214.777.4287
**krcl.com** | **krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete
it. Thank you.

---

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 4, 2020 5:24 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>;
Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]

Thanks, Drew – I'll get with my client tomorrow and we can plan to talk on Friday.  Of
course, I am hoping a motion to compel can be avoided.

I suggest early afternoon Frida to talk.

While we are talking discovery, I've repeatedly reached out to Brian requesting information on WattStock's discovery responses as well as dates for deposition of Mr. Watson. I was told I'd have a substantive response a couple times but am still waiting. Can you please check on those issues?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 4, 2020 5:11 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Counsel,

We have several outstanding issues with the written discovery responses served by your predecessor counsel on August 24 in this case. We are hopeful that we can work with you to resolve these issues, but intend to file the attached motion to compel by the end of the week as to any matters for which we can't reach an agreement.

To that end, please let us know your availability tomorrow and/or Friday to conference on this motion.

Thanks,

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

<Proposed Protective Order.DOCX>

# Exhibit 3

| From: | Drew Robertson |
|---|---|
| To: | Michael Cancienne |
| Cc: | Brian Hail; Jeb Golinkin |
| Subject: | RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944] |
| Date: | Monday, November 23, 2020 9:15:09 AM |
| Attachments: | image001.png |

Michael,

As pointed out in some of our discovery objections, we believe there are some documents involving confidential business information and processes that your client has never paid us for. It would be an unfair advantage if they were allowed to violate the terms of our agreement and then use discovery in this lawsuit to obtain that information without paying for it. Hence the "highly confidential" category to keep your client from seeing any information it is not entitled to view. Again, we will certainly not abuse this category. We're just trying to make sure that all bases are covered here.

Please let us know if the protective order is going to be a problem or if we can get something finalized here soon. We are honestly trying to make this process easier, not more burdensome.

Thanks,

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Thursday, November 19, 2020 6:59 PM
**To:** Drew Robertson <DRobertson@krcl.com>
**Cc:** Brian Hail <BHail@krcl.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Subject:** Re: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Can you let me know that documents you are talking about?

Michael Cancienne
Jordan, Lynch & Cancienne PLLC
713.294.0073


On Nov 19, 2020, at 6:38 PM, Drew Robertson <DRobertson@krcl.com> wrote:

Michael,

We think there are some documents that may need to be attorneys' eyes only at least initially, and it wouldn't surprise us if you do as well. We aren't going to over-use that designation and we're certain you won't either, but it's a pretty standard provision we include in a lot of our commercial litigation cases.

Also, Brian got back to me with a couple of additional revisions, which I have included here in red. Please review and let me know your thoughts.

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel**  214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 18, 2020 8:29 PM
**To:** Drew Robertson <DRobertson@krcl.com>
**Cc:** Brian Hail <BHail@krcl.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Drew –

Why the highly confidential designation? Is there a need for that in this case?  I am struggling to see a need for it in this case, and it adds to the costs associated with litigation significantly.

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 18, 2020 1:49 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

The base form of the order is the standard Dallas County order that most of the judges utilize. Judge Parker doesn't have it on her website specifically, but she has used it before and several of the other judges have it posted for download. That version is attached here as a PDF.

We have made some modifications to the standard Dallas County order, including a "Highly Confidential" category for use by attorneys but not to be shared with parties. And I've revised the categories of persons entitled to view different designations of documents based on our prior experience and use of similar orders.

Thanks,

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
**krcl.com** | **krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 18, 2020 1:34 PM
**To:** Drew Robertson <DRobertson@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Is this a form from Judge Parker? I didn't see one on her website.

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 18, 2020 1:04 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]
**Importance:** High

Michael,

Please review the attached proposed protective order and let us know if you have any revisions.

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Monday, November 16, 2020 11:30 AM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Thanks, Drew –

And on the GE issue, we discussed the service of the subpoena and no issue was raised as to the compliance with the rules, but I told you I'd send over any objections to GE that you served on me as a courtesy.

And, to clarify, Alta will produce docs responsive to 7, 12, 13, 14 to the extent we have them after a protective order is in place.

We look forward to reviewing the draft protective order. And a note on confidentiality: our client remains concerned with the perceived cavalier approach WS took to confidential documents early in the litigation. We hope the protective order that details the handling of confidential information will provide prevent these issues from arising going forward.

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Monday, November 16, 2020 11:19 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>

**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Michael,

To follow up on this morning's call, this will confirm our agreement that you will serve amended responses to Rog 2, 6, and 7 as well as amend all "see Alta's production" responses to provide more clarity as to whether responsive documents have been produced with the production or whether there were no responsive documents for each request. The remaining issues are still contested.

Also, if you are willing to clarify with your amended responses that for RFP 7, 12, 13, 14, you will produce responsive documents subject to a protective order, that would address our concern that your current response says you will not do so absent "a Court order." The way it reads currently it sounds like you are requiring us to compel the protection, but if the issue is just protection/confidentiality, then we don't have any disagreement on those RFPs.

Regarding the protective order, I will retrieve Judge Parker's standard order and send a copy over after I have reviewed it. If her standard order is workable for this case, we can go ahead and get that executed and in front of the Court today.

Finally, you agree to provide the supplemental responses we have discussed by close of business on Wednesday, 11/18.

Please let me know if any of this is incorrect and thanks for working with me on these.

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 4:52 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Does 11am work?

Michael Cancienne

713.955.4025 (o)

713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 13, 2020 4:20 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Michael,

I can't do 1:30. How about something Monday morning?

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
**krcl.com** | **krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

---

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 9:43 AM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Drew,

See below. Seems I need to better understand what you are asking for on a few issues – can you call me at 1:30 on Monday? If so, I'll send an invite. I will hold off on substantive amendment until we get that clear so I can avoid multiple amendments.

Michael Cancienne

713.955.4025 (o)

713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>

**Sent:** Friday, November 13, 2020 9:32 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]


Michael,

Hope all is well. I was optimistic that we had resolved a majority of the issues below
based on our conversation, but I'm concerned that we haven't heard back from you or
anyone else in your office all week. Please advise whether you are providing amended
responses today in accordance with what I have outlined or if we will have to proceed
with filing the entire motion to compel.

Thank you,

**DREW ROBERTSON**
Attorney
<image001.png>

Kane Russell Coleman Logan PC
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
**krcl.com** | **krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete
it. Thank you.

**From:** Drew Robertson
**Sent:** Tuesday, November 10, 2020 9:23 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]
**Importance:** High


Michael,

To follow up on our conference yesterday, my understanding of where we stand is as
follows:

- Rog 2 – you will amend your response to state that there were no ultimate
  investments.
  - What about the steps Alta took to obtain financing? Do you have any
    intention of providing additional detail about negotiations (dates, offers,
    etc.) beyond the names of the potential investors you identified, or do
    you intend to stand on the response as is with only the one revision we

discussed about the ultimate investments?

Alta's answer provides a substantive response. Your questions in the subpart are not consistent with what ROG 2 seeks.

- Rog 5 – you believe the rog misrepresents the facts and have no response to the rog as written

This is correct.

- Rogs 6 and 7 – you believe that your amended pleading expected in roughly "two weeks" will provide more clarity

  ○ Are you willing to supplement the rog responses to provide such clarity this week? If so, we can probably avoid a motion on these two.

I am awaiting guidance from client but suspect we'll provide further clarity to avoid any further issue here.

- RFP 6, 9, and 16 – you have no responsive documents and will amend the response to say so

This is correct for 6 and 9.  16 is really over broad as written and impossible to respond. We should discuss further. I'm free Monday at 1:30 pm.

- RFP 7, 12, 13, 14 – you have responsive documents but want a protective and/or confidentiality order in place before producing subject to such order(s)
  ○ Our current issue is that these responses say you will not produce absent a "Court order" to do so. If you will produce with a protective order, please clarify in an amended response. We have no objection to entering into a protective/confidentiality order.

I asked you to provide a protective order.  If you want us to draft, we are happy to.

- RFP 10 and 11 – you dispute their relevance / no agreement possible

Yes

- RFP 15 – you dispute its current relevance / no agreement possible at this time

Yes. This simply means I could foresee a possibility where our claims are amended and this information becomes relevant.

- RFP 17 and 18 – you will check with the client to confirm that you have no additional responsive documents and will amend the response to say so

I think we discussed the problems with this – our obligation is to conduct a reasonable search and produce responsive documents. I can confirm we have conducted a search for documents and have produced them.

- Finally, can you clarify your position on our general objection that your responses fail to provide one of the four (4) permissible responses under Rule 196.2?
  - As mentioned, we believe your direction to "see Alta's production" is too vague to comply with Rule 196.2 and request that you provide a more definitive statement in accordance with the rule. Please let us know whether you are willing to amend these.

I disagree with what you are claiming, perhaps because I do not fully understand it. Happy to talk further.

Please let me know if any of this is incorrected. **For the parts that we appear to have reached an agreement, please provide amended responses by the close of business on Friday of this week so that we can determine what portions of the motion may still need to be resolved by the Court.**

Thank you,

**DREW ROBERTSON**
Attorney

Kane Russell Coleman Logan PC
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
**krcl.com | krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Drew Robertson
**Sent:** Friday, November 6, 2020 3:36 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

11:00 a.m. on Monday will work, and I will follow up with Brian before then regarding your request.

Talk to you then.

Thanks,

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 6, 2020 3:25 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Sorry for the miscommunication – I was thinking early Friday afternoon would work and was hoping for confirmation from you. Anyway, how about we talk on Monday? I'm free at 9am or 11am. Will you have the information I've been requesting below by then?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 6, 2020 3:22 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Michael,

Hadn't heard anything further so just wanted to follow up and see if you're still available to confer today?

Thanks,

**DREW ROBERTSON**
Attorney

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 4, 2020 5:24 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Thanks, Drew – I'll get with my client tomorrow and we can plan to talk on Friday. Of course, I am hoping a motion to compel can be avoided.

I suggest early afternoon Frida to talk.

While we are talking discovery, I've repeatedly reached out to Brian requesting information on WattStock's discovery responses as well as dates for deposition of Mr. Watson. I was told I'd have a substantive response a couple times but am still waiting. Can you please check on those issues?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 4, 2020 5:11 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Counsel,

We have several outstanding issues with the written discovery responses served by your predecessor counsel on August 24 in this case. We are hopeful that we can work with you to resolve these issues, but intend to file the attached motion to compel by the end of the week as to any matters for which we can't reach an agreement.

To that end, please let us know your availability tomorrow and/or Friday to conference on this motion.

