**BAKER BOTTS L.L.P.**
Jessica B. Pulliam, TX SBN 24037309
*jessica.pulliam@bakerbotts.com*
2001 Ross Avenue, Suite 900
Dallas, TX  75201-2980
Telephone:     214.953.6500

David R. Eastlake, TX SBN 24074165
*david.eastlake@bakerbotts.com*
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:    713.229.1234

*Co-Counsel for Alta Power LLC*

**JORDAN, LYNCH & CANCIENNE PLLC**
Michael Cancienne
State Bar No. 24055256
Kevin Jordan
State Bar No. 11014800
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4028
*mcancienne@jlcfirm.com*
*kjordan@jlcfirm.com*
*jgolinkin@jlcfirm.com*

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: WATTSTOCK, LLC, | ) Chapter 11 (Subchapter V) |
| | ) Case No. 21-31488 (SGJ) |
| *Debtor.* | ) |
| | ) |
| WATTSTOCK, LLC, | ) |
| | ) Adv. No. 21-03083 (SGJ) |
| *Plaintiff,* | ) |
| | ) *Removed from the District Court of Dallas County,* |
| v. | ) *Texas, 116th Judicial District* |
| | ) Case No. DC-20-08331 |
| ALTA POWER LLC, | ) |
| | ) |
| *Defendant, Counter-Plaintiff, and* | ) |
| *Third-Party Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| WATTSTOCK, LLC, | ) |
| | ) |
| *Counter-Defendant*, and | ) |
| | ) |
| GENERAL ELECTRIC INTERNATIONAL, | ) |
| INC., d/b/a GE POWER SERVICES, | ) |
| | ) |
| *Third-Party Defendant*. | ) |

## ALTA POWER'S RESPONSE TO GENERAL ELECTRIC INTERNATIONAL INC.'S RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PROCEDURAL AND FACTUAL BACKGROUND..................................................... 2

LEGAL STANDARD......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

    I.     Alta pleads viable fraud and negligent misrepresentation claims against GE. ........ 7

        a.    Alta's fraud and negligent misrepresentation allegations satisfy
             Rule 9(b). ........................................................................................... 7

        b.    The "direct contradiction" rule does not apply. ........................................ 10

        c.    The economic loss rule does not apply. .................................................... 11

    II.    Alta plausibly pleads unjust enrichment. ................................................................ 12

    III.   Alta pleads actionable contract and tort claims against GE................................. 13

        a.    Alta plausibly pleads partnership by estoppel. ......................................... 13

        b.    Alta plausibly pleads a joint enterprise between GE and WattStock......... 15

        c.    Alta plausibly pleads an agency theory of liability.................................... 19

    IV.   Alta plausibly pleads entitlement to consequential damages.............................. 21

        a.    Alta pleads that GE proximately caused its damages. .............................. 21

        b.    No contractual damages waiver limits Alta's consequential damages. .... 22

CONCLUSION .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

CASES

*Am. Realty Trust, Inc. v. Travelers Cas. and Sur. Co. of Am.*,
    362 F. Supp. 2d 744 (N.D. Tex. 2005) ................................................................10

*Array Techs., Inc. v. Mitchell*,
    305 F. Supp. 3d 1256 (D.N.M. 2018) ................................................................22

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*,
    343 F.3d 719 (5th Cir. 2003) ..........................................................................7, 9

*Blakely v. Andrade*,
    360 F. Supp. 3d 453 (N.D. Tex. 2019) ................................................................7

*Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*,
    444 F. App'x 1 (5th Cir. 2011) ..........................................................................22

*Bowman v. CitiMortgage Inc.*,
    No. 3:14-CV-4036-B, 2015 WL 4867746 (N.D. Tex. Aug. 12, 2015)....................11

*Bransom v. Standard Hardware, Inc.*,
    874 S.W.2d 919 (Tex. App.—Fort Worth 1994, pet. denied) ...............................12

*Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC*,
    573 S.W.3d 198 (Tex. 2019)...............................................................................24

*CCR, Inc. v. Chamberlain*,
    No. 13-97-312-CV, 2000 WL 35721225 (Tex. App.—Corpus Christi June 1, 2000, pet.
    denied)................................................................................................................14

*Chesapeake Operating, Inc. v. Whitehead*,
    No. C-10-301, 2011 WL 335084 (S.D. Tex. Jan. 31, 2011)..................................20

*Chevez v. Brinkerhoff*,
    No. 05-13-00572-CV, 2014 WL 7246798 (Tex. App.—Dallas Dec. 22, 2014, no pet.) ........16

*Cicalese v. Univ. of Texas Med. Branch*,
    924 F.3d 762 (5th Cir. 2019) .............................................................................14

*Clark v. PFPP Ltd. P'ship*,
    455 S.W.3d 283 (Tex. App.—Dallas 2015, no pet.).............................................11

*Clements v. HLF Funding*,
    No. 05-19-01295-CV, 2021 WL 3196962 (Tex. App.—Dallas July 28, 2021, pet. denied)...10

*Cunningham v. Politi*,
    No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519568 (E.D. Tex. Apr. 30, 2019)..................19

*DaimlerChrysler Motors Co., LLC v. Manuel*,
    362 S.W.3d 160 (Tex. App.—Fort Worth 2012, no pet.) .........................................................24

*Derrick Petroleum Servs. v. PLS, Inc.*,
    No. H–14–1520, 2014 WL 7447229 (S.D. Tex. Dec. 31, 2014) .............................................14

*Douglass v. Beakley*,
    900 F. Supp. 2d 736 (N.D. Tex. 2012) ...................................................................................12

*Duke Energy Int'l, L.L.C. v. Napoli*,
    748 F. Supp. 2d 656 (S.D. Tex. 2010) ...................................................................................18

*E.S. v. Best W. Int'l, Inc.*,
    510 F. Supp. 3d 420 (N.D. Tex. 2021) ..................................................................................20

*Emtel, Inc. v. Lipidlabs, Inc.*,
    583 F. Supp. 2d 811 (S.D. Tex. 2008) ...................................................................................19

*Encore Int'l Inv. Funds, LLC v. 2608 Inwood, Ltd.*,
    No. 05-19-00070-CV, 2020 WL 1685420 (Tex. App.—Dallas Apr. 7, 2020, no pet.)...........23

*Energy Intel. Grp., Inc. v. Bank of Am., N.A.*,
    No. 4:17-CV-3767, 2018 WL 3303166 (S.D. Tex. July 5, 2018) ..........................................18

*First Nat'l Bank of Luling v. Nugent*,
    384 S.W.2d 224 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.) .......................................23

*Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*,
    960 S.W.2d 41 (Tex. 1998)..............................................................................................11, 12

*Guidry v. Am. Pub. Life Ins. Co.*,
    512 F.3d 177 (5th Cir. 2007) ...................................................................................................7

*Guidry v. Bank of LaPlace*,
    954 F.2d 278 (5th Cir. 1992) ...................................................................................................7

*Harrison v. Aztec Well Servicing Co.*,
    No. 1:20-CV-038-H, 2021 WL 6073164 (N.D. Tex. Dec. 23, 2021)....................................17

*Higher Perpetual Energy, LLC v. Higher Power Energy, LLC*,
    No. 17-cv-0414, 2018 WL 3031780 (E.D. Tex. June 18, 2018) ............................................22

*Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*,
    111 S.W.3d 75 (Tex. 2003)....................................................................................................23

*IberiaBank Corp. v. Illinois Union Ins. Co.*,
    953 F.3d 339 (5th Cir. 2020) ....................................................................6

*In re Life Partners Holdings, Inc.*,
    926 F.3d 103 (5th Cir. 2019) ..................................................................10

*In re THEAG N. Arlington LLC*,
    No. 19-41108-ELM, 2020 WL 7330055 (Bankr. N.D. Tex. Dec. 11, 2020) .........................10

