```
 1                IN THE UNITED STATES BANKRUPTCY COURT

 2               FOR THE NORTHERN DISTRICT OF TEXAS

 3                         DALLAS DIVISION

 4   WATTSTOCK, LLC              §     CASE NO. 21-31488-sgj11
                                 §     DALLAS, TEXAS
 5                               §
         DEBTOR.                 §
 6

 7   WATTSTOCK LLC.,             §     CASE NO.  21-03083
                                 §     DALLAS, TEXAS
 8       PLAINTIFF,              §     WEDNESDAY, MAY 18, 2022
                                 §     9:30 A.M.
 9   vs.                         §
                                 §
10   ALTA POWER,                 §
                                 §
11       DEFENDANT.              §

12

13                         ORAL ARGUMENTS

14          BEFORE THE HONORABLE STACEY G. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE
15

16

17   APPEARANCES:

18   FOR THE DEBTOR:                THOMAS DANIEL BERGHMAN, ESQ.
                                    MUNSCH HARDT KOPF & HARR, P.C.
19                                  500 N. Akard Street
                                    Suite 3800
20                                  Dallas, TX  75201
                                    (214) 855-7554
21
     FOR ALTA POWER LLC:            JESSICA PULLIAM, ESQ.
22                                  JOHN B. LAWRENCE, ESQ.
                                    KRISTIE WALLACE
23                                  BAKER BOTTS LLP
                                    2001 Ross Avenue
24                                  Suite 900
                                    Dallas, TX  75001
25                                  (214) 953-6873
```

```
 1   APPEARANCES, CONTD:

 2
     FOR GENERAL ELECTRIC          ANDREW LEGRAND, ESQ.
 3   INTERNATIONAL, INC.          POOJA PATEL, ESQ.
                                  GIBSON DUNN & CRUTCHER LLP
 4                                2001 ROSS AVENUE
                                  STE 2100
 5                                DALLAS, TX 75201

 6

 7   COURT RECORDER:              Clerk's Office
                                  U.S. BANKRUPTCY COURT
 8                                501 W. 10TH STREET
                                  FORT WORTH, TX  76102
 9

10   TRANSCRIPTION SERVICE:       ACORN TRANSCRIPTS, LLC
                                  Nancy B. Gardelli
11                                3572 Acorn Street
                                  North Port, FL  34286
12                                (800)750-5747

13

14

15

16

17

18

19

20

21
           Proceedings recorded by electronic sound recording;
22             transcript produced by transcription service.

23

24

25
```

1                        C A L E N D A R

2

3   Rule 12 (c) Motion for Judgment on the
    Pleadings filed by 3rd Party Defendant
4   General Electric International Inc.

5   Motion to dismiss adversary proceedings
    Filed by 3rd Party Defendant General
6   Electric International, Inc. (30)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>I N D E X</u>

2

3

4  GENERAL ELECTRIC INTERNATIONAL, INC.

5    ARGUMENT BY ANDREW LEGRAND, ESQ. . . . . . . . . . .   7

6

7  ALTA POWER LLC

8    ARGUMENT BY JESSICA PULLIAM. . . . . . . . . . . . .   42

9

10  GENERAL ELECTRIC INTERNATIONAL, INC.

11    REBUTTAL BY ANDREW LEGRAND, ESQ. . . . . . . . . . .   75

12

13  ALTA POWER LLC

14    REBUTTAL BY JESSICA PULLIAM . . . . . . . . . . . .   80

15

16

17  COURT'S RULING:

18    MOTION TO DISMISS – DENIED. . . . . . . . . . . . .   86

19

20

21

22

23

24

25

1   DALLAS, TEXAS, WEDNESDAY, MAY 18, 2022; 9:30 A.M.

2           THE COURT:  All right.  We're here this morning for

3   oral arguments in *Wattstock v. Alta Power, et al.*, Adversary

4   21-3083.  We have oral arguments on a motion to dismiss filed

5   by third party Defendant, General Electric.

6           We'll get lawyer appearances at this time.  First,

7   for General Electric.

8           MR. LEGRAND:  Your Honor, this is Andrew LeGrand of

9   Gibson Dunn & Crutcher, on behalf of General Electric, along

10  with my colleague, Pooja Patel, of Gibson Dunn & Crutcher.

11          THE COURT:  Okay.  Good morning.  All right.

12          Now for Alta, who do we have appearing?

13          MS. PULLIAM:  Good morning, Judge.  My name is

14  Jessica Pulliam from Baker Botts, and I'm here with my

15  colleagues, John Lawrence, and my brain trust, Kristie

16  Wallace.

17          THE COURT:  That's quite a compliment.

18          MS. PULLIAM:  I may need her.

19          THE COURT:  Okay.  All right.

20          Do we have any appearances for the Plaintiff

21  Debtor, Wattstock?

22          MR. BERGHMAN:  Good morning, Your Honor.  Thomas

23  Berghman with Munsch Hardt, Debtor's counsel.  Just

24  observing.

25          THE COURT:  Okay.  Thank you.

1           MR. BERGHMAN:  Good morning.

2           THE COURT:  All right.  Well, we have two hours on

3   our calendar estimated for this.  Let me just double check

4   that for planning purposes.  Is that, you think, what you

5   each need, an hour each?  Or was that just sort of a plug

6   number?

7           MR. LEGRAND:  Your Honor, I believe we'll be done a

8   little bit early.  I don't suspect we'll need a full hour.

9           THE COURT:  Okay.

10          MR. LEGRAND:  I'm not sure if Alta's counsel feels

11  the same way, but --

12          MS. PULLIAM:  I hope so.

13          THE COURT:  Okay.

14          MS. PULLIAM:  I've learned not to make guarantees

15  in --

16          THE COURT:  Okay.

17          MS. PULLIAM:  -- these matters, but --

18          THE COURT:  Okay.

19          MS. PULLIAM:  -- we'll strive to give you back some

20  time.

21          THE COURT:  Okay.  Good deal.

22          MS. PULLIAM:  There's a lot of issues, so we'll do

23  our best.

24          THE COURT:  All right.  Well, and I do have a 12:00

25  noon conference call.  So I'll just ask the law clerk, Bob,

1  let us know if someone has approached an hour, and then I'll

2  probably say wrap it up here pretty quick.  Okay?

3          MR. LEGRAND:  Absolutely.

4          THE COURT:  Not hard and fast, but goals, let's

5  say.

6          All right.  Well, are there any housekeeping

7  matters before I hear your arguments?

8          MR. LEGRAND:  Yes, Your Honor.  We have a

9  presentation, a deck.  We have hard copies, as well as an

10 electronic copy.  I'm not sure what Your Honor's preference

11 is, but we certainly can provide both or either.

12         THE COURT:  All right.

13         MR. LEGRAND:  What's convenient.

14         THE COURT:  Well, I'd love a hard copy, and then

15 we'll -- I presume you're going to bring it up on the screen.

16         MR. LEGRAND:  Yes, Your Honor.  May I approach?

17         THE COURT:  Uh-huh.  You may.  You can hand it to

18 me.  Thank you.

19         All right.  Well, if there are no other

20 housekeeping matters, I'll hear GE's argument.

21         MR. LEGRAND:  Thank you, Your Honor.

22         THE COURT:  I'm going to call your client "GE" for

23 shorthand, if that's okay.  I know there are a lot of GE

24 entities.

25         MR. LEGRAND:  That's perfect, Your Honor.

1          THE COURT:  Okay.

2          MR. LEGRAND:  May it please the Court?

3          THE COURT:  Mm-hmm.

4          MR. LEGRAND:  The third-party petition acknowledges

5   that Alta did not have a contract with GE, that GE insisted

6   that Alta contract directly with Wattstock, and that the

7   memorandum of understanding expressly disclaims any

8   partnership or agency relationship between Wattstock and GE.

9   Those allegations are fatal.

10          As a matter of law, Alta cannot hold GE vicariously

11   liable for Wattstock's conduct, or even directly liable on

12   the fraud-based claims it advances.  Alta's vicarious

13   liability claims invoke the partnership by estoppel doctrine,

14   joint enterprise liability, and principles of agency and

15   ostensible agency.

16          Alta's claims fail as a matter of law, as we

17   explain in our briefing, because it did not extend credit to

18   a partnership.  It cannot allege a community of pecuniary

19   interest.  And it pleaded itself out of Court by

20   incorporating the MOU, the "Memorandum of Understanding," by

21   reference into its complaint.

22          Any reasonable diligence would have revealed what

23   the MOU memorializes.  There was no partnership or agency

24   relationship between GE and Wattstock.  Alta's fraud-based

25   claims fail as a matter of law for a similar reason.  Alta

1   cannot allege that it justifiably relied on or exercised

2   reasonable diligence to investigate any of the vague

3   statements it alleges GE/Wattstock made about being partners.

4   Alta's claims against GE should be dismissed.

5          Your Honor, we've organized our argument today kind

6   of along these lines, starting first with reviewing Alta's

7   allegations and claims against GE.  Then I'll address the

8   vicarious liability claims, and then the direct claims.  And,

9   Your Honor, taking my obligation to mentor and provide

10  opportunities to train younger lawyers, if Your Honor gives

11  me permissions, we'd like Ms. Patel to argue the last point

12  related to consequential damages.

13          THE COURT:  Okay.  That's fine.

14          MR. LEGRAND:  Starting with Alta's allegations and

15  claims against GE, the dispute really is about three

16  contracts.  Two between Alta and Wattstock, and one between

17  Wattstock and GE.  Alta and Wattstock entered into a Master

18  Agreement on February 27th, 2019.  They later entered into a

19  Limited Notice to Proceed Proposal on December 23rd, 2019.

20          In Footnote 1 of their opposition to our motion for

21  judgment on the pleadings, Alta calls the LNTP a "definitive

22  agreement related to the scope, terms, and price of Alta's

23  purchase of the turbine units."  So the LNTP is the

24  definitive agreement here.

25          In February of 2020 -- February 5th, 2020, Alta and

1   Wattstock later amended their master agreement.  Now, Alta

2   admits, as it must, that GE was not a named party or

3   signatory to the Alta/Wattstock contracts.  Indeed, according

4   to Alta, GE insisted that Alta contract directly with

5   Wattstock.

6            Now, the third relevant contract to this dispute is

7   the memorandum of understanding, the MOU.  And that -- that

8   contract, that memorandum of understanding is between

9   Wattstock and GE.  It was executed years earlier on June

10  26th, 2017.

11           Now, Alta acknowledges that the MOU "outlines" the

12  relationship between Wattstock and GE.  And they concede --

13  Alta concedes that the MOU expressly contains this no

14  partnership or agency provision.  Despite that admission,

15  Alta seeks to hold GE liable under the Alta/Wattstock

16  contracts for Wattstock's failure to deliver certain used

17  aeroderivative gas turbines at certain price points.

18           It also seeks to hold GE liable on these fraud-

19  based claims based on GE's refusal to step in and fulfill

20  Wattstock's obligations after Wattstock became insolvent.

21           We think the chronology here is very important

22  because it shows why Alta's claims are not plausible.  After

23  Alta and Wattstock entered into the Master Agreement, a

24  representative from Wattstock in February of 2019 traveled to

25  Turkey to begin inspections and negotiations on used

1  turbines.  In July of 2019, GE sent a letter to Alta,

2  providing further clarification of the GE/Wattstock

3  relationship.  That letter expressly references the MOU.  As

4  I mentioned in December of 2019, the LNTP was executed

5  between Alta and Wattstock, and Alta alleges that the LNTP

6  guaranteed a not to exceed price of $6.5 million for the

7  Turkish units.

8          Then Alta paid $750,000 on December 24th, 2019, and

9  then another $750,000 in January of 2020.  In February of

10  2020, around the time that Alta and Wattstock amended their

11  master agreement, the Turkish company apparently disclosed

12  certain termination fees to Alta that had to be paid to GE

13  for these turbines.  According to Alta's allegations in the

14  spring of 2020, Alta nevertheless asked GE to step in and

15  fulfill Wattstock's obligations under the contract, and GE

16  refused to do so.

17          Alta asserts five causes of action against GE.

18  Count I seeks a declaration that GE and Wattstock are

19  "principal agent or partners."  Count II is for respondeat

20  superior, and it is based on principles of ostensible agency

21  and estoppel.  And Alta acknowledges that the MOU has this no

22  partnership or agency provision.  But they, in a conclusory

23  fashion, label that provision a sham or subterfuge, designed

24  to conceal the true legal status of GE and Wattstock.

25          Count IV is for unjust enrichment in the amount of

1   $1.5 million.  Count VII is for fraud.  And it appears to be

2   based on representations made by GE and Wattstock, related to

3   the nature of their relationship in pricing of these units.

4   And Count VIII is for negligent misrepresentation in the

5   alternative.  And then finally, as I mentioned, one of the

6   issues that we've teed up in our 12(c) motion is this issue

7   of consequential damages, because it appears, at least from

8   our reading of the third-party petition, that Alta is seeking

9   consequential damages.

