```
1               IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION

3

4    IN RE:                  )   BK. NO:  21-31488-SGJ

5                            )

6    WATTSTOCK, LLC          )

7       D E B T O R.         )

8    _____

9    WATTSTOCK v ALTA POWER )   ADV. NO:  21-3083

10

11              *   *   *   *   *   *   *   *   *   *

12                  TRANSCRIPT OF PROCEEDINGS

13              *   *   *   *   *   *   *   *   *   *

14

15

16

17

18

19

20      BE IT REMEMBERED, that on the 23rd day of January, 2023,

21   before the HONORABLE STACEY G. JERNIGAN, United States

22   Bankruptcy Judge at Dallas, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

CINDY SUMNER, CSR (214) 802-7196

1                    P R O C E E D I N G S

2              THE COURT:  All right.  We are going back on

3    the record now.  We have WattStock versus Alta.  Adversary

4    21-3083.  Let's go ahead and get formal appearances here.  I

5    think we may have some people on the line, but we'll hear

6    appearances in the courtroom, please.

7              MR. LeGRAND:  Yes, Your Honor.  This is Andrew

8    LeGrand of Gibson Dunn & Crutcher on behalf of General

9    Electric International.  Also with me is my colleague Pooja

10   Patel and my colleague Bryan Sohn.  Although he has not

11   appeared in this case, he's helping with the tech today.

12             THE COURT:  Okay.  Good morning to all.

13        Other appearances?

14             MR. CANCIENNE:  Good morning, Your Honor.

15   Michael Cancienne, Jessica Pulliam, John Lawrence, and Jeb

16   Golinkin for Alta Power, LLC.

17             THE COURT:  Thank you.

18             MR. CANCIENNE:  Thank you.

19             MS. SEARS:  Good morning, Your Honor.  Natalie

20   Sears and Thomas Berghman of Munsch Hardt on behalf of

21   WattStock, LLC.

22             THE COURT:  Okay.  Thank you.

23        All right.  Any other appearances on the Webex, by

24   chance?

25        All right.  Well, before we get started, I'm going to

1    tell you all that I usually -- I was going to say, pride

2    myself, but show respect to the lawyers by reading all of

3    their submissions before court.  I mean, that's just

4    fundamental, right?  But I was at a conference Friday and

5    Saturday.  Got home Saturday evening.  And when I was

6    preparing for my docket yesterday afternoon, you know, I had,

7    as you heard, a few other things set this morning, and so

8    what I did is I thought, okay, the GE motion to amend

9    scheduling order and temporarily stay discovery, I can come

10   in Monday morning and read that one.  It's you, it's a motion

11   to amend scheduling order.  How much paper could there be?

12         Well, guess what, there were hundreds of pages.  You

13   know, the GE motion to amend was only like three pages, but

14   there was a brief with an appendix, and then the response

15   with its appendix was over 300 pages, in case you didn't zero

16   in on that.  So I'm just letting you know, I don't feel as

17   prepared for this hearing as I like to be.  I didn't think

18   there would be more than, you know, 15 or so pages of paper

19   to read when I got in.  And obviously there's a lot more.  So

20   keep that in mind when you're making your argument.  I

21   haven't as carefully reviewed your submissions as I would

22   normally have done.

23         With that, Mr. LeGrand, are you going to be making the

24   argument?

25              MR. LeGRAND:  Yes, Your Honor.

1                    THE COURT:  Okay.  I will hear you.

2                    MR. LeGRAND:  Thank you, Your Honor.

3          May it please the Court.

4                    THE COURT:  Uh-huh.

5                    MR. LeGRAND:  Your Honor, our motion requests

6    a deadline for the parties to amend their pleadings.  Rule

7    16(b) requires it.  Both GE and WattStock agreed that one

8    should be added to the scheduling order.  And, frankly, in

9    light of how this litigation has unfolded so far, GE believes

10   it is necessary to avoid trial or summary judgment briefing

11   by ambush.  Now, Alta disagrees, but they have not identified

12   any reasonable basis for their opposition.

13         On December 16th the parties filed a stipulation,

14   that's at docket 81, to confer on a proposed schedule after

15   this motion is resolved.  So the only outstanding issue at

16   the moment is whether the parties must include a deadline to

17   amend the pleadings in their proposed schedule.  We

18   respectfully request that the Court order the parties to do

19   so and that the deadline be set for 14 days from the date of

20   the Court's order.

21         Now, our briefing explains why a deadline to amend the

22   pleadings is both required and necessary -- I see I have a

23   little technical glitch here -- and necessary in this case.

24   I'll address very quickly Rule 16(b).  And unless the Court

25   has any questions -- and I know Your Honor didn't have an

1   opportunity to go through our briefing.  But unless the Court

2   has any questions about why we felt the need to file this

3   motion, so the run up to this motion being filed.  I'm not

4   going to spend time rehashing the parties' disputes about the

5   allegations in the third-party petition.

6        Sufficed it to say, though, for purposes of background

7   that Alta served amended interrogatory responses three days

8   before GE was scheduled to depose Alta's principal witness

9   and CFO, Matthew Laterza.  Those amended responses raised for

10  the very first time the idea that GE and WattStock promised

11  Alta that they would deliver nine used aeroderivative

12  turbines for an average price of $10 million per unit.  After

13  Mr. Laterza's deposition confirmed GE's suspicion that Alta

14  was now somehow disavowing their prior claims about this case

15  being about GE and WattStock actively concealing the

16  existence of LTSA termination fees, GE and Alta had a couple

17  of conferences about whether Alta intended or would amend

18  their complaint.  Frankly, we couldn't get a straight answer

19  on that question from Alta, and so we filed this motion.

20       Like I said, Your Honor, I'm not going to spend time

21  rehashing all of the background.  I'll just focus on the

22  Rule.  Because I think it's clear that a deadline to amend

23  the pleadings is required by the Rules.  And I, frankly,

24  don't know why Alta opposes any such deadline.

25       So Rule 16(b), itself, makes clear that the scheduling

1    order must limit the time to amend the pleadings, requests to

2    amend after the deadline set in the scheduling order, or

3    effectively request to modify the scheduling order itself

4    subject to the good cause standard.  So it's no surprise that

5    case dockets in this District are replete with scheduling

6    orders that include deadlines to amend the pleadings.

7         Alta's opposition ignores Rule 16(b) and the cases that

8    we cite and instead argues that adding a deadline to amend

9    the pleadings is, quote, procedurally nonsensical, at page 2

10   of their response.  Because leave of court is already

11   required for any such amendment under Rule 15(a).  And it's

12   black letter law that the standards for motions to amend the

13   pleadings are more lenient under Rule 15(a) than under Rule

14   16(b).  And the leniency is written into the text of Rule

15   15(a)(2) which says, Courts should, quote, freely give leave

16   when justice so requires.

17        We refer the Court to a couple of cases that we cited

18   in our briefs.  One is Navarro versus Microsoft.  The other

19   is Voucho (phonetic) versus Dallas County Hospital District.

20   Both stand for the proposition that requests for leave to

21   amend after the deadline set in the scheduling order are

22   subject to good cause -- the good cause standard, which is

23   more exacting then the liberal and more lenient standard of

24   Rule 15.

25        In Navarro the plaintiffs sue for discrimination under

1  the Texas Labor Code.  Two months after the deadline to

2  amend, they tried to add Section (indecipherable word due to

3  audio cutting out) claims.  The Court denied their motion,

4  because they couldn't reasonably explain the delay.

5  Plaintiff's motion, though, was denied under the good cause

6  standard because Rule 16 applied because the motion for leave

7  had been filed outside of the deadline set by the scheduling

8  order.

9       Voucho was an (indecipherable two words) unpaid wages

10  case.  Plaintiff moved to amend to add state law claims after

11  the deadline to amend.  The Court, after apply a four-factor

12  test under Rule 16(b) denied the motion, pointing out that

13  plaintiff sought leave to add state law claims, quote, after

14  she realized that her originally pleaded claims were in

15  danger of being dismissed on the merits.  That's the exact

16  situation that we're seeking to avoid here.  We don't want to

17  continue down this path, which we feel has been ongoing for

18  quite a while, of trying to figure out what this case is

19  about.  If plaintiff -- if Alta is going to amend their

20  complaint, they should do so within 14 days.  If not, they

21  should be forced to live with the complaint as currently

22  pleaded.

23       The text of Rule 16 and the case law in the District

24  require a scheduling order to set a deadline to amend the

25  pleadings.  And Alta has no rational basis for its opposition

1   to GE's request.  So this Court should order the parties to

2   include a deadline to amend their pleadings in the upcoming

3   proposed scheduling order.  And that deadline should be set

4   14 days from the date of the Court's order.

