**GIBSON, DUNN & CRUTCHER LLP**
John T. Cox III (Tex. Bar No. 24003722)
Andrew LeGrand (Tex. Bar No. 24070132)
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Tel:  214.698.3100
TCox@gibsondunn.com
ALegrand@gibsondunn.com

*Counsel to General Electric International, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| **IN RE WATTSTOCK, LLC,** | **Case No. 21-31488-sgj11V** |
| *Debtor*. | **Chapter 11** |
|  | **Subchapter V** |
| **WATTSTOCK LLC,** | **Adv. No. 21-03083-sgj** |
| *Plaintiff,* | *Removed from the District Court of Dallas County, Texas, 116th Judicial District* |
| **v.** | |
| **ALTA POWER LLC,** | **Case No. DC-20-08331** |
| *Defendant, Counter-Plaintiff, and Third-Party Plaintiff,* | |
| **v.** | |
| **WATTSTOCK LLC,** | |
| *Counter-Defendant,* **and** | |
| **GENERAL ELECTRIC INTERNATIONAL, INC., d/b/a GE POWER SERVICES,** | |
| *Third-Party Defendant.* | |

**GENERAL ELECTRIC INTERNATIONAL, INC'S COUNTERCLAIM FOR
DECLARATORY JUDGMENT AND BREACH OF CONTRACT**

Third-Party Defendant General Electric International, Inc. ("GE") files this Counterclaim for Declaratory Judgment and Breach of Contract against Third-Party Plaintiff, Alta Power LLC ("Alta"). In support hereof, GE would respectfully show the Court as follows:

## I.    INTRODUCTION

1.    GE seeks a declaratory judgment from this Court, pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201), Federal Rule of Civil Procedure 57, and Texas Civil Practice & Remedies Code § 37.003, that Alta has waived its right to seek any incidental, indirect, or consequential damages from GE.

2.    On February 27, 2019, WattStock LLC  ("WattStock") and Alta entered into a Master Agreement ("Master Agreement"). A true and correct copy of the Master Agreement is attached as Exhibit A.

3.    Article 9.1(A) of the Master Agreement limits "each Party's liability for any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs, so that the total aggregate liability of a party to the other shall not exceed the amount of USD $100,000." Ex. A, Article 9.1(A).

4.    Article 9.1(B) of the Master Agreement states that "neither Party, their respective officers, directors, partners, employees, representatives, contractors or subcontractors shall be liable to the other or shall make any claim for any incidental, indirect or consequential damages arising out of or connected in any way to this agreement." Ex. A, Article 9.1(B).

5.    On February 24, 2021, Alta filed a Third-Party Petition ("TPP"), asserting vicarious liability causes of action against GE for the recovery of incidental, indirect or consequential

damages as an alleged representative or partner of WattStock.  A true and correct copy of Alta's Third-Party Petition is attached as Exhibit B.

6.      By this proceeding, GE seeks a declaration that, under Article 9.1(B) of the Master Agreement, Alta is barred from making a claim for or recovering incidental, indirect or consequential damages for any cause of action against GE that arises out of or is connected to the Master Agreement.[1]

7.      GE also seeks a declaration that, under Article 9.1(A) of the Master Agreement, Alta's damages for any claim other than those expressly excepted by the Master Agreement are capped at $100,000, including any claims seeking to hold GE vicariously liable for WattStock's alleged contractual breaches or tortious conduct.

## II.      PARTIES

8.      General Electric International, Inc. is a company incorporated under the laws of Delaware with its principal place of business located in Cincinnati, Ohio.

9.      Alta Power LLC is a Texas limited liability company with its principal place of business located in Texas, and all of Alta's members are citizens of the State of Texas.

## III.      JURISDICTION AND VENUE

10.      Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.  This Court also has core jurisdiction under 28 U.S.C. §§ 157 and 1334.

---

[1] Alta has argued that Article 9 does not apply to its claim that WattStock breached the Master Agreement's confidentiality provision by disclosing Alta's "imminent" financing from Deutsche Bank to one of Alta's competitors, Castleman Power, LLC.  Even if that were true, however, the Master Agreement expressly provides that WattStock—not GE—would be liable for any such breach under Article 7.2 of the Master Agreement, which specifies that "[t]he Receiving Party shall be responsible for any breach or threatened breach of this Article 7 by its Affiliates or Representatives or any third-party to whom its Affiliates or Representatives disclose Confidential Information."

11.     This Court has personal jurisdiction over Alta because Alta maintains its principal place of business in the State of Texas, regularly conducts business in this State, maintains an agent for service of process in Texas, and purposefully availed itself of the privileges of this Texas forum.

12.     Venue in this Court is proper under 28 U.S.C. §§ 1408, 1409, and 1452.

## IV.     FACTS

13.     On February 27, 2019, WattStock and Alta entered into a Master Agreement. WattStock's President, Jay Manning, signed the agreement on behalf of WattStock, and Alta's Chief Financial Officer, Matthew Laterza, signed the agreement on behalf of Alta.

14.     The Master Agreement refers to Alta and WattStock—and only Alta and WattStock—respectively as a "'Party' and collectively as the 'Parties.'"  No other person or entity is a named Party or signatory to the agreement.

15.     The Master Agreement was entered into "to leverage each Party's unique skills to provide for an expedited and efficient means for (i) locating, evaluating, and pricing surplus combustion turbine generator assets available for purchase, (ii) purchasing and refurbishing of selected generator assets, and (iii) designing, constructing, and operating power generation plants in the Texas market ('Business Purpose')."  Ex. A, Page 1.

16.     The Master Agreement contains a Limitation of Liability provision in Article 9.1.[2]  Subsection (A) of that Article caps liability for "any and all claims [or] losses . . . arising under this agreement" to $100,000.  Subsection (B) of the Article waives Alta's and WattStock's respective rights to seek "any incidental, indirect or consequential damages" against each other as

---

[2]  The prefatory language of Article 9.1 contains some exceptions, but these exceptions do not apply to Alta's claims for damages resulting from Alta's breach of LNTP claim or claims regarding any alleged tortious conduct.

parties to the Agreement and against each other's "officers, directors, partners, employees, representatives, contractors or subcontractors."

17.     Article 9.1(A) of the Master Agreement provides:

> To the maximum extent permitted by law, each Party agrees to limit the other Party's liability for any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs, so that the total aggregate liability of a Party to the other shall not exceed the amount of USD $100,000.  It is intended that this limitation shall apply to any and all liability or cause of action arising under this agreement however alleged or arising, unless otherwise prohibited by law.

18.     Article 9.1(B) of the Master Agreement applies to Alta, WattStock, and the Parties' respective officers, directors, partners, employees, representatives, contractors or subcontractors. The provision states:

> Notwithstanding any other provision of this agreement, and to the fullest extent permitted by law, neither Party, their respective officers, directors, partners, employees, representatives, contractors or subcontractors shall be liable to the other or shall make any claim for any incidental, indirect or consequential damages arising out of or connected in any way to this agreement.  This mutual waiver of consequential damages shall include, but is not limited to, loss of use, loss of profit, loss of business, loss of income, loss of reputation or any other consequential damages that either party may have incurred from any cause of action including negligence, strict liability, breach of contract and breach of strict or implied warrantee.

19.     When he signed the Master Agreement on behalf of Alta, Matthew Laterza knew, understood, or believed that WattStock and GE had a contractor-subcontractor relationship.  Alta contends that Mr. Laterza believed that GE was acting as a "representative" of WattStock such that the Master Agreement's Limitation of Liability provision would apply to GE.  In fact, for the projects or transactions involving WattStock and Alta that were contemplated and covered by the Master Agreement, WattStock engaged GE as a subcontractor to provide certain long-lead hardware, engineering activities, and preliminary drawings.

20.     Mr. Laterza also knew, understood, or believed that, by agreeing to Article 9 of the Master Agreement, Alta waived its right to seek incidental, indirect, or consequential damages, such as loss of use, loss of profit, or loss of business, against WattStock and its subcontractors or representatives under the Master Agreement.

21.     Article 12.3 of the Master Agreement states that "[e]ach party hereto has been represented by counsel and participated in the drafting of this agreement." Ex. A, Article 12.3. And, in fact, Alta had Joel Goldberg—an attorney with Porter Hedges LLP—review the Master Agreement before Mr. Laterza executed it on Alta's behalf.

22.     On December 23, 2019, Alta and WattStock entered into the Limited Notice to Proceed Proposal ("LNTP").  Jay Manning signed the LNTP on behalf of WattStock, and Matthew Laterza signed the agreement on behalf of Alta.  GE is not a named party or signatory to the LNTP. A true and correct copy of the LNTP is attached as Exhibit C.

23.     The LNTP relates to the Business Purpose of the Master Agreement by providing pricing and commercial terms to Alta for (1) surplus combustion turbine generator assets available for purchase and (2) refurbishment of selected generator assets.  *See* Exhibit C.

24.     The LNTP was executed in furtherance of Alta's plan to design, construct, and operate power generation plants in the Texas market.  *See* Ex. B, ¶ 91.

25.     On February 24, 2021, Alta filed a Third-Party Petition against GE alleging that GE is vicariously liable for WattStock's alleged breach of contract and tortious conduct because "GE is an 'affiliate' or 'representative' of WattStock and, therefore, a party to the Master Agreement."  *Id.* at ¶ 46.

26.     Alta alleges that "GE is also vicariously liable for WattStock's breaches of the Master Agreement and LNTP," *id.* at ¶ 120, and seeks "unliquidated damages" to compensate for these alleged breaches.  *Id.* at ¶ 121.

27.     Alta also alleges that "GE's refusal to go forward with the Nuh Cemento project once WattStock became insolvent was a breach of the LNTP[.]" *Id.* at ¶ 105.

28.     Alta further alleges that GE and WattStock are "partners such that GE is responsible for WattStock's torts and breaches." *Id.*

29.     Alta seeks incidental, indirect, and consequential damages of up to $330 million from WattStock[3] and/or GE, including sums it claims it would not have spent and profits it claims it would have made but for WattStock and GE's alleged breach of the Master Agreement, LNTP, and for other tortious conduct related to the Business Purpose of the Master Agreement.

30.     On June 18, 2021, before this case was removed to this Court, GE filed a Third-Party Answer ("Answer"), including defenses and a jury demand, in the District Court of Dallas County, 116th Judicial District (Cause No. DC-20-08331).  GE's Answer is hereby incorporated by reference as though fully set forth herein.  A copy of GE's Answer is attached as Exhibit D.

## V.      CAUSES OF ACTION

### COUNT I – DECLARATORY JUDGMENT (Incidental, Indirect, and Consequential Damages)

31.     GE realleges paragraphs 1 through 30 and incorporates them by reference, as though fully set forth herein.

32.     The Master Agreement states that "neither Party, their respective . . . partners [or] representatives, contractors or subcontractors . . . shall be liable to the other or shall make *any*

---

[3] On January 20, 2023, Alta and WattStock filed an agreed motion to dismiss their claims against one another with prejudice. The Bankruptcy Court granted that motion on January 31, 2023, thereby dismissing WattStock from this case.

claim for *any* incidental, indirect or consequential damages arising out of or connected in *any way* to this agreement." Ex. A, Article 9.1(B) (emphasis added).

33.     This Limitation of Liability provision covers any and all types of incidental, indirect, and consequential damages connected in any way to the Master Agreement, including but not limited to "loss of use, loss of profit, loss of business, loss of income, [and] loss of reputation." *Id.* It also applies to "*any other* consequential damages that either party may have incurred from *any* cause of action including negligence, strict liability, breach of contract and breach of strict or implied warrantee." *Id.* (emphasis added).

34.     Alta knew, understood, or believed that WattStock and GE had a contractor-subcontractor relationship. Alta contends that it also believed WattStock and GE were "partners" or that GE was WattStock's "representative" under the Master Agreement such that Article 9.1(B) would apply to any claims or causes of action asserted by Alta against GE that arose out of or were connected in any way to the Master Agreement.

35.     Alta also knew, understood, or believed that, by executing the Master Agreement, Alta waived and agreed not pursue any right it might have otherwise had to seek incidental, indirect, or consequential damages from WattStock or GE. Alta's claims for incidental, indirect, and consequential damages against GE have unquestionably arisen out of or are connected to the Master Agreement.

36.     An actual and justiciable controversy that is ripe for adjudication has arisen and currently exists between Alta and GE as to whether Alta can seek or recover incidental, indirect, or consequential damages for claims arising out of or connected in any way to the Master Agreement.

37.     A determination by this Court would terminate the controversy and would aid Alta and GE going forward in governing themselves based on their relative rights and obligations for expenses that have been and will be incurred by GE in connection with Alta's claims.

38.     GE requests a declaration that, under Article 9.1(B) of the Master Agreement, Alta is barred from making any claim other than those for which a valid and express exception exists for incidental, indirect, or consequential damages that arises out of or is connected to the Master Agreement, and GE therefore cannot be liable for any such claims.

**COUNT II – DECLARATORY JUDGMENT (Limitation of Liability)**

39.     GE realleges paragraphs 1 through 38 and incorporates them by reference, as though fully set forth herein.

40.     Section 9.1(A) of the Master Agreement states that "each Party agrees to limit the other Party's liability for any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs, so that the total aggregate liability of a Party to the other shall not exceed the amount of USD $100,000." Ex. A, Section 9.1(A). This Limitation of Liability provision covers "any and all liability or cause of action arising under this agreement however alleged or arising, unless otherwise prohibited by law." *Id.*

41.     Alta claims that GE is vicariously liable for WattStock's alleged breach of the Master Agreement, LNTP, and for related tortious conduct. *See* Ex. B, ¶ 120.

42.     Alta also claims that it believes GE is a "party" to the Master Agreement such that Section 9.1(A) would apply to any claim by Alta against GE arising under the Master Agreement. *Id.* at ¶ 46.

43.     Alta alleges damages in excess of $100,000 from GE for those causes of action.

44.     An actual and justiciable controversy that is ripe for adjudication has arisen and currently exists between Alta and GE as to whether Alta can seek or recover damages of any nature in excess of $100,000 for claims or causes of action arising under the Master Agreement against GE.

45.     Article 9.1(A) applies to Alta's claims against GE because Alta seeks to hold GE vicariously liable for WattStock's alleged breach of the Master Agreement and related tortious conduct.  Alternatively, Article 9.1(A) applies to Alta's claims against GE because Alta alleges that GE is a "party" to the Master Agreement.

46.     A determination by this Court would terminate the controversy and would aid Alta and GE going forward in governing themselves based on their relative rights and obligations for expenses that have been will be incurred by GE in connection with Alta's claims.

47.     GE requests a declaration that, under Article 9.1(A) of the Master Agreement, Alta cannot recover more than $100,000 from GE for any and all claims for which GE, if at all, is vicariously liable for WattStock's alleged contract breaches or tortious conduct.

48.     Alternatively, GE requests a declaration that, under Article 9.1(A) of the Master Agreement, if the Court finds that GE is a "party" to the Master Agreement, GE's liability for any and all claims, losses, costs, damages, including attorneys' fees and costs, arising under the Master Agreement is capped at $100,000.

**COUNT III – BREACH OF CONTRACT (Incidental, Indirect, and Damages)**

49.     GE realleges paragraphs 1 through 48 and incorporates them by reference, as though fully set forth herein.

50.     GE is a third-party beneficiary of the Master Agreement and, as a result, may sue for damages caused by Alta's failure to comply with the terms of that agreement.  *See MCI*

*Telecomms. Corp. v. Tex. Utils. Elec. Corp.*, 995 S.W.2d 647, 651 (Tex. 1999) (holding that a non-signatory to a contract may sue for damages caused by a contract's breach if the non-signatory qualifies as a third-party beneficiary).

51.    A party who sues under a contract is subject to the terms of that contract.  *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001).  By suing under the Master Agreement, Alta subjected itself to the contract's terms.

52.    At minimum, Alta is equitably estopped from denying that the Master Agreement is a valid and enforceable agreement, and that the terms of that agreement apply to Alta's dispute with GE. *See, e.g. GT Leach Builders, L.L.C. v. Sapphire V.P., LP*, 458 S.W.3d 502, 527 (Tex. 2015).