Thanks,

**DREW ROBERTSON**
Attorney
<image001.png>

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

<Proposed Protective Order.DOCX>

# Exhibit 4

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PROTECTIVE ORDER

In order to preserve the rights of litigants in these proceedings to claim confidentiality of certain documents to be produced in this litigation by the parties, the Court orders as follows:

1. Terms.

    a. "Confidential Information" means information that constitutes a trade secret or reveals confidential research, development, or commercial information. Confidential Information does not include information that has been disclosed in the public domain.

    b. "Protected Documents" means materials, documents or discovery responses containing Confidential Information or Highly Confidential Information disclosed or produced by any party in this litigation.

    c. "Confidential Material" means any document(s) claimed pursuant to Section 2(a) of this Order and any Confidential Information claimed to be contained therein, to the extent allowed by this Order.

2. Designation.

    a. A document (or portion of a document) that a party determines in good faith to be a Protected Document may be claimed as confidential or highly confidential by (1) stamping the term "CONFIDENTIAL" on the document, or (2) using any other reasonable method agreed to by the parties. Such stamping shall not obscure any writings on the documents.

    b. A party may, on the record of a deposition or by written notice to opposing counsel not later than ~~seventy two hours~~seven days after receipt of the final deposition transcript, claim any portion(s) of the deposition as "CONFIDENTIAL" based on

a good faith determination that any portions so claimed constitute a Protected Document. To the extent possible, any portions so claimed shall be transcribed separately and marked by the court reporter as "CONFIDENTIAL."

c. By claiming a document Confidential Material pursuant to Section 2(a) or 2(b), a party represents that it has made a bona fide, good faith determination that the document does, in fact, contain Confidential Information or Highly Confidential Information.

3. Challenge to Claim.

a. Any party may challenge a claim made under Section 2(a) or 2(b) by written notice of its objection to counsel for the claiming party or non-party. Challenge to a claim made under Section 2(b) may be made either upon the record of the deposition or as provided in the preceding sentence.

b. In the event a claim is challenged, the party requesting confidential treatment will move for an appropriate ruling from the Court. The material shall be treated as Confidential Material until the expiration of twenty days if no motion is made by the party requesting confidential treatment (at which time the material shall no longer be treated as Confidential Material), or, if a motion is made, until the Court rules.

c. A party shall not be obligated to challenge the propriety of the designation of documents as Confidential Materials at the time of designation, and failure to do so shall not preclude a subsequent challenge to the designation.

4. Use of Confidential Material Limited.

Confidential Material shall be treated as confidential and used (1) by counsel in this case solely for the litigation of this case or (2) by counsel in other actions arising out of the same or similar set of facts, transactions, or occurrences that are asserted in the petition filed in this case solely for the litigation of such actions. Except as set forth in Section 6, Confidential Material shall not be revealed or used without the express written consent of the party claiming same as Confidential Material or upon written order of the Court.

5. Not Applicable to Trial.

This Order shall not apply to the disclosure of Protected Documents or the information contained therein at the time of trial, through the receipt of Protected Documents into evidence or through the testimony of witnesses. The closure of trial proceedings and sealing of the record of a trial involve considerations not presently before the Court. These issues may be taken up as a separate matter upon the motion of any party in compliance with Rule 76a TRCP.

6. Permitted Disclosures.

Confidential Material may be shown, disseminated, or disclosed only to the following persons:

a.   All attorneys of record for the parties in this case, including members of their respective law firms, and their employees assisting in the preparation of this case for trial;

b.   Experts and consultants retained by the parties for the preparation or trial of this case;

c.   Translators privately retained by the parties for the preparation or trial of this case;

d.   The Court, its staff, court reporters. deposition videographers. mediators, court appointed translators, witnesses. and the jury in this case;

e.   Any attorney representing a party in other present or future cases in any court in the United States against the party asserting confidentiality alleging claims arising out of the same or similar set of facts, transactions, or occurrences that are asserted in the petition filed in this case.

e.f.   Employees of the parties in this case, including in-house counsel.

7. Agreement by Recipients.

Before being given access to Confidential Material, each person described in paragraph 6(b), (c), or (e), or (f) shall be advised of the terms of this Order, shall be given a copy of this Order, and shall sign a copy of Exhibit "A."

8. Retention of Jurisdiction by Court.

This Court shall retain jurisdiction to make amendments, modifications, and additions to this Order as the Court may, from time to time, deem appropriate, as well as to resolve any disputes.

9. Production Not a Waiver.

The Production of Confidential Material pursuant to this Order is not intended to constitute a waiver of any privilege or right to claim the trade secret or confidential status of the documents, materials, or information produced.

10. Public Health and Safety.

Nothing in this Order is intended to prevent any party from raising with the Court any concern that the non-disclosure of certain Confidential Material may

have a possible adverse effect upon the general public health or safety, or the administration or operation of government or public office.

This Order does not seal Court Records in this case and is only intended to facilitate the prompt production of discovery materials. Any motion to seal Court Records must strictly adhere to Rule 76a, TRCP. No determination is being made by the Court at this time that these documents are confidential or entitled to protection. Such issues are reserved and will be ruled upon pursuant to this Order and any applicable notice and hearing provisions. This Order merely provides a framework for the parties to claim such materials as confidential to preserve their right to seek protection for these documents as confidential proprietary information, and to preserve such issues for ruling until each party may prepare their appropriate arguments on these issues.

Signed this the_____ day of _____, 2020.


_____
Judge Presiding,
116th District Court

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## <u>EXHIBIT A</u>

The undersigned states subject to the penalties of perjury:

1. I have been retained by a party to this litigation or by a party's counsel of record to offer analysis or advice, either as an expert witness or consultant.

2. I have been furnished a copy of the Protective Order entered in this case restricting the use of Confidential information.

3. I promise to abide by the Protective Order with respect to Confidential documents and information furnished to me in this litigation.

4. As a condition to receipt of Confidential documents and information in this litigation, I consent to personal jurisdiction over me in the 116th Judicial District Court, solely for the purpose of enforcing the Protective Order.

Signed: _____

Dated: _____

_____
Printed Name

_____
Address

_____
City, State, Zip

**Automated Certificate of eService**
This automated certificate of eService was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Joseph Golinkin II on behalf of Joseph Golinkin II
Bar No. 24087596
jgolinkin@jlcfirm.com
Envelope ID: 48752193
Status as of 12/8/2020 4:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 12/8/2020 3:22:33 PM | SENT |
| Andrew Robertson | 24090845 | drobertson@krcl.com | 12/8/2020 3:22:33 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 12/8/2020 3:22:33 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 12/8/2020 3:22:33 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 12/8/2020 3:22:33 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 12/8/2020 3:22:33 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 12/8/2020 3:22:33 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 12/8/2020 3:22:33 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 12/8/2020 3:22:33 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 12/8/2020 3:22:33 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 12/8/2020 3:22:33 PM | SENT |

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Vicki Sedon | | vsedon@krcl.com | 12/8/2020 3:22:33 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 12/8/2020 3:22:33 PM | SENT |
| Connie Nims | | cnims@krcl.com | 12/8/2020 3:22:33 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 12/8/2020 3:22:33 PM | SENT |
| Kevin Jordan | | kjordan@jlcfirm.com | 12/8/2020 3:22:33 PM | SENT |

FILED
12/11/2020 9:26 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC,<br>　　　Plaintiff/Counter Defendant, | IN THE DISTRICT COURT OF |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC,<br>　　　Defendant/Counter Plaintiff. | 116th JUDICIAL DISTRICT |

## **NOTICE OF HEARING**

Please take notice that Alta Power LLC's Motion for Entry of Protective Order and Response to WattStock's Motion for Entry of Protective Order is set for oral hearing on January 6, 2021 at 3:15 p.m. *via* teleconference hearing with Honorable Tonya Parker, presiding. Procedures for the hearing will be forwarded by the Court to all parties.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: _____*Michael Cancienne*_____
　　　　Michael Cancienne
　　　　State Bar No. 24055256
　　　　Kevin Jordan
　　　　State Bar No. 11014800
　　　　Joseph W. ("Jeb") Golinkin II
　　　　State Bar No. 24087596
　　　　1980 Post Oak Blvd., Suite 2300
　　　　Houston, Texas 77056
　　　　Telephone: 713.955.4025
　　　　Facsimile: 713.955.9644
　　　　mcancienne@jlcfirm.com
　　　　kjordan@jlcfirm.com
　　　　jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to the following counsel of record through the Court's electronic filing system on December 11, 2020.

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for WattStock LLC*

_____*/s/ Jeb Golinkin*_____
Jeb Golinkin

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Linda Thomas on behalf of Michael Cancienne
Bar No. 24055256
lthomas@jlcfirm.com
Envelope ID: 48859316
Status as of 12/11/2020 11:49 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 12/11/2020 9:26:20 AM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 12/11/2020 9:26:20 AM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 12/11/2020 9:26:20 AM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 12/11/2020 9:26:20 AM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 12/11/2020 9:26:20 AM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 12/11/2020 9:26:20 AM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 12/11/2020 9:26:20 AM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 12/11/2020 9:26:20 AM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 12/11/2020 9:26:20 AM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 12/11/2020 9:26:20 AM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 12/11/2020 9:26:20 AM | SENT |

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 12/11/2020 9:26:20 AM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 12/11/2020 9:26:20 AM | SENT |
| Connie Nims | | cnims@krcl.com | 12/11/2020 9:26:20 AM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 12/11/2020 9:26:20 AM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 12/11/2020 9:26:20 AM | SENT |

FILED
12/30/2020 4:01 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
John P White DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC, | IN THE DISTRICT COURT OF |
| *Plaintiff/Counter Defendant,* | |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC, | |
| *Defendant/Counter Plaintiff.* | 116<sup>th</sup> JUDICIAL DISTRICT |

**ALTA POWER LLC'S RESPONSE TO WATTSTOCK'S MOTION TO QUASH ALTA POWER LLC'S SUBPOENA TO PRODUCE DOCUMENTS AND THINGS TO NON-PARTY GENERAL ELECTRIC COMPANY AND OBJECTIONS TO SUBPOENAS**

Alta Power LLC ("Alta Power") files this response to WattStock LLC's ("WattStock") Motion to Quash Alta's Subpoena to Produce Documents and Things to Non-Party General Electric Company ("GE") and Objections to Subpoena.

## I. SUMMARY OF ARGUMENT

This is a commercial dispute between two parties involved in the supply for electrical energy in Texas. An issue in this case is the supply of equipment from GE for ultimate use by Alta Power. Alta Power alleges that it paid WattStock for certain GE equipment it never received. Alta Power served a third-party document subpoena on GE. In response to the subpoena, GE has agreed to comply and produce documents (and has already served objections), but WattStock asks the Court to quash Alta Power's subpoena anyway because WattStock claims the Alta Power subpoena was technically deficient. WattStock alleges Alta Power "did not attach any actual subpoena" to the Notice of Subpoena it served on WattStock. (WattStock's Motion to Quash at 1.)