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*,
    892 F.3d 719 (5th Cir. 2018) ..................................................................18

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
    341 S.W.3d 323 (Tex. 2011)....................................................................11

*JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*,
    546 S.W.3d 648 (Tex. 2018)....................................................................10

*Marquis v. OmniGuide, Inc.*,
    No. 3:09-CV-2092-D, 2011 WL 321112 (N.D. Tex. Jan. 28, 2011)...............................21

*Oxy USA, Inc. v. Sw. Energy Prod. Co.*,
    161 S.W.3d 277 (Tex. App.—Corpus Christi 2005, pet. denied)...............................23

*Prudential Ins. of Am. v. Jefferson Assocs., Ltd.*,
    896 S.W.2d 156 (Tex. 1995)....................................................................25

*Rainier DSC 1, L.L.C. v. Rainier Cap. Mgmt., L.P.*,
    828 F.3d 356 (5th Cir. 2016) ..............................................................14, 15

*Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*,
    336 S.W.3d 764 (Tex. App.—Houston [1st Dist.] 2011, no pet.) .............................20

*Remuda Ranch v. Archer Daniels Midland Co.*,
    No. 07-05-0234-CV, 2006 WL 2726234 (Tex. App.—Amarillo Sept. 22, 2006, no pet.)......21

*Rosenbrock v. Deutsche Lufthansa, A.G., Inc.*,
    No. 6:16-CV-0003, 2016 WL 2756589 (S.D. Tex. May 9, 2016).............................16

*Schakosky v. Client Servs., Inc.*,
    634 F. Supp. 2d 732 (E.D. Tex. 2007).......................................................19

*Shoemaker v. Whistler's Estate*,
    513 S.W.2d 10 (Tex. 1974)................................................................16, 18

*St. Joseph Hosp. v. Wolff*,
    94 S.W.3d 513 (Tex. 2002)....................................................................16

*Strebel v. Wimberly*,
    371 S.W.3d 267 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)....................................24

*Sullivan v. Leor Energy, LLC*,
    600 F.3d 542 (5th Cir. 2010) .................................................................................................12

*Sw. Bell Tele. Co. v. DeLanney*,
    809 S.W.2d 493 (Tex. 1991).................................................................................................11

*Tex. Dep't of Transp. v. Able*,
    35 S.W.3d 608 (Tex. 2000)............................................................................................17, 18

*Triplex Commc'ns, Inc. v. Riley*,
    900 S.W.2d 716 (Tex. 1995).................................................................................................18

*Tryad Serv. Corp. v. Mach. Tool Ctr., Inc.*,
    512 S.W.2d 785 (Tex. App.—Houston [14th Dist.] 1974, pet. denied) ...............................20

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ..................................................................................................7

*West v. City of Santa Fe, Texas*,
    No. 16-CV-0309, 2018 WL 4047115 (S.D. Tex. Aug. 16, 2018) .........................................16

*Williams v. Holiday Inns, Inc.*,
    No. 93-1790, 1994 WL 90396 (E.D. La. Mar. 16, 1994) ......................................................20

*Worldwide Asset Purchasing, L.L.C. v. Rent-A-Ctr. E., Inc.*,
    290 S.W.3d 554 (Tex. App.—Dallas 2009, no pet.).............................................................24

*YUM! Brands, Inc. v. Doe*,
    No. 01-19-00844-CV, 2021 WL 5113021 (Tex. App.—Houston [1st Dist.] Nov. 4, 2021) .21

*Yumilicious Franchise, L.L.C. v. Barrie*,
    No. 3:13-CV-4841-L, 2015 WL 1856729 (N.D. Tex. Apr. 23, 2015) ...................................11

*Zachry Const. Corp. v. Port of Houston Auth. of Harris Cty.*,
    449 S.W.3d 98 (Tex. 2014)...................................................................................................23

## INTRODUCTION

As all Texans have experienced, our State's power grid can struggle to keep up with electricity needs during times of peak electricity usage.  This leaves Texans vulnerable to power outages.  Alta sought to address this vulnerability through the use of "peaker power plants" to provide additional capacity to the electrical grid during times of peak demand.  GE and its partner WattStock also saw opportunity in the market for "peaker" plants.  WattStock is a small group of former GE employees officing inside of GE's secured energy facility.  GE duped Alta into agreeing to rely on the GE-WattStock "partnership" to find and acquire used GE aeroderivative gas turbine engines for Alta.  GE promised certain pricing and to ensure WattStock's performance in the event of a default.  Alta relied on GE's representations and paid GE and WattStock millions of dollars only to have GE and WattStock pocket its money without delivering anything of value.  As a result, Alta lost its ability to enter the power-peaking market at a critical time.

GE has already failed once when attempting to end this litigation at the pleading stage. Before this case was removed, the state district court heard and fully rejected GE's motion to dismiss making nearly identical arguments to those in its Motion for Judgment on the Pleadings before this Court.  Rather than accept the result in state court, the Motion is yet another in a long string of delay tactics GE has employed to keep this case from moving forward.  Just as the state court did, this Court should reject GE's Motion:

*Fraud and Negligent Misrepresentation*: GE disregards the detailed factual allegations set out in Alta's 158-paragraph Petition supporting each element of Alta's claims for fraud and negligent misrepresentation.  GE's additional arguments based on the "direct contradiction" and "economic loss" rules disregard precedent making those doctrines inapplicable.

*Unjust Enrichment*: Just as in the state court, GE's arguments ignore that unjust

1

enrichment is indisputably a remedy for fraud, which Alta adequately alleges against ***both*** GE and WattStock.  GE cannot obtain dismissal of the unjust enrichment claim by feigning ignorance of Alta's allegation that at least $1.5 million of its money landed in GE's coffers.

***Partnership by Estoppel and Joint Enterprise***: GE again relies on the irrelevant legal tests for partnership and joint venture, rather than for partnership by ***estoppel*** and joint ***enterprise***.  This Court should reject this sleight of hand, just as the state court did.

***Agency***: Alta's agency theory is supported by detailed factual allegations that GE fails even to mention, much less engage.  GE's previous motion to dismiss also disregarded these well-pleaded facts, a mistake GE repeats here.

***Consequential Damages***: The consequential damages waiver to which GE clings does not say what GE says it does.  As Alta explained during the last round of briefing, the parties did ***not*** agree to waive consequential damages incurred due to fraud or confidentiality breach (which Alta plausibly alleges).  Tellingly, GE does not bother to address this point.

GE offers no basis to dismiss any of Alta's claims, and its Motion should be denied.

## PROCEDURAL AND FACTUAL BACKGROUND

***Alta's allegations.***  This is a case about a bait-and-switch.  Alta, a start-up formed to develop so-called "peaker plants," turned to GE and a group of former GE executives to supply the used aeroderivative gas turbines Alta needed for those plants. Pet. ¶¶ 17–19, 25, 40.  GE is a leading manufacturer of aeroderivative gas turbines and one of the largest companies in the world. *Id.* ¶¶ 24, 44.  Historically, GE had no presence in the market for ***used*** aeroderivative gas turbines but recognized this as a white space opportunity sometime before 2018.  *Id.* ¶ 25.  GE had one problem: GE did not want to be involved in the work of actually acquiring and selling the used turbines.  *Id.* ¶ 3.  As a solution, some GE employees spun off to start WattStock.  *Id.*  ¶¶ 3, 25.