10          Just to quickly go over the procedural history,

11  Your Honor.  The case began when Wattstock actually sued Alta

12  in state court for breach of contract.  After Wattstock and

13  Alta engaged in some party discovery, Alta filed its third-

14  party petition, bringing GE into the case.  GE did file a

15  motion to dismiss under Texas Rules of Civil Procedure 91A,

16  while the case was in state court, and that was denied on May

17  18th of 2021.  But after Wattstock filed its Chapter 11

18  petition, and this case was removed, the parties negotiated a

19  proposed scheduling order that specifically contemplated

20  dispositive motions, including a motion to dismiss.

21          And at no point since the parties discussed the

22  schedule or proposed -- or tendered a proposed scheduling

23  order has Alta sought leave to amend its petition or tendered

24  a proposed amendment.

25          So to turn first to Alta's vicarious liability

1   claims, I want to start with the agency and ostensible agency

2   arguments.  Now, Alta seeks a declaration, as I mentioned,

3   that GE and Wattstock were "principal/agent or partners."

4   The third-party petition, in summary fashion, also claims an

5   "ostensible agency existed between Wattstock and GE."

6          As an initial matter under Texas law, when partners

7   are known to the contracting parties, but the contract is

8   entered into by one partner only, the non-signatory partner

9   is not bound by that contract.

10          We cited, for example, in our briefing the *Mayers*

11   *v. Addison Brown* case.  We think it is directly on point from

12   the Northern District of Texas.

13          In that case, the plaintiff contracted with a third

14   party, Addison Brown, for an oil and gas lease.  The

15   plaintiff claimed that the defendant, Comstock, and the third

16   party, Addison Brown, represented during the negotiations

17   that they were partners.  The Court dismissed the plaintiff's

18   claims for agency and partnership by estoppel at the motion

19   to dismiss stage, because the equitable and estoppel

20   principles did not apply where the defendant signed the

21   contract in individual name only.

22          *Mayers*, frankly, Your Honor, should end the inquiry

23   here.  But Alta's vicarious liability claims also fail as a

24   matter of law because it cannot allege or show the type of

25   control necessary to find a principal/agent relationship

1  between GE and Wattstock.

2       Agency requires control such that the agent isn't

3  free -- is not free to do the work in his or her own way. The

4  *Intel* case, we think, is instructive.  In that case, which

5  involved the vicarious liability claim against certain labs

6  and facilities based on physician's use of allegedly patent-

7  infringing video conferencing technology, the Southern

8  District of Texas found no agency, despite the fact that

9  defendants required the physicians to comply with medical

10  standards, to be available on call at certain times, to carry

11  insurance, and to perform their jobs.

12       And, in fact, the labs and facilities exercised

13  certain oversight in tracking over the physicians' day-to-day

14  operations as well.

15       Now, Alta alleges that the MOU outlines the

16  relationship between Wattstock and GE, and it shows that GE

17  was in "complete control" of Wattstock.  Now, we don't

18  believe that conclusory allegation is entitled to any weight

19  under the federal pleading standards.  And more importantly,

20  it's directly contradicted by the memorandum of understanding

21  that is incorporated by reference into Alta's complaint.

22       As I mentioned, the MOU has this express, no-

23  partnership or agency provision, but it also has a provision

24  in that same section of the agreement that says neither party

25  shall be obligated to purchase or sell any equipment, parts,

1   or services under the MOU.  So GE and Wattstock have this MOU

2   that exists years before the Alta and Wattstock relationship.

3   That MOU expressly says no partnership or agency

4   relationship.  And it also expressly says that GE can't force

5   Alta to sell certain equipment and vice versa.  There's no

6   obligation under the MOU to sell any equipment or provide any

7   services pursuant to the MOU.

8         Alta can't manufacture a plausible claim for relief

9   by misreading or misrepresenting documents that are expressly

10  incorporated by reference into its complaint.  Now, in its

11  opposition to our motion, Alta argues that the July 31st,

12  2019 letter that GE sent Alta also shows complete control.

13  But that letter simply describes the general business

14  relationship between GE and Wattstock that's memorialized in

15  the memorandum of understanding.

16        And in fact, the letter expressly references the

17  memorandum of understanding.  And again, going back to the

18  chronology, this letter was sent in July of 2019, months

19  before the LNTP, which Alta concedes is the definitive

20  agreement related to its purchase of these gas turbine units,

21  months before the LNTP was executed.

22        And in any event, tracking daily progress and

23  conducting oversight of Wattstock's work does not come close

24  to the type of control that is necessary to show an agency

25  relationship.  It's not even remotely close to the type of

1  control that was at issue in *Intel*, where the Court had no

2  trouble finding -- no agency as a matter of law.

3        This is no different than setting the "basic

4  parameters" for work to be done, and overseeing and tracking

5  that work based on those parameters.  That was exactly what

6  was at issue in the *Intel* case.

7        Alta also claims that GE is liable for Wattstock's

8  alleged breach of contract and torts based on the ostensible

9  agency doctrine.  The doctrine is based on principles of

10  equity, and it requires proof of a reasonable belief and an

11  agent's authority, and justifiable reliance on

12  representations of that authority by the principal.  So only

13  the conduct of the principal is relevant to ostensible

14  agency.

15        In other words, the Plaintiff must allege and prove

16  that it did what a reasonably prudent person, using diligence

17  and discretion would do to ascertain the agent's authority.

18        Alta, for its part, doesn't allege any diligence

19  whatsoever, let alone any reasonable diligence, nor can it,

20  as its complaint completely undermines any argument about

21  diligence.

22        But the complaint expressly references or admits

23  that the MOU outlines the relationship between GE and

24  Wattstock.  The complaint admits that GE refused to be a

25  party to the contracts between Alta and Wattstock, and that

1 | GE is not a party to any contract directly with Alta.

2 |       The complaint also incorporates that July 2019

3 | letter by reference.  And that letter expressly references

4 | the MOU.  And the MOU, as we know it, contains that no

5 | partnership or agency provision.  So any diligence -- any

6 | reasonable diligence conducted by Alta, or conducted by

7 | someone acting as a reasonably prudent person, would have

8 | simply revealed what the MOU memorializes.  There was no

9 | partnership or agency relationship between GE and Wattstock.

10 |       I turn now to the partnership and partnership by

11 | estoppel theories that also appear to be a basis for Alta to

12 | seek to hold GE liable for Wattstock's conduct.  Now, in its

13 | opposition to our motion, Alta concedes that GE and Wattstock

14 | were not legally partners.  There was no legal partnership

15 | relationship between the two entities.  So Alta points to a

16 | straight reference to the word estoped in the third-party

17 | petition at paragraph 110 to argue that GE is vicariously

18 | liable for Wattstock's conduct under the partnership by

19 | estoppel doctrine.

20 |       That one reference to estoped, is it -- that's the

21 | sum total of Alta's allegations related to the partnership by

22 | estoppel doctrine.  Now, partnership by estoppel, like

23 | ostensible agency, requires a showing of due diligence.  But

24 | it also requires a plaintiff to allege, and ultimately prove,

25 | that it extended credit to a partnership.  Alta cannot

1   plausibly plead due diligence, or diligent -- reasonable

2   diligence under the partnership by estoppel doctrine, for all

3   of the same reasons it cannot do so under the ostensible

4   agency doctrine.

5          We cite, for example, the *Lost Maples* case.  In

6   that case, a debtor signed a contract with a creditor to

7   purchase an ice machine from a supplier.  The supplier never

8   delivered.  After the creditor sued the debtor for not making

9   payments under the contract, the debtor tried to invalidate

10  that contract under the partnership by estoppel doctrine,

11  arguing that the contract failed for lack of consideration

12  because the ice machine was never delivered.

13         The Court held that the debtor's claim failed for

14  lack of due diligence because the relevant contracts

15  contained a no partnership or agency provision, just like the

16  MOU between GE and Wattstock here.

17         Now, in its opposition, Alta argues that it did not

18  see the MOU until discovery in this case.  Now, that's not an

19  allegation in its complaint.  In fact, the complaint

20  expressly incorporates the MOU by reference.  But more

21  importantly, Alta doesn't allege that it was unaware of the

22  MOU, or that it asked for the MOU and was denied access to

23  it, or that it did anything, as I mentioned, to investigate

24  the true legal relationship between Wattstock and GE.

25         Alta's partnership by estoppel claims also fails as

1   a matter of law because Alta cannot allege that it extended

2   credit to a partnership.  Alta alleges it made two $750,000

3   payments for long lead hardware engineering activities and

4   preliminary drawings.  It does not allege, and it cannot

5   allege, that it extended credit or it made a loan or

6   investment to the partnership, or to the putative

7   partnership, that it expected to be repaid.

8           And this element of the partnership by estoppel

9   doctrine we think is critically important.  The doctrine

10  really is about protecting creditors who rely on the

11  reputation of one putative partner to extend a loan on the

12  believe that that, you know, highly regarded putative partner

13  will make sure that that loan is repaid.

14          We cite, for example, the *CCR* case which involved a

15  plaintiff who hired a law firm for a debt offering, but that

16  never materialized.  The plaintiff tried to hold the

17  individuals associated with the law firm liable under the

18  partnership by estoppel doctrine based on these marketing

19  representations, marketing materials that suggested that the

20  law firm was organized as a partnership.

21          And the Court held that the partnership by estoppel

22  doctrine was "inapplicable because the plaintiff never

23  extended credit to the partnership."  The dispute was about a

24  service contract.  Our dispute here is about a service and

25  products contract, not a credit agreement.

1          Alta's last theory of vicarious liability is based

2    on law of joint enterprise liability.  Here again, Alta

3    concedes in its opposition that Wattstock and GE were not

4    legally in an actual joint venture.  Instead, pointing back

5    to that same paragraph 110, where they had that reference to

6    estopped, Alta argues that it is seeking to hold GE liable

7    under the joint enterprise theory, or joint enterprise

8    liability theory.

9          Now, to pursue a claim for joint enterprise

10   liability, Alta must plausibly allege that GE and Wattstock

11   have a "community of pecuniary interests and a specific,

12   common purpose."

13         Alta must also plead plausibly that both GE and

14   Wattstock have an equal right of control over the enterprise

15   or project at issue.  It cannot satisfy either requirement as

16   a matter of law.

17         Alta does not and cannot allege a community of

18   pecuniary interests.  As Alta's opposition brief concedes, it

19   must plausibly allege that GE and Wattstock pooled their

20   profits or assets related to the particular project.  Alta

21   argues in its opposition that the factual details of the

22   financial relationship are within GE and Wattstock's

23   exclusive possession.  You know, that's sufficient as a

24   matter of pleading, and frankly, it's demonstrably false as a

25   matter of judicial notice.

1          We cited, for example, Wattstock's statement of

2    financial affairs, Docket Entry 50, that shows no such thing,

3    no such relationship where GE is in control, or has sharing

4    or pooling of assets with Wattstock.

5          We cited the case of *St. Joseph's Hospital v.*

6    *Wolff*, the Supreme Court of Texas.  And that case made clear

7    that a general interest in a common endeavor, or a, you know,

8    common business interest is not enough under the joint

9    enterprise or joint venture liability theory.

10          That case involved an integrated, medical residency

11    program, organized by a hospital and a foundation.  A medical

12    resident's negligence caused severe injuries to the

13    plaintiff, and the plaintiff sought to hold the hospital and

14    the foundation liable for that negligence.  The court -- the

15    Texas Supreme Court found that the joint enterprise theory

16    didn't apply because there was no pooling or sharing of

17    assets or profits between the hospital and the foundation,

18    specifically related to the residency program.

19          Alta also cannot plausibly plead that GE and

20    Wattstock had an "equal right of control over the

21    enterprise."  Alta pleads itself out of court by alleging,

22    what we think in a conclusory fashion, but alleging

23    nonetheless, that GE was in "complete control" of Wattstock.

24          More importantly, there's no allegation, and Alta

25    cannot plausibly allege that Wattstock had any control over

1  GE.  The *Triplex* case -- we cite the *Triplex* case, which is

2  another Texas Supreme Court case.  That case involved a Dram

3  Shop Act claim against a bar and a radio station for

4  overserving patrons who injured police officers while

5  driving.

6          The radio station had advertised "ladies' night" at

7  this bar.  And the bar had actually used a DJ from the radio

8  station during some of these events.  The Texas Supreme Court

9  held that no joint enterprise liability could be found there

10  because there was no equal right of control.

11          The bar had "complete control over who to serve,

12  what to serve, and how much to serve."  And more importantly,

13  there was no evidence that the bar had any control over the

14  radio station.  That's exactly the circumstance that we have

15  here.

16          Alta is alleging, again in a conclusory fashion,

17  that GE had complete control over Wattstock, but they had no

18  allegations whatsoever that Wattstock had control or an equal

19  right of control over GE.