5       Unless the Court has any questions, that's all I've got

6   for today.

7           THE COURT:  All right.  Thank you,

8   Mr. LeGrand.

9           MR. LeGRAND:  Thank you.

10          THE COURT:  All right.  So WattStock is in

11  agreement on this and it's just Alta who's opposing.  All

12  right.

13          MR. CANCIENNE:  Your Honor, if I may?

14          THE COURT:  I didn't know if you wanted to say

15  anything.

16          MR. BERGHMAN: I'm sorry, Your Honor.  It's

17  also just for housekeeping.

18      On Friday there was a motion to dismiss filed that

19  takes WattStock out of the case.  And so, you know, we're not

20  going to get in the way of this hearing.  I just wanted the

21  Court to be aware that that's been on file and so, you know,

22  we'll set that for a hearing, if need to.  Or, otherwise,

23  we'll just get with Ms. Ellison and get an order uploaded.

24          THE COURT:  Okay.  Thank you.

25      All right, counsel.

1                   MR. CANCIENNE:  Your Honor, Michael Cancienne

2   for Alta Power with Jessica Pulliam.  We'd like to split the

3   presentation, if okay with the Court.  It's been allowed

4   previously.

5                   THE COURT:  Okay.  That's fine.

6                   MR. CANCIENNE:  May I approach?

7                   THE COURT:  You may.

8                   MR. CANCIENNE:  I'll get my technology

9   working.

10                  THE COURT:  Okay.

11                  MR. CANCIENNE:  Always the most anxiety

12  inducing part of this job.

13          Your Honor, I have to say that presentation was

14  extraordinary to me, because this is not about Rule 16 in the

15  original pleading filed.

16          What kicked this off, what kicked why we are here today

17  unequivocally when you read their original brief in November

18  was a letter transmitted to me on October 31st, Halloween, I

19  remember it well for a lot of reasons.  I've got four young

20  kids.  We return home from trick-or-treating and I get a

21  letter from Mr. LeGrand that details why in General

22  Electric's view counsel for Alta Power and Alta Power have

23  violated Rule 11.  That letter, six pages in length, uses

24  Rule 11 eight times, by my count.  How many times does it

25  mention Rule 16?  Zero.  This is not about Rule 16.  We have

1   no problem -- and I think everyone will say that we have been

2   more an accommodating relative to schedule, relative to

3   setting schedule.  I attempted to reset a schedule recently

4   with General Electric and say, let's move these deadlines,

5   because we're obviously not accomplishing enough because of

6   the questions you have with respect to whatever issues you

7   have factually.  Let's move them back.  And their response

8   was not, we need a Rule 16 deadline.  Their response is,

9   let's push everything out until this hearing.  A new schedule

10  unequivocally has to be ordered.

11       And I want to take you through the evidence that shows

12  we're not moving the goal post.  Because when you read their

13  original motion, their original motion is premised on Alta

14  Power making representations to the Court and representations

15  in pleadings that are not true.  That's what they claim,

16  false -- they claim that we're making false pleadings.  And

17  obviously we take that very seriously, which is why we

18  commanded so much of the Court's time today.  And I apologize

19  for that, because I see how busy the Court is.

20       But for them to sit here and say this is purely about

21  Rule 16 is inconsistent with what they actually asked for in

22  late October and early November and the briefing they filed.

23  They wanted three separate things.  They wanted us to drop

24  claims.  That's the demand they made.  They wanted us to drop

25  claims and not be able to use other discovery.  And they

1  wanted us to contact the Court saying, you shouldn't be able

2  to do this because of these -- we believe this evidence says

3  this.  That's what they did.  And that's the threats they

4  made to us.  And we said, no.  And all throughout this we

5  have said we'll amend, if -- we have no intention to amend.

6  Initially we said we may amend, or we intend to amend, but

7  then we said, you know, we don't intend to amend,

8  particularly in light of the fact that you're making threats

9  to us based on what we view as a misrepresentation to the

10 Court that you're making.

11      So in light of all of that, I think what's happening

12 here -- and I think they do want you to read the briefing,

13 because they're trying to set up a straw man for this Court.

14 They recognize when you look at the evidence -- and we've had

15 to marshall our evidence in response to this motion.  That's

16 what we've had to do.  I have never had to respond to a

17 non-summary judgment with this level of detail.  They forced

18 us to do that in the accusations they made.  And as a result

19 of that, they've benefited.

20      What else have they done as a result of this?  They

21 delayed this case again.  It's a pattern of stonewalling,

22 particularly with respect to discovery.  And it places us at

23 a disadvantage.  I think they perhaps are trying to win a war

24 of attrition.  That's what it certainly seems like.  But what

25 they've made us do in response to this motion -- and when you

1   read their motion and read our response, it will be very

2   clear.  These are serious factual allegations.  This is not

3   about Rule 16.

4       GE's requested relief was that we strike our pleadings.

5   They want us also to not only put a deadline for amending,

6   they want to close the pleadings so we can never amend.  And

7   that's not what Rule 16 allows.  Rule 16 says if you can

8   amend with good cause shown, the Court should grant leave to

9   allow so.  We were okay living with that.  You're probably

10  thinking, why are we here?  When I heard Mr. LeGrand's

11  presentation, that's how I felt.  But you have to look at

12  what they said in their original briefing and what they said

13  in correspondence between the parties.  They made the point

14  that the evidence doesn't support Alta's claims and that's

15  why Alta Power must amend.  And that's why Alta Power --

16  that's why you need -- the Court needs to present a deadline

17  by which Alta Power should amend.  That's what this is about.

18  Alta can't support its allegations.  Therefore, it must

19  amend.  That's what they started with.  Sounds a lot like

20  Rule 56 to me, and that's how they postured this.

21      They -- first of all, the misconstrue our allegations.

22  And this is part of the straw man.  They're trying to set up

23  a straw man for the Court that says, Alta Power's case is

24  about one thing.  Alta Power's case is about whether we ever

25  used certain words when communicating with them.  They're

1  doing that strategically.  They're doing that because they

2  know when the Court does consider the evidence, the Court is

3  going to look at Alta Power's claims and understand they're

4  well founded.  And we'll take you through some of that.  But

5  these are the allegations from our amended petition.

6       This case is about the total acquisition cost of the

7  units.  It's about how much the units could be obtained for,

8  the specific units price requirements of Alta, detailed cost

9  estimates, how much more expensive they were compared to what

10 GE represented, and how those financial burdens prevented

11 Alta Power from actually launching this 150 to 450 megawatt

12 power operation.

13      The genesis of this case is why the price kept

14 changing.  GE wants you to believe that this case is about

15 whether they simply disclosed these fees.  But what the case

16 about is the fact that they hid the impact, they hid the

17 impact of the existence of these fees on the ultimate price

18 to Alta Power.  GE knew about these termination fees that

19 were so important.  They knew in March of 2019.  This is an

20 email between General Electric and WattStock talking about

21 those fees, those fees that later would -- those fees that

22 would later show to be absolutely detrimental to the project

23 itself.  And what were they doing a year before?  It's going

24 to be hard to have folks write off those termination fees,

25 unless I can sell the same level of revenue is replaced by

1  other means.  They knew these fees were going to be something

2  they had to deal with.  Did they ever tell Alta Power?

3  Absolutely not.

4      Now, in one of the, frankly, most shocking allegations

5  that GE has leveled against counsel is the fact that we

6  manipulated a document in a deposition.  That is in their

7  briefing, that counsel for Alta Power manipulated a document

8  to use in a deposition.  This is the document they claim that

9  we manipulated.

10          MR. LeGRAND:  Your Honor, I don't mean to

11  interrupt.  But we do have some documents being shown that

12  are subject to the protective order.  And I understood this

13  was not being broadcast on the Webex.  I think Mr. Berghman

14  said it was not.  I just wanted to make sure that we -- this

15  is either a closed courtroom, or we understand that these --

16  these documents are not being shared.

17          MR. CANCIENNE:  They're not.  I don't believe

18  they're being shown on the Webex.

19          THE COURT:  They're not being shown on the

20  Webex.

21          MR. LeGRAND:  Thank you, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          MR. CANCIENNE:  This is the document that they

24  claim we manipulated.  Okay.  And I'll go through how they

25  claim that.  But the document itself, the one they say we

1   manipulated, shows that the pricing they're offering to us --

2   now, this document is a pricing document.  It's a list where

3   WattStock with GE came up with the pricing that they're going

4   to show Alta Power.  This document, the one they claim we

5   manipulated, says the price includes eliminating the fee.  It

6   says that.