53.    The Master Agreement contains an express covenant not to sue for incidental, indirect, or consequential damages.  Under Article 9.1(B) of the Master Agreement, Alta agreed that neither party to the contract "shall make *any* claim for *any* incidental, indirect or consequential damages arising out of or connected in *any way* to this agreement."  Ex. A, Article 9.1(B) (emphasis added).

54.    Article 9.1(B) of the Master Agreement expressly releases the Parties and their respective partners, representatives, contractors or subcontractors from any liability for any "incidental, indirect or consequential damages" arising out of or connected to the Master Agreement, which "include[s], but is not limited to, loss of use, loss of profit, loss of business, loss of income, loss of reputation or any other consequential damage that either party may have incurred from any cause of action including negligence, strict liability, breach of contract and breach of strict or implied warrantee."  *See id.*

55.     Alta knew, understood, or believed that WattStock and GE had a contractor-subcontractor relationship.  Alta contends that it believed WattStock and GE were "partners" or that GE was WattStock's "representative" under the Master Agreement.

56.     If, as Alta alleges, it in fact believed that GE was WattStock's partner or representative, Alta intended Article 9.1(B)'s Limitation of Liability provision of the Master Agreement to apply to any claims asserted by Alta against GE, other than those expressly excepted by the contract, that arose out of or were connected in any way to the Master Agreement.

57.     Alta sued GE under the Master Agreement by alleging that GE is a "party" to that agreement, and that as WattStock's representative or partner, GE is vicariously liable for WattStock's breach of the Master Agreement, breach of the LNTP, and for other tortious conduct.

58.     Alta also alleges that GE breached the LNTP.

59.     Alta's Third-Party Petition seeks "unliquidated damages" to compensate for this alleged breach of the LNTP and tortious conduct, both of which are connected to the Master Agreement.

60.     Alta breached the Master Agreement by suing GE for incidental, indirect, and consequential damages for alleged breaches of the LNTP and for other tortious conduct connected to the Master Agreement.  Alta was aware before it filed its Third-Party Petition that its claim for incidental, indirect, and consequential damages relies on causes of action arising out of or connected to the Master Agreement.  Alta was also aware that these causes of action are not covered by one of the exceptions to the Master Agreement's Limitation of Liability provision. Absent enforcement of the covenant not to sue for incidental, indirect, or consequential damages, Alta will continue to wrongfully assert such damages against GE.

61.    Alta's breach of the Master Agreement's Limitation of Liability provision has caused GE to incur substantial damages, including over $1,500,000 in attorneys' fees, discovery fees, court costs and expenses in connection with defending against Alta's claims for incidental, indirect, and consequential damages.  Absent relief from this Court, GE will continue to suffer damages from Alta's continuing breach of the Master Agreement.

## VI.      REQUEST FOR ATTORNEYS' FEES

62.    GE requests an award of costs and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 38.001(8) and any applicable contractual provisions or common law.

## VII.      CONDITIONS PRECEDENT

63.    All conditions precedent to GE's right to recover and to Alta's liability, including presentment of attorneys' fees, have been performed, have been waived, or have occurred.

## VIII.      PRAYER

For these reasons, GE respectfully prays for relief as follows:

a.  That the Court declare that Alta is barred from seeking or recovering incidental, indirect, or consequential damages from GE, as expressly stated in and subject to any valid exceptions to Section 9.1(B) of the Master Agreement;

b.  That the Court declare that GE may not be held liable for any incidental, indirect, or consequential damages arising out of or connected in any way to the Master Agreement, as expressly stated in and subject to any valid exceptions to Section 9.1(B) of that Agreement;

c.  That the Court declare that GE's vicarious liability for WattStock's alleged contract breaches and tortious conduct is capped at $100,000, as expressly stated in and subject to any valid exceptions to Section 9.1(A) of the Master Agreement;

d.  Alternatively, if the Court finds that GE is a "party" to the Master Agreement, that the Court declare that GE's liability for any and all claims, losses, costs, and damages is capped at $100,000, as expressly stated in and subject to any valid exceptions to Section 9.1(A) of the Master Agreement;

e.  A judgment that Alta has breached the Master Agreement;

f.  An award of damages sufficient to compensate GE for Alta's breach of the Master Agreement, including attorneys' fees, expert fees, and any other court costs or expenses;

g.  An award of GE's costs and attorneys' fees, as authorized by Texas Civil Practice & Remedies Code §§ 37.009, 38.001; and

h.  Any such other and further relief to which GE may be entitled.

Dated:  February 17, 2023

Respectfully submitted,

/s/   Andrew LeGrand
John T. Cox III  (Tex. Bar No. 24003722)
Andrew LeGrand (Tex. Bar No. 24070132)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel:    214.698.3100
Email: TCox@gibsondunn.com
            ALegrand@gibsondunn.com

Robert Klyman (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel: 213.229.7562
RKlyman@gibsondunn.com

*Counsel to General Electric International, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document has been served on counsel

of record pursuant to the Federal Rules of Civil Procedure.

*/s/ Andrew LeGrand*
Andrew LeGrand

*Attorney for General Electric
International, Inc.*

# EXHIBIT A

### MASTER AGREEMENT

This Master Agreement ("Agreement") is made and entered into as of the 27th day of February 2019 ("Effective Date") by and between Alta Power LLC, a Texas limited liability company ("Alta") with offices at 4605 Post Oak Place Dr. Suite 270, Houston, TX 77027, and WattStock LLC, a Texas limited liability company ("WattStock") with offices at Suite 850, 4040 North Central Expressway, Dallas, Texas 75204. Alta and WattStock are also each referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Alta is a power plant developer with a unique strategy for developing power generation projects in the Texas market using surplus combustion turbine packages; and

WHEREAS, WattStock is a supplier of power generation equipment and services, with extensive knowledge of the power equipment market; and

WHEREAS, Alta and WattStock seek to enter into an agreement or agreements to leverage each Party's unique skills to provide for an expedited and efficient means for (i) locating, evaluating, and pricing surplus combustion turbine generator assets available for purchase, (ii) purchasing and refurbishing of selected generator assets, and (iii) designing, constructing, and operating power generation plants in the Texas market ("Business Purpose").

NOW, THEREFORE, for and in consideration of the mutual covenants and promises and representations contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Alta and WattStock agree as follows:

### Article 1.    Definitions

Whenever used in this Agreement with initial capitalization, the following definitions shall be applicable:

**"Affiliate"** of a Party means any other person (natural person, corporation limited liability company, partnership, firm, association, or any other entity whether acting in an individual, fiduciary or other capacity) that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the Party specified, including, without limitation such Party's owners, directors, officers, and employees.

**"Assets"** means major sub-components of an LM6000 Generator Set that may qualify for purchase for the Business Purpose including (i) generator set package with combustion turbine engine and electric generator, (ii) generator set package without combustion turbine engine and/or electric generator, (iii) combustion turbine engine only, (iv) electric generator only, and/or (v) such other equipment as the Parties may agree.

**"Business Day"** means a Day, other than a Saturday or Sunday or a legal or bank holiday, in the State of Texas.

**"Business Purpose"** has the meaning ascribed to it in the Preamble.

1

**"Confidential Information"** means the existence and terms of this Agreement, the fact that discussions are taking place between the Parties concerning the Business Purpose, and any and all information related to the Business Purpose disclosed to a Receiving Party prior to, on or after the Effective Date by a Disclosing Party (whether written, oral, digital or visual) that has economic value and is not generally known to the public, or which would constitute a trade secret under the U.S. Uniform Trade Secrets Act and any oral, electronic or written communications thereof, including without limitation information concerning discoveries, developments, designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, computer programs, program code, specifications, analyses, reports, drawings, sketches, models, samples, data, algorithms, trade secrets, models, samples, calculations, formulas, WattStock manufacturing specifications or methods, analytical or quality control methods, actual and projected sales information, cost, price and other financial information, information relating to actual or potential suppliers and customers. markets, marketing opportunities, business structure, assets, liabilities, budgets, operations and strategies or other technical or business information, together with any information developed or derived by Receiving Party from such disclosed information.

**"Day" or "day"** means a calendar day, unless otherwise specified.

**"Disclosing Party"** means a Party providing Confidential Information to the Receiving Party.

**"Effective Date"** has the meaning ascribed to it in the Preamble.

**"Equipment Purchase and Sale Agreement"** means a definitive agreement to be entered into by Alta and WattStock for the purchase by Alta from WattStock of an LM6000 Generator Set.

**"Exclusivity Period"** has the meaning ascribed to in Article 6.1.

**"Initial List of Assets"** has the meaning ascribed to in Article 2.1.

**"Inspection Conclusions and Estimates"** means any reports, condition assessments, analyses, recommendations, estimates to repair or refurbish, proposals, work scopes or other information prepared by WattStock or for WattStock by any WattStock subcontractor based upon Inspection Data.

**"Inspection Data"** means any information documenting the existing condition of the Asset including borescope photos, videos, operation and maintenance logs or other data obtained during the course of an Asset inspection but excluding any Inspection Conclusions and Estimates.

**"LM6000 Generator Set"** means a skid-mounted, GE aeroderivative combustion turbine power generation package refurbishment by WattStock.

2

"**Owner**" means the person or entity that owns or controls the right to sell an Asset. The term "Owner" may include third-party agents or brokers retained by the title holder of the Asset to find potential buyers.

"**Receiving Party**" means a Party to whom Disclosing Party provides Confidential Information.

"**Representatives**" of a Party means any attorneys, accountants, consultants, agents and advisors, as well as actual or prospective partners, joint venturers, co-owners, lenders, financing parties, underwriters, and equity investors.

"**Term**" has the meaning ascribed to it in Article 5.

### Article 2.   Identifying and Prioritizing LM6000 Generator Sets

2.1    Promptly following the Effective Date, WattStock will deliver to Alta as Confidential Information an initial list of Assets that WattStock believes may be available for purchase. The initial list will include general information about the country of the Asset's last known location, its approximate age, and if available, price being asked by the Owner ("Initial List of Assets").

2.2    Within two (2) Business Days following Alta's receipt of the Initial List of Assets, Alta shall (i) advise WattStock in writing of any Asset on the Initial List of Assets that Alta has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide WattStock with reasonable documentation demonstrating Alta's prior awareness of the Asset and Alta's efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

2.3    The Parties shall jointly rank-order the Initial List of Assets with goal of developing a list of top target Assets sufficient, once refurbished, as required, by WattStock, to make up nine (9) LM6000 Generator Sets.

2.4    At any time during the Term of this Agreement, either Party may disclose to the other Party as Confidential Information additional Assets that were not on the Initial List of Assets. In such event, the Party receiving the disclosure information shall within two (2) Business Days following its receipt of the newly disclosed Asset, (i) advise the disclosing Party in writing that the receiving Party has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide the disclosing Party with reasonable documentation demonstrating the receiving Party's prior awareness of the Asset and its efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

### Article 3.   Securing Right to Purchase Units

3.1    With approval of Alta, WattStock will arrange with the Owner of an Asset an inspection to evaluate the condition and refurbishment requirements of such Asset. Alta understands and acknowledges that the types of Asset inspections that WattStock will be able to perform in the

field cannot identify all defects in an Asset, even with the benefit of borescope inspections of the internals of a combustion turbine engine. Alta will be responsible for reimbursing WattStock for WattStock's out-of-pocket, expenses incurred in performing Asset inspections. Aggregate expenses in excess of $20,000 will require prior written Alta approval. WattStock shall provide Alta with a copy of the Inspection Data and WattStock may retain a copy of the Inspection Data. Any Inspection Conclusions and Estimates delivered by WattStock to Alta shall be WattStock Confidential Information.

3.2     Following inspection of Assets sufficient to make-up a generator package, WattStock will provide to Alta as Confidential Information a not-to-exceed price for an agreed upon scope of work to complete an LM6000 Generator Set. For the avoidance of doubt, the agreed upon scope of work for the LM6000 Generator Set will exclude any defects that are not reasonably identifiable through the field inspections performed by WattStock pursuant to Article 3.1.

3.3     Prior to WattStock securing from the Owner of an Asset the exclusive right to purchase same, WattStock and Alta would agree in writing on the terms, including the amount of any non-refundable payments Alta would agree upon in order that WattStock may secure the right to purchase the Asset.

3.4     WattStock would then enter into negotiations with the Owner of an Asset on purchase terms or a purchase option consistent with the terms approved by Alta. Commencing from the date that WattStock and Alta have agreed pursuant to Article 3.1 that WattStock should inspect an Asset and continuing through the first to occur of the date that (i) Alta rejects such Asset, (ii) Owner declines to grant WattStock an exclusive right to purchase such Asset, or (iii) is sixty (60) days following WattStock's latest proposal to the Owner of an Asset to grant WattStock an exclusive right to purchase such Asset (or such longer period as may be agreed by the Parties) and Owner still has not granted WattStock an exclusive right to purchase the Asset, WattStock agrees it shall not market such Asset to any third-parties.

### Article 4. Refurbishing of Assets for Alta

4.1     Alta and WattStock will enter into one or more definitive Equipment Purchase and Sale Agreement describing the scope, terms, and price under which Alta would purchase from WattStock each LM6000 Generator Set.

4.2     Alta acknowledges that the price for each LM6000 Generator Set may vary due to the variable conditions of each Asset and the variable scopes of refurbishment work that may be required for each Asset. Certain defects or conditions, including what is commonly referred to as "fallout", are not discoverable until the Asset is disassembled in a repair shop setting. To the extent such additional repairs are discovered, the Parties would agree to a change order to the Equipment Purchase and Sale Agreement, including price and schedule to perform the work.

4.3     All amounts paid by Alta to WattStock for payment to the Owner to secure the Asset (excluding reimbursement of WattStock expenses described in Article 3.1) shall be treated as payments toward the purchase price of the LM6000 Generator Set.

4

4.4    If Alta and WattStock are unable to reach agreement on an Equipment Purchase and Sale Agreement then the Parties will agree upon a plan for dealing with any Assets that were secured with the intent of incorporation into an LM6000 Generator Set.

4.5    Failure by the Parties to reach agreement on any one (1) Equipment Purchase and Sale Agreement shall not be grounds for terminating this Agreement.

### Article 5. Term

5.1    The term of this Agreement shall be twenty-four (24) months following the Effective Date, unless the Parties have agreed to an extension in writing or the Agreement has been earlier terminated pursuant to Article 11.

### Article 6. Exclusivity and Non-Circumvention

6.1    For any Assets that an Owner has granted WattStock an exclusive right to purchase during the Term of this Agreement, Alta will have an exclusive right to purchase an LM6000 Generator Set from WattStock utilizing such Asset for the period equal to WattStock's exclusivity ("Exclusivity Period").

6.2    Without derogation of any confidentially obligations pursuant to Article 7, during the Term of this Agreement and for a period of twelve (12) months following the expiration or termination of this Agreement for Assets that have been inspected pursuant to Article 3 of this Agreement or for a period of six (6) months for Assets that have not been inspected pursuant to Article 3 of this Agreement:

A. Alta agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset (1) on the Initial Assets List or (2) otherwise disclosed by WattStock to Alta during the Term of this Agreement; and

B. WattStock agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset disclosed by Alta to WattStock during the Term of this Agreement, except as otherwise provided in the Agreement.

C. WattStock shall be free to purchase an Asset without any restrictions or further obligations to Alta with respect to such Asset in the following circumstances:

    i.    If Alta rejects an Asset for use in connection with the Business Purpose for any reason;

    ii.    If WattStock is unable to reach agreement with Owner on purchase terms or a purchase option consistent on the terms approved by Alta;

    iii.    If Alta and WattStock cannot agree on terms of an Equipment Purchase Sale Agreement.

5

## Article 7. Confidentiality

7.1     The Parties agree that the WattStock Standard Mutual Nondisclosure Agreement that was entered by the Parties on or about May 8, 2018 is hereby superseded by this Agreement. Any Confidential Information disclosed pursuant to that prior Mutual Nondisclosure Agreement shall continue to be deemed Confidential Information protected against disclosure pursuant to this Article 7.