WattStock's argument presupposes that the Texas Rules of Civil Procedure require service of the actual subpoena on WattStock, but that is not true. Instead, Alta Power was required

to serve WattStock with a Notice of Subpoena to GE at least ten days before serving GE with the subpoena. That is exactly what Alta Power did, as the attachments to WattStock's motion makes clear. For this reason, WattStock's Motion to Quash must fail.

WattStock also serves a variety of objections and complains that its relationship to GE is not relevant to the dispute. The Texas Rules of Civil Procedure do not allow WattStock to object to Alta Power's document requests to a third party. And even if the objections were not procedurally improper, WattStock's suggestion that its relationship with GE is not relevant to this lawsuit is demonstrably false. Accordingly, WattStock's Motion to Quash should be denied in its entirety.

## II. BACKGROUND

Alta Power was one of the first companies in the United States to try to use used "aeroderivative gas turbine"—basically, a power generating jet engine—to provide extra capacity to the power grid when the grid is overwhelmed by demand. GE is one of the few companies that manufactures, sells, and services aeroderivative gas turbines. A market for previously owned aeroderivative gas turbines has emerged due to regulatory issues in certain parts of the world and these used engines are more financially viable than new engines.

To take advantage of GE's unique position in this marketplace, a group of former GE executives founded WattStock. According to GE's website, GE and WattStock work "hand-in-hand" as "partners" to provide the TRUEPACKAGE™ or Certified Turbine Power—CTP™[1] system, "[t]he only authorized OEM [original equipment manufacturer] certified pre-owned

---

[1]    GE/WattStock uses the TRUEpackage™ descriptor on GE's Website and CTP™ on WattStock' s website. *See* https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions and https://www.WattStock.com/ctp.

package offering in the industry."[2] Although Alta Power considered purchasing used aeroderivative turbines from multiple sources, GE persuaded Alta Power that its equipment and service package was superior to those offered by its competitors. But GE refused to sell Alta Power the TRUEpackage™ equipment certification and warranty directly. Instead, GE referred Alta Power to WattStock. After issues arose between WattStock and Alta Power, WattStock pre-emptively sued Alta Power for breach of contract and related claims, and Alta Power asserted counterclaims against WattStock.

On October 21, 2020, Alta Power filed and served WattStock with a Notice of Subpoena to Produce Documents and Tangible Things (the "Notice"). The Notice makes clear its purpose:

> Pursuant to Texas Rule of Civil Procedure 205.3, Alta Power LLC files this Notice of Subpoena to Produce Documents and Tangible Things *from non-party General Electric Company*. The documents/and or items requested are set out in "Exhibit A" to this Notice.

(*Id.* at 1) (emphasis added.) The Notice contains the definitions and document requests that were ultimately served on GE. (*Id.* at 3-6.)

On November 5, WattStock served Alta Power with its Objection to Alta Power, LLC's Notice of Subpoena to Produce Documents and Tangible Things (attached as Ex. 1.) WattStock argued the subpoena was "defective on its face" because "WattStock is a party to this litigation, not a 'nonparty' within the meaning of Rule 205.3, and a subpoena therefore cannot be used to compel the production of any documents from WattStock." (*Id.* at 1.)

Five days later, WattStock's lawyer emailed counsel for Alta Power and—despite having received and even objected to Alta Power's Notice of Subpoena to Produce Documents and Tangible Things *from non-party GE*— accused Alta Power of "fail[ing] to comply with the

---

[2]     https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.

ten-day notice requirement mandated by Rule 205.2." (11/16/20 Email Chain Between Robertson and Cancienne, attached as Ex. 2.) Alta Power responded by pointing out that it served WattStock with the required Notice of Subpoena to GE on October 21, and that WattStock already served untimely objections to that Notice. (*Id.*)

Undeterred, WattStock filed a Motion to Quash on November 25, 2020. While WattStock originally complained that it did not receive notice of Alta Power's subpoena to GE, it now concedes it did, but instead argues the Court should quash Alta Power's subpoena to GE because "the Notice <u>did not</u> attach any actual subpoena, nor was such a subpoena served separately on WattStock." (WattStock's Motion to Quash at 1) (emphasis original.) In its Motion to Quash, WattStock also purports to assert objections to Alta Power's document requests to GE. (*Id.* at 6-15.)

GE, for its part, has agreed to comply with the subpoena. (12/3/20 Letter from GE to Alta Power, attached as Ex. 3.)

### III. DISCUSSION

WattStock moves to quash Alta Power's Subpoena to GE on two grounds. First, WattStock argues the subpoena is improper because Alta Power "did not attach any actual subpoena" to the Notice of Subpoena it served on WattStock. (WattStock's Motion to Quash at 1.) Separately, WattStock argues the subpoena should be quashed because GE's relationship with WattStock is irrelevant to this case. (*Id.* at 5.) Neither of WattStock's arguments withstands scrutiny.

### A. Alta Power properly served WattStock with the Notice.

WattStock argues that the Court should "quash the subpoena in its entirety and grant a protective order pursuant to Rule 192.6 preventing GE from producing the requested discovery

because the GE Subpoena was never served by Alta on WattStock." (*Id.* at 4.) This argument is legally incorrect because the Texas Rules of Civil Procedure do not require a party seeking documents from a third party to serve its counterparties with a copy of the subpoena. Texas Rule of Civil Procedure 205—"Discovery from Non-parties"—governs third party discovery. Rule 205.2 sets out the general Notice requirement for third party discovery:

> A party seeking discovery by subpoena from a nonparty must serve, on the nonparty and all parties, *a copy of the form of notice required under the rules governing the applicable form of discovery*. A notice of oral or written deposition must be served before or at the same time that a subpoena compelling attendance or production under the notice is served. A notice to produce documents or tangible things under Rule 205.3 must be served at least 10 days before the subpoena compelling production is served."

(TEX. R. CIV. P. 205.2) (emphasis added).

Rule 205.3—called "Production of Documents and Tangible Things Without Deposition"—provides that"[a] party may compel production of documents and tangible things from a nonparty by serving - reasonable time before the response is due but no later than 30 days before the end of any applicable discovery period - the notice required in Rule 205.2 and a subpoena compelling production or inspection of documents or tangible things." (Tex. R. Civ. P. 205.3).

Finally, Rule 205.3(b) explains what must be included in a notice of a third-party document subpoena:

> (b) **Contents of notice.** The notice must state:
>
> (1) the name of the person from whom production or inspection is sought to be compelled;
>
> (2) a reasonable time and place for the production or inspection; and
>
> (3) the items to be produced or inspected, either by individual item or by category, describing each item and category with reasonable particularity, and, if applicable, describing the desired testing and sampling with

sufficient specificity to inform the nonparty of the means, manner, and procedure for testing or sampling.

(TEX. R. CIV. P. 205.3(b)) (emphasis original).

As the Rules make clear, the Rules do not require Alta Power to serve *WattStock* with a copy of the "actual subpoena," as claimed by WattStock. Instead, the Rules required Alta Power to serve a Notice that notified WattStock that it was seeking production from GE, identified the time and place of production, and listed the items to be produced. (*Id.*) That is exactly what Alta Power did.

Although the plain text of Rule 205.2 does not provide any basis for WattStock's assertion that it was entitled to service of a copy of the subpoena itself, WattStock cites an unpublished San Antonio Court of Appeals decision in which the Court wrote in dicta that "[t]he notice and subpoena must be served on the non-party and on all other parties to the litigation. Tex. R. Civ. P. 205.2." *In re Guardianship of Benavides*, 04-13-00196-CV, 2014 WL 1494606, at *2 (Tex. App.—San Antonio Apr. 16, 2014, no pet.). *Benavides* did not involve a party complaining about not being served with a copy of the subpoena. Instead, the case concerned the validity of sanctions issued against an attorney for failing to produce documents responsive to a subpoena with which he was not served. Regardless, the *Benavides* court's dicta is contrary to the plain text of Rule 205.2. To rely on *Benavides*, as WattStock urges, invites legal error and to the extent the dicta in this unpublished opinion is of any precedential value, the *Benavides* decision is not binding on this Court. Indeed, *Benavides* has never been cited by *any* court (for that or any other proposition).

**B.    The Court should strike WattStock's objections.**

In its Motion, WattStock also purports to assert a variety of objections to Alta Power's document requests to GE. The Court should strike these objections for three separate

reasons.

First, WattStock does not have standing to object to Alta Power's document requests *to GE*. Unlike a motion to quash, which can be filed by any person challenging the subpoena, the Texas Rules of Civil Procedure only allow the recipient of the subpoena—in this case, GE—to assert written objections. *See* TEX. R. CIV. P. 176.6(d). Alta Power's subpoena to GE does not command WattStock to do anything, so WattStock does not have standing to assert objections or request ruling on those objections.

Of course, WattStock does have the authority to seek a protective order limiting the scope of discovery. TEX. R. CIV. P. 192.6(a). However, a party moving for a protective order must state their reasons with particularity and not simply provide boilerplate statements. *See In re Liberty Mut. Ins. Co.*, No. 14-09-00086-CV, 2009 WL 441897, *5 (Tex. App.—Houston [14th Dist.] Feb. 24, 2009, no pet.) (holding that a trial court abused its discretion by granting a protective order where petitioner produced no specific evidence that the third-party discovery requests were unduly burdensome or unnecessarily harassing). "The party seeking to avoid discovery must show a particular, specific, and demonstrable injury by facts sufficient to justify a protective order, and the trial court may not grant a protective order limiting discovery unless the party seeking such protection has met this burden." *Id. See also In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 181 (Tex. 1999) ("The party resisting discovery is not free to make conclusory statements that the requested discovery is unduly burdensome or unnecessarily harassing, but, instead, must produce some evidence supporting its request for a protective order."); *Garcia v. Peeples*, 734 S.W.2d 343, 345 (Tex. 1987) (requiring "a particular, articulated and demonstrable injury, as opposed to conclusory allegations").

WattStock's Motion contains nothing but boilerplate objections and generic

complaints, and should fail for this reason alone. To the extent WattStock makes a specific argument at all, it maintains that that "proprietary and confidential information surrounding WattStock's third-party business relationship with GE" "has no relevance to this lawsuit" because "Alta has failed to pay WattStock for the very refurbishment services and processes it now seeks to obtain discovery about." (WattStock's Motion to Quash at 5.) WattStock has it backwards: the fact that the work product prepared by GE relates to the contractual dispute in this case makes the information extraordinarily relevant. WattStock's claim that Alta Power somehow owes it money for this work done by GE confirms the relevance of the requested information.

Moreover, WattStock's suggestion that GE had nothing to do with the dispute in this case is simply wrong. Alta Power only did business with WattStock because GE refused to directly work with Alta Power. GE's involvement was nevertheless an essential condition of the transactions between the parties. GE's involvement with WattStock is confirmed by GE itself in a letter it sent—on its letterhead—to Alta Power in response to Alta Power's questions regarding WattStock and GE's relationship. (7/31/19 Letter from GE to Alta Power Re. "GE TRUEpackage LM6000's and WattStock Refurbishment Services," attached as Ex. 4.)