GE would engage WattStock, and WattStock would act as GE's *de facto* sales force and point of entry into the used gas turbine market. *Id.*

WattStock and GE's touted "partnership" created synergies for both companies. GE's status and renown in the turbine industry lent credibility to the unknown WattStock. *Id.* ¶ 44. Together, GE and WattStock said they worked "hand-in-hand" to devise the "exclusive" TRUEpackage™ turbine refurbishment program. *Id.* ¶¶ 26, 31. GE and WattStock further claimed that GE's TRUEpackage™ was unique because GE—the turbines' original manufacturer—was the only company that could provide an end-to-end warranty and performance guarantee at a fixed price. *Id.* ¶¶ 31, 34.

Intrigued by the TRUEpackage™ concept, Alta met with GE and WattStock several times at GE's Jacintoport facility, where GE and WattStock are co-located. *Id.* ¶ 32. During these meetings, GE repeatedly held itself out as WattStock's "partner" and emphasized that the only way to obtain GE's TRUEpackage™ warranty was through WattStock. *Id.* ¶ 35. Alta made clear that it would not agree to purchase anything from GE and WattStock unless they could satisfy Alta's detailed budgetary requirements. *Id.* ¶¶ 33, 41. After reviewing the information provided by Alta, GE emphatically represented that it and its partner, WattStock, could deliver the turbines at the right fixed price. *Id.* ¶ 33. Relying on these representations, Alta selected GE and WattStock rather than another provider. *Id.* ¶¶ 31, 40.

GE and WattStock "jointly determined" to structure the deal such that Alta would enter a Master Agreement directly with WattStock, with GE standing behind it. *Id.* ¶ 42; GE APP19 (*cited at* Pet. ¶ 78). GE led Alta to believe that GE's involvement would insulate Alta from risks related to the financial viability of WattStock. *Id.* ¶ 44. GE actively participated in contract negotiations between WattStock and Alta, and even agreed to "step in" and "assume responsibility" should

WattStock fail to meet its contractual obligations. *Id.* ¶¶ 40–49; GE APP19. Alta agreed to the arrangement and executed the Master Agreement in February 2019.[1] *Id.* ¶ 45.

With the Master Agreement in place, Alta began negotiating financing with Deutsche Bank. *Id.* ¶¶ 76–77. During due diligence, Deutsche Bank asked GE to confirm its relationship with WattStock. *Id.* ¶¶ 77–78. In response, GE confirmed what it had been telling Alta all along. *Id.* ¶ 78. GE wrote that "[s]hould WattStock fail to meet its contractual obligations to Alta [], GE would be in a position to assume responsibility to complete any outstanding work," that "GE is willing to warranty WattStock's work on this project," and that GE "already conduct[s] oversight of all aspects of WattStock's work." GE APP19. Reassured once again, Alta continued moving forward with WattStock and GE. *Id.* ¶¶ 78, 83.

Having locked Alta into the Master Agreement, GE and WattStock began to implement their bait-and-switch scheme. *Id.* ¶¶ 57, 146. GE's playbook was simple. Time and again, GE presented pricing and purchase options to Alta knowing full well that those were not the true turbine prices. *Id.* ¶¶ 53–54. Each turbine presented to Alta was burdened by material secret liabilities, all of which were driven by internal GE policies—the existence of which GE and WattStock conspired to conceal from Alta until after Alta had already spent significant money on the projects. *Id.* For example, many of the turbines' existing owners had "Long Term Service Agreements" with GE, carrying steep penalties for their early termination. *Id.* ¶¶ 54–55. Others contained non-GE components that GE would refuse to refurbish unless replaced, regardless of

---

[1]       The Master Agreement generally provides that WattStock will locate suitable gas turbines for Alta, arrange inspections to evaluate their condition and refurbishment requirements, and negotiate the purchase price with the existing owners (with GE standing behind it). Pet. ¶¶ 42, 49; GE APP73 (*cited at* Pet. ¶ 45). Despite its name, the Master Agreement is limited in scope, covering only the preliminary steps toward acquiring the turbines. *See id.* The Master Agreement contemplated that the parties would enter subsequent "definitive" agreements that would also describe the scope, terms, and price for the purchase of any given turbine. GE APP76. One such agreement was the parties' December 2019 Limited Notice to Proceed ("LNTP"). GE APP91 (*cited at* Pet. ¶ 91).

their condition. *Id.* ¶ 74. These hidden costs would all be passed on to Alta, resulting in significant increases over the prices GE quoted. *Id.* ¶ 56. Other turbines GE presented as candidates for its supposed "lease pool" option. *Id.* ¶¶ 66–72. Alta could cut costs, GE claimed, by purchasing a turbine "package"—essentially the housing for the turbine—then marrying the package to one of GE's "lease pool engines." *Id.* ¶¶ 65–67. But the supposed "lease pool" did not exist. *Id.* ¶ 71.

When the dust settled, WattStock and GE had deliberately identified for Alta ***only*** those turbines burdened with liabilities so that GE could recover profits under the Alta/WattStock contract ***and*** additional profits associated with the hidden liabilities. *Id.* ¶¶ 50–51, 56, 71, 146. GE and WattStock did not reveal these undisclosed liabilities until after (1) the turbines were targeted, (2) purchase agreements were executed between the owners and WattStock, and (3) Alta paid millions of dollars in down payments. *Id.* ¶¶ 55, 62, 71, 74. GE and WattStock concealed the existence of these undisclosed liabilities on every turbine suggested to Alta, in hopes that Alta would be forced to pay the extra fees at the 11th hour once project financing had been secured and the project was well underway. *Id.* ¶ 57.

Ultimately, Alta discovered that the turbine prices were false and WattStock's "partnership" with GE was a sham. In the spring of 2020, WattStock began experiencing financial issues and Alta requested that GE "step in" as promised to fulfill WattStock's contractual commitments to Alta. *Id.* ¶¶ 98–99. GE refused, even as WattStock's financial troubles mounted and it eventually became insolvent. *Id.* ¶¶ 100–102. GE walked away, having pocketed more than a million dollars of Alta's money. *Id.* ¶¶ 6, 125. With no equity capital left and no turbine supplier, Alta missed its opportunity to be a first mover in the Texas peaking electricity market. *Id.* ¶ 103.

WattStock sued Alta in Texas state court for breach of contract. *See generally* GE APP57–70. Alta answered and later filed a third-party petition against GE, asserting counterclaims

against GE and WattStock for breach of contract, unjust enrichment, conversion, theft, fraud, and negligent misrepresentation.  *See generally* GE APP28–53.

**GE's first motion to dismiss.**  In April of 2021, GE filed a Rule 91a motion to dismiss which the Dallas County district court denied in its entirety.

**GE obstructs discovery.**  Even prior to GE joining the case as a party, Alta served GE with a third-party document subpoena on November 4, 2020.  On November 17, 2020, GE agreed to produce documents but never did so.  After Alta filed its third-party petition against GE, it once again served (near identical) document requests on GE in May of 2021.  GE continued to refuse to produce ***any*** documents—over six months after the original requests.  As of February 2022, GE ***still*** had not produced even a single document despite repeated promises and a legal obligation to do so.  Although GE recently began producing documents on February 21, 2022, serious deficiencies remain, including GE's refusal to run even basic searches on its custodians.

**GE moves to dismiss—again.**  On August 17, 2021, WattStock filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas.  WattStock then removed this case to the United States District Court for the Northern District of Texas, which referred the matter to this Court pursuant to the standing order of reference.  Alta's subsequent motion to withdraw the reference is currently pending. While still refusing to meaningfully participate in discovery, and seeking another bite at the apple under the different federal pleading standard, GE filed its second motion to dismiss under Rule 12(c) on February 28, 2022.

## LEGAL STANDARD

Motions to dismiss are "viewed with disfavor and [are] rarely granted."  *IberiaBank Corp.*

*v. Illinois Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020).[2]  To defeat a motion to dismiss, the

plaintiff need only allege facts that "raise a right to relief above the speculative level."  *Blakely v.*

*Andrade*, 360 F. Supp. 3d 453, 471 (N.D. Tex. 2019).