20          I'll turn now to Alta's direct claims against GE.

21  Alta's direct claims against GE are all, we think, grounded

22  in fraud.  Therefore, specifically for fraud, negligent

23  misrepresentation, unjust enrichment.  But as alleged, each

24  are predicated on some allegedly false statement or

25  misrepresentation made by GE/Wattstock that Alta claims they

1   had relied on.

2          Fraud requires justifiable reliance and Alta cannot

3   plead justifiable reliance as a matter of law.  As an initial

4   matter, as we point out in our briefing, Alta's fraud-based

5   claims are woefully insufficient as a matter of pleading for

6   two reasons.

7          First, Alta engages in these impermissible group

8   pleadings.  By our count, there are over 100 references to

9   GE/Wattstock, Wattstock/GE, or some iteration of that phrase

10   or term in Alta's third-party petition.

11          But Alta also fails to plead with particularity the

12   who, what, when, where, and why of the alleged fraud.  The

13   allegations about GE/Wattstock's representation simply do not

14   reasonably support an inference of fraud.

15          Alta's fraud-based claims appear to be based, at

16   least on our reading of the complaint, on GE/Wattstock's

17   alleged representations about being partners.  But as we

18   explained in our briefing, Texas courts have long recognized

19   that the term partner is ubiquitously used in the business

20   context.

21          So Alta must plausibly plead that GE and Wattstock

22   were not simply using the work colloquially.  It has not done

23   so and it cannot do so.  There -- they don't allege the type

24   of detail or specificity that would show, for example, that

25   when Wattstock and GE said we're partners, they meant it in a

1   legal sense.  There's no allegation, for example, that -- you

2   know, when the parties were at the negotiating table, getting

3   ready to execute the contract, GE said, you know, don't worry

4   about it.  We're Wattstock's partner, so we're not going to

5   sign this agreement, but you have our word.  We're going to

6   be right there in case we need to be, because we're partners.

7   I mean, that's not the allegation.  It's just these general

8   references to being partners.

9         And the Texas Supreme Court has expressed extreme

10  skepticism about using the term partner to mean something

11  other than just the colloquial -- you know, in the colloquial

12  business sense.

13        Now, Alta's fraud-based claims also appear to be

14  based on representations by GE/Wattstock about their ability

15  to refurbish used gas turbines at competitive prices.  Alta

16  alleged that GE/Wattstock hid the existence of undisclosed

17  liabilities on virtually all of these used turbines.  I think

18  they call it a bait-and-switch maneuver.  The bait and switch

19  doesn't really work here because again, if you look at the

20  chronology, the LNTP, which was the definitive agreement

21  according to Alta for its purchase of these turbines, that

22  LNTP was executed after, obviously, the MOU was signed

23  between GE and Wattstock, and after this letter was sent in

24  July of 2019 that expressly referenced that MOU.

25        But nonetheless, Alta's allegations about this --

1   these misrepresentations related to price don't reasonably

2   support an inference of fraud.  Alta's complaint points, for

3   example, to the Nuh Cemento units covered by the LNTP.  Alta

4   alleges that the LNTP included a not to exceed price of $6.5

5   million, and that it also claims that in February of 2020,

6   Nuh Cemento disclosed or someone disclosed for the first time

7   the existence of this $1.4 million in termination fees that

8   had to be paid to GE.

9         The LNTP, however, again incorporated by reference

10  into Alta's complaint.  That LNTP does not include a not to

11  exceed price of $6.5 million.  Instead, it sets the price of

12  the two Nuh Cemento units for a combined $8.125 million.  And

13  it makes clear that the proposal, the LNTP proposal, the

14  total purchase price of nearly $20 million is based on an

15  assumption that those units could be purchased at that $8.125

16  million price.

17        So Alta saw this in its contract, in the LNTP in

18  December of 2019 and signed it.  Then, despite these supposed

19  hidden liabilities on the Nuh Cemento units coming to light

20  in February of 2020, Alta alleges in the spring of 2020, it

21  was "ready, willing, and able to go forward with the Nuh

22  Cemento project with GE alone."

23        So in addition to falling sort of far short of

24  alleging that -- you know, with particularity the who.  Like,

25  which individual at GE made what representation about being

1  partners is the legal sense, or that could reasonably be

2  interpreted to mean legally partners, and in what context,

3  and on what days.  The allegations just simply do not

4  reasonably support an inference of fraud.

5          And setting aside the pleading deficiency issues,

6  Alta's fraud-based claims fail for a more fundamental reason.

7  Alta cannot plead or prove justifiable reliance as a matter

8  of law.  Again, going back to the LNTP, which is the

9  definitive agreement here, that LNTP conclusively negates

10 reliance.

11         On Section 33.1 of the LNTP makes clear that Alta

12 "has not relied on or been induced by any representations not

13 contained in the contract."

14         The Texas Supreme Court made clear in the

15 *Schlumberger Tech* case that parties may negate fraud-based

16 claims by specifically disclaiming reliance in a merger

17 clause.  That's exactly what we have here.  We also cited the

18 *DT Apartment* case from Northern District of Texas that

19 dismissed fraud-based claims where the relevant contract

20 included a disclaimer of reliance on any representations pre-

21 dating that agreement.

22         In addition to the merger clause which, again,

23 conclusively negatives reliance, Alta's fraud-based claims

24 fail as a matter of law because multiple red flags warned

25 Alta away from relying on these alleged misrepresentations

1   about Wattstock and GE being partners.  The red flags should

2   have warned them away from interpreting or construing those

3   alleged representations as meaning their legal partners.

4         We cited the *JPMorgan Chase vs Orca* case.  That

5   involved an oil and gas lease or contract where the defendant

6   represented that certain tracks were open, but had already

7   leased those tracks to someone else.  That earlier party that

8   had leased the tracks delayed reporting those leases in the

9   property records.  And when the plaintiff went to go record,

10  the plaintiff learned about these earlier leases.

11         The parties' contract in that case had a negation

12  of warranty clause that shifted the risk of failure, title

13  failure to the plaintiff.  The Court found justifiable

14  reliance negated as a matter of law because the parties were

15  "sophisticated," even though the defendant was a "newly

16  formed company."  The transaction was large.  It involved

17  $3.2.  Our case involves nearly $20 million.  And the

18  defendant made certain statements about uncertainty related

19  to the track being open.  And the plaintiff could have

20  checked and, in fact, was checking the property records

21  periodically, but ultimately stopped checking those records

22  before closing the transaction and the Court found that the

23  plaintiff could not show diligence because of these red

24  flags.

25         Red flags abound in our case based solely on the

1   allegations in Alta's complaint.

2          First, the Alta/Wattstock contracts were red flags.

3   Again, at GE -- Alta alleges that GE insisted that Alta

4   contract directly with Wattstock.  And the contracts that

5   Alta and Wattstock signed do not name GE as a party, do not

6   reference GE by name, do not seek or require GE's consent or

7   approval or permission to execute the agreements.  They don't

8   contain any provision even remotely suggesting that GE

9   intended to be bound by the Alta Wattstock contracts.

10          And they were signed on February 27th, 2019 --

11   December 23rd of 2019 and then amended in February of 2020.

12   At any point over that timeline, Alta could have insisted, if

13   it believed that GE was going to be liable under these

14   contracts, Alta could have insisted that GE be named or at

15   least expressly referred to by name in these contracts, and

16   it did not do so.  So those should have been red flags that

17   warned Alta away from believing, from reasonably believing

18   that when GE and Wattstock allegedly said they were partners,

19   they meant that they were legal partners.

20          And the contracts, the Alta Wattstock contracts are

21   important because they also memorialize the fact that Alta

22   and Wattstock were sophisticated parties both represented by

23   counsel, just like the Texas Supreme Court cases that I've

24   mentioned, the *Orca* case.  When you have sophisticated

25   parties represented by counsel, you know, that counts as a

1  red flag.

2          And to make matters worse, the Alta Wattstock

3  master contract actually has a no partnership or agency

4  provision in it, too.  And so you would think that

5  sophisticated parties represented by counsel, sitting at the

6  negotiating table, talking about who is going to be liable

7  under a contract, who has certain obligations in the contract

8  they're negotiating and they say, hey, we're -- this contract

9  is not going to create any agency or partnership

10 relationship, that that wouldn't raise any red flags for

11 sophisticated counsel to think, oh, there's this other third

12 party, GE.  I wonder if they have a similar no-partnership or

13 agency provision that governs their relationship.  And that's

14 a massive red flag that, again, Alta incorporates by

15 reference into its complaint because it relies on the master

16 agreement.

17         As we've already discussed, we know that the MOU

18 between Wattstock and GE had a similar no agency or

19 partnership provision and that was a massive red flag as

20 well.

21         Now at Page 15 of its opposition brief, Alta

22 suggests that it had no knowledge, that's what it suggests,

23 although it doesn't come outright and say it.  It had no

24 knowledge of the MOU until discovery in this case.  Now

25 that's in its opposition brief, again, not actually in its

1  complaint.

2        As we already explained, we don't believe or we

3  believe Alta did not put that in its complaint and can't put

4  that in its complaint for good reason, because the July 31st,

5  2019 letter which predates the LNTP, expressly references the

6  memorandum of understanding.  Now Alta calls this letter a

7  smoking gun.  We actually agree.  It is a smoking gun, but

8  not for the reason that Alta claims.  It's a smoking gun

9  because it shows that Alta was on notice about the memorandum

10 of understanding before it executed the LNTP.

11       So all of these red flags, including that letter,

12 show that Alta cannot plausibly plead that it exercised any

13 reasonable diligence to avoid negation of reliance as a

14 matter of law.

15       And just, again, Alta's complaint is completely

16 devoid of any allegations related to any diligence, much less

17 any reasonable diligence.

18       I'll just quickly address the negligent

19 misrepresentation claim.  That's Count VIII.  As a separate

20 and independent bar to that claim, we've invoked the economic

21 loss rule.  It's pretty clear that you can't assert a

22 negligent misrepresentation claim to try to seek the same

23 damages that you're seeking in the contract, and that's

24 exactly what Alta has done here.  So we believe the economic

25 loss rule bars Alta's negligent misrepresentation claim.

1            And, finally, just turning to the unjust enrichment

2    claim, very quickly, we believe it's -- the allegations

3    related to unjust enrichment are impermissibly vague.  The

4    allegation at 125 of the third-party petition says that GE

5    has been unjustly enriched in the amount of $1.5 million.

6            Again, looking at the complaint and the documents

7    incorporated by reference in the complaint, Alta paid -- made

8    two $750,000 payments in December of 2019 and January of

9    2020.  The LNTP, that is the contract that was executed in

10   December of 2019 actually requires two $750,000 payments upon

11   execution of the LNTP by the parties.  It refers to Article

12   VII for the payment terms, and Article VII lists those two

13   $750,000.

14           Now in its opposition Alta argues that it's seeking

15   the $1.5 million it paid for hardware and drawings it never

16   received.  Its complaint also references some hardware

17   engineering activities and preliminary drawings that GE

18   allegedly needed to be paid for, but also doesn't allege that

19   it made any payment directly to GE and its opposition

20   acknowledges that it doesn't allege that.

21           But, more importantly, Alta does not allege how GE

22   was unjustly enriched or why it would be unconscionable for

23   GE to retain the benefit it allegedly received from

24   Wattstock.

25           Alta's opposition doubles down on this fraud

1  theory.  But as I've already explained, Alta's fraud claims

2  fail as a matter of law.  And because the unjust enrichment

3  claim is based on fraud, the unjust enrichment claim should

4  be dismissed as well.

5          Unless the Court has any questions for me, I'll

6  turn it over now to my colleague, Ms. Patel.

7          THE COURT:  I do have two or three questions.

8          First, a very basic procedural question.  I did

9  note in preparing that the State Court had heard and denied a

10 GE motion to dismiss that first took me aback, like why are

11 we here again.  But as I understand it, it's Rule 9 that made

12 you come forward again.  There's not the same requirement of

13 pleading fraud with particularity in the State Court system.

14 Is --

15         MR. LEGRAND:  That's exactly right, Your Honor.

16         THE COURT:  Uh-huh.

17         MR. LEGRAND:  And I think Alta concedes in its

18 opposition brief that there is no analog in State Court to

19 Rule 9.

20         THE COURT:  Okay.

21         MR. LEGRAND:  I would also point the Court to Rule

22 81 and Rule 12(h).

23         Rule 81 says that the federal rules apply to remove

24 actions.  Now they certainly don't have an obligation to

25 replead unless their pleadings are challenged.  Rule 12(h)

1   allows us to bring a motion for failure to state a claim at

2   any time, including at trial or in a 12(c) motion.

3         So after the pleadings have closed -- the *DT*

4   *Apartment* case that we cite I think is also instructive here.

5   After the pleadings close, if the Court can resolve a case on

6   the pleadings, that's what 12(c) is designed for.  And all

7   we're basically saying is that they haven't, you know,

8   alleged a claim.  They've failed to state a claim for which

9   relief can be granted.