7         Now, let's talk about this manipulation, which is

8   extremely significant.  They claim that we didn't show, Alta

9   Power's counsel didn't show a document appropriately to a

10  witness.  When the witness, Pete Watson, who's one of the

11  executive at WattStock was shown the document, he was shown

12  the pdf of it.  And this is how it printed, Your Honor.  It

13  says, the price for this -- the relevant price for this unit

14  was 2.625 million with 4 percent down payment.  Now, that's

15  how the document was used in the deposition.

16        The native version of the document has this little red

17  triangle on it.  Okay?  And this little red triangle,

18  apparently, is an indicator of a comment.  And when  you

19  scroll over it, this pops up, PPP raised their price, or BLP

20  from 150 to 250.  That's how it shows up in the document

21  itself, the Excel version of the document.

22        What GE did when they showed the document to

23  Mr. Laterza, is they moved the comment out and expanded it so

24  the whole comment could be viewed.  Is that appropriate?  Is

25  that manipulation appropriate?  Frankly, I don't think it is.

1   But I'll tell you this much, it goes to the relevant --

2   relevance of the evidence and the competency in which the

3   questioner can use the document.  It doesn't go towards -- I

4   didn't accuse them of manipulating this document when they

5   used it this way with Mr. Laterza.  And there's a reason for

6   that.  Because I understood what they were trying to do.  I

7   understood they did change the document.  And if I had an

8   objection about how they did it, that goes -- that's an

9   evidentiary issue.  But for them to claim that taking a pdf

10  spreadsheet with no apparent indication of a comment and

11  using it and then because it had the red dot in Excel is

12  manipulating the document, it's a fabrication.  It's just

13  wrong.  And for them to claim that we manipulated the

14  evidence is extremely significant and disappointing,

15  candidly.

16        Now, why is this important?  Again, remember the

17  question in this case is about the impact of these

18  termination fees on the ultimate pricing.  During that time

19  period -- now, they're telling us in April -- what are they

20  telling us?  Includes eliminating the GE 1.4 debt.  Okay?

21  Now, we didn't see this.  This full comment is what it says.

22  But whether we saw it or not is an issue.  But irrespective

23  of that, what are they saying in May of 2019?  They know that

24  certain termination fees won't be raised on a unit called the

25  Arcisol (phonetic) Unit.  This is May of 2019.  Lance

1  Harrington hearing from Fernando Seldrin, his colleague, we

2  cannot give up the termination fee.  But what are they

3  telling Alta Power?  It says the fee's 500,000, not 2.3.  GE

4  again recognizes that this had an impact on our ability to

5  close financing.  This is from May of 2019.  We need to come

6  to some conclusion as quickly as we -- we need to come to a

7  conclusion quickly, as this could impact financial close.

8  That's Alta Power's financial close.

9      July 8th, 2019, they recognize the seriousness of this.

10  Discussing the Alteor (phonetic) termination fees and how

11  they're going to be handled.  Jay Manning says, this is --

12  Jay Manning is with WattStock emailing General Electric.

13  This is serious.  What are the plans to get some relief?  The

14  plan to get some relief was never to tell Alta Power what the

15  real pricing was.  That wasn't the plan.  The plan, as they

16  knew in July of 2019, was to simply increase the expense to

17  Alta Power.  There's a problem with that.  They never told

18  Alta Power.  They continued to misrepresent the pricing.  And

19  their plan was to do it -- the plan was to spring this on

20  Alta Power at the 11th hour.  A classic bait and switch.

21      Now, there can be no doubt -- I'm going to continue to

22  go through the document, because this is -- why am I going

23  through the documents, Your Honor?  I'm going through the

24  documents because this is what the complaint was about.  We

25  had no basis for what we were seeking in our amended

1    petition.  That is what the motion's about, not Rule 16.

2        August 2009 (sic), GE is still looking for a solution,

3    but hasn't disclosed the New Simento (phonetic) fee that it

4    won't be eliminated and the Arcisol fee is four and a half

5    times more than they're representing.  February 26, 2020, the

6    solution is finally sprung on Alta Power.  And why does this

7    matter?  As detailed in our amended petition, this is right

8    when we're on the cusp of closing financially for three

9    units.  And what do they do?  They say to us, hey, come in

10   for a meeting so we can chat about service agreements.  What

11   they were going to do was try to replace the termination fee

12   revenue with service agreements so it can withstand scrutiny

13   internally at GE.  Now that was GE's plan all along from

14   July, at least July 2019.  And in February of 2020, they

15   finally sprang it on Alta.

16       What's the response internally between WattStock and GE

17   when Alta learns about the fee?  Man, what a day.  Bombs

18   everywhere.  Now you can see the importance of the

19   termination fee.  But they could kill the deal.

20       A day later internally at GE Lance Harrington, who is

21   probably the most important witness in this case, discussing

22   the termination fees internally and how it's getting very

23   close to financial close for the customer.  And they're still

24   trying to understand how the termination fee is going to

25   impact the price.  A month later after the parties are unable

1   to come to any resolution, Jay Manning at WattStock emails

2   Lance Harrington and Alex Baboo at GE, the primary contacts

3   at GE and says, game over, unless the term fee is negotiable,

4   any amount more than 500k kills the deal.  Internally GE's

5   representing that the fees remain a real challenge to

6   financial close.

7        This document is interesting to us, Your Honor, because

8   it says in stark terms, it identifies that Cap X for Alta is

9   a real challenge for the project.  And the problem they have

10  in the final ending documents is that the price continues to

11  move.  That's what they're saying in the document.  This

12  document is not part of the Court's record because it was

13  produced, unfortunately, last Wednesday, I believe, Wednesday

14  evening at around 11:00.

15       So how did we get to this point today?  And I'll run

16  through this briefly before I turn it over to Ms. Pulliam.

17  WattStock sued Alta Power in June of 2020.  The Court's

18  familiar with that.  We filed a counterclaim.  We believe

19  WattStock's preemptive suit over some payments, frankly, were

20  to establish itself as plaintiff.  But WattStock and Alta

21  Power after that lawsuit in June 2020, Alta Power reached out

22  to GE to try to figure out what we needed to be doing to

23  better understand the GE relationship.  Our internal counsel

24  reaches out to Alex Baboo, who responds -- or Alex Baboo and

25  asks for an opportunity to talk to legal.  This is on July

 1  23rd, 2020.  In response to this, Mr. Baboo leaves the

 2  company and General Electric deletes his emails.  This is

 3  right after Mr. Baboo says, hey, we're going to have this

 4  reviewed internally by legal counsel.  And I think that's

 5  important because I'm trying to let the Court know why we're

 6  here today, based on GE's conduct and why it's taking so

 7  long.  Alex 5th -- August 5th is when Mr. Baboo leaves.

 8       At that point, Alta Power has no options but to

 9  subpoena GE.  They do in October of 2020.  That stonewalling

10  continues until -- throughout the Fall of 2020.  Pete Watson

11  is deposed in January of 2021.  And Mr. Watson's deposition

12  confirmed precisely what Alta Power at that point believed,

13  which is that Alta Power -- that Alta Power was not made

14  aware of the significance of the -- of the termination fees.

15  It was not brought up to us as something we needed to be

16  worried about.  He confirmed that GE was aware that those

17  units were burdened.

18       And as a result of Mr. Watson's testimony -- now, when

19  this began, one of the things they wanted was us to never be

20  able to use Mr. Watson's testimony because of that exhibit.

21  The questioning of that exhibit of 160 something pages, 180

22  pages was about 32 lines.  They said, we want you to not be

23  able to use Watson's deposition.  Of course we said, that's

24  ridiculous.  If you have a question with the exhibit, we can

25  address it with the Court at the appropriate time.  They

1   didn't want Watson's deposition used for obvious reasons.  It

2   went (inaudible word) for GE in retrospect.  GE didn't

3   participate it in, to be clear.  And my response to them was,

4   let's go take Pete Watson's deposition again.  You guys

5   should have an opportunity to question him.  He lives in

6   Houston.  Subpoena him.  Instead their response was, we don't

7   want you to ever use it and we're going to file a motion with

8   the Court.  And their motion now has transitioned to this

9   Rule 16 motion.

10        GE didn't produce documents in the Fall.  Eventually

11  Alta Power had to sue GE.  GE moved to dismiss in state

12  court.  That motion was denied.  The stonewalling continued,

13  of course until -- until Gibson Dunn was involved, frankly.

14  And then WattStock filed for bankruptcy in August of 2021.

15  The case was removed to bankruptcy court in November where

16  the Court said that after GE moved on the pleadings again,

17  which the Court may remember, GE finally made its first

18  production in February of 2022.  The Court denied GE's motion

19  and the original scheduling order was put in place.  That

20  original scheduling order was very aggressive.  It

21  contemplated discovery ending in October of 2022.