7.2     Confidential Information shall not be disclosed to any third party by Receiving Party or any of its Affiliates or Representatives, and shall not be used by Receiving Party or any of its Affiliates or Representatives for any purpose other than the Business Purpose, including but not limited to developing and/or providing any product or service or establishing any relationship that is competitive with or against the best interests of the Disclosing Party.  Confidential Information shall be held in strict confidence by the Receiving Party and shall not be disclosed in any manner whatsoever without the prior written consent of the Disclosing Party, except to those Affiliates or Representatives of the Receiving Party with a need to know the Confidential Information in connection with the Business Purpose. The Receiving Party shall inform any of its Affiliates or Representatives to whom Confidential Information is disclosed of the existence of the restrictions in this Article 7, and that the Confidential Information has been shared with the Receiving Party in strict confidence. The Receiving Party shall be responsible for any breach or threatened breach of this Article 7 by its Affiliates or Representatives or any third-party to whom its Affiliates or Representatives disclose Confidential Information. The Receiving Party and its Affiliates and Representatives shall protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Receiving Party uses to protect its own confidential and proprietary information.

7.3     The Disclosing Party has reserved and shall retain all rights, title, and interest to the Confidential Information disclosed to the Receiving Party. No express or implied license or right is granted to Receiving Party with respect to any intellectual property or other proprietary rights of the Disclosing Party with respect to the Confidential Information. The Receiving Party shall not acquire any patent, copyright, trademark, or other intellectual property rights in such Confidential Information except for the limited right to use the Confidential Information for the specific purposes described herein. Any invention made or discovery based upon or arising from the Confidential Information is, and shall remain, the sole property of the Disclosing Party.

7.4     This Article 7 imposes no obligation upon the Receiving Party with respect to Confidential Information that: (i) is or becomes generally known or publicly available through no fault of the Receiving Party; (ii) was known to the Receiving Party on a non-confidential basis prior to disclosure by the Disclosing Party (iii) is lawfully obtained by the Receiving Party from a third-party under no obligation of confidentiality or (iv) is independently developed by or for the Receiving Party without use of the Confidential Information.

7.5     In the event that the Receiving Party is requested or required (by oral questions, interrogatories, requests for information, or by applicable legal or regulatory authority or by any

rule or regulation of any stock exchange or market or by any administrative or government body) to disclose any Confidential Information, the Receiving Party shall promptly notify the Disclosing Party in writing of such request or requirement prior to disclosure so that the Disclosing Party may seek an appropriate protective order and/or waive compliance with the terms of this Article 7, as applicable. The Parties shall cooperate with each other and their respective counsel in any Party's efforts to prevent such disclosure of Confidential Information. In the event that a protective order or other remedy is not obtained, by the time that the Receiving Party is required to disclose the Confidential Information, or the Disclosing Party waives compliance with the provisions hereof, the Receiving Party agrees to furnish only that portion of the Confidential Information that it reasonably determines, in consultation with its counsel, is legally required to be disclosed, and to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information after its disclosure.

7.6     At any time upon written request of the Disclosing Party, the Receiving Party shall promptly destroy (and supply written confirmation thereof to the Disclosing Party) all Confidential Information, including all copies, summaries, extracts and notes thereof, in possession of the Receiving Party or any of its Affiliates or Representatives.

7.7     Neither Party makes any representations or warranties, whether written or oral, statutory, express or implied, with respect to any information provided hereunder, including without limitation any warranty of accurateness, completeness, merchantability or fitness for a particular purpose. Neither the Disclosing Party nor any of its Affiliates or Representatives shall have any liability resulting from the use of the Confidential Information by the Receiving Party.

7.8     Notwithstanding any expiration or termination of this Agreement, all obligations of confidentiality and all restrictions on the use of Confidential Information under this Article 7 shall remain in effect for a period of three (3) years following the date of expiration of termination, and with respect to Confidential Information that constitutes a trade secret under applicable law, for as long as such information remains a trade secret.

7.9     The Parties hereto agree that money damages would not be a sufficient remedy for any breach of this Article 7 and that the Disclosing Party shall be entitled to injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Article 7. Such remedy shall not be the exclusive remedy for any breach of this Article 7 but shall be in addition to all other rights and remedies available at law or in equity.

### Article 8. Indemnification

8.1     Both Alta and WattStock agree to indemnify and hold one another harmless from and against any and all liability, loss, expense, attorneys' fees, or claims for physical injury to third-parties and/or physical damages to property of third-parties from or in any way connected to the performance of this Agreement, but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from such indemnifying Party's negligence, willful misconduct or intentional acts.

7

### Article 9. Limitation of Liability

9.1     EXCEPTING ARTICLE 6 (EXCLUSIVITY AND NON-CIRCUMVENTION), ARTICLE 7 (CONFIDENTIALITY), AND 8 (INDEMNIFICATION):

   A. **TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY AGREES TO LIMIT THE OTHER PARTY'S LIABILITY FOR ANY AND ALL CLAIMS, LOSSES, COSTS, DAMAGES OF ANY NATURE WHATSOEVER OR CLAIMS EXPENSES FROM ANY CAUSE OR CAUSES, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT-WITNESS FEES AND COSTS, SO THAT THE TOTAL AGGREGATE LIABILITY OF A PARTY TO THE OTHER SHALL NOT EXCEED THE AMOUNT OF USD $100,000. IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT HOWEVER ALLEGED OR ARISING, UNLESS OTHERWISE PROHIBITED BY LAW.**
   B. **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.**

### Article 10. Warranty Disclaimer

10.1    WattStock makes no warranty, express or implied, including regarding the condition of an Asset or title thereto. All warranties, if any, to be made by WattStock to Alta will be set forth in any executed Equipment Purchase and Sale Agreements.

### Article 11. Termination

11.1    Neither Party may terminate the Agreement for its convenience.

11.2    Alta may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of WattStock or (ii) a material breach of this Agreement by WattStock which WattStock fails to cure within thirty (30) days after notice thereof from Alta.

11.3    WattStock may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of Alta or (ii) a material breach of this Agreement by Alta which Alta fails to cure within thirty (30) days after notice thereof from WattStock.

11.5    Expiration or termination of this Agreement shall not terminate, modify or otherwise impact any Equipment Purchase and Sale Agreement in effect as of the effective date of

expiration or termination of this Agreement; provided, however, in the event of a bankruptcy by one Party, the non-filing Party shall have the right to terminate any or all pending Equipment Purchase and Sale Agreement(s) for cause.

### Article 12. Miscellaneous

12.1    The Agreement shall be governed by the laws of the state of Texas. Any disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas.

12.2    Any notice or other formal communication to be given under this Agreement shall be in writing and signed by or on behalf of the Party giving it. All such communications will be deemed given: (a) at the time of delivery, if delivered to the appropriate address by hand or by internationally recognized overnight courier service (costs prepaid); (b) at the time of transmission, if sent by fax or email with confirmation of transmission by the transmitting equipment; or (c) at the time of receipt or rejection by the addressee, if sent by certified mail, return receipt requested, provided that, in each case, where the delivery, transmission, receipt or rejection occurs outside working hours, notice shall be deemed given at the start of working hours on the next business day. The mailing or delivery addresses, email addresses and fax numbers for the Parties for the purpose of this clause are:

**If to Alta:**

| | |
|---|---|
| COMPANY: | Alta Power LLC |
| ATTENTION: | Matthew Laterza |
| ADDRESS: | 4605 Post Oak Place Dr, Suite 270 |
| CITY: | Houston |
| STATE: | Texas |
| ZIP: | 77027 |
| EMAIL: | mlaterza@altapowerdev.com |
| Copy to: | twest@altapowerdev.com |

**If to WattStock:**

| | |
|---|---|
| COMPANY: | WattStock LLC |
| ATTENTION: | Jay Manning |
| ADDRESS: | Suite 850, 4040 North Central Expressway |
| CITY: | Dallas |
| STATE: | Texas |
| ZIP: | 75204 |
| EMAIL: | j.manning@wattstock.com |
| Copy to: | p.jenevein@wattstock.com |

12.3    Each Party hereto has been represented by counsel and participated in the drafting of this Agreement. This Agreement shall be construed as if drafted jointly by the Parties and no

9

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

12.4    Each Party shall bear its own legal and other costs in connection with the negotiation and preparation of this Agreement and any subsequent definitive agreements contemplated hereby.

12.5    Each Party agrees to comply with all applicable laws during the performance of its obligations pursuant to this Agreement, including:

A. Fair Labor Standards Act of 1938, as amended;
B. Occupational Safety and Health Act of 1970, as amended;
C. anti-bribery and anti-corruption laws, including, as applicable, the United States Foreign Corrupt Practices Act and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions dated 21 November 1997;
D. any applicable laws and regulations concerning the export or import of products or technology; and
E. applicable anti-money laundering, anti-terrorism and related laws of the United States and, when applicable, the country in which an Asset is located.

12.6    Each Party represents and covenants to the other that it will not directly or indirectly:

A. Offer, give, make, promise, pay or authorize the offering, giving, making, promising or payment of any money, gift, or anything of value to any government official, that is an officer or employee of any government, or any department, agency or instrumentality thereof, any public international organization, any person acting in an official capacity on behalf of such government, any candidate for or appointee to a political or government office, or any political party;
B. Knowingly engage in any transaction which involves:
    i.   Receiving, transferring, transporting, retaining, using, structuring, diverting, or hiding the proceeds of any criminal activity whatsoever, including drug trafficking, fraud, and bribery of any individual covered in 12.6.A above;
    ii.  Engaging, becoming involved in, financing, supporting financially or otherwise sponsoring, facilitating, or giving aid or comfort to any terrorist person, activity or organization; and
    iii. Employing, engaging in any transaction or otherwise conducting business with a "designated person," namely a person or entity that appears on any list issued by the United States or the United Nations with respect to money laundering, terrorism financing, drug trafficking, or economic or military embargoes.

12.7    This Agreement does not create any agency or employment relationship, partnership, joint venture or co-venture between Alta and WattStock. Neither Party is granted any express or implied right or authority to assume or to create any obligation on behalf of or in the name of the other Party. Each Party shall pay for all social security, federal income taxes, unemployment insurance, workmen's compensation insurance, pensions, annuities or other liabilities or taxes incurred by, or on behalf of, or for the benefit of such Party or any of its Representatives, agents,

employees or servants who are not directly employed by the other Party, and arising out of the performance by the its obligations under this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties have executed this Master Agreement in duplicate originals effective as of the Effective Date.

WATTSTOCK LLC

By: _____

Printed Name: _____

Title: _PRESIDENT_

ALTA POWER LLC,

By: _____

Printed Name: _Matthew Lotorza_

Title: _CFO_

EXECUTION COPY

## FIRST AMENDMENT TO MASTER AGREEMENT

This First Amendment to Master Agreement ("Amendment") is made and entered into as of the 5th day of February, 2020 ("Amendment Effective Date") by and between ALTA POWER LLC, a Texas limited liability company ("Alta") with offices at 4605 Post Oak Place Dr. Suite 270, Houston, TX 77027, and WATTSTOCK LLC, a Texas limited liability company ("WattStock") with offices at Suite 850, 4040 North Central Expressway, Dallas, Texas 75204. Alta and WattStock are also each referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Alta and WattStock entered into that certain Master Agreement dated effective as of the 27th day of February 2019 ("Original Agreement"); and

WHEREAS, Alta and WattStock desire to amend the Original Agreement to make certain changes to the Original Agreement as are set forth in this Amendment.

NOW, THEREFORE, for and in consideration of the mutual covenants and promises and representations contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree that the Original Agreement is hereby amended as is set forth below. Unless otherwise expressly provided in this Amendment, defined terms used in this Amendment shall have the meanings ascribed to them in the Original Agreement.

Section 6.2(A) of the Original Agreement is hereby amended and restated to read:

"Alta agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset (1) on the Initial Assets List or (2) otherwise disclosed by WattStock to Alta during the Term of this Agreement, except as may be expressly agreed by WattStock in writing; and."

1.  Miscellaneous. This Amendment shall become effective only upon full execution and delivery by Alta and WattStock. All provisions of the Original Agreement not explicitly amended or modified in this Amendment shall remain in full force and effect, and the Original Agreement, as modified by this Amendment, shall be binding upon and shall inure to the benefit of the parties hereto, their successors and permitted assigns.

2.  Applicable Law and Venue. This Amendment shall be governed by the laws of the state of Texas. Any disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas.

3.  Counsel Review. Each Party hereto has been represented by counsel and participated in the drafting of this Amendment. This Amendment shall be construed as if drafted

1

jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Amendment.

4.    Legal Costs. Each Party shall bear its own legal and other costs in connection with the negotiation and preparation of this Amendment.

5.    Counterparts. This Amendment may be executed in any number of counterparts. All counterparts together will be taken to constitute one instrument.


IN WITNESS WHEREOF, the parties have executed this Amendment in duplicate originals effective as of the Amendment Effective Date.


**ALTA POWER LLC,** a Texas
limited liability company,

By: _____
Name: _Matthew Lutcoza_
Title: ____CFO____

**WATTSTOCK LLC,** a Texas limited
liability company

By: _Andrew F. Herg_
Name: _Andrew F. Herg_
Title: _CEO_

2

# EXHIBIT B

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC. <br>     *Plaintiff* <br><br> v. <br><br> ALTA POWER LLC, <br>     *Defendant, Counter-Plaintiff, and Third-Party Plaintiff,* <br><br> v. <br><br> WATTSTOCK LLC <br>     *Counter-Defendant, and* <br><br> GENERAL ELECTRIC INTERNATIONAL, INC., d/b/a GE POWER SERVICES <br>     *Third-Party Defendants.* | IN THE DISTRICT COURT OF <br><br><br><br> DALLAS COUNTY, TEXAS <br><br><br><br> 116th JUDICIAL DISTRICT |

## ALTA POWER LLC'S FIRST AMENDED ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION

Alta Power LLC ("Alta Power") files this First Amended Answer and Counterclaim and Original Third-Party Petition against Counter-Defendant WattStock LLC ("WattStock") and Third-Party Defendant General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

### I.        SUMMARY OF ACTION

1.        This case is necessitated by repeated misrepresentation made by GE and WattStock to Alta Power concerning GE/WattStock's relationship, capabilities, and program to entice Alta Power to use GE/WattStock as the source of used aeroderivative gas turbines.

2.        Alta Power was created to develop power assets that would provide additional power capacity to the Texas energy grid when the grid was overburdened. As part of

this, Alta Power intended to purchase and place into service used aeroderivative gas turbines (essentially jet engines on skids) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

3.    GE was eager to participate in the used gas turbine market, a segment in which it historically had no presence. GE, however, did not want to be involved in the work of actually acquiring and selling the used turbines. Instead, GE engaged former GE employees who started WattStock to act as its sales force and point of entry into the used gas turbine market.

4.    Starting in 2018, GE and WattStock persuaded Alta Power to purchase used GE aeroderivative gas turbines, marketing the units as both more reliable and cost competitive, similar to the "Certified Pre-Owned Mercedes Benz®" program. Critically, Alta Power relied on GE's and WattStock's representations regarding the nature of the WattStock/GE relationship, the total acquisition cost of used units, and the benefits of GE's "OEM certified program." Ultimately, Alta Power agreed to move forward with WattStock/GE.

5.    GE's and WattStock's representations were false and have caused Alta Power to miss opportunities in the marketplace. Instead of the benefits claimed by GE and WattStock, Alta Power put money into potential units that were never going to fit their budgetary requirements because the units were either (1) burdened by undisclosed liabilities related to GE's "Long Term Services Agreements," (2) were prohibitively expensive for refurbishment by GE, or (3) were not available as marketed. Simply put, the acquisition costs and the benefits lauded by GE and WattStock were false.

6.    GE and WattStock's breaches of contract and tortious conduct caused Alta Power to lose more than one hundred million dollars of essential financing, profits related to its

business, and millions in payments to GE and WattStock for undelivered equipment and phantom services. After investing millions, Alta Power has nothing to show for what it has paid to GE and WattStock.

## II.       DISCOVERY CONTROL PLAN

7.       Discovery is intended to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## III.       PARTIES

8.       Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Both Alta Power and WattStock have already appeared.

9.       Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas and can be served with Citation through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136.

## IV.       VENUE AND JURISDICTION

10.       This Court has personal jurisdiction over WattStock related to Alta Power's claims as WattStock originally filed this case. This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

11.       Venue is proper in Dallas County, Texas under Section 15.002 of the Texas Civil Practice & Remedies Code because all, or a substantial part of the events or omissions giving rise to the claims against WattStock and GE, occurred in Dallas County and WattStock's principal place of business is in Dallas County, Texas.