## CONCLUSION

Alta Power properly served WattStock with a Notice of Subpoena to non-party GE, and the information sought the subpoena is relevant to this case. Accordingly, Alta Power respectfully requests that the Court deny WattStock's Motion to Quash and strike the objections asserted therein.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: _____*Michael Cancienne*_____
       Michael Cancienne
       State Bar No. 24055256
       Kevin Jordan
       State Bar No. 11014800
       Joseph W. ("Jeb") Golinkin II
       State Bar No. 24087596
       1980 Post Oak Blvd., Suite 2300
       Houston, Texas 77056
       Telephone: 713.955.4025
       Facsimile: 713.955.9644
       mcancienne@jlcfirm.com
       kjordan@jlcfirm.com
       jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## <u>CERTIFICATE OF SERVICE</u>

       This certifies that a copy of the above and foregoing was sent to the following counsel of record via the Court's electronic filing system on December 30, 2020:

> Brian N. Hail
> Andrew D. Robertson
> Kane Russell Coleman Logan PC
> 901 Main Street, Suite 5200
> Dallas, Texas 75202
> bhail@krcl.com
> drobertson@krcl.com
> *Attorneys for WattStock LLC*

                        */s/ Michael Cancienne*
                        Michael Cancienne

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## **PROPOSED ORDER**

The Court hereby DENIES WattStock LLC's Motion to Quash Alta Power LLC's Subpoena to Produce Documents and Things to Non-Party General Electric Company and STRIKES the objections asserted therein by WattStock LLC.

_____
Judge Presiding,
116th District Court

# Exhibit 1

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF/COUNTERCLAIM DEFENDANT WATTSTOCK, LLC'S OBJECTION TO ALTA POWER LLC'S NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND TANGIBLE THINGS

TO:  Alta Power LLC, by and through its counsel of record, Michael Cancienne, JORDAN, LYNCH & CANCIENNE, PLLC, 1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056.

Plaintiff/Counterclaim Defendant WattStock, LLC ("WattStock" or "Plaintiff") serves its Objection to Alta Power, LLC's ("Alta" or "Defendant") Notice of Subpoena to Produce Documents and Tangible Things ("Subpoena") as follows:

WattStock objects that Alta's Subpoena, served pursuant to Texas Rule of Civil Procedure 205.3 is defective on its face because WattStock is a party to this litigation. Rule 205.3 provides that "[a] party may compel production of documents and tangible things **from a nonparty** by serving ... the notice required in Rule 205.2 and a subpoena compelling production or inspection of documents or tangible things." Tex. R. Civ. P. 205.3(a) (emphasis added). WattStock is a party to this litigation, not a "nonparty" within the meaning of Rule 205.3, and a subpoena therefore cannot be used to compel the production of any documents from WattStock. Because Rule 205.3 is inapplicable to WattStock, WattStock need not respond to the Subpoena.

WattStock further objects that the Subpoena provides only twenty (20) days for compliance rather than the thirty (30) days required by Rule 196.2(a) for a request for production to a party.

To the extent that Alta may later serve a request for production seeking the same or similar documents, WattStock reserves the right to assert any and all objections it may have to specific requests in accordance with Texas Rule of Civil Procedure 196.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: /s/ Brian N. Hail
    Brian N. Hail
    bhail@krcl.com
    State Bar No. 08705500
    Andrew D. Robertson
    drobertson@krcl.com
    State Bar No. 24090845

901 Main St.
Suite 5200
Dallas, Texas 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that on 5th day of November, 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record as follows:

VIA E-SERVICE:
Michael Cancienne
mcancienne@jlcfirm.com
JORDAN, LYNCH & CANCIENNE, PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056

**ATTORNEYS FOR DEFENDANT/
COUNTERCLAIM PLAINTIFF**

/s/ Brian N. Hail
Brian N. Hail

# Exhibit 2

| From: | Michael Cancienne |
|---|---|
| To: | Drew Robertson; Kevin Jordan; Jeb Golinkin |
| Cc: | Brian Hail; Connie Nims |
| Subject: | RE: GE Subpoena [IWOV-iManage.FID2005944] |
| Date: | Monday, November 16, 2020 10:11:17 AM |
| Attachments: | image001.png |
| | Notification of Service for Case DC-20-08331 WATTSTOCK LLC vs. ALTA POWER LLC for filing Notice Envelope Number 47391388.msg |
| | 20201105 Wattstock"s Objection to Alta Power"s Notice of Subpoena to Produce Docs and Tangible Things.pdf |

Drew,

I'm very confused by your message, as we complied with the rules. Yes, GE was served. Service was 10 days after we served notice on all parties per Rule 205.2. You objected after the 10 day period (on 11/5 – its also attached). The objection seemed to presuppose we were seeking documents from Wattstock, which we were not.

Anyway, I'm working with GE to produce documents and they have no problem with the service of the subpoena. I've given them more time to respond as a courtesy and told them we'd work through any issues they have on scope.

To the extent this remains an issue, I'm happy to discuss at 11am.

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

---

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Monday, November 16, 2020 9:55 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>; Connie Nims <CNims@krcl.com>
**Subject:** GE Subpoena [IWOV-iManage.FID2005944]
**Importance:** High


Michael,

We received a call from GE's legal department about a subpoena that was apparently served on GE by you in the WattStock/Alta matter. Please confirm whether this is the case.

If you have served GE with a subpoena, note that you failed to comply with the ten-day notice requirement mandated by Rule 205.2. On that basis, we object to your third-party subpoena and will file an emergency motion to quash if you do not voluntarily withdraw the subpoena today. We can talk about this on our 11:00 a.m. call if you like.

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel**  214.777.4287
**krcl.com** | **krclblogs.com**

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

Exhibit 3



DAIGLE FISSE
& KESSENICH

MICHAEL D. FISSE[†]

Please Reply To:

P.O. Box 5350
Covington, LA 70434-5350
985.871.0800 phone
985.871.0899 fax
mfisse@daiglefisse.com

[†] Admitted in Louisiana, Texas and New York

3 December 2020

VIA EMAIL: mcancienne@jlcfirm.com
CERTIFIED MAIL
RETURN RECEIPT REQUESTED: Article No. 7019 1120 0000 0930 0726

Michael Cancienne
Jordan, Lynch & Cancienne, PLLC
1980 Post Oak Blvd, Suite 2300
Houston, Texas 77056

RE:   Alta Power LLC Notice of Subpoena to General Electric Company (the "Subpoena")
        *WattStock LLC v. Alta Power LLC*, Case No. DC-20-08331
        116th Judicial District Court of Dallas County, Texas (the "Litigation")

Dear Mr. Cancienne,

This will follow-up on our earlier communications advising that we are the attorneys supporting the General Electric Company ("GE") in connection with the Subpoena served through your office in the referenced Litigation matter and attached hereto as Exhibit A (the "Subpoena"). We are supporting the other GE Legal representatives that you have conferred with regarding the Subpoena; and we are glad to have this chance to work with you.

Please note that GE is working to determine documents that may be appropriately disclosed in response to the Subpoena; but we will not be able to have that process completed by the 4 December 2020 compliance date that Alta has specified. The requested records concern transactions that date back years and that involve multiple persons and business groups concerning complex industrial power production equipment. The process of identifying documents responsive to the subpoena is burdensome and expensive. It may also be necessary for GE to notify and/or obtain consent from other parties concerning document disclosures requested by the Subpoena. We have also noted that there is now pending a discovery motion in the Litigation that may affect these processes, and we appreciate your understanding on all these matters.

Daigle Fisse & Kessenich, A Professional Law Corporation • Counsellors at Law and Admiralty
New Orleans • Baton Rouge • Covington

Michael Cancienne
3 December 2020
Page 2

As discussed in our meet and confer discussions, we appreciate you working with us to reduce burden and expense by narrowing the scope of the Subpoena request to limited classes of documents from a pool of agreed-upon custodians, and to forward to us exemplar documents to assist the GE search. We are working to follow up on these items, and we appreciate your cooperation in that regard.

GE is working to determine as soon as possible documents that may be responsive and appropriately disclosed in response to the Subpoena. In the meantime, and in order to confirm a more formalized response to the Subpoena, please note the following GE objections to the Subpoena:

1. GE objects to the Subpoena to the extent it requires a person or entity that is not domiciled in Texas or that does not maintain a principal place of business in Texas to produce records or to make any appearance in Texas; or to the extent that it requires a person who is neither a party nor a party's officer to travel more than the mileage limitations set forth in the applicable rules of court from where that person resides, is employed, or regularly conducts business in person.

2. GE objects to the Subpoena's requests for the production of documents that are not in the possession, custody or control of GE. Any GE production of documents that have been prepared by other persons is not to be taken as a representation that such documents are within GE's possession, custody or control.

3. GE objects to the Subpoena's requests for the production of documents that are more readily obtained from other persons involved with the transactions at issue in the Litigation or other parties to the Litigation, including without limitation, WattStock LLC and other persons involved with the transactions at issue in the Litigation or with whom the requesting party issuing the Subpoena has a contractual or similar relationship.

4. GE objects to the Subpoena for lack of proper service of process and/or citation, and/or for lack of reasonable notice and sufficient time to respond as required by the applicable rules of court.

5. GE objects to those portions of the Subpoena titled "Definitions" and other portions of requests contained in the Subpoena that impose different, additional, other, or more burdensome requirements than those imposed by the applicable rules of court and the Texas Rules of Civil Procedure; including without limitation (1) requests or Definitions that reference transactions to

Michael Cancienne
3 December 2020
Page 3

which GE is not party, (2) requests or Definitions that require GE to create or prepare documents not currently in existence, or to explain or provide statements in connection with its responses, (3) requests or Definitions that require GE to segregate or organize records in ways different than from how they are maintained in the regular course of business, (4) requests or Definitions that purport to change the ordinary meaning or usage of particular terms, (5) requests or Definitions that are not stated with particularity, (6) documents from attorneys or accountants which are exempted from discovery by privilege or work product exceptions to discovery, and (7) requests or Definitions that call for the production of original documents.

6. GE objects to the Subpoena as vague and ambiguous for its use of vague and undefined terminology including without limitation "actual or prospective;" quoted terminology in Request No. 1, "resale," "Master Agreement," "Acasoy Surplus," "TRUEPackage LNTP," "LM6000PC Contractual Services Agreement Budgetary Proposal," "expired," "Memorandum of Understanding," "the July 31, 2019 letter sent by GE to Alta," "financing," "ALTA LNTP project," "Change Order" terminology in Request No. 20, "directly or indirectly," terminology in Request Nos. 21 to 23, and similarly vague and ambiguous terminology; and for otherwise failing to describe with reasonable particularity the items requested for production.