## ARGUMENT

### I.    Alta pleads viable fraud and negligent misrepresentation claims against GE.

#### a.    Alta's fraud and negligent misrepresentation allegations satisfy Rule 9(b).

Without citation to ***any*** pleaded allegation, GE concludes that Alta "falls short" of meeting

Rule 9(b)'s pleading requirement to state its fraud and negligent misrepresentation claims with

sufficient particularity.  Mot. 17.  Rule 9(b) requires that plaintiffs allege "the particulars of time,

place, and contents of the false representations, as well as the identity of the person making the

misrepresentation and what he obtained thereby."  *Benchmark Elecs., Inc. v. J.M. Huber Corp.*,

343 F.3d 719, 724 (5th Cir. 2003).  "What constitutes 'particularity' will necessarily differ with

the facts of each case."  *Id*. (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)).

"Rule 9(b) does not reflect a subscription to fact pleading and requires only simple, concise, and

direct allegations of the circumstances constituting fraud."  *United States ex rel. Grubbs v.*

*Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009).  And in all events, "[m]alice, intent, knowledge,

and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

Although Alta filed suit in Texas state court where there is no equivalent to Rule 9(b), its

allegations satisfy that standard.  Extending well beyond GE's broad one-paragraph summary of

the allegations, Alta's 158-paragraph Petition sets forth multiple instances of the requisite "who,

what, when, where, and how" of the alleged fraud.  The Petition alleges: GE misrepresented its

"partnership" with WattStock, the benefits and security it afforded, and the true price of every

---

[2]      The standard for deciding a motion for judgment on the pleadings under Rule 12(c) is identical to a motion to dismiss under Rule 12(b)(6).  *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

turbine GE suggested for acquisition, Pet. ¶¶ 4, 26, 33, 44, 54, 57, 78; these representations were false or misleading, *id.* ¶¶ 5, 54, 57, 100; Alta relied on GE's misrepresentations by foregoing other opportunities and paying money to GE and WattStock, *id.* ¶¶ 31, 40, 55, 62, 92–94; Alta suffered injury as a result—incurring out-of-pocket expenses, wasting equity capital, and losing profits and financing (and ultimately its projects in their entirety), *id.* ¶¶ 6, 95, 103, 152.

Indeed, far from broadly alleging that "at some point . . . GE represented that it was 'partners' with WattStock," Mot. 17, the Petition identifies many instances in which GE fraudulently misrepresented the existence of a partnership and benefits therefrom.  Among other things, the Petition points to statements from GE's own website where it emphasized that, together with WattStock, it provides "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."  Pet. ¶ 26; *see also id.* n.2 (providing hyperlink to where GE's statements are found).  The Petition also points to GE's June 26, 2018 Memorandum of Understanding, *id.* ¶ 27, which outlines GE and WattStock's relationship, and cites GE's July 31, 2019 letter signed by its Global Sales Leader Lance Herrington representing that "GE is willing to warranty WattStock's work on this project," and that GE "already conduct[s] oversight of all aspects of WattStock's work."  *Id*. ¶ 78 (citing GE APP19).

GE also ignores that the Petition describes statements made by GE during meetings at GE's Jacintoport facility (where WattStock is co-located) both before and after WattStock and Alta entered into the Master Agreement.  Pet. ¶¶ 32, 35, 38, 44.  For instance, the Petition alleges that GE—and only GE—specifically represented that "the only way Alta [] could obtain the TRUEpackage™ equipment certification and warranty was by working with the GE and WattStock partnership," *id.* ¶ 35, and that "delivery could occur within the time frame required by [Alta's] plans if Alta [] used the GE/WattStock TRUEpackage ™ program," *id.* ¶ 37.

Finally, GE entirely ignores Alta's well-pleaded allegations that GE fraudulently represented that it could obtain the units Alta required for the prices Alta needed to make its projects economical. *Id.* ¶¶ 32–33. Representations on price were made in meetings at the Jacintoport facility before and after the February 2019 Master Agreement, and in "detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the 'not to exceed price,' then the fully refurbished unit could be delivered within [Alta's] budgetary requirements. " *Id.* ¶ 42. Alta explicitly alleges that the pricing misrepresentations were "driven by GE's data," including data from GE on "detailed refurbishment pricing models." *Id.* ¶ 51.

Alta sets forth the "who, what, when, and where" of the alleged fraud, and "explains why the various assertions are fraudulent or misleading." *Benchmark*, 343 F.3d at 724. Alta details how, contrary to its representations, GE "refused to step in and take over for WattStock" when Alta "notified GE that WattStock was insolvent" causing Alta to miss its opportunity "to be a first mover in the highly competitive Texas peaking electricity market." *Id.* ¶¶ 100–103. And how additional undisclosed costs "materially increased project costs above the previous budget and impacted [Alta's] ability to obtain financing for the project." *Id.* ¶¶ 88–95.

Alta's allegations satisfy its pleading burden. *See Benchmark*, 343 F.3d at 724 (vacating judgment and holding that allegations that identified false representations in various discussions occurring over four months sufficiently "put [the defendant] on notice as to the challenged assertions"). Further, though the law does not require any more detailed allegations than already pleaded, Alta is able to plead additional detail concerning meetings with GE and other GE representations that further support its claims. Dismissal with prejudice is thus in all events

inappropriate.[3]  *See, e.g.*, *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019) ("Even if a plaintiff's pleadings are deficient under Rule 12(b)(6), a district court should freely give leave to amend when justice so requires.").

### b.  The "direct contradiction" rule does not apply.

GE misapplies the "direct contradiction" rule relating to the element of justifiable reliance,[4] which does not bar recovery here.  Mot. 19.  GE alleges that Alta cannot have relied on assurances that GE and WattStock were partners because the "plain language of the Alta-WattStock contracts contradicts any claims of reliance."  *Id.*  But the "direct contradiction" rule ***only*** bars reliance on oral representations that are "directly contradicted by the ***express, unambiguous terms*** of a written agreement between the parties."  *JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 658 (Tex. 2018) (emphasis added).  GE fails to identify ***any*** term in the Master Agreement concerning GE's relationship with WattStock, much less a term that expressly and unambiguously dispels GE and WattStock's representations.  *Clements v. HLF Funding*, No. 05-19-01295-CV, 2021 WL 3196962, at *9 (Tex. App.—Dallas July 28, 2021, pet. denied) ("Clements contends there is a direct contradiction between the representations and the Agreement because the representations are not specifically mentioned in the Agreement. . . . Put simply, silence is not direct contradiction.").  The only evidence GE cites is the ***absence*** of a reference to

---

[3]      Although unnecessary, leave to replead would be doubly appropriate as to Alta's negligent misrepresentation claim.  In the event a negligent misrepresentation claim is held to be so intertwined with the fraud claim as to warrant dismissal under a Rule 9(b) pleading standard, courts are to provide leave to amend so that plaintiffs have the option of separating out those allegations.  *See Am. Realty Trust, Inc. v. Travelers Cas. and Sur. Co. of Am.*, 362 F. Supp. 2d 744, 752–53 (N.D. Tex. 2005) (dismissing under Rule 9(b) negligent misrepresentation claims intertwined with inadequately pleaded fraud claims without prejudice).

[4]      GE's suggestion that Alta cannot have justifiably relied on the representations due to supposed "red flags" is likewise misplaced.  Mot. 19.  At the pleading stage, the relevant inquiry is whether Alta has facially alleged plausible justifiable reliance—as detailed above, it has.  GE inappropriately asks the Court to "head[] straight to the trial stage, where the justifiability of the alleged reliance is to be tested based upon the evidence presented."  *See In re THEAG N. Arlington LLC*, No. 19-41108-ELM, 2020 WL 7330055, at *16 (Bankr. N.D. Tex. Dec. 11, 2020) (rejecting argument that a party could not have justifiably relied on the alleged misrepresentations given supposed red flags).