10        THE COURT:  Uh-huh.  All right.

11        My next question is what do you say about this, the

12  fact that there are so few documents here, I guess three,

13  really.  I mean, I know there's the letter and, you know,

14  website snapshots and whatnot.  But, I mean, we're really

15  just talking about the memorandum of understanding between

16  Wattstock and GE, and then the Alta master agreement with

17  Wattstock and then the, what you call the LNTP.

18        Do you think I am correct in worrying, the fact

19  that there are so few documents is back -- actually, a bad

20  fact for GE in this motion to dismiss.  It suggests to me

21  that there might need to be discovery to see what other, you

22  know, conduct or other pieces of paper there might be out

23  there that go to their claims.

24        MR. LEGRAND:  I don't think so at all for a couple

25  of reasons.

1         First, as I mentioned, when the case was in State

2    Court Alta and Wattstock did engage in some discovery.  Since

3    the case has been removed, GE and Alta have engaged in

4    discovery.  Now I know Alta raises these unripe, and we think

5    non-existent discovery disputes, but we've been producing

6    documents.

7         But more importantly, Your Honor, Alta's claims are

8    barred as a matter of law.  All right.  We're not saying --

9    our arguments aren't that they -- their -- they fail to

10    allege things that they can allege.  Our arguments are

11    basically like if you look at the documents that they've

12    incorporated by reference into their complaint, their claims

13    fail as a matter of law.  And they can't possibly be -- I'll

14    let my friend on the other side tell me she disagrees.  But

15    they can't possibly allege, for example, that they extended

16    credit to a partnership for joint -- for partnership estoppel

17    doctrine applied or that GE and Wattstock shared assets or

18    pooled their profits for joint enterprise liability to apply.

19         I mean, so we think the lack of documents expressly

20    referenced in -- by -- incorporated by reference into the

21    complaint isn't a problem for us because, again, over the

22    last four and a half months at any point Alta could have

23    tendered or forwarded them in a complaint based on the

24    documents that they've received in discovery, both from the

25    State Court and since the case has been removed, and they've

1  failed to do so.  I mean, their third-party petition

2  expressly refers to this MOU that they got in discovery in

3  the State Court.

4          THE COURT:  Okay.  What about the factual

5  allegations dangled out there about the co-location.  That's

6  not a legal term of art.  But, you know, as I interpreted the

7  complaint, it meant that Wattstock and GE operated out of a

8  common location and, you know, they dangle out there that

9  Wattstock is comprised of former GE executives.  GE didn't

10  want to do this in-house.

11          So, I mean, the true package concept that was --

12  you know, this is why you should go with us because we have

13  this arrangement with GE.  I mean, that makes me

14  uncomfortable that there are facts here that need to be

15  further explored maybe.

16          MR. LEGRAND:  Right.

17          Well, Your Honor, I would point the Court to the

18  Texas Supreme Court cases that we cited, for example, *St.*

19  *Joseph* and *Triplex.*

20          THE COURT:  Uh-huh.

21          MR. LEGRAND:  The Texas Supreme Court has expressed

22  extreme skepticism about finding or applying these equitable

23  principles of vicarious liability based on even the sharing

24  of location, the sharing of employees, et cetera by itself

25  because otherwise any time, for example, you have a lessor

1  and a lessee, you could potentially impose vicarious

2  liability because there's an agreement.

3          Now Alta doesn't allege why, for example, Wattstock

4  was co-located in the same Jacintoport facility.  I'm sure

5  they know, you know, there was an arrangement.  But it goes

6  back to the point.  I think the Texas Supreme Court is

7  saying, like there has to be some line drawing here.  Right.

8  We don't want every single business that does or every single

9  company that does business with another company to be liable

10 for whatever the other company does under these equitable

11 principles.

12         And so the joint enterprise liability doctrine,

13 partnership by estoppel, agency, a ostensible agency, they

14 have those very specific elements that are required to be

15 alleged and proved to draw that line, to ensure that we're

16 not, you know, imposing liability on anyone essentially in

17 this -- in the chain of supply.  And they specifically refer

18 to distinctions between, you know, employees versus

19 independent contractors or suppliers and saying that these

20 equitable principles traditionally or typically don't apply

21 to subcontractors or suppliers in the chain.

22         THE COURT:  Okay.  So, to summarize, you don't

23 think they've dangled enough out there in their complaint to

24 live another day on the issue?

25         MR. LEGRAND:  I don't, Your Honor.

1              THE COURT:  Okay.

2              MR. LEGRAND:  And I don't think they can, I don't

3    think they can overcome the legal impediments to their

4    claims.  Again, it -- you know, this -- I think this would be

5    entirely different -- going back to the *Mayer's* case, it

6    would be entirely different, for example, if, you know, GE

7    and Wattstock were at the negotiating table, you know, and GE

8    said, Wattstock is signing on our behalf, or Wattstock has

9    authority to sign for us, or the contracts expressly referred

10   to GE.

11             But as the *Mayer's* case makes clear, when you know

12   about an alleged partnership and one individual partner to

13   that alleged partnership signs a contract in its individual

14   name, that non-signatory is not bound by that contract.  I

15   mean, that -- we have to be able to hold parties to their

16   contracts.  Right.  I mean, that's ultimately what we're

17   trying to do.

18             You had a contract with Wattstock.  You admit and

19   allege in your complaint that GE refused to sign that

20   contract.  You can't possibly hold GE liable for those

21   contracts.

22             THE COURT:  Okay.  Got it.  Thank you.

23             MR. LEGRAND:  Thank you, Your Honor.

24             THE COURT:  All right.  Ms. Patel, what were you

25   going to add?

1        MS. PATEL:  Good morning, Your Honor.

2        THE COURT:  Good morning.

3        MS. PATEL:  Like Alta's other claims, Alta's claim

4   for consequential damages also fails as a matter of law

5   because Alta contractually waived consequential damages in

6   its agreement with Wattstock.

7        Article IX of the Wattstock/Alta master agreement

8   specifically limits consequential damages for all claims,

9   including fraud claims.

10       In fact, the first sentence of Section 9.1(b)

11  provides that "Notwithstanding any other provision of this

12  agreement and to the fullest extent permitted by law, neither

13  party or their respective officers, directors, partners,

14  employees, representatives, contractors or subcontractors

15  shall be liable to the other or shall make any claim for any

16  incidental, indirect or consequential damages arising out of

17  or connected in any way to this agreement."

18       This broad waiver, as you can see, applies to any

19  claim for any consequential damages arising out of or

20  connected in any way to the agreement.

21       The second sentence of Section 9.1(b) provides

22  further information about the waiver, but it in no way limits

23  that first sentence.  The second sentence says, "This mutual

24  waiver of consequential damages shall include, but is not

25  limited to, any other consequential damages that either party

1   may have incurred from any cause of action."

2          Alta argues in its opposition brief that the second

3   sentence of this waiver limits consequential damage -- the

4   consequential damages waiver to the specific causes of action

5   enumerated at the end of the waiver.  But Texas courts have

6   routinely held that waiver clauses with similar language and

7   composition, including this - including to or including but

8   not limited to language that Alta is concerned about should

9   be applied broadly and in conjunction with the rest of the

10  sentences in the waiver provision.

11         We've cited in our brief *Forest Oil and Biscamp*.

12  In both of those cases the Courts looked at similar waiver

13  provisions and read them as a whole rather than focusing on

14  specific words or every other word the way that Alta proposes

15  that we should focus on this waiver provision.

16         *Biscamp* especially is on point with our waiver

17  provision because it includes very similar language like the

18  including and including but not limited to language.  There

19  the plaintiffs argue that because negligence was not

20  specifically enumerated in the waiver provision, the Court

21  should not waive the negligence claim.

22         There the Court looked at the waiver as a whole,

23  especially the language at the very beginning of the waiver

24  that said, any and all claims, and held that the waiver

25  provision actually excluded all liability and ended up

1  applying it to the negligence claim even though it was not

2  specifically enumerated in the waiver provision.

3          Here in our waiver provision we have very similar

4  language where the Court can see that we have the, any cause

5  of action, any claim, and to the fullest extent permitted by

6  law.  This type of language is very similar to the language

7  in *Biscamp* that should be construed broadly to apply to any

8  claim in any cause of action.

9          And another reason why the Court should hold that

10  our reading of this waiver provision is the only reasonable

11  reading of this provision is because Alta's reading would

12  render meaningless the very first sentence of the waiver

13  provision.  As we said, the very first sentence broadly

14  excludes any claim for any consequential damages arising out

15  of and connected in any way to this agreement.

16          Alta also argues that the damages waiver is not --

17  is vitiated by its fraud claim.  Taken to its logical

18  conclusion, Alta's argument means that any time a plaintiff

19  brings a fraud claim, the Court cannot enforce a damages

20  waiver for consequential damages.

21          This is untrue.  Courts -- the Texas Supreme Court

22  and other Texas courts can and do enforce waiver provisions

23  when a plaintiff brings a fraud claim or a fraudulent

24  inducement claim.  Specifically, courts look at the nature of

25  the parties, whether they are sophisticated parties

1  represented by counsel.  They also look to whether the

2  contract included a merger clause.

3        In *Forest Oil,* a case that we cite in our brief,

4  the Court looked at whether or not the parties had a merger

5  clause that specifically disclaimed reliance on extra

6  contractual representations.  The Court held that because the

7  merger clause in the agreement, similar to our merger clause

8  in our agreement, specifically disclaimed reliance on

9  parties' extra contractual representations, that was

10  sufficient to prevent the fraudulent inducement claim from

11  vitiating the contract, and vitiating the waiver provision.

12        In sum, for all the reasons my colleague and I have

13  discussed today, and for all the reasons that we've argued in

14  our brief, this Court should grant General Electric's motion

15  for judgment on the pleadings.

16        THE COURT:  All right.  Thank you, Ms. Patel.

17        All right.  We'll hear from Alta now.

18        MS. PULLIAM:  See, my brain trust is already

19  helping.

20        THE COURT:  You already need her.

21        MS. PULLIAM:  She's reminding me that I may need to

22  give you a copy of our presentation.

23        THE COURT:  All right.  Very good.  You may

24  approach.

25        MS. PULLIAM:  May I approach?

```
1            THE COURT:  Uh-huh.

2            MS. PULLIAM:  Thank you, Your Honor.

3            THE COURT:  Thanks.

4            Did you have an extra one for the law clerk, too?

5            MS. PULLIAM:  I -- of course we do.

6            Thank you.

7            THE COURT:  I can't remember.

8            Mr. LeGrand, did you have one --

9            MR. LEGRAND:  I do have an extra --

10           THE COURT:  -- of yours for the law clerk?

11           MR. LEGRAND:  -- one, Your Honor.

12           May I approach?

13           THE COURT:  Yeah.  I should have thought of that

14  earlier.  It was on the screen, though, so I didn't worry

15  about it.  Yeah.

16           MS. PULLIAM:  Thanks.

17           THE COURT:  Thank you.

18      (Pause)

19           MS. PULLIAM:  Okay.

20           THE COURT:  Mine shows up here in case --

21           MS. PULLIAM:  It does.  Okay.

22           THE COURT:  -- you were wondering.  Yeah.

23           MS. PULLIAM:  I was.

24           THE COURT:  Okay.

25           MS. PULLIAM:  May it please the Court?  Thank you,
```

1   Your Honor.

2          I want to start with some general issues with

3   respect to motions to dismiss.  As you just eluded in

4   questions to Mr. LeGrand, we are here on a motion to dismiss.

5   We are not here on a motion for summary judgment, nor are we

6   here after a jury trial like in many of the cases that were

7   cited to you.

8          So this is about the pleadings.  We did start in

9   State Court actually before Baker Botts was involved in this

10  case, and there are different pleading standards, of course,

11  that apply in State Court.

12         We have been diligently seeking discovery from GE

13  for almost two years.  We are awaiting more discovery from

14  GE.  My co-counsel, our co -- Baker Botts' co-counsel in the

15  case has been handling the discovery issues.  But my basic

16  understanding is that we still have yet to get documents that

17  resulted from agreed search terms run by GE.  So the Court's

18  questions about documents that may be out there are very

19  present in our mind as well.

20         All that being said, the pleadings before the

21  Court, we believe, are sufficient to allege even under the

22  federal standards all of the causes of action that Alta has

23  put in its petition.

24         As the Court knows, the motion to dismiss standard

25  is a lenient one.  I will certainly address Rule 9.  But with

1   respect to anything but the causes of action to which Rule 9

2   applies, the fraud-based causes of action, the petition

3   needed only, even under federal standards, to raise a right

4   to relief above a speculative level.  That's a pretty low

5   bar.  And this Court certainly has the opportunity to

6   reexamine the causes of action at summary judgment and

7   certainly after trial.

8          So I know the Court is familiar with those

9   standards pretty intimately, but I think they were largely

10  ignored on the initial presentation.  So I wanted to be sure

11  to raise that.