22  Unfortunately because of document production issues and

23  getting a lot more witnesses to be deposed than I think the

24  parties originally anticipated, that became unworkable.  The

25  schedule was amended to extend it to December.  And as we

1   were working through starting depositions, this issue arises

2   and, frankly, has effectively halted discovery between the

3   parties.  We served interrogatories -- for example, we served

4   interrogatories on General Electric and their response was,

5   you're going to get a bunch of objections, because we think

6   you may need to amend.  How about you give us until after the

7   hearing until we respond?

8        Could we have said, no, we want to see your objections?

9   Of course we could have said that.  But what did we say,

10  what's the point?  We don't want to burden the Court with a

11  motion to compel, if all you've got is objections based on a

12  motion you have pending.  So we said, that's fine.  Because

13  that's, frankly, our attempt to continue to move the case

14  forward.  There remain a lot of depositions.  And expert

15  reports were due in December.  As a result of that, the

16  parties agreed, via stipulation, that those deadlines were

17  off and now there are no deadlines in the case that are

18  applicable.

19       They made much of Matt Laterza's testimony.  And I

20  encourage the Court to -- to review it close.  Mr. Laterza,

21  in my view, was a talented deponent who testified clearly,

22  unequivocally about the impact GE's conduct had on Alta

23  Power, particularly related to their misrepresentations and

24  how we relied on what they were saying about pricing and

25  their capacity to deliver units.  And how what they told us

1   turned out to be incorrect and why that was the case.

2       And that leads us to where I'll conclude.  Mr. LeGrand

3   contacted us on October 31st.  Sent it to me personally,

4   individually.  I'm not sure why that was the case.  He wanted

5   to talk to see if we were interested in seeing if we could

6   come to some agreement on path forward.  We did have several

7   subsequent conversations regarding this November 1st letter.

8   The letter raised two issues; termination fees, Watson's

9   deposition exhibit -- or three issues, rather, and the

10  Castleman issue.  The Castleman issue is, again, a straw man

11  that GE is trying to set up.  We believe strongly in our

12  claim related to Castleman.  Castleman was a third party that

13  we allege WattStock violated its confidentiality order to us

14  in disclosing certain information to them that impacted our

15  financing.  GE is now trying to convince this Court that

16  that's our only path to consequential damages.  We don't

17  think that's legally right.  But we suspect that's the straw

18  man they're trying to set up.  They're trying to say this is

19  their only path and we think they have a good chance to

20  defeat it.  The reality is, the case is a fraud, in which

21  GE's representations and GE's independent conduct matters.

22      We did have a conference in November of 2022 where they

23  demanded we strike allegations.  We explained that we believe

24  the evidence supported the allegations and did not intend to

25  amend.  And we had no present intention of amending.  We made

1    clear on the call that the evidence supports this allegation

2    and we would not respond to General Electric's threats by way

3    of its November 1st letter.  That culminated on the November

4    23rd, 2022 motion that was filed where they requested three

5    things; lengthy stay of the proceedings, amend schedule, and

6    force WattStock and Alta Power to amend.  And then thereafter

7    limit amendments.  Now we're here today and the reply brief

8    is saying, we really just want a Rule 16 deadline.  That's

9    putatively what they're here for.  But the reality is,

10   they're also requesting the Court amend the schedule to close

11   the pleadings, whatever that undefined term means.  I suspect

12   they don't want us ever to have the opportunity to amend

13   again, which would be contrary to Rule 16.

14        Now I'll turn it over, unless there's some questions

15   about the facts, Your Honor, I'll turn it over to

16    Ms. Pulliam.

17             THE COURT:  No questions.  Thank you.

18             MS. PULLIAM:  Your Honor, I appreciate the

19   opportunity to address the Court, in addition to

20   Mr. Cancienne.  I have to tell you, I'm pretty emotional

21   about this hearing.  I have practiced in this court for more

22   than two decades and my time clerking in this court is still

23   probably one of the proudest things in my life.  I take my

24   oath of -- that we all take as members of the Bar quite

25   seriously.  And what has happened to me in this hearing today

1   is stunning, I have to say.

2          This motion that was filed alleges repeated Rule 11

3   violations.  You can see the examples of the language used in

4   the motion on the screen.  The Court was told that Alta and

5   its counsel, including me personally, made

6   misrepresentations, factual inaccuracies, factual errors,

7   false representations, statements that were not true, false

8   factual allegations, patently false allegations.  They allege

9   that these misrepresentations raise significant questions

10  about Alta's and its counsel's candor to the tribunal.  They

11  allege that Alta's claims were entirely baseless and

12  frivolous.  They allege that Alta's counsel failed to conduct

13  a cursory pre-suit investigation.  And, again, claim that we

14  made patently false statements to the Court, in addition to

15  the specious argument that my co-counsel manipulated evidence

16  by printing or using a printed pdf version of a spreadsheet.

17         So if you are wondering why there were so many pages

18  filed in response to GE's motion, this is why.  I can imagine

19  the Court's surprise this morning when it realized how much

20  documents it was supposed to read.  But this is why.  This, a

21  motion that says this, is a Rule 11 motion.  They didn't call

22  it that.  The letter that they sent threatening Rule 11

23  violations, for some reason not addressed to me, even though

24  they were putting that I had violated Rule 11, that letter,

25  as Mr. Cancienne explained, repeatedly discusses Rule 11.

1    Their motion is not titled a motion for sanctions under Rule

2    11, but that is what the substance of it is.  GE seeks relief

3    for alleged Rule 11 violations.

4        On page 14 of its motion, GE sought a stay of this case

5    for we counted, I think more than 100 days.  The first reason

6    for that stay was, quote, Alta's pleadings, filings, and

7    arguments in this case rely on significant factual

8    misrepresentations, none of which would have survived even a

9    cursory pre-suit investigation.  So this is a Rule 11 motion

10   in disguise.  The seriousness of such allegations are the

11   kinds of thing that counsel speaks to its own counsel about.

12   Counsel has to have serious conversations with its client

13   about.  It is not a laughing matter, although I've seen

14   laughing in the courtroom today.  It is dead serious.  And

15   it's undoubtedly a Rule 11 motion.  But was Rule 11 procedure

16   followed?  Absolutely not.

17       There is a reason that Rule 11 states that a motion for

18   sanctions must be made separately from any other motion.  And

19   the reason for that is that if a party has a request for the

20   Court that is procedural, or if a party seeks to move for

21   summary judgment, or if a party wants to add something to the

22   scheduling order that it had not previously done, the party

23   is supposed to bring those issues based on the merits and the

24   procedure that apply to that.  If there are serious

25   allegations about counsel's candor to the Court, that is

1   something that is supposed to be raised separately.  It is

2   that important.  It is that sacrosanct.  It is under the

3   Rules supposed to be made separately from other motions.  Not

4   only is it supposed to be made separately, the motion is

5   supposed to be made and not filed.  That also did not happen

6   here.

7        So Alta asks that this Court deny the Rule 11 motion.

8   As the Court may know, Rule 11 also provides for attorney's

9   fees.  And I'd like to explain to the Court why, although it

10  is unusual, I think attorney's fees for Alta are appropriate

11  here.

12       In response to what we've heard this morning is now

13  simply a request to add a Rule 16 deadline in the scheduling

14  order, Alta has had to pay counsel to respond to claims that

15  it has essentially lied to this Court.  It has required

16  counsel to marshall its evidence in the middle of discovery,

17  before most of its witnesses have been deposed.  Mr. Baboo

18  you heard about earlier.  Mr. Harrington, who made all of the

19  statements that you saw in the presentation before, they

20  haven't been deposed yet.  But what did this motion force us

21  to do?  It forced us to pull together some of the most --

22  most important evidence that proves the claims in advance of

23  their depositions.  And it cost a lot of money.  When lawyers

24  are accused of lying to the Court, they take it seriously.

25  It's not a laughing matter.  And we would request the

1  opportunity to put before the Court our attorney's fees.

2        I know that the opinion that this Court set forth in

3  Dondi is something that may be used sometimes a little bit

4  too much.  Here, I think it's appropriate.  I knew Judge

5  Barefoot Sanders well who was on the court when this opinion

6  was written.  I knew his character and the importance of the

7  way that counsel conducts itself in this courtroom.  And I

8  take that opinion very seriously, as well.

9        What we have here, and Mr Cancienne alluded to it, is a

10 series of delays, this being another one, because GE

11 disagrees vehemently -- I don't deny that.  They can disagree

12 with our characterization of the facts.  But this motion

13 caused further delay.  And a significant increase in cost to

14 this litigation.  It is contrary to Dondi.  It is also

15 contrary to Magistrate Horan's opinion in this, I'm not going

16 to try to pronounce it, AZW case that talks about how parties

17 should not make filings that engage or attack their opponents

18 or opposing counsel merely because they take factual or legal

19 positions with which a party disagrees.