12.       As required by Rule 47(b) of the Texas Rules of Civil Procedure, Alta Power seeks monetary relief of more than $1,000,000. Alta Power also seeks pre-judgment and post judgment interest at the highest legal rate.

## V.    GENERAL DENIAL

13.    Alta Power denies all the allegations set forth in WattStock's Original Petition and any subsequent amended petition and demands strict proof thereof as required by the laws of Texas.

## VI.    AFFIRMATIVE DEFENSES

14.    Alta Power asserts the following affirmative defenses:

a.    WattStock's claims are barred because of WattStock's material breaches of the Master Agreement, the LNTP, and the Ethos Authorization; and

b.    WattStock's claim for attorneys' fees fails for lack of presentment.

## VII.    FACTUAL ALLEGATIONS

A.    **Alta Power develops a strategy for meeting peak energy demands.**

15.    Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

16.    The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets 20% of its sizeable electricity demand with wind power.

17.    As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly—in less than 10 minutes.

18.    Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power determined that

ALTA POWER LLC'S FIRST AMENDED ANSWER AND
COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION - PAGE 4

peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

19.    Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

20.    Developing natural gas-fired peaker projects is a complex process, including (1) identifying areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigating the state and federal regulatory waters of the electrical power market; (3) sourcing used aeroderivative gas turbines that can be purchased and refurbished within budget; and (4) obtaining project financing.

21.    This complexity, along with relatively high entry costs, means that there were only a few companies competing with Alta Power. However, given the limited size of the market, being a first mover was critical.

22.    By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

23.    At this point Alta Power turned to identifying surplus aeroderivative gas turbines units, which, once contractually secured, would allow it to obtain project financing.

**B.    GE and WattStock's Partnership**

24.    GE is one of the limited suppliers of aeroderivative gas turbines.

25.    GE historically has not had a presence in the sale of used aeroderivative gas turbines but recognized a need to be present in this market at some point prior to 2018. As such,

GE partnered with WattStock, a group of former GE executives. WattStock marketed itself (along with GE) as a fully integrated locator, dealer, refurbisher, and servicer of used aeroderivative gas turbines. WattStock markets itself as a unique solution in the used aeroderivative gas turbines, and as the only authorized distributor of used GE aeroderivative gas turbines.

26.    In reality, GE intended for, and held out WattStock to be, the *de facto* sales force in the used aeroderivative gas turbine market for GE. GE and WattStock work "hand-in-hand" as "partners" to provide the "TRUEPACKAGE$^{TM}$" or Certified Turbine Power—CTP$^{TM1}$ system, "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."[2]

27.    GE and WattStock entered in a Memorandum of Understanding ("MOU") on June 26, 2018 that "outlines" their relationship. The MOU establishes that GE is in complete control, especially in the context of transactions related to aeroderivative gas turbines originally manufactured by GE.

28.    Consistent with their relationship, GE and WattStock held themselves out publicly and privately as "partners" both orally and in writing.

## C.    GE directs Alta Power to WattStock

29.    In 2018, Alta Power began to determine which used aeroderivative gas turbines would best suit its needs. Availability and total acquisition costs were key drivers in its decision on which aeroderivative gas turbines to select. Because the used aeroderivative gas turbines must be refurbished, acquisition costs necessarily include the costs associated with

---

[1]    GE/WattStock uses the TRUEpackage$^{TM}$ descriptor on GE's Website and CTP$^{TM}$ on WattStock's website. *See*    https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions    and https://www.WattStock.com/ctp.

[2]    https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.

purchasing the units, the costs of refurbishment, and the costs associated with placing the unit at the location and into service.

30. After sharing these considerations with GE and WattStock, and after meetings with GE, WattStock and others, Alta Power determined that used GE LM6000 aeroderivative turbine packages were best suited for Alta Power's strategy of tapping into the niche peaker plant market in Texas based on assurances from GE and WattStock.

31. GE/WattStock were not the only companies that marketed used and refurbished GE LM6000s. Indeed, Alta Power met with several GE "certified" companies that refurbished used aeroderivative gas turbines. None, however, offered a fully OEM-certified and warranted end-to-end product like the TRUEpackage™, which GE/WattStock marketed as their "exclusive" service offering of being the "only authorized OEM certified preowned package offering in the industry."

32. Alta Power had several meetings with both GE and WattStock personnel mainly at GE's Jacintoport facility where WattStock is co-located. To protect Alta Power's confidential information concerning its unique strategy, the parties entered into a Confidentiality Agreement.

33. During these meetings, Alta Power disclosed to GE/WattStock the detailed budgetary requirements of Alta Power's business model. Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units cannot exceed a certain price point if the project is to remain within budget and financeable. GE and WattStock repeatedly confirmed that used units could be obtained for the prices Alta Power needed.

34. GE/WattStock also persuaded Alta Power that its exclusive TRUEpackage™ OEM warranty was superior to anything offered in the market because GE would

provide an end-to-end package warranty covering both the aeroderivative gas turbine and the electrical generation components. GE/WattStock further stated that other competitors could only warrant a portion of the package.

35.     During these meetings, GE and WattStock described themselves as "partners." GE made it clear that the only way Alta Power could obtain the TRUEpackage™ equipment certification and warranty was by working with the GE and WattStock partnership.

36.     Specifically, GE refused to provide equipment certifications and warranties without WattStock.

37.     In addition to the pricing and warranties, GE and WattStock knew time was of the essence for Alta Power, as competitors were also attempting to enter the market. GE made it clear that delivery could occur within the time frame required by Alta Power's plans if Alta Power used the GE/WattStock TRUEpackage™ program.

38.     GE/WattStock emphasized that (1) GE had a proprietary global database of used LM6000 units including the operational and maintenance history on each, and (2) only GE and WattStock had access to this "proprietary" database. This "proprietary" data was a key selling point for Alta Power.

39.     GE/WattStock represented that GE and WattStock could efficiently locate used units, generate a detailed refurbishment scope, and cost estimate and streamline the acquisition, refurbishment, and delivery process all within Alta Power's required budget.

**D.     WattStock and Alta Power enter into a "Master Agreement."**

40.     Based on the representations concerning the benefits of the TRUEpackage™ program, including, (1) the benefits from GE and WattStock "collaborating" as "partners;" (2) the ready availability of used units that met Alta Power's project budget; (3) the

ability to timely close purchases and refurbish units; and (4) the "benefits" of the warranty with respect to the overall economics of the project, Alta Power agreed to move forward with GE/WattStock for the acquisition of used GE aeroderivative gas turbines to effectuate Alta Power's unique strategy.

41.     Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available.

42.     The parties began negotiating financial and contractual terms for the relationship in February 2019. At GE's insistence, Alta Power contracted directly with WattStock. GE/WattStock required that WattStock (with GE standing behind it) negotiate the purchase price of each used GE aeroderivative unit with the prior owner and acquire the unit in WattStock's name for an agreed not to exceed price. GE/WattStock presented Alta Power with detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the "not to exceed price," then the fully refurbished unit could be delivered within Alta Power's budgetary requirements.

43.     The parties also agreed that in the event Alta Power paid any amounts prior to the units being acquired, those interim payments would be credited towards the purchase price Alta Power ultimately agreed to pay.

44.     GE and WattStock caused Alta Power to believe that GE's involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE and WattStock caused Alta Power to believe that WattStock had the financial resources to pay for the units or complete the necessary steps leading to GE's certification under the TRUEpackage$^{TM}$ OEM program.

45.    On February 27, 2019 WattStock and Alta Power entered into a "Master Agreement" confirming the negotiations concerning how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units. At no point was WattStock to be paid any mark-up on "down payments" made by Alta Power or on any out-of-pocket expenses for which Alta Power reimbursed WattStock.

46.    While not a named party to the Master Agreement, GE is an "affiliate" or "representative" of WattStock and, therefore, a party to the Master Agreement.

47.    In the Master Agreement, Alta Power and GE and WattStock agreed to a very strict confidentiality provision. GE/WattStock agreed to hold confidential information in "strict confidence" and agreed such information would "not be disclosed in any manner whatsoever." The Master Agreement also contains an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid).

48.    Additionally, the confidentiality provision required WattStock and GE not to use any information obtained for any other purpose other than the agreed "business purpose," including but not limited to, providing any product or service, or establishing a relationship that is competitive with or against the best interest of Alta Power.

49.    Under the "Master Agreement," the parties also agreed that Alta Power would reimburse WattStock for specific out-of-pocket expenses incurred in arranging inspection and evaluation of the condition of used aeroderivative gas turbines, with prior written approval needed for expenditures more than $20,000.

E.     **WattStock and GE's misrepresentations continue.**

50.     Fully cognizant of the pricing sensitivities of Alta Power's projects, GE/WattStock presented Alta Power with financial information for the acquisition of available units.

51.     The knowledge of the availability of units was largely driven by GE's data. The financial information related to the acquisition of units included WattStock's own estimates based on its "experience" and data from GE based on GE's own data and detailed refurbishment pricing models for each unit.

52.     In February 2019, Pete Watson, WattStock's Vice President of CTP Operations, travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense pursuant to the Master Agreement.

53.     Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStock presented Alta Power price and purchase options for nine used GE units based in Turkey.

54.     What WattStock and GE did not tell Alta Power was that the presented prices of the units were not the true prices. All the units GE/WattStock persuaded Alta Power to spend money on were burdened by hidden liabilities. Many of the potential units were significantly more expensive than represented because GE had Long Term Service Agreements ("LTSA") carrying hefty termination fees with the prior owners seeking to sell the used LM6000 aeroderivative gas turbine units. Units not burdened by LTSAs had other material undisclosed liabilities – all of which were driven by internal GE policies.

55.     These LTSAs generally required the prior owner pay GE millions of dollars to terminate. GE/WattStock failed to disclose the existence of these LTSA financial burdens to Alta Power up front. In fact, the LTSA termination fees were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements.

56.     It was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned of the existence of the LTSA termination fees. In February 2020, one of the sellers of two units, a Turkish company called Nuh Cemento, began demanding reimbursement for the LTSA termination fees to be paid GE in addition to the agreed upon purchase price. GE ultimately refused to waive the LTSA termination fee unless Alta Power entered into a multi-million dollar service agreement with GE. As a result, the project was burdened by expenses materially above Alta Power's project budgets.

57.     GE/WattStock were aware of the undisclosed termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE/WattStock knew adding the undisclosed termination fees would make the prices of those units higher than Alta Power's project budget. Utilizing a classic "bait and switch move," GE/WattStock deliberately hid the existence of the termination fees in the hope Alta Power would have no choice but to pay them at the 11th hour after Alta Power's project financing had been secured and the projects were already well underway.

58.     Prior to learning of the true cost of these units due to the undisclosed associated liabilities, Alta Power, relying on GE and WattStock, moved throughout 2019 and into 2020 attempting to purchase the two Nuh Cemento units.

59.    WattStock also improperly marked up Alta Power's down payment that would have never been made had Alta Power known the true price of the Nuh Cemento units. Per the terms of the Master Agreement, WattStock entered Equipment Purchase Agreements with Nuh Cemento. When WattStock sent an invoice to Alta Power for the $250,000 down-payment, WattStock added a "mark-up" of $125,000. Alta Power refused to pay the "mark-up" since it was inconsistent with the Master Agreement. Recognizing it had no entitlement to these funds, WattStock did not reiterate its demand for payment until litigation between the parties became imminent.

60.    WattStock, GE, and Alta Power identified an additional unit in Turkey owned by a Turkish company called Acarsoy.

61.    As with the Nuh Cemento units, WattStock/GE failed to disclose that the Acarsoy unit was burdened with a multi-million-dollar LTSA termination fee, which was not included in the pricing presented to Alta Power.

62.    Like with Nuh Cemento, Alta Power paid $475,000 in down payments related to this unit, unaware of the true cost of the unit. Alta Power would never have done so had GE/WattStock disclosed the liabilities associated with the unit which rendered it uneconomical for Alta Power's projects.

63.    Once again, WattStock even attempted to mark-up this down payment (as they did with every other payment from Alta Power) despite having no contractual basis to do so. Alta Power rebuffed these attempts, and WattStock recognized it had no basis for payments, and did not request the payments again until just before the filing of its lawsuit against Alta Power.

64.    In addition to units made uneconomical by LTSAs, WattStock also marketed units that were uneconomical for other reasons.

65.   In May of 2019, WattStock informed Alta Power of the existence of a package owned by EthosEnergy. WattStock suggested Alta Power purchase the package from EthosEnergy, claiming demand for the package was high. The "package" was essentially the housing for the aeroderivative gas turbine.

66.   GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease pool engine.

67.   GE/WattStock claimed these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

68.   Based on these representations, Alta Power purchased the EthosEnergy package for $200,000.

69.   When WattStock sent an invoice for this purchase, it marked up the purchase price initially by $175,000 and then later by $115,000.

70.   Once again Alta Power refused to pay the mark-up, as there was no contractual basis for such a mark-up. Indeed, the contractual relationship between Alta Power and WattStock contemplated that this package would not be marked up.

71.   GE/WattStock also did not disclose that the EthosEnergy unit was in a dilapidated condition and was only suggested as a possibility so that GE/WattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the previously promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

72.   Had GE/WattStock disclosed the true condition of the EthosEnergy unit or the unavailability of the lease pool, Alta Power would not have purchased the Ethos unit at any

price. Furthermore, WattStock still has possession of the EthosEnergy unit, despite having been paid for it.

73.     WattStock convinced Alta Power to make a down payment for a unit owned by a company in Turkey called Bosen. As with all other units, WattStock and GE represented that the delivered unit would be priced consistent with Alta Power's needs.

74.     Alta Power put $300,000 dollars down for the purchase of the Bosen unit. Alta Power was later informed that GE/WattStock would not service units containing non-GE components unless the non-GE components were first replaced—regardless of their condition.

75.     The Bosen unit contained non-GE components and as a result the "new" purchase price including the refurbishment work which was several million dollars higher than previously represented by GE/WattStock and the unit was uneconomical for Alta's projects.

**F.     WattStock scuttles Alta Power's efforts at financing.**

76.     Throughout 2019, Alta Power discussed potential financing options for its power project. Alta Power reached out to several sources of funding. In the summer of 2019, Alta Power identified its best source of funding for the purchase of the nine aeroderivative units: Deutsche Bank.

77.     Alta Power engaged in negotiations with Deutsche Bank concerning financing for its unique peaker plant strategy. As part of its due diligence, Deutsche Bank requested a meeting with WattStock. WattStock met with Deutsche Bank and during these meetings, WattStock confirmed that GE and WattStock were "partners."

78.     Of course, Deutsche Bank would rely not solely on WattStock's representation that GE and WattStock were "partners." Accordingly, Deutsche Bank formally asked GE to provide appropriate assurances. On July 31, 2019, GE responded to this request in a

letter confirming that if WattStock failed to meet its contractual obligations, GE would step in since GE and WattStock are partners in this venture. GE also confirmed that GE engineering will be overseeing WattStock's work and that GE has a "strong incentive" for the project to succeed.

79.    Sometime before financing was closed, WattStock disclosed to Ryan Castleman of Castleman Power Development LLC ("Castleman"), one of Alta Power's few competitors, that project financing from Deutsche Bank was imminent. Knowing the financing would decrease the available used units in the marketplace and would allow Alta Power's projects to come online first, Castleman predictably attempted to scuttle Alta Power's financing. Specifically, Castleman threatened to file a frivolous "trade secret" lawsuit against Alta Power to stop the financing.

80.    Alta Power was forced to disclose this frivolous claim to Deutsche Bank. Alta Power worked to quickly resolve the frivolous dispute, and ultimately had no choice but to pay Castleman an extortion fee to settle the frivolous claim. But the damage was already done. Castleman's strategy of causing delay to destroy financing worked.

81.    Deutsche Bank decided against providing financing to Alta Power, delaying Alta Power's ability to bring units into service.

**G.    WattStock steals $100,000 from Alta Power to finance WattStock's operations.**

82.    Despite the Deutsche Bank financing falling through, Alta Power remained committed to its unique peaker plant strategy and continued to explore other financing options in the fall of 2019.