7. GE objects to the Subpoena because it not limited to a reasonable time-period, topic or other scope of application.

8. GE objects to the Subpoena's requests for the production of "all documents" or documents "concerning," "sufficient to identify," "related to," "identifying," "in connection with," or "showing," a particular topic; or requests using similarly broad terminology. Such requests are overly broad, vague, unduly burdensome, and fail to describe with reasonable particularity the items requested for production as required by the applicable rules of court.

9. GE objects to the Subpoena to the extent it seeks the production of any documents concerning financial, accounting, pricing and similar information as such documents are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Further, such documents may contain proprietary and/or confidential commercial information not properly subject to

Michael Cancienne
3 December 2020
Page 4

production herein.

10. GE further objects to the production of any documents in response to said Subpoena until a Confidentiality Agreement and Protective Order in satisfactory form(s) is/are signed and returned to GE.

11. GE objects to the Subpoena to the extent that it makes requests that are duplicative of any discovery requests that have already been pursued in connection with the Litigation; and GE also objects to the production of documents that are more readily obtainable or as easily obtainable by the requesting party from third parties and/or other parties to the pending Litigation as they are from GE; including without limitation persons with whom the requesting party has a contractual or similar relationship, and person or parties identified in Objection No. 3 above.

12. GE objects to the production of any documents that contain proprietary information, trade secrets or other confidential research, development or commercial information, including, but not limited to, documents regarding the design, construction, manufacture, sale and/or rental of GE products or services.

13. GE objects to the Subpoena to the extent it may be construed as calling for documents encompassed by privilege or other exemption from discovery; including without limitation attorney-client, accountant-client, work product and/or any other applicable privilege or exemption from discovery.

14. GE objects to the Subpoena because the listing of requested documents contained therein are unbounded by reasonable time constraints and include terminology that is undefined, vague, ambiguous, overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

15. GE objects to the Subpoena to the extent it calls for the production of documents that are confidential, proprietary, trade secret and/or encompassed by privacy interests as to GE and/or any other person or party; including third parties or persons with whom GE may have a contractual relationship that limits or precludes disclosure of such documents.

16. GE objects to the production of documents that are not relevant to any justiciable issue in the Litigation, that do not concern the specific equipment that is at issue in these proceedings, and that are

Michael Cancienne
3 December 2020
Page 5

not reasonably calculated to lead to the discovery of admissible evidence.

17. GE objects to the production of documents at the offices of attorneys or court reporters not previously agreed by GE. Copies of any documents produced in response to the subpoena may be forwarded to the requesting party or the documents may be produced at a mutually agreed time and location.

18. GE objects to the Subpoena to the extent it calls for the production of electronically stored information from sources that are not reasonably accessible because of undue burden or cost.

19. GE objects to the Subpoena to the extent it is in violation of, inconsistent with, or contrary to any court order, ruling or decree; including without limitation rules of court that require the requesting party to serve notice of the Subpoena on all parties before the Subpoena is served on GE.

20. GE objects to the Subpoena to the extent that it is related to or the subject of any objections, discovery disputes, motions to quash, court rulings, or similar items or procedures in the pending Litigation between the parties and to the extent that it requires the production of documents prior to the Court's resolution of those items or procedures.

21. GE's response that it is working to determine documents that may be appropriately disclosed in response to the Subpoena shall mean that GE will conduct a reasonable search through those of its files or records believed likely to contain responsive, non-privileged documents or documents reasonably responsive to the requests, subject to the objections and limitations stated herein. GE's response that it will determine documents that may be appropriately disclosed in response to the Subpoena is not to be taken as a representation that such documents exist.

22. GE objects to the Subpoena to the extent that it imposes undue burden or expense on GE; to the extent that the requesting party has not taken reasonable steps to avoid imposing undue burden or expense on GE in responding to the subpoena; or to the extent that the discovery requested through the Subpoena is not relevant to any party's claim or defense, or not proportional to the needs of the case considering the importance of the issues at stake in the Litigation, the amount in controversy, the parties' relative access to

Michael Cancienne
3 December 2020
Page 6

relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Subject to and without waiving the above objections, GE is working to determine documents that may be appropriately disclosed in response to the Subpoena as soon as possible. The Subpoena is quite broad, and we appreciate your help in working to narrow the scope of the Subpoena, determining more particular documents that are necessary for these processes, and determining court rulings on any pending motions or similar court filings related to the discovery or disclosures identified in the Subpoena.

Thanks in advance for your attention to these matters.

Sincerely,

Michael D. Fisse

Enclosure

FILED
10/21/2020 1:28 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

WATTSTOCK LLC,
Plaintiff/Counter Defendant,

v.

ALTA POWER LLC,
Defendant/Counter Plaintiff.

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

116th JUDICIAL DISTRICT

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND TANGIBLE THINGS

TO: Plaintiff/Counter-Defendant Wattstock, LLC, by and through its attorneys of record Brian N. Hail, Andrew D. Robertson, Kane Russell Coleman Logan PC, 901 Main Street, Suite 5200, Dallas, Texas 75202.

Pursuant to Texas Rule of Civil Procedure 205.3, Alta Power LLC files this Notice of Subpoena to Produce Documents and Tangible Things from non-party General Electric Company. The documents/and or items requested are set out in "Exhibit A" to this Notice, and shall be produced at the offices of Jordan Lynch & Cancienne PLLC—1980 Post Oak Blvd., Suite 2300, Houston, Texas 77056—no later than 20 days after service of the Subpoena.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: _Michael Cancienne_
    Michael Cancienne
    State Bar No. 24055256
    Kevin Jordan
    State Bar No. 11014800
    Joseph W. ("Jeb") Golinkin II
    State Bar No. 24087596
    1980 Post Oak Blvd., Suite 2300
    Houston, Texas 77056
    Telephone: 713.955.4025
    mcancienne@jlcfirm.com
    kjordan@jlcfirm.com
    jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC


tabbies®
EXHIBIT
A

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to the following counsel of record through the Court's electronic filing system on October 21, 2020.

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for Wattstock LLC*

/s/ Jeb Golinkin
Jeb Golinkin

2

EXHIBIT "A"

Definitions

1. "Wattstock" means Wattstock LLC and any of its subsidiaries or parent companies.

2. "GE" means General Electric Company and any of its subsidiaries, including but not limited to GE Packaged Power, LLC., and GE Capital.

3. "Alta" means Alta Power LLC.

4. "Bosen" means BOSEN Energy Electric Production Inc.

5. "Communication" or "Communications" include conversations, discussions, meetings, emails, text messages, telephone calls, letters, telecopies, and all other forms of oral or written expression by which information may be conveyed.

6. "Document" and "Documents" as used herein includes any written, recorded, or graphic matter, however produced or reproduced, including, but not limited to, memoranda, reports, studies, analyses, contracts, agreements, charts, graphs, indices, data sheets, information in magnetic or electronic form (including data processing cards or tapes and computer disks and electronic mail), and notes, work papers, entries, letters, telegrams, telecopies, advertisements, brochures, circulars, tapes, records, bulletins, papers, books, pamphlets, accounts, invoices, bills, order forms, photographs, calendars, or diaries. If you do not have custody or control of the original, the term "document" shall also include any carbon, photograph, or photocopy, or any other copies, reproductions, or facsimiles thereof. If you have custody or control of the original and copies, reproductions, or facsimiles, the term "document" shall mean the original and any copy, reproduction, or facsimile that is in any way different from the original. This definition includes all ESI.

7. "Identify" means:

(a) with respect to an individual, the person's full name, title at the time in question, and current or last known employer, business address, and home address;

(b) with respect to a company, the name of the company, the place of incorporation of the company, and the address of the company's principal place of business;

(c) with respect to a document, the date, the full names of the author(s) and each addressee or distributee, the subject matter(s), and/or title, a brief description of its contents, and its present location and custodian;

(d) with respect to a communication, the date, location, and general subject matter, all participants in or to the

3

communication, and all witnesses or other persons who have knowledge or information thereof.

8. "Person" means any natural individual in any capacity whatsoever or any entity or organization, including, but not limited to, a public or private corporation, partnership, joint venture, association, union, collective bargaining unit, trust, agency commission, bureau or department.

## Document Requests

1. All documents and communications concerning the actual or prospective "refurbish[ing] [of] existing LM2500 and LM6000 Gas Turbines manufactured by GE" for Wattstock or Alta.

2. All documents and communications concerning the actual or prospective resale of existing LM2500 and LM6000 Gas Turbines manufactured by GE" to Wattstock or Alta.

3. All documents and communications concerning the February 27, 2019 Master Agreement between Alta and Wattstock.

4. All documents and communications concerning the Acarsoy Surplus LM6000 package.

5. All documents and communications concerning the LM6000PC TRUEPackage LNTP between GE and Wattstock dated July 18, 2019.

6. All documents and communications concerning GE's "LM6000PC Contractual Services Agreement Budgetary Proposal" to Alta.

7. All invoices sent to or received from Wattstock since January 1, 2018.

8. Any contracts or written agreements (including those that have expired) between Wattstock and GE.

9. Documents sufficient to identify all money received from Wattstock since January 1, 2018.

10. Documents sufficient to identify the basis and/or reason for any money transferred between Wattstock and GE since January 1, 2018.

11. Documents sufficient to identify all services provided to Wattstock since January 1, 2018.

12. Documents sufficient to identify all work done or services provided that in any way concern Wattstock since January 1, 2018.

13. All documents and communications concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

4

14. All text messages concerning work done by GE pursuant to the "Memorandum of Understanding that sets out how Wattstock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units" referenced in the July 31, 2019 letter sent by GE to Alta.

15. All documents and communications concerning financing for any actual or prospective project concerning Alta.

16. All text messages concerning financing for any actual or prospective project concerning Alta.

17. All documents and communications with any third-party concerning Alta.

18. All documents and communications concerning Alta's efforts to obtain financing from Deutsche Bank in connection with any contract with Wattstock.

19. All documents and communications concerning any September 16, 2019 proposal prepared by GE related to the "ALTA LNTP project."

20. All documents and communications related to the GE Power Services-Aero Contract Change Order transmitted to or discussed with Wattstock on November 22, 2019 concerning Alta.

21. All documents and communications related to any work done by GE directly or indirectly related the December 23, 2019 Limited Notice to Proceed Proposal to Alta for the Goodlow Peak Power Site for Two (2) TRUEpackage ML6000 PC Sprint GTG's," including but not limited to:

- Woodard Controls Upgrade Hardware;

- Fin-Fan Lube Oil Cooler;

- Internal Gas Vent Valve;

- Generator Enclosure Design to modify from 50Hz Design;

- Gas Turbine/Generator Coupling;

- Generator Lube Oil (GLO) Skid;

- Automatic Voltage Regulator-EX2100e(AVR);

- External Block & Bleed Gas Valves;

- Approx. 1100 hours of Engineering Support for Engineering Drawings.