GE in the Master Agreement and extra-contractual documents such as the MOU. Neither suffices.[5]

And the Supreme Court of Texas has expressly rejected GE's argument that a general merger clause precludes reliance. Mot. 20. "Pure merger clauses, without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 334 (Tex. 2011).

### c.  The economic loss rule does not apply.

GE's invocation of the economic loss rule, Mot. 21, is also misplaced. The economic loss rule "precludes recovery in tort when the loss is the subject matter of a contract between the parties" and "[i]n deciding whether the economic loss rules applies . . . the Court must 'examine the source of the defendant's duty and the nature of the claimed injury." *Bowman v. CitiMortgage Inc.*, No. 3:14-CV-4036-B, 2015 WL 4867746, at *3 (N.D. Tex. Aug. 12, 2015) (citing *Sw. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 288 (Tex. App.—Dallas 2015, no pet.)).

This rule does not bar Alta's claims because GE's duty to engage honestly in negotiations with Alta is independent of the duties arising under the Master Agreement. *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("[I]t is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself."). Moreover, many of GE's misrepresentations **predate** the Master Agreement and therefore do not arise from any contractual obligations. *See Yumilicious Franchise, L.L.C. v. Barrie*, No. 3:13-CV-4841-L, 2015 WL

---

[5]       The state court rejected GE's attempt to rely on the "direct contradiction" doctrine after Alta explained that the Master Agreement nowhere contradicts GE's misrepresentations about pricing issues that were already known to GE at the time of the misrepresentations.  GE now pivots and proffers a new argument that is not even connected to text in the Master Agreement.

1856729, at *7 n.8 (N.D. Tex. Apr. 23, 2015) (the economic loss rule does not apply to fraud and negligent misrepresentation claims predating the parties' contract). That GE continued the fraud after entering into the contract is of no moment. *Formosa*, 960 S.W.2d at 46 (the Supreme Court of Texas has "repeatedly recognized that a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract").

## II. Alta plausibly pleads unjust enrichment.

There is also no basis to dismiss Alta's claim for unjust enrichment, which seeks return of the $1.5 million Alta paid for hardware and drawings it never received. Pet. ¶¶ 92, 125. As GE acknowledges, a claim for unjust enrichment must be sustained on a Rule 12 challenge when a plaintiff has plausibly alleged that the defendant "obtained a benefit . . . by fraud." Mot. 15 (quoting *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550 (5th Cir. 2010)). Though GE implies otherwise, the alleged fraud need not be the recipient's own fraud; unjust enrichment is an available remedy even where the recipient passively received the benefits of another's fraud. *Sullivan*, 600 F.3d at 550. Because the Petition alleges GE received the $1.5 million in connection with a fraud perpetrated against Alta, the Motion should be denied.

*First*, GE feigns ignorance about whether "GE, as opposed to WattStock, obtained the $1.5 million benefit." Mot. 16. But the Petition plainly alleges that GE and WattStock "represented to Alta [] that ***GE needed to be paid***" $1.5 million, and that Alta consequently provided that amount.[6] Pet. ¶¶ 92–93 (emphasis added).

*Second*, at minimum, Alta adequately pleads that GE benefited from WattStock's fraud, which is all that is required for Alta's claim to survive. *Douglass v. Beakley*, 900 F. Supp. 2d 736, 753 (N.D. Tex. 2012); *see also Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 922 (Tex.

---

[6]    In any event, if required to replead, Alta can provide documentary proof (obtained in discovery) that WattStock did indeed transfer that $1.5 million that Alta provided to GE, as it told Alta it would.

App.—Fort Worth 1994, pet. denied) (affirming unjust enrichment damages where husband received the benefits of wife's fraud, despite no evidence that husband participated in or even knew about wife's fraudulent scheme). GE's argument that "Alta has not plausibly alleged that GE engaged in any wrongful conduct," Mot. 16, is beside the point.

**Third,** Alta plausibly alleges that GE committed fraud, too. The Petition alleges that Alta "paid [the $1.5 million]" after "GE and WattStock represented to Alta [] that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings" for the Nuh Cemento project. Pet. ¶¶ 92–93. Only later did Alta learn of the hidden termination fees GE was aware of all along. *Id.* ¶ 57. Alta would not have paid a dime toward the Nuh Cemento units (or any of the other units) had GE disclosed the true prices. *Id.* ¶ 62. Thus, Alta can recover the undue gains GE obtained by fraud.

## III.    Alta pleads actionable contract and tort claims against GE.

GE tries to shield itself from liability by focusing on the wrong law and ignoring critical facts. Alta's allegations sound in estoppel and joint enterprise and do not assert that GE and WattStock were partners or engaged in a joint venture. GE tenders no valid basis to dismiss any of Alta's claims premised on theories of estoppel, joint enterprise, and agency.

### a.    Alta plausibly pleads partnership by estoppel.

GE repeats the same error that it made in state court on its first motion to dismiss. GE sweeps aside Alta's ***actual*** allegation that "GE is estopped from denying liability" because "GE and WattStock represented to Alta [] that they were 'partners,'" Pet. ¶¶ 106, 110, instead making the irrelevant argument that GE and WattStock were not partners under Texas law. The issue is not whether GE and WattStock satisfied the partnership elements of the Texas Business Organizations Code, but whether Alta has adequately alleged that GE should be estopped from denying that a partnership existed.

Alta plausibly pleads partnership by estoppel. *Rainier DSC 1, L.L.C. v. Rainier Cap. Mgmt., L.P.*, 828 F.3d 356, 361 (5th Cir. 2016). "Partnership by estoppel consists of two elements: (1) a representation that the one sought to be bound is a partner; and (2) the one to whom the representation is made must rely on the representation." *Id.* "The representation may be made directly by the alleged partner, or by others, provided the alleged partner knowingly allows others to make the representation and fails to correct them." *CCR, Inc. v. Chamberlain*, No. 13-97-312-CV, 2000 WL 35721225, at *10 (Tex. App.—Corpus Christi June 1, 2000, pet. denied).

Alta's Petition is replete with allegations that GE *itself* represented to Alta that WattStock was its "partner." *See, e.g.*, Pet. ¶¶ 26, 28, 35, 106. What is more, the facts as pleaded confirm that GE *also* allowed WattStock to perpetuate the same falsehood. *See, e.g., id.* ¶¶ 25, 77–78. And Alta alleges it relied on those representations. *See, e.g.*, ¶¶ 40, 44, 77–78, 92, 101, 107. Alta's allegations rise well above the pleading threshold. *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019) ("[A] plaintiff need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss.").

GE makes only passing reference to estoppel, citing a single case that is readily distinguishable. Mot. 6 (citing *Derrick Petroleum Servs. v. PLS, Inc.*, No. H–14–1520, 2014 WL 7447229, at *14 (S.D. Tex. Dec. 31, 2014)). In *Derrick*, the court held—*after a bench trial*—that estoppel did not apply when the plaintiff and the defendant took no "concrete actions" supporting an alleged intent to be legal partners. *Id.* Importantly, the court considered estoppel *as between the purported partners themselves*—not as to an innocent third party. *See id.* GE cites no authority that suggests the Court should use the five-factor test it espouses when considering whether allegations *by a third-party* of partnership by estoppel are sufficient. Application of those factors makes no sense in that context. A third-party has no means to know or assess the facts

14

underpinning those factors, nor would they necessarily bear on whether the test for estoppel is met.