12         The other piece --

13         [To unknown] I'm not advancing, so I may need you

14  to –

15      (Pause)

16         MS. PULLIAM:  So the other piece that -- I forgot

17  some notes here -- that I want to make clear at the outset is

18  there's certainly an effort by GE to make this case about the

19  three documents that you just mentioned.  And this is -- you

20  know, you heard Mr. LeGrand say, this is a dispute about

21  three contracts.  We don't agree with that at all, Your

22  Honor.

23         With respect to GE, this dispute is about repeated

24  misrepresentations that GE made to Alta outside of contracts.

25  So we will go through those, but I want to reorient the Court

1  to what this case really is about with respect to GE.

2  There's certainly a lot of allegations in the petition

3  concerning Wattstock.

4       But with respect to GE, at its very heart this case

5  is a fraud claim, a negligent misrepresentation claim

6  directly against GE because of the representations that it

7  made directly to Alta.

8       So I'm going to start there with the fraud and

9  negligent misrepresentation claims.  This slide shows the

10 issues that we want to cover.  The -- first we'll start with

11 fraudulent negligent misrepresentation.  We'll talk about one

12 of the remedies for that which is unjust enrichment.  Then

13 we'll talk through all of the various theories whereby GE can

14 be held liable for Wattstock's conduct.  Again, those are

15 secondary to the direct fraud claim, certainly, and then we

16 can talk about consequential damages.

17      So let's start with fraud.  Next slide.

18      So, first, I want to point the Court to this

19 benchmark case.  It's a Fifth Circuit case and, you know, it

20 makes clear that what constitutes particularity with respect

21 to Rule 9, you know, differs with the facts of each case.

22 And in that case is a good example of a situation much like

23 ours where, you know, there were pleadings of the who, what,

24 when, where, you know, with respect to names of an entity,

25 general time frames, you know, a month during the year and

1   that kind of thing.  And the Court held that those

2   allegations were sufficient.

3             So next slide.

4             The Rule 9 issue, the who, what, when, where,

5   there's -- I think, really, GE is just pretending that

6   certain allegations in the petition don't exist.  But they

7   do.  So who?  Let's talk about who.

8             Mr. Harrington's name does not appear expressly in

9   the petition, but as the Court knows and as GE's counsel has

10  repeatedly represented to the Court, the petition references

11  documents between the parties and those documents are

12  incorporated by reference into the petition.  And one of the

13  express representations that's outside those three contracts

14  that GE wants you to focus solely on is a letter from Mr.

15  Harrington that is referenced expressly in Paragraph 78 of

16  the petition.  It is a representation by Mr. Harrington.  It

17  is plausible to -- it is plausible from the pleadings that

18  the other meetings between Alta and GE would have involved

19  Mr. Harrington since they were looking to Mr. Harrington to

20  set forth representations about GE's involvement in writing.

21            It looks like you have a question.

22            THE COURT:  Well, this was a big question I had

23  coming in.  You know, we've all heard a million times you

24  have to plead the who, what, when, where and how for fraud.

25  And most of your paragraphs use the phraseology, Alta/GE did

1  this, said this, whatever.  And, you know, is that a problem

2  for you?

3          MS. PULLIAM:  Yeah.  I think that's a great

4  question.  And, one, it certainly wasn't a problem in State

5  Court.

6          THE COURT:  Uh-huh.

7          MS. PULLIAM:  And, two, even under the federal

8  standard, this is why I would urge the Court to look at this

9  *Benchmark* case.  I don't think it is.  We obviously -- you

10 know, when the petition was written, it was not written for

11 Federal Court.  It might have been written slightly

12 differently.  But all of the elements are there.  So I don't

13 think it is a problem ultimately if the Court looks to what's

14 referenced in the petition which it's actually required to

15 do.

16         So the who even under the *Benchmark* case can be GE.

17 I mean, when you're talking about a website, it's GE's

18 website, right?  But with respect to other representations,

19 and a big one is this written representation by Mr.

20 Harrington that supplies directly from the petition a named

21 individual.  It is certainly very plausible from the

22 pleadings in the petition to glean that Mr. Harrington was

23 the one involved in the discussions between GE and Alta and

24 GE and Wattstock and involved in those meetings given that he

25 was the one who responded in writing with that letter with

1    respect to questions about the relationships when it was

2    asked of him.

3           THE COURT:  Okay.  So if I go back and look at the

4    *Benchmark* case, you're telling me it involved facts where the

5    who, the human being was not actually identified in the

6    pleading, and the Fifth Circuit said that was good enough?

7           MS. PULLIAM:  So I don't remember every single fact

8    in that case --

9           THE COURT:  Uh-huh.

10          MS. PULLIAM:  -- and there may, like in our

11   situation, be -- there may have been references to an

12   individual.  But there also were allegations like in our case

13   about an entity.

14          THE COURT:  Uh-huh.

15          MS. PULLIAM:  So, I mean, here I don't think that

16   the individual is missing.  The individual person isn't

17   missing.  He's there.  The fact that his name does not appear

18   per -- you know, in Paragraph 78 I think is no moment because

19   Paragraph 78 references a letter that he sent.

20          THE COURT:  Okay.  Thank you.

21          MS. PULLIAM:  Sure.

22          So that's the who.

23          The what, the petition contains numerous

24   allegations about what the misrepresentations were.  It's not

25   just that GE were in and Wattstock were in a partnership.

1  That is a big part of it.  But as we will see, Mr. Harrington

2  represented the benefits of that partnership, the

3  relationship of that partnership, what that partnership meant

4  and what Alta could rely on if Wattstock, because there were

5  concerns at the time about Wattstock being this fledgling

6  entity, if something were to happen to Wattstock.  Mr.

7  Harrington addressed those issues and the benefits of the

8  partnership.

9          With respect to the price of the turbines, there

10  were -- there's also multiple allegations about that.  It

11  doesn't -- let me clarify something, too.  This LNTP contract

12  is just related to one piece of this overall relationship.

13  But -- and so there were representations in that contract

14  that we can talk about with respect to pricing.  But there

15  are also representations outside of that contract with

16  respect to pricing that are alleged in the petition.

17          And the key thing that I think was lost earlier,

18  and this was something that the State Court certainly focused

19  on and denied all of these same arguments.  And, by the way,

20  what's interesting -- I forgot to mention this -- GE had

21  prior counsel and prior counsel in the State Court actually

22  did argue that Rule 9(b) applied in Texas State Court.  He

23  wasn't from Texas.  He sort of made a mistake.  So, actually,

24  they already did make all of these same arguments before the

25  State Court and they were soundly rejected.

1        But one of the things that the State Court focused

2   on was what -- explain this issue to me with respect to the

3   pricing.  And here's the issue.  So there was discussions,

4   there were discussions about the pricing and how important it

5   was to Alta.  And that's all set forth in the petition.

6        And the reason that those were misrepresentations

7   was because what was missing from the pricing were fees, sort

8   of like if you think of like breakup fees that these turbine

9   owners were required to pay to GE.  So what was missing from

10  the pricing representations was peculiar with -- peculiarly

11  in the knowledge of GE.  It knew that it had these

12  requirements to be paid these fees.  That was in GE's

13  knowledge.  It wasn't in Alta's knowledge.  So that's the

14  issue with the pricing misrepresentation, if that makes

15  sense.  That's something that the State Court rightfully

16  wanted to understand.

17       So, okay.  Then the when, we've got allegations in

18  the petition.  The petition sort of goes, if you look at it,

19  it starts talking in 2018, describes meetings that occur in

20  2018 and then talks about how this master agreement is formed

21  in February of 2019.  So, you know, does the law require in

22  these kinds of allegations for there to be a particular date,

23  you know, a single date or a point in time when these

24  meetings took place.  No.  It just doesn't.  They can't point

25  to a case that says that.  The petition has certainly

1  sufficient particularity to say there were meetings that took

2  place over the course of 2018 that led up to this master

3  agreement being signed.

4          The website, that was available and something

5  that's alleged in the petition and, you know, that's -- it

6  was available over, you know, a lengthy time period.  So

7  that's also the when.

8          The Harrington letter that we've been talking

9  about, that is referred to specifically in the petition.

10 There is a date associated with it in July of 2019.

11         The LNTP agreement itself with those written

12 pricing representations that we can talk about.  There's

13 obviously a specific date associated with that.

14         Where, you mentioned the Jacintoport facility.

15 There are specific representations about where those

16 representations were made, GE's own website and in these

17 written representations that we've talked about.

18         So the who, what, when and where are satisfied.

19         Now let's talk about -- and this is the GE website,

20 and I would just focus the Court on certain representations

21 in it, talking about how GE and Wattstock were going to

22 collaborate, how GE was the one to select the best -- the gas

23 turbine to best meet the operating profile; that Wattstock

24 was going to refurbish the package in accordance with GE

25 standards, and that GE, importantly, was going to warranty

1   all of this.

2          Next slide.

3          Now this is the letter that Mr. Harrington sent.

4   It's a blow up of it, obviously.  This is what is referred to

5   in Paragraph 78 of the petition and it -- they want to run

6   from everything in this letter except for the fact that it

7   references the MOU, which GE did not send to our parties and

8   instead sent this letter.

9          So what does this letter say?  Well, it says that

10  there are a whole lot of reasons that GE is willing to

11  warranty Wattstock's work on this project.  That warranty

12  language is the exact same language that you just saw on the

13  website.

14          First, Wattstock's operation is collocated next to

15  our engine overhaul facility.  So we're co-located.

16          GE will be tracking project progress daily and

17  could quickly assume work scope without transportation.  We

18  already conduct oversight of all aspects of Wattstock's work

19  and we will be intimately acquainted with each unit and its

20  refurbishment program.

21          As a leader in this area, we have broad network

22  suppliers that we expect to be able to call on.  And most

23  importantly, GE has a strong incentive for this project to

24  succeed.

25          Those are pretty strong representations, Your

1  Honor.  What we heard earlier was that, well, Alta was just,

2  you know, crazy to rely on these issues because GE might have

3  said partner, but they didn't mean it in a legal sense.  GE,

4  and I wrote this down because it surprised me.  GE never said

5  "we're going to be right there."  I don't know how else you

6  interpret this letter.  It literally says, we're going to be

7  right there.

8       So that letter provides one of the cores of the

9  fraud claim, Your Honor, one of the core representations that

10  is alleged in the petition.

11      All right.  We're getting to a topic that is near

12  and dear to my heart, Your Honor.  I love justifiable

13  reliance.  I confess I'm usually on the defense side of that

14  issue.  The *Orca* case that Mr. LeGrand spoke about was a case

15  that I had in Texas State Court and won the motion for

16  summary judgment.  I lost in the Court of Appeals and my

17  partner, Evan Young, had to go bail me out before the Texas

18  Supreme Court.  So I know that case pretty well.

19      And one of the reasons, I'll tell you, that we took

20  this case is because we believed that there were no direct

21  contradiction issues.  And we believed that there were not

22  the kind of red flags that presented themselves in the *Orca*

23  and other cases.

24      So, first of all, all of the cases on these issues

25  talk about how justifiable reliance is always fact bound.

1   And there are some circumstances in which it can be decided

2   as a matter of law.  Rarely, certainly not in the Orca case,

3   can it be decided at a motion to dismiss stage without the

4   benefit of discovery.

5          One -- so let's talk about the *Orca* case for just a

6   minute.  And, actually, let me take a step back.

7          This, I don't know how to say this *Arlington*, the

8   name of this *Arlington* case, but that's a good case we cite.

9   I think there's a footnote about it in our response brief,

10  just talking about how this typically should not be an issue

11  that's decided on pleadings, certainly.

12         *Orca*, there was tons of discovery in that case

13  before the issue was decided.  We were headed to trial and

14  the Court granted a judgment as a matter of law really on the

15  eve of trial, so tons of discovery had taken place.

16         But what was the key issue in that case was that,

17  first of all, the parties, there were two parties.  There was

18  *Orca* on the one hand, *JPMorgan* on the other, and they signed

19  a letter of intent between the two of them and ultimately a

20  lease for oil and gas assets in Texas.

21         And the letter of intent and the lease contained a

22  specific contractual provision that basically said, hey,

23  *Orca*, you are responsible for, it is your job to figure out

24  title of these oil and gas assets.  That's on you.  It's not

25  on us, *JPMorgan*.  That's on you.

1        And that was the big red flag.  Okay.  So there

2    were lots of other red flags.  *JPMorgan* was a sophisticated

3    party.  The guy who on O*rca* was a very sophisticated party,

4    and he -- what *Orca* was alleging was that *JPMorgan* made

5    representations that were directly to the contrary of what

6    their job was.  Their job was to go figure out title and the

7    bank made no representations about title.

8        And so when they came to the courthouse and said,

9    well, they -- *JPMorgan* misrepresented title to us, you know,

10   the Court was understandably skeptical about how it could be

11   that you could justifiably rely on the bank's representation

12   about title when the contractual agreement that you signed,

13   both of them, said, hey, *Orca,* you're the one who was

14   supposed to investigate and you're the one who was totally

15   responsible for issues of title.  That's *Orca*.  That is not

16   our case.