20       What happened here is that GE discovered this hidden

21 comment in the native version of an Excel spreadsheet and

22 said, ah-ha, we've got them.  In reality, the comment

23 supports the allegations.  There's no evidence that our

24 client ever saw it.  And multiple other communications also

25 support the allegations, which GE tries to read so narrowly

1   so as to completely misconstrue them.  But that kind of

2   position, that kind of gotcha tactics is not proper under

3   Dondi or the other opinions in this court.

4        The other problem with this motion is that it did

5   require us to respond essentially as if we were -- we were

6   facing a Rule 56 motion.  It was a preview of what we would

7   do in response to a Rule 56 motion.  It, in fact, in effect

8   was a Rule 56 motion.  Because what they did was they

9   repeatedly said that what our client alleges is patently

10  false.  Could not be proved.  And this Court should set a

11  deadline for which the pleadings should be closed.  Implying

12  that my client should withdraw or strike allegations.  The

13  Court should close the pleadings.  And, therefore, those

14  claims concerning these pricing issues and the Castleman

15  claims should not see a jury.  Well, what is that?  That's a

16  motion for summary judgment.  And this Court also has ruled

17  that one motion for summary judgment be filed.  So we would

18  ask this Court to say, you had your chance, GE.

19       And as I said earlier, their entire motion, the bulk of

20  it, in addition to calling me, my co-counsel, and my client

21  essentially liars to the Court and accusing us of lacking

22  candor is the seeking of a 100 plus day stay.  Which wasn't

23  even mentioned in the presentation earlier.  Also stuns me.

24       I think the excuses somehow that, oh, gosh, we didn't

25  know until Mr. Cancienne confirmed in an email again at the

1   time of the filing of our response that we had no intention

2   to bend to these threats.  And said that, clearly in writing,

3   again, that we were not going to amend in response to the

4   allegations that GE had made.  But GE knew that well before

5   that email and well before it filed its motion.  Because when

6   we conferred on this Rule 11 agreement -- I'm sorry, this

7   Rule 11 letter, that was not addressed to me, but accused me

8   of lacking candor to the Court, I sat on a conference call

9   one evening.  I recall it well because I was in my car on the

10  way to a sporting event.  And I made it quite plain that it

11  made no sense to amend as a result of these allegations.

12  That I had not been in the detail of the case for a while.

13  That Mr. Cancienne and his colleague had been handling

14  discovery.  But that I had reviewed a whole lot of emails

15  from GE and a whole lot of documents in the interim that

16  suggested to me that not only were our allegations well

17  founded at the time, but that there was a boat load of

18  evidence that supported them since.  And that it made to

19  sense to me to amend in response to these threats.

20        So GE knew, certainly, well before filing its motion

21  that there was no desire on Alta's part to amend in response

22  to its threats.  And now it comes to the Court and says, oh,

23  all we're asking for is we want the Rule 16 standard to apply

24  as opposed to the Rule 15 standard for motions to amend.

25        Your Honor, I imagine that if that was the request made

1   on Halloween night, it would have been met with a very

2   different answer than what the Court has had to hear today

3   and the papers that have had to have been filed.  So I

4   appreciate the Court's time.

5       I will also say with respect to Rule 16, I think I have

6   it right that counsel said earlier that Rule 16 states that

7   the scheduling order must include such a deadline.  That is

8   not accurate.  I'm reading from Rule 16 right now and it says

9   that the contents of the order -- under that section it says

10  the scheduling order may.  It does not use the word, must.

11  So the parties certainly can confer about whether a Rule 16

12  deadline to amend makes sense.  But Alta requests from this

13  Court that it issue what Dondi referred to, I believe, as a

14  stern warning against the (inaudible word) tactics that have

15  been going on in this case.

16      Although we hate to burden the Court further, we do

17  think that attorney's fees are appropriate here.  And we ask

18  the Court to enforce its rules under Rule 56.

19      I will say, Your Honor, and this -- after hearing this

20  may be pleasing to your ears, that this case was originally

21  filed in state court, as you know.  And as a result of the

22  agreement with WattStock on Friday, WattStock, assuming the

23  Court dismisses WattStock, would no longer be a defendant in

24  this adversary proceeding.  And we are contemplating whether

25  it makes sense to remand the case, as the Court to remand the

1  case.  That, of course, has nothing to do with Your Honor.

2  But rather, you know, a question for our client.  And that's

3  something that we are considering and will -- and will confer

4  with the other parties about.

5            THE COURT:  All right.  Let me think ahead to

6  that.  Again, I haven't paid attention to this motion to

7  dismiss WattStock.  But if WattStock is dismissed, will the

8  outcome of this action have any affect on the confirmed plan?

9            MS. PULLIAM:  I'm probably not the best person

10  to answer that question.

11          THE COURT:  Okay.  And the Court is not going

12  to hold anyone one way or another.  I'm just trying to think

13  ahead, big picture.

14          MS. PULLIAM:  Well, let me -- let me address

15  one thing.

16          THE COURT:  Uh-huh.

17          MS. PULLIAM:  I do think regardless of whether

18  this Court decides to remand the case, what has occurred with

19  respect to this motion should be addressed, because it has

20  happened here and it can't be -- the bell cannot be un-rung.

21  I'm going to confirm your question, though.

22          THE COURT:  Okay.  And, again, nothing anyone

23  says is going to be like judicial estoppel from taking any

24  contrary position.  I'm just thinking big picture how this

25  might play out.

1            MR. BERGHMAN: I appreciate that, Your Honor.

2  Right.  And I'm thinking back to the confirmed plan, the

3  confirmation order, the provisions we had that spoke to the

4  litigation.  And my recollection is that there is -- the way

5  that we structured it, I don't think there would be any

6  affect on the administration of the plan, of the estate.  We

7  just have a particular indemnity provision in the

8  confirmation order that would be affected whether the

9  litigation was here, or in state court, or whenever.  I don't

10 think that it -- it's basically built in and baked in.  It

11 doesn't turn on any sort of determination by this Court.

12 It's just whatever, you know, the judgment ends up being.  If

13 there is one, it gets treated a particular way under the

14 plan.  So it's built in and provided for.  And, frankly, I

15 would personally be, you know, okay if it were remanded and I

16 could close the bankruptcy case.  That would be just fine

17 with WattStock, of course.

18           THE COURT:  Okay.  But is there any scenario

19 where the estate and creditors might get some pot of money

20 under the plan, you know, if whoever --

21           MR. BERGHMAN:  No, Your Honor.  We have a --

22           THE COURT:  -- wins?

23           MR. BERGHMAN:  We've got a pot plan that pays

24 out over three years a million dollars regardless of what the

25 pot of unsecured creditors are.  And the -- this particular

1   dismissal is mutual.  And so any claims, any affirmative

2   claims that WattStock had against Alta are likewise being

3   dismissed.

4              THE COURT:  Mutual releases.

5              MR. BERGHMAN:  Correct.

6              THE COURT:  Uh-huh.

7              MR. BERGHMAN:  And so as a result, there would

8   be no additional funds coming, no unexpected funds.  And even

9   if there were, which there aren't going to be, they would

10  still just fall into the plan and be treated under our

11  confirmed plan.  I don't think that we would have any new or

12  different issues come up where we would need the Court's

13  jurisdiction to interpret the plan or to -- you know, or

14  anything like that.  Understanding that even

15  post-confirmation jurisdiction is narrow to begin with.

16             THE COURT:  Okay.  Thank you.

17             MR. BERGHMAN:  Thank you.

18             THE COURT:  All right.  Mr. LeGrand, you get

19  the last word.

20             MR. LeGRAND:  Thank you, Your Honor.  If I may

21  respond just briefly to the procedural question before I

22  respond to the other issues.

23        Our view is that, one, the District Court has already

24  entered an order stating that it will take this case when

25  it's ready for trial.  And nothing about the settlement

1    disturbs or upends that order.  And, second, this Court has

2    related-to jurisdiction over the litigation as the litigation

3    is intertwined with core proceedings, particularly as

4    WattStock's counsel mentioned the indemnification claim.

5         GE filed a proof of claim against WattStock for the

6    indemnification for pre- and post-petition fees and costs.

7    And as this Court held in In re Senior Care Centers, 622 B.R.

8    680, the Court has subject matter jurisdiction over post-plan

9    confirmation adversarial proceedings that implicate

10   outstanding obligations that must be resolved before a plan's

11   full consummation.  And that's where we are here.  So I know

12   Your Honor mentioned that you're not going to hold us to the

13   word, but I believe that's our position on that issue.