83.    By the fall of 2019, GE and WattStock continued to lead Alta Power to believe that the targeted units could be acquired consistent with WattStock and GE's earlier pricing guidance. Because of this, Alta Power continued to fund the potential acquisition of units.

84.    In October 2019, Alta Power sent WattStock $100,000 for potential use in extending an option to purchase units from Bosen. During WattStock's negotiations with Bosen, Alta Power ultimately decided not to go through and told WattStock to cease negotiations. WattStock complied and the parties never entered into an agreement extending the option period with Bosen.

85.    WattStock never sent Alta Power's $100,000 to Bosen since the negotiations were called off before the $100,000 was used.

86.    Alta Power requested the return of the $100,000. WattStock acknowledged the funds would be returned, and repeatedly promised to do so on multiple occasions during the fall and winter of 2019-2020.

87.    WattStock broke these promises. Instead, WattStock converted Alta Power's $100,000 and used it to cover serious cash flow issues, which WattStock had previously failed to disclose to Alta Power and did not disclose until May of 2020.

**H.    WattStock continues to fail to disclose the true costs of units.**

88.    Despite the Deutsche Bank financing falling through, Alta Power was still committed to the development of its projects. Consistent with this and based on WattStock's false representations that other buyers were targeting the Turkish units, Alta Power paid WattStock over $200,000 for extensions to keep alive potential deals with Acarsoy and Nuh Cemento in the fall of 2019.

89.    At no time did WattStock inform Alta Power that the true costs of these units were inconsistent with WattStock's and GE's representations.

90.     During the fall of 2019, Alta Power considered a variety of funding structures, and decided to finance each project separately, rather than approaching potential lenders with a portfolio of three projects.

91.     Consistent with this, Alta Power and WattStock entered a Limited Notice to Proceed Proposal ("LNTP") on December 23, 2019 for two separate units to be acquired from Nuh Cemento. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to purchase the units from Nuh Cemento that GE/WattStock told Alta Power will be sufficient to purchase the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE/WattStock's profit margin for the project.

92.     GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackage$^{TM}$ project. The $1,500,000 was divided into two payments of $750,000.

93.     Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

94.     In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million **plus** the cancellation of GE's LTSA termination fee of over $1.4 million.

95.     The impact of the cancellation fee materially increased project costs above the previous budget and impacted Alta Power's ability to obtain financing for the project.

96.     For the units being considered (as with the Bosen unit), the significant liabilities were *not* disclosed until *after* Alta Power made the final payment to GE under the LNTP.

97.    By March 2020, the global economy was in the grips of the COVID-19 crisis. This delay impacted the closing of Alta Power's project financing. Regardless, Alta Power remained financially committed to the project and was ready, willing, and able to go forward with the two Nuh Cemento units under the LNTP.

98.    In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

99.    During this time, Alta Power requested that GE step in and fulfill its commitment to Alta Power to assist in securing the units needed for Alta Power's project. GE refused.

100.    Alta Power was ready, willing, and able to go forward with the Nuh Cemento project with GE alone. GE refused to allow Alta to pay directly for the LNTP components, despite repeated requests by Alta Power due to concerns regarding WattStock's financial situation. And GE further refused to step in and take over for WattStock (despite contrary written representations) when Alta Power notified GE that WattStock was insolvent.

101.    Alta Power also continued to negotiate with other sources of funding for the Project, including Riverstone and Macquarie.

102.    Despite Alta Power's effort sand GE's prior representations, GE made it clear, once again, that it would only move forward with WattStock, thereby constructively cancelling the LNTP and the Nuh Cemento project.

103.    Consequently, Alta missed their opportunity to be a first mover in the highly competitive Texas peaking electricity market.

## VIII.    CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT (AGAINSTGE AND WATTSTOCK)

104.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

105.    Alta Power seeks a declaratory judgment pursuant to Tex. Civ. Prac. & Rem. Code § 37.001 *et seq.* Alta Power requests the Court to declare that:

a.   No contractual agreement exists by which WattStock is entitled to "mark-ups" on goods or services.

b.   GE and WattStock are principal/agent or partners such that GE is responsible for WattStock's torts and breaches.

c.   As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the Master Agreement, which excuses Alta Power of any further performance.

d.   As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the December 23, 2019 LNTP.

e.   GE's refusal to go forward with the Nuh Cemento project once WattStock became insolvent was a breach of the LNTP requiring GE to refund money paid to WattStock/GE by Alta Power.

### COUNT II: RESPONDEAT SUPERIOR (AGAINST GE)

106.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein. GE and WattStock represented to Alta Power that they were "partners" and that WattStock acted as GE's Authorized Service Provider.

107.    Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

108.    In fact, without the representations, Alta Power would have never entered any contracts with WattStock.

109.    Accordingly, an ostensible agency existed between WattStock and GE.

110.    GE is estopped from denying liability for WattStock's breaches and torts and/or GE and WattStock engaged in a joint enterprise for which joint and several liability exists.

111.    Despite the fig leaf boiler-plate language in the MOU between GE and WattStock, the language of the MOU shows GE controlled WattStock. Accordingly, the "no partnership or agency" provision is a sham or subterfuge designed to conceal the true legal status of GE/WattStock. Extrinsic evidence also shows actual control by GE over WattStock.

112.    GE is *respondeat superior* liable for the breaches and torts of WattStock.

## COUNT III: BREACH OF CONTRACT (AGAINST WATTSTOCK)

113.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

114.    Alta Power and WattStock entered into the Master Agreement, which is and was a valid and enforceable contract. Alta has standing to sue for breach of the Master Agreement.

115.    Alta Power performed its obligations under the Master Agreement.

116.    WattStock breached the confidentiality provisions of the Master Agreement by disclosing confidential information about Alta Power and its financing to Castleman. WattStock's breach has proximately caused injury to Alta Power. Specifically, WattStock's breach caused Alta Power to lose project financing for its a unique strategy for developing power generation projects in the Texas market.

117.    Had WattStock not breached the confidentiality provisions, Alta Power would have closed financing with Deutsche Bank and been able to implement its unique strategy.

118.    As a direct result of WattStock's breaches, Alta Power has been severely damaged.

119.    Alta Power paid GE/WattStock $1.5 million related to the Nuh Cemento project for GE to acquire long-lead hardware, start engineering activities, and deliver preliminary drawings.

120.    The Master Agreement and LNTP were cancelled due to WattStock's insolvency.

121.    In addition to its liability under the theory of respondeat superior, GE is also vicariously liable for WattStock's breaches of the Master Agreement and LNTP. Consequently, GE must refund to Alta Power the $1.5 million under the contracts between the parties.

122.    To compensate it for the damages outlined above, Alta Power seeks unliquidated damages.

123.    Pursuant to Texas Civil Practice and Remedies Code section 38, Alta Power is entitled to attorney's fees, costs, and expenses, due to WattStock's breach of the agreement.

## COUNT IV: UNJUST ENRICHMENT (AGAINST GE)

124.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

125.    GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

126.    Alta Power demands restitution of all amounts GE has been justly enriched.

## COUNT V: CONVERSION (AGAINST WATTSTOCK)

127.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

128.    In October 2019, Alta Power sent WattStock $100,000 to extend an option to purchase units from Bosen.

129.    Alta ultimately declined to extend the option and instructed WattStock to return the $100,000.

130.    Alta repeatedly demanded that WattStock return the $100,000 during the fall and winter of 2019-2020. WattStock refused (and continues to refuse) to return this money, and thereby assumed and exercised dominion and control over Alta's money in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Alta's rights.

## COUNT VI: TEXAS THEFT LIABILITY ACT (AGAINST WATTSTOCK)

131.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

132.    Alta has a possessory right to the $100,000 it paid WattStock.

133.    WattStock misappropriated and enjoyed these monies knowing full well it was not entitled to same.

134.    All of this was done without Alta's consent. WattStock intended to and did in fact deprive Alta of these monies which led Alta to suffer significant financial damages in an amount to be proven at trial, plus court costs and reasonable and necessary attorney's fees as allowed by the TLA.

## COUNT VII: FRAUD (AGAINST GE AND WATTSTOCK)

135.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

136.    GE and WattStock intentionally misrepresented the nature of their relationship to induce Alta Power to contract with GE/WattStock.

137.    GE represented it would "stand behind" WattStock. However, when the time came to do so GE did not.

138.    Simply put, the pricing provided by GE and WattStock was intentionally misrepresented and did not include the true cost of acquisition of the units. Alta Power relied on these representations to its detriment.

139.    GE had the right under its MOU with WattStock to force WattStock to sell GE any gas turbine purchased pursuant to the TRUE PACKAGE™ program. In effect, GE had the right to push WattStock aside and ensure that any deal was consummated.

140.    Yet, when WattStock became insolvent GE refused to "stand behind" WattStock and take the necessary steps to consummate the LNTP with Alta Power and Nuh Cemento.

141.    GE/WattStock misrepresented the benefits of the TRUEpackage™ program.

142.    GE/WattStock represented that the program would enhance the ability to obtain financing when it did not.

143.    GE/WattStock represented that the program would be able to move quickly to service the narrow window Alta Power had for this unique strategy when in fact the GE/WattStock relationship created a bureaucracy that only slowed down projects.

144.    GE/WattStock represented that the TRUEpackage™ program was of a superior quality when in fact it was not.

145.    GE/WattStock represented that units from the TRUEpackage™ program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not.

146.    GE/WattStock hid the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver.

147.   GE/WattStock's misrepresentations were material and false.

148.   Both GE and WattStock knew these representations were false when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

149.   These representations were made with the intent that Alta Power act on them.

150.   Alta Power relied on GE and WattStock's representations regarding their relationship.

151.   GE and WattStock's misrepresentations caused Alta Power injury well beyond the minimum jurisdictional limits of the Court.

152.   Alta Power has wasted at least $10 million based on GE/WattStock's misrepresentations.

153.   Had GE/WattStock not misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost significant revenue as a result.

## COUNT VIII: NEGLIGENT MISREPRESENTATION (AGAINST GE AND WATTSTOCK)

154.   Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

155.   Alternatively, each fraudulent misrepresentation made by GE and WattStock were made negligently since GE/WattStock did not exercise reasonable care or competence in obtaining or communicating the information.

156.   Alta Power has wasted at least $10 million based on GE/WattStock's negligent misrepresentations.

157.    Had GE/WattStock not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost significant revenue as a result.

## IX.    JURY DEMAND

158.    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## X.    PRAYER

ACCORDINGLY, Alta Power prays that WattStock and GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against WattStock and GE awarding Alta Power the following relief:

a)  An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE and WattStock;

b)  An award of equitable damages, as requested above;

c)  An award of exemplary damages;

d)  Reasonable and necessary attorneys' fees;

e)  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f)  Cost of court; and

g)  Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC


By: /s/ Michael Cancienne
      Michael Cancienne
      State Bar No. 24055256
      Kevin Jordan
      State Bar No. 11014800
      Joseph W. ("Jeb") Golinkin II
      State Bar No. 24087596
      1980 Post Oak Blvd., Ste. 2300
      Houston, Texas 77056
      713.955.4028
      713.955.9644 Facsimile
      mcancienne@jlcfirm.com
      kjordan@jlcfirm.com
      jgolinkin@jlcfirm.com

**ATTORNEYS FOR DEFENDANT,
COUNTER-PLAINTIFF AND THIRD-
PARTY PLAINTIFF ALTA POWER
LLC**


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certified that a true and correct copy of the above pleading was served on all parties through the Court's electronic filing service on the 24th day of February, 2021.


By:    /s/ Michael Cancienne
        Michael Cancienne

# EXHIBIT C



# WattStock LLC Limited Notice to Proceed Proposal

TO

## Alta Power LLC

FOR THE

### Goodlow Peak Power Site

FOR

#### Two (2) TRUEpackage™ LM6000 PC Sprint GTG's

##### December 23, , 2019

PREPARED BY: Jay C. Manning
J.MANNING@WATTSTOCK.COM
713.248.4148

CONFIDENTIAL

Alta 0037101



December 23, 2019

Mr. William Phelps
Alta Power LLC
4605 Post Oak Place Dr., Suite 270
Houston, TX 77027

Subject: LM6000PC TRUE Package Limited Notice to Proceed Proposal for the Goodlow Site

Dear Bill,

After numerous meetings and discussions between and among WattStock LLC, Alta LLC, and GE, we have prepared the following revised proposal. This Proposal is also sometimes referred to herein as Purchase Order.

All terms and conditions of our proposal are contained within our attached Proposal/Purchase Order.

Thank you for this opportunity to work with Alta, and please do not hesitate to call me if you have any questions.

Regards,

WattStock LLC

Jay C. Manning
**President**

CONFIDENTIAL



## 1. Scope of LNTP Work and LNTP Pricing

| Description | Quantity | Delivery | Price ($) |
|---|---|---|---|
| Woodard Controls Upgrade Hardware | 2 | 2/28/2020 | 453,218 |
| Fin-Fan Lube Oil Cooler | 1 | 2/28/2020 | 188,415 |
| Internal Gas Vent Valve | 2 | 2/28/2020 | 12,495 |
| Generator Enclosure Design to modify from 50Hz Design | 1 | 2/28/2020 | 431,635 |
| Gas Turbine/Generator Coupling | 1 | 2/28/2020 | 90,452 |
| Generator Lube Oil (GLO) Skid | 2 | 2/28/2020 | 443,390 |
| Automatic Voltage Regulator - EX2100e (AVR) | 2 | 2/28/2020 | 44,855 |
| External Block & Bleed Gas Valves | 2 | 2/28/2020 | 69,113 |
| Approx. 1100 hours of Engineering Support for Engineering Drawings | 1 | 2/28/2020 | 149,858 |
| Woodward Acarsoy Cancellation Fee 1 NA | 1 | N/A | 48,213 |
| GE Acarsoy Engineering Labor Charge 1 NA | 1 | N/A | 32,609 |
| Supplier Non-Returnable/Cancellation/Restocking fee's* | TBD* | TBD | TBD |
| 20% WattStock Markup | | N/A | 491,063 |
| TOTAL (subject to maximum increase of $285,000 for items marked *) | | | 2,455,316 |

Notes to Above Table:

*(i) Any Supplier materials related to the 3rd Acarsoy Unit have been cancelled. Those materials that are non-returnable, or subject to supplier cancellation/restocking fees, GE will invoice WattStock at cost plus 10%, and WattStock will in turn invoice Alta for the amount invoiced by GE without further markup. These fees are for items such as: Generator GLO, block valves, gas valves, AVR, etc.*

*(ii) Any reference to Acarsoy cancellation fees does not refer to any cancellation fees or liability that may be payable by WattStock if the Acarsoy PSA is terminated.*

*(iii) Note: The above price is in 2019 US Dollars, and does not include applicable sales, excise, value added, use or similar taxes.*


## 2. LIST OF ENGINEERING ITEMS – *Due within five (5) business days following project financial closing:*

Preliminary Main Unit (General Arrangement)
Preliminary Anchor Bolt
Preliminary One-Line Diagram
Preliminary Foundation Loads
Air Filter (General Arrangement)
Sprint Skid (General Arrangement)
Water Injection (General Arrangement)
Aux Skid (General Arrangement)
Plan & Elevation (P&E) for TCP
Technical Specification for package motors and heaters

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

CONFIDENTIAL
Alta 0037103



## 3. Changes

The LNTP Price shall be adjusted as necessary to take account of (a) Change Orders, or (b) other adjustments specifically provided for in this Proposal. Prices shall not change without the express written consent of Customer in a Change Order signed by both parties.

Changes to specifications, drawings, services or hardware will be evaluated by Seller for a Change in Scope to the Proposal. Seller will quote the changes and a Customer Change Order must be received before work is to proceed.

Storage Costs, additional travel, delays at work, unit restart delays and overtime work out of scope of the project will be subject to the Change Order process above and considered additional work and will be charged according to Seller's published rates at time of execution and in lieu of any pre-existing agreement. As of the date of this revision to the Proposal, no such additional work has occurred.

## 4. Compliance

Compliance and certifications are within current Seller's design practices and standards. The price presented here does not include compliance with any state or local codes unless expressly defined by Customer prior to sale.

## 5. Proposal Basis

Price quoted herein is valid for five (5) days.

Price quoted is per the Terms and Conditions stated herein.