22. All documents and communications concerning any actual or prospective "Equipment Purchase and Sale Agreement" between Acarsoy Enerji Elektrik Üretim San. Ve Tic. A.S. and Wattstock.

23. All documents and communications concerning the GE LM6000PC Unit owned and/or operated by Nuh Energy since January 1, 2018.

# Exhibit 4



GE Power

**Lance Herrington**
Global Sales Leader
Aero Upgrades

Power Services

16415 Jacintoport Blvd
Houston, TX 77015

T +1 832 418 9788
www.lance.herrington@ge.com

Matt Laterza
Alta Power LLC
4605 Post Oak Place Dr.
Suite 270
Houston, TX 77027

July 31, 2019

Subject: GE TRUEpackage LM6000's and WattStock Refurbishment Services

Dear Matt:

We understand that your lenders seek clarification regarding the GE-WattStock relationship, and how GE could respond in the event that WattStock becomes unable to meet its contractual obligations to Alta Power LLC under agreements between WattStock and Alta Power for WattStock to supply a minimum of 9 refurbished LM6000 units.

WattStock and GE have entered into a Memorandum of Understanding that sets out how WattStock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units. In general, GE is committed to overhauling engines and supplying engineering analysis and diagrams to ensure the entire unit is refurbished to GE-specifications, and WattStock is committed to acquiring used units and refurbishing the balance-of-plant. By refurbishing units in this fashion, GE is able to warranty the completed unit. WattStock and GE have agreed that either party might act in the role of prime contractor, depending on a variety of factors. With regard to the Alta Power project, we jointly determined that WattStock would take the lead, and GE will perform its engineering and engine overhaul work as a subcontractor to WattStock.

Should WattStock fail to meet its contractual obligations to Alta Power, GE would be in a position to assume responsibility to complete any outstanding work, subject to several considerations. For illustration and without limitation, those considerations would likely include: (1) the absence of any legal or access issues; (2) GE and Alta being able to agree to a revised scope of work, associated cost, and terms and conditions, (3) GE's assessment that there are no insurmountable engineering or manufacturing issues, and (4) any applicable Purchase Orders or Change Orders should be modified and reassigned to GE.

There are a number of reasons that GE is willing to warranty WattStock's work on this project. First, WattStock's operation is co-located next to our engine overhaul facility, GE will be tracking project progress daily and could quickly assume work scope without transportation. Second, as part of our engineering services on this project we already conduct oversight of all aspects of WattStock's work – we will be intimately acquainted with each unit and its refurbishment program. Third, as the leader in aero-derivative power plants, we have a broad network suppliers that we expect to be able to call on to assist if need be. Fourth – and most importantly – GE has a strong incentive for this project to succeed.

Closing,

Lance Herrington
Global Sales Leader
Aero Upgrades

cc

Alex Babu, GE
Jay Manning, WattStock LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joseph Golinkin II on behalf of Joseph Golinkin II
Bar No. 24087596
jgolinkin@jlcfirm.com
Envelope ID: 49317227
Status as of 12/31/2020 3:43 PM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Vicki Sedon | | vsedon@krcl.com | 12/30/2020 4:01:17 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 12/30/2020 4:01:17 PM | SENT |
| Connie Nims | | cnims@krcl.com | 12/30/2020 4:01:17 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 12/30/2020 4:01:17 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 12/30/2020 4:01:17 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 12/30/2020 4:01:17 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 12/30/2020 4:01:17 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 12/30/2020 4:01:17 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 12/30/2020 4:01:17 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 12/30/2020 4:01:17 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 12/30/2020 4:01:17 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 12/30/2020 4:01:17 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 12/30/2020 4:01:17 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 12/30/2020 4:01:17 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 12/30/2020 4:01:17 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 12/30/2020 4:01:17 PM | SENT |

FILED
12/31/2020 1:25 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff/Counter Defendant, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| Defendant/Counter Plaintiff. | § | 116th JUDICIAL DISTRICT |

## ALTA POWER LLC'S RESPONSE TO WATTSTOCK LLC'S MOTION TO COMPEL

Alta Power LLC ("Alta Power") files this Response to WattStock LLC's ("WattStock") Motion to Compel and would respectfully show the following:

## I.    SUMMARY OF ARGUMENT

In its Motion to Compel, WattStock argues Alta Power failed to appropriately respond to three interrogatories and six document requests. All of WattStock's complaints are either moot or unsound. Alta Power appropriately responded to each of the disputed interrogatories, and Alta Power has already agreed to produce documents responsive to all but two of the disputed requests for production once the Court enters a protective order. That leaves only two disputed document requests, neither of which seek documents that are in any way related to any issue in this case. Instead, the disputed discovery requests seemed solely designed to harass Alta Power. For these reasons, WattStock's Motion to Compel should be denied in its entirety.

## II.    BACKGROUND

Alta Power was established to provide a creative and profitable way to supply additional capacity to the energy-grid when supply fell short of demand. Alta Power intended to purchase and place into service used aeroderivative gas turbines that could be turned on and off efficiently and quickly to help meet instances in which power demand exceeded available supply.

1

During these times, prices are highest, and Alta Power intended to capture a substantial share of this market.

To implement this strategy, Alta Power aimed to purchase used aeroderivative gas turbines manufactured by GE. Doing so presented two logistical problems: there is no public marketplace where a company like Alta Power can buy used aeroderivative gas turbines, and such turbines are difficult to service once they have been acquired. GE was thus in a unique position to help solve each of these problems. As the original seller of the aeroderivative gas turbines, GE knew which companies actually owned used turbines. And as the original manufacturer of the aeroderivative gas turbines, GE had the specialized knowledge necessary to actually service these turbines.

Alta Power approached GE and expressed a desire to purchase used aeroderivative gas turbines originally manufactured by GE, and contract with GE to perform ongoing service of the turbines. While GE was eager to capture revenue from this market, GE itself did not want to be involved in acquiring turbines in the used market. Instead, GE directed Alta Power to work through GE's exclusive partner: WattStock.

On February 27, 2018, Alta and WattStock entered into the Master Agreement, which set out how Alta Power would compensate WattStock for specific out-of-pocket expenses incurred in arranging inspection and evaluation of the condition of the used aeroderivative gas turbine, with prior written approval needed for expenditures in excess of $20,000.

The Master Agreement called for WattStock (with GE standing behind it) to negotiate the purchase price of each used GE aeroderivative unit and acquire the unit in WattStock's name for an agreed amount. The parties then would negotiate a price by which Alta Power would purchase the unit from WattStock. Any amounts paid by Alta Power in the interim period would be credited towards the purchase price Alta Power agreed to pay. The Master

Agreement also included a strict confidentiality provision, as well as an exclusivity and non-circumvention provision.

Alta and WattStock were to subsequently (and did on some occasions) enter into various other agreements related to the acquisition of used units.

For reasons that remain in dispute, the parties' relationship collapsed.

On June 16, 2020, WattStock sued Alta Power claiming it breached the Master Agreement, a "Limited Notice to Proceed" between Alta Power and WattStock LNTP, and what WattStock claims is an agreement between the parties related to a company named Ethos. On August 24, Alta Power served its Answers to WattStock's First Set of Interrogatories and its Objections and Responses to WattStock's first Requests for Production.

WattStock's counsel subsequently raised certain complaints regarding the contents of Alta Power's discovery responses. Counsel for the parties conferred and based on these conversations, Alta Power amended its responses to multiple document requests and interrogatories. (See November 18, 2020 Email Chain Between Michael Cancienne and Drew Robertson, attached as Ex. 1.) There were, however, a limited number of issues the parties could not resolve and WattStock sought the Court's intervention on those issues.

## III. DISCUSSION

In its Motion to Compel, WattStock complains about Alta Power's responses to three interrogatories and six document requests. These complaints are either moot or meritless, and WattStock's Motion to Compel should be denied in its entirety.

### A. Alta fully answered the disputed interrogatories.

#### i. *Interrogatory 2*

In Interrogatory 2, WattStock asked Alta to "explain what steps Alta took to obtain financing for the Projects, including the identities of all potential investors in the Projects with whom Alta negotiated in 2019 or 2020 and the date(s) and amount(s) of any ultimate investment(s) in the Projects." (WattStock's Motion to Compel, Ex. 1 at Rog. 2.) After asserting valid and necessary objections, Alta Power answered by detailing the entities from which it attempted to obtain financing related to the projects at issue:

> Ares, EIG, ECP, GIP, GIC, Angelo Gordon, Alliance Bernstein, Mass Mutual, John Hancock, DNB Nordbank, Texas Capital Bank, Cadence Bank, Atlas Credit, Anchorage Capital, Blackstone, Arroyo Energy, Rockland Capital, Carlyle, Hullstreet Energy, EMG, Charlesbank, Oaktree, Rock Hill, Quantum Energy, Capital Dynamics, EIV Capital, Starwood Infrastrucre, Mason Capital, Moore Capital, Avenue Capital, Mill Rock Capital, Basalt Infrastructure, Fengate, AMP Infrastructure, IFM Investors, ING, Vantage Infrastructure, Blackrock Real Assets Team, Prudential, Allstate, Cigna, Apollo, Stonepeak, Fortress, GSO, Nomura, GE Capital, Arclight, Alcentra, Angel Island, Beach Point, Benefit Street, Blue Torch, Capital Southwest, Derby Capital, Deerpath, Guggenheim, King Street, KKR, Macquarie, Marathon, MGG, Neuberger Berman, NexBank, Perot, Riverstone, Solus, Stellus, Summit Credit, TCW, WhiteOak, BBVA, MUFG, Investec, CIT, Deutsche Bank, BNP Paribas, Societe Generale, First Tennessee, Orion Energy, Perot, Renova, Santander, SMBC, RBC, UMB, TPG, TD Securities, and Western Alliance.

(*Id.*)

WattStock ignores this response and argues that Alta Power's answer is "partially nonresponsive to the interrogatory as it fails to identify with any specific 'what steps Alta took to

obtain financing for the Projects.'" (WattStock's Motion to Compel at 6.) This is simply not true. Alta Power's answer is *very* specific: it identifies each and every entity with which it interacted regarding financing for the projects. Alta Power has thus appropriately answered WattStock's interrogatory, and its complaints should be rejected.

### ii.  *Interrogatory 5*

WattStock next demands that the Court order Alta Power to answer Interrogatory 5, which instructs Alta Power to "explain why Alta reduced the size of the Projects consisting of three sites, totaling nine units, to one site totaling two units." (WattStock's Motion to Compel , Ex. 1 at Rog 5.)