GE's reliance on the language of its MOU with WattStock is also misplaced.  Mot. 7–9.
Each of the cases on which GE relies concerns whether two parties were partners *as between*
*themselves*, and do not involve a third party alleging estoppel.  The distinction is significant:
purported partners are best positioned to ascertain the context and reasonableness of their own
statements.  Third parties are not similarly situated.

More importantly, GE's argument fails to view the well-pleaded facts through Alta's eyes
as the deal progressed.  Alta knew that WattStock had spun off from GE when a group of former
GE executives created it, Pet. ¶¶ 3, 25; that WattStock and GE were "co-located" at the same
facility, *id.* ¶ 32; that WattStock and GE marketed themselves as "partners" with an exclusive
service offering, *id.* ¶¶ 25, 31; and that WattStock and GE were *both* heavily involved in all the
contract negotiations, *id.* ¶¶ 32–42.  From Alta's vantage point, the context in which GE and
WattStock used the term "partner" was legally significant.

Moreover, GE cannot defeat Alta's allegation of partnership by estoppel by pointing to the
contents of a document—the MOU—that Alta did not see until discovery began in this litigation.
*See Al-Saud v. Youtoo Media, L.P.*, 754 F. App'x 246, 253 (5th Cir. 2018) ("[P]artnership by
estoppel demonstrates the point that official documents do not always control.").  It is what GE
and WattStock represented to Alta—not what they hid from it—that is relevant to the elements of
the claim: (1) whether they represented to Alta that they were partners, and (2) whether Alta relied
on that representation.  *Rainier*, 828 F.3d at 361.

### b.  Alta plausibly pleads a joint enterprise between GE and WattStock.

In arguing that Alta does not adequately allege a "joint venture," Mot. 1, 6–9, 11–12, GE
again takes aim at a target that does not exist.  Alta does not plead any claim contending any joint

*venture* between GE and WattStock; Alta alleges a joint *enterprise*, Pet. ¶ 110, which GE ignores.

Joint enterprise liability is a wholly distinct concept from joint venture under Texas law.

*Shoemaker v. Whistler's Estate*, 513 S.W.2d 10, 16 (Tex. 1974) (explaining that "joint enterprise"

and "joint venture" are distinct doctrines); *Rosenbrock v. Deutsche Lufthansa, A.G., Inc.*, No. 6:16-

CV-0003, 2016 WL 2756589, at *6 n.5 (S.D. Tex. May 9, 2016) ("[A] joint enterprise is not the

same as a joint venture and is not governed by the rules applicable to joint ventures.") (citation

omitted).  GE's failure to address the joint enterprise theory that Alta alleges means GE has

presented no valid grounds for dismissing this theory.[7]

Though GE has not contested the sufficiency of Alta's joint *enterprise* allegations, those

allegations are more than sufficient.  The Supreme Court of Texas has set forth the following

elements of joint enterprise liability, each of which the Petition's allegations support: "(1) an

agreement, express or implied, among the members of [a] group; (2) a common purpose to be

carried out by the group; (3) a community of pecuniary interest in that purpose, among the

members[,] and (4) an equal right to a voice in the direction of the enterprise, which gives an equal

right of control."  *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).  Where parties are

engaged in a joint enterprise, the acts of one may be imputed to the other.  *Chevez v. Brinkerhoff*,

No. 05-13-00572-CV, 2014 WL 7246798, at *8 (Tex. App.—Dallas Dec. 22, 2014, no pet.).

*Agreement and Common Purpose.*  Exhibit 1-E to GE's own Motion (which Alta

references in its Petition) forecloses any argument by GE that Alta does not meet the first two

elements.  On its face, GE's July 31, 2019 letter to Alta concedes an express agreement between

GE and WattStock and also describes the common purpose of their relationship:

WattStock   and   GE   will   ***work   together***   to   refurbish   previously   owned

---

[7]      *Cf. West v. City of Santa Fe, Texas*, No. 16-CV-0309, 2018 WL 4047115, at *10 (S.D. Tex. Aug. 16, 2018)
(refusing to dismiss claim where defendant "did not raise [a certain] argument in its Motion to Dismiss, and the Court
[wa]s reluctant to invite the Fifth Circuit to reverse a *sua sponte* dismissal").

aero-derivative power units, including the LM6000 series units. In general, GE is committed to overhauling engines and supplying engineering analysis and diagrams to ensure the entire unit is refurbished to GE-specifications, and WattStock is committed to acquiring used units and refurbishing the balance-of-plant. . . . WattStock and GE **have agreed** that either party might act in the role of prime contractor, depending on a variety of factors. With regard to the Alta Power project, we **jointly determined** that WattStock would take the lead, and GE will perform its engineering and engine overhaul work as a subcontractor to WattStock.

GE APP19 (emphasis added).

In addition to this smoking gun, the Petition is replete with allegations from which an agreement and shared purpose between GE and WattStock can be plausibly inferred. *See, e.g.*, Pet. ¶¶ 25–26 (WattStock and GE jointly marketed themselves as, in essence, a one-stop-shop); *id.* ¶ 3 (GE held out WattStock as its sales force); *id.* ¶ 32 (GE and WattStock were "co-located" at GE's Jacintoport facility); *id.* ¶¶ 38, 51 (GE and WattStock shared the "proprietary database" used to identify units and create refurbishment models); *id.* ¶ 27 (GE and WattStock entered into a Memorandum of Understanding); *id.* ¶¶ 31, 34 (GE and WattStock mutually devised the TRUEpackage™ program). These sorts of facts are enough even to survive the more onerous summary judgment standard. *See Harrison v. Aztec Well Servicing Co.*, No. 1:20-CV-038-H, 2021 WL 6073164, at *22 (N.D. Tex. Dec. 23, 2021) (fact issue existed in part because, despite "different bank accounts and incorporation documents," defendants "voluntarily elected to hold themselves out to the world as a family through marketing materials" and "share[d] an office").

***Community of Pecuniary Interest.*** In determining whether a community of pecuniary interest exists, the Supreme Court of Texas has focused on facts suggesting the pooling of efforts and monetary resources between entities to achieve certain goals, namely reducing costs and achieving economic gain by approaching the project as a joint undertaking. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 614 (Tex. 2000). "[T]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are

17

peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (citations omitted); *see also Energy Intel. Grp., Inc. v. Bank of Am., N.A.*, No. 4:17-CV-3767, 2018 WL 3303166, at *7 (S.D. Tex. July 5, 2018) (denying motion to dismiss where certain information was "inaccessible to [plaintiff] until discovery commences").   Here, Alta adequately pleads a joint enterprise given that the factual details of GE's and WattStock's financial relationship are within their exclusive possession.   Alta alleges that GE was "eager to participate in the used gas turbine market" and engaged WattStock to "act as its sales force" because it "did not want to be involved in the work of actually acquiring and selling the used turbines." Pet. ¶ 3.  GE, by its own admission, had "strong incentive" for the project to succeed. *Id.* ¶ 78 (quoting GE's July 31, 2019 letter).

*Equal Right of Control.*   As for the final element, each participant "must have an authoritative voice or ... must have some voice and right to be heard." *Shoemaker*, 513 S.W.2d at 15.  This factor requires an authoritative voice, some right to do more than make suggestions that can be adopted or rejected. *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). The control inquiry is necessarily fact intensive. *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 674 (S.D. Tex. 2010).  That one participant exercises day-to-day control over operations does not negate the equal right of control element so long as both participants possess a "mutual right to control the direction and management of the enterprise." *Able*, 35 S.W.3d at 616.

Alta plausibly pleads that both GE and WattStock possessed a meaningful voice in the conduct of their business affairs.  GE and WattStock held themselves out as "partners" who worked "hand-in-hand" to provide the TRUEpackage™ program they created together. *See* Pet. ¶¶ 26, 31. They jointly met and negotiated contractual terms with Alta as though they were equal cohorts.