17       What happened in our case is that there was a

18   memorandum of understanding back in 2018 between GE and

19   Wattstock.  There is no allegation that that memorandum of

20   understanding is ever given to Alta.  Instead, the petition

21   alleges that when Alta reaches out with its banker -- I keep

22   doing that.

23       THE COURT:  Everyone does.

24   (Laughter)

25       MS. PULLIAM:  I talk with my hands.  I learned it

1   from my daddy and I just can't, I can't break the habit.

2        So when Alta reaches out through its banker,

3   Deutsche Bank, and says, hey, we need some assurances because

4   you've been saying things to us like you're, you know, you're

5   GE.  You're Wattstock's partner.  We need some assurances

6   here.  We -- our banker wants to know, you know, what do you

7   really have to say about this, GE.  Right it down for us.

8        Does the petition say at that point that GE hands

9   over the MOU?  No, it does not.  It says that Mr. Harrington

10  writes a letter and the letter references the MOU and,

11  therefore, suggest that the MOU is consistent with the very

12  representations that Mr. Harrington writes in his letter.

13        And let's look back at it.

14        So Alta reaches out with is banker and says, hey,

15  we need these assurances, what's your relationship.  Yes,

16  this letter that Mr. Harrington writes refers to the MOU,

17  doesn't give it, doesn't attach it, nothing in the petition

18  says that.  Instead, it says all of these things that

19  reassure Alta about GE's relationship.  It literally says

20  that we will warranty Wattstock's work on this project and we

21  will conduct oversights of all aspects of Wattstock's work.

22        So let's go to the next page.

23        This memorandum of understanding cannot be a red

24  flag.  This red flag was concealed.  Instead, GE gave Alta a

25  green light.

1      And go back one more time.  Sorry.  I'm bouncing

2  around, Krissy (sic).

3      This Stabilis Fund case is another one that I think

4  is helpful for the Court to look at, too, because it's one

5  that GE actually cites in its reply brief and relies upon.

6  And it again addresses the motion to dismiss standard.  They

7  cite it for the purpose of saying that a party has to follow

8  up if there are these red flags.  What they're ignoring is

9  that's exactly what Wattstock -- I mean, what Alta Power did.

10  It followed up.  It said, hey, give us something in writing.

11  That's what happened.

12      Alta did get something in writing.  The supposed

13  true nature of the relationship between GE and Wattstock was

14  not given, and instead GE suggests in this letter that the

15  MOU is consistent with what this says.

16      All right.  So I want to address next the direct

17  contradiction issue.  The direct contradiction issue is

18  narrow.  Again, the direct contradiction in the *Orca* case was

19  on the one hand a representation, yeah, there's maybe title,

20  and on the other hand, a contractual provision that said,

21  hey, *Orca,* you're totally responsible for investigating title

22  and figuring out title and you bear all the economic risk of

23  title.  That's a direct contradiction.  Those two can't

24  simultaneously exist.

25      There's no direct contradiction in our case.  The

1   best that they muster is, well, you -- Alta, you signed a

2   contract with Wattstock.  Well, okay.  Sure.  We admit that.

3   We -- you suggested that that's how the relationship should

4   take place.  Does the fact that we signed a contract with

5   Alta preclude the existence of a partnership between GE and

6   Wattstock?  No.  Those two things can simultaneously exist.

7   It can be true that Alta Power signs a contract with

8   Wattstock and Wattstock and GE can still be in a partnership.

9   Those two things do not -- are not mutually exclusive.

10          The other thing that's not mutually exclusive is it

11  can be true that Alta signs a master services agreement with

12  Wattstock and yet GE still makes representations about how it

13  is going to stand by Wattstock in the carrying out of that

14  relationship.

15          In fact, that's exactly what happened here.  As we

16  just discussed, there was a master services agreement signed

17  in February of 2019.  And then what happened after the

18  February 19 master services agreement?  Well, Alta was out

19  trying to get financing, working with Deutsche Bank.

20  Deutsche Bank says, hey, we would like to get some assurances

21  about GE's involvement here.

22          What happens next?  July of 2019, Mr. Harrington

23  sends that letter that we've been looking at.  Did in that

24  letter Mr. Harrington say, well, I can't say anything.  There

25  is nothing.  There is nothing to see here.  I can make no

1  assurances because Alta signed the contract with Wattstock,

2  not GE, so I can't make you any assurances.  Is that what Mr.

3  Harrington said?  No.  Mr. Harrington instead made all kinds

4  of representation about how GE was going to be standing right

5  there with Wattstock.

6          Finally, the other really interesting thing to me

7  is that there continue to be these references about merger

8  clauses and contracts and how they preclude reliance.  We

9  cited the Court to *Italian Cowboy* in our response.  It's a

10  crazy case name.  You can't forget it.  It was a restaurant

11  name.  But it's in this line of cases along with *Orca* and

12  several others related to justifiable reliance.

13          And in that case, I believe it was a lease

14  situation between this restaurant called *Italian Cowboy* --

15  I've always wondered what they served for food.

16      (Laughter)

17          MS. PULLIAM:  So in that case there was a standard

18  merger clause in the contract and in one of those --= this --

19  these representations are -- these -- the contract contains

20  all the provisions.  Right.  There aren't extra contractual

21  provisions to the contract.

22          And the Texas Supreme Court said, and I quote,

23  "Pure merger clauses without an express, clear and

24  unequivocal intent to disclaim reliance or waive claims for

25  fraudulent inducement have never had the effect of precluding

1  claims for fraudulent inducement."

2          So there's a whole body of Texas case law about how

3  merger clauses don't preclude claims for fraud.  It would

4  probably take another hour of my time to go into all of that.

5  *Italian Cowboy* is the place to look.  Somehow GE just ignored

6  that in their briefing.  It continues to surprise me.

7          So the other piece is this LNTP contract, again,

8  that just related to one of these units, not the overall

9  relationship.  You know, the -- if you look at Page 43 of

10  GE's presentation to you, it's got -- it looks like this.

11  And it's got these pricing representations in it.

12          If -- here's the problem with that, right, is that

13  there's no direct contradiction here either because it talks

14  about the pricing.  Right.  And it says, you know, based on

15  the below listed assumptions here's the purchase price.  The

16  problem here is that there's no disclosure of this known fee

17  that I mentioned earlier.  That's not a direct contradiction.

18  That's just like you failed to mention something that's

19  material that you know about.  So that's just a

20  representation in the contract itself that certainly can't go

21  away because of the merger clause and can't even go away

22  because of a non-reliance clause in the LNTP.  It's a

23  representation right there in the agreement itself.

24          All right.  That -- that's -- those are the basic

25  issues on fraud, one of my favorite issues in the law, so

1  happy to discuss it.  I could talk about it forever.

2  Economic loss rule.

3          Let's go to the next slide.

4          You didn't even really hear today any argument that

5  the economic loss rule applies to fraud.  It doesn't.

6          Next slide.

7          And this is a case that I confess we did not cite

8  in our response brief, probably should have, but it talks

9  about the application of the economic loss rule to negligent

10 misrepresentation.  And here concludes that it does not bar a

11 claim for out of pocket or reliance damages caused by

12 negligent misrepresentation.  So while the negligent

13 misrepresentation claim may be somewhat limited in the remedy

14 that can be sought, it -- the economic loss rule does not

15 preclude the claim entirely.

16         Okay.  That's it on the fraud, the substance of the

17 fraud and negligent misrepresentation.

18         With respect to unjust enrichment, again, very

19 little time spent on that earlier.  I'll go through it

20 quickly.

21         So this is a remedy for fraud.  This case out of

22 the Fifth Circuit can -- talks about how unjust enrichment is

23 a remedy for fraud when one person has obtained a benefit

24 from another by fraud and it -- unjust enrichment categorizes

25 the result of failure to make restitution of the benefits

1   either wrongfully or passively received under the

2   circumstances.

3           So that's what happened here.

4           Next slide.  Oops.

5       (Pause)

6           MS. PULLIAM:  So with respect to unjust enrichment,

7   here are the allegations in the petition.  GE and Wattstock

8   represented to Alta Power that GE needed to be paid $1.5

9   million to secure the purchase of these products.  Alta paid

10  over two payments and then all of a sudden Alta learns that

11  the pricing was misrepresented.

12          So what do you -- what is fair to glean from these

13  allegations; that GE needed to be paid that amount and that

14  Alta paid them once GE got the money.  You know, that can

15  certainly come out in discovery which has since occurred

16  since the filing of the petition.  But the allegations are

17  right there that support the unjust enrichment claim.

18          All right.  Partnership by -- so, okay.  So we've

19  now talked through fraud, negligent misrepresent -- I mean,

20  fraud, negligent misrepresentation, unjust enrichment, both

21  the direct claims against GE, again, the real focus of the

22  suit against GE.

23          So now we'll start talking about these theories

24  whereby it's also true because of GE's conduct that GE can be

25  held liable for Wattstock's conduct.  So secondary issue, but

1   certainly sufficiently pleaded in the petition.  And, again,

2   all of these issues were raised to the State Court who denied

3   the motion to dismiss.  All of these issues are covered by

4   the general pleading standard, are not required to be pled

5   with particularity and, again, that standard that just

6   requires us to raise a right to relief above a speculative

7   level applies to all of these allegations.

8           So, first, partnership by estoppel, the thing that

9   is odd to me is that it seems that GE keeps saying that this

10  only applies in situations where credit is being extended.

11  Certainly, there are cases talking about how partnership by

12  estoppel, you know, may apply in those situations and that

13  there may be particular sensitivities about whether

14  partnership by estoppel can apply in a credit situation.

15          The cases don't say that partnership by estoppel

16  does not exist outside of that context.  There's nothing that

17  GE has cited that says that.  And, in fact, this *Rainier* (ph)

18  case is not about an extension of credit.  And there I'll

19  tell the Court that the plaintiff didn't win on the theory at

20  the end of the day.  But that was because the courts held,

21  not in the extension of credit context, to two elements, a

22  representation that one sought to be bound as a partner and

23  the other party to whom here would be Alta, the

24  representation is made, relies on the representation.  Those

25  are the only elements.

1          In the Rainier case, the problem was with the

2  second element, that the defendants didn't actually know

3  about the representations, so it didn't apply there.  Well,

4  here, you know, we've got meetings.  We've got the Harrington

5  letter.  We've got the website.  Certainly, Alta knew and

6  relied on the representations.

7          You know, the other cases that I think were cited,

8  this *Naples* case that was cited.  I mean, the big difference

9  here -- and what, from what they're saying is that MOU was

10  concealed and misrepresented.  In that Harrington letter,

11  it's referred to and then Harrington goes on to say about all

12  these great things that GE was going to do.  Did he say one

13  time, by the way, we're not partners.  There's no agency

14  here.  No.  He didn't say that.

15          So do we -- do the pleadings satisfy these two

16  fairly simple elements under the general pleadings standard?

17  The answer to that is yes.  Representation that one sought to

18  be bound as a partner, that's littered throughout the

19  petition.  We've talked about, you know, this doesn't have to

20  be in this context, a particularized pleading, but actually

21  it is in the petition, and reliance on that representation.

22  There are gads of allegations that Alta relied on those

23  representations.

24          So that's partnership by estoppel.

25          Let's next talk about joint enterprise.  So here

1  are the elements of joint enterprise.  There are four of

2  them.  An agreement expressed or implied amongst the members

3  of a group; a common purpose to be carried out by the group;

4  a community of pecuniary interest in that purpose among the

5  members; an equal right to voice in the direction of

6  enterprise which gives an equal right of control.

7           Let me just pause on this last one for a second.

8  It seems like GE's big argument here is like, oh, I think

9  it's Paragraph 27 of the petition.  I could have that wrong.

10  Oh, you know, Alta pleads themselves out of court -- I love

11  that -- because they say that GE was actually the one in

12  control.  Well, you know, again, we're at the pleading stage

13  and there's no requirement at the pleading stage that you

14  pick one cause of action.

15           So there are also allegations in the petition that

16  these parties were -- both had a voice in this joint

17  enterprise.

18           So let's walk through each of these elements.

19           The first two, an agreement expressed or implied

20  amongst the members of the group a common purpose to be

21  carried out by the group.  Again, I'm going to go back to

22  this letter from Mr. Harrington.  This is just one of the

23  allegations in the petition that supports this, also the

24  meetings, et cetera, but this letter is just a great summary

25  of it all.

1        I mean, this is literally Mr. Harrington

2    representing to Alta that there is an express or implied

3    agreements amongst the members of the group for a common

4    purpose.  You see the words, jointly determined.  We will

5    work together.  We have agreed.  Those elements are met, Your

6    Honor.

7        A community of pecuniary interest in that purpose

8    amongst the members.  You know, GE seems to suggest that

9    there's got to be like an ownership interest or a control

10   over a bank account.  And that's just not the case.  It's

11   certainly not the case that those kinds of allegations must

12   be made at the pleadings stage.  Again, certainly, GE would

13   be welcome to revisit this issue at the summary judgment

14   stage if for some reason the actual evidence demonstrates

15   that this is false.  But it does not appear that it will

16   because, first of all, GE and Wattstock represented that Alta

17   Power need -- represented to Alta Power that GE needed to be

18   paid this $1.5 million.  We believe that that allegation is

19   true.