14        There was a lot, Your Honor, and I want to respond to

15   as much of it as I possibly can.  The reason we filed the

16   motion that we did is because we conferred on November 18th,

17   2022 and asked, will you agree to a deadline to amend the

18   pleadings?  And we did so because we feel like, and I believe

19   rightfully so, that this case has changed from when it first

20   began.  If you read the allegations in the complaint, which

21   were noticeably absent from the presentation a second ago.

22   If you read the allegations in the complaint and you look at

23   even the arguments on the motion for judgment on the

24   pleadings, this case, the fraud case against GE was

25   predicated on GE supposedly concealing the existence of LTSA

1   termination fees.

2        Now, you heard a lot about representations, supposedly,

3   about the pricing of these particular units.  There's no

4   reference in the complaint to this supposed $10 million per

5   unit cap.  That's not in the complaint.  That appeared in

6   WattStock's -- excuse me, Alta's amended interrogatory

7   responses for the first time three days before GE was

8   scheduled to depose WattStock's -- Alta's witness.  That was

9   three days we got an amended interrogatory response saying,

10  this case is really about GE and WattStock representing that

11  they could deliver these units for $10 million.  Why is that

12  important to us?  Because if this case is about

13  representations on price, the contract deals with that.  If

14  that's all this case is about, why are you alleging fraud

15  against GE?

16       Instead, when we filed our motion for judgment on the

17  pleadings, Your Honor heard multiple arguments, multiple

18  references to these supposedly concealed LTSA termination

19  fees.  Now, the only reason we are here is because we asked

20  for a deadline to amend the pleadings and they refused.  Yes,

21  we had a back and forth about their allegations.  I don't

22  dispute that.  We believe that those allegations are false.

23  We absolutely stand by those -- and I clerked here too.  And

24  I take my obligation to this Court very seriously.  I clerked

25  on this Court and I understand the implications of Dondi.

1    And I think it violates Dondi to not agree to a deadline that

2    the Rule and the cases that we point to and the sample

3    orders, scheduling orders that we point to say, must be

4    included in the scheduling order.  And our only belief was

5    that the reason why they were withholding that agreement,

6    that consent is because they were going to surprise us down

7    the road.  That when we file summary judgment they're going

8    to say, oh, no, this case isn't really about this any more,

9    it's about something else.  Or this case is -- they've

10   already done it.  If you read the briefs, the case -- they

11   say at one point in the briefs, it was -- the point was never

12   that GE failed to disclose the existence of the LTSA fees.

13   That's not true.  We had a whole hearing about whether we can

14   disclose the existence of these termination fees.  And, in

15   fact, the documents that Mr. Cancienne showed show pretty

16   clearly that those fees were referenced in that document in

17   April of 2019, before they started paying any money to seek

18   these turbines.

19        And I'll just take a step back, Your Honor, because I

20   think it's really important.  What this case is really about,

21   it's about these turbines that were owned by third parties.

22   They were not owned by GE.  These turbines were not owned by

23   GE.  WattStock and Alta had a contract, a master agreement

24   signed in February of 2019 to negotiate for the price that

25   WattStock would be allowed to offer to obtain these -- use

1  gas turbines.

2       The only reason why GE is in this case is because

3  WattStock claimed -- Alta claims that GE knew about these

4  LTSA termination fees and didn't disclose them.  That's why

5  we're in this case.  But we did disclose them.  GE and

6  WattStock disclosed them in these documents that

7  Mr. Cancienne showed.  And so what you're talking about these

8  representations about price, GE wasn't even a party to the

9  agreement about the prices that WattStock would be allowed to

10 offer to obtain these third-party use gas turbines.

11      Now, this is a Rule 16 -- I mean, this is a motion

12 about Rule 16.  This is not a Rule 11 motion.  We did not

13 file a Rule 11 motion.  We're not asking for any sanctions

14 here.  The reason why we had -- we provided the background

15 because they're right, it doesn't make sense.  Why do we have

16 to file a motion to get a deadline to close the pleadings.

17 Why do we have to file that motion?  We were totally confused

18 about why they just wouldn't agree to a deadline.  They

19 forced us to file this motion.  I mean, when we asked them

20 they said, no.  We had three conferences, three conferences

21 where we talked specifically about a deadline to -- excuse

22 me, about their pleadings.  And we asked them, are you going

23 to amend your complaint?  First it was, yes, we've always

24 intended to amend our complaint.  That was on November 1st.

25 Mr. Cancienne and I had that conversation.  We asked them

1    during the second meet and confer that Ms. Pulliam referenced

2    that evening, are you going to amend your complaint?  We do

3    not intend to materially amend our complaint.  And then in

4    December, after we filed this motion, that's when

5    Mr. Cancienne said, no, we're not going to amend our

6    complaint by email, which is included in our -- in our

7    appendix to our reply brief.  So we filed this motion because

8    we were trying to get a deadline so that we're not surprised

9    on summary judgment and we're not surprised on summary

10   judgment and we're not surprised at trial.

11         There were -- there were a lot of arguments about the

12   facts in this case.  Now, what they did not talk about is the

13   allegation that GE and WattStock failed to disclose the

14   existence of these fees.  That is in paragraph -- it's all

15   over the complaint.  I mean, I think there are references --

16   we counted ten references to hidden burdens, hidden

17   liabilities, failure to disclose, concealment of these fees,

18   concealment of the existence of the fees.  But if you look at

19   allegations, paragraph 55 and 56, for example, Alta alleges

20   that GE and WattStock -- if you look at 55 and 56, Alta

21   alleges that GE and WattStock failed to disclose the

22   existence of these LGSA financial burdens to Alta Power.  It

23   was not until almost nine months after Alta had paid the

24   first down payment that Alta Power learned of the existence

25   of the LTSA termination fees, in February of 2020.  And they

1   say that's because the third-party owner of these units began

2   to demand payment for them.  And that was part of their -- I

3   believe and it's in the master agreement, part of their

4   contract with WattStock.  They were going to negotiate with

5   these owners.  And some owners might agree to waive these

6   fees.  Some owners might agree not to.  Some owners might

7   agree to pay them themselves.  That's the -- that was their

8   allegation.  That's why we're here under this claim of

9   alleged fraud that GE actively concealed and failed to

10   disclose the existence of these LTSA termination fees that

11   Alta believes GE had specific knowledge of, unique knowledge

12   of.  And they weren't disclosed until February of 2020.

13       And these documents that they showed with -- they

14   jumped around, quite frankly, quite a lot between documents

15   from GE and WattStock referencing these fees.  And honestly,

16   if you look at the documents -- and I'm happy they gave you a

17   copy of it, of the presentation.  The documents show that GE

18   and WattStock were trying to find a solution to this problem.

19   That is, once it became clear that the owners of the units

20   weren't going to pay the termination fees on our

21   (indecipherable word) unit, which was in the tracker in April

22   of 2019 that Mr. Cancienne showed, you see limitation of that

23   cancellation fee to $500,000.  On the New Simento (phonetic)

24   units you see a reference to the $1.4 million cancellation --

25   cancellation of the $1.4 million LTSA fees.  So the documents

1   that they're relying on actually show the exact opposite.

2   Not that we hid these fees, but that we were discussing them.

3   We were negotiating.  We were trying to figure out a solution

4   so that they could move forward with their projects.

5        Now there's a reference, multiple references to how

6   we're trying to stonewall or delay.  And that's, quite

7   frankly, not true, Your Honor.  And I take that personally

8   because we have not been stonewalling.  We produced 15,000

9   pages of documents.  They've already deposed four

10  individuals.  They only get ten.  Yet, we've sent them dates

11  for Mr. Baboo and Mr. Harrington.  In October of 2022 we said

12  they could be available in late November, early December.

13  Got no word back.  On their 30(b)(6) notice, we sent them

14  objections offering to meet and confer.  They haven't said

15  anything back.  It's like every time we come here, we get

16  accused of, you know, doing something wrong in discovery, or

17  trying to stonewall.  That's not at all what we're trying to

18  do.  What we're trying to do is get a deadline so that we

19  know what their claims are, what their allegations are, and

20  we can move forward.

21       To be quite frank with you, Your Honor, it is

22  strategically in our best interest for them to have

23  allegations that we believe are false.  Because we get to

24  confront every single one of their witnesses with those

25  allegations.  And we can dispute, we can argue about what

1    Mr. Laterza said or did not say in his deposition.  But he

2    pretty clearly said on multiple occasions that the

3    allegations in the complaint weren't worded correctly, or he

4    might have worded it differently.  Because they're not true.

5    I mean, that's what's going on here.  That's what led us to

6    file the motion.  That's what led us to first request that we

7    have a deadline because we're trying to figure out, hey,

8    what's your allegations?  That's all we want to know.  What

9    are your claims?  Is it about the existence of the LTSA fees?