Parts and Services are subject to prior sale.

Subject to Article 2 on this LNTP, delivery time of drawings shall be confirmed upon the execution of Equipment and Services Supply Agreement.

## 6. Commercial Items

Terms and Conditions

This Proposal is in accordance with WattStock Terms and Conditions attached hereto as Exhibit A. In the event of any conflict in the terms and conditions between this LNTP agreement and the WattStock Terms and Conditions, the terms and conditions of the proposal shall govern. Customer and Seller agree that in the event a firm ESA is executed for the TRUEPackages (i) all payments made under this LNTP shall be applied to the ESA Purchase Price**, (ii) all work performed under this LNTP will be deemed to have been work performed pursuant to the ESA, and (iii) the terms and conditions of this LNTP shall be replaced in their entirety by the terms and conditions of the ESA. Upon execution of this LNTP by both parties and receipt by WattStock of the first $750,000 payment referenced in Article 7, this LNTP will supersede the letter signed by Alta Power LLC on August 9, 2019 that the parties have commonly referred to as the "backstop letter".

**As of the date of this LNTP Proposal, the Purchase Price is $19,583,426, based upon the below listed assumptions:

- Scope of work described in Exhibit B attached to December 21, 2019 draft of Equipment Supply Agreement;
- Purchase of 2 Nuh Cemento Units for a combined price of $8,125,000;
- Project financial closing no later than February 28, 2020;
- Guaranteed substantial completion no sooner than 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Site does not change;

CONFIDENTIAL

Alta 0037104



- Schedule is not substantially different from 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Lender due diligence changes;
- ESA changes from present version;
- ESA Purchase Price subject adjustment in accordance with final terms of the Equipment Supply Agreement, including for example, discovery of latent or concealed conditions which differ materially from those described in the borescope inspection reports.

## 7. Payment Terms & Schedule

| Milestone | Amount | Net Receipt of Invoice |
|---|---|---|
| 1. Upon LNTP Purchase Order Execution | $750,000 | 2 business Days |
| 2. Second Invoice | $750,000 | 5 days |
| 3. Invoice Issued January 28, 2019 Prior to Expected Parts Shipment (Cash received prior to releasing material for shipment) | $464,253 | 25 days |
| 4. Supplier Non-Returnable/Cancellation/Restocking Fees (if any) - to be invoiced no later than January 28, 2020 | TBD | 25 days |
| 5. Upon Financial Close of the Project | $491,063 | 2 days |

All payments will be made via wire transfer and, except as otherwise provided in the Milestone table above, are due no later than 30 days from receipt of Seller's invoice without any setoff (including, without limitation, setoff under other contracts with Seller or with WattStock LLC or its affiliates). These terms will take precedence over any conflicting payment terms referenced. Seller agrees to provide Buyer within two (2) business days following Seller's receipt of Buyer's wire transfer of funds paid to Seller pursuant to this LNTP a wire transfer confirmation showing that such payments made by Buyer to Seller (excluding the payment for Seller's 20% markup to be made upon closing of Buyer's financing for the project referenced in Milestone #5) have been remitted to General Electric Company.

## 8. Termination Schedule

In the event Buyer terminates the Purchase Order through no fault of Seller, or Seller terminates the Purchase Order for Buyer default, the Buyer shall be liable to Seller for the following termination amounts:

CONFIDENTIAL

Alta 0037105



| Termination on or Before | Termination Amount Due (USD) |
|---|---|
| 8/16/2019 | 15% of Contract |
| 9/16/2019 | 30% of Contract |
| 10/25/2019 | 75% of Contract |
| 12/6/2019 | 100% of Contract |

Upon receipt of payment of all amounts due, (i) WS will deliver to Buyer all materials procured under this LNTP to which WattStock has received title from GE, and (ii) Buyer and Seller shall then have no further liability to the other under this LNTP.

## 9. Invoicing Methods

Unless mutually agreed otherwise, WattStock shall submit invoices to Customer by e-mail, and if Customer so requests then WattStock shall also provide to Customer a paper invoice by regular mail.

CONFIDENTIAL

Alta 0037106



## 10. Submittal and Acceptance

This proposal submitted by:

Name:     Jay C. Manning

Title:     President

For:     WattStock LLC

Date:     July 19, 2019

This Proposal is accepted by Customer:

Name:

Title:     CFO

For:     Alta Power LLC

CONFIDENTIAL



### EXHIBIT A – TERMS AND CONDITIONS OF SALE

**1. Scope of Supply**

1.1. The Seller shall supply the Equipment and perform the associated Services as more fully described in the Proposal, subject to the terms and conditions as set forth in the Contract. The Equipment and Services are collectively referred to herein as the "Work".

**2. Price**

2.1. The Buyer shall pay to the Seller the Contract Price in consideration of the Work. The Contract Price is exclusive of sales, VAT or other taxes, which will be added at the time of invoicing, unless a tax exemption or resale certificate is provided. The Contract Price shall be adjusted as necessary to take account of (a) Change Orders, including those related to the exercise of any options that may be described in the Proposal, or (b) other adjustments provided for in the Contract.

**3. Payments**

3.1. Payment of the Contract Price shall be made via wire transfer in accordance with the Payment Schedule and the payment terms set forth in the Proposal..

3.2. Wire transfer instructions shall be provided on each invoice. Payments are due ten [10] days from Buyer's receipt of Seller's invoice. Late payments shall be subject to an interest charge equal to the lesser of (i) five percentage points (5%) in excess of the prime rate as published in the Wall Street Journal, at that time, compounded on a monthly basis or (ii) the maximum rate allowed by applicable law.

3.3. Seller may require that any or all payments by Buyer to Seller will be secured by an on-demand irrevocable standby letter of credit issued or confirmed by a United States or other bank acceptable to Seller on terms acceptable to Seller ("Payment Security"). If required by Seller, the Payment Security shall become operative and delivered to Seller within (30) thirty Days after the Effective Date, but in any event prior to Seller delivery of the Equipment to Buyer.    All Payment Security shall provide for partial payments pro rata on partial deliveries and for the payment of any charges for storage, export shipment, price adjustments, cancellation or termination, and all other payments due from Buyer under this Contract against Seller's invoice and certification of the charges and grounds for such payment. Buyer will increase the amount(s) and/or extend the validity period(s) and make appropriate modifications to any Payment Security within ten (10) days of Seller's notification that such is necessary to provide for payments to become due.

**4. Effect of Changes in Contract Price**

4.1. If any adjustment results in an increase to the Contract Price, Buyer shall pay for the increase in accordance with the applicable Change Order and corresponding invoice submitted by Seller. If any adjustment results in a decrease in the Contract Price, payments previously made shall be retained by the Seller and will be applied to subsequent payments as they become due.

4.2. Seller shall not be responsible for back charges or field modifications performed by Buyer unless Seller authorizes such charges in writing prior to the incurrence thereof. Buyer specifically waives any right of set-off relating to such charges. Any claim or set-off for back charges shall be accompanied by a copy of such written authorization. In no event shall Buyer offset any amounts due under the Contract by amounts that may be due Buyer from Seller or any of its Affiliates under this Contract or any other agreement, judgment or order.

**5. Certain Buyer Obligations**

5.1. In addition to the other Buyer obligations described in the Contract, Buyer shall be responsible for timely obtaining all permits required for owning, installing, operating and maintaining the Equipment, including environmental and use permits, all other licenses (including but not limited to export licenses, import licenses), exemptions, permits (including but not limited to foreign exchange permits and work permits), authorizations, approvals, local building and construction permits, and easements necessary for the construction and operation of the Facility, and shall be responsible for any additional costs, fees or fines arising from any delay or failure to obtain such permits, licenses, exemptions, authorizations or approvals, even though any such permits, licenses, exemptions, authorizations or approvals may be applied for by Seller.

5.2. Seller shall not be liable if any permits, licenses, exemptions, authorizations or approvals are delayed, denied, revoked, restricted or not renewed and Buyer shall not be relieved thereby of its obligations under this Contract, including paying Seller for the Equipment.

**6. Delivery.**

6.1. The Seller shall deliver the Equipment ExWorks (Incoterms 2010) ("Delivery").

**7. Risk of Loss.**

7.1. With respect to each item of Equipment, risk of loss shall pass to the Buyer upon the earliest of (i) Delivery, (ii) shipment to storage as provided hereinbelow, or (iii) passage of title to the Buyer pursuant to Contract.

**8. Shipment to Storage.**

8.1. If any part of the Equipment cannot be shipped to the Buyer when ready due to any cause not attributable to the Seller, the Seller may ship such Equipment to storage, such storage being in accordance with any technical specifications or other instructions provided by the Seller. Buyer shall make all reasonable efforts to inform Seller of the potential for this event to occur. If such Equipment is placed in storage, including storage at the Seller's facility, the following conditions shall apply: (i) title and risk of loss shall thereupon pass to the Buyer; (ii) any amounts otherwise payable to the Seller upon Delivery or shipment shall be payable upon presentation of the Seller's invoice(s); (iii) all expenses incurred by the Seller, such as for preparation for and placement into storage, handling, inspection, short-term preservation, storage, removal charges and any taxes shall be payable by the Buyer upon submission of the Seller's invoice(s); (iv) if the Contract includes Services, any such Services shall be subsequently changed to the rate prevailing at the time of actual use and Buyer shall pay the net increase; and (v) when conditions permit and upon payment of all amounts due hereunder, the Seller shall resume Delivery of the Equipment. Notwithstanding anything to the contrary contained herein, storage and shipment to storage, and arranging for insurance once in storage is

WattStock Limited Notice to Proceed Proposal to Alta Power

CONFIDENTIAL: NOT FOR DISTRIBUTION

CONFIDENTIAL

Alta 0037108



8.2. the sole and direct responsibility of the Buyer and the Seller shall not assume any liability associated therewith and Buyer shall indemnify, defend and hold Seller harmless for any damages, costs, expenses and fees, including reasonable attorneys' fees associated therewith. Any Seller invoicing or collection related to shipment is only a service provided to the Buyer and represents no direct or indirect responsibility associated with storage.

9. Observation and Inspection

9.1. Observation at the Site.

9.1.1. The Seller shall be afforded access during normal business hours to observe the Work in progress at the Site. The Seller may visit the Site at any time or times, or may maintain representatives to observe Buyer's or Buyer's contractors work, provided such activity and inspections do not unreasonably interfere with the Work.

9.2. Inspections and Tests at Seller's Facilities.

9.2.1. Upon the Buyer's request, the Buyer's inspector shall be provided reasonable access to the Seller's facilities during normal business hours to obtain information on production progress and make inspections.

9.2.2. Inspections and Tests at Suppliers' Facilities.

9.2.3. Subject to the conditions set forth in the foregoing paragraph, the Seller will make reasonable efforts to obtain for the Buyer's access to Seller's suppliers' facilities for the purposes described in the paragraph above if applicable.

10. Warranty

10.1. Warranty Period.

10.1.1. The Seller shall warrant the Equipment and the associated Services on the terms set forth in this Article for twelve (12) months following the date the Equipment is energized at the Site or eighteen (18) months following the date of Seller's Notice of Delivery/Readiness to Ship, whichever period shall first expire (the "Warranty Period"), unless otherwise stated in the Proposal. Equipment must be transported and stored in accordance with Seller's recommendations.

10.2. Warranty Coverage

10.3. The Seller warrants to the Buyer that during the Warranty Period (i) the Equipment to be delivered hereunder (A) shall meet the technical specifications outlined in the Proposal when operated in accordance with the Seller's or original manufacturer's written guidelines or operation instructions and, in the absence thereof, in accordance with generally accepted operation practices of the electric power producing industry, and (B) shall be free from defects in material, workmanship and title; and (ii) the Services shall be performed in a competent, diligent manner.

10.4. Remedy

10.4.1. If the Equipment delivered or Services performed hereunder do not meet the above warranties during the Warranty Period, the Buyer shall promptly notify the Seller in writing and make the Equipment available for correction. The Seller shall thereafter, as soon as is practicable, correct any warranty defect, at its option and expense, (i) by re-performing the defective Services, (ii) repairing the defective part of the Equipment, or (iii) by making available necessary

replacement parts at Seller's factory. Buyer shall, at Seller's option, return any defective part that is replaced by Seller at Buyer's expense to Seller's designated repair facility within thirty (30) Days from the date of written instruction by Seller. The Seller shall provide technical advisory Services reasonably necessary for any such repair of the Equipment, but the Seller shall not be responsible for (i) removal or replacement of structures or other parts of the facility and (ii) site labor or transportation of parts or components. The Buyer shall be responsible for the installation of any repaired or replacement part and for payment of any customs duties or similar levies, which may be assessed as a result of the shipment of any such replacement parts. If a defect in the Equipment or part thereof cannot be corrected by the Seller's reasonable efforts, the Parties will negotiate an equitable adjustment in price with respect to such Equipment or part thereof, however the adjustment in price shall be limited to the price of the respective equipment

10.5. Warranty on Remedial Work.

10.5.1. Any re-performed service or repaired or replacement part furnished under this warranty shall carry warranties on the same terms as set forth above, except that the applicable warranty period for the repair/replacement part or re-performed Service shall be for the longer of (a) the remainder of the original Warranty Period or (b) three (3) months from the date of such re-performance, repair or replacement. In any event the repair/replacement warranty period and the Seller's responsibilities set forth herein for such repaired or replacement part shall end no later than three (3) months after expiration of the original Warranty Period.

10.6. Exclusions.

10.6.1. The Seller does not warrant the Equipment or any repaired or replacement parts against normal wear and tear, including that due to environment or operation, or erosion, corrosion or material deposits from fluids. The warranties and remedies set forth herein are further conditioned upon (i) the proper storage, installation, operation, and maintenance of the Equipment in conformance with the operation instruction manuals (including revisions thereto) provided by the Seller and/or its subcontractors or suppliers, as applicable (including any required warranty preservation services in the event of long term storage) and (ii) repair or modification pursuant to the Seller's instructions or approval. The Buyer shall keep proper records of operation and maintenance during the Warranty Period and make such records available to Seller for reasonable review and inspection.

11. Exclusive Remedies and Warranties.

11.1. THE PRECEDING PARAGRAPHS SET FORTH THE SOLE AND EXCLUSIVE REMEDIES FOR ALL CLAIMS BASED ON FAILURE OF OR DEFECT IN THE EQUIPMENT AND SERVICES PROVIDED UNDER THE CONTRACT, WHETHER THE FAILURE OR DEFECT ARISES BEFORE OR DURING THE WARRANTY PERIOD AND WHETHER A CLAIM, HOWEVER INSTITUTED, IS BASED ON CONTRACT, INDEMNITY, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND GUARANTEES WHETHER WRITTEN, ORAL, IMPLIED

CONFIDENTIAL

Alta 0037109



OR STATUTORY.    NO IMPLIED STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY

12. Taxes

12.1. Seller Taxes.

12.1.1. Unless otherwise specified in the Contract, the Seller shall be responsible for, and shall pay directly, all sales and use taxes imposed on Seller or its subcontractors and for which they are required to pay sales and use tax, (b) all personal property taxes imposed on Seller, (c) all franchise and income taxes imposed on Seller or its subcontractors, and (d) all payroll, unemployment, occupational, or employment compensation tax, social security tax, or similar tax, each as imposed on Seller or its subcontractors ("Seller Taxes"). If Buyer deducts or withholds Seller Taxes, the Buyer shall furnish within thirty (30) Days of the Seller's request official receipts from the appropriate governmental authority for each deducted or withheld Seller Taxes.