As Alta Power explained in its objections, this interrogatory cannot be answered as written because it is intentionally misleading. (*Id.*) WattStock does not even dispute that proposition. Instead, it simply argues that Alta Power "should clarify what it believes is misleading about the request and provide a substantive answer subject to whatever clarification it may wish to provide." (WattStock's Motion to Compel at 6.) This is not Alta Power's obligation under the rules and this suggestion ignores an important part of Alta Power's objection: Interrogatory 5 *cannot be answered as written*. It is not Alta Power's job to reform WattStock's objectionable questions, especially when WattStock deliberately crafted the question to *be* objectionable. If WattStock wants to serve an interrogatory inquiring about the factors that impacted the scope of the Projects, WattStock should serve an interrogatory  that makes such a request.

### iii.  *Interrogatory 6*

Finally, WattStock seeks an order compelling Alta Power to amend its response to Interrogatory 6:

> If You contend that WattStock committed a material breach of the Master

Agreement, the LNTP, and the Ethos Authorization, as alleged in Paragraph 1 of Your Affirmative Defenses, explain the factual basis for that contention. As part of Your answer, identify all specific provisions of such agreements that You contend WattStock materially breached and the dates of any and all notices of each breach sent to WattStock.

(WattStock's Motion to Compel, Ex. 1 at Rog 6.)

After asserting sound objections, Alta Power fully answered this Interrogatory:

Subject to and without waiving the foregoing objections, please see Alta's Counterclaim for a detailed explanation of WattStock's breaches of contract. Alta further provides that there was no "Ethos Authorization" given to Wattstock, and this is a document that Wattstock cannot and has not produced. Alta further alleges that Wattstock's breached agreements with Alta by (1) the improper disclosure of confidential information to third parties,(2) becoming insolvent and unable to return certain funds to Alta, and (3) misappropriating funds from Alta. Discovery is on-going. Alta will supplement this response.

(*Id.*)

WattStock argues that Alta Power's reference to the substance of its counterclaims is inappropriate because the counterclaims do not "provide any further clarity into Alta's claims or contentions in this lawsuit." (WattStock's Motion to Compel at 7-8.) Even if this were true—and it is not—WattStock completely ignores the substance of Alta Power's answer, which explicitly identifies the three specific acts that materially breached the parties agreement. In sum, Alta Power has fully answered this interrogatory.

**B.     Requests for Production**

WattStock also demands that the Court order Alta Power to amend its responses to Requests for Production Nos. 7, 10, 12, 13, 14, and 16. Although Alta Power is reluctant to produce confidential documents due to WattStock's history of inappropriately disclosing its confidential information, Alta Power has agreed to produce documents responsive to Request Nos. 7, 12, 13, and 14 once the Court enters a protective order. Consequently, WattStock's concerns related to these Requests for Production are moot. The only disputes remaining concern Request for Production Nos. 10 and 16, both of which seek information that is *not* reasonably calculated

to lead to the discovery

Request for Production 10 seeks "all documents reflecting the current unit holders of Alta and the number of units owned by each," while Request for Production 16 commands Alta Power to produce "[a]ll current term sheets for future equity raises or additional debt that are currently under consideration by Alta." (WattStock's Motion to Compel, Ex. 2 at RFP 10 and RFP 16.)

Alta Power objected to both of these requests because neither Request for Production 10 nor Request for Production 16 is reasonably calculated to lead to the discovery of admissible evidence. (*Id.*) WattStock asks the Court to overrule this objection because it claims Alta's "inability or unwillingness to obtain project financing is a key part of this case that directly relates to the parties' contractual agreements and entire business relationship." (WattStock's Motion to Compel at 10.)

This argument ignores the reality that neither the identity of Alta Power's individual owners nor Alta's *future* plans has anything to do with Alta's pre-litigation attempts to obtain project financing. Alta Power's going forward plans for future equity raises or additional debt are simply not relevant to the current dispute. And asking to Alta Power to identify its equity owners is equally irrelevant and purely and attempt to harass Alta Power. For these reasons, the Court should reject WattStock's inappropriate requests.

## IV. CONCLUSION

For the reasons set out above, the Court should deny WattStock's Motion to Compel.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: _____*Michael Cancienne*_____
     Michael Cancienne
     State Bar No. 24055256
     Kevin Jordan
     State Bar No. 11014800
     Joseph W. ("Jeb") Golinkin II
     State Bar No. 24087596
     1980 Post Oak Blvd., Suite 2300
     Houston, Texas 77056
     Telephone: 713.955.4025
     Facsimile: 713.955.9644
     mcancienne@jlcfirm.com
     kjordan@jlcfirm.com
     jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to the following counsel of record via the Court's electronic filing system on December 31, 2020:

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for WattStock LLC*

_/s/ Michael Cancienne_____
Michael Cancienne

CAUSE NO. DC–20–08331

| | | |
|---|---|---|
| WATTSTOCK LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff / Counterclaim Defendant*, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALTA POWER LLC, | § | |
| | § | |
| *Defendant / Counterclaim Plaintiff.* | § | 116th JUDICIAL DISTRICT |

**PROPOSED ORDER**

The Court hereby DENIES WattStock LLC's Motion to Compel.

_____
Judge Presiding,
116th District Court

# Exhibit 1

**From:** **Michael Cancienne** mcancienne@jlcfirm.com
**Subject:** RE: WattStock v. Alta - Alta's First Amended Answers to ROGs and Responses to RFPs
**Date:** November 18, 2020 at 8:25 PM
**To:** Drew Robertson DRobertson@krcl.com, Kevin Jordan kjordan@jlcfirm.com, Jeb Golinkin jgolinkin@jlcfirm.com
**Cc:** Brian Hail BHail@krcl.com, Linda Baumgartner lbaumgartner@jlcfirm.com, Michael Cancienne mcancienne@jlcfirm.com



Drew,

See attached and be in touch with additional questions.


Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Monday, November 16, 2020 11:19 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Michael,

To follow up on this morning's call, this will confirm our agreement that you will serve amended responses to Rog 2, 6, and 7 as well as amend all "see Alta's production" responses to provide more clarity as to whether responsive documents have been produced with the production or whether there were no responsive documents for each request. The remaining issues are still contested.

Also, if you are willing to clarify with your amended responses that for RFP 7, 12, 13, 14, you will produce responsive documents subject to a protective order, that would address our concern that your current response says you will not do so absent "a Court order." The way it reads currently it sounds like you are requiring us to compel the protection, but if the issue is just protection/confidentiality, then we don't have any disagreement on those RFPs.

Regarding the protective order, I will retrieve Judge Parker's standard order and send a copy over after I have reviewed it. If her standard order is workable for this case, we can go ahead and get that executed and in front of the Court today.

Finally, you agree to provide the supplemental responses we have discussed by close of business on Wednesday, 11/18.

Please let me know if any of this is incorrect and thanks for working with me on these.

**DREW ROBERTSON**
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 4:52 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Does 11am work?

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 13, 2020 4:20 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]


Michael,

I can't do 1:30. How about something Monday morning?

DREW ROBERTSON
Attorney

**KRCL**

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 13, 2020 9:43 AM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Drew,

See below. Seems I need to better understand what you are asking for on a few issues – can you call me at 1:30 on Monday? If so, I'll send an invite. I will hold off on substantive amendment until we get that clear so I can avoid multiple amendments.

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 13, 2020 9:32 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Michael,

Hope all is well. I was optimistic that we had resolved a majority of the issues below based on our conversation, but I'm concerned that we haven't heard back from you or anyone else in your office all week. Please advise whether you are providing amended responses today in accordance with what I have outlined or if we will have to proceed with filing the entire motion to compel.

Thank you,

DREW ROBERTSON
Attorney



**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Drew Robertson
**Sent:** Tuesday, November 10, 2020 9:23 AM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]
**Importance:** High

Michael,

To follow up on our conference yesterday, my understanding of where we stand is as follows:

follows.

- Rog 2 – you will amend your response to state that there were no ultimate investments.
  - What about the steps Alta took to obtain financing? Do you have any intention of providing additional detail about negotiations (dates, offers, etc.) beyond the names of the potential investors you identified, or do you intend to stand on the response as is with only the one revision we discussed about the ultimate investments?

Alta's answer provides a substantive response. Your questions in the subpart are not consistent with what ROG 2 seeks.

- Rog 5 – you believe the rog misrepresents the facts and have no response to the rog as written

This is correct.

- Rogs 6 and 7 – you believe that your amended pleading expected in roughly "two weeks" will provide more clarity

  - Are you willing to supplement the rog responses to provide such clarity this week? If so, we can probably avoid a motion on these two.

I am awaiting guidance from client but suspect we'll provide further clarity to avoid any further issue here.

- RFP 6, 9, and 16 – you have no responsive documents and will amend the response to say so

This is correct for 6 and 9. 16 is really over broad as written and impossible to respond. We should discuss further. I'm free Monday at 1:30 pm.

- RFP 7, 12, 13, 14 – you have responsive documents but want a protective and/or confidentiality order in place before producing subject to such order(s)
  - Our current issue is that these responses say you will not produce absent a "Court order" to do so. If you will produce with a protective order, please clarify in an amended response. We have no objection to entering into a protective/confidentiality order.

I asked you to provide a protective order. If you want us to draft, we are happy to.

- RFP 10 and 11 – you dispute their relevance / no agreement possible

Yes

- RFP 15 – you dispute its current relevance / no agreement possible at this time

Yes. This simply means I could foresee a possibility where our claims are amended and this information becomes relevant.

- RFP 17 and 18 – you will check with the client to confirm that you have no additional responsive documents and will amend the response to say so

I think we discussed the problems with this – our obligation is to conduct a reasonable search and produce responsive documents. I can confirm we have conducted a search for documents and have produced them.

- Finally, can you clarify your position on our general objection that your responses fail to provide one of the four (4) permissible responses under Rule 196.2?
  - As mentioned, we believe your direction to "see Alta's production" is too vague to comply with Rule 196.2 and request that you provide a more definitive statement in accordance with the rule. Please let us know whether you are willing to amend these.

I disagree with what you are claiming, perhaps because I do not fully understand it. Happy to talk further.

Please let me know if any of this is incorrected. **For the parts that we appear to have reached an agreement, please provide amended responses by the close of business on Friday of this week so that we can determine what portions of the motion may still need to be resolved by the Court.**

Thank you,

**DREW ROBERTSON**
Attorney

**KRCL**

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel**  214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Drew Robertson
**Sent:** Friday, November 6, 2020 3:36 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

11:00 a.m. on Monday will work, and I will follow up with Brian before then regarding your request.

Talk to you then.

Thanks,

**DREW ROBERTSON**
Attorney

# KRCL

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Friday, November 6, 2020 3:25 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Sorry for the miscommunication – I was thinking early Friday afternoon would work and was hoping for confirmation from you. Anyway, how about we talk on Monday? I'm free at 9am or 11am. Will you have the information I've been requesting below by then?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Friday, November 6, 2020 3:22 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses [IWOV-iManage.FID2005944]

Michael,

Hadn't heard anything further so just wanted to follow up and see if you're still available to confer today?