*See id.* ¶¶ 32–42.  Together they developed and presented to Alta detailed (albeit misleading) cost estimates for the refurbishment of turbines and communicated with Alta using one voice.  *See id.* ¶¶ 42, 44, 50–51, 92.  Because these well-pleaded facts support a plausible inference of WattStock's right to be heard, GE's Motion should be denied.

### c.  Alta plausibly pleads an agency theory of liability.

GE also fails to address Alta's allegations of an agency relationship between GE and WattStock.  "Agency relationships do not require the principal to expressly appoint the agent," as "the parties' conduct under certain circumstances may imply an agency relationship."  *Schakosky v. Client Servs., Inc.*, 634 F. Supp. 2d 732, 735 (E.D. Tex. 2007).  As GE concedes, the key inquiry is control, meaning there "must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."  Mot. 12–13 (quoting *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F. Supp. 2d 811, 837 (S.D. Tex. 2008)).  Agency is usually a fact question, and the plaintiff at the pleading stage need only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts."  *Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519568, at *6 (E.D. Tex. Apr. 30, 2019).

GE myopically focuses on the MOU as the only source supporting Alta's actual agency theory and ignores numerous allegations in the Petition unrelated to the MOU, including its own damning admissions in the documents underlying those allegations.  For example, in a July 31, 2019 letter to Alta, GE admitted that it "***track[s] project progress daily***" and "***conduct[s] oversight of all aspects of WattStock's work***."  GE APP19 (emphasis added).  The Petition alleges that GE treated WattStock as its "*de facto* sales force," an allegation plausibly suggesting that GE controlled WattStock in the way an employer controls an employee.  Pet. ¶ 26.  The Petition also alleges—consistent with the language in the MOU, and contrary to GE's assertions—that "GE had the right under its MOU with WattStock to force WattStock to sell GE any gas turbine purchased

pursuant to the TRUEpackage™ program." *Id.* ¶ 139.  The MOU expressly provides that "For any [] Package purchased by WS from a third-party owner, GE, ***at its sole option***, may purchase the associated gas turbine(s) from WS."  GE APP22 (*cited at* Pet. ¶ 27) (emphasis added).

Alta's description of GE's extensive oversight over WattStock (its *de facto* sales agent), and its description of GE's right to push WattStock aside and take over turbines acquired in the course of the Alta project are sufficient to plausibly plead an agency relationship.  *See E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 429 (N.D. Tex. 2021) (denying motion to dismiss where plaintiff generally alleged that defendant "exercise[d] an ongoing and systemic right of control," including by "conducting regular inspection of the facility and operation").

Alta's allegations of ostensible agency also far exceed the requirements of Rule 8(b).  Liability may be imposed under the doctrine of ostensible agency "in circumstances when the principal's conduct should equitably prevent it from denying the existence of an agency."  *Chesapeake Operating, Inc. v. Whitehead*, No. C-10-301, 2011 WL 335084, at *5 (S.D. Tex. Jan. 31, 2011).  "Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise."  *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 784, 790 (Tex. App.—Houston [1st Dist.] 2011, no pet.).  Whether a plaintiff's belief was reasonable is usually a question of fact.  *Williams v. Holiday Inns, Inc.*, No. 93-1790, 1994 WL 90396, at *4 (E.D. La. Mar. 16, 1994) (applying Texas law).

Texas courts have applied the doctrine of ostensible agency when, as here, an ostensible agent acted as a broker or middleman through which a transaction between the principal and the plaintiff was consummated.  *See Tryad Serv. Corp. v. Mach. Tool Ctr., Inc.*, 512 S.W.2d 785, 789

20

(Tex. App.—Houston [14th Dist.] 1974, pet. denied) (contract to sell machinery could be enforced against defendant who did not sign it where evidence supported that apparent agent executed contract on defendant's behalf); *Remuda Ranch v. Archer Daniels Midland Co.*, No. 07-05-0234-CV, 2006 WL 2726234, at *3 (Tex. App.—Amarillo Sept. 22, 2006, no pet.) (contract between ostensible agent and plaintiff could satisfy the statute of frauds as to defendant principal).

GE summarily dismisses Alta's well-pleaded facts alleging that GE not only was aware of and approved the deal structure with Alta, but it actively participated in the negotiation, execution, and performance of the deal. *See, e.g.*, Pet. ¶¶ 4, 26, 28, 32, 35, 42, 44, 51, 56, 78, 92. These allegations are far afield of the facts in *Doe v. YUM! Brands, Inc.*, which GE contends renders Alta's belief unreasonable as a matter of law. Mot. 15. There, the court merely held—on summary judgment—that a franchisee's use of Pizza Hut's trademark in national advertising could not confer apparent authority. *YUM! Brands, Inc.*, No. 01-19-00844-CV, 2021 WL 5113021, at *14 (Tex. App.—Houston [1st Dist.] Nov. 4, 2021). Here, by contrast, Alta's belief was not only reasonable, it was ***reinforced*** by GE when GE, after being directly questioned about its relationship with WattStock, wrote (among other things) that it would "warranty," "oversee," and "assume responsibility" for WattStock's work. GE APP19. GE's arguments are without merit.

**IV.    Alta plausibly pleads entitlement to consequential damages.**

**a.    Alta pleads that GE proximately caused its damages.**

To plead consequential damages, a plaintiff must allege facts plausibly inferring that the defendant's actions proximately caused the plaintiff's harm. *Marquis v. OmniGuide, Inc.*, No. 3:09-CV-2092-D, 2011 WL 321112, at *9 (N.D. Tex. Jan. 28, 2011). The nexus between Alta's allegations of its injuries and GE's actions is clear. GE (1) defrauded Alta into believing that it would stand behind WattStock, Pet. ¶ 137; (2) tied Alta up into a Master Agreement that expressly precluded Alta from pursuing the gas turbines from other sources—so that Alta would be boxed

out of the market and barred from seeking another turbine supplier, GE APP77; (3) steered Alta, under false pretenses, exclusively toward uneconomical turbines in order to maximize its own profits, Pet. ¶¶ 50–51, 56, 71; (4) terminated the parties' relationship in the middle of Alta's negotiations with funding sources, *id.* ¶¶ 100–103; and (5) all but totally depleted Alta's equity capital by swindling Alta out of millions for undelivered equipment and phantom services, *id.* ¶¶ 6, 42, 54, 102. The natural and probable consequence of GE's conduct was that Alta's business ground to a halt, causing Alta to miss its opportunity to be the first mover in the Texas peaking electricity market. *Id.* ¶ 103. Plainly, Alta's claims for lost profits and lost financing are rationally connected to these well-pleaded facts. *Array Techs., Inc. v. Mitchell*, 305 F. Supp. 3d 1256, 1271 (D.N.M. 2018) (*Twombly* does not require the plaintiff to "specifically plead each and every element of damages," so long as the alleged facts "support a reasonable inference of loss"). GE's arguments concerning the consequential damages allegations lack legal support. Mot. 23–24.[8]

### b. No contractual damages waiver limits Alta's consequential damages.

The consequential damages waiver in Section 9.1(b) of the Master Agreement also does not save GE. ***First*,** the Master Agreement's damages waiver does not encompass fraud. GE's cursory analysis of Section 9.1(b) ignores the plain language of that provision, in which the parties did ***not*** agree to waive consequential damages incurred because of fraud. Section 9.1(b) states:

> THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES, **<u>SHALL INCLUDE, BUT IS NOT LIMITED TO,</u>** LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE

---

[8]    In *Higher Perpetual Energy*, for example, the court merely held that the plaintiff's alleged damages were precluded by the economic loss rule. *Higher Perpetual Energy, LLC v. Higher Power Energy, LLC*, No. 17-cv-0414, 2018 WL 3031780, at *7 (E.D. Tex. June 18, 2018). The case had nothing to do with adequately pleading proximate causation for purposes of stating a claim to consequential damages. Similarly, in *Blue Gordon*, the court held (on summary judgment) that the defendant's supposed wrongful termination of a lease for non-payment (the injury) was entirely unrelated to misrepresentations concerning the defendant's legal ability to execute the lease. *Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*, 444 F. App'x 1, 9–10 (5th Cir. 2011). Because the lease termination was caused by the plaintiff's own failure to cure payment defaults—not the defendant's lack of authority to execute the lease—there was no causal link between the misrepresentations and the injury. *Id.* Here, the causal link is manifest.