20       And GE also represented to Alta directly that there

21   were all these reasons why GE was willing to warranty -- a

22   warranty certainly involves some pecuniary interest --

23   Wattstock's work on this project.  GE expressly represented

24   to Alta that it has a strong incentive for this project to

25   succeed.  Again, if those allegations aren't -- don't raise a

1   right to relief about a speculative level, I don't know what

2   does.

3            I will suggest the Court turn to --

4            Let's go to the next slide.

5            This *Abel* (ph) case that we cite in our briefing

6   and is at the bottom of this slide here.  That case -- in

7   that case the Court found a joint enterprise between two

8   entities with respect to an accident that occurred.  The

9   Court found that a joint enterprise existed even though one

10  entity exercised -- was exercising the day-to-day control.

11  This was a joint enterprise between the Houston Metro and Tex

12  DOT, I believe.  So there's a joint enterprise even though

13  one entity was exercising the day-to-day control to maintain

14  the road.  But the Court noted the evidence that both parties

15  invested significant resources funds and contemplated pooling

16  efforts to best utilize those funds.  There was nothing in

17  this case about shared bank accounts or an ownership

18  interest.

19           So, again, there are sufficient pleadings of facts

20  to get past the plausibility standard here.  GE and Wattstock

21  jointly determined how to carry out the project, and they

22  jointly negotiated and there's plenty of allegations.

23           The fact that there is a stray reference to

24  complete control in one part, one paragraph in the petition

25  really does not matter because at this stage we are allowed

1  to allege alternative and mutually exclusive theories.

2  That's not something that should be decided at the motion to

3  dismiss stage.

4          All right.  Next topic.  Apparent authority.

5          Just real quickly, back to joint enterprise, I just

6  want to make the pleading point one more time.  I believe

7  it's *St. Joseph's*.  It's also a joint enterprise case.  You

8  heard a lot about it before.  I'm told again by Ms. Wallace

9  that that case was following a jury trial.  The opinion in

10  that case followed a jury trial.  So, again, we're just in a

11  very different procedural stage of the case here.

12          All right.  Apparent authority, apparent authority

13  to do an act is created as to a third person by written or

14  spoken words or any other conduct of the principal which

15  reasonably interpreted causes a third person -- here, Alta --

16  to believe that the principal consents to have the act done

17  on his behalf by the person purporting to act for him.

18          That's kind of a mouthful.  But, basically,

19  apparent authority means what it sounds like it should mean.

20  It means that Alta, it was apparent to Alta, that there was

21  authority given in the GE Wattstock relationship.  Again,

22  gads of pleadings about this that aren't required to be

23  specific under the pleading standards, but nevertheless are.

24          GE intended for and held out Wattstock to be the de

25  facto sales force and they used error derivative gas turbine

1  market for GE.  GE penned a letter confirming that if
2  Wattstock failed to meet its contractual obligations, GE
3  would step in.  They had meetings in which both personnel
4  joined at the Jacintoport facility.  During these meetings,
5  GE and Wattstock described themselves as partners and made it
6  clear that the only way Alta Power can obtain this true
7  package certification and warranty was by working with their
8  partnership.  You know, GE directed the contracting between
9  Alta and Wattstock, and GE and Wattstock caused Alta Power to
10  believe that GE's involvement would insulate Alta Power from
11  concerns related to Wattstock's financial viability.
12        All of that is in the petition.  All of that is --
13  goes directly to these apparent authority standards.
14        Actual agency, it's interesting.  That's where my
15  colleague started.  So, here, let's advance.
16        So this is an alternative theory that's pled in the
17  petition.  And, again, we are at the pleading stage and we
18  can plead multiple theories and they can be tested through
19  evidence.  But the pleading to support this is here.  Agency
20  is a consensual relationship whereby one is subject to --
21  where the agent is subject to the principal's control.  And
22  agency relationships do not require the principal to
23  expressly appoint the agent, and the parties' conduct can
24  imply an agency relationship.
25        The *Intel* case that was cited on previously is

1 about doctors.  It is -- it's a very industry specific case,

2 and I think the facts and circumstances of it were ignored.

3 And it certainly doesn't apply here where, you know, you've

4 got one party basically saying that it will take

5 responsibility for and warranty the work of another party.

6 That just wasn't present in the *Intel*, the case that you

7 heard about earlier.

8          Next slide.

9          Agency is typically a factual issue with the

10 plaintiff at the pleading stage only required to allege fact

11 -- a factual basis that gives rise to an inference of an

12 agency relationship through the use of generalized as opposed

13 to evidentiary facts.

14          So let's talk about what those are.

15          The agent agrees to act on the principal's behalf.

16 Here's the allegation.  GE engaged former GE employees who

17 started at Wattstock to act as its sales force.  The petition

18 alleges in reality GE intended for and held out Wattstock to

19 be the de facto sales force in the used error derivative gas

20 turbine market for GE.

21          We also know that the pleadings allege that GE

22 required money to be paid to it as part of this relationship.

23          Agent acts subject to the principal's control.

24 Allegation, GE's willing to warranty Wattstock's work on this

25 project.  GE will be tracking progress daily and already

1  conducts oversight of all aspects of Wattstock's work.

2  Again, that's out of GE's own mouth in writing signed by Mr.

3  Harrington.

4          Another allegation, for any package purchased by

5  Wattstock from a third-party owner, GE at its sole option may

6  purchase the associated gas turbines from Wattstock.

7          So, again, we're at the pleading stage.  These

8  allegations are certainly sufficient to satisfy the

9  evidentiary standard.

10          Now I'm going to go into consequential damages

11  unless the Court has a question.

12          THE COURT:  No questions.

13          MS. PULLIAM:  Okay.

14          So let's look at this consequential damages'

15  provision, and so a couple of things to know.  It's sort of

16  funny to me.  So we're talking about consequential damages

17  provision in the master services agreement that was signed in

18  February of 2019.  One of the things that's important to

19  note, right, is where we started.  This case primarily

20  against GE relates to fraudulent statements that it made

21  directly to Alta.  Those fraudulent statements are outside of

22  the master services agreement that GE -- that -- I'm sorry --

23  outside of the master services agreement that Alta signed

24  with Wattstock.

25          So, again, what we're looking at is language from a

1  February 2019 master services agreement.  After this

2  agreement is signed, we've got Mr. Harrington in July of 2019

3  making direct representations to Alta that are outside of

4  this agreement.

5          So all this issue about -- is about is whether Alta

6  has pleaded any basis, that's all we need to get past the

7  dismissal stage for consequential damages.  Well,

8  consequential damages is one of the measures of damages for a

9  fraud claim.  We've alleged multiple bases for a fraud claim

10  against GE.  I'm just going to give one example that is

11  clearly outside of the master services agreement, comes after

12  based on Mr. Harrington's letter in July of 2019.

13          So just looking at the very top of this, this

14  provision, it just doesn't apply to certainly one of the

15  bases for consequential damages.  So, you know, that --

16  that's game over for consequential damages.  All we need is

17  one theory to get past this at the dismissal stage.

18          There's a whole lot more, though.  Even under this

19  language, this language does not preclude fraud --

20  consequential damages for fraud and the inducement of this

21  master services agreement.  And that issue involves a lot of

22  contractual interpretations that have all those Latin words

23  that I never can remember, but I'm going to do my best to get

24  through it.

25          So, first of all, if you look at the first

1  provision, right, it's clear there's a limitation of

2  liability.  Right.  What does it apply to?  Any and all

3  liability or cause of action arising under this agreement.

4        Well, the law says that fraud does not arise under

5  a contract.  Fraud is independent and there are independent

6  duties to not defraud another.  So fraud does not arise under

7  a contract, so that doesn't apply.

8        Then go to the next provision and there's a couple

9  of issues here.  There's a provision in this 9.1(b) and then

10 there's sort of two pieces of it is what I'm trying to get

11 across.  And the first piece relates to the type of damages

12 that are limited.  So it says, this mutual waiver of

13 consequential damages shall include, but is not limited to,

14 the loss of use, loss of profit, yada, yada, yada, yada.

15       And you notice that language, shall include, but is

16 not limited to.  So that's in the agreement.  Clearly, the

17 parties know how to use that phrase that lawyers like to use,

18 shall include, but not limited to, which indicates these are

19 examples but they are not intended to be limiting.

20       Then you go to the next phrase and this next phrase

21 relates to the causes of action to which that consequential

22 damages' waiver applies.  Now there do you see the shall

23 include, but is not limited to language?  No, you don't.

24 Instead it says, any cause of action including negligence,

25 strict liability, breach of contract, breach of strict or

1    implied warranty.

2           So what do all those causes of action have in

3    common?  They're not causes of action like fraud that have a

4    scienter intent component.  So if you look at Texas case law

5    and all of those Latin concepts that relate to how you

6    interpret contracts, and you fit the contractual languages

7    together, what you see is that even this contract, setting

8    aside the independent representations that GE made directly

9    to Alta that provide their own avenue for a consequential

10   damages' claim, even if you're just talking about fraudulent

11   inducement of this contract, the very language of the

12   contract doesn't prohibit that.

13          So let's talk through some of these concepts.

14          THE COURT:  And I'm going to let you know you've

15   gone just over an hour.

16          MS. PULLIAM:  I'm sorry.

17          THE COURT:  No.  So if you could --

18          MS. PULLIAM:  I'm going to wrap it up.

19          THE COURT:  -- speed it along.

20          MS. PULLIAM:  So --

21          THE COURT:  Five minutes.

22          MS. PULLIAM:  -- I'm going to -- thank you.

23          THE COURT:  Uh-huh.

24          MS. PULLIAM:  I told you I might need that

25   reminder.

1          So these language -- these cases just talk about

2     these contractual concepts that I'm not going to bore you

3     with and help you understand how that contractual language

4     works together.

5          And if -- let's keep advancing.  Something's funny

6     with our slide there.  Can you refresh that?  I don't --

7     maybe it's just me.  There we go.

8          So this is just a little way to help you organize,

9     you know, just what we're talking about with respect to

10    fraudulent -- consequential damages that would flow from

11    fraudulent inducement of that master services agreement.  It

12    does not apply to intentional torts and, therefore,

13    consequential damages for an intentional tort, a fraudulent

14    inducement are not waived.

15         And then the only piece that I will go back to is

16    that you heard again in a consequential damages' argument

17    this notion that somehow merger clauses in a contract defeat

18    fraudulent inducement.  And, again, that is just not Texas

19    law.  That is just flat out wrong and *Italian Cowboy* is

20    really all the cite you need for that.

21         And with that, Your Honor, I will stop boring you.

22         THE COURT:  Okay.  Thank you.

23         All right.  Mr. LeGrand, did you care for a

24    rebuttal?  You had just a few minute --

25         Bob, how much time did he have left?  He had --

1                    UNIDENTIFIED SPEAKER:  Just a couple -- an hour

2      exactly.

3                    THE COURT:  Oh, he went an hour exactly?

4                    UNIDENTIFIED SPEAKER:  Including the time you --

5                    THE COURT:  Including my questions.

6                    I'll give you a couple of minutes rebuttal if

7      you --

8                    MR. LEGRAND:  Thank you, Your Honor.

9                    THE COURT:  -- if you want to make that --

10                   MR. LEGRAND:  I'll be brief.

11                   Your Honor, Alta's argument seems to be that these

12     types of claims can never be dismissed at the pleadings

13     stage.  I would just point the Court to *Mayer* and the *DT*

14     *Apartment* case, both Northern District of Texas cases, which

15     dismiss these exact types of claims on the pleading.

16                   I just want to take through a couple of the cases

17     that came up in Alta's presentation.

18                   First, the *Benchmark* case, I think there was a

19     representation about that being a group pleading case.

20     Actually, the parties stipulated to the individual who made

21     the representations.

22                   The THEAG North Arlington case actually involved an

23     allegation of due diligence and, in fact, it came up in the

24     context of a purchase of a company.  And so there was actual

25     due diligence being done and questions being asked about the

1  finances of the company.

2          Interestingly, the plaintiff in that case actually

3  pleaded the why or the how of the fraud, too, why the

4  statements about the company's financial affairs were

5  fraudulent or misleading.

6          The *Italian Cowboy* case, that case was actually --

7  actually pre-dated the *Orca* case which my friend said she was

8  personally involved in.  And I would again point the Court

9  back to *DT Apartment* where Judge Fitzwater actually deals

10  with this and explains how you reconcile all these cases.  If

11  you have a pure merger clause that doesn't expressly disclaim

12  reliance, yeah, you don't negate, conclusively negative

13  reliance as a matter of law.  If you have a merger clause

14  like we have here that does expressly disclaim reliance, you

15  have no fraud.