10   Apparently not.  Okay, so what is it about?

11        Now they're saying it's about this $10 million per unit

12   cap.  All right.  If that's going to be your claim, put it in

13   the pleadings.  If not, you've got to be forced to live with

14   the pleadings as they currently are.  You can't surprise us

15   later on down the road.

16        The last thing I want to address, Your Honor, is Dondi.

17   And then I'll make sure I didn't miss anything.  But Dondi

18   also says that it is inappropriate to withhold consent

19   from -- for routine requests.  Dondi says specifically two of

20   the things that the counsel owe as a courtesy to each other

21   is a duty of courtesy and cooperation to each other.  And if

22   a fellow member of the Bar makes a just request for

23   cooperation, a lawyer will not arbitrarily or unreasonably

24   withhold consent.  We asked -- Rule 16 requires a deadline

25   for a motion to amend pleadings -- will you agree to one of

1   those deadlines?  They said, no.  That's the only reason why

2   we filed the motion.  Had they said, yes, this motion would

3   not have been filed.  I mean, that's the bottom line.

4        And on the request for attorney's fees.  Honestly, Your

5   Honor, I believe GE is entitled to attorney's fees, not Alta,

6   because we should not have had to file this motion.  We

7   shouldn't have.  And they forced us to do so because they

8   wouldn't give us consent to a very routine request.  That is

9   the scheduling order that we agreed to by oversight, like

10  this deadline, it should have been in there.  We have a

11  stipulation that we're going to amend the scheduling order,

12  should that proposed scheduling order have a deadline to

13  amend the pleadings.  We believe, yes.  The Rule requires it.

14  And for some reason they just kept saying, no.

15            THE COURT:  The Rule requires it?

16            MR. LeGRAND:  Yes, Your Honor.  Rule 16 says

17  that the scheduling order must set a deadline for -- Rule

18  16(b)(3)(A) says the scheduling order must limit the time to

19  join other parties, amend the pleadings, complete discovery,

20  and file motions.  And as we mentioned -- as I mentioned

21  earlier, Your Honor, the dockets in this District are full of

22  scheduling orders that have these deadlines.  And the cases

23  that I cite -- we cited in our brief explain why.  Because

24  Courts are principally concerned with this idea that you get

25  to -- you litigate a case a certain way all the way down the

1    road until you realize, oh, you know what, my claims actually

2    are subject to being dismissed, the Voucho case.  And so let

3    me change them.  And, quite frankly, that's the posture that

4    we're worried about being in at summary judgment.  Because

5    this whole case was about the existence of LTSA fees until it

6    became clear after we deposed one of their witnesses that

7    they knew about the LTSA termination fees.  And then the case

8    became about this $10 million cap, which is nowhere alleged

9    in their -- in their complaint.

10             THE COURT:  Okay.  I was just double checking

11   that because our standard form of scheduling order in the

12   Bankruptcy Court for the Northern District of Texas  does not

13   have a time limit under Rule 16 for amended  pleadings.  And

14   so I'm like, whoa, has this been a wrong thing for 30 years?

15   Way before my time this has been the form.

16       Ms. Pulliam, did you -- I'm going to allow some back

17   and forth on this one.

18             MS. PULLIAM:  Yeah.  Look, again, the request

19   was for a 100 plus day stay.  And if the only request was, we

20   would like to be under the Rule 16 standard versus the 15

21   standard for amending, we would be having a very different

22   conversation.  The Rules currently require Alta to come to

23   the Court to request an amendment.  The only question is is

24   which standard applies.  And if the only request, again, that

25   had been made was, hey, we would like the Rule 16 standard to

1    apply to any amendments, because when we negotiated the

2    scheduling order we, GE, didn't say that we wanted a deadline

3    to amend the pleadings, we would have had a very different

4    conversation.

5                    THE COURT:  Gotcha, okay.

6                    MR. LeGRAND:  And, Your Honor, I'll just say

7    that this Court's model scheduling order does not include,

8    but other Bankruptcy Courts, including SD TX -- the Western

9    District of Texas does have a deadline to amend the

10   pleadings.  And we didn't discuss the stay until after they

11   said that we wouldn't -- they wouldn't agree to a deadline to

12   amend the pleadings.  Again, even their brief says it's

13   procedurally nonsensical.  Why would we have one, if we have

14   Rule 15?  And so, yes, we did ask for a stay, because we felt

15   like we want to know what this case is before we get too far

16   down the road and you ask -- because, frankly, Your Honor, we

17   intend to file a counterclaim against -- against Alta.  And

18   we don't want you to complain about not being able to depose

19   our folks before we file that counterclaim and ask them to

20   depose them again.  But they have already deposed three GE

21   witnesses, one WattStock witness.  And we've exchanged

22   written discovery.

23                   THE COURT:  So let me get that straight.  I

24   heard that earlier.

25        There have been four depositions in this litigation?

1              MR. LeGRAND:  Yes, Your Honor.

2              THE COURT:  Only four?

3              MR. LeGRAND:  Well, we've only taken one.

4    But, yes, there had been -- there had been four depositions

5    in this litigation.

6              THE COURT:  It's been pending quite a whole,

7    at least by bankruptcy universe terms, okay.  But it was

8    filed June 16th and then, of course, it became an adversary

9    by removal November 9th, 2021.  I'm just -- I'm dismayed.  I

10   know you all think it's a complicated lawsuit.  But, wow,

11   only four depositions have happened.

12             MR. LeGRAND:  I would also add, though, Your

13   Honor, again, we offered dates for two other witnesses.  I

14   know they've been talking to WattStock about depositions for

15   two other witnesses.  And when they served the 30(b)(6), we

16   objected and asked for a meet and confer and we got no meet

17   and confer.

18             THE COURT:  Okay.

19             MR. LeGRAND:  So that's four, two, two, and

20   one that, again, we discussed dates about, but it just never

21   came to fruition.

22             THE COURT:  Okay.  I've heard enough.  I've

23   heard way more than I usually hear on this type of motion.

24        Let me pick on Mr. Berghman for a minute.

25        Do you have a setting on your Rule 41, or the Rule 41

1  motion?

2             MR. BERGHMAN:  Your Honor, we don't.  But on

3  Friday -- I need to reach out to Ms. Ellison and get us a

4  setting.

5             THE COURT:  Okay.

6             MR. BERGHMAN:  I think we could have filed it

7  on negative notice and we didn't.

8             THE COURT:  I think the Rule says, unless all

9  of the parties to the litigation sign off on it, you have to

10 have a Court order.

11            MR. BERGHMAN:  Yeah.  And I think -- I think

12 you can tell there's some discussions that need to happen

13 among counsel on some of these issues.  And so we'll endeavor

14 to get that done.  And if we need a hearing, I think we'll

15 get a setting from Ms. Ellison.

16            THE COURT:  Okay.

17            MR. BERGHMAN:  And I would add just one

18 wrinkle.  I was just looking at the confirmation order very

19 quickly.  I'm confident that we won't need the Court -- if

20 we're out of the Alta lawsuit, there's an indemnification

21 obligation.  If there is a judgment, it does not include

22 attorney's fees, expenses or fees.  And so really it is --

23 assume it goes to state court, Alta gets a judgment against

24 GE, GE pays it and then GE gets an indemnification claim

25 under the plan, you know, if there was an interpretation

1   issue down the road, maybe conceivably we could need the

2   Court.  But just otherwise, it's just a straight up

3   contractual obligation, like a confirmation order and a plan

4   is between the creditors and the debtor to perform an

5   obligation.  So I don't think there's any special bankruptcy

6   (inaudible word) to that, just for clarification.

7                  THE COURT:  But, again, I asked this before

8   and I think I was clear on the answer.  There is no scenario

9   where creditors' recovery is changed one way or another by

10  the result of the Alta --

11                 MR. BERGHMAN:  No, Your Honor.

12                 THE COURT:  -- and GE claims against each

13  other?

14                 MR. BERGHMAN:  There is no scenario where that

15  would happen.

16                 THE COURT:  Okay.  All right.  Thank you.

17                 MR. BERGHMAN:  Thank you.

18                 THE COURT:  All right.  Well, just to kind of

19  drive home the point I made at the very beginning of this

20  hearing.  I was flabbergasted when I got in this morning.  I

21  think that's the right word to use.  Because, again, I take

22  my own obligation very seriously to read all the pleadings

23  and read all the briefs.  And, you know, if your clients paid

24  for this, if you all thought it was important to say certain

25  things to the Court, I owe you all the respect of thoroughly

1    reading your submissions.  So thought it would be no problem.