12.2. Buyer Taxes.

12.2.1. Equipment exported from the United States is presumed to be exempt from Buyer taxes levied with the United States. When requested by Seller, Buyer agrees to furnish without charge evidence of tax or duty exemption acceptable to the taxing or customer authorities. Furthermore, if Buyer arranges for export shipment, Buyer agrees to provide Seller without charge, an export bill of lading. The Buyer shall be responsible for, and shall pay directly when due and payable, (a) any sales or use taxes, duties, or dues directly imposed on Buyer with respect to the Work or Equipment (b) real and personal property taxes on the Site, Facility or any Equipment to which Owner holds title at the relevant time; and (c) income taxes directly imposed on Buyer ("Buyer Taxes"). All payments due and payable by the Buyer to the Seller hereunder shall be made in the full amount of the Contract Price, free and clear of all deductions and withholding, for Buyer Taxes. If the Buyer deducts or withholds Buyer Taxes from Seller payments, the Buyer shall pay additional amounts to the Seller to cause the amounts actually received by the Seller, net of deducted or withheld Buyer Taxes, to equal the full amount of the Contract Price, and shall provide to the Seller within thirty (30) Days of Seller's request, accurate official receipts from the appropriate governmental authority for deducted or withheld Buyer Taxes. If the Seller is required to pay Buyer Taxes, the Buyer shall, promptly upon presentation of the Seller's invoice for such Buyer Taxes, pay to the Seller in the Contract Currency an amount equal to the U.S. dollar of such Buyer Taxes

13. Invoices.

13.1. The Seller shall issue an official value-added, sales (or similar) tax invoice in addition to the Contract Price, in accordance with applicable laws

14. Duty Drawback.

14.1. All rights to drawback of customs duties paid by the Seller to the customs authorities of the country of manufacture of any Equipment belong to and shall remain with Seller. Buyer agrees to cooperate with Seller and to furnish such documents to Seller as may be necessary to obtain drawback.

15. Changes

15.1. Changes Resulting from Force Majeure, Changes in Codes, or Changes in Law.

15.1.1. If any change to the Codes and Standards, Ambient Site Conditions, Site Requirements or any Change in Law has a negative impact in the cost or time to perform the Work or requires a change to the Equipment or Services, the Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted. If the Seller is entitled to a Change Order, the Seller shall submit to the Buyer a draft Change Order.

15.2. Buyer-Initiated Changes.

15.2.1. The Buyer shall have the right to request that the Seller consider changes to the Equipment or the Services, including modifications, alterations or additions. If the Buyer wishes to request such a change, the Buyer shall notify the Seller in writing. Within fifteen (15) Days after receipt of such notice (unless otherwise extended by mutual agreement), the Seller shall advise the Buyer of the feasibility of the requested change, and shall submit to the Buyer a draft Change Order, unless the matter requires further investigation and research in which case Seller will provide an estimate of the time frame in which Seller will be able to submit a detailed response to Buyer.

15.3. Seller-Initiated Changes.

15.3.1. If the Seller wishes to propose a change, or if the Seller is entitled to a Change Order pursuant to the provisions of this Contract, the Seller shall submit to the Buyer a draft Change Order.

15.4. Contents of Draft Change Order

15.4.1. Any draft Change Order shall include: (i) a technical description of the proposed change in such detail as the Buyer may reasonably require, (ii) a lump sum firm price adjustment (increase or decrease) in the Contract Price, if any, caused by the proposed change, (iii) all potential effect(s), if any, on the Scheduled Delivery Date(s), or any other schedule or date for performance by the Seller hereunder caused by the proposed change, and (iv) all potential effect(s), if any, on the Seller's ability to comply with any of its obligations hereunder, including the Seller's warranties and Performance Guarantees caused by the proposed change.

15.5. Process for Concluding Change Order.

15.5.1. The Buyer shall, within two (2) Days from the date of receipt of such information, either approve or disapprove the draft Change Order in writing or request additional time to consider the draft Change Order. If the Buyer approves the Change Order, the Buyer and the Seller shall then sign the Change Order that shall operate as an amendment to this Contract. Any delays resulting from a delay in this procedure are the sole responsibility of the Buyer.

15.6. Agreement Required.

15.6.1. Except for Change Orders to which the Seller is expressly entitled pursuant to this Contract, all changes under this contract shall be subject to mutual agreement, and no Change Order will be effective until signed by both Parties.

16. Excusable Delays

CONFIDENTIAL

Alta 0037110



16.1. The Seller shall not have any liability or be considered to be in breach or default of its obligations under this Contract to the extent that performance of such obligations is delayed or prevented, directly or indirectly, due to, but not limited to, the following:

16.1.1. causes beyond its reasonable control;

16.1.2. acts of God;

16.1.3. acts (or failures to act) of governmental authorities;

16.1.4. fires, severe weather conditions, floods earthquakes;

16.1.5. strikes or other labor disturbances;

16.1.6. war (declared or undeclared), terrorism, epidemics, civil unrest, riots;

16.1.7. delays or accidents in transportation or car or transporter shortages; or

16.1.8. delays in the prerequisite work of the Buyer, Buyer's other contractors or suppliers, or other acts (or omissions) of the Buyer, including but not limited to failure to promptly: (A) provide the Seller with information and approvals necessary to permit the Seller to proceed with work immediately and without interruption, or (B) comply with the terms of payment; or shipment to storage in accordance with the Contract.

16.2. The Seller shall notify the Buyer of any such excusable delay. Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted.

17. General Indemnity

17.1. General Indemnity.

17.1.1. Each party (each an "Indemnifying Party") shall be liable to and indemnify the other party, its officers, employees, agents and subcontractors (each an "Indemnified Party") for any physical injuries to third parties or physical damage to third party property, and, at its expense, shall defend against and hold the Indemnified Party harmless from any claims raised by a third party arising in connection with the Contract, to the extent such physical damages are caused by the negligence of the Indemnifying Party or its officers, employees, agents or subcontractors and to the extent the Indemnified Party is liable to the third party under applicable law.

17.2. Concurrent Negligence.

17.2.1. If physical damage or injury is caused by the joint or concurrent negligence of the parties, their officers, employees, agents, or subcontractors, the parties shall bear the loss in proportion to their or their officers', employees', agents' or subcontractors' degree of negligence.

17.3. Notice.

17.3.1. The indemnities provided in this Article shall apply only if the party seeking indemnity gives the Indemnifying Party prompt notice of any claim and provides the Indemnifying Party all necessary information and assistance so that the Indemnifying Party may, at its option, defend or settle the claim.

17.4. "Third Parties" Defined.

17.4.1. "Third parties" under this Article do not include the Parties, the owner of the Site, their affiliates, agents, successors or assigns, any operation or maintenance contractor of the Parties or the owner of

the Site, or any entity (i) with an equity or security interest in any Party or the owner of the Site, or their assets or property, (ii) that seeks to claim any rights, power or privileges of one of the Parties or the owner of the Site, or (iii) that seeks to claim as a third party beneficiary of one of the Parties or the owner of the Site. No portion of the Equipment, the Facility, electricity, fuel or hydrocarbons is "third party property" for the purposes of this Article.

18. Insurance

18.1. Insurance for Injuries to Workers (Worker's Compensation).

18.1.1. During the term of this Contract, both Parties shall maintain the insurance for work-related injuries or disease of their own employees in such forms and amounts as may be required by laws that are applicable to each Party and its employees.

18.2. General Liability and Automobile Insurance

18.2.1. During the term of this Contract, each Party shall maintain the following insurance coverage at its own expense to protect its own interests: (i) Commercial General Liability or Public Liability insurance, in broad form, either per occurrence and effective for at least three years after the expiration of the Contract, that includes coverage for contractual liability, bodily injury and third party property damage, with a combined single limit of not less than U.S. $1,000,000 per occurrence and U.S. $1,000,000 in the aggregate annually, for primary and excess policies combined; and (ii) automobile liability insurance covering all owned, non-owned, and hired automobiles used by it in connection with the Work, if any, with a combined single limit of not less than U.S. $1,000,000 per occurrence, for primary and excess policies combined.

18.2.2. Each of the foregoing insurance policies shall not be cancelled or materially changed without thirty (30) Days' advance written notice to the other Party or, in the case of non-payment, ten (10) Days' advance written notice. Upon request, each Party shall deliver to the other Party certificates of insurance showing that the foregoing insurance is in full force and effect.

18.3. Failure to Maintain Insurance.

18.3.1. If at any time the Buyer fails to maintain insurance complying with the requirements of the Contract in full force and effect, (a) the Buyer shall be responsible for any resulting losses or costs sustained by the Seller and shall hold the Seller harmless from actions brought against the Seller as the result of the absence of the Buyer's required insurance, and (b) the Seller shall not be required but may elect to do any of the following: (i) immediately suspend all or a portion of the Work and be entitled to an equitable adjustment in the price, schedule and other terms of this Contract for the impact of the suspension, (ii) pay premiums or purchase alternate insurance at Buyer's expense or (iii) pursue such other remedies as may be allowed by law, equity, or the Contract.

19. Buyer's Risks.

19.1. In no event shall the Seller be responsible for Buyer's Risks. Buyer's Risks include damages and losses due to (i) war, hostilities, terrorism, rebellion, revolution, civil disturbances, nuclear radiation or similar occurrence, (ii) acts or omissions of the Buyer, (iii) natural perils (such as flood or earthquake) or other perils to the extent that peril is

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

CONFIDENTIAL

Alta 0037111



excluded from the ARBR/CAR policy coverage or the loss is in excess of the policy limits.

20. Suspension

20.1. Suspension by Buyer of Work at Site.

20.1.1. The Buyer shall have the right, at any time, to suspend Work at the Site upon written notice to the Seller. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension.

20.2. Suspension by Buyer of Work in Seller's Facilities.

20.2.1. It is expressly agreed that the Buyer shall have no right to suspend Work of Seller on the Equipment before Delivery.

20.3. Suspension by Seller.

20.3.1. The Seller shall have the right to suspend all Work, including the delivery of any Equipment, upon the failure of the Buyer to make any payment when due. The Seller shall further have the right to suspend any shipment of the Equipment if all payments due prior to the applicable Scheduled Delivery Date have not been made. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension, except that Seller's suspension shall not be deemed to extend the Warranty Period hereunder.

21. Termination for Cause

21.1. Grounds for Termination by Buyer.

21.1.1. The Buyer shall have the right to terminate the Contract for cause in the event that the Seller: (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; (ii) substantially breaches and fails to comply or perform its material obligations hereunder (but only with respect to a material obligation for which this Contract does not provide exclusive remedies), (iii) notwithstanding satisfaction of all conditions precedent, Seller refuses to execute a loan agreement on terms substantially in accordance with the Loan Agreement Term Sheet attached to this LNTP, provided that: (A) the Buyer shall first have provided the Seller with written notice of the nature of such breach and of the Buyer's intention to terminate this Contract as a result of such breach, and (B) the Seller shall have failed within thirty (30) Days after receipt of such notice (or such extended period as is considered reasonable by the Parties) either (1) to commence to cure such breach and diligently thereafter to pursue such cure, or (2) to provide reasonable evidence that no such breach has occurred; or (iv) Seller's relationship with General Electric Company, or any of its affiliates, is terminated through no fault of the Buyer.

21.2. Remedy in the Event of Termination by Buyer.

21.2.1. If the Buyer terminates the Contract as provided above, the Buyer shall pay the Seller for that portion of the Contract Price allocable to the Equipment title transferred or Services performed prior to the termination. If the payments received by the Seller as of the date of such termination are in excess of such portion of the Contract Price, the Seller shall return the excess of such payments to the Buyer. In addition, the Seller shall pay to Buyer an amount equal to the difference between that portion of the Contract Price allocable to the terminated Work and such actual and reasonable amount paid by the Buyer to another vendor for equipment comparable to those terminated, subject to the limitation of liability set forth in Article 22.

21.3. Grounds for Termination by Seller.

21.3.1. The Seller shall have the right to terminate the Contract for cause in the event that the Buyer: (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; or (ii) substantially breaches and fails to comply or perform its material obligations hereunder, including failure to comply with the requirement of the Contract, or fails to make any payment when due or to fulfill any payment conditions, including any payment security, as set forth in this Contract, provided: (A) that the Seller shall first have provided the Buyer with written notice of the nature of such failure and of the Seller's intention to terminate this Contract as a result of such failure, and (B) that the Buyer shall have failed within thirty (30) Days after receipt of such notice to correct such failure.

21.4. Remedy in the Event of Termination by Seller.

21.4.1. If the Seller terminates the Contract as provided above, the Buyer shall pay to the Seller the charges set forth in the Termination Schedule. In such event, Seller shall retain title to all Equipment not yet delivered to Buyer as of the effective date of termination.

22. Limitation of Liability

22.1. Limitation.

22.1.1. The total liability of the Seller for all claims arising out of or relating to the performance or breach of the Contract or use of any Equipment shall not exceed the portion of the Contract Price allocable to the portion of the Equipment giving rise to the claim. The Seller's liability shall terminate at the end of the Warranty Period for the Equipment giving rise to the claim. The Buyer may enforce a claim that accrued before that date by commencing an action, as applicable under the dispute resolution clause, before the expiration of the applicable statute of limitations or repose, but not later than ninety (90) Days after the expiry of the Warranty Period.

22.2. Consequential Damages.

22.2.1. The Seller shall not be liable for loss of profit or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages.

23. Sale, Transfer, Assignment to Third Party.

WattStock Limited Notice to Proceed Proposal to Alta Power

CONFIDENTIAL: NOT FOR DISTRIBUTION

CONFIDENTIAL

Alta 0037112



23.1. If the Buyer is supplying, transferring or assigning the Work to a third party, the Buyer shall require the third party to agree to be bound by this Article. If the Buyer does not obtain this agreement for the Seller's benefit, or if the agreement is found void or unenforceable, the Buyer shall indemnify, defend and hold the Seller, its Affiliates, subcontractors and suppliers of any tier, and their agents and employees, individually or collectively, harmless from and against any and all liability arising out of claims made by the third party in excess of the limitations and exclusions of this Article.

24. Gratuitous Advice.

24.1. The Seller shall not be liable for any advice or assistance that is not required under this Contract.

25. Limitations to Prevail.

25.1. The limitations and exclusions in the Contract shall apply regardless whether a claim is based in contract (including warranty or indemnity), tort (including negligence or strict liability), statute, equity or any other extra-contractual theory.

26. Limitation of Remedies; Overriding Effect.

26.1. The Buyer's and the Seller's rights, obligations and remedies arising out of or relating to the Work are limited to those rights, obligations and remedies described in the Contract. This Article shall prevail over any conflicting or inconsistent terms in the Contract, unless those terms further restrict the Seller's liability.

27. Export Control

27.1. Export Controls.

27.1.1. The Buyer hereby agrees that it shall not, except as said laws and regulations may expressly permit, make any disposition by way of transshipment, re-export, diversion or otherwise, of U.S. origin goods and technical data (including computer software), or the direct product thereof, supplied by the Seller hereunder. The obligations of the Parties to comply with all applicable export control laws and regulations shall survive any termination, or discharge of any other contract obligations.

27.2. Buyer to Keep Informed.

27.2.1. The Buyer undertakes to keep itself fully informed of, and to comply with, the export control laws and regulations of the respective Government and any amendments thereof.

28. Assignment

28.1. Eligible Assignees.

28.1.1. An Eligible Assignee is: (i) an Affiliate of the Buyer, or (ii) an engineering or construction contractor under contract with the Buyer for the installation of the Equipment, provided that the Eligible Assignee offers Seller satisfactory evidence of its ability (both financial and otherwise) to fulfill the obligations of Buyer hereunder; in either case provided that the Seller would not be penalized or become subject to additional requirements under any Law as a result of entering into contract with such person.

28.2. Buyer's Right to Assign to Eligible Assignees.

28.2.1. The Buyer may once assign its rights and delegate its obligations under the Contract to an Eligible Assignee, provided: (i) that the Buyer shall notify the Seller of its intent to assign no less than ten (10) Days prior to the execution of any such assignment; (ii) that Buyer

shall either (at Seller's option and election) (A) guarantee the obligations of the assignee by executing a guaranty in a form acceptable to Seller or (B) retain its obligations under any payment, indemnity and any bonus provisions of the Contract; (iii) that the first assignee may not further assign or delegate any rights or obligations hereunder except to the original Buyer; and (iv) that the Buyer shall in no event assign to its engineering or construction contractor the right to receive liquidated damages under the Contract.

28.3. Collateral Assignment.

28.3.1. The Buyer may also assign a collateral interest in this Contract to a lender who is not an Eligible Assignee as collateral security for a loan for the acquisition of the Equipment, provided however, that Buyer and Lender agree that any future assignment to the Lender shall occur only as the result of the exercise by Lender of its remedies under the loan agreements relative to a bankruptcy or liquidation of Buyer. Under no circumstances, however, shall a collateral assignment require Seller to deliver Equipment to Buyer or an assignee if Seller has not been fully paid for such Equipment.

28.4. All Other Assignments and Transfers by Buyer.

28.4.1. All other assignments or transfers by Buyer of any or all of its duties or rights under this Contract (by operation of law or otherwise) are subject to Seller's prior written consent. Further, Buyer agrees that, until Buyer receives title to the Equipment as set forth herein, Buyer shall not, directly or indirectly sell, offer to sell or otherwise broker the Equipment.

28.5. Seller's Right to Assign.

28.5.1. The Seller may assign its rights and delegate its obligations under this Contract to any Affiliate or subsidiary company. Seller may assign its rights and obligations to other parties with the prior written consent of Buyer. In the event of such assignment, the Seller's assignee will be responsible for the assigned Work and will invoice directly to and collect payments directly from the Buyer.

28.6. Conditions.

28.6.1. Any assignment shall be subject to all limitations of liability contained in this Contract. The Buyer may not assign this Contract except in accordance with this Article. Any purported assignment not in accordance with this Article shall be void and without effect.

29. Dispute Resolution

29.1. Referral to Senior Management.

29.1.1. Any and all controversies, disputes or differences between the Parties to the Contract, if not amicably settled by the Parties with thirty (30) Days following written notice of dispute, shall be referred to senior management of the Parties for resolution. In the event the dispute has not been resolved within forty-five (45) Days following referral to senior management, or such longer period as the Parties may mutually agree, then either Party may, upon ten (10) Days' notice to the other party, pursue their remedies at law.

30. Venue.

30.1. Any legal action or proceeding with respect to the Contract shall be brought in the United States District Court for the Southern District of Texas or, in a District Court of the State of Texas in Harris County. Each of the Parties hereby accepts and consents to, generally and

CONFIDENTIAL

Alta 0037113



unconditionally, the jurisdiction of the aforesaid courts and appellate courts from any appeal thereof. Each of the Parties irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at the address first set forth in the this Contract. Each of the Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Contract brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

31. Governing Law

31.1. The Contract, including but not limited to, the validity, performance and all matters relating to the interpretation and effect of this Contract and all further documents executed pursuant to it, shall be construed and interpreted in accordance with the laws of the State of Texas, excluding their conflict of law rules, provided that any provision of such law invalidating any provision of this Contract or modifying the intent of the Parties as expressed in the terms of this Contract shall not apply.

32. Effective Date

32.1. The Contract shall become effective when it is signed by both Parties (the "Effective Date"), however, the Seller shall not be required to commence any Work associated with, connected to, or arising from, directly or indirectly, the Equipment or Services, until the Seller receives the initial payment described in the Proposal, together with any required Payment Security. Further, if the initial payment or required Payment Security is not timely received in accordance with the terms of this Contract (the "Delayed NTP"), in addition to Seller's right to terminate, the Seller shall have the right to adjust the Scheduled Delivery.

33. Entire Agreement

33.1. The Contract represents the entire agreement between the Parties with respect to the Work, and supersedes in its entirety all prior agreements concerning the subject matter hereof, and no modification, amendment, revision, waiver, or other change shall be binding on either Party unless consented to in writing by the Party's authorized representative. Any oral or written representation, warranty, course of dealing, or trade usage not contained or referenced herein shall not be binding on either Party. Each Party agrees that it has not relied on, or been induced by, any representations of the other Party not contained in the Contract.

34. Miscellaneous Provisions

34.1. Third-Party Beneficiaries.

34.1.1. Except as provided in the Article entitled "Limitation of Liability", these provisions are for the benefit of the Parties hereto and not for any other third party.

34.2. Survival.

34.2.1. All provisions or obligations contained in the Contract which by their nature or effect are required or intended to be observed, kept or performed after termination or expiration of this Contract shall survive and remain binding upon and for the benefit of the Parties, including, without limitation, the Articles with the following titles, which shall survive termination of this Contract: Taxes, Warranty, Patents, General Indemnity, Limitation of Liability, Proprietary Information, Dispute Resolution, Governing Law, Software License, Personal Data Protection, Export Control, Contract Documents, Entire Agreement and Miscellaneous Provisions.

34.3. Non-Waiver.

34.3.1. Waiver by either Party of any right under the Contract shall not be deemed a waiver by such Party of any other right hereunder.

34.4. Invalidity.

34.4.1. The invalidity in whole or in part of any part of the Contract shall not affect the validity of the remainder of this Contract.

35. Counterparts.

This Contract may be signed in any number of counterparts, each of which shall constitute one and the same instrument.

CONFIDENTIAL



WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

Page 15 | 15

CONFIDENTIAL

Alta 0037115

# EXHIBIT D

FILED
6/18/2021 4:39 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
CAROLYN SELLERS DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC,<br>*Plaintiff* | IN THE DISTRICT COURT OF |
| v. | |
| ALTA POWER LLC,<br>*Defendant, Counter-Plaintiff, and Third-Party Plaintiff,* | DALLAS COUNTY, TEXAS |
| v. | |
| WATTSTOCK LLC<br>*Counter-Defendant, and* | |
| GENERAL ELECTRIC INTERNATIONAL,INC.,<br>d/b/a GE POWER SERVICES<br>*Third-Party Defendant.* | 116th JUDICIAL DISTRICT |

## THIRD-PARTY DEFENDANT'S ANSWER, DEFENSES, AND JURY DEMAND

General Electric International, Inc. ("GE"), improperly identified herein as "General Electric International, Inc., d/b/a GE Power Services ('GE')" (hereafter, "Third-Party Defendant" or "GE") files its Answer, Defenses, and Jury Demand to the First Amended Answer and Counterclaim and Third-Party Petition (hereafter "Third-Party Petition") filed herein by Alta Power LLC (hereafter, "Alta" or "Third-Party Plaintiff"). In support, Third-Party Defendant states as follows:

## SPECIAL EXCEPTIONS

Third-Party Defendant incorporates by reference herein its previously filed Rule 91a Motion to Dismiss Causes of Action Alleged in Alta Power LLC's Third-Party Petition, and specially excepts under Rule 91 of the Texas Rules of Civil Procedure to the insufficiency of the allegations contained in the Third-Party Petition as specified in said Rule 91a Motion to Dismiss.

THIRD-PARTY DEFENDANT'S ANSWER,
DEFENSES, AND JURY DEMAND

## GENERAL DENIAL

As authorized by Rule 92 of the Texas Rules of Civil Procedure, Third-Party Defendant denies each and every, all and singular, of the allegations contained in Alta's Third-Party Petition and demands strict proof thereof.

## VERIFIED DENIAL

Pursuant to Texas Rule of Civil Procedure 93, Third-Party Defendant provides its verified denial of the following matters alleged in Alta's Third-Party Petition:  that a partnership existed between GE and WattStock LLC as alleged in the Third-Party Petition.

## DEFENSES

Without admitting any of the allegations contained in the Third-Party Petition, GE states that Alta's claims are barred or limited as specified by the following defenses.  To the extent that any defense may be inconsistent with Third-Party Defendant's denials herein or with any other defense, such defenses are pleaded in the alternative.

1.

The allegations stated in the Third-Party Petition purport to state claims or causes of action that have no basis in law or fact and that fail to state claims or causes of action for which relief might be granted.

2.

The allegations stated in the Third-Party Petition are insufficient because they are vague, obscure, generalized, and otherwise fail to provide a short and plain statement of the alleged claims and fail to state with particularity the alleged facts upon which the asserted causes of action are based.

THIRD-PARTY DEFENDANT'S ANSWER,
DEFENSES, AND JURY DEMAND

3.

The claims attempted to be asserted by Alta may be time-barred by the applicable statute of limitations, laches, and/or by the written terms and conditions of the contract documents governing the relationships among the parties to this litigation.

4.

Alta has not alleged and there is no evidence establishing that contractual privity exists between GE and Alta.

5.

The claims attempted to be asserted by Alta are barred or waived by the terms and conditions of written contract documents relating to the transactions and occurrences described in the Third-Party Petition. Alternatively, the terms and conditions of these contract documents bar or limit any rights, recovery, and remedies that may be available to Alta herein (if any).

6.

Alta's alleged claims against GE for breach of contract are barred by the statute of frauds.

7.

There is no evidence that there was any fault, commission, omission or breach of any contractual duty or warranty on the part of GE; or that any such fault, commission, omission or breach of any contractual duty or warranty caused, contributed to, or brought about by the claims and damages alleged in the Third-Party Petition. To the contrary, the claims and damages alleged in the Third-Party Petition were caused by Alta's own fault, negligence, commissions, omissions or breach of contractual duty or warranty; or were the result of such actions on the part of others for whom GE was not responsible and for whom GE has no legal liability. Such fault of Alta and/or other parties serves to bar any recovery by Alta herein or to proportionately reduce any such

recovery.

8.

Alta assumed the risk of the losses alleged in the Third-Party Petition.

9.

GE is entitled to credit and/or set-off for any settlement that Alta may reach with other persons in connection with the matters in dispute, and for any benefits, collateral sources, or other sources of set-off or recoupment available to Alta; and GE accordingly claims such set-offs, credits and recoupments as may be allowed by law.

10.

Alta may not recover against GE because Alta itself materially breached and/or failed to perform or satisfy conditions precedent in the contract agreements to which Alta was party.

11.

Alta's alleged claims are barred for failure to provide notice, presentment, or amicable demand as required by law and/or contract.

12.

Alta has failed to mitigate its alleged damages.

13.

Alta may not recover attorney fees from GE because Alta has not alleged and there is no evidence establishing that contractual privity exists between GE and Alta.  Alternatively, the attorney fees and other expenses allegedly paid or incurred by Alta were not reasonable; and/or were not necessarily incurred in connections with the transactions at issue; and/or there was a failure of presentment as required by Tex. Civ. Prac. & Rem. Code § 38.002.  Alternatively, Alta may not recover from GE attorney fees in pursuing claims against WattStock.

THIRD-PARTY DEFENDANT'S ANSWER,
DEFENSES, AND JURY DEMAND

14.

There is no evidence establishing that any partnership, principal-agent, or other relationship

existed between GE and WattStock such that either of them could be responsible for the actions or

omissions of the other as alleged in the Third-Party Petition.

15.

GE specifically denies that the doctrine of *respondeat superior* or any other alleged basis

for vicarious, joint, or several liability applies as alleged in the Third-Party Petition.

16.

Alta's alleged claims are barred by V.T.C.A., Business Organizations Code §§ 152.053(b)

and 152.054.

17.

Alta's alleged claims may be barred by waiver and estoppel as those terms are known and

understood at law.

18.

Alta's alleged claims may be barred or limited by set-off, compromise, accord and

satisfaction, payment and/or release as those terms are known and understood at law.

19.

Alta's alleged claims may be barred or limited by equitable estoppel, collateral estoppel,

issue preclusion, and/or *res judicata* as those terms are known and understood at law.

20.

There is no evidence establishing that GE was in breach of any contract agreement or failed

to satisfy or comply with any contractual obligations.

21.

There is no evidence establishing that Alta's alleged reliance on the alleged misrepresentations described in the Third-Party Petition was justifiable.

22.

Alta expressly agreed and accepted that the price of any turbine equipment that it might purchase under its contract with WattStock might vary due to the variable conditions of the equipment and the variable scopes of refurbishment work that may be required for the equipment.

23.

There is no evidence establishing that Alta may recover for consequential, incidental, or indirect damages as alleged in the Third-Party Petition.

24.

Alta may not recover exemplary damages because the award of such damages under the circumstances of this case are not authorized by fact or law and because an award of exemplary damages would by violative of Third-Party Defendant's rights under the United States and Texas Constitutions.

25.

Alta may not assert claims for equitable relief because such claims are not authorized by law.  Alternatively, such claims are barred by Alta's "unclean hands" or other conduct.

26.

Alta's claim for attorney fees is barred by the excessive demand doctrine.

27.

No clear and convincing evidence supports Alta's claims as required by law.

28.

Third-Party Defendant reserves its right to supplement and/or amend this Answer and these

Defenses as may be appropriate under the Texas Rules of Civil Procedure.

### JURY DEMAND

Third-Party Defendant demands a jury trial on all claims so triable.

**ACCORDINGLY**, General Electric International, Inc. respectfully requests that all of

Alta's claims be dismissed with prejudice, and that there be judgment in GE's favor against Alta

on the alleged claims, and for costs and expenses (including attorney fees) as may be recoverable

by GE as may be allowed by law, and for such other and further relief to which GE may be entitled.

Respectfully submitted this 18th day of June 2021.

**DAIGLE FISSE & KESSENICH, PLC**

*/s/ Michael D. Fisse*
Michael D. Fisse (TX Bar No. 07070550)
227 Highway 21
Madisonville, LA  70447
Telephone:    985-871-0800
Facsimile:    985-871-0899
E-mail:        mfisse@daiglefisse.com
***Counsel for Third-Party Defendant,***
***General Electric International, Inc.***

THIRD-PARTY DEFENDANT'S ANSWER,
DEFENSES, AND JURY DEMAND

## CERTIFICATE OF SERVICE

This is to certify that true and correct copies of *Third-Party Defendant's Answer, Defenses, and Jury Demand* have been served upon the following:

| | |
|---|---|
| Brian N. Hail | Michael Cancienne |
| Andrew D. Robertson | Kevin Jordan |
| Kane Russell Coleman Logan PC | Joseph W. "Jeb" Golinkin, II |
| 901 Main Street, Suite 5200 | 1980 Post Oak Blvd., Suite 2300 |
| Dallas, TX 75202 | Houston, TX 77056 |
| bhail@krcl.com | mcancienne@jlcfirm.com |
| drobertson@krcl.com | kjordan@jlcfirm.com |
| ***Counselors for WattStock LLC, Plaintiff and*** | jgolinkin@jlcfirm.com |
| ***Counter-Defendant*** | ***Counselors for Alta Power LLC, Defendant,*** |
| | ***Counter-Plaintiff and Third-Party Plaintiff*** |

Jessica Pulliam
Kirstie Wallace
John B. Lawrence
Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201
Jessica.pulliam@bakerbotts.com
Kirstie.wallace@bakerbotts.com
john.lawrence@bakerbotts.com
***Counselors for Alta Power LLC, Defendant,***
***Counter-Plaintiff and Third-Party Plaintiff***

by electronic transmission on the 18th day of June, 2021.

/s/ Michael D. Fisse

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michael Fisse on behalf of Michael Fisse
Bar No. 07070550
mfisse@daiglefisse.com
Envelope ID: 54577243
Status as of 6/23/2021 10:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Bill Merrill | | bmerrill@susmangodfrey.com | 6/18/2021 4:39:26 PM | SENT |
| Andrew Robertson | 24090845 | drobertson@krcl.com | 6/18/2021 4:39:26 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 6/18/2021 4:39:26 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 6/18/2021 4:39:26 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 6/18/2021 4:39:26 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 6/18/2021 4:39:26 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 6/18/2021 4:39:26 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 6/18/2021 4:39:26 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 6/18/2021 4:39:26 PM | SENT |
| Renee Rubert | | rrubert@susmangodfrey.com | 6/18/2021 4:39:26 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 6/18/2021 4:39:26 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 6/18/2021 4:39:26 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 6/18/2021 4:39:26 PM | SENT |
| Jessica Pulliam | | jessica.pulliam@bakerbotts.com | 6/18/2021 4:39:26 PM | SENT |
| John Lawrence | | john.lawrence@bakerbotts.com | 6/18/2021 4:39:26 PM | SENT |
| Kirstie Wallace | | kirstie.wallace@bakerbotts.com | 6/18/2021 4:39:26 PM | SENT |
| Jessica Aquino | | jessica.aquino@bakerbotts.com | 6/18/2021 4:39:26 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 6/18/2021 4:39:26 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 6/18/2021 4:39:26 PM | SENT |

Associated Case Party: WATTSTOCK LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Michael Fisse on behalf of Michael Fisse
Bar No. 07070550
mfisse@daiglefisse.com
Envelope ID: 54577243
Status as of 6/23/2021 10:04 AM CST

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Vicki Sedon | | vsedon@krcl.com | 6/18/2021 4:39:26 PM | SENT |
| VICKI SEDON | | vsedon@krcl.com | 6/18/2021 4:39:26 PM | SENT |
| Connie Nims | | cnims@krcl.com | 6/18/2021 4:39:26 PM | SENT |