Thanks,

**DREW ROBERTSON**
Attorney

# KRCL

**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202
**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

**From:** Michael Cancienne <mcancienne@jlcfirm.com>
**Sent:** Wednesday, November 4, 2020 5:34 PM

**Sent:** Wednesday, November 4, 2020 5:24 PM
**To:** Drew Robertson <DRobertson@krcl.com>; Kevin Jordan <kjordan@jlcfirm.com>; Jeb
Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** RE: WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]

Thanks, Drew – I'll get with my client tomorrow and we can plan to talk on Friday. Of
course, I am hoping a motion to compel can be avoided.

I suggest early afternoon Frida to talk.

While we are talking discovery, I've repeatedly reached out to Brian requesting
information on WattStock's discovery responses as well as dates for deposition of Mr.
Watson. I was told I'd have a substantive response a couple times but am still waiting.
Can you please check on those issues?

Thanks,

Michael Cancienne
713.955.4025 (o)
713.294.0073 (m)

**From:** Drew Robertson <DRobertson@krcl.com>
**Sent:** Wednesday, November 4, 2020 5:11 PM
**To:** Michael Cancienne <mcancienne@jlcfirm.com>; Kevin Jordan
<kjordan@jlcfirm.com>; Jeb Golinkin <jgolinkin@jlcfirm.com>
**Cc:** Brian Hail <BHail@krcl.com>
**Subject:** WattStock v. Alta - Conference on Motion to Compel Discovery Responses
[IWOV-iManage.FID2005944]

Counsel,

We have several outstanding issues with the written discovery responses served by your
predecessor counsel on August 24 in this case. We are hopeful that we can work with
you to resolve these issues, but intend to file the attached motion to compel by the end of
the week as to any matters for which we can't reach an agreement.

To that end, please let us know your availability tomorrow and/or Friday to conference on
this motion.

Thanks,

**DREW ROBERTSON**
Attorney



**KRCL**
**Kane Russell Coleman Logan PC**
901 Main Street | Suite 5200 | Dallas, Texas 75202

**Tel** 214.777.4287
krcl.com | krclblogs.com

This email and any attachments are confidential. If you received this email in error, please inform the sender and delete it. Thank you.

   

20201118 Alta's   20201118 Alta's
First A...ies.pdf   FIrst A...Ps.pdf

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joseph Golinkin II on behalf of Joseph Golinkin II
Bar No. 24087596
jgolinkin@jlcfirm.com
Envelope ID: 49336398
Status as of 1/4/2021 10:51 AM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Vicki Sedon | | vsedon@krcl.com | 12/31/2020 1:25:04 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 12/31/2020 1:25:04 PM | SENT |
| Connie Nims | | cnims@krcl.com | 12/31/2020 1:25:04 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 12/31/2020 1:25:04 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 12/31/2020 1:25:04 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 12/31/2020 1:25:04 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 12/31/2020 1:25:04 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 12/31/2020 1:25:04 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 12/31/2020 1:25:04 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 12/31/2020 1:25:04 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 12/31/2020 1:25:04 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 12/31/2020 1:25:04 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 12/31/2020 1:25:04 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 12/31/2020 1:25:04 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 12/31/2020 1:25:04 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 12/31/2020 1:25:04 PM | SENT |

FILED
1/4/2021 2:59 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC, | IN THE DISTRICT COURT OF |
| Plaintiff/Counter Defendant, | |
| | |
| v. | DALLAS COUNTY, TEXAS |
| | |
| ALTA POWER LLC, | |
| Defendant/Counter Plaintiff. | 116th JUDICIAL DISTRICT |

**FIRST AMENDED NOTICE OF VIDEO DEPOSITION OF PETE WATSON**

TO:  Plaintiff/Counter Defendant, WattStock, LLC, by and through its attorney of record, Brian N. Hail and Andrew D. Robertson, Kane Russell Coleman Logan PC, 901 Main Street, Suite 5200, Dallas, Texas 75202.

Please take notice that pursuant to Rule 199 of the Texas Rules of Civil Procedure, Defendant/Counter Plaintiff Alta Power, LLC will take the video deposition of Pete Watson, on Friday, December 4, 2020, at 9:00 a.m.

The deposition will be conducted remotely *via* Zoom. The court reporter will report the deposition from a location separate from the witness. Counsel for the parties and their clients will be participating from various, separate locations. The court reporter will administer the oath to the witness remotely. The witness will be required to provide government-issued identification satisfactory to the court reporter, and this identification must be legible on camera. Each participating attorney may be visible to all other participants, and their statements will be audible to all participants. All exhibits will be provided simultaneously and electronically to the witness and all participants. The court reporter will record the testimony and it may be recorded electronically.

Counsel for all parties will be required to stipulate on the record:

1.      Their consent to this manner of deposition; and

2. Their waiver of any objection to this manner of deposition, including any objection to the admissibility at trial of this testimony based on this manner of deposition.

The deposition will be videotaped and recorded by a certified court reporter and will continue from day to day until concluded.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By:      *Michael Cancienne*
     Michael Cancienne
     State Bar No. 24055256
     Kevin Jordan
     State Bar No. 11014800
     Joseph W. ("Jeb") Golinkin II
     State Bar No. 24087596
     1980 Post Oak Blvd., Suite 2300
     Houston, Texas 77056
     Telephone:  713.955.4025
     Facsimile:  713.955.9644
     mcancienne@jlcfirm.com
     kjordan@jlcfirm.com
     jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to the following counsel of record by electronic mail on January 4, 2021:

Brian N. Hail
Andrew D. Robertson
Kane Russell Coleman Logan PC
901 Main Street, Suite 5200
Dallas, Texas 75202
bhail@krcl.com
drobertson@krcl.com
*Attorneys for Wattstock LLC*

_____/s/ Jeb Golinkin_____
Jeb Golinkin

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joseph Golinkin II on behalf of Joseph Golinkin II
Bar No. 24087596
jgolinkin@jlcfirm.com
Envelope ID: 49374816
Status as of 1/5/2021 11:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 1/4/2021 2:59:01 PM | SENT |
| Andrew Robertson | 24090845 | drobertson@krcl.com | 1/4/2021 2:59:01 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 1/4/2021 2:59:01 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 1/4/2021 2:59:01 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 1/4/2021 2:59:01 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 1/4/2021 2:59:01 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 1/4/2021 2:59:01 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 1/4/2021 2:59:01 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 1/4/2021 2:59:01 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 1/4/2021 2:59:01 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 1/4/2021 2:59:01 PM | SENT |

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Vicki Sedon | | vsedon@krcl.com | 1/4/2021 2:59:01 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 1/4/2021 2:59:01 PM | SENT |
| Connie Nims | | cnims@krcl.com | 1/4/2021 2:59:01 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 1/4/2021 2:59:01 PM | SENT |
| Kevin Jordan | | kjordan@jlcfirm.com | 1/4/2021 2:59:01 PM | SENT |

FILED
1/4/2021 6:47 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC, <br>     Plaintiff/Counter Defendant, | IN THE DISTRICT COURT OF |
| v. | DALLAS COUNTY, TEXAS |
| ALTA POWER LLC, <br>     Defendant/Counter Plaintiff. | 116th JUDICIAL DISTRICT |

## SECOND AMENDED NOTICE OF VIDEO DEPOSITION OF PETE WATSON

TO:   Plaintiff/Counter Defendant, WattStock, LLC, by and through its attorney of record, Brian N. Hail and Andrew D. Robertson, Kane Russell Coleman Logan PC, 901 Main Street, Suite 5200, Dallas, Texas 75202.

Please take notice that pursuant to Rule 199 of the Texas Rules of Civil Procedure, Defendant/Counter Plaintiff Alta Power, LLC will take the video deposition of Pete Watson on January 12, 2021 at 9:30 a.m.

The deposition will be conducted remotely *via* Zoom. The court reporter will report the deposition from a location separate from the witness. Counsel for the parties and their clients will be participating from various, separate locations. The court reporter will administer the oath to the witness remotely. The witness will be required to provide government-issued identification satisfactory to the court reporter, and this identification must be legible on camera. Each participating attorney may be visible to all other participants, and their statements will be audible to all participants. All exhibits will be provided simultaneously and electronically to the witness and all participants. The court reporter will record the testimony and it may be recorded electronically.

Counsel for all parties will be required to stipulate on the record:

1.    Their consent to this manner of deposition; and

2.    Their waiver of any objection to this manner of deposition, including any objection to the admissibility at trial of this testimony based on this manner of deposition.

The deposition will be videotaped and recorded by a certified court reporter and will continue from day to day until concluded.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By:    *Michael Cancienne*
        Michael Cancienne
        State Bar No. 24055256
        Kevin Jordan
        State Bar No. 11014800
        Joseph W. ("Jeb") Golinkin II
        State Bar No. 24087596
        1980 Post Oak Blvd., Suite 2300
        Houston, Texas 77056
        Telephone:  713.955.4025
        Facsimile:  713.955.9644
        mcancienne@jlcfirm.com
        kjordan@jlcfirm.com
        jgolinkin@jlcfirm.com

ATTORNEYS FOR ALTA POWER LLC

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was sent to the following counsel of record by electronic mail on January 5, 2021:

> Brian N. Hail
> Andrew D. Robertson
> Kane Russell Coleman Logan PC
> 901 Main Street, Suite 5200
> Dallas, Texas 75202
> bhail@krcl.com
> drobertson@krcl.com
> *Attorneys for Wattstock LLC*

<div align="center">

_____*/s/ Jeb Golinkin*_____
Jeb Golinkin

</div>

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joseph Golinkin II on behalf of Joseph Golinkin II
Bar No. 24087596
jgolinkin@jlcfirm.com
Envelope ID: 49387376
Status as of 1/5/2021 3:39 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 1/4/2021 6:47:09 PM | SENT |
| Andrew Robertson | 24090845 | drobertson@krcl.com | 1/4/2021 6:47:09 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 1/4/2021 6:47:09 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 1/4/2021 6:47:09 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 1/4/2021 6:47:09 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 1/4/2021 6:47:09 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 1/4/2021 6:47:09 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 1/4/2021 6:47:09 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 1/4/2021 6:47:09 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 1/4/2021 6:47:09 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 1/4/2021 6:47:09 PM | SENT |

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Vicki Sedon | | vsedon@krcl.com | 1/4/2021 6:47:09 PM | SENT |
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 1/4/2021 6:47:09 PM | SENT |
| Connie Nims | | cnims@krcl.com | 1/4/2021 6:47:09 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 1/4/2021 6:47:09 PM | SENT |
| Kevin Jordan | | kjordan@jlcfirm.com | 1/4/2021 6:47:09 PM | SENT |