OF ACTION **INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE**.

GE APP80 (emphasis altered).  Texas courts have long recognized the maxim *expressio unius est exclusio alterius*—"the expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed." *First Nat'l Bank of Luling v. Nugent*, 384 S.W.2d 224, 226 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.).  Here, Section 9.1(b)'s enumeration of specific types of causes of action that the waiver applies to implies the exclusion of other causes of action that do not conform to those types.[9]  Section 9.1(b)'s enumerated causes of action are all business claims not similar in kind or class to intentional torts like fraud.  Nothing in Section 9.1(b) expresses the parties' intent to immunize any type of claim for willful misconduct.[10]

This construction is buttressed by Section 9.1(b)'s disparate use of the phrases "including" and "includ[ing], but not limited to."  Section 9.1(b) contains two "lists" that serve to clarify its intended scope: (1) a list of different categories of consequential damages, and (2) a list of different causes of action.  Section 9.1(b) employs the phrase "includ[ing], ***but not limited to***" earlier in the provision to tee-up the (unlimited) categories of consequential damages that the provision waives.  But when Section 9.1(b) enumerates the types of causes of action to which the waiver applies, it uses the more limited phrase "including."  The words "including" and "includ[ing], but not limited to" must convey different meanings—otherwise "but not limited to" is mere surplusage.  The

---

[9]        *See CKB & Assocs., Inc. v. Moore McCormack* Petroleum, Inc., 734 S.W.2d 653, 655–56 (Tex. 1987); *Encore Int'l Inv. Funds, LLC v. 2608 Inwood, Ltd.*, No. 05-19-00070-CV, 2020 WL 1685420, at *4 (Tex. App.—Dallas Apr. 7, 2020, no pet.); *Oxy USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 285 (Tex. App.—Corpus Christi 2005, pet. denied).

[10]        *See Zachry Const. Corp. v. Port of Houston Auth. of Harris Cty.*, 449 S.W.3d 98, 115 (Tex. 2014) ("As a matter of textual interpretation, it is doubtful whether the rule of *ejusdem generis* [a cousin to *expressio unius*] would allow 'other fault', following 'negligence' and 'breach of contract', to include the kind of deliberate, wrongful conduct the [defendant] was found by the jury to have engaged in."); *cf. Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003).

parties chose to use distinct phrases, and that choice should be given effect.[11]

Lastly, Section 9.1(b)'s sister provision—Section 9.1(a)—confirms that the parties did not intend for Section 9.1(b)'s consequential damages waiver to encompass claims sounding in fraud. Section 9.1(a)—a separate damages limitation—limits each parties' liability for claims arising directly "under" the Master Agreement to $100,000:

> IT IS INTENDED THAT THIS LIMITATION [OF $100,000] SHALL APPLY TO **ANY AND ALL** LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT **HOWEVER ALLEGED OR ARISING**[.]

GE APP80 (emphasis altered).  First, that Section 9.1(a)'s $100,000 limitation applies to "any and all" causes of action "however alleged" under the Master Agreement, reaffirms that the parties knew how to draft unlimited clauses.  Section 9.1(b) did not take a similar linguistic approach.

Moreover, when both provisions are construed together,[12] it makes sense why each has a different scope.  Section 9.1(a) is narrower in the sense that it applies only to claims brought directly "under" the Master Agreement, but broader in the sense that it limits damages arising from "any and all" causes of action "however alleged" under the Master Agreement.  By contrast, Section 9.1(b) is broader in scope in that it covers claims for consequential damages "arising out of or connected" to the Master Agreement.  But Section 9.1(b) is also narrower in the sense that "any and all" causes of action are not covered—claims like fraud are excluded.  The parties' own intentional calibration of the damages waivers should not be disturbed.

***Second,*** the damages waiver exempts Article 7 (Confidentiality).  Section 9.1(b)'s

---

[11]     *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 185 (Tex. App.—Fort Worth 2012, no pet.) (Texas courts presume that different language conveys different meanings); *Strebel v. Wimberly*, 371 S.W.3d 267, 277 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (Texas courts strive to give each word effect so as not to render any mere surplusage); *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Ctr. E., Inc.*, 290 S.W.3d 554, 560 (Tex. App.—Dallas 2009, no pet.) (same).

[12]     *Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019) (courts "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract").

consequential damages waiver also expressly does not include claims for breach of the contract's confidentiality provisions.  GE APP80.  Alta alleges that WattStock "breached the confidentiality provisions of the Master Agreement by disclosing confidential information about Alta and its financing to Castleman," Pet. ¶ 116, that GE is responsible for that breach, *id.* ¶¶ 109–12, which caused Alta "to lose project financing," which "severely damaged" Alta, *id.* ¶¶ 116, 118. Accordingly, GE's reliance on Section 9.1(b) ignores an explicit exception to the consequential damages waiver and supplies an additional reason for its Motion to be denied.

*Third,* fraud vitiates the damages waiver.  Not only does the Master Agreement make clear the parties did not agree to waive consequential damages for fraud, had the parties done so under Texas law it would have no effect.  If Alta's allegations of fraud are proven, that would invalidate the waiver. *See Prudential Ins. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995) ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller.").  In *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings LLC*, the Court enforced a contractual *punitive* damages waiver despite the defendant's fraud.  572 S.W.3d 213, 232 (Tex. 2019).  In doing so, the Court distinguished the punitive damages waiver and the "as is" clauses that it had previously explained were vitiated by fraud.  *Id.* at 232–33.  Because *Bombardier*'s punitive damages waiver did not "limit actual damages," the plaintiff's proffered comparisons to the "as is" clauses discussed in *Prudential* were inapt.  *Id.*  By contrast, a consequential damages waiver here *would* limit Alta's actual damages.

## CONCLUSION

For these reasons, Alta respectfully requests that the Court deny GE's Motion in its entirety.  If the Court grants the Motion in any respect, Alta requests leave to amend.

25

Dated: March 17, 2022
Dallas, Texas

Respectfully submitted,

By: */s/ John B. Lawrence*

**BAKER BOTTS L.L.P.**
Jessica B. Pulliam, TX SBN 24037309
*jessica.pulliam@bakerbotts.com*
John B. Lawrence, TX SBN 24055825
*john.lawrence@bakerbotts.com*
Kevin Chiu, TX SBN 24109723
*kevin.chiu@bakerbotts.com*
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone:    214.953.6500
Facsimile:    214.953.6503

–and–

David R. Eastlake, TX SBN 24074165
*david.eastlake@bakerbotts.com*
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:    713.229.1234
Facsimile:    713.229.1522

**JORDAN, LYNCH & CANCIENNE PLLC**
Michael Cancienne
State Bar No. 24055256
Kevin Jordan
State Bar No. 11014800
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4028
713.955.9644 Facsimile
*mcancienne@jlcfirm.com*
*kjordan@jlcfirm.com*
*jgolinkin@jlcfirm.com*

***Co-Counsel for Alta Power LLC***

26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 17, 2022, I caused a copy of the foregoing to be served on the Debtor and all parties eligible to receive service through the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas by electronic mail.

By: */s/ John B. Lawrence*