16          My friend cited the *Rainier* case from the Fifth

17  Circuit and said that wasn't a credit card.  It actually was

18  an investment case, so there was an expectation of repayment.

19  But in any event, the Fifth Circuit said in that case it

20  expressed it was highly doubtful that the representations

21  about being partners could be sufficient.  The Fifth Circuit

22  said that in the *Rainier* case, and then it went on to, as my

23  friend said, throw out the claim because there was no proof

24  or allegation that the plaintiff had relied on the statements

25  that were allegedly made because they hadn't seen them.

1          And then finally the *Abel* case, which was cited,

2    and I think the -- you know, the *Abel* case is, if I remember

3    correctly, it was about joint enterprise liability.  That

4    case again if you compare it to *Triplex*, and the other case

5    is escaping me right now, *Triplex* and *St. Joseph Hospital*, I

6    think the *St. Joseph Hospital* and *Triplex* line of authority

7    actually applies.

8          Oh, I'm sorry.  And the one thing that applies

9    there, I meant to flag in the *Abel* case, I think my friend

10   said that there was no allegation about the two government

11   agencies sharing resources or pooling your property.  That's

12   actually not true.  The case actually expressly refers to the

13   fact that these -- that Tex DOT and Metro had shared money

14   and had shared responsibility for the operation and

15   maintenance of the toll roads.

16         Quickly, Your Honor, on the termination fee issue,

17   this is why I think, you know, Rule 9(b) is so important

18   because they don't allege who from GE specifically said that

19   there was a not to exceed price of $6.5 million.  Instead, at

20   Paragraph 145 of their third-party petition they allege that

21   GE/Wattstock or GE and Wattstock represented that these

22   turbines could be procured at competitive prices.

23         Now what does that mean?  If you look at the actual

24   contract that's incorporated by reference into the complaint,

25   the contract says $8.125 million.  So, I mean, was there any

1  discussion or representation about termination fees, who made

2  -- or not, who made those representations, who made the

3  representation about specific prices.  That's not actually

4  included in their complaint.

5          They refer to this letter from July 19 that they

6  say that we ignore certain parts of it, but it's actually not

7  true.  That letter just simply says exactly what the MOU

8  says.  Of course GE is -- if it says we're going to warranty

9  certain work, we're going to try to make sure that work is

10  being done according to standards.  That's just like the case

11  we cited where the physicians were subject to, you know,

12  certain medical professional standards.

13          I also heard arguments about alternative theories.

14  You know, we can allege complete control, but then, you know,

15  also allege equal control.  You might be entitled to allege

16  alternative theories of pleadings, but you can't actually

17  allege alternative facts.  You have to have facts to support

18  your claims.  I mean, that's what the pleading standard is.

19          You know, my friend said that the pleading standard

20  is a low bar.  Twombly Iqbal is a low bar.  I frankly have

21  not heard that before.  I think as I understand the standard

22  it requires a plaintiff or a party to plead facts sufficient

23  to support a reasonable inference that the other party or the

24  defendant is liable for the claims being made.

25          Lastly, on the consequential damages, Alta's

1   counsel just simply ignored 9.1(b) language that says neither

2   party shall be liable or make any claim for consequential

3   damages, that's any claim, arising out of or connected in any

4   way to this agreement as my colleague, Ms. Patel pointed out.

5        And finally, Your Honor, we heard a lot, especially

6   in connection with the references to the July 2019 letter.

7   We heard a lot about GE saying it would warranty the work.

8   But last time I checked, they're not arguing that GE breached

9   a warranty.  This is not a breach of warranty case.  Right.

10  This is a fraud cause and a vicarious liability case

11  allegedly based on GE's failure to step in and take over the

12  contract, the LNTP and, you know, take on Wattstock's

13  obligations under those contracts.

14       So if GE -- if Alta wants to plead some breach of

15  warranty claim, we haven't seen it.  They certainly may try

16  by relying on the letter, but the letter doesn't support

17  fraud because it expressly references the MOU.  And it

18  certainly doesn't support their claim that GE somehow said

19  that they would step in and take over for Alta, especially in

20  light of the fact that Alta and Wattstock had separate

21  contracts that GE was not a party to.

22       With that, Your Honor, again, I would just point

23  the Court back to *Mayer* and *DT Apartment*.  We think those two

24  cases from the Northern District of Texas should control

25  here.  They are directly analogous to the allegations in this

1  case, separate and apart from the pleading deficiencies, as

2  well as the *Orca* case as we mentioned that negates Alta's

3  fraud-based claims.

4          Unless the Court has any questions, we would

5  request that our motion be granted.

6          THE COURT:  I do not have questions.

7          All right.

8          MR. LEGRAND:  Thank you, Your Honor.

9          MS. PULLIAM:  Could I literally have one sentence

10 with respect to a factual issue that I think is --

11         THE COURT:  One sentence.

12         MS. PULLIAM:  Yeah.  The only non-reliance clause

13 in any contract you heard about today is the -- is contained

14 only in the LNTP.  So it's only in the LNTP.  There is not a

15 no reliance clause in the master services agreement.  The no

16 reliance clause in the LNTP says the parties will not rely on

17 out -- extracontractual relationships, extracontractual

18 representations by the parties to the LNTP, which does not

19 include GE.

20         So --

21         THE COURT:  Okay.

22         MS. PULLIAM:  -- that's it.  Sorry.

23         THE COURT:  That was a run on sentence, but --

24    (Laughter)

25         MS. PULLIAM:  I'm sorry.  You're right.  It had --

```
 1                THE COURT:  Okay.

 2                MS. PULLIAM:  -- had multiple semicolons.

 3                THE COURT:  I'm going to take a few minutes to look

 4    at a few of these cases.  I'm also going to let my conference

 5    call people know that I'm going to be a few minutes late for

 6    my 12:00 conference call.

 7                We'll come back at 10 after 12.  All right.

 8                MR. LEGRAND:  Thank you, Your Honor.

 9                MS. PULLIAM:  Thank you.

10                COURT OFFICER:  All rise.

11        (Recess taken at 11:45 a.m.; reconvened at 12:11 p.m.)

12                THE COURT OFFICER:  All rise.

13                THE COURT:  All right.  Please be seated.

14                We're back on the record in Adversary 21-3083,

15    Wattstock versus Alta Power et al.

16                All right.  First, I want to compliment all of the

17    lawyers.  We had excellent briefing, wonderful PowerPoint

18    demonstratives.  I'm a very visual thinker.  I really -- I

19    appreciated those PowerPoints, and just excellent oral

20    argument.  I wish I had some summer interns here to have

21    heard this.  You all could not have been any better, I think.

22    So I don't throw out compliments lightly.  I really enjoy

23    good lawyering and feel like it needs to be recognized.

24                As far as my ruling, as we all know my inquiry

25    today at this early 12(c) stage is whether Alta's third-party
```

1  claims against GE as now pleaded are plausible.  Assuming all

2  of the allegations pleaded are true, is there a plausible

3  claim for relief as to the various causes of action asserted?

4  This is the so-called Iqbal Twombly standard.

5          So the Court focuses not on probability and we

6  don't know what all the evidence may or may not prove.  This

7  is only about is there enough in the pleading to live another

8  day and see what discovery and the credible evidence

9  ultimately establishes.

10          And we also look at whether the complaint gives

11  fair notice of what is being alleged, and with respect to

12  fraud, is there enough particularity or specificity pleaded.

13          Here, the Court will deny the motion to dismiss

14  concluding that plausible claims have been articulated.

15          The one area I struggled a bit with was whether

16  fraud is sufficiently pleaded, the who, what, when, where and

17  how.  We went back and considered the benchmark Fifth Circuit

18  case and others.  I do conclude that these stand for

19  collectively the notion that what constitutes particularity

20  varies from case to case.

21          Here, while Lance Harrington of GE is not

22  specifically named in the body of the complaint, his July

23  31st, 2019 letter is specifically referenced and there's

24  plenty of the what, when, where and how, I think, to survive

25  this Rule 12(c) motion.  There's enough there there.

1          I will throw out that significant facts here that

2    pointed towards survivability of the complaint are the July

3    31st, 2019 letter I just mentioned of Lance Harrington, the

4    dearth of formal documents as we talked about in oral

5    argument, and the general allegations that GE and Wattstock

6    shared a co-location, that Wattstock was operated by former

7    GE execs.  And, again, these suggested to me that it's

8    plausible.  The evidence might end up showing that there was

9    a joint enterprise or agency or partnership by estoppel.

10          Moreover, I believe the allegations make such

11   things as justifiable reliance and the possibility of

12   consequential damages plausible depending on what the

13   evidence shows.

14          So this is not a comment about the merits.  We'll

15   see what the evidence ends up showing.  But there's enough

16   there there to go forward and live another day.

17          So, again, I have the highest compliments for the

18   arguments and presentations today, but this is the ruling of

19   the Court.

20          I don't know if you all have in your scheduling

21   order anything about mediation, but I really want to -- I'm

22   hesitating to -- am I going to require it or just encourage

23   it.  You know, I'm not sure at the end of the day the

24   possibility of damages.  You know, it's been dangled out

25   there, this is a $1.5 million case.  You know, I can see

1  rounds of motions for summary judgment, and then if this goes

2  to trial, you know, it will get expensive for sure.

3          So have you all talked about mediation?  Have you

4  put it in your scheduling order?

5          MR. LEGRAND:  Your Honor, I can speak to that.

6          We do have a mediation in our scheduling order,

7  which I believe is 60 days from the date of the Court's

8  ruling.

9          THE COURT:  Okay.

10          MR. LEGRAND:  You know, for what it's worth, Your

11  Honor, I think we -- there's a major dispute about the value

12  of this case, and so that's why we brought the 12(c) motion.

13          THE COURT:  Yeah.  I don't know if --

14          MR. LEGRAND:  So --

15          THE COURT:  -- it's 1.5 or --

16          MR. LEGRAND:  Exactly.

17          THE COURT:  I just know that was dangled out there

18  probably by you.  I don't know.  But --

19          MS. PULLIAM:  Yeah.  We certainly -- our side

20  believes it's a lot more.  That's just --

21          THE COURT:  Uh-huh.

22          MS. PULLIAM:  -- one piece of the alleged damages.

23          I have to refresh myself on the mediation, but

24  that's certainly something that we will explore with our

25  colleagues representing --

1          THE COURT:  Okay --

2          MS. PULLIAM:  -- GE.

3          THE COURT:  -- because I believe this is Judge

4   Brantley Starr who will ultimately try this if it goes to

5   trial.  And I don't have memorized off the top of my head his

6   standard scheduling order, but I know most of our District

7   Judges require mediation or at least a settlement conference.

8   So, you know, this -- again, you know, fascinating issues,

9   but a client never wants to hear, just like a patient doesn't

10  want to hear, oh, you have a really interesting case, you

11  know, if you're a patient the doctor saying that.  You know,

12  let's bring in the medical students.  You know, a client

13  doesn't want to hear that about his or her legal case, you

14  know.

15         So it could be a fascinating trial with fascinating

16  issues, but, gosh, settlement is always wonderful.

17         Mr. Berghman, you were standing up.  Did you want

18  to --

19         MR. BERGHMAN:  Your Honor, the scheduling --

20         THE COURT:  -- add something?

21         MR. BERGHMAN:  -- order provides for a mediation

22  within 45 days of a ruling, and I think, you know, that's

23  from today.

24         THE COURT:  Okay.

25         MR. BERGHMAN:  But I'm sure the parties can work on

1   that.

2          THE COURT:  Very good.  We'll see where that leads.

3          Ms. Pulliam, if you could just upload a simple

4   order denying the motion to dismiss.

5          MS. PULLIAM:  Will do.

6          THE COURT:  All right.  Thank you.

7          We're adjourned.

8          MR. LEGRAND:  Thank you, Your Honor.

9          MS. PULLIAM:  Thank you, Your Honor.

10         THE COURT OFFICER:  All rise.

11      (Whereupon, proceedings concluded at 12:19 p.m.)

12                            *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                R U L I N G S

3

4                                                          PAGE

5   Rule 12 (c) Motion for Judgment on the
    Pleadings filed by 3rd Party Defendant
6   General Electric International Inc.

7   Motion to dismiss adversary proceedings
    Filed by 3rd Party Defendant General
8   Electric International, Inc. (30)
      - **DENIED**                                          86
9

10

11

12
                       C E R T I F I C A T I O N
13

14
            I, Nancy B. Gardelli of Acorn Transcripts, LLC,
15

16  hereby certify that the foregoing transcript is correct, to

17  the best of my ability from the audio received of the

18  proceedings in the above-entitled matter.

19

20
    /s/ *Nancy B. Gardelli*          Dated:  August 25, 2022
21  Nancy B. Gardelli
    Acorn Transcripts, LLC
22
    Florida Notary Public
23  My commission expires:  June 28, 2023

24

25