2    Thought, okay, Rule 16 motion to extend and for stay, you

3    know, how long could that be?  Never contemplated briefing,

4    because, you know, it's a Rule 16 issue.

5        And so not only did I have this long brief in support

6    of the Rule 16 motion with a long appendix, I think it was

7    over 100 pages collectively, then I had the response of Alta

8    that altogether with appendix was over a 300 page thing to

9    read.  And then I forgot to mention there was even a reply

10   from GE that was collectively over 100 pages.  So I just,

11   again, drive this home because I'm partly upset with myself

12   for just assuming I would have less than 20 pages to read in

13   connection with a Rule 16 motion and then having all of this

14   paper.  But I'm also, I guess expressing my dismay that we

15   have this huge, huge brouhaha.  You know, you each have made

16   very passionate arguments.  But as far as GE, there's a heck

17   of a lot more in this Rule 16 motion and briefing, I should

18   say, then just, you know, we think Rule 16 should be applied

19   here so that a good cause standard will apply, if anyone

20   wants to amend.  And, by the way, we think we should get a

21   stay for X reason.  You know, there are quite highly charged

22   accusations put out there in the briefing.  And then, you

23   know, we've got Alta trying to defend its honor with it's own

24   extensive arguments.

25       I'm very dismayed.  I'm very dismayed.  I am going to

1  deny the motion.  I think it's premature.  Although I might

2  not have imagined, given the timetable here it would be

3  premature, given that we have a lawsuit that first started

4  June of 2020 in state court and has been in the bankruptcy

5  court for about 14 months now.  You know, it doesn't sound

6  like a heck of a lot of discovery has actually been concluded

7  here.  So I think it's fair to allow a little more discovery

8  to happen here before we can set in stone no more amendments

9  after X date without good cause.  I just -- you know, I want

10  this to move along.  I'm dismayed it isn't closer to trial

11  ready.  But I'm going to deny the motion.

12       I am also, you know, Alta has asked, we want attorney's

13  fees.  We think this was so over the top.  You know, they

14  feel Dondi is implicated.  What I'm going to do is strike all

15  of these pleadings; the motion with brief and appendix; the

16  response with, you know, arguments and appendix; the reply

17  with appendix.  I'm just going to strike it all.  And, you

18  know, the irony here is because it is, I should say that I

19  haven't really read all of this.  Okay?  I've just scanned it

20  to see, oh, my goodness, why do we have so much in the way of

21  paper submissions?  So I've not been influenced.  I've not

22  been tainted or biased in favor of one side or the other, or

23  offended by, you know, accusations.  None of it stuck.  None

24  of it has stuck on me, essentially the Magistrate Judge, just

25  because I didn't have time to read it.  Never expected I was

1  going to have so much paper.  So I feel like we -- the

2  fairest thing to do is just to strike it all, so that I don't

3  ever consider this.  So that a District Judge upstairs

4  doesn't ever consider it.  So a State Court Judge doesn't

5  ever consider it.  Everybody is going to have to be left to

6  their proof.  If someone thinks a Rule 11 motion is

7  appropriate, God forbid then, you know, it's going to have to

8  happen in the context of a Rule 11 motion.  If someone wants

9  to file a motion for summary judgment, you know, I don't want

10  anyone to have already some evidence in their brain or

11  argument in their brain from this Rule 16 motion.  So I'm

12  going to deny any request for attorney's fees.  But I'm going

13  to strike every darn piece of paper as part of my ruling

14  today.

15      I will further say that we need a scheduling order in

16  place.  And it sounds like the one we have is expired.  I

17  think discovery should continue on.  And the parties should

18  please negotiate in good faith regarding an amended

19  scheduling order.  Maybe it will have a Rule 16 deadline.  In

20  fact, I think probably it should, now that I've looked at the

21  Rule.  But I'm not going to grant the relief that, you know,

22  30 days after today, the Court's ruling, you know, amendments

23  shall close.

24      Let me ask you, was your previous scheduling order, did

25  it have a trial docket date on it?

1                    MR. CANCIENNE:  It had a day which all the

2    hearings had been concluded and we'd be ready for trial.

3                    THE COURT:  And that was what?

4                    MR. CANCIENNE:  August, I believe.

5                    THE COURT:  August?

6                    MR. LeGRAND:  Yes.

7                    MR. CANCIENNE:  We would -- we would ask the

8    Court for some guidance on that so we can work through the

9    schedule.  I'm sure we can, believe it or not, I think we can

10   collaborate to get a schedule done, if we get some guidance

11   from the Court on a trial date, or a trial ready date.

12                   THE COURT:  Okay.  Well, I'm going to say plug

13   in October, because it sounds like you're a little behind

14   where you thought you would be discovery wise.  And so we'll

15   give a couple of extra months to get that going.  And so I'll

16   tell you what I told the previous folks at the earlier

17   hearing, if you can't otherwise agree, just use our standard

18   form of scheduling order for adversaries in this District

19   where all other deadlines roll off the trial docket call.

20   And to be clear, that would be the second Monday in October,

21   unless that's Columbus Day.

22       Mike, is that a Federal Holiday, the second Monday?  If

23   it is, then we'll do it the Tuesday.

24       Okay.  Let's just use October 9th.  I'm going to guess

25   it's going to be --

1          MR. CANCIENNE:  That is Columbus Day.

2          THE COURT:  That is Columbus Day?  Never mind.

3   Okay.  So we'll make it October 10th at 1:30.

4       And, again, unless otherwise agreed, just roll all

5   other dates, such as the date for pre-trial submissions, you

6   know, witness and exhibit lists, the deadline for pre-trial

7   briefing, summary judgments, close of discovery, roll

8   everything off of that.  But, again, I think it might be

9   entirely appropriate to set a deadline for amended pleadings,

10  you know, let's say two weeks after the close of discovery

11  that's contemplated.

12         MR. CANCIENNE:  I think that's appropriate.

13         THE COURT:  Okay.  Now, the last thing I will

14  say -- so I'm going to look for an order reflecting -- an

15  order reflecting my ruling on the Rule 16 motion, as well as

16  an amended scheduling order.  And I'll ask defendants to be

17  the scrivener on that and run it by Mr. LeGrand before

18  submitting it to the Court.  Shouldn't be a very elaborate

19  order on either one of those things.

20      But I'm going to let you all know that a motion for

21  remand, the Court is going to have to take a very hard look

22  at that.  You know, Bankruptcy Courts or District Courts

23  exercising bankruptcy subject matter jurisdiction have to

24  look very, very hard at whether there is federal jurisdiction

25  under 28 USC Section 1334.  Okay?  So, you know, I asked Mr.

1  Berghman the questions I asked him about, is there going to

2  be some impact on the plan?  Would the outcome of this action

3  affect the implementation, execution, or interpretation of

4  the plan?  That's usually the narrower scope of bankruptcy

5  subject matter jurisdiction post-confirmation in a Chapter

6  11.  Now sometimes, I mean, if you do have an adversary filed

7  before confirmation, even if it doesn't fit into that

8  narrower test, sometimes the 5th Circuit has said, well, it's

9  still okay for the Court to continue to exercise bankruptcy

10  subject matter jurisdiction.  But there's always

11  discretionary remand.  And, you know, even if mandatory

12  abstention or, you know, mandatory grounds to remand don't

13  apply here, even if a lack of bankruptcy subject matter

14  jurisdiction doesn't apply here, it may be in the interest of

15  comity for State Courts and out of, you know, respect for

16  state law and in the interest of justice to send it back to

17  state court.

18        And I'm not saying that because I'm annoyed with you

19  all today, I'm just saying that because, you know, this is a

20  big deal in the world of bankruptcy.  You know, we shouldn't

21  be exercising jurisdiction if there's no basis to, or even if

22  there's a basis to, sometimes it's just better to let the

23  State Court go forward.  So we may be there.  We may be there

24  if this motion to dismiss of WattStock gets granted.  So be

25  thinking about that.  Be thinking about what's appropriate

1    there.  And, you know, we'll see if it gets filed and if it

2    gets objected to.

3          All right.  So I'm looking for two forms of order.

4    Anything else?

5          All right.  Thank you.  We stand adjourned.

6                        (End of Proceedings.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2              I, CINDY SUMNER, do hereby certify that the

3   foregoing constitutes a full, true, and complete

4   transcription of the proceedings as heretofore set forth in

5   the above-captioned and numbered cause in typewriting before

6   me.

7

8

9

10

11

12

13

14                              /s/Cindy Sumner

15                        _____

16                        CINDY SUMNER, CSR #5832
                          Expires 10-31-2024
17                        Cindy Sumner, CSR
                          5001 Vineyard Lane
18                        McKinney, Texas 75070
                          214 802-7196
19

20

21

22

23